## **COMPLAINT FOR INJUNCTIVE RELIEF AND JURY TRIAL DEMAND**

### **Nature of the underlying cause of actions**

1.     The customs and practices of the Massachusettts Probate & Family Court systemically violate the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution—the Due Process Clause "was intended to prevent government 'from abusing its power, or employing it as an instrument of oppression.'"  Collins v. City of Harker Heights, Texas, 503 U.S. 115, 126 (1992).

2.     The Fifth and Fourteenth Amendments of the U.S. Constitution forged a family's inalienable right to be free from unwarranted and unlawful government intrusion.

3.     Herein this Complaint and accompanying exhibits, Plaintiffs provide specific and concrete evidence that there is an established systemic pattern by officials associated with the Massachusetts Probate & Family Courts of deliberately engaging in knowingly unlawful acts of intrusion into the private affairs of citizens for the specific purpose of maintaining a very intricate and extensive criminal enterprise of embezzlement and money laundering—such criminal enterprise is operated under the veil of color of authority.  As a matter of routine custom and practice, officials of the Massachusetts Probate & Family Courts engage in knowingly illegal conduct specifically intended to dismantle the family unit and the sanctity of family integrity so as to facilitate their ultimate objective of obtaining illicit gain.

4.     Herein this Complaint and accompanying exhibits, Plaintiffs provide specific and concrete evidence that these officials have *knowingly and purposefully* intruded into the lives of families with no legitimate grounds or evidence to lawfully do so.

5.      The above-described criminal enterprise consists of two (2) common schemes carried out by officials of the Massachusetts Probate and Family Court: 1) embezzeling from elders who become subjects of petitions for guardianship and conservatorship and 2) embezzeling through the probating of estates when people die.

6.     Plaintiff Daughters present specific and concrete evidence of the Massachusetts Probate & Family Courts being used to money launder embezzled funds. See attached **table of contents** for documentation provided.

7.      The embeddedness of the above-described criminal enterprise in the Massachusetts Probate & Family Courts is illustrated by **Massachusetts Appeals Court Justice Mitchell Sikora's** apparent use of the **Suffolk Probate & Family Court** to money launder embezzled funds; along with the established pattern of involvement by the **Massachusetts Attorney General's Office** and the **Abandoned Property Division of the State Treasurer's Office**.  (Specific and concrete details are set forth in this Complaint, with attached supporting documentation).

8.      Foremost, Plaintiffs bring this Federal action seeking urgent and immediate injunctive relief to stop *the continuation and compounding of irreparable physical and emotional harm* being inflicted by designated Defendants upon Plaintiffs' 86 year-old father and the Plaintiffs.  Designated Defendant State officials have deliberately and maliciously deprived Plaintiffs of their Federal Constitutional rights—and Defendants continue to do so through illegal acts committed during their duties in their respective official capacities.

9.      Ultimately, Plaintiffs, also, seek preliminary and permanent injunctive relief and declaratory relief to terminate any and all involvement of State government representatives—and their agents—in the affairs of Plaintiffs' family.

10.      In addition, Plaintiffs seek damages and attorney's fees for the harm suffered—and continue to suffer—because of the unlawful and malicious acts by Defendants.

11.      Plaintiffs establish herein this Complaint that the incessant abuse of power inflicted by Defendants—and their agents—is overwhelmingly widespread throughout the Massachusetts Probate & Family Courts and not an isolated situation or aberration.

12.      Herein this Complaint and provided supporting documentation, Plaintiffs demonstrate that there is an embedded racketeering scheme *within* the framework of the Massachusetts Probate & Family Court system.  Plaintiffs establish through specific and concrete evidence that the Massachusetts Probate & Family Court system has been an established enterprise since the **1980s.**

13.      Of significance, Plaintiffs establish that public officials of the Massachusetts Probate & Family Courts have specifically operated this criminal enterprise through *claimed* lawful authority.  These officials have been able to do so because their illegal acts are veiled under statutorily granted powers by the Legislature.  Patently, these statutory provisions were crafted to be overly broad—especially, the statutory provisions put in effect in **2009** and in **2012**.

14.     In the **1980s**, court appointed conservators *expressly* did not have statutory authority to make wills for elders—see *In the matter of Wanda W. Jones*, 379 Mass 826 (1980); and now it is standard custom and practice for court appointed conservators and guardians to be given authority *to dismantle* advance estate planning instruments.

15.     Herein this Complaint, Plaintiffs demonstrate that an inordinate number of written decisions of the Massachusetts appellate courts evidence that the powers bestowed upon court appointed fiduciaries by the State Legislature have made it *easy* for court appointees to carry out financial exploitation—with such unlawful acts of court appointees *furthered* by standard and routine rubber-stamping by Massachusetts Probate and Family Cour judges.

16.     Herein this Complaint, Plaintiffs have provided concrete and specific evidence that the Massachusetts Legislature has set forth statutory provisions (G.L. c. 190B) that promote the rubber-stamping by Massachusetts Probate & Family Court judges of motions and pleadings filed by court appointees.

17.     Plaintiffs set forth, herein this Complaint, concrete and specific evidence that the Massachusetts Legislature has set forth statutory provisions in G.L. c. 190B that promote abuse of power by officials associated with the Massachusetts Probate & Family Court.

18.     Plaintiffs set forth, herein this Complaint, concrete and specific evidence that the Massachusetts Legislature has set forth statutory provisions in G.L. c. 190B that *directly* facilitate embezzlement by court appointees—specifically, under the guise of color of law.

19.     Designated Defendants—individually and jointly—have intentionally and maliciously resorted to beyond the pale acts of retaliation against Plaintiffs Daughters for openly exposing designated Defendants' misconduct and for Plaintiffs having exercised their legal right to advocate and protect their father's constitutional rights, as well as, their family's and their own individual constitutional rights.  (Examples of such retaliation are provided in **Exhibit 1**).

20.     As a direct result of Plaintiffs' continuous and unwavering exposure of designated Defendants' unethical and unlawful conduct, designated Defendants resorted to acts of retaliation against Plaintiffs that shock and chill the conscience.

21.     The underlying circumstances of this federal action involve Plaintiffs—and their 86 year-old father—having been unlawfully and unjustly stripped of their family's Fourteenth Amendment inalienable right for family members to live together; unlawfully and unjustly stripped of their family's inalienable right to see and communicate with each other without restrictions; unlawfully and unjustly stripped of their father's long-established expressed desire and intentions that Plaintiffs be his caregivers and facilitators of *his* needs and wants.

22.     As set forth earlier, officials of the Massachusetts Probate & Family Court systemically use tactics to dismantle the family structure, under a pretext of authority.  As a matter of practice, the nature of the tactics routinely used include, but are not limited to, obtaining *court orders* to: forcibly separate families who live together; unjustifiably and unlawfully restrict communications between elders and their families and friends; unjustifiably and unlawfully drug elders with antipsychotics.  Consequently, the systemic use of such afore-described tactics inflict serious physical and emotional harm upon the elders and their families.

23.     The Massachusetts Legislature has explicitly stated that the objective and purpose of the Massachusetts Uniform Probate Code is "to promote a speedy and efficient system for <u>liquidating</u> the estate."

24.     When elders—and any other individual—become ward of the State by being judicially deemed incapacitated, the common means for court appointees to obtain ill-gotten gains is to *liquidate* the elder's assets.

25.     Plaintiffs provide specific and concrete evidence that SJC Rule 1:07 court appointees attain illicit financial gain *even* when elders—and other individuals deemed incapacitated by illness—*do not* have *any* actual personal estate or real estate; ill-gotten profit is still obtainable by SJC Rule 1:07 court appointees through regular recipients of government benefits (SSI, SSDI, VA and the like).

26.     The afore-described modus operandi is openly flaunted by **Defendant Attorney Robert Ledoux**—a key perpetrator in the central underlying probate case of this federal action and others for **over 30 years** through the Massachusetts Probate & Family Courts; as he has been operating a business (in the role as president) called: **CFD LIQUIDATING CORPORATION**.

27.     **CFD Liquidating Corp** *originally* had been named **North Shore Human Services Corp,** which was then changed to **Center for Family Development, Inc**. in **1984** and then to **CFD Liquidating Corporation** in **1988**.  This business was registered with the Secretary of State's Office as a *private mental health care service organization* (purportedly dissolved in **June of 2012)**.  (Copy of the afore-described Articles of Organization and Articles of Amendment are provided in **Exhibit 2A**).

28.     The filed Articles of Organization and Articles of Amendment for the **CFD Liquidating Corp** state that the purpose of the organization was to: "provide home health, mental health and related health services to people within and without the North Shore region of Greater Boston . . . ."

29.     The afore-described Articles of Amendment identify Philip Lazaroff (now deceased) as having served as Clerk for this business owned by **Defendant Attorney Ledoux**.  Philip Lazaroff was a psychiatrist and had been the Director of inpatient and outpatient care of the North Shore Children's Hospital in Salem, MA.

30.     It is self-evident that the above-described outpatient mental health business service's name being **CFD Liquidating Corporation** has absolutely *no* legitimate or genuine connotation related to mental health services.

31.     For approximately 30 years, **Defendant Attorney Ledoux** has served as legal counsel in the following roles, simultaneously:

> a regularly court appointed SJC Rule 1:07 guardian and conservator for multiple Probate & Family Courts,

> private legal counsel to **North Shore Medical Center/Salem**, **Defendant Beverly Hospital**, **Kindred Hospital** and **Winchester Nursing Home**; and

> provides legal services to private citizens concentrating on estate planning, guardianships and conservatorships and other probate matters.

(Downloaded profile information from Defendant Attorney Ledoux's website is provided in **Exhibit 2B**).

32.     As set forth herein this Complaint, the *true* significance of **CFD Liquidating Corporation** is inescapably linked to the criminal enterprise embedded in the Massachusetts Probate & Family Court.

33.     Evidence of consciousness of guilt is demonstrated by **Defendant Attorney Ledoux** having facially dissolved the 30-year –old **CFD Liquidating Corporation** with the Secretary of State's Office *after* Plaintiffs submitted complaints to the Office of Bar Counsel and Plaintiffs having filed an emergency civil action with the Supreme Judicial Court.


## JURISDICTION

34.     Foremost, Plaintiffs seek injunctive and declaratory relief to end Defendants' continuous acts that have unlawfully and maliciously deprived the Plaintiffs of their substantive and procedural due process rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution—as well as, the Massachusetts Articles of Declaration and State Constitution.  Accordingly, this federal action is properly before this Court pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, 28 U.S.C. § 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

35.     A substantial part of this federal action is properly before this Court based on diversity jurisdiction, involving Plaintiffs seeking injunctive relief and damages for independent and direct tortious actions of foreign corporations **Defendant BNY Mellon** and **Defendant Merrimack Valley Hospital**—breach of fiduciary duty, fraud, conspiracy, unjust enrichment, intentional infliction of emotional distress.

36.     This federal civil action is properly before this Court seeking to redress the deprivation of rights and privileges guaranteed by the Federal Constitution, pursuant to 42 U.S.C. § 1983 (intentional abuse of power by State actors); 42 U.S.C. § 1985(3) (Federal Conspiracy Claim); 18 U.S.C. § 162I (RICO); 18 U.S.C. § 1962(d) (RICO Conspiracy).

37.     Civil rights claims are properly before this Honorable Court pursuant to 28 U.S.C. § 1391.

38.     The underlying federal constitutional deprivations, on which the above described cause of actions are based, include the First Amendment (retaliation for exercising legal rights), the Fourteenth Amendment (right to privacy and family sanctity); and State and Federal constitutional guarantees of substantive and procedural due process (Fifth and Fourteenth Amendments of the U.S. Constitution and Article X of the Massachusetts Declaration of Rights).

39.     State law claims raised under this federal action are, also, properly before this Court, pursuant 28 U.S.C. § 1367, as they are so enmeshed with the claims having original jurisdiction in this Court.  Therefore, raised state claims form part of the same case and controversy under Article III of the United States Constitution.

40.      Furthermore, Plaintiffs have no adequate avenue for remedy of law in the State court.

41.     Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 where a substantial part of acts and omissions, on which this action is based, occurred in Massachusetts.

## STANDING

42.     Plaintiffs (Lisa Siegel Belanger, Esq. and Devora Kaiser) and their family have been irreparably harmed by unjustified and unlawful acts, inflicted by designated Defendants—which should _never_ have taken place from the first instance; and is compounding gravely *with each and every day that passes.*

43.     Plaintiffs bring this federal action in their capacities as:

daughters of now 86 year-old Marvin H. Siegel (herein referred as "Father");

designated co-trustees of the declaration of trust, originally created by Father on January 5, 1982, named the "DSL Trust"—a copy of the DSL Trust is provided in **Exhibit 3**;

designated capacities as respective attorney-in-fact and successor attorney-in-fact, designated by Father in his Durable Power of Attorney on February 11, 2003 (herein referred as "2003 DPOA"—a copy of which is provided in **Exhibit 4** and Father's written re-affirmation in writing and health care proxy executed on June 16, 2011 in **Exhibit 5**); and

designated beneficiaries of Father's estate planning instruments, executed on February 11, 2003 (Copy of updated Will is provided in **Exhibit 6**).

44.     The **DSL Trust** was originated and executed by Father on **January 5, 1982**.  Father derived the name of the Trust by having used the first initial from each of his three (3) biological children's names: D for Devora—the eldest daughter (57 years-old); S for Sheryl—the middle daughter (54 years-old); and L for Lisa—the youngest daughter (47 years-old).

## PARTIES

45.    **Plaintiff Lisa Siegel Belanger** (herein referred as "Daughter Lisa") and her family's (husband and two children) permanent residence is 15 Arrowhead Farm Road, Boxford, MA.  (Copy of Father's notarized letter to the Boxford Schools is provided in **Exhibit 7**).

46.    Plaintiff Daughter Lisa and her family have been unlawfully and unjustly forced to vacate their permanent residence.  Plaintiff Daughter Lisa has been deprived of her Federal Constitutional rights to continue as caregiver for her father and right to absolute unrestricted communications and physical presence with her father.

47.    For 3 years and through the present, Plaintiff Daughter Lisa has been unlawfully and unjustly deprived of the above-described Federal Constitution; with such deprivations entirely arising from ill-motives and illegal conduct by the designated Defendants (individually and jointly).

48.    **Plaintiff Devora Kaiser** (herein referred as "Daughter Devora") has been deprived of her Federal Constitutional rights to continue as caregiver for her father and by being subjected to severely restricted visitations with her father; such deprivations and restrictions have arisen entirely from ill-motives and illegal conduct of the designated Defendants (individually and jointly).

49.    **Defendant BNY Mellon Asset Management LLC** (herein referred as "BNY Mellon") is the financial institution, having physical custody and control of the **DSL Trust** since **1999** (at that time called Mellon Private Asset Management) to manage as an investment account.  Defendant BNY Mellon is registered with the Secretary of State for the Commonwealth as a foreign corporation, based in Delaware and the principal place of business is 201 Washington Street, Boston, MA.

50.    **Defendant Brian Nagle** is an individual residing in Brookline, MA.  At all times relevant, Defendant Brian Nagle was employed as Vice President and Senior Portfolio Manager for **Defendant BNY Mellon**—up until **September of 2013**.  At all times relevant, Defendant Brian Nagle was the direct and primary investment manager of the DSL Trust as an agent and representative for Defendant BNY Mellon.  As of **September 2013**, Defendant Brian Nagle is now Managing Director and Portfolio Manager at First Republic Investment Management East Coast.  At all times relevant, Defendant Brian Nagle served as investment manager of all Fathers' accounts held at Defendant BNY Mellon and/or representative for, on and behalf of, Defendant BNY Mellon.

51.     **Defendant Burns & Levinson, LLP** is the law firm representing **Defendant BNY Mellon** in the matter of In re Marvin H. Siegel.  The below designated counsel and several other high ranking officials of Defendant Burns & Levinson, LLP have been intricately involved in fraudulent and deceptive acts set forth herein this Complaint.  In addition to below designated counsel, other members of the firm who worked directly and indirectly in the matter of In re Marvin H. Siegel include: **Brian Bixby, Esq**., **Christopher Arnold, Esq**., **J. Boylan, Esq**., **Andrea Dunbar, Esq**., and **Michael Samarel, Esq**.  The principal office for Defendant Burns & Levinson, LLP is 125 Summer Street, Boston, MA.

52.     **Defendant Lisa Cukier, Esq.** is an individual residing in Brookline, MA.  She is a licensed attorney in the Commonwealth and is employed by the law firm **Defendant Burns & Levinson, LLP**.  On behalf of **Burns & Levinson, LLP, Defendant Attorney Cukier** is counsel for **Defendant BNY Mellon** in the matter of In re Marvin H. Siegel.   At all times relevant, Defendant Attorney Cukier served—and continues to serve—as a representative for, and on behalf of, Defendant Burns & Levinson and Defendant BNY Mellon.

53.     **Defendant Laura Studen, Esq.** is an individual residing in Weymouth, MA.  She is a licensed attorney in the Commonwealth and is employed by the law firm **Defendant Burns & Levinson, LLP**.  Defendant Attorney Studen is co-counsel for **Defendant BNY Mellon.**  At all times relevant, Defendant Attorney Studen served—and continues to serve—as a representative for, and on behalf of, Defendant Burns & Levinson and Defendant BNY Mellon.

54.     **Defendant Tarlow, Breed, Hart & Rodgers, P.C.** (herein referred as "Law Firm TBHR") is the law firm that purportedly became privately retained counsel for Father (Marvin H. Siegel) on **May 25, 2011**—such legal representation having been attained through fraud and deception.  Below designated counsel and several other high-ranking officials have been intricately involved in fraudulent and deceptive acts set forth herein this Complaint.  In addition to below designated counsel, other members of TBHR who worked on the underlying matter include: **Richard Breed, III**, **Karen McKenna**, **John Stuebing**, **Patrick Minnihan**, and **Jacqueline Scott**.  The principal office is located at 101 Huntington Avenue, Suite 500, Boston, MA.

55.     **Defendant Edward Tarlow, Esq.** is an individual residing in Concord, MA.   He is a licensed attorney, as Partner and President of Law Firm TBHR.  At all times relevant, Defendant Attorney Tarlow served—and continues to serve—as a representative for **Defendant Law Firm TBHR**.

56.     **Defendant Albert DeNapoli, Esq.** is an individual residing in Walpole, MA.  He is a licensed attorney employed by **Defendant Law Firm TBHR**, as well as being a shareholder and a director.  At all times relevant, Defendant Attorney DeNapoli served—and continues to serve—as a representative for, and on behalf of Defendant Law Firm TBHR.

57.     **Defendant Catherine Watson, Esq.** is an individual who resides in Norwood, MA.  She is a licensed attorney in the Commonwealth and is employed by **Defendant Law Firm TBHR**.  At all times relevant, Defendant Attorney Watson served—and continues to serve—as a representative for, and on behalf of Law Firm TBHR.

58.     **Defendant Marsha Kazarosian, Esq.** is an individual residing in Haverhill, MA.  She is a licensed attorney in the Commonwealth and is now a Partner of the law firm of **Kazarosian Costello & O'Donnell, LLP**.  The principal location for Defendant Attorney Kazarozian's law office is 546 Main Street, Haverhill, MA.

59.     At all times relevant through December 2013, **Defendant Attorney Kazarosian** served as a representative of the Law Office of Marsha Kazarosian; thereafter, she served—and continues to serve—as a representative of, and on behalf of, **Defendant Kazarosian Costello & O'Donnell, LLP**.  (Published profiles for Defendant Attorney Kazarosian are provided in **Exhibit 8**).

60.     Specifically because of fraudulent and deceptive acts of counsel committed by **Defendant Law Firm TBHR**, Father privately retained Defendant Kazarosian to represent him as legal counsel.

61.     Upon revelation of fraudulent and deceptive acts of **Defendant Attorney Kazarosian**, Father has explicitly stated his desire for Defendant Attorney Kazarosian to terminate her legal representation—and continues to express that desire.  Defendant Attorney Kazarosian has refused to comply with Father's request and the **Essex Probate & Family Court** has repeatedly refused to address Father's expressed desire and intent that Defendant Attorney Kazarosian be terminated as Father's counsel.

62.     **Defendant Kazarosian Costello & O'Donnell, LLP** is the law firm that is currently designated as representing Father, where in **December of 2013**, **Defendant Marsha Kazarosian, Esq.** established the afore-referenced law firm with **Defendant Walter Costello, Esq**. and Kathleen O'Donnell, Esq.  In **November of 2014**, Attorney O'Donnell was appointed as a member of the **Judicial Conduct Commission**.  The Resident Agent for **Defendant Kazarosian Costello & O'Donnell, LLP** is Defendant Attorney Kazarosian, having the principal office located at 546 Main Street, Haverhill, MA.

63.     **Defendant Brian T. Cuffe, Esq.** is an individual residing in Newburyport, MA.  He is a licensed attorney in the Commonwealth.  Defendant Attorney Cuffe has a private law practice located at 430 Boston Road, Suite 105, Topsfield, MA.  Defendant Brian Cuffe was appointed guardian in the matter of In re Marvin H. Siegel by the **Essex Probate & Family Cour**t, pursuant to Supreme Judicial Court Rule 1:07.  He is paid at a private attorney's rate of $275 per hour, with his fees being directly paid from the **DSL Trust**.  At all relevant times, Defendant Brian Cuffe has served—and continues to serve—as a court appointee and/or representative for, and on behalf of, Essex Probate & Family Court.

64.     **Defendant James Feld, Esq.** is an individual who resides in Woburn, MA and is a licensed attorney in the Commonwealth and has a private law practice operating out of his residence in Woburn, MA.  Defendant Attorney James Feld was appointed conservator in the matter of In re Marvin H. Siegel by **the Essex Probate & Family Court**, pursuant to Supreme Judicial Court Rule 1:07.  He is paid at a private attorney's rate of $275 per hour, with his fees being directly paid from the **DSL Trust**.  At all relevant times, Defendant James Feld served—and continues to serve—as a court appointee and/or representative for, and on behalf of, Essex Probate & Family Court.

65.     **Defendant Attorney Feld**, also, has served as legal counsel for the **Department of Mental Health** in numerous matters filed with the Middlesex Probate & Family Court.

66.     **Defendant Walter A. Costello, Jr**., **Esq**. is an individual residing in Swampscott, MA.  He is a licensed attorney in the Commonwealth and Partner of the law firm **Kazarosian Costello & O'Donnell, LLP**.  **Defendant Attorneys Feld** and **Cuffe** filed motions with the Essex Probate & Family Court requesting that they be allowed to privately retained by the legal services of Defendant Attorney Costello to represent *them* (Defendant Attorneys Feld and Cuffe) in the matter of In Re Marvin H. Siegel as a direct result of Plaintiffs exposing Defendant Attorney Feld's and Cuffe's misconduct.  Defendant Attorney Costello's private legal services to act as counsel for Defendant Attorneys Feld and Cuffe have been entirely and directly paid from the **DSL Trust**.  (Public profile information for Defendant Attorney Costello is provided in **Exhibit 9**).

67.     **Defendant Thomas Barbar, Esq.** is an individual residing in Boston, MA.  He is a licensed attorney in the Commonwealth, and a principal of the law office **Deutsch Williams Brooks DeRensis & Holland**.  Defendant Attorney Barbar's role in the matter of In re Marvin H. Siegel arose as a substitute for **Defendant Attorney Costello**.

68.    For illegitimate reasons, in **November/December of 2013**, **Defendant Attorney Walter Costello** withdrew as counsel for **Defendant Attorneys Feld** and **Cuffe** and **Defendant Attorney Barbar** was unilaterally allowed to be substituted as counsel. As with Defendant Attorney Costello, Defendant Attorney Barbar's private legal services are, also, entirely and directly paid from the **DSL Trust.**  At all relevant times, Defendant Attorney Barbar has served—and continues to serve—as a representative for, and on behalf of, Defendant Attorney Cuffe and Defendant Attorney Feld.

69.    **Defendant Mary Ann Remillard, Esq.** is an individual residing in Middlesex County.  She is a licensed attorney in the Commonwealth, and has a private law practice at the location of two Gaythorne Road Methuen, MA.  Defendant Attorney Remillard filed her Notice of Appearance as private legal counsel for Defendant Attorney Cuffe on **July 17, 2014**.  Defendant Attorney Remillard's private legal services are being entirely and directly paid from the **DSL Trust**.  .

70.    **Defendant Robert A. Ledoux, Esq.** is an individual residing in Danvers, MA.  He is a licensed attorney in the Commonwealth, whose law firm—Law Offices of Robert A. Ledoux—is located at 30 Federal Street, Suite 200, Salem, MA.  Defendant Attorney Ledoux represents Plaintiffs' sister, Sheryl Sidman, in the underlying matter of In re Marvin H. Siegel.  At all relevant times, Defendant Attorney Ledoux served—and continues to serve—as a representative for, and on behalf of, **Defendant Sheryl Sidman**. (Defendant Attorney Ledoux's profile is provided in prior referenced Exhibit 2).

71.    As previously set forth, **Defendant Attorney Ledoux** operated the purported mental health service organization—**CFD Liquidating Corp**.

72.    **Defendant Attorney Ledoux** has a long established working relationship with **Defendant Attorney Cuffe** and Defendant Attorney Cuffe's suitemate, **Attorney Susan Hubbard**.  Defendant Attorney Ledoux, also, has long-established intricate connections with **Defendant Attorney Maxa Berid** and **Defendant Attorney Garmil**.

73.    **Defendant Maxa Berid, Esq.** is an individual residing in Lowell, MA. She is an attorney licensed in the Commonwealth¸ and has an established private law practice—**Berid & Schutzbank LLC**—that was instituted in **2004** while, simultaneously, serving as General Counsel for **Elder Services of Merrimack Valley, Inc**.

74.    **Defendant Attorney Berid** became involved in the matter of In re Marvin H. Siegel by filing a motion, on behalf of **Defendant Elder Services of Merrimack Valley,** to be allowed as an intervening party.  At all relevant times, Defendant Attorney Berid served—and continues to serve—as a representative for, and on behalf of, Defendant Elder Services of Merrimack Valley, Inc.

75.     **Defendant Attorney Berid** is registered with the Massachusetts Board of Bar Overseers as a private practicing attorney.  Defendant Attorney Berid's registration information with the Board of Bar Overseers does not, in any manner, identify her role as General Counsel for **Defendant Elder Services of Merrimack Valley**.  (Provided is the downloaded registration information for Defendant Attorney Berid in **Exhibit 10**).

76.      **Defendant Berid & Schutzbank LLC** is located at 327 Gorham Street, Lowell, MA.  **Defendant Attorney Berid's** law partner (**Eric Schutzbank, Esq.**), also, provides private legal counsel for **Defendant Elder Services of Merrimack Valley, Inc**.  Defendant Attorney Berid and Attorney Schutzbank have used their position and influence with Elder Services of Merrimack Valley, Inc. to benefit their private law practice and vice versa.

77.     Downloaded information from the website of **Defendant law firm of Berid & Schutzbank LLC** is provided in **Exhibit 11**.  Under the caption of "Elder planning", it is stated:

> Our elder law attorneys are able to help you plan for the future, when a member of your family, is failing in either physical or mental health to help make this difficult time less trying, by explaining what steps need to be taken before a family member is no longer able to care for themselves.

Under the caption of "Elder Care, Abuse or Neglect", it is stated:

> Elderly family members can be vulnerable.  Our elder care attorneys will help you prepare for the time when you may need assistance in making decisions, or taking care of yourself.  A family or friend taking on a caregiver's role for an older person can be quite challenging and emotional.  You may find yourself in a situation that you are unprepared for.  We can assist you to ensure that you are provided the best care by those who are trying to help you.  We can also aid those providing help to their elder family members. . . .

> When there is an emergency involving elderly abuse, neglect or financial mismanagement, our attorneys can help you take immediate control of a loved one's assets and treatment plan through a guardianship proceeding and, if necessary, nursing home placement.  <u>The firm has substantial experience obtaining protective orders for those Elders who have been abused, neglected, financially exploited or otherwise at risk</u>.

78.     Photographs of billboard advertising for **Berid & Schutzbank LLC** are provided in **Exhibit 12**.  The afore-referenced photographs show the large yellow billboard advertising of Berid & Schutzbank at LeLacheur Park (the stadium for the Lowell Spinners baseball team).  The billboard is located at the third base section of the stadium and is visible from the first base section.

79.     **Defendant Elder Services of Merrimack Valley, Inc.** (herein referred as "**ESMV")** is a quasi-private nonprofit corporation that provides various services geared to the elderly.  Simultaneously, ESMV functions as a State designated protective service agency, which is governed under the Executive Office of Elder Affairs.

80.     **Defendant ESMV** receives and investigates reports of elder abuse. Defendant ESMV is located at 360 Merrimack Street, Building 5, Lawrence, MA.  At all times relevant, Defendant ESMV has served—and continues to serve—as a representative for, and on behalf of, the Commonwealth of Massachusetts.

81.     In **1984**, **Defendant Attorney Berid** served as president for **Defendant ESMV**—downloaded filings with the Secretary of State's Office for Defendant ESMV is provided in **Exhibit 13**.  The Articles of Amendment specifically demonstrates the inherent conflict of interest by Defendant ESMV functioning as both a state protective agency and as a private corporation; as in its private corporate capacity it has stated that it has the specific intention "to serve as temporary or permanent guardian, conservator, executor, administrator, or trustee."

82.     **Defendant Attorney Berid**, also, served as **president** of **Merrimack Valley Elderly Housing of West Newbury, Inc.**, which originated in **1983**.  As previously discussed regarding **Defendant Attorney Ledoux's** dissolution of the long established CFD Liquidating Corp. in **June of 2012** *after* Plaintiffs' submissions to the Board of Bar Overseers and the Supreme Judicial Court, **Defendant Attorney Berid**, also, dissolved the long established Merrimack Valley Elderly Housing of West Newbury, Inc. on **June 18, 2012**.  (Downloaded information from the Secretary of State's Office regarding Merrimack Valley Elderly Housing of West Newbury is provided in **Exhibit 14**).

83.     Throughout the years, specifically, on behalf of **Defendant ESMV**, **Defendant Attorney Berid** has been directly and indirectly involved in an inordinate number of probate matters in the Essex Probate & Family Court.

84.     Throughout the years, **Defendant Attorney Berid**, also, has been directly involved in probate matters, exclusively, in her capacity as a private attorney, involving her being a SJC Rule 1:07 a court appointee.

85.     **Defendant Attorney Berid** has served on the Board of Directors for **Neighborhood Legal Services, Inc.** from **2004** *through the present*.  A high-ranking Clerk for the **Essex Probate & Family Court**, **Julie Matuschak** (also, a credentialed attorney) served on the Board of Directors for Neighborhood Legal Services, Inc., alongside **Defendant Attorney Berid** from **2004 throughout 2009**.  Clerk Julie Matuschak has worked over twenty (20) years for the Essex Probate & Family Court.

(Copy of the listing of Board of Directors for Neighborhood Legal Services, Inc. is provided in **Exhibit 15**).

86.     **Defendant Diane Powell** is an individual residing in Swampscott, MA.  At all relevant times, Diane Powell served—and continues to serve—as supervisory personnel and/or representative for, and on behalf of, **Defendant ESMV**.

87.     **Defendant Scott Dailey** is an individual residing in Haverhill, MA.  At all relevant times, Scott Dailey served—and continues to serve—as supervisory personnel and/or representative for, and on behalf of, **Defendant ESMV**.

88.     **Defendant Michael Springman** is an individual whose residence is not known.  At all relevant times, Defendant Michael Springman served—and continues to serve—as a caseworker and/or representative for, and on behalf of, **Defendant ESMV**.

89.     **Defendant Cheri Myette, Esq.** is an individual, with her residence unknown.  She is a licensed attorney with the Commonwealth, with a business address of 15 Lincoln Street, No. 259, Wakefield, MA.   At all relevant times, Defendant Attorney Myette has served—and continues to serve—as a representative for, and on behalf of, Essex Probate & Family Court, as well as her own private law office.

90.     **Defendant Attorney Myette** regularly accepts work as a court appointee— on the behalf of the Committee for Public Counsel Services (CPCS)—purportedly representing people being subjected to proceedings for being deemed incapacitated, being involuntarily committed to psychiatric facilities and being court ordered to take antipsychotics.

91.     Prior to CPCS assigning **Defendant Attorney Myette** to represent Father, she had previously worked on other matters with **Defendant Attorney Saunders** and **Defendant Merrimack Valley Hospital**.  Contemporaneous with the matter of In re Marvin H. Siegel, Defendant Attorney Myette has, also, worked on multiple guardianship and conservatorship matters in the Essex Probate & Family Court with **Defendant Attorney Cuffe's** suitemate, **Attorney Susan Hubbard**.

92.     In **January of 2012**, **Defendant Attorney Myette** was court appointed by the Essex Probate & Family Court as Roger's Counsel for Father, pursuant to the Supreme Judicial Court Rule 1:07.  **Defendant Attorney Myette's** court appointment initially came about by *her*, personally requesting to be appointed to the matter of In re Marvin H. Siegel as Roger's counsel—not the State.  She did so by faxing a private letter to **Judge Abber** requesting to be court appointed in the specific matter—which is a violation of the Massachusetts professional code of ethics  (Copy **of Defendant Attorney Myette's** faxed letter to **Judge Abber** is provided in **Exhibit 16**).

93.    Prior to **Defendant Attorney Myette** sending the afore-described fax to **Judge Abber**, she had actual knowledge that Father's estate was valued <u>over $6 million</u>. Defendant Attorney Myette *did not* notify or disclose to Plaintiffs that she had communicated with Judge Abber regarding her request for appointment.

94.    Further evidencing that **Defendant Attorney Myette** actively sought to be court appointed as Roger's Counsel for illicit purposes is the fact that, several months after having been appointed, she brought a motion before **Judge Abber** requesting that her court appointment be <u>*revised*</u> to allow her to be paid at an hourly rate as a *private* attorney and directly from the **DSL Trust**—*not* by CPCS; which was allowed by **Judge Abber**. (Copy of Attorney Myette's motion is provided in **Exhibit 17**).

95.    **Defendant Cheri Myette** did not submit any billing to CPCS for legal services purportedly rendered in the matter of In re Marvin H. Siegel.  Instead, she waited to obtain the allowance of the above-described motion and was paid from the **DSL Trust** via the conservator, **Defendant Attorney Feld**.

96.    **Defendant Attorney Feld's** financial filing of **February 14, 2013** stated that **Defendant Attorney Myette** was paid **<u>over $41,000</u>**.  (Copy of the itemized attorney's fees paid out by **Defendant Attorney Feld** is provided in **Exhibit 18**).

97.    Regarding **Defendant Attorney Myette's** above-described misconduct— and collusion involving designated Defendants—Plaintiff Daughter Lisa notified and submitted formal written complaints to the following regulatory entities of such misconduct, consisting of: **Office of Bar Counsel**, **Board of Bar Overseers** and **Chief of Committee for Public Counsel Services**.  (Copies of written complaints are provided in **Exhibit 19**—to-date, these agencies refuse to open an informal investigation.  Plaintiff Daughter Lisa left several messages with staff of CPCS for a return call from Chief Benedetti, but he has not contacted her in any manner).

98.    As Roger's counsel, the scope of **Defendant Attorney Myette's** legal representation of Father is supposed to be limited to issues regarding antipsychotic medication; yet, Defendant Attorney Myette has consistently and continuously been present at court proceedings that have nothing to do with medication issues.  She has received compensation for her attendance at hearings that exceed her scope of representation and that are wholly unrelated to medication issues.  From the inception of Defendant Attorney Myette's appointment as Roger's counsel, she has joined in—through representation of her signed name—in every adverse filing by co-opposing counsel against Plaintiff Daughters.

99.     **Defendant Michael Novack** is an individual residing in Waltham, MA. He is registered as a LICSW and works for **Defendant Elder Resources, Inc.  Defendant Attorney Cuffe**—in his capacity of court appointed guardian—hired Defendant Michael Novack in his official role with Defendant Elder Resources.  Defendant Attorney Cuffe hired Defendant Michael Novack for contracted services as a geriatric case manager. Defendant Michael Novack and Elder Resources, Inc. are paid directly from the funds of the **DSL Trust**.  (Copy of the published profile for Defendant Michael Novack and Elder Resources, Inc. are provided in **Exhibit 20**)

100.     Contemporaneous with the matter of In re Marvin H. Siegel, **Defendant Michael Novack** was hired by **Defendant Attorney Cuffe** to work on other Essex Probate & Family Court probate matters—such as, In re Robert and Gertrude Pigeon and In re James and Hope Pentoliros.

101.     At all times relevant, **Defendant Michael Novack** has served—and continues to serve—as a representative for, and on behalf of, **Elder Resources**; and as a representative for, and on behalf of, **Defendant Attorney Cuffe**; and as a representative for, and on behalf of, Essex Probate & Family Court.

102.     **Defendant Beverly Hospital**, doing business as **Northeast Hospital Corporation**, has its principal office located at 85 Herrick Street in Beverly, MA.  On **May 19, 2011**, Father was taken by the Boxford Police Department to the Defendant Beverly Hospital, based solely on a call made by a part-time, home care assistant for Father—the Boxford Police did not observe conduct warranting an involuntary commitment, pursuant to G.L. 123, §12 (herein referred to as "Section 12").

103.     **Defendant Whittier Pavilion** is the psychiatric facility under the corporation **Whittier Health Network, Inc**., which principal office is located at 25 Railroad Square, Haverhill, MA.  Defendant Whittier Pavilion unlawfully facilitated the involuntary civil commitment of Father; unlawfully gave Father antipsychotics; unlawfully restricted Plaintiff Daughter Lisa from seeing Father; unlawfully disregarded Plaintiff Daughter Lisa's capacity as Father's attorney-in-fact; and engaged in deceptive and fraudulent acts with attorneys from **Defendant Law Firm TBHR**.

104.     **Defendant Richard Garmil, Esq.** is an individual residing in Haverhill, MA.  He is an attorney licensed in the Commonwealth, with his private law practice— Law Office of Richard G. Garmil, located at 3 Washington Square, Suite 220, Haverhill, MA.  Defendant Attorney Garmil serves as private legal for **Defendant Whittier Pavilion**.

105.     In the underlying matter of In re Marvin H. Siegel, **Defendant Attorney Garmil** appeared before the Essex Probate & Family Court on **June 14, 2011**, as legal counsel for **Defendant Whittier Pavilion**.  At all relevant times, Defendant Attorney Garmil has served—and continues to serve—as a representative of Defendant Whittier Pavilion; and as a representative of the Law Office of Richard G. Garmil.

106.     **Defendant Attorney Garmil**, also, has represented **Defendant Merrimack Valley Hospital** as private legal counsel in other probate matters in Essex Probate & Family Court.

107.     **Defendant Attorney Garmil** has a long-established personal and working relationship with **Defendant Attorney Cuffe**.  Defendant Attorney Garmil has worked in a court appointed capacity with Defendant Attorney Cuffe (In re Robert Pigeon and In re Gertrude Pigeon).  In addition, in the matter of Mary Jane Bartlett v. Brian T. Cuffe (2012-J-0147), Defendant Attorney Garmil served as private legal counsel *for* Defendant Attorney Cuffe—which matter stemmed from alleged misconduct of Defendant Attorney Cuffe in his capacity as a court appointed fiduciary.

108.     **Defendant Dr. Ping Cui** is an individual residing in Acton, MA.  She is a private practicing geriatric psychiatrist of 288 Groveland Street, Suite C2, Haverhill, MA.  According to the Massachusetts Board of Registration, she is exclusively affiliated with **Defendant Merrimack Valley Hospital**.  Defendant Dr. Ping Cui was Father's treating psychiatrist commencing on or about, **June 16, 2011 through January of 2012**.

109.     **Defendant Dr. Janice Funk** is an individual residing in Essex County.  She is a staff neuropsychologist at **Whittier Rehab Hospital** in Haverhill, MA and provides private services in her self-owned business called **Neuroeducation, Inc**.  Dr. Funk's business address is listed as 76 Summer Street, Haverhill, MA.

110.     **Dr. Funk** has used **Attorney Timothy Sullivan** as her own private legal counsel for services regarding her private company, **Neuroeducation, Inc.**  (Copy of the filed Articles of Organizations for Neuroeducation, Inc. is provided in **Exhibit 21**).  Attorney Timothy Sullivan has a long-established history working as a SJC Rule 1:07 court appointee of the Essex Probate & Family Court.  He has, also, worked with several designated Defendants in the capacity as a court appointee, including, but not limited to: **Defendant Attorney Berid**, **Defendant Attorney Ledoux**, **Defendant Attorney Garmil**, **Defendant Attorney Cuffe**).

111.    **Defendant Merrimack Valley Hospital** is a foreign corporation under **Steward Family Hospital, Inc**., which its principal office in Massachusetts is located at 500 Boylston Street, Boston, MA.  As a result of **Defendant Attorney Cuffe's** facilitation of Father being involuntarily committed to Defendant Merrimack Valley Hospital—under a Section 12, Defendant Merrimack Valley Hospital filed a motion with the **Essex Probate & Family Court** to become an intervening party in the underlying matter of In re Marvin H. Siegel.

112.    **Defendant Brandon Saunders, Esq.** is an individual, with his residence not known.  He is an attorney licensed in the Commonwealth and is employed by the law firm **Pierce & Mandell, PC**.

113.    **Defendant Pierce & Mandell** has its principal office located at 11 Beacon Street, Suite 800, Boston, MA.  **Defendant Merrimack Valley Hospital** privately retained the law firm of Pierce & Mandell for legal representation, and assigned **Defendant Attorney Saunders** as legal counsel for Defendant Merrimack Valley Hospital in the underlying matter of In re Marvin H. Siegel.  At all times relevant, Defendant Attorney Saunders served—and continues to serve—as representative for Defendant Merrimack Valley Hospital; and as representative for Defendant Pierce & Mandell.  (He, also, was involved in working, in the contemporaneous matters of James and Hope Pentoliros, alongside, **Defendant Attorney Cuffe** and **Defendant Attorney Ledoux**).

114.    **Defendant Dr. Kai Hayes a/k/a Karla Hayes** is an individual residing in Haverhill, MA.  She works as a psychiatrist for **Defendant Merrimack Valley Hospital**.  She holds herself out to be a geriatric psychiatrist, but is <u>not</u> Board certified.  Dr. Kai Hayes was the admitting and treating doctor, regarding the afore-described involuntary commitment of Father to Defendant Merrimack Valley Hospital.  At all times relevant, Defendant Dr. Hayes served—and continues to serve—as a representative of Defendant Merrimack Valley Hospital.

115.    **Defendant Dr. Robert Portney** is an individual residing in Boston, MA.  He is listed with the Massachusetts Board of Registration as specializing in geriatric psychiatry and neuropsychiatry.  He reported that his primary work setting is the hospital, having affiliations with Massachusetts General Hospital, McLean Hospital, and Whittier Rehabilitation Hospital.   His business address is listed as 6 Hearthstone Place, Andover, MA.  Defendant Dr. Portney has been Father's treating psychiatrist commencing in **January 2012 through the present**.

116.    **Defendant Dr. Peter W. Cohen** is an individual residing in Wellesley, MA.  He is listed with the Massachusetts Board of Registration as a general psychiatrist, with qualifications in forensic psychiatry, with his primary work setting at Lemuel Shattuck Hospital.  His business address is listed as 43 Woodchester Drive, Chestnut Hill, MA.  Defendant Dr. Cohen's role was, exclusively, as medical expert witness providing services to the designated defendant parties of the underlying matter of In Re Marvin H. Siegel.

117.    **Defendant Dr. Cohen** did not and does not have a doctor/patient relationship with Father—prior to Dr. Cohen's testifying as an expert witness for designated Defendant's, **Defendant Dr. Portney** had already been engaged by **Defendant Attorney Cuffe** as treating psychiatrist for Father.  Yet, court ordered forced administering of antipsychotics had been based on an affidavit of Dr. Cohen, as if he were the treating psychiatrist for Father, which, in fact, was not the case—with that fact specifically known by **Judge Abber**.

118.    **Defendant Kenney Enterprises LLC dba Right at Home** is a private business providing home health care services, owned and established in **2002**, by **Jay Kenney** of Marblehead, MA and **Rosaleen Doherty-Kenney**.  The Certificate of Organization states that the general character of the company's business is "non-medical senior home care."  The principal office is located at 19 Front Street, Salem, MA.

119.    **Defendant Brenda M. Wojick, R.N.** is an individual residing in Peabody, MA.   She was and is the original and direct nurse responsible for the care of Father (Marvin H. Siegel), and works on behalf of **Defendant Kenney Enterprises LLC dba Right at Home**.  She is registered in Massachusetts as a licensed registered nurse.  At all relevant times, Defendant Brenda Wojick served—and continues to serve—as a representative of **Defendant Right at Home**.

120.    **Defendant Sheryl Sidman** is the middle daughter of Marvin H. Siegel. She resides in Wellesley, MA.  Defendant Sheryl Sidman has knowingly and deliberately engaged in acts of fraud and deception—individually and in concert with designated Defendants.

121.    **Defendant Alan Sidman** is the husband of **Defendant Sheryl Sidman** and resides in Wellesley, MA.  Defendant Alan Sidman has knowingly and deliberately engaged in acts of fraud and deception—individually and in concert with designated Defendants.

122.    The **Commonwealth of Massachusetts** is a defendant in this action pursuant to 42 U.S.C. § 1982 arising from deliberate and conscience-shocking acts and omissions by individual officials and agents that include: State elder protective service agency (**ESMV**), **Essex Probate & Family Court**, and the **Supreme Judicial Court**; such acts and omissions of State officials having occurred while acting in their specific designated official roles.

## INTRODUCTION

**A.  Necessitated urgent and immediate ex-parte relief sought by Plaintiffs to stop the continuing fraud and deception by designated Defendants that is gravely jeopardizing Father's health and the DSL Trust**

**i.  Defendants are intentionally subjecting Plaintiffs' father to unnecessary risk of fatality and accelerating his progression of dementia by Defendants' knowingly obtaining unwarranted and unlawful court ordered forced administering of antipsychotics**

123.    Designated Defendants, knowingly and intentionally, are subjecting Plaintiffs' father to unnecessary and excessive use of court ordered forced administration of antipsychotics.  Specific conduct attributed to designated Defendants are set forth in detail herein this Complaint.

124.    Designated Defendants have, knowingly and intentionally, jeopardized Father's health and increased risk of death by forced administration of antipsychotics of Seroquel and Risperdal (especially, when Father, also, takes medications such as Trazadone, Ativan, Neurontin and the like). The FDA has declared that elders diagnosed with dementia should <u>not</u> be given antipsychotics.  The well known dangers have been held out to the public through legal actions brought by **Attorney General Martha Coakley** against multiple drug manufacturers for having promoted the use of antipsychotics with the elderly in **2010** and **2011**.

125.    Defendants' own statements and conduct, unequivocally, demonstrate that Father is being forced to ingest antipsychotics with Father having <u>*no*</u> underlying diagnosis of any psychiatric or mood disorder—the court ordered forced administering of antipsychotics is based <u>*solely*</u> on the diagnoses of Alzheimer's and dementia.

126.    In court testimony of **Defendant Dr. Peter Cohen**—the expert psychiatric witness used by designated Defendants in the matter of In re Marvin H. Siegel evidences that Father *does <u>not</u>* have an underlying diagnosis of an actual psychiatric or mood disorder warranting the use of antipsychotics.

127.    The Massachusetts appellate courts have emphasized that antipsychotics "are used for treating psychoses, like schizophrenia."  In re Linda, 401 Mass. 783, 787 fn1 (1988).

128.    In **1988**, the Supreme Judicial Court declared that the forcible injection of antipsychotics is extraordinarily intrusive, stating, in Guardianship of Roe, 383 Mass. 415, 436:

> We can identify few legitimate medical procedures which are more intrusive than the forcible injection of antipsychotic medication.

129.    In **1991**, the Supreme Judicial Court declared that the side-effects of antipsychotics are frequently devastating and often irreversible.  Guardianship of Weedon, 409 Mass. 196.

130.    Designated Defendants have unlawfully and unjustly subjected Father to court ordered injected antipsychotics—such court orders having been issued by **Judge Jeffrey Abber** (then of the **Essex Probate & Family Court**).

131.    **Defendant ESMV's** written records document—*before* Father had been forced to take antipsychotics in **May of 2011**—that Father was very capable of independent activities at that time; such as self-care, handling of medication, use of the telephone, and the ability to walk with the mere use of a cane.  Also, reflected in the records was the above average intellectual functioning of Plaintiffs' father *before* forced administration of antipsychotics.

132.    The above-described physical and mental capabilities pertaining to Plaintiffs' father is, also, documented in the written attestation by **Defendant Attorney Marsha Kazarosian**, which was submitted to the **Essex Probate & Family Court**; as well as, the records of **Defendant Whittier Pavilion** and **Defendant Right At Home**. (Copy of the afore-referenced affidavit of Defendant Attorney Kazarosian is provided in **Exhibit 22**).

133.    Throughout this Complaint, submitted exhibits are referenced that wholly consist of court documents and other independent sources of proof.  All submitted court records have been accessed by Plaintiff Daughters from public files, having been directly provided by the Clerk's Offices of the Massachusetts Probate & Family Courts.

134.    A compilation of court audio recordings of proceedings held in the matter of In re Marvin H. Siegel are provided in **Exhibit 23** with court transcripts provided in **Exhibit 24**.

135.     As a result of continuous court ordered forced administration of antipsychotics, Plaintiffs' father's emotional and physical quality of life has *rapidly* declined.  Medical treatises well establish that Seroquel and Risperdal *accelerate* the deterioration of an elder's cognitive function.

136.     Overwhelming evidence shows that up until **December 16, 2011**, Plaintiffs' father had been ambulatory and had been regularly engaging in activities outside of his home.  After **December 16, 2011**—and through the present day, Plaintiffs' father has been—for all intent and purposes of designated Defendants—*a prisoner in his own home*.

137.     **Defendant Diane Powell** recorded in the notes of **Defendant ESMV** on **March 23, 2012**: "There is a concern by all present that elder [Father] is 'under stimulated.'"

138.     Provided in **Exhibit 25** are copies of multiple letters sent by designated Defendants to multiple specified family and *friends* of Plaintiffs' father.  These letters sent by designated Defendants have imposed unjustified and unlawful restricted visitation by *anyone* who wants to see Plaintiffs' father.  In the letters, designated Defendants make specific unlawful and unjustified threats to Plaintiff Daughters *and the listed family and friends*.

139.     The specified ex-parte injunctive relief sought by Plaintiff Daughters is, literally, time sensitive.  Defendants have caused Plaintiffs to have been unlawfully and unjustly stripped of *3 years* of precious time with their father; and, Father has lost that time with his daughters, his grandchildren and friends—time and quality of life that can *never* be replaced.   Those years of time that Plaintiffs have vigorously and unwaveringly sought accountability for Defendant's criminal conduct—through *many and various* legal avenues.

140.     Father's existence, as of **December 16, 2011**, has consisted of an isolated and sedentary life—*solely* because of Defendants' greed, vindictiveness, and utter lack of conscience.

141.     Designated Defendants have been able to openly break the law.  Actual knowledge of designated Defendants' illegal conduct has been known by the **Essex Probate & Family Court**, **Supreme Judicial Court**, **Committee for Public Counsel Services**, **Judicial Conduct Commission**, **Office of Bar Counsel**, **Board of Bar Overseers**, **Massachusetts Attorney General's Office**, and numerous other regulatory agencies.

142.     Plaintiff Daughters seek from this Court immediate restoration of unrestricted and unhampered physical presence and communications with their 86 year-old Father—to allow Plaintiffs to spend the remaining time they may have left together *without* unlawful and malicious retribution.

143.     Since **2005**, the FDA has issued the above-described black-box warning regarding antipsychotics, that are *specifically*, based on the increased risk of fatality for elders due to the most common adverse side-effect of causing pneumonia and other respiratory issues.  Low blood pressure is another common side-effect causing fatality in elders.  Designated Defendants know that Plaintiffs' father has had recurring pneumonia *since* his having been administered antipsychotics.  Designated Defendants are, also, well aware of Plaintiffs' father having a history of low blood pressure.

144.     Imminent risk of death and other irreparable physical and emotional harm to Plaintiffs' father is evidenced by the most recent court proceeding held on **July 17, 2014**, before **Judge Amy Blake** (then) of the **Essex Probate & Family Court**. Designated Defendants used fraud and deception in seeking a continued court order for forced administration of antipsychotics.

145.     Plaintiff Daughters present solid and concrete evidence that there is an established pattern of deliberate lack of accountability by the above-described State regulatory agencies.

### ii.  Most recent fraud and deception relating to continued court ordered forced administrating of antipsychotics issued on July 17, 2014

146.     Plaintiff Daughters were not served a copy of **Defendant Attorney Cuffe's** motion and supporting documents to extend and amend court ordered forced antipsychotics in the matter of In re Marvin H. Siegel, *until after* court proceedings had already been called into session on **July 17, 2014**.  As a matter of law, designated Defendants were required to give Plaintiffs a copy of the motions and supporting documentation, at least, 7 days *in advance* of the scheduled court proceeding.

147.     The audio court recording for the proceeding of **July 17, 2014** is provided in prior referenced Exhibit 23.

148.     In addition, when Plaintiff Daughter Lisa was handed a copy of the motion and attached documents, **Defendant Attorney Cuffe** *did not* provide Plaintiff Daughter Lisa a complete set of documents that he had given to **Judge Blake** and referenced in his motion.  Designated Defendants *did not* provide Plaintiffs the affidavit of the treating psychiatrist, **Defendant Dr. Portney**.

149.    Evidenced in the afore-referenced audio recording during the court proceeding of **July 17, 2014**, Plaintiff Daughter explicitly informed **Judge Amy Blake** that **Defendant Attorney Cuffe—**and his counsel—had failed to give her a copy of **Defendant Dr. Portney's** affidavit.

150.    Prior to the court proceeding of **July 17, 2014**, designated Defendants submitted an already completed court order for forced administration of Risperdal and a blank pre-designated signature line for **Judge Amy Blake**.

151.    The court recording for the proceeding of **July 17, 2014** shows that the afore-described treatment order submitted to **Judge Blake** *exceeded* the dosage prescribed by **Defendant Dr. Portney—**which was explicitly stated in Defendant Dr. Portney's affidavit and done in handwriting.  As evidenced, designated Defendants had a motive for concealing Defendant Dr. Portney's affidavit and Defendants knowingly and intentionally attempted to conceal Defendant Dr. Portney's affidavit from Plaintiffs.

152.    The court audio recording for the proceeding of **July 17, 2014** shows that Plaintiff Lisa Belanger explicitly informed **Judge Amy Blake** about the above-described discrepancy during the court proceedings.

153.    Furthermore, **Defendant Dr. Portney's** affidavit stated that Plaintiffs' father had not shown any adverse side-effects from taking Seroquel—to the contrary, overwhelming evidence shows that Defendant Dr. Portney knew that such statement was false; that he had specific knowledge that Father, *in fact*, has suffered adverse side-effects from taking Seroquel—which was, also, well-known by designated Defendants (**Attorney Marsha Kazarosian**, **Attorney Brian Cuffe**, **Attorney Robert Ledoux**, **Attorney Cheri Myette**, **Attorney Maxa Berid**, **Attorney Thomas Barbar**, **LICSW Michael Novack**).

154.    Other prior and continuous fraud and deception by Defendants, specifically relating to court ordered forced administrating of antipsychotics, is set forth in detail herein this Complaint.

### iii.    Fraudulent and deceptive financial filings by Defendant Attorney Feld and condoned by the Essex Probate & Family Court

155.    From the inception of the matter of In re Marvin H. Siegel (**May 27, 2011**) commenced in the **Essex Probate & Family Court**, filed pleadings through counsel—on behalf of Plaintiff Daughter Lisa in her capacity as attorney-in-fact for Father—provided overt information that Plaintiffs' father's personal estate was valued *over $6 million* and that his real estate was valued over **$860,000**.

156.     As evidenced by the court record for In re Marvin H. Siegel, **Defendant Attorney Feld** knew the above-described reported values of Father's estate from *the very start of his court appointment* as conservator. He filed a Bond, in the matter of In Re Marvin H. Siegel, on **August 25, 2011**, in which he stated that the estimated value of real estate was "$726,500.00"—and then, again, on **October 24 2012**.  The **Essex Probate & Family Court** had issued a bond for $1 million to Defendant Attorney Feld.

157.     Even though **Defendant Attorney Feld** was given a bond for <u>$1 million</u>, in the very *first* Inventory filed by **Defendant Attorney Feld** on <u>**November 7, 2011**</u>, he stated—and signed under the pains and penalties of perjury—that Plaintiffs' father's total value of personal property was supposedly  <u>**"$3,987.60"**</u> and that the total real estate value as <u>**"$.00"**</u>.

158.     It was <u>*after*</u> Plaintiff Daughter Lisa exposed the afore-described suspect conduct of **Defendant Attorney Feld** to the **Essex Probate & Family Court** on **December 11, 2012** that Defendant Attorney Feld changed his financial statements to reflect the approximate true multi-million dollar value of Father's estate.

159.     Copies of the Bonds filed by **Defendant Attorney Feld** are provided in **Exhibit 26**.

160.     Copies of the Inventories filed by **Defendant Attorney Feld** are provided in **Exhibit 27**.

161.     **Defendant Attorney Feld** did not serve Plaintiffs with copies or notice of the afore-described filings, which is evidenced in the court audio recording for the proceeding held on <u>**December 11, 2012**</u>.  Plaintiffs discovered the filings *solely* through inadvertence, when Plaintiffs had randomly reviewed the electronic dockets for In re Marvin H. Siegel.  (See prior referenced Exhibit 23 for the court audio recording of **December 11, 2012** and Exhibit 24 for the transcript).

162.     Of significance, the Inventory—which was dated by **Defendant Attorney Feld** as being completed by him was <u>**November 5, 2011**</u>, but the document has a filing date-stamp of **Essex Probate & Family Court** as stating: <u>**"Jan 19 2012"**</u>.

163.     A petition for order of complete account were filed on <u>**November 5, 2012**</u> and was filled out by **Defendant Attorney Feld** and labeled as: "First and Final Account" for ES11P1465PM.

164.     The bottom of the first page of the afore-described Account, in handwriting, states that the Account consisted of "20 pages"; however, the Account (dated **November 5, 2012**) that exists in the court files for the matter of In re Marvin H. Siegel only has three (3) pages out of supposedly 20.  Attorney Feld filed another Account in **February of 2013**.  (Copy of the filings are provided in **Exhibit 28**).

165.     Conspicuously, the petition for order of complete account—which **Defendant Attorney Feld** filed recently on **August 25, 2014**—was overtly labeled as: "First Annual Account" for the matter of In re Marvin H. Siegel (ES11P1465PM).  (Copy of this second petition for order of complete account is provided in **Exhibit 29**).

166.     The afore-described Accounts evidence fraud and deception, which is set forth in detail herein this Complaint, along with other continuous deceptive and fraudulent financial filings by designated Defendants.

167.     Plaintiff Daughters explicitly brought designated Defendants' illicit conduct—with specific regard to financial matters—to the direct attention of **Judge Abber**; and had done so on multiple occasions, through in-court statements and in written pleadings.  (Refer to prior referenced Exhibit 23 for court recordings of **October 22, 2012**; **December 11, 2012**).

168.     Written pleadings by Plaintiff Daughters explicitly raising illicit conduct regarding financial management by **Defendant Attorney Feld** to the direct attention of **Judge Abber** include, but not limited to:

> joint motions filed by Plaintiff daughters requesting discovery and an evidentiary hearing for the removal of **Defendant Attorney Feld** as temporary court appointed conservator and **Defendant Attorney Cuffe** as temporary court appointed conservator (copy of motions are provided in **Exhibit 30**);

> joint opposition to petition for order of complete settlement—which Defendant Attorney Feld filed the petition on **November 5, 2012** (copy of joint opposition is provided in **Exhibit 31**);

> joint opposition filed by Plaintiff Daughters on **December 11, 2012**—provided in **Exhibit 32**.

169.     Plaintiff Daughters explicitly raising illicit conduct regarding financial management by **Defendant Attorney Feld** and the deliberate disregard and condoning of such illicit conduct by **Judge Abber**, in writing, to the direct attention of the **Board of Bar Overseers**—which regulatory entity refuses to conduct an investigation.

170.     Written pleadings by Plaintiff Daughters explicitly raising illicit conduct regarding financial management by **Defendant Attorney Feld** and deliberate disregard and condoning of such illicit conduct by **Judge Abber**, in writing, to the direct attention of the **Judicial Conduct Commission**— which regulatory entity refuses to conduct an investigation.

171.     After <u>2 years</u> of **Judge Abber** presiding over the matter of In re Marvin H. Siegel and sitting in the **Essex Probate & Family Court,** on or about **December 5, 2013**, he was relocated to **Middlesex Probate & Family Court**—which information had been kept from Plaintiff Daughters.  Plaintiff Daughters did not learn of Judge Abber's departure until attending court on **December 30, 2013**.

172.     Designated Defendants involved in the litigation of In re Marvin H. Siegel knew about **Judge Abber's** no longer being the presiding judge in the matter of In re Marvin H, Siegel; with designated Defendants deliberately and jointly concealing this information from Plaintiff Daughters.

173.     Of significance, **Judge Abber's** re-assignment to **Middlesex Probate & Family Court** occurred after Plaintiff Daughters had filed several formal written complaints to the Office of Bar Counsel.

174.     Also, of significance, in the afore-referenced written complaints to the Office of Bar Counsel, Plaintiff Daughters set forth illicit concerted conduct involving **Judge Susan Ricci**—who was, also, sitting as a judge in the **Essex Probate & Family Court**.  Conspicuously, *at the very same time* that **Judge Abber** was relocated on **December 5, 2013**, **Judge Ricci** was relocated to **Worcester Probate & Family Court**.

175.      **Judge Amy Blake** became the presiding judge in the matter of In re Marvin H. Siegel (until her recent appointment to the **Appeals Court** on **July 17, 2014**).

176.     During the time period that **Judge Blake** presided over the matter of In re Marvin H. Siegel, Plaintiff Daughters explicitly brought to Judge Blake's attention designated Defendants' illicit conduct—through in-court statements and in written pleadings.  (See prior referenced Exhibit 23 for the court recordings of **May 1, 2014**, and **June 9, 2014**).

177.    Plaintiff Daughters joint written pleadings directly setting forth **Defendant Attorney Feld's** misconduct and that of concerted joint efforts by designated Defendants—consisting of:

> Plaintiff Daughters' joint pre-trial memorandum (provided in **Exhibit 33**); and

> Plaintiff Daughters' joint objections to the Account of **November 5, 2012** (refer to prior referenced Exhibits 31 & 32).

178.    **Judge Blake** overtly disregarded substantial evidence of illicit conduct by designated Defendants and made actual rulings and issuance of orders *in favor* of designated Defendants and to the detriment of Plaintiff Daughters.  (Copy of Judge Blake's written findings is provided in **Exhibit 34**).

179.    Soon thereafter, **Defendant Attorney Feld** and **Defendant Attorney Barbar** filed a motion explicitly asking **Judge Blake** to:

> amend the date of the petition for order for complete settlement (prior referenced Exhibit 28) that was filed on **November 5, 2012**, changing the stated date of **November 5, 2012** to **November 2, 2012**;

> delete the check mark in the box of the second line of paragraph 6; and

> delete the names and addresses of Susan Miller and Brian T. Cuffe in the boxes immediately beneath the second line.

(Copy of the designated Defendants' motion is provided in **Exhibit 35**).

180.    Plaintiff Daughters filed a joint opposition to designated Defendants' afore-described motion to amend decree and order is provided in **Exhibit 36**.

181.    Plaintiff Daughters, in their afore-referenced joint opposition, substantiated and proved that the designated Defendants had outright asked **Judge Blake** to use the judicial process to unlawfully alter pleadings for the purpose of covering up evidence of designated Defendants' criminal conduct—which Judge Blake rubber-stamped as evidenced in prior referenced Exhibit 35).  Plaintiff Daughters made the **Office of Bar Counsel** and the **Board of Bar Overseers** aware—in writing—of the misconduct evidenced by the designated Defendant's motion to amend decree and order.

182.    There is an established pattern of illicit tampering and altering of electronic docket entries in the matters of In re Marvin H. Siegel.  Dockets for ES11P1466GD are provided in **Exhibit 37** and ES11P1465PM are provided in **Exhibit 38**. Plaintiff Daughters made the **Office of Bar Counsel**, **Board of Bar Overseers** and **Judicial Conduct Commission** aware—in writing—of such unlawful conduct.

**B.** **Well-established pattern of abuse of power by Massachusetts public officials and gross lack of oversight by the Commonwealth**

183.     The prevalent nature of abuse of power by public officials in the Massachusetts is evidenced by the well-publicized exposure of extensive falsification and fabrication of information involving the drug crime lab and the most recent prosecution by the US Attorney General's Office regarding corruption in the Massachusetts Trial Courts' Probation Department.

184.     The well-publicized issues regarding the Department of Children and Families (DCF) illustrate the prevalent and long-established lack of oversight by State agencies in the Commonwealth.

185.     Further lending credibility to Plaintiffs' claim of abuse of power by governmental officials is the recent high-profile exposure of document falsification by the Veteran Affairs health care system (VA).  From 2005 through 2012, the inspector general issued 18 reports documenting delays in care nationwide.  In 2011, the VA set a goal that patients should be seen within 14 days of requesting appointment.  Within the Phoenix VA, by the summer of 2013, Dr. Sam Foote had discovered that patients had been dying as a result of a wait-list scheme—appointment requests were deliberately not input into the computer and were, instead, kept in secret, off-the-book lists to create an illusion of meeting the afore-described 14-day goal.  Other illicit tactics included staff making appointments for people who were already dead and calling other people re-scheduling their appointments.  (Provided in **Exhibit 39** is copy of the article published in AARP).

186.     On **June 29, 2014**, CBS's Sixty Minutes aired an exposé on schemes between attorneys and judges involving putting people on government-funded disability.

**C.** **Well established awareness by Legislators (state and federal) and the American Bar Association of financial exploitation and abuse of elders by court appointed guardians and conservators as a nation-wide crisis since 1989**

187.     The magnitude of invasiveness by having a court appointed permanent guardian is illustrated by the Supreme Judicial Court's statement that "the permanent guardian stands in the place of the ward in making decisions about the ward's well-being." Guardianship of Lon Hocker, 439 Mass. 709 (2003).

188.     The U.S. Senate and House and the American Bar Association have issued numerous written publications acknowledging the existence of the widespread problem of financial exploitation and abuse *by court appointed guardians and conservators*.

189.    In **1989**, commissions of the American Bar Association (herein referred as "ABA") issued a publication called **Recommendations of the National Guardian Symposium and Policy of the American Bar Association**.  (Copy of the afore-described publication is provided in **Exhibit 40**).

190.    The **Recommendations of the National Guardian Symposium and Policy of the American Bar Association** articulated that it had been determined "in many instances, the content, submission and court review of guardian's report was lacking, quantitatively, as well as qualitatively."

191.    The **Recommendations of the National Guardian Symposium and Policy of the American Bar Association** galvanized the U.S. Government Accountability Office (herein referred as "GAO") to conduct succeeding studies on the crisis of financial exploitation of the elderly—with several studies, specifically, focusing on court appointed/public guardians.

192.    Numerous publications by the ABA and the GAO demonstrate that financial exploitation by court appointed/public guardians and conservators is prevalent throughout the individual states.  (Copies of the various GAO reports are provided in **Exhibit 41**).

193.    In **September of 2010**, the GAO published the results of its study in its issuance of ***Report to the Chairman, Special Committee on Aging, U.S. Senate— Guardianships*** *(Cases of Financial Exploitation, Neglect, and Abuse of Seniors)*.

194.    On page 8 of the ***Report to the Chairman, Special Committee on Aging, U.S. Senate—Guardianships (Cases of Financial Exploitation, Neglect, and Abuse of Seniors)***, the GAO found that a significant factor for financial exploitation by court appointed/public guardians and conservators being so prevalent was the courts' failure to oversee guardians after their appointment.

195.    Also, on page 8 of the ***Report to the Chairman, Special Committee on Aging, U.S. Senate—Guardianships (Cases of Financial Exploitation, Neglect, and Abuse of Seniors)***, the GAO cited that there was a problem peculiar to court appointed public guardians and conservators because these appointees serve multiple roles with *conflicting fiduciary interests*.

196.    On **September 22, 2011** there was a Subcommittee Hearing before the Judiciary Subcommittee on Administrative Oversight and the Courts, U.S. Senate.

197.    From that **September 22, 2011 hearing**, the GAO publically issued the **Testimony of Robert N. Baldwin, Executive Vice President and General Counsel, National Center for State on Protecting Seniors and Persons with Disabilities – An Examination of Court-Appointed Guardians.** (Copy of the afore-described testimony in **Exhibit 42**).

198.    On page 4 of the publicly issued **Testimony of Robert N. Baldwin, Executive Vice President and General Counsel, National Center for State on Protecting Seniors and Persons with Disabilities – An Examination of Court-Appointed Guardians**, it showed that the results of Mr. Baldwin's case studies found major concerns including: "the absence of quality data on adult guardianship filings and caseloads in most states" and "inadequate monitoring of guardianships and conservatorships."

199.    Also, from that **September 22, 2011 hearing**, the GAO publically issued the **Testimony of Naomi Karp, J.D., Senior Strategic Policy Advisor, AARP Public Policy Institute.** (Copy of the afore-described testimony is provided in **Exhibit 43**).

200.    On page 3 of **Testimony of Naomi Karp, J.D., Senior Strategic Policy Advisor, AARP Public Policy Institute**, it states that Ms. Karp testified that AARP's Public Policy Institute spent two years specifically studying the court monitoring of guardians, in conjunction with the American Bar Association Commission on Law and Aging.

201.    On page 3 of **Testimony of Naomi Karp, J.D., Senior Strategic Policy Advisor, AARP Public Policy Institute**, particular relevant findings stated: "[a]lthough, almost all states require guardians to file annual reports and accounts, one third of survey respondents said no one at their court verifies or investigates these reports" and that "40 percent of respondents said that no one is assigned to visit the wards—the only real way to see how they are faring."

202.    In **1998**, the ABA issued a pamphlet for members of the media entitled "Law and the Elderly".  (Copy of the "Law and the Elderly" is provided in **Exhibit 44**).

203.    The **ABA** designed the pamphlet in the format of question and answer. Following is quoted material from the pamphlet:

### Question 16

How many adults are under guardianship in this country?

**Answer**: *No one knows*.  Guardianship cases are handled by different courts in different jurisdictions.  Many courts do not process or do not keep adult guardianship records.

However, one estimate by the Associated Press in **1987** was that there were approximately 400,000 adults under guardianship in the United States, a number that has likely increased and is likely to continue to increase as the population ages.

### Question 18

Can a guardianship ever be terminated?

**Answer**:  It is possible to terminate a guardianship and restore an incapacitated person's rights *if he or she regains capacity*.  A court hearing is required. Restoration is rare, *as it is difficult for the incapacitated person to retain a lawyer and/or prove capacity*.

### Question 19

Are there disadvantages to guardianship?

**Answer:**  . . . Guardianship can be expensive and emotionally difficult for everyone involved.  *And although guardians must report to the court in most states, sometimes no one makes sure that the guardian is acting appropriately on behalf of the incapacitated person.*

**D.** **Established widespread improper partisanship amongst members of the Massachusetts judiciary, regulatory agencies, and attorneys**

204.     Several existing "professional" associations and the Supreme Judicial Court's creation of "professional" committees created by the Supreme Judicial Court are organized in such a manner that members of the judiciary and practicing attorneys have frequent, outside of court contact that is substantially extensive and of a personal nature.

205.     Some of the professional associations publicly tout and advertise the "collegial" bonds fostered between members of the judiciary and practicing attorneys, which such afore-described conduct is expressly prohibited by the Massachusetts Judicial Cannons of Ethics.

206.     The Massachusetts Judicial Cannons of Ethics state that it is a violation of judicial ethics for judges to maintain any social and/or professional membership that involves close and intimate contact with lawyers who regularly appear before them.

207.     Commentary by the Judicial Conduct Commission regarding a judge's relationship with attorneys in professional associations **under section 2A**, states:

> Public Confidence in the judiciary is eroded by irresponsible or improper conduct by judges.  A judge must avoid all impropriety and *appearance of impropriety*.  A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen. . . .  The test for imposition of sanction for violation of this Canon is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.

208.     **Under section 2B**, the Judicial Conduct Commission states:

> A judge should be careful to avoid developing excessively close relationships with frequent litigants[], in any court where the judge often sits, if such relationships could reasonably tend to create either an appearance of partiality or the likely need for later disqualification under Section 3E(1).

209.     Under **section 4C**, the Judicial Conduct Commission expresses that, in general, a judge may be a member in "organizations devoted to the improvement of the law, the legal system, or the administration of justice"; however, the Commission has expressed that *even if an organization meets the afore-stated standard, it is not an absolute condition of permissibility*.

210.     The Judicial Conduct Commission states that such membership is not permissible when membership and/or service on the board "otherwise casts doubt on the judge's capacity to act impartially as a judge."

211.    The Judicial Conduct Commission states that such membership is not permissible when membership and/or service on the board "interfere[s] with the proper performance of judicial duties."  The Commission used the following examples of suspect interference: the more a judge takes on a leadership role; holding office in the organization; organizations that membership consists of individuals who *frequently* comprise or represent the same side in litigation.

212.    In **CJE Opinion No. 2011-6**, regarding an inquiry about associating with attorneys who may appear before a judge, it states: "The Committee is of the opinion that the Code prohibits judges from associating in any way on social networking web sites with attorneys who *may* appear before them.  Stated another way, in terms of a bright-line test, judges may only 'friend' attorneys as to whom they would recuse themselves when those attorneys appeared before them."

213.    In its Conclusion of the above-referenced CJE Opinion, the Committee stated:

> A judge's 'friending' attorneys on social networking sites creates the impression that those attorneys are in a special position to influence the judge. . . .  The pervasiveness of social media in today's society makes this situation one which requires a judge to 'accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen.

### American Inns of Court

214.    **American Inns of Court** is a national organization that formally organized in **1989**.  This national professional association states that it was originated to improve ethics of the legal profession.  However, it has become evident that Massachusetts judges and regulatory officials have misused this association's original intended purposes.

215.    The **American Inns of Court** charters smaller, local associations throughout individual states.  In Massachusetts, there are various and separate chapters of the **American Inns of Court**; some of which are broad scoped and others that focus on one specific area of law.

216.    Documentation downloaded from the official website of the **American Inns of Court** that describes the organization's structure and protocols is provided in **Exhibit 45**.

217.     A member of any individual local chapter of the **American Inns of Court**, also, is automatically a *simultaneous member* with the national association, **American Inns of Court**.  (Refer to "Frequently Asked Questions" section and "Future Members").

218.     **American Inns of Court** is an organization that promotes substantial and intimate communications amongst judges and attorneys.

219.     The **American Inns of Court** reports "there are more than 28,000 judges and lawyers actively participating in an Inn of Court."

220.     This national organization's established customs are set forth, on top of page 3 of the **"Frequently Asked Questions"** section of the **American Inns of Court** homepage:

- membership in an Inn of Court requires active participation;

- most Inns hold monthly meetings from September through May;

- members are expected to participate in pupilage teamwork to develop one of the monthly programs; and

- many Inns, also, have structured mentoring programs that require <u>additional time</u>.

221.     The **Lawyers Journal**, a publication of the **Massachusetts Bar Association**, issued an article describing the various American Inns that are established in Massachusetts and the uniform practices of the American Inns.  (Copy of the MBA article is provided in **Exhibit 46**).

222.     In the afore-described article published by the **Lawyer's Journal**, "pupilage team" is described in the following way:

- It entails "divid[ing] the inn membership into 'pupilage teams,' each consisting of a few members from each membership category.  Each pupilage conducts one program for the inn each year."

- "Pupilage team members get together <u>informally outside of monthly inn meetings in groups of two or more</u>.  This allows the less-experienced attorneys to become more effective advocates and counselors by learning from the more-experienced attorneys <u>and judges</u>."

- "In addition, each less-experienced member is <u>assigned</u> to a more-experienced attorney *<u>or judge</u> who acts as a mentor* and encourages conversations about the practice of law."

223.    On the website for the **American Inns of Court**, there is a section called **"Mentoring"** and it states as follows:

> Sharing experiences and insights between seasoned members and less experienced practitioners is a fundamental principle of American Inns of Court. In addition to practical, skills-oriented programs, personal interaction in mentoring relationships is a benefit of Inn membership.  The American Inns of Court has also developed a Model Mentoring Program available for use at local Inns.

224.    The **American Inns of Court** states that it "offers free listserv capability to active Inns of Court and their members.  Listservs are a platform for sharing information among Inn Leaders and other groups of individuals."  (Refer to "Listserv" of American Inns of Court).

225.    The **American Inns of Court** website describes the Listserv as active "discussion" lists, where "*all members of the list are permitted to post e-mails to the entire list.*"

226.    The website explicitly states that communications do not have to involve the whole group; that a member can reply, privately, to the initial sender of the message.

227.    The **American Inns of Court** webpage sets forth a section, specifically entitled: "benefits" of the listserv, which states:

- "Listservs may be utilized to facilitate discussion among Inn members"; and

- "Listservs can simplify communications *between inn officers and the members.*

228.    The **American Inns of Court** and its local chapters are very overt in promoting substantially personal relationships between attorneys and judges, which directly contravenes the standards of ethical conduct set forth by the Massachusetts Judicial Conduct Commission.

229.    Information downloaded from the individual website of the **Massachusetts Family & Probate American Inn of Court** is provided in **Exhibit 47**.

230.     Information downloaded from the individual website of the **Greater Boston Probate & Family Law of the American Inn of Court** is provided in **Exhibit 48**.

231.    Information downloaded from the individual website of the **Boston Inn of Court** is provided in **Exhibit 49**.

232.    The **Massachusetts Family and Probate American Inn of Court's** homepage states that this specific chapter "meets regularly throughout the year, as a means of *fostering collegiality* and providing peer education on topics of importance to the practice of law in the Family and Probate Courts."

233.    Several prominent Massachusetts attorneys are members of the **American Inns of Court**—*and* of its various individual local chapters in Massachusetts; and have publicly touted the exceptional magnitude of *"collegiality"* that emanates from such membership, *in particular, between attorneys and judges*.

234.    **Defendant Attorney Lisa Cukier**  (past president of the **Massachusetts Family and Probate American Inn of Court)** was quoted in an article published by the MBA's Lawyer's Journal, saying: *"There is no other organization in the Commonwealth* that offers practitioners, <u>judges</u>, <u>registrars</u>, professors and legal scholars the opportunity to mingle with people <u>exactly in the same practice area</u>. . ."  (See article in prior referenced Exhibit 46).

235.    Attorney Ken Wright of Smith & Dugan— co-founder of the **Massachusetts Family & Probate American Inn of Court** states in his profile, from his website, that he is "renown[ed] in the divorce, child custody, trust litigation and estate litigation fields of law and was recognized by his being voted in **<u>1998</u>**, the first President of the Massachusetts Family & Probate American Inn of Court**, *an organization of top family and estate litigation practitioners <u>and</u> members of the Probate & Family Court judiciary.*"  (Downloaded profile for Attorney Wright from his website is provided in **Exhibit 50**).

236.    Attorney Ken Wright, also, states in his profile from his website that the **Massachusetts Family & Probate American Inn of Court** is chartered by the American Inns of Court Foundation and is believed to be the largest Inn of Court in the United States.

237.    Attorney Wright states on his webpage "approximately one-half of the Massachusetts Probate Court judges joined the Inn its first year of existence and this same level of judicial participation *has continued throughout its existence*."

238.    As acknowledged in the above-described article published by the Lawyer's Journal, **American Inns of Court** is an <u>exclusive </u>organization—"members are not recruited."

239.     A copy of the membership form for **Massachusetts Family & Probate American Inn of Court** is provided in **Exhibit 51**.  The membership form shows that membership directly hinges on the applicant already knowing an *existing* member of the Inn.

240.     The newly formed **Greater Boston Family Law Inn of Court**, also, openly displays its exclusive membership.  On the homepage of the **Greater Boston Family Law Inn of Court**, it explicitly states: "Members are admitted by application reviewed by a committee which considers a wide range of factors, not just years practicing."

241.     There is a specific section labeled on the websites for all **American Inns of Court** that leads to a roster of membership, however, it is not accessible to the general public.  The restricted access to the listing of members speaks volumes about the appearance of impropriety.  (Provided is copy of restricted access for list of members in **Exhibit 52**).

242.     **American Inns of Court** and its various chapters are not published in the commonly used and standard legal reference of the Lawyer's Diary—which the Lawyer's Diary has specific sections designated for listings of professional associations, nationally and for individual states.

243.     The following individuals have openly held themselves out as members and/or are reported as belonging or associated with **Massachusetts Family and Probate American Inn of Court**:

> **Chief Justice of the Trial Court, Paula Carey**
>
> **Chief Justice of Probate & Family Court, Angela Ordonez**
>
> **Judge Jeffrey Abber (Board member)**
>
> **Judge Susan Ricci  (Past Board member)**
>
> **Judge Amy Blake**
>
> **Judge Joan Armstrong (Past President)**
>
> **Judge Patricia Gorman**
>
> **Judge Peter DiGangi**

**Judge Spencer Kagan**

**Judge Jennifer Rivera-Ulwick**

244.    The following individuals have openly held themselves out as members and/or are reported as belonging or associated with **The Boston American Inn of Court:**

**Justice Barbara Lenk of the Supreme Judicial Court** (Past President, 2001 & 2010)

**Ret. Judge Gordon Doerfer** (Past President and Past member of the Executive Committee)

**Judge James F. McHugh, Esq.** (Past President, 1996 & 2008 and Past member of the Executive Committee)

**Judge Barbara Pearson** (Past President, 1997 & 2009)

**Judge Thayer Fremont-Smith** (Past President, 1998)

**Former Judge Daniel Winslow** (Past President, 1999)

**Judge Nonnie Burnes** (Past President, 2000)

**Judge Jay Blitzman, First Justice of the Juvenile Court** (Past President, 2002)

**Judge E. Choteau** (Past President, 2003)

**Judge Judith Fabricant** (Past President, 2004 & 2011)

**Judge Jonathan Brant** (Past President 2005)

**Judge Janet Sanders** (Past President, 2006 & 2012)

**Judge Mitchell Kaplan** (Current President; Executive Committee, 2012-2013)

**David Donnelly, First Justice of Boston Municipal Court**

**Jeffrey Woolf, Assistant General Counsel of the Board of Bar Overseers** (Past President & Program Chair)

**John Zanini, Suffolk County District Attorney** (Treasurer & Current Executive Commitee)

**Rosemary Connolly of the Attorney General's Office** (Current Executive Committee)

**Susan Weise, First Assistant Corporation Counsel for Litigation at the City of Boston Law** (Past President)

245.   The following individuals have openly held themselves out as members and/or are reported as belonging or associated with **The Frank J. Murray American Inn of Court**:

**Attorney General Martha Coakley**

**Justice Janis Berry of the Appeals Court** (counselor)

**Judge Peter J. Lauriat**

**Paula Carey, Chief Justice of the Trial Court** (Life Time Achievement Award, 2013)

**Ret. Justice John C. Cratsley** (Lifetime Achievement Award, 2011)

**Ret. Judge Margaret H. Hinkle**

**Rosemary Connolly of the Attorney General's Office**

**Associate Justice Mitchell J. Sikora, Jr. of the Appeals Court**

**Judge Frank Williams**

**MBF Society of Fellows**

246.   The official website for the Massachusetts Bar Foundation states that the Society of Fellows is a "*membership* organization of *select* Massachusetts attorneys and judges." (Downloaded information from the official website is provided in **Exhibit 53**).

247.   To become a member of the **MBF Society of Fellows**, the applicant must be nominated by an already established member of the **MBF Society of Fellows**. (Copy of the required Nomination form of the **MBF Society of Fellows** is provided in **Exhibit 54**).

248.     There are four categories of *ascending* levels of membership.  The level of membership is determined by the applicants selection of: 1) the designated box of the pre-set amount of money that applicant promises (the MBF calls a "pledge") to pay the organization (which the MBF states "can be fulfilled over time") and 2) the applicant's selection of the pre-set amount of *annual* dues to be paid until the "pledge" is "fulfilled".

249.     Upon a member's payment of the full amount of the original "pledge," he or she then obtains "Life Fellow Status".  Life Fellow status is publicly acknowledged in the directory of Society Fellows.

250.     The **MBF Society of Fellows** offers the member the opportunity to keep their identity unknown to the public.

251.     Members of the **Massachusetts Supreme Judicial Court** who hold out to the public their membership with the **MBF Society of Fellows** include:

**Hon. Margot Botsford** (Life member)

**Hon. Barbara Lenk** (Life member)

**Hon. Francis X. Spina** (Life member)

252.     **Justices of the Massachusetts Appeals Court** who hold out to the public their membership with the **MBF Society of Fellows**, include:

**Hon. Francis R. Fecteau -** Trustee

**Chief Justice Phillip Rapoza –** (Life member)

**Hon. Peter W. Agnes, Jr.** (Life member)

**Hon. Cynthia J. Cohen**

**Hon. Elspeth Cypher** (Life member)

**Hon. Mitchell Sikora**  (Life member)

**Hon. John Greaney, Form. Chief Justice**

**Hon. Rudolph Kass** (Life member)

**Hon. Scott Kafker** (Life member)

253.    **Justices of the Massachusetts Probate & Family Court** who have held out to the public their membership with the **MBF Society of Fellows** include:

**Hon. Paula Carey, Chief Justice of the Trial Court (Former Chief Justice of the Probate & Family Court)**

**Hon. Jeffrey A. Abber**  (Life member)

**Hon. John D. Casey** (Life member)

**Hon. Megan H. Christopher**   (Life member)

**Hon. Beth Crawford, First Justice** (Life member)

**Hon. Brian Dunn** (Life member)

**Hon. Linda S. Fidnick, First Justice** (Life member)

**Hon. Katherine Field** (Life member)

**Hon. Ann Geoffrion, First Justice**

**Hon. Barbara Hyland** (Life member)

**Hon. Randy J. Kaplan**

**Hon. Elaine Moriarty** (Life member)

**Hon. Susan Ricci** (Life member)

**Hon. Arthur Ryley**

**Hon. David Sacks** (Life member)

**Hon. Richard A. Simons, First Justice**  (Life member)

**Hon. Patrick W. Stanton**

**Hon. Geoffrey Wilson** (Life member)

254. **Administrative Offices and County Clerk's Offices of the Probate & Family Court** who hold out to the public their membership with the **MBF Society of Fellows**, include:

> **Jocelynne D. Welsh, Esq., Administrative attorney for the Administrative Office of the Probate & Family Court**

> **Miriam H. Babin, Esq. – Louis D. Brandeis Fellow (Clerk of the Bristol Probate & Family Court)**

> **Stephen G. Abraham, Esq. – Registrar of the Worcester Probate & Family Court**

255. **Judicial Conduct Commission, Office of Bar Counsel, Board of Bar Overseers** who have held out to the public their membership with the **MBF Society of Fellows**, include:

> **Hon. Judith Fabricant, Member of the Judicial Conduct Commission**

> **Karen D. O'Toole, Associate General Counsel for the Board of Bar Overseers**

> **Jeffrey Woolf, Esq. – Assistant General Counsel for the Board of Bar Overseers** (Louis D. Brandeis Fellow)

> **Thomas A. Kenefick, III, Esq. – Board of Bar Overseers**

> **Lisa Arrowood, Esq., Board of Bar Overseers** (Life member)

> **Linda G. Bauer, Esq., Assistant Bar Counsel** (Life member)

> **Kenneth Luke, Esq., Assistant Bar Counsel** (Life member)

> **Susan Strauss Weisberg, Assistant Bar Counsel** (Life member)

> **Daniel Crane, Esq., Former Chief Counsel for the Office of Bar Counsel**

256.    State regulatory officials who hold to the public their membership with the **MBF Society of Fellows** include:

> **Martha Coakley – Attorney General** (Life member)
>
> **Andrew A. Rainer, Esq., Trustee, Office of the Attorney General of Massachusetts**
>
> **Margaret J. Hurley, Esq., Office of the Attorney General of Massachusetts** (Life member)
>
> **Angela McConney Scheepers, Esq., Trustee (Division of Administrative Law Appeals)**
>
> **Maxa S. Berid, Esq., General Counsel for Elders Services of Merrimack Valley, Inc.** (Life member)

### E. Change of attitude by the Supreme Judicial Court regarding administration of justice after the institution of various Massachusetts chapters of the American Inn of Courts

#### i. Lessened judicial accountability

257.    In the **early 1970's**, two (2) judges were disbarred—**Matter of DeSaulnier**, 360 Mass 787 (1972) and **Matter of Troy**, 364 Mass 15 (1973).  There have been no subsequent disbarments since **1973**.

258.    The pendulum has swung so far the other way that judges, who have been formally charged and facing disbarment, have been _allowed_ to retire and collect their pensions—as if retirement with benefits was a sanction.

259.    The history of disbarment proceedings consists of:

> In **1980**, a notice of formal proceedings was filed against Judge Elwood McKenney for the manner in which he acquired possession of two (2) motor vehicles—completely distinct and separate incidents.  A hearing commenced on July 17, 1980, which was suspended because Judge McKenney entered into a negotiated settlement, allowing him to retire, instead of being disbarred.  Matter of McKenney, 384 Mass 76 (1981).

In **2005**, proceedings commenced against Judge Michael J. Livingstone of the Probate & Family Court.  The charges largely consisted of business and financial dealings.  An agreed disposition resulted in **March of 2008**, with the resolution being that Judge Livingstone was allowed to retire from the bench.

In **2006**, proceedings commenced against Judge Ernest Murphy, charging him with improperly using his position as a judge, involving letters that he wrote to the publisher of the Boston Herald, regarding the reduction of the $2.09 million award of damages to $2.01 million in the civil suit he won against Boston Herald for libel—which reduction resulted because Boston Herald filed a motion to reduce the award of damages.  In **2008**, a stipulation was attained between the Judicial Conduct Commission and Judge Murphy, in which it was stipulated that Judge Murphy was "permanently disabled from performing his duties as a Justice of the Superior Court."  Judge Murphy was allowed to continue receiving his judicial compensation for 120 days from the time of signing the stipulation and the Judicial Conduct Commission allowed Judge Murphy to file for a disability pension.

260.    There is evidence of an established pattern of conduct by the appellate courts that shows, actual and overt, aiding and abetting of judicial and attorney misconduct—this evidenced by a pattern of patently suspect impoundment of information by the appellate courts.  An inordinate number of cases have been impounded; being designated as having been dismissed, with virtually *no* identifying information disclosed on the public docket.  There is not even any use of pseudonyms—as use of pseudonyms is a standard custom and practice used by the appellate courts when issuing opinions and the court rules for impoundment.  The court rules regarding impoundment do _not_ require concealment of _all_ information.

261.    Suspect impoundment procedures are demonstrated by provided examples of appellate dockets in **Exhibit 55**.

262.    The provided impounded dockets illustrate suspect ill-motives where the impounded dockets commonly show essentially only the names of the attorneys.  Highly suspect is that, often, the space designated for identifying what specific court is involved or the nature of the case, such information is _not_ left completely blank, but rather contains snippets of information to give a superficial appearance that information is being disclosed.  The nature and overwhelming amount of information that is being concealed in impounded dockets being tends to show that such impoundment is not being done for legitimate purposes—but rather to cover up illicit conduct.

263.     A prime example of the Massachusetts appellate courts condoning illict conduct perpetrated by court appointed fiduciaries of the Probate & Family Courts is the extremely sparse nonpublished rescript by the Appeals Court regarding Faith E. Delaney, guardian v. Gino DeGiacomo, 11-P-1826 (Mass. App. 2012).  Justice Cynthia Cohen was one of the three presiding justices—a member of the **MBF Society of Fellows**. Attorney Faith Delaney was court appointed temporary guardian of Albert Pecce, and then made permanent guardian.  Attorney Delaney has been a practicing attorney for many years in the area of probate law.  As guardian, Attorney Delaney implemented a new estate plan for Albert Pecce, of which Attorney Delaney was made trustee.  The purpose of the new trust was to facilitate that Albert Pecce become eligible for government assistance. Hours after the death of Albert Pecce, Attorney Delaney made a $400,000 transfer to the trust.  It is well-established law that once the ward dies, a guardian no longer has authority to transfer any funds to the trust.  Attorney Delaney had spent "part" of the $400,000 as trustee.  Upon administration of the deceased's estate, the Probate Court disallowed the $400,000 transfer because it was an unauthorized transaction.  Attorney Delaney appealed the court's disqualification, which is the subject of this Appeals Court's opinion.  Such above-described conduct by Attorney Delaney constitutes grave violations of the professional rules of ethics for attorneys—*the only action taken by the Appeals Court was to send the matter back to the probate court judge to determine what offsets should take place*.

264.     Other examples of the appellate courts having overtly condoned suspect conduct by court appointees of the Probate & Family Courts are described below—in particular, Guardianship of Lon Hocker, 439 Mass. 709 (2003) and Guardianship of Quigley, 11P491 (2012).

265.     As evidenced, there is a deeply embedded mindset throughout the Massachusetts State judiciary that the law does not apply to them; which is reinforced by the fact that state judges are treated in that manner by other public officials *specifically* responsible for enforcement of the law.  A prime illustration is the recent incident regarding District Court Judge, Patricia Curtin, who was exposed by Boston TV Fox 25's undercover reporter, Mike Beaudet, for having committed larceny.  On Fox 25's website is the posted report by Mike Beaudet, entitled: **"Judge accused of stealing is cleared opening way for pension boost."**

266.     The above-referenced posted report by Fox 25 contains surveillance video from Logan Airport showing Judge Curtin intentionally pocketing a $4,000 Cartier watch that she knew *did not* belong to her.  As reported by Mike Beaudet, the alleged offense was a *felony*—which means the average citizen would be arrested and booked, with the routine process having a complaint issued by the police and followed by an arraignment. However, that usual and customary process *did not* occur with Judge Curtin.

267.     Instead, the State Police merely issued Judge Curtin a summons to appear before the clerk magistrate for East Boston District Court—which is *not* the standard process when involving a felony.  As a matter of custom and practice, larceny—in excess of $4,000—*does not* entail going before a clerk magistrate; the customary and routine procedure is an arraignment before a district court judge.

268.     As substantiated in the report by Fox 25, the dismissal by the clerk magistrate for East Boston District Court is suspect.  Retired Superior Court Judge Isaac Borenstein—who now teaches at Suffolk Law School—was consulted by Mike Beaudet and it was reported that Judge Borenstein expressed that the existing information shows that District Attorney Dan Conley had ample probable cause to charge Judge Curtin (confirming that there was no reason for this matter to have gone before a clerk magistrate).

269.     Further evidencing the corrupt nature of the Massachusetts judiciary is the fact that Judge Curtin was allowed to retire—with *an increase* in her retirement pension, of an additional $10,000 per year, which was attained while put on administrative duty.

### ii.  Specific ties of individual justices of the Supreme Judicial Court

270.     **Chief Justice Roderick Ireland** was appointed Chief Justice of the Supreme Judicial Court in **2010**, having presided as an associate justice since **2007**.  He presided in the Appeals Court from **1990 through 2007**, and as a Juvenile Court judge from **1977 through 1990**.  **Chief Justice Ireland** is publicly held out to be a member of the **Massachusetts Bar Association.**

271.     **Justice Francis Spina** has presided as an associate justice of the Supreme Judicial Court since **1999**, and has just been appointed Chief Justice on **July 28, 2014**.  **Justice Spina** presided as an associate justice of the Appeals Court from **1997 through 1999** and as a Superior Court judge from **1993 until 1997**.  Justice Spina's legal career consisted of being Partner of Katz, Lapoint & Spina from **1987 through 1993**.  **Justice Spina** is a Life Member of the **MBF Society of Fellows**.  He is also a member and past Secretary of the **Massachusetts Bar Association**.

272.     **Justice Margot Botsford** was appointed to the Supreme Judicial Court in **2007** and had presided as an associate justice of the Superior Court from **1989 through 2007**.  She has held out to the public that she is a Life Member of the **MBF Society of Fellows**.  From **1983-1989**, **Justice Botsford** worked in the Middlesex District Attorney's Office as Chief of the Appeals Bureau and Chief of the Community & Family Crimes Bureau; prior to which she was involved in the law firm of Rosenfeld, Botsford & Krokidas from **1979-1983**.  She is a member of the **Massachusetts Bar Association**.

273.    **Justice Barbara Lenk** was appointed to the Supreme Judicial Court in **2011**.  She presided in the <u>Appeals Court from 1995</u> until her appointment to the Supreme Judicial Court.  **Justice Lenk's** legal career consisted of working for the law firm of Brown, Rudnik, Freed & Gersmer from **1979 through 1993**.  She has held herself out publicly to be a member and past co-president of the **Boston Inn of Court** and the **American Inns of Court**.  She is also a Life Member of the **MBF Society of Fellows**.

274.    **Justice Robert Cordy** was appointed to the Supreme Judicial Court in **2011** and has presided **since <u>2001</u>**; prior to which, he was Managing Partner of the international law firm of McDermott, Will & Emory, which he had joined in **1993**.  From **1991 through 1993**, **Justice Cordy** worked as Chief Legal Counsel for Governor William Weld.  His legal career also includes being **Partner at the law firm of Burns & Levinson**; being Chief of the Public Corruption Unit; Federal Prosecutor; Associate General Counsel in Charge of enforcement at the State Ethics Commission; and Deputy Commissioner and Special Assistant Attorney General for the Department of Revenue.

275.    **Justice Ralph Gants** was appointed to the Supreme Judicial Court in **<u>2009.</u>** He presided as a judge of the Superior Court from **1997 through 2009**; prior to which his legal career included working as a Special Assistant for the Federal Bureau of Investigation, as an Assistant U.S. Attorney and Chief of the Public Corruption Division, and Partner at Palmer & Dodge, LLP.

276.    **Justice Fernande Duffly** was appointed to the Supreme Judicial Court in **2011**.  She presided on the <u>Appeals Court from **2000 until 2011**</u> and sat as a Probate & Family Court judge from **1992 until 2000**.  Prior to which she worked for the law firm of Kirkpatrick & Lockhart LLP.  Justice Duffly is publicly held out to be a member of the **Massachusetts Bar Association** and American Academy of Matrimonial Lawyers.

277.    **Justice Geraldine Hines** was sworn in as an associate justice to the Supreme Judicial Court on **<u>July 28, 2014</u>**.  She was appointed to the <u>Appeals Court in 2013</u>; prior to which she had been a judge in the Superior Court since **2001.  Justice Hines** has previously served on the Judicial Nominating Council and Judicial Nominating Committee.

278.    Of significance, **Justice Cordy** and **Justice Gants**, both, held the position of Chief of the Public Corruption Unit for the Attorney General's Office and they blatantly chose to disregard concrete and specific evidence of corrupt acts committed by designated Defendants that were directly presented by Plaintiff Daughter Lisa.in the filed civil action (SJC-11193).

### iii.  **Opportunity and motive for corruption through the Massachusetts Judicial Selection Process**

279.    The Massachusetts judicial selection process is set forth in a publication issued by the **Massachusetts Bar Association**, called: <u>A Guide to the Massachusetts Judicial Selection Process—The Making Of A Judge</u>, 2nd Edition.  (Copy of the publication is provided in **Exhibit 56**).

280.    In Massachusetts, judges are appointed by the governor and have "lifetime" tenure; as well as, clerk-magistrates.

281.    The **Judicial Nomination Commission** was created by executive order and consists of 21 members who "identify and invite application by persons qualified for judicial office" and "advise the governor".

282.    In conjunction with the **Judicial Nomination Commission**, the **Massachusetts Bar Association** and **Boston Bar Association** "has played both formal and informal roles in assisting the Executive Branch in the merit selection of judicial officers"—having created the <u>25-member</u> **Joint Bar Committee**, which "the function of the Joint Bar Committee is to <u>*independently*</u> review, evaluate and report on the qualifications of judicial and clerk-magistrate aspirants <u>*to all courts of the commonwealth*</u>."

283.    The **Joint Bar Committee** "has played a role with every <u>*administration*</u> in evaluating the qualifications of judicial applicants.  The committee *works with the governor's chief legal counsel*, <u>on a confidential basis</u>, in serving as the <u>final</u> independent check and balance on those individuals selected by the governor for nomination."

284.    The **Judicial Nomination Commission** and the **Joint Bar Committee** conduct separate "interviews".

285.    The **Joint Bar Committee** "may, <u>*on its own*</u>, obtain additional information <u>*as desired*</u>, including the <u>*interview of judges*</u>, attorneys, court personnel, and other individuals who may have pertinent information regarding the candidate.

286.    The **Governor's Council** consists of 8 members, elected every 2 years from electoral districts.  The Council "gives it advice and consent to the executive upon his nomination of a candidate to the judicial office."  A majority vote of the council is necessary for a nominee to be confirmed.

287.    **Defendant Attorney Marsha Kazarosian** has served on the above-described **Joint Bar Committee** for selecting judicial nominees**.**  She is current **President** of the **Massachusetts Bar Association**—and has served as: **Secretary** in **2010-2011** and **Vice President** in **2008-2009** and **2011-2012**.  (See Defendant Attorney Kazarosian's profile provided in prior referenced Exhibit 8).

288.    **Defendant Attorney Kazarosian's** associate in her law firm, **Attorney Janet Dutcher**, <u>currently</u> serves on the **Joint Bar Committee.**  (Copy of the current member listing for the Joint Bar Committee is provided in **Exhibit 57**).

289.    **Attorney Jeremiah Doyle, IV** of **Defendant BNY Mellon** served as a member of the **Joint Bar Committee**.  (Copy of Attorney Doyle's profile published by Defendant BNY Mellon is provided in **Exhibit 58**).

290.    Co-founding partner of **Defendant Burns & Levinson**, **Attorney Thomas Burns** served as a member of the **Joint Bar Committee**.  (Copy of Attorney Burns's profile is provided in **Exhibit 59**).


### iv.  <u>Visible post-1989 adverse change in attitude by the State appellate courts regarding due process for alleged incapacitated individuals</u>

291.    In the **1970s**, the Supreme Judicial Court declared, in <u>Belchertown State Sch. v. Saikewicz</u>, 373 Mass 728 (1977), that a person who is declared incompetent is not any less worthy of dignity or respect in the eyes of the law.  Reinforced in its written opinion of <u>Doe v. Doe</u>, 377 Mass. 272 (1979), the Supreme Judicial Court set forth that a judicial finding of incompetency does not obviate the necessity of a guardian or judge taking into consideration the ward's feelings or opinions regarding his care.

292.    The Supreme Judicial Court firmly established that the mere assertion that a person was mentally ill was not sufficient, by itself, to warrant the imposition of a guardian—it was required that it be proven that the individual did not have the ability to take care of himself by reason of mental illness.  <u>Fazio v. Fazio</u>, 375 Mass 394 (1978).  The Court emphasized that a probate court judge must rely on actual presented evidence that show the person in question was unable to think or act for himself as to matters concerning personal health, safety and general welfare; and actual evidence showing that the individual in question was unable to make informed decisions as to property or financial interests.  <u>Fazio v. Fazio</u>, 375 Mass at 408.

293.     The Appeals Court decision in the **1982** case of <u>New England Merchants</u> <u>Nat. Bank v. Spillane</u>, 14 Mass. App. Ct. 685, explicitly shows that it was the practice of the appellate courts to actually implement such above-described standards. During the **1970s and 1980s**, the appellate courts made removals and vacatings of court appointed guardians and conservators—which such orders for removal are now, virtually, nonexistent.

294.     The written opinion, in <u>New England Merchants Nat. Bank v. Spillane</u>, is a specific illustration of the visible change in practices of the appellate court after the institution of the **American Inns of Court**.  The written opinions of the appellate courts show the philosophy of adhering to the law *visibly* changed **by the 1990s**—so much so, that the pendulum has swung to complete abrogation of the law.

295.     Of significance, the Appeals Court, in <u>New England Merchants Nat. Bank</u> <u>v. Spillane</u>, emphasized the import of probate court judges following the established procedural requirements set forth for appointments of guardian and conservator.  The Appeals Court highlighted the failure of the probate court judge to follow the procedural requirements was not an oversight; having supported that conclusion *<u>with a detailed</u>* *<u>discussion of numerous specific and concrete facts</u>*.

296.      The underlying guardianship matter of <u>New England Merchants Nat. Bank</u> <u>v. Spillane</u> is the epitome of what *still is* "business as usual" throughout the Massachusetts Probate & Family Courts—the difference being that appellate courts, during the **1970s** and **1980s**, practiced the philosophy of adhering to the law.

297.     <u>New England Merchants Nat. Bank v. Spillane</u> involved the guardianship and conservatorship of Miss Shaw—an elderly woman who was 92 and had suffered a series of strokes and was confined to bed at her home.  Having no immediate family, Miss Shaw had given a general power of attorney to the Bank, where she had a long-time business and fiduciary relationship.  Advised by Miss Shaw's personal physician, the Bank filed a petition for conservatorship with the Worcester Probate Court.

298.     The probate judge appointed Attorney Spillane as guardian ad litem for Miss Shaw, upon which Attorney Spillane recommended that the Bank should be appointed as temporary conservator and that he (Attorney Spillane) be appointed temporary guardian.  As repeatedly emphasized by the Appeals Court, the probate court judge, *acting on his own motion*, appointed Attorney Spillane as temporary guardian. Subsequently, the Bank moved to discharge Attorney Spillane as temporary guardian, and the judge denied the motion without a hearing.

299.    While the Bank appealed the afore-described denial, a petition for permanent guardianship and conservatorship had been filed by one of the cousins and two friends of Miss Shaw—they sought the Bank to be permanent conservator and Miss Shaw's very close and long-time friend and neighbor be permanent guardian.  An evidentiary hearing was held where the petitioners presented overwhelming evidence that Attorney Spillane was <u>not</u> a suitable person to be appointed as permanent guardian, and presented solid evidence that Mrs. Brown was a suitable person to act in that capacity. Despite petitioners' specific request for Mrs. Brown to be appointed permanent guardian and presented supporting evidence, the probate court judge, instead, made Attorney Spillane permanent guardian.

300.    Common sense dictates that it would be "politically incorrect" to blatantly overturn such above-described espoused values in long-established case law; and therefore, **post-1989**, the appellate courts felt compelled to resort to smoke and mirror tactics.  As shown by the written opinion of the Supreme Judicial Court, in the <u>Guardianship of Lon Hocker</u>, the Court espoused such above-described principles of law, while, its rulings were the exact opposite of such standards.  The <u>Guardianship of Lon Hocker</u> involved court ordered forced administration of antipsychotics.  The son of Lon Hocker sought relief from the Supreme Judicial Court based on his father being deprived of state and federal constitutional guarantees of due process.

301.    The Court stated, in the <u>Guardianship of Lon Hocker</u>:

> The ward and his family members remain free to challenge [the court appointed guardian's] fitness as guardian or the ward's continued need for a permanent guardian of his person.

Then in the footnotes, in direct contradiction, the Court stated:

> This appeal was filed by the ward's son, Lon Hocker, Third and Attorney Ryman, acting for the ward and on her own behalf.  An appeal from an order of a judge in the Probate and Family Court is governed by G.L. c. 215, § 9, which allows appeals only be a 'person aggrieved by an order, judgment, decree or denial of a probate court.'  The son is not an aggrieved person.

302.     The Supreme Judicial Court, also, espoused in the <u>Guardianship of Lon Hocker</u>:

> We agree that, in certain circumstances where the guardian faces a conflict of interest or a likelihood of conflict with the ward, Massachusetts law contemplates that the ward be represented by independent counsel.  Those circumstances are not present here, and they do not create a generalized and continuing 'right to counsel of one's choosing' for a person adjudicated under our laws to be mentally incompetent.

Yet, in the footnotes of <u>Guardianship of Lon Hocker</u>, the Court, set forth, *more than ample*, specific factors that do indeed create "a likelihood of conflict" between the guardian and the ward—the Court, explicitly noted: "The guardian also filed a motion for temporary orders to prevent 'family members' from interfering with her care of the ward or his medical or legal appointments" and that the ward did not attend the hearing.

303.     In the matter of <u>Guardianship of Quigley</u>, 11P491 (2012), Mr. Quigley appealed the Probate & Family Court judge's court order subjecting *him* to forced administration of antipsychotics.  Mr. Quigley, specifically, raised the issue that the judge did not, in any manner, <u>take into consideration</u> his own preference.   The Appeals Court made the empty, blanket statement: "The judge's findings demonstrate, however, that appropriate consideration was given to all of the pertinent factors."  Conspicuously, the Court did not refer to any specific examples—like that of the Full Bench in <u>New England Merchants Nat. Bank v. Spillane.</u>

304.     The above quoted statement had an attached footnote, that, unequivocally, intimates that the judge *did not* consider Mr. Quigley's preference—as shown, the Court felt compelled to proffer a justification for the judge's failure to do so; stating in the footnote:

> We do not discount the importance of Quigley's actual preference in the substituted judgment determination. [citation omitted].  In this case, the evidence sufficiently established that Quigley's inability to recognize the benefits of his treatment and the risks associated with ending treatment are characteristic of his psychiatric illness.  In fact, Quigley does not believe, or understand, that he has a mental illness.  Quigley's preference is, therefore, not informed.

305.     The above-described footnote blaringly reveals the Court's true colors, and shows the Court's overt and reckless disregard for the alleged incapacitated person's preference and the United States Constitution.

306.     As evidenced above, the pattern of conduct by the appellate courts, **post 1989**, consists of their knowing the desired result and then taking existing applicable law and contorting it to make it superficially support the desired end result.

307.     Showing the magnitude of the appellate courts' judicial philosophy of misshaping existing rules of law to meet their desired result is In re Guardianship of Flaherty, 74 Mass. App. Ct. 1108 (2009) and Guardianship of Quigley, 11P491 (2012).

308.     In Flaherty, the plaintiff's mother was diagnosed as having "dementia with delusions and anxiety."  Instead of the Appeals Court focusing on the lack of an evidentiary hearing, it relied on the supposed premise that "there was no evidence of an adverse relationship between the ward and her guardian."  The Appeals Court declared that there was no need for an evidentiary hearing to evaluate the proffered in-court statements made by the plaintiff's mother (deemed ward)—that she did not purportedly want her son to be guardian.  The Appeals Court seemingly espoused that *the ward's supposed desires mattered and was a controlling factor*.

309.     However, when a ward expresses that he or she _wants_ her family member to be his or her guardian, *then* the appellate courts render the ward's statements feeble.  For example, in the 2012 appellate court matter of Guardianship of Quigley, *the ward's established preference that a family member was _entirely_ discounted* by the Appeals Court.  As evidenced, the real controlling factor is whatever the appellate courts desire the result to be at that time.

### v.   Visible post-1989 adverse change in attitude by the State appellate courts regarding pro se litigants

310.     During the **1970's and 1980's**, the written opinions of the Supreme Judicial Court expressed that it was of crucial importance for citizens to have the perception of fair administration of matters by the courts, amongst *all* litigants—with specific and explicit emphasis towards pro se litigants.

311.     During the above-described time period, the Supreme Judicial Court regularly made open declarations of the import of affording pro se litigants the *opportunity* to be heard by the Supreme Judicial Court upon a showing of having been gravely aggrieved.

312.     **Post 1989,** no longer did the Supreme Judicial Court hold out to the public that it endorsed fairness to be ensured to pro se litigants—with the pendulum swinging so far the other way, the Supreme Judicial Court began a new era of open declarations and actions that *actually, encouraged **hinderance** of pro se litigants' access to due process*.

313.   **Post-1989** written decisions of the Supreme Judicial Court demonstrate an overt pattern of regular and summarily preclusion of pro se litigants from being even heard, *even* though a preliminary showing of serious harm, suffered under extraordinary circumstances had been met.

314.   It is well established that an exceedingly large percentage of litigants in probate and family matters are ordinary citizens, having no alternative other than to legally represent themselves in court because of financial inequity.  This is evidenced by reports issued from the Massachusetts Probate & Family Court, along with the annual reports of the Judicial Conduct Commission and the Supreme Judicial Court's own initiated study.

315.   In **1997**, the Massachusetts Probate & Family Court issued a report entitled: "Pro Se Litigants the Challenge of the Future"—of which a copy is provided in **Exhibit 60**.

316.   **Justice Fernande Duffly** of the Supreme Judicial Court—at that time sitting as associate justice in the Middlesex Probate & Family Court—was a member of the Committee for the above-described report issued by the Probate & Family Court.

317.   It was emphasized in the introduction of the above-described report that attorneys and judges, *alike*, viewed pro se litigants as "a problem".  The report listed out what the attorneys and judges stated as to what *they viewed* the problems were regarding pro se litigants, which they stated as:

the *pro se* litigant is given an advantage and assistance by the court and staff;

the increased costs of litigation when one party has an attorney and the other does not, thereby causing "delays occasioned by interacting with and waiting for *pro se* litigants";

difficulties experienced by both the court and the attorney dealing with the *pro se* litigant who can afford an attorney but chooses not to hire one;

difficulties of non-English speaking *pro se* litigants and the court in meeting their needs, given the frequent unavailability of interpreter services; and

the shortage in legal services available to indigent or lower income litigants due to government funding cuts.

318.     The content of the above-described report was not expressed in a manner conveying concern that pro se litigants obtain fair and equitable justice from the courts, but rather as expressing that pro se litigants were the cause for inadequate administration by the courts.

319.     In **August of 2002**, the **then-Chief Justice Margaret Marshall** of the Supreme Judicial Court appointed a "Visiting Committee on Management in the Courts" (herein referred as "Visiting Committee") to conduct an independent investigation on the state of management in the Judiciary to: 1) obtain an objective appraisal and 2) to provide recommendations for improvement.  This report was known as the Monan report.  (Copy of the Visiting Committee's report is attached in **Exhibit 61**).

320.     The Visiting Committee characterized that the specific reason that Chief Justice Marshall created the committee was because she personally believed that there was a "pressing" need "to re-examine and reform the management of the Judiciary."

321.     The Visiting Committee spent six (6) months visiting courthouses across the Commonwealth, interviewing hundreds of justices, court personnel, and leaders of the bar and the community.  **On March 4, 2003**, the Visiting Committee filed its report with Chief Justice Marshall.

322.     The Visiting committee made the following findings:

there was a problem with the quality of judicial decisions;

[s]ome citizens get better justice than others;

the administration and management of the Judiciary is uneven at best, and often times dysfunctional at worst;

despite pockets of genuine excellence, the management of the Judiciary is preventing people of Massachusetts from receiving the justice they deserve.

323.     The Visiting Committee identified the following root causes for the above-described problems: 1) defective "leadership culture and structure"; 2) a lack of performance measurement and accountability; and 3) an inability to manage costs and resources.

324.     The Visiting Committee specifically cited the following example as to the type of problems that undermines the quality of justice in Massachusetts:

> one clerk-magistrate was accused of over 100 acts of misconduct over a period of years before action was taken.  This misconduct included slowing the handling of cases filed by lawyers he disliked, suggesting that a court employee "go commit suicide," and illegally attempting to influence the outcome of a criminal case.

325.     The Visiting Committee stated that, during its personal visits to the courts across the Commonwealth, they heard "many stories of justice denied through delay or excessive cost came to light."

326.     The Visiting Committee noted that there was a distinct problem regarding a lack of uniformity in the treatment of the public with courtesy and respect.

327.     Today, it is not uncommon for the Supreme Judicial Court, in its published opinions, to berate pro se litigants for pursuing legal relief.  An example of such conduct is the Supreme Judicial Court's written decision regarding the matter of In re Gorbatova. (Copy of the written decision is provided in **Exhibit 62**).

328.     As established in the afore-discussed report of the Massachusetts Probate & Family Court, it is well-known that pro se litigants, generally, lack the requisite knowledge of courts rules and procedures; thereby, precluding awareness and/or confidence to address suspect conduct by the court appointed guardian and conservators. Consequently, established documentation shows a pattern of court appointees intentionally submitting mandatory filings with inadequate information, as deliberate omissions help court appointees hinder real oversight of their activities by entitled interested parties.

329.     In addition, there is an established pervasive pattern by court appointees (again, who are almost exclusively attorneys) using retaliatory court actions—routinely rubber-stamped by the Probate & Family Court judges—specifically to intimidate family members from challenging the court appointees in court, knowing that most family members are unable to endure the emotional and financial toll of embroiled litigation.

330.     Even when family members may, initially, have financial resources to retain private legal representation, generally, any attempt to seek relief from the Probate and Family Court and/or the Massachusetts appellate courts is futile where many private attorneys—particularly in the area of probate and family law—abandon their duty of loyalty and effective advocacy for their client's interests because of an existing custom and practice by these attorneys to take the attitude of "play along to get along".

331.    Provided in **Exhibit 63** is a copy of an email that **Defendant Attorney Kazarosian** sent to Plaintiff Daughter Lisa, advising Plaintiff Daughter Lisa that she needed to adopt that very philosophy of "play along to get along."

332.    Bolstering the existence of this custom and practice in the area of probate and family law is the motive to abandon their duty to their clients because of: 1) social ties from exclusive memberships in associations like the **American Inns of Court** and **MBF Society of Fellows** and/or 2) not wanting to risk adverse outcomes in other pending and future cases by taking a stand that might offend these Probate & Family Court judges, before whom they regularly appear—especially, where there are no jury trials in the Probate & Family Court.

**STATEMENT OF FACTS**

I. <u>**Overview of criminal enterprise embedded in the Massachusetts Probate & Family Court**</u>

A. <u>**Broad scope**</u>

333.    It is well-established by the First Circuit Court of Appeals in <u>U.S. v. Boylan</u>, 898 F.2d 230 (C.A. 1  (Mass) 1989), that, as a matter of law, a governmental agency can constitute a criminal enterprise, specifically in terms of laws regarding Racketeer Influenced and Corrupt Organizations (RICO).  In <u>U.S. v. Boylan</u>, the Boston Police Department constituted an enterprise, whereby the illicit activities of several police officers had engaged in conduct that were strikingly similar with a significant degree of connectedness, and done in the course of carrying out their official duties as police officers.

334.    Most recently, the prosecution by the US Attorney General's Office regarding the State's Probation Department further demonstrates a governmental agency constituting a criminal enterprise.

335.    As previously set forth, the overall criminal scheme conducted within the Massachusetts Probate & Family Court system is financial exploitation.  The main facilitators of this financial exploitation scheme being attorneys, judges and administrative staff of the Probate & Family Courts.  The scope of the enterprise includes racketeering activities carried out through the usual and ordinary course of duties for these various court officials and their agents.  As previously set forth, this criminal enterprise has been able to exist because such illicit actions are carried out under a pretext of lawful authority and the overwhelming lack of actual oversight.

336.    As previously set forth, there are two (2) separate and distinct avenues that court officials use to facilitate financial ill-gotten gains: 1) the management of guardianship and conservatorship and 2) the administration of estates upon death.

337.    Often, financial exploitation that arises in a guardianship and conservatorship will continue into the administration of the estate upon the death of the elder.  However, financial exploitation is not dependent upon a prior existing guardianship and/or conservatorship—independent probate actions are regularly commenced to administrate a decedent's estate, with no underlying guardianship or conservatorship.

338.    The usual course of guardianships, conservatorships, and estate administrations of decedents involve routine court appointments, made pursuant to **Supreme Judicial Court Rule 1:07** (herein referred as SJC Rule 1:07)—and consist of: guardian, conservator, guardian ad litem (herein referred as GALs), counsel for the person deemed incapacitated, Roger's counsel *for* the incapacitated, and monitors for court-ordered forced administration of antipsychotics.

339.    As a matter of routine custom and practice, judges of the Massachusetts Probate & Family Courts provide court appointed fiduciaries complete and exclusive control over a judicially deemed incapacitated person.

340.    Each Massachusetts Probate & Family Court physically possesses and maintains its own individual list of people who are certified to act as SJC Rule 1:07 court appointees.

341.    SJC Rule 1:07 court appointees for the Massachusetts Probate & Family Courts, almost, exclusively consist of private practicing attorneys, whose area of practice focuses on probate and family law.  Provided in **Exhibit 64** are examples of published information from the websites of various private practicing attorneys who are regularly used as SJC Rule 1:07 court appointees.

342.    An extraordinarily large percentage of Massachusetts Probate & Family Court judges and SJC Rule 1:07 court appointees are mutual members of local probate and family law chapters of the American Inns of Court.

**B. Established pattern of illicit conduct by designated Defendant attorneys who regularly provide private estate planning services while acting as court appointees for the Massachusetts Probate & Family Courts**

343.    A significant percentage of attorney disciplinary cases involve attorneys who engage in self-dealing tactics for financial gain when providing private legal services to a client, involving guardianship, conservatorship and estate administration of decedents.

344.    Disciplinary proceedings reported by the Board of Bar Overseers, overwhelmingly, have consisted of privately prepared estate planning instruments—wills, trusts, durable power of attorneys, and health care proxies.  Through the role of private counsel, attorneys have incorporated self-dealing provisions in the above-described types of instruments, while inducing their clients to name them as a fiduciary and/or beneficiary.

**i.  Specific and concrete illustrations of improper use of the Massachusetts Probate & Family Courts by privately retained counsel**

**Defendant Attorney Robert Ledoux**

345.    **Defendant Attorney Ledoux** provided private legal estate planning services for Ernest Latour, having drafted Mr. Latour's Will.  In Mr. Latour's Will, Defendant Attorney Ledoux was named as the guardian for Mr. Latour's disabled son. (Copy of Mr. Latour's Will and a Codicil to Will—with Defendant Attorney Ledoux's preceding law firm's name printed on the side of the executed document—are provided in **Exhibit 65**).

346.    Subsequent to **Defendant Attorney Ledoux** having drafted and executed estate-planning instruments for Ernest Latour, Defendant Attorney Ledoux filed a petition for conservatorship and guardianship *over Ernest Latour* (his own client) in the **Essex Probate & Family Court**.  (Copies of Defendant Attorney Ledoux's filed petition for conservatorship and for guardianship are provided in **Exhibit 66**).

347.    In the afore-referenced petitions seeking guardianship and conservatorship over Ernest Latour, **Defendant Attorney Ledoux** represented that he and his co-petitioners were bringing the petition *as private individuals having a personal relationship with Mr. Latour*.  Defendant Attorney Ledoux and his co-petitioners stated, in the petitions, that they were filing under the category of "relatives or friends" of Ernest Latour.

348.     **Defendant Attorney Ledoux** and his co-petitioners provided their personal residential addresses, *not* their business address.

349.     With regard to the petition for conservatorship, which was filed in **November of 2002**, the co-petitioner was identified as Linda Serpa.  Neither, **Defendant Attorney Ledoux** nor Linda Serpa had a personal relationship with Ernest Latour.

350.     Contemporaneous with the time period of the above-referenced **November 2002** filing, **Defendant Attorney Ledoux** had been serving as private legal counsel for the City of Salem, Massachusetts.

351.     It is suspect that **Linda Serpa** became an employee of the City of Salem *in 2003*, *after* signing as co-petitioner with **Defendant Attorney Ledoux**.   Given Defendant Attorney Ledoux's capacity as legal counsel for the City of Salem, he had the motive and opportunity to get Linda Serpa a job with the City of Salem, in exchange for her illicit role as co-petitioner in the matter of Ernest Latour.

352.     **Defendant Attorney Ledoux**, also, filed a Bond in the matter of In re Ernest Latour, in which Defendant Attorney Ledoux had **Defendant Attorney Cuffe** personally certify that Defendant Attorney Ledoux was "qualified" to be a surety.  (Copy of the Bond showing Defendant Attorney Cuffe's certification is provided in **Exhibit 67**).

353.     In the afore-referenced petition for guardianship, it was, again, represented that **Defendant Attorney Ledoux** and his co-petitioner (this time being Attorney Lynch) were bringing the petition for guardianship *as individuals having a personal relationship with Ernest Latour.* Again, Defendant Attorney Ledoux and his co-petitioner provided their personal addresses, not their law office address.

354.     Several court documents show that a separate court docket had been opened to probate the estate when Ernest Latour died, designated as Docket No. ES04P1399VE1; however, the Clerk's Office for the Salem division of the Essex Probate & Family Court has repeatedly represented to Plaintiff Lisa Siegel Belanger, Esq., that there is no existing file or docket in the computer system for the above-stated docket number.  (Copies of various court records in the matter of In re Ernest Latour that have written notations stating docket number ES04P1399VE1 are provided in **Exhibit 68**.  Note the consistent crossing out of that docket number on the various court records).

### Defendant Attorney Lisa Cukier

355.     Specific illicit conduct as privately retained counsel is evidenced in a lawsuit that was brought by a nursing home (Woodlawn Nursing Home) against **Defendant Attorney Cukier**, for her intentional omission in filing for Medicaid benefits, on behalf of her 90 year-old client (Eleanor Mulligan).  Essentially, it was a civil action for fraud (filed in Middlesex Superior Court— Docket No. MICV96-5259).  (Copy of the complaint is provided in **Exhibit 69**).

356.     At the time of the above-described lawsuit, **Defendant Attorney Cukier** was a sole practitioner.  She retained **Defendant Burns & Levinson** to defend her—as evidenced and speaking volumes, Defendant Burns & Levinson offered Defendant Attorney Cukier a job soon thereafter.

357.     In addition, counsel from **Defendant Burns & Levinson** who had been representing **Defendant Attorney Cukier** (David Hatem, Esq.), also, had been representing **then-Attorney Jeffrey Abber** for legal malpractice during that time period——Jeffrey Abber was appointed to the bench many years later in **2010**.  (The lawsuit filed against Jeffery Abber was, also, filed in Middlesex Superior Court, DiPierro v. Abber, Docket No. MICV1995-00062).

358.     A copy of the 93A Demand letter sent to **Defendant Attorney Cukier** by counsel for the nursing home is provided in **Exhibit 70**—which describes, in detail, intentional misconduct by Defendant Attorney Cukier.

359.     A representative of **Mystic Valley Elder Services** had personally and directly referred 90 year-old Eleanor Mulligan to **Defendant Attorney Cukier**.  After Defendant Attorney Cukier had secured Eleanor Mulligan as a client, she had Eleanor Mulligan execute a durable power of attorney (DPOA).  The DPOA stated that Defendant Attorney Cukier was attorney-in-fact for Eleanor Mulligan, her own client.  (Copy of the DPOA is in **Exhibit 71**).

360.     **Defendant Attorney Cukier** sent a letter to Eleanor Mulligan's brother (Vincent Mulligan); in which she explicitly stated that his 90-year-old sister had come to hire her services through the referral made by Peggy Sullivan of Mystic Valley Elder Services.  (Copy of Defendant Attorney Cukier's letter is provided in **Exhibit 72**).

361.     In **Defendant Attorney Cukier's** afore-described letter to her client's brother, she stated: "As you know, Peggy Sullivan of Mystic Valley Elder Services recommended to Miss Mulligan that she sign a durable power of attorney and retain me to perform necessary duties *that she cannot now manage*."

362.     The afore-referenced DPOA, signed by **Defendant Attorney Cukier's** client, is dated **May 10, 1995**.  In the letter to Mr. Mulligan, dated **June 2, 1995**, Defendant Attorney Cukier expressed that Eleanor Mulligan *did not have presence of mind* to be able to handle her own personal affairs; it is suspect that if that assertion were true, it would stand to reason that Eleanor Mulligan did not have presence of mind to sign the afore-described DPOA.

363.     In addition, the legitimacy of the DPOA signed by Ms. Mulligan is questionable where Defendant Attorney Cukier used a social worker to witness the signing of the DPOA.

364.     It is conspicuous that Eleanor Mulligan entered the nursing home on **June 1, 1995**, just weeks *after* signing the DPOA, making Defendant Attorney Cukier attorney-in-fact.

365.     **Defendant Attorney Cukier**, also, stated in the afore-described letter to her client's brother:

> [] I will be sending you copies of each correspondence I send to others that is in any way related to my financial management of Ms. Mulligan's affairs.  I will also send you my statements for payment of my services which I bill at a rate of $100.00 per hour.  *You do not have to pay my bill; I will pay myself from your sister's assets*, but I will send you a copy of the bill so you will know exactly what I receive for my work as soon as I get it.

**<u>Defendant Attorney Edward Tarlow</u>**

**<u>Estate of Richard R. Vazza</u>**

366.     Specifically, **Defendant Attorney Tarlow** committed fraud upon the court of the above-described nature in the matter of Estate of Richard R. Vazza (Suffolk Probate & Family Court No. 07P-1667-EP1).

367.     In **March of 1993**, **Defendant Attorney Tarlow** prepared estate-planning instruments for Richard R. Vazza; he drafted and executed the Will for Richard R. Vazza. (Provided is a copy of the Will for Richard R. Vazza in **Exhibit 73**).

368.     At the time of **Defendant Attorney Tarlow's** having provided legal services to Richard Vazza for estate planning purposes, Richard Vazza's financial worth was in excess of $20 million.

369.    **Defendant Attorney Tarlow** was specifically named in Richard R. Vazza's Will as co-executor, along with with Richard R. Vazza's then wife and children.

370.    In the above-described Will, the wording of provision numbered 3.1—regarding the manner in which decisions were to be made by the executors—gave unfair advantage and influence, specifically, to **Defendant Attorney Tarlow**.

371.    **Defendant Attorney Tarlow's** knowingly and pre-meditated illegal conduct is evidenced in the following provisions of the above-described Will:

> **Provision 3.2** which states: "No one dealing with my executors need inquire concerning the validity of anything that they purport to do or need see the application of any money paid or any property transferred to, or upon order of, my executors";

> **Provision 4.1** gives unconscionable unfettered discretion in the "retaining and investing of stocks, shares and obligations of corporations, unincorporated associations (including, but not limited to, capital investments in joint ventures and limited or general partnerships), trusts and investment companies, common trust funds or securities."  The provision *explicitly* and *expressly* gives the executor(s) permission to make investments that are "in such amounts, upon such terms, and of such character [] that *would not be considered proper for executors to make or retain" and "that might violate the principles of investment diversification"*; and

> **Provision 4.3** states that the executors are permitted to "hold bonds, shares or other securities in bearer form, or in the name of the executors or in the name of a nominee, *without indication of any fiduciary account in a bank, without indication of any fiduciary capacity*."

372.    In addition to **Defendant Attorney Tarlow** drafting the above described Will for Richard R. Vazza, he, also, *acted as the notary for the execution of the Will*—purportedly certifying that *his own client* signed the Will of his own free will and full knowledge; *the very document that explicitly made Defendant Attorney Tarlow a co-executor*.

373.    The above-described Will explicitly declared that Richard Vazza was a resident of Florida.  In addition, on **April 27, 2007**, Richard Vazza filed his written attestation, in his then-pending divorce matter in Norfolk County that his primary domicile was Florida.  (Copy of Richard R. Vazza's affidavit is provided in **Exhibit 74**).

374.     **Defendant Attorney Tarlow** acted as notary for Richard Vazza's execution of the afore-described affidavit of **April 27, 2007** that his primary domicile was Florida.

375.     Two (2) months after Richard Vazza's having executed the above-described affidavit—and having been *notarized by* **Defendant Attorney Tarlow,** Richard Vazza suddenly and unexpectedly died on **July 10, 2007**.

376.     On **August 7, 2007**, when **Defendant Attorney Tarlow** commenced the estate administration for Richard Vazza, he did so in the Suffolk Probate & Family Court, filing an Affidavit of Domicile attesting that Richard Vazza's primary domicile was Massachusetts—which *explicitly contradicted* the previously described affidavit of Richard Vazza filed in the divorce matter with Norfolk County.   (Copy of Defendant Attorney Tarlow's affidavit is provided in **Exhibit 75**).

377.     Subsequent to the afore-described filing of **Defendant Attorney Tarlow's** Affidavit of Domicile, the adult children of Richard Vazza obtained independent counsel and filed a motion to dismiss Defendant Attorney Tarlow's petition for probate and for release of Will.  They did so because Defendant Attorney Tarlow had filed false information in the filed pleadings to begin probate of the estate for Richard R. Vazza—a copy of the motion and stipulated agreement are in **Exhibit 76**.

378.     In the above-referenced probate matter, **Defendant Attorney Tarlow**, knowingly and deliberately, prepared and filed false information with the Suffolk Probate & Family Court.

379.     In the above-referenced probate matter, **Defendant Attorney Tarlow**, knowingly and deliberately, committed perjury.


**North Street Irrevocable Trust**

380.     **Defendant Attorney Tarlow** provided private legal services to Everett N. Cole, Jr. for estate planning purposes.  In **January of 1977, Defendant Attorney Tarlow** prepared and drafted an irrevocable trust for Everett N. Cole, Jr., called the North Street Irrevocable Trust—Everett N. Cole, Jr. was owner of real property located at 937 North Street, Tewksbury, MA.  (A copy of the above-described Trust is provided in **Exhibit 77**).

381.     In the afore-described Irrevocable Trust, **Defendant Attorney Tarlow** was declared <u>*sole*</u> Trustee of such Irrevocable Trust.

382.     As evidenced by the main substance of the above-described Irrevocable Trust, Everett N. Cole, Jr. was induced to transfer the property of 937 North Street, Tewksbury, MA to **Defendant Attorney Tarlow.**

383.     In the afore-described Irrevocable Trust, Everett N. Cole, Jr., transferred the property to **Defendant Attorney Tarlow**, as if Defendant Attorney Tarlow were a private individual—it was *not* transferred to Defendant Attorney Tarlow in his capacity as an attorney for Everett N. Cole, Jr.

384.     The afore-described Irrevocable Trust provided that **Defendant Attorney Tarlow**, as sole Trustee, had unfettered discretion to do as he pleased with the trust estate. The Irrevocable Trust stated that Defendant Attorney Tarlow, as Trustee, could act "with the same freedom and lack of restriction as the Donor [Everett N. Cole, Jr.] would have were he the sole individual owner thereof of free of trust"; that Defendant Attorney Tarlow was not, *in any manner*, restricted "by the degree of risk and/or speculation involved."

385.     The above-described Irrevocable Trust explicitly gave **Defendant Attorney Tarlow** authority "to borrow money, and to encumber or hypothecate trust property by mortgage, by deed or trust, pledge or otherwise."

386.     Everett N. Cole, Jr. signed the execution of the above-described Irrevocable Trust on **January 17**, **1977.**  Two (2) days later, on **January 19, 1977**, **Defendant Attorney Tarlow** took out a personal loan for **$38,000**, using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 78**).

387.     In **November of 1987**, **Defendant Attorney Tarlow** took out a loan for **$120,000** with Bank Five for Savings using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 79**).

388.     In **June of 1988**, **Defendant Attorney Tarlow** took out another loan for **$35,000** with Bank Five Savings using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 80**).

389.     In **1989**, the daughter of Everett N. Cole, Jr. filed a civil action against **Defendant Attorney Tarlow** in her capacity as beneficiary.  She sought to compel Defendant Attorney Tarlow to provide her an accounting for the above-described Irrevocable Trust.  (Copy of the Complaint and docket sheet are provided in **Exhibit 81**).

390.     The above-described Irrevocable Trust explicitly provided that **Defendant Attorney Tarlow** would, at the minimum, affirmatively provide the beneficiaries an accounting.

391.     It is suspect that **Defendant Attorney Tarlow** did not file an Answer to the Complaint until, almost, _three (3) years later_ in **1992**.  (Copy of the afore-referenced Answer is provided in **Exhibit 82**).

392.     In **Defendant Attorney Tarlow's** filed Answer to the above-referenced Complaint, he denied that he did not provide an accounting—however, he _did not_ affirmatively claim to have, in fact, provided an accounting.

393.     In the afore-described civil action, **Defendant Attorney Tarlow** was represented by **Defendant Attorney DeNapoli**.

394.     After the commencement of the above-described civil action against **Defendant Attorney Tarlow**—which was _one (1) year prior_ to his filing the above-referenced Answer, took out another loan for **$87,000** with Bank Five Savings using estate property in the above-described Irrevocable Trust as collateral.  (Copy of the mortgage is provided in **Exhibit 83**).

395.     Also, in **July of 1998**, **Defendant Attorney Tarlow** assigned leased property in the above-described Irrevocable Trust to Bank Five Savings.  (Copy of the afore-described assignment is provided in **Exhibit 84**).

396.     Over two (2) years _after_ the above-described civil action was brought—but _before_ filing an Answer, it is suspect that **Defendant Attorney Tarlow** resigned as Trustee of the above-described Irrevocable Trust.  (Provided is a copy of Defendant Attorney Tarlow's filed Resignation with the Middlesex County Registry of Deeds in **Exhibit 85**).

397.     **Defendant Attorney Maxa Berid** was a party formally named in a civil action pertaining to the sale of marital property, specifically, involving the afore-discussed **North Street Irrevocable Trust**.  Defendant Attorney Berid had represented Everett Cole, III in his divorce and the sale of marital property.   The civil action naming Defendant Attorney Berid was brought in Middlesex County—which Complaint explicitly identified **Defendant Attorney Tarlow** as co-trustee of North Street Irrevocable Trust with Everett Cole, Jr.  (Copy of Complaint of the afore-referenced Middlesex civil action and docket sheet are provided in **Exhibit 86**).

## II. DEFENDANTS' USE OF INFLUENCE—FOSTERED THROUGH EXCLUSIVE MEMBERSHIPS—TO FACILITATE ILLEGAL ACTS

### A. Evidence of Defendants' incestuous-like relationships as SJC Rule 1:07 court appointees

#### i. Long-established relationships

398.    As previously set forth, in **2003**, **Defendant Attorney Cuffe** personally signed a bond certifying and vouching for **Defendant Attorney Ledoux's** qualification to be a surety in the matter of <u>In re Ernest Latour.</u>

399.    In **2007**, **Defendant Attorney Ledoux** was the petitioner for guardianship and conservatorship, with **Defendant Attorney Cuffe** court appointed as GAL, in the matter of <u>In re John Polando.</u>

400.    In **2008**, multiple matters spawned from **Defendant ESMV's** filing of protective orders pertaining to Antoinette Carpinone (ES08P2785PM, 09P0361GI, 09P2332), which involved *numerous* designated Defendants.  **Judge Amy Blake** was the primary presiding judge throughout the above-identified probate cases.

#### ii. Depth of embedded incestuous-like relationships illustrated by the matters relating to Antoinette Carpinone

401.    In **2008**, **Defendant ESMV** filed protective orders alleging that Antoinette Carpinone (then 91 years-old) was being financially exploited by her sister, Lillian Schiavoni (90 years-old).

402.    **Defendant Attorney Berid** filed her appearance as legal counsel for **Defendant ESMV**, along with **Attorney Eric Schutzbank** as co-counsel—as previously set forth, they, also, operated a completely separate and distinct private law firm (**Defendant Berid & Schutzbank, LLC**).

403.    **Defendant Berid & Schutzbank** almost exclusively represents private individuals, specifically in the area of probate and domestic law.  In addition, Attorneys Berid and Schutzbank accept work as SJC Rule 1:07 GAL court appointees.  These additional roles create direct conflicts of interest because of Attorney Berid's and Attorney Schutzbank's role as counsel for a State agency that is inescapably intertwined with the Probate & Family Court.

404.     **Defendant Attorney Berid** and **Attorney Schutzbank** received payment from the estate of Antoinette Carpinone, even though their role was designated as acting for **Defendant ESMV**—but they received payment as though they were working in a private capacity.  (Copy of submitted invoice for payment by **Defendant Berid & Schutzbank** to **Judge Blake** and written admission as to their specific designated role in the matter as public officials for elderly protective service in **Exhibit 87**).

405.     **Defendant Diane Powell** of **Defendant ESMV** was, also, actively involved in the matters of Antoinette Carpinone.

406.     As stated by **Defendant Attorney Berid**, in her signed pleadings filed with the Essex Probate & Family Court, **Judge Blake** had "ordered Petitioner [**Defendant ESMV**] to file a Conservatorship Petition requesting that **Susan Hubbard** be appointed as Conservator (as recommended by the GAL)."  (Copy of Defendant Attorney Berid's pleading).

407.     As previously set forth, **Attorney Susan Hubbard** was **Defendant Attorney Cuffe's** suitemate; and was court appointed as conservator and co-guardian over Antoinette Carpinone.  For several years, Attorney Hubbard and Defendant Attorney Cuffe have shared a small two-room office suite; with, both, regularly accepting SJC Rule 1:07 court appointed work from the Essex Probate & Family Court.

408.     In **February of 2009**, **Attorney Hubbard**, as conservator, filed a Bond with the Essex Probate & Family Court, having stated and certified that Antoinette Carpinone had "0" value in real estate and $17,000 in personal assets.  That Bond shows that **Defendant Attorney Cuffe** had *vouched and signed for Attorney Hubbard as a personal surety*.  (Copy of filed personal surety is provided in **Exhibit 88**).

409.     It was well established and on record prior to **February of 2010**, that Antoinette Carpinone and her sister (Lillian Schiavoni) were joint owners of the house in which Antoinette Carpinone resided.

410.     When **Attorney Hubbard** subsequently became permanent conservator, she filed a subsequent Bond (in **February of 2010**) stating that Antoinette Carpinone *had "0" value in terms of, both, personal assets and real estate*—evidencing Attorney Hubbard having knowingly and deliberately made false representations.  (Copy of the afore-described Bond and the Bond filed in March of 2010 in Atty Hubbard's handwriting—and suspect resignation of Richard Carpinone as co-guardian are provided in **Exhibit 89**).

411.    Provided in **Exhibit 90** is documentation by the court appointed GAL indicating that **Attorney Hubbard**—as conservator—used Antoinette Carpinone's estate to engage in _reverse mortgage_ transactions.  Also provided is the filed Inventory on showing six figures worth of assets and the filing of Antonette Carpinone as insolvent on

412.    In **April of 2009**, **Defendant BNY Mellon** was, also, involved in the guardianship matter of Antoinette Carpinone.  The GAL had sent letters of inquiry and certified appointments to **Defendant BNY Mellon**.  (Provided are copies of relevant portions of GAL's invoice showing Defendant BNY Mellon's involvement in **Exhibit 91**).

413.    As previously set forth, asset liquidation is the main objective of the criminal enterprise embedded in the Probate & Family Court.  Consistent with the established pattern of accomplishing asset liquidation, **Defendant ESMV** _initiated_ court action; then sought judicial declaration of the sisters as being incapacitated, followed by removal of Antoinette Carpinone and other occupants from the residence.

414.    Provided in **Exhibit 92** are proposed court orders for liquidation filed by **Attorney Hubbard** and an Order issued by **Judge Blake** authorizing Attorney Hubbard to take out an equity loan.

415.    On **March 21, 2011**, **Attorney Hubbard** sought a court order for DNR/DNI pertaining to Antoinette Carpinone—which DNR/DNI was _not_ initiated or wanted by involved family members.  Antoinette Carpinone died on **March 24, 2011**. (Copy of the allowed Do Not Rescuscitate/Do Not Intubate Order—herein referred to as "DNR/DNI"—issued by **Judge Amy Blake** is provided in **Exhibit 93**).

416.    In **June of 2010, Defendant Attorney Ledoux** became involved in the guardianship matter pertaining to Antoinette Carpinone, as private counsel representing Philip Schiavoni (nephew of Antoinette Carpinone).  **Defendant Right At Home** had, also, been involved from **July of 2010 to February of 2011**.  (Provided in **Exhibit 94** are copies of court records showing the above-described involvement).

### iii.  **Carry-over of embedded relationships in probate matters contemporaneous with that of In re Marvin H. Siegel**

**Matters regarding Robert and Gertrude Pigeon**

417.    In **2007**, Robert G. Pigeon was having gradual loss of memory. **Dr. Janice Funk** (neuropsychologist), through her affiliation with Whittier Rehabilitation Hospital began seeing Robert Pigeon (then 88 years-old) as a client.

418.    Robert Pigeon and his wife, Gertrude (then 86 years-old) resided in their own house, which they had owned for, approximately, 60 years.  Their son (Robert A. Pigeon), as well as, nieces and part-time professional vistiting nurses helping them with all their needs.

419.    Robert G. Pigeon (Father) owned an electrical business for over 40 years, with his son working with him full-time.  The daughter (Ann Cox) seasonally resided in Maine and Florida.

420.    Provided in **Exhibit 95** are copies of filed pre-trial memoranda, filed affidavits of son Robert A. Pigeon and daughter Ann Cox and other relevant court records.

421.    Robert Pigeon (Father) had long used John Cleary, Esq. as an attorney for his personal affairs.  In **1984**, he had Attorney Cleary prepare and execute his Will; and then in **February of 2009**, he had Attorney Cleary prepare and execute a health care proxy and durable power of attorney that designated his son (Robert A. Pigeon) as his attorney-in-fact.  In addition, Robert Pigeon had transferred his ownership of the business to his son.

422.    Months later, in **April of 2009**, the daughter (Ann Cox) had returned to New England for the season.  The court record shows—especially, from her own filed pleadings—that she felt slighted because her brother had been deemed attorney-in-fact by their father, where she then became intent on rifling through her father's financial affairs.

423.    **In June 2009**, the daughter brought her father to a notary to execute a written revocation of those afore-described instruments; after doing so, the daughter made a report to **Defendant ESMV** that her brother was financially exploiting her father.

424.    **Defendant ESMV** investigated and permitted Robert G. Pigeon (Father) to execute, through Attorney Cleary, a re-affirmation of the original durable power attorney that was executed in **February of 2009**.   Subsequent to that, in **October of 2009**, the daughter took her father to **Attorney Faith Delaney** and had him sign a new durable power of attorney.  (Attorney Faith Delaney was previously referenced in the introduction of this Complaint in the described case of Faith Delaney, guardian v. Gino DeGiacomo, Appeals Court No. 11P1826).

425.    Thereafter, **Defendant ESMV** had instructed the son (Robert A. Pigeon) to obtain a geriatric evaluation of his father and then initiate guardianship proceedings— which the son did.  (Copy of Attorney Thomas Schiavoni's attestation is provided in **Exhibit 96**).

426.    However, it is evident that **Defendant ESMV**, also, instructed the son to retain the private legal services of **Attorney Thomas Schiavoni** and his law partner, **Attorney Mary McGee**.  Attorneys Schiavoni and McGee have well-established partisan relationships with Defendant ESMV and **Defendant Attorney Cuffe** in other probate matters.  In addition, Attorneys Schiavoni and McGee, both, are regularly court appointed by the Essex Probate & Family Court per SJC Rule 1:07.

427.    **Attorney Schiavoni** filed a petition for the son to be appointed guardian on **November 23, 2009**—and specifically set forth that the son was attorney-in-fact for his father, through existing written durable power of attorney and health care proxy.

428.    On **December 17, 2009**, instead of the son (Robert A. Pigeon) being appointed as temporary guardian and conservator, **Judge Ricci** issued an order appointing **Defendant Attorney Cuffe** as guardian.  (Docket No. ES0932243PM).

429.    It is readily apparent that **Attorney Schiavoni** sandbagged his own client (son Robert A. Pigeon), as Attorney Schiavoni *had contacted* **Defendant Attorney Cuffe** *prior* to Defendant Attorney Cuffe being officially court appointed as guardian.  The court proceeding in which Defendant Attorney Cuffe was appointed took place on **December 17, 2009**.  Attorney Schiavoni *billed* for teleconferencing and communicating by email with Defendant Attorney Cuffe on **December 8, 2009**; as well as, having *prior* communications on **December 9, 2009** and **December 15, 2009**. (Provided in **Exhibit 97** is the copy of the invoice filed by Attorney Schiavoni, with the Essex Probate & Family Court showing the suspect communications).

430.    Compounding the suspect nature of the above-described communications is the fact that **Attorney Schiavoni's** invoice shows that, beginning on **December 17, 2011**, he started to use only the identifier of guardian—*no longer referring to Defendant Attorney Cuffe by name.*

431.     In **April of 2010**, **Defendant Attorney Cuffe** facilitated the removal of Robert and Gertrude Pigeon from their home and placed into the long-term care facility, **Methuen Village**—subsequently, Defendant Attorney Cuffe separated Robert and Gertrude; moving Robert to Sutton Hill Nursing Home in Andover, MA.

432.     Robert and Gertrude Pigeon's primary care physician was changed by **Defendant Attorney Cuffe** to a person identified as "Dr. Soma"—which was stated in an email from Defendant Attorney Cuffe's agent, **Defendant Michael Novack, LICSW**. (Copy of the email is provided in **Exhibit 98**).

433.     In **September of 2010**, Gertrude Pigeon having been diagnosed with dementia and Alzheimer's and placed in Methuen Village, Defendants began giving Gertrude Pigeon antipsychotics (Risperdal)—based on the medical certificate provided by **Defendant Dr. Janice Funk**.

434.     As previously set forth, **Defendant Dr. Funk** is listed as a clinical psychologist—who lists her office address as the same address as that of **Defendant Whittier Pavilion** (**76 Summer Street, Haverhill, MA**).  Defendant Dr. Funk is reported to be ranked in the top 5% of clinical psychologists to *receive* payments from Medicare. The reported *average* total Medicare payment received by clinical psychologists, nation-wide, in **2012** was **$ 12,989** and in Massachusetts was **$13,167**.  In **2012**, Dr. Funk's total Medicare payment received was **$115,641**.

435.     In **November of 2010**, **Defendant Attorney Ledoux**—at the behest of **Defendant Attorney Cuffe**—petitioned for guardianship of Gertude Pigeon; however, Defendant Attorney Ledoux withdrew his petition because the son objected.  (Provided in **Exhibit 99** is a copy of the letter from **Attorney Schiavoni** to Defendant Attorney Ledoux containing the above-described events).

436.     In **January of 2011**, **Defendant Attorney Cuffe** specifically filed a petition requesting that his suitemate, **Attorney Hubbard**, be appointed as conservator for Gertrude Pigeon.  (Copy of the petition is provided in **Exhibit 100**).

437.     On behalf of Daughter Ann Cox, **Defendant Attorney Cukier** filed specific written objections to the court appointment of **Attorney Hubbard** due to her being **Defendant Attorney Cuffe's** suitemate.  (Copy of the written objections are provided in **Exhibit 101**).

438.     In **March of 2011**, **Defendant Attorney Garmil** was court appointed as guardian for Gertrude Pigeon by **Judge Abber**.

439.    In **April of 2011**, Daughter Ann Cox hired **Defendant Attorney Cukier** to represent her as counsel—in which Defendant Attorney Cukier petition that she (herself) be appointed conservator.  (Refer to petition provided in prior referenced Exhibit 95).

440.    Despite previous estate planning executed prior to Robert and Gertrude Pigeon being deemed wards of the State, designated Defendants actively planned on creating new estate planning instruments for Robert and Gertrude Pigeon.  **Defendant Attorney Cuffe** conferred with **Attorney Maria Baler** of the law firm Samuel, Sayward and Baler LLC for such new estate planning strategies.  (Copy of the detailed letter from Attorney Baler to Defendant Attorney Cuffe is provided in **Exhibit 102**).

441.    Designated Defendants have conferred with **Attorney Baler**, in the matter of *In re Marvin H. Siegel*, *actively* and *fervently* pursuing ways to dismantle the **DSL Trust** and to create new estate planning instruments.  (Copies of relevant portions of Defendants' invoices are provided in **Exhibit 103**).

442.    Robert Pigeon died on **March 11, 2012** and Gertrude Pigeon died on **May 24, 2012**.  It is suspect that the **Essex Probate & Family Court** estate administration matter for Gertrude Pigeon is designated as being "closed" and the estate administration for Robert G. Pigeon is designated as "active"—where Robert Pigeon died 2 months *prior to* Gertrude Pigeon.  Of significance, Robert G. Pigeon had VA benefits showing that the reason for the discrepancy in status (Active vs. Closed) is because the Defendants are still collecting Robert Pigeon's VA benefits.  (Copies of the court dockets are provided in **Exhibit 104**).

### Matters of In re James and Hope Pentoliros

443.    James and Hope Pentoliros were husband and wife, having three adult sons (George, Perry and Larry).  They ran a family restaurant business in New Hampshire, known as Hope's Diner.  (Provided is a copy of newspaper article about the family diner business in **Exhibit 105**).

444.    George Pentoliros has held himself out to be a practicing medical doctor and Perry Pentoliros was retired, having had a business in real estate development.  Court records did not specify Larry Pentoliros' career history.

445.    Of significance, George Pentoliros has held himself out to the public as a doctor associated with **Amesbury Village Nursing Home**, as well as, **Lahey Clinic**. (Provided in **Exhibit 106** is a documented search of the Massachusetts registration site for licensed medical practitioners—which shows that there is _no_ record of licensure in Massachusetts for George Pentoliros).

446.     Public information shows "Dr. George Pentoliros" working for "Lahey Amesbury, 24 Morrill Pl., Amesbury, MA" and having purportedly graduated medical school from "Universidad Autonoma De Guadalajara, Facultad De Medecicina"—apparently, George Pentoliros did not pursue the added procedural requirements mandated by the Commonwealth of Massachusetts.  (Copy of the downloaded information is presented in **Exhibit 107**).

447.     George Pentoliros, also, had used a medical license number that is not valid.  He was identified as the certifying doctor on his aunt's death certificate (Helen Kichu—Hope Pentoliros's sister), which listed the afore-referenced medical license number; however, the medical license number is not registered with the Commonwealth of Massachusetts.  Helen Kichu purportedly died at home in **October of 2009**.   (Copy of Helen Kichu's death certificate is provided in **Exhibit 108**).

448.     The Will filed in the estate administration matter of Helen Kichu, with **Essex Probate & Family Court**, bequeathed a substantial greater portion of the estate to George Pentoliros.  (Copy of Helen Kichu's Will is provided in **Exhibit 109**).

449.     James and Hope Pentoliros began having health problems in **2008**, and so Perry had moved into his parents' home to be their caregiver.  In **2010**, James Pentoliros was hospitalized, and when he recuperated, he was then able to be discharged.  George's son (Tyler Pentoliros—who is an attorney) made a lot of commotion about his grandparents living in their own home; evidenced herein, Tyler had ulterior motives of selling his grandparent's residence (16 Longview, Haverhill, MA).  (Provided in **Exhibit 110** are copies of the affidavits and pleadings filed by Perry Pentoliros and Larry Pentoliros).

450.     Consequently, James and Hope Pentoliros moved into their son Larry's home—which was then renovated for handicap accessibility.  Their son, Perry, also, moved in to Larry's home to be their parents' caregiver.

451.     In **November of 2010**, Hope Pentoliros executed a Trust, as settlor—and deemed the three sons to be underline equal beneficiaries, *but naming only Perry and Larry as successor co-trustees*; showing ill-motives of George Pentoliros against his brothers (A copy of the Trust is provided in **Exhibit 111**).

452.     Around **April of 2011**, James Pentoliros's physical and mental condition had declined, making care at home not feasible; consequently, he was admitted to the VA in Bedford, MA.  As a result, Hope Pentoliros wanted to return to her own home (16 Longview), which Larry and Perry abided by her wishes.

453.    When Hope Pentoliros moved back to her own home with son Perry, George and his son (Tyler) were very upset when they found out.  **In September of 2011**, George and his son (Tyler) contacted **Defendant ESMV** and made allegations that Perry was financially exploiting their mother.

454.    Invoices of multiple counsel, filed with the Essex Probate & Family Court, show that representatives of **Defendant ESMV** involved in the matters of James and Hope Pentoliros included: **Defendant Attorney Berid**, **Defendant Caseworker Springman** and **Defendant Diane Powell**.

455.    On **October 11, 2011**, Tyler Pentoliros (George's son) retained Attorney Dennis Spurling to draft a durable power of attorney, naming Tyler Pentoliros as attorney-in-fact for his grandmother (Hope Pentoliros), which Tyler had Hope sign.  Through Attorney Spurling, Tyler Pentoliros filed a petition for guardianship over Hope Pentoliros on **October 21, 2011**.  (Copy of the petition is provided in **Exhibit 112**).

456.    On **January 24, 2012**, **Defendant Merrimack Valley Hospital** filed a petition for guardianship of James Pentoliros—the manner in which the petition was sought is suspect of illicit intent where the petitioner was identified only as **Beth Dymek, LICSW**.  There was no reference of any kind made regarding Defendant Merrimack Valley Hospital, yet the address listed for Beth Dymek was that of Defendant Merrimack Valley Hospital.

457.    Furthermore, the attorney who signed the petition was Suzanne Fuchs of the **law firm of Pierce and Mandell**—which is the *very same* law firm that employs **Defendant Attorney Saunders**.  Of significance, Defendant Attorney Saunders was directly involved in the matter of James Pentoliros, acting as counsel for Defendant Merrimack Valley Hospital.  (Copies of the afore-described petition for guardianship and pleadings submitted by Defendant Merrimack Hospital and by Defendant Attorney Saunders—on behalf of Defendant Merrimack Valley Hospital—are provided in **Exhibit 113**).

458.    As set forth, the above-described petition for guardianship of James Pentoliros filed by **Defendant Merrimack Valley Hospital** specifically requested that Tyler Pentoliros be appointed guardian.

459.    On **January 31, 2012**, **Judge Ricci** court appointed counsel for James Pentoliros (Attorney Daniel Zampino)—in **April of 2012**, Attorney Zampino sought court ordered removal of Tyler Pentoliros as guardian.

460.    On **February 1, 2012**, **Attorney Renee Lazar** of Bedford, MA, was court appointed by **Judge Ricci** to act as "counsel" for Hope Pentoliros—as evidenced herein, Attorney Lazar's conduct was *not consistent* with the intentions and desires of Hope Pentoliros.

461.    On **April 25, 2012**, counsel for Hope Pentoliros (Attorney Renee Lazar) filed a motion for temporary guardianship, to specifically place Hope Pentoliros in a nursing home—in which, she explicitly, requested that **Defendant Attorney Ledoux** be court appointed as guardian.  (Copy of the petition is provided in **Exhibit 114**).

462.    Also, at the court proceeding of **April 25, 2012**, **Judge Ricci** court appointed **Attorney Paul Gormley** as guardian and conservator for James Pentoliros. Attorney Gormley had represented, in his filing for Bond, that the value of James Pentoliros's personal assets and real estate as being "0"—where, the circumstances show that he knew full well that the estate was of substantial value.  (Copy of Bonds are provided in **Exhibit 115**).

463.    **Defendant Attorney Ledoux** had been contacted about the probate matters of James and Hope Pentoliros *prior* to his being officially court appointed as guardian and conservator of Hope Pentoliros at the court proceeding on **April 25, 2012**—as evidenced by Defendant Attorney Ledoux's own invoice that was filed with the **Essex Probate & Family Court**, he described his discussing the matter with court appointed counsel for James Pentoliros (**Attorney Zampino**) for *50 minutes* on **April 24, 2012**.  This was, also, reflected by Attorney Zampino in his filed invoice; in which he stated that he called Defendant Attorney Ledoux on **April 24, 2012**.  In the filed invoice of **Attorney Gormley** (court appointed guardian and conservator for James Pentoliros), he explicitly stated that he had discussed matters with Defendant Attorney Ledoux prior to the hearing.

464.    **Defendant Attorney Ledoux** filed a Bond with the **Essex Probate & Family Court** as guardian for Hope Pentoliros (on **August 25, 2012**)—in which he represented that the value of Hope Pentoliros's personal assets and real estate were: "0". As set forth above, Defendant Attorney Ledoux knew that the estate was of substantial value.  (Copy of Atty Ledoux's filing of the Bond is provided in **Exhibit 116**).

465.    On or about **August 1, 2012**, Defendants facilitated Hope Pentoliros being involuntary admitted to the psychiatric ward of **Defendant Merrimack Valley Hospital** and then placed her in **Amesbury Village**.  **Defendant Attorney Ledoux** had obtained a verbal court order from Judge Ricci authorizing Hope Pentoliros's removal from her home.

466.    On **August 3, 2012**, **Defendant Attorney Cuffe** was court appointed by **Judge Ricci** as GAL in the matters of James and Hope Pentoliros.  (When Hope Pentoliros died on **March 4, 2013**, Defendant Attorney Cuffe—having been court appointed GAL in, both afore-referenced Pentoliros matters—then became the proposed fiduciary for the estate administration proceedings for Hope Pentoliros.  Defendant Attorney Cuffe's interim report shows that **Defendant Attorney Ledoux** and **Attorney Gormley** knew the true value of the estate of James and Hope Pentolirios prior to their filing of their Bonds/   (Copies of the court appointment as GAL, GAL interim report and the docket sheets for the related matters are provided in **Exhibit 117**).

467.    On **August 6, 2012**, by ex-parte, **Defendant Attorney Ledoux**, again, went before **Judge Ricci** regarding the removal of Hope Pentoliros from her home.  **Defendant Attorney Ledoux** submitted a handwritten affidavit (on **August 6, 2012**), stating that he had previously requested a court order for Hope Pentoliros to be removed from her home at the court proceeding held on **August 1, 2012** and that **Judge Ricci** had given a *"verbal order"* to do so—and explained that he was back before Judge Ricci because he needed the court order for removal to be put in writing.  (Copies of the ex-parte motions and affidavit and court order are provided in **Exhibit 118**).

468.    **Defendant Attorney Ledoux**, in his afore-described affidavit explicitly explained the reasons why he needed **Judge Ricci** to put the court order in writing, wherein he stated:

> Since that date [August 1, 2012] the undersigned, together with all other counsel & elder services have attempted to find a way to remove her [Hope Pentoliros] from her home.

> If the court issues the requested order, it is the intention of the undersigned to visit the building inspector's office in Haverhill seeking condemnation of the family home or in the alternative visit the Haverhill District Court seeking apprehension under the provisions of Mass. General Laws Chap 123 § 12c.

469.    As previously set forth, son George Pentoliros had worked at **Amesbury Village** (purportedly as doctor) and had a contentious relationship with his brothers (Perry and Larry).  When Hope Pentoliros had been placed at Amesbury Village, the staff at Amesbury Village restricted visitation by Perry and Larry—the restrictions were imposed by the facility; *it was not court ordered*.  (Provided in **Exhibit 119** is a copy of motion filed by counsel requesting a court order to enable Perry and Larry Pentoliros to visit their mother).

470.     On **August 29, 2012**, counsel for Perry and Larry Pentoliros (Attorney William Sullivan) filed a motion with the Essex Probate & Family Court requesting that their mother be permitted to return to her home; that the sons would hire full-time professional home health care—*to be selected by the guardian*, so that their mother could live in her own home.  (Copy of the afore-described motion and affidavit is provided in **Exhibit 120**).

471.     Furthermore, in the above-described motion and supporting affidavit, counsel certified that he spoke with the Haverhill Health Inspector (Lisa Rosario) and he was informed an inspection had been done of Hope Pentoliros's home  (16 Longview), having documented the home to be in "excellent condition".

472.     No action was taken by the **Essex Probate & Family Court** as to the above-described filed motion and supporting affidavit; however, on **September 6, 2012**, **Judge Ricci** issued a court order allowing **Defendant Attorney Ledoux's** request to retain **Defendant Michael Novack** as "a geriatric care specialist" to evaluate "possible residential placement."  (Copy of the court order is provided in **Exhibit 121**).

473.     On **October 4, 2012**, **Judge Ricci** issued a court order that *all* the court appointees in the matters of James and Hope Pentoliros were to be paid *directly from the private estate* of James and Hope Pentoliros—which court order enumerated the named court appointees and had explicitly stated that the court appointees were to be paid from the private estate starting at the inception of their appointments, *not the date of the court order*.  (Copy of the court order is provided in **Exhibit 122**).

474.     In early **November of 2012**—based on ill-motives, **Attorney Lazar** sought a court order for son Perry Pentoliros to be subjected to a "mental examination" to supposedly determine whether he would be a suitable caregiver for his mother.  (Copy of the allowed court order issued by **Judge Ricci** is provided in **Exhibit 123**).

### iii. **Additional evidence of enmeshed relationships revealed in the matter of In re Marvin H. Siegel**

475.     As previously set forth, in the matter of In re Marvin H. Siegel, the specific roles of previously discussed Defendants consisted of:

**Defendant Attorney Garmil** represented **Defendant Whittier Pavilion**;

**Defendant Attorney Saunders** represented **Merrimack Valley Hospital**;

**Defendant Attorney Cuffe** was court appointed as guardian;

**Defendant Attorney Feld** was court appointed conservator;

**Defendant Attorney Ledoux** represented **Defendant Daughter Sheryl**;

**Defendant Attorney Berid** represented **Defendant ESMV** (with involvement of **Defendant Caseworker Springman** and **Defendant Diane Powell**); and

**Defendant Attorney Cukier** represented **Defendant BNY Mellon**.

476.     In the underlying matter of In re Marvin H. Siegel (ES11P1466GD, ES11P1465PM, and ES11E0075QP), **Judge Abber** had been the presiding judge commencing on **June 7, 2011** up and through **December 4, 2013**. **Judge Abber**, **Defendant Attorney Feld**, and **Defendant Attorney Cukier** worked together as co-fiduciaries in the same matter of In Re Esterina Milano, from **2009 through 2010**—which is set forth in detail herein this Complaint.

477.     **Defendant Attorney Studen**, counsel for **Defendant BNY Mellon**, directly solicited the legal services of **Defendant Attorney Ledoux** to represent **Defendant Daughter Sheryl**. Defendant Daughter Sheryl emailed **Defendant Attorneys Tarlow, DeNapoli** and **Watson,** on **June 22, 2011,** stating:

> I spoke to the attorney who is representing Mellon Bank regarding my Dad's financial account there.  Her name is Laura Studen.  Her firm is Burns and Levinson. . . . *[Laura Studen] said that she will send me the names of three attorneys that I can speak to, in order to get a second opinion.*

478.     **Defendant Daughter Sheryl** subsequently emailed **Defendant Attorney Laura Studen,** on **June 26, 2011**, stating:

> I am pleased that **Atty. Robert Ledoux** phoned you and that he filed his appearance on behalf of me and my sister Devora. . . .  I would still like to get a second opinion from other lawyers to determine if there is something that Devora and I can do to proactively stop my sister rather than be in react mode all the time.  Could you please still send me the names of three attorneys that I can speak with to get another opinion.

479.     As previously set forth, **Defendant Attorney Cuffe** had engaged in a substantial amount of services from **Attorney Baler** with intent to change Father's already executed estate planning—as he did in the matters regarding Robert and Gertrude Pigeon.

480.     **Defendant Whittier Pavilion** facilitated Father being treated via outpatient by a private practicing psychiatric doctor—**Defendant Dr. Ping Cui**—when Father had been discharged.  Defendant Dr. Cui was, also, involved in the probate matter of In re Regina Ianalfo, in which **Defendant Attorney Garmil** was court appointed guardian for Regina Ianalfo.

481.     While Regina Ianalfo had been a patient at **Amesbury Village**, her niece was informed by the staff of Amesbury Village that her aunt needed to be treated with antipsychotics—which was the very first time that her aunt had ever been prescribed antipsychotics and is highly suspect that the timing was when her aunt's private funds were near depletion and that Medicare was needed to cover expenses.  (Provided in **Exhibit 124** are copies of pleadings in the matter of Regina Ianolfo).

482.     For illicit reasons described herein, **Defendant Attorney Cuffe** replaced **Defendant Dr. Ping Cui** with **Defendant Dr. Robert Portney**, as treating psychiatrist for Father.  Defendant Dr. Portney is, also, affiliated with **Defendant Whittier Pavilion**.

483.     **Defendant Dr. Portney** had been involved in the previously discussed matters of **Antoinette Carpinone**—**Defendant Attorney Berid**, on behalf of **Defendant ESMV** had Defendant Dr. Portney evaluate Antoinette Carpinone (which is described in further detail herein).

484.     **Defendant Attorney Cuffe** terminated Father's personal primary care doctor (Dr. Ellenbogen) and *all* of Father's other <u>long-held</u> personal medical specialty providers (urologist, dermatologist, gastroenterologist doctor, neurologist, and the like).  Defendant Attorney Cuffe then replaced Father's primary care doctor with **Dr. Spencer Amesbury**—whom has a *long-established* working relationship with Defendant Attorney Cuffe's suitemate, **Attorney Susan Hubbard**.

485.    For several years, **Dr. Amesbury** and **Attorney Hubbard** have been members together on the **Board of Health for the Town of Ipswich**.  (Provided in **Exhibit 125** is documentation of that relationship).

486.    **Dr. Amesbury**, also, works for nursing homes and other long-term care facilities.  He certified the death certificate of **Hope Pentoliros**— yet, he *was not* the doctor obtained by designated Defendants to provide a letter purportedly supporting **Defendant Attorney Ledoux's** zealous pursuit for a court-ordered DNR/DNI.

487.    **Dr. Amesbury** is listed as a family practitioner with Medicare. And reported to be ranked in the <u>top 10%</u> of family practitioners to *receive* *payments from Medicare*.  The reported *average* total Medicare payment received by family practitioners, nation-wide, in **2012** was **$33,324.10** and, in Massachusetts, was **$27,168**.  In **2012**, **Dr. Amesbury's** total Medicare payment received was **$158,546.02**.

488.    A wrongful death suit was brought against **Dr. Amesbury** for care that he provided for Harborside Healthcare in Essex Superior Court (Docket No. ESCV2010-01833)—which resulted in Dr. Amesbury agreeing to a settlement out-of-court.  (Provided in **Exhibit 126** are court records from the malpractice suit).

489.    **Dr. Amesbury** was, also, the attending physician in a probate matter that **Defendant Attorney Cuffe** had been court appointed as special administrator for decedent Mary Walker.  (Copy of Death Certificate for Mary Walker provided in **Exhibit 127_**

490.    Highly suspect conduct on the part of **Defendant Attorney Cuffe's** court appointment is demonstrated in the court documents provided, demonstrating the following suspect indicators:

the estate of Mary Walker was reported as having very little of any value for personal estate—Masshealth had reported to the Commonwealth that it was owed approximately 11,000—and listed only one property of approximately $220,000 (documentation regarding Masshealth is provided in **Exhibit 128**);

there are 3 estate dockets for the decedent <u>Mary Walker</u>, who died in **<u>December of  2006</u>** (ES09P3189EA, ES10P3566EA, ES11P0592EA—copies of which are provided in **Exhibit 129**).  It appears that Mary Walker had 3 daughters: Elizabeth Shafner; Ellen Walker and Anne Ackerman;

the first petition regarding the estate administration for Mary Walker was filed one month shy of <u>three (3) years</u> after Mary Walker died—which the docket (ES09P3189EA) states that the petitioner for that matter was Elizabeth Shafner, being represented by John Christopher, Esq;

the docket for ES09P3189EA shows that **Judge Sahagian** originally appointed **Defendant Attorney Cuffe** as GAL on **December 2, 2009**, which Judge Sahagian purportedly voided on that same date and then on **December 8, 2009**, she appointed him as "fiduciary";

Ellen Walker subsequently filed a petition to probate in **December of 2010** which was opened as Docket ES10P3566EA.  In that petition it was indicated Elizabeth Shafner had died in **May of 2010**—she was identified in the petition as "Elizabeth Shafner Estate *Alan Shafner* Executor".

Ellen Walker and **Alan Shafner** had specifically requested in Ellen Walker's petition that **Defendant Attorney Cuffe** be appointed Special Administrator— which was allowed.  Alan Shafner was law partner law in the firm of Shafner, Keating & Cuffe—and is the same law firm that had previously employed **Defendant Attorney Cuffe** (copy of the petition filed by Ellen Walker and a cover letter filed by Defendant Attorney Cuffe holding himself out to the public as having worked as an attorney for Shafner, Keating & Cuffe in an unrelated matter provided in **Exhibit 130**);

Anne Ackerman filed a petition to probate her mother's estate (Mary Walker) in **March of 2011** (ES11P0592EA)—a copy of the petition is provided in **Exhibit 131**.  The two earlier dockets (ES09P3189EA, ES10P3566EA) do not record that Mary Walker had a will—it was only *first* raised in the last petition filed by Ann Ackerman.  Provided is a copy of Ann Ackerman's motion to revoke in which she attests as to the illicit motives of Defendant Attorney Cuffe and his cohorts' not presenting Mary Walker's will in the prior estate matters for Mary Walker—as Elizabeth Shafner and Ellen Walker financially benefitted through Mary Walker's estate being probated as intestate;

the docket sheet for the original petition for probate (ES09P3189EA) *does not* identify Ellen Walker or Anne Ackerman as interested parties;

during litigation of the second petition (ES10P3566EA), Defendant Attorney Cuffe brought a Complaint for Contempt against Ann Ackerman—which was presided over by **Judge Ricci** and in Defendant Attorney Cuffe's favor (Copy of Complaint for Contempt is provided in **Exhibit 132**);

the nature of the proceedings that took place in the last petition to probate Mary Walker's estate—filed by Anne Ackerman—and the time span is very suspect, with a final settlement and case closed in **April of 2014**.

491.    In **September of 2012**, **Defendant Attorney Cuffe** was court appointed guardian in the matter of In re Lay Bou.  Defendant Attorney Cuffe specifically requested that **Defendant Attorney Feld** be court appointed as GAL—which was allowed.  (Copy of the court appointment regarding Defendant Attorney Feld is provided in **Exhibit 133**).

### B.  Evidenced tendency of designated judges of the Essex Probate & Family Court involving bribery and illicit collusion

### i.  Improper use of judicial status by Judge Jeffrey Abber and Judge Susan Ricci to financially benefit the Massachusetts Association of Guardian ad Litems (MAGAL)

492.    MAGAL is a professional association which membership is exclusively comprised of people certified to accept court appointments as GAL.

493.    Provided is a copy of a flyer for a <u>fundraising</u> event held by MAGAL in **Exhibit 134**—which the specific purpose of the flyer was to sell tickets to the fundraising event, featuring **Judge Abber** and **Judge Ricci** as key speakers for the event. The graphics for the flyer had a Madi Gras theme, with the caption of "Let the Good Times Roll" translated in French.

494.    Plaintiffs reported the above-described information—and provided substantiating documentation—to the Judicial Conduct Commission in a formal written complaint filed on **March 27, 2014**.  The Judicial Conduct Commission's deliberate disregard of this information is set forth in detail herein this Complaint.

### ii.  Engaging in prohibited membership by Judge Jeffrey Abber and Judge Amy Blake

495.    **Judge Jeffrey Abber** and **Judge Amy Blake** are listed as current members of the **American Association of Matrimonial Lawyers** (AAML).

496.    Explicitly stated in the membership information distributed by the **AAML**, judges who are actively sitting on the bench are supposed to be prohibited from being members.  (A copy of the membership criteria is provided in **Exhibit 135**—along with the narrative of the purpose and scope of the organization and the downloaded list of Massachusetts members from the website of the AAML).

497.    Provided in **Exhibit 136** are copies of recent <u>individual profiles</u> on the **AAML** website for **Judge Abber** and **Judge Amy Blake**.

498.    Plaintiffs Daughters reported the above-described information—and provided substantiating documentation—to the Judicial Conduct Commision in a formal complaint filed on **March 27, 2014**.

## Evidenced improprieties in Judge Abber's listed profile with the AAML

499.    **Judge Abber** <u>does</u> <u>not</u> identify himself as a judge in his existing "profile" with the **AAML**—as previously set forth, **AAML** states that a *member <u>cannot</u> be a sitting judge*.

500.    **Judge Abber's** contact information gives his address as: 105 Salem Street, Malden, MA—which is the address of his former law practice.  (Refer to provided invoices of then-Attorney Abber regarding the matter of In Re Esterina Milano).

501.    105 Salem Street is, also, property that **Judge Abber** still co-owns with Attorney John Todisco.   (Provided is a copy of current information filed with the Secretary of State's Office, which lists Judge Abber as co-owner of the above-referenced property in **Exhibit 137**).

502.    Attorney John Todisco operates his law practice and is registered with the **BBO** with his office listed as: 105 Salem Street, Malden, MA.  (Copy of the BBO registration information is provided in **Exhibit 138**).

503.    **Judge Abber** lists his telephone number in his profile with **AAML** as: 781-324-4711—which is the <u>same telephone number for John Todisco's law office</u>, as evidenced by Attorney Todisco's registration information with the BBO.

## Evidenced improprieties in Judge Blake's listed profile with the AAML

504.    Like **Judge Abber**, **Judge Blake** *<u>does</u> <u>not</u>* identify herself as a judge.

505.    **Judge Blake's** contact information listed with the **AAML** was the then *address of the Salem Division of the Essex Probate & Family Court*.  Conspicuously, Judge Blake only provides the address, and deliberately *<u>omitted</u>* the designation of the address being the location of the Essex Probate & Family Courthouse in Salem, MA.

**C. Evidence of designated Defendants' actual use of bribery in the matter of In re Marvin H. Siegel**

506.    At the court proceeding held on **January 24**, **2012**, in the matter of In re Marvin H. Siegel, **Judge Abber** stated that he <u>did</u> <u>not</u> want the parties, in this specific matter, to bring motions before other sitting judges in the Essex Probate & Family Court; that he wanted *all* motions, in this matter, to be solely brought before him.

507.    **Judge Abber** presided over the trial, pertaining to permanent guardianship and conservatorship.  The trial was conducted on the *separate and individual* days of: **June 27, 2012**, **June 29, 2012**, **July 2, 2012** and a half-day on **July 11, 2012**.

508.    At the court proceeding held on **October 22, 2012**, **Defendant Attorney Feld** submitted to **Judge Abber** a written motion to increase amount of funds by *another* $1 million—a copy of which is provided in **Exhibit 139**.

509.    **Judge Abber** had *<u>specifically</u>* and *<u>directly</u>* asked **Defendant Attorney Feld** (conservator) if there was a problem with the existing bond in this matter. Unequivocally, the audio recording demonstrates that **Defendant Attorney Feld** led **Judge Abber** to believe that there was *<u>no issue</u>* with the existing Bond; which led **Judge Abber** to state that he would have his clerk (Peter Krosunger, Esq.) prepare the paperwork for the additional $1 million for when he (Judge Abber) returns from vacation. (The court audio recording for **October 22, 2012** is provided in prior referenced Exhibit 23).

510.    **Defendant Attorney Feld** responded by overtly inquiring how long **Judge Abber** would be away.  When Judge Abber said he would be away for two (2) weeks, conspicuously, **Defendant Attorney Ledoux** quickly interceded and stated that "if <u>needed</u>" the administrative clerk, **Julie Matuschak** (clerk and former Board Member with **Defendant Attorney Berid**) could do it for Judge Abber while he was away—to which Judge Abber indicated that this was acceptable <u>if</u> an *urgent* situation arose.

511.    Confirming the fact that **Judge Abber** had ended the hearing of **<u>October 22, 2012</u>** with the specific understanding that there was *no existing urgency* to issue an additional $1 million bond at that time**,** Judge Abber left the above-described submitted Bond unsigned, and with a single-line crossed through the rubber-stamp for allowance or denial (see prior referenced Exhibit 139).

512.    As evidenced, **Judge Abber**, intentionally and deliberately, *did not* take action regarding the Bond request for **Defendant Attorney Feld.**

**Ex-parte dealings between designated Defendants and Judge Ricci on
October 24, 2012 & October 25, 2012**

513.    On **October 22, 2012**, **Judge Abber** issued permanent decrees and orders
for permanent guardianship and conservatorship in the matter of In re Marvin H. Siegel,
along with issuing written findings from the afore-described trial that took place in **mid-
July 2012**.

514.    Even though **Judge Abber** had held a court proceeding, in the matter of In
re Marvin H. Siegel during the *morning* of **October 22, 2012,** he waited until the very end
of the day to issue the above-described decrees and orders.  (Refer to court audio
recording in prior referenced Exhibit 23).

515.    Prior to **October 24, 2012**, **Judge Susan Ricci** did not have *any* official
role as presiding judge in the matter of In re Marvin H. Siegel; and, as previously set forth,
**Judge Abber** had strongly expressed to the litigants in the matter of In re Marvin H.
Siegel, that he did not want the parties bringing motions before any other judge.

516.    On **October 24, 2012**, *without any notice* to Plaintiff Daughters,
**Defendant Attorney Feld**, **Defendant Attorney Cuffe**, and **Defendant Attorney
Ledoux** requested **Judge Ricci** to vacate the afore-referenced permanent decrees issued by
**Judge Abber** on **October 22, 2012**; they requested Judge Ricci to give greater authority
to Defendant Attorneys Feld and Cuffe than the original decrees and orders.

517.    **Defendant Attorney Feld** and **Defendant Attorney Cuffe**, specifically,
requested in writing for **Judge Ricci** to issue brand <u>new</u> decrees—with *new and additional*
provisions.  (Copies of the motions to vacate Judge Abber's permanent decrees issued on
**October 22, 2012** filed by Defendant Attorney Feld and Defendant Attorney Cuffe are
provided in **Exhibit 140**).

518.    In the above-described motions to vacate **Judge Abber's** decrees and
orders of October 22, 2012, **Defendant Attorney Cuffe** and **Defendant Attorney Feld**
did not proffer, in any manner, that their requested relief involved any exigent or urgent
circumstances necessitating their bringing these motions before Judge Ricci.

519.    **Defendant Attorney Feld** requested that **Judge Ricci** issue (2) Bonds in
the matter of In re Marvin H. Siegel, totaling **<u>$6.7 million</u>**—(one for $1 million and the
other for $5.7 million).

520.    Copies of the decrees and orders issued by **Judge Ricci** are provided in
**Exhibit 141**.

521.     As previously set forth, at the court proceeding of **October 22, 2012** (before Judge Abber), **Defendant Attorney Feld** _did_ _not_ request a bond amount of **$6.7 million**.  The court recordings of **October 22, 2012** and the afore-referenced written motion submitted to **Judge Abber**, on **October 22, 2012**, by **Defendant Attorney Feld** evidence that Judge Abber _did not_ intend to allow _more than_ an additional **$1 million** bond—and, _unequivocally,_ Judge Abber did not intend to issue bond(s) for **$6.7 million**.

522.     In **Defendant Attorney Cuffe's** motion to vacate—submitted to **Judge Ricci**, he stated that the reason for vacating the permanent decrees and orders issued by **Judge Abber** was based on:

> the last paragraph on page 1 of the Decree does not specify whether the guardian's powers are limited or not limited.  The guardian understood that his powers were not limited.

523.     **Defendant Attorney Cuffe** did not _proffer_ any evidence to support his assertion that **Judge Abber** intended to have the decree of permanent guardianship give unlimited authority to the guardian.  As previously set forth, **Judge Ricci** _did not_ preside over the trial for permanent guardianship and conservatorship, which evidences the inherent unethical and unprofessional nature of Judge Ricci vacating Judge Abber's issuance of the above-described permanent decrees.

## Established outside-of-court relationship between designated Defendants and Judge Ricci

524.     For several years, up until **December 5, 2013**, **Judge Susan Ricci** had been sitting as a judge in the **Essex Probate & Family Court**.

525.     **Judge Ricci** and **Defendant Attorney Ledoux** had served years, _together_, on the **Supreme Judicial Court's Mental Health Legal Advisory Board**.

526.     Lending support to the existence of ulterior motives by **Defendant Attorney Ledoux** and **Judge Ricci**, it is demonstrated that—as a matter of practice—the **Mental Health Legal Advisory Committee** _does not_ truly advocate on behalf of _incapacitated individuals_.  A prime example is in Fazio v. Fazio, 375 Mass. 394, fn9 (1978), where the **Mental Health Legal Advisory Committee** filed an amicus brief _arguing that the ward should be deemed mentally ill_.

527.     As previously set forth**, Judge Ricci**, **Defendant Attorney Cuffe** (guardian), and **Defendant Attorney Ledoux** are all members of the **MBF Society of Fellows**.

528.    There is established prior illicit outside-of-court communications involving **Judge Ricci** and designated Defendants in the previously described matters of James and Hope Pentoliros.  This is evidenced by the handwritten note made by **Judge Ricci**, which Plaintiff Daughter Lisa found in the public court files for the matters of James and Hope Pentoliros.  (Copy of the note is provided in **Exhibit 142**).

529.    The afore-described note stated:

> I have reviewed 4 motions – 3 by Collela & 1 by Gormley.
> I think 3 of them should be Complaints for Contempt.
> If you agree – have Julie or Ralph or Jeannie [staff of the Clerk's Office] call Collela to refile Cs for C [Complaints for Complaint] – & I will give short date for summons.

**Surreptitious court proceeding held by Judge Ricci on October 25, 2012**

530.    Designated Defendants obtained a court proceeding before **Judge Ricci** on **October 25, 2012,** without any notice to Plaintiff Daughters—with deliberate intentions and acts to keep Plaintiff Daughters from knowing that such proceeding was held.

531.    Plaintiff Daughter Lisa learned about the ex-parte proceeding of **October 25, 2012** out of mere happenstance; when she had obtained updated docket sheets for review and saw notations indicating that the ex-parte hearing was held.

532.    The court audio recording for the proceeding of **October 25, 2012** is provided in prior referenced Exhibit 23.

533.    In the court audio recording, right at the very start of the proceeding— *immediately* after the identification of the case (In re Marvin H. Siegel), the *very first words* spoken by **Judge Ricci** were: **"This case goes under, no good deed goes unpunished."**

534.    It is well established that **Judge Ricci's** above-described comment was specifically directed at Plaintiffs—and at Plaintiff Daughter Lisa, in particular; as the court record shows Plaintiff Daughter Lisa had *repeatedly and continuously* presented evidence, in open court, of Defendants' and **Judge Abber's** misconduct; as well as, Plaintiff Daughters having submitted concrete documentation of misconduct to the Office of Bar Counsel and to the Judicial Conduct Commission.  It was well-established—even in the face of blatant and flagrant malicious retaliatory conduct—that Plaintiff Daughters were not going to back down or give up their legal pursuit to protect their father's constitutional rights, as well as their own individual constitutional rights

535.   *Prior* to **October 25, 2012**, Plaintiff Daughters had filed multiple written complaints to the **Office of Bar Counsel** against designated Defendants; misconduct in the matter of In re Marvin H. Siegel—including but not limited to: **Judge Abber, Defendant Attorney Ledoux, Defendant Attorney Feld, Defendant Attorney Cuffe**.

536.   *Prior* to **October 25, 2012**, Plaintiff Daughter Lisa made an in-person report to the **Judicial Conduct Commission** regarding misconduct by **Judge Abber**.  In **March of 2012,** Plaintiff Daughter Lisa physically went to the office of the Judicial Conduct Commission to give an in-person attestation because of the graveness of judicial misconduct committed by Judge Abber and to prevent her family's further suffering of irreparable harm.  Immediate action was necessary—but due to the extraordinary intricacy and voluminous concrete evidence in Plaintiff's possession, it was not possible to file a sufficiently adequate written complaint at that time.  So, Plaintiff Daughter Lisa went to the office of the Judicial Conduct Commission with two (boxes) filled with supporting documentation.

537.   When Plaintiff Daughter Lisa went to the office of the Judicial Conduct Commission—with the boxes of supporting documentation, she informed the receptionist she wanted to make an in-person complaint.  Counsel came out to the reception area to speak with her.  Despite, Plaintiff Daughter Lisa explaining the urgent and immediate circumstances to counsel, he stated that the complaint needed to be in writing.  However, counsel did ask for the specific name of the probate court judge and the court in which the judge was presiding—which Plaintiff Daughter Lisa did provide that information to counsel.

538.    **Judge Ricci** had previously served a six-year term as a member of the Judicial Conduct Commission, having served two (2) years as Chair; while, **First Justice Mary Ann Sahagian** of the Essex Probate & Family Court had been serving on the Judicial Conduct Commission—and continues to do so through the present.

539.   **Judge Ricci's** immediate comment at the proceeding of **October 25, 2012**—"this case goes under no good deed goes unpunished"—evidences that Plaintiff Daughter Lisa's discussion with counsel at the Judicial Conduct Commission had been relayed back to Judge Ricci.

540.   In addition, *prior* to **October 25, 2012**, Plaintiffs filed a civil action with the **Supreme Judicial Court**, seeking emergency injunctive and declaratory relief that was wholly based on misconduct by **Judge Abber** and designated Defendants.  (Copy of the civil action is provided in **Exhibit 143**).

541.   Throughout the entire proceeding of **October 25, 2012**, **Judge Ricci** and the designated Defendants engaged in malicious bantering and laughter.

542.     As stated in the court audio recording, the *only* reason that the court proceeding took place was out of necessity to cover up for the fact that **Judge Ricci** had made a mistake on the decrees and orders that she had signed the day prior (**October 24, 2012**).

543.     Heightening the illicit nature of the proceeding was **Judge Ricci's** statements as to *why* she was purportedly holding the proceeding.  She gave a *very* elaborate nonsensical explanation as to how she was just doing what Judge Abber had asked her to; giving a very detailed description of fabricated events as to *supposedly why* Judge Abber asked her to sign the afore-described decrees and orders.  (Set forth herein is solid and concrete evidence that **Judge Abber** de facto *did not* ask Judge Ricci to act on his behalf).

544.     During the ex-parte proceeding, the discussion that took place amongst **Defendants Attorneys Feld, Defendant Attorney Ledoux** and **Judge Ricci** involved them outright stating that Judge Ricci had inadvertently signed her own name on the decree—that she should have signed Judge Abber's name.

545.     In the audio court recording of **October 25, 2012**—at the time it was explicitly made known that **Judge Ricci** was actually signing the new decrees of permanent guardianship and conservatorship—**Defendant Attorney Ledoux** stated to Judge Ricci that **she could "now retire on this case."**   Judge Ricci responded that she did not agree to retire; that she had only agreed to sign the Bonds and Decrees.

546.     The very manner in which **Defendant Attorney Cuffe** and **Defendant Attorney Feld** sought **Judge Ricci** to amend the permanent decrees shows that they knew **Judge Abber** *did not* have any intention to implement the changes made; further evidencing the very reason why a monetary incentive was needed to have Judge Ricci facilitate designated Defendants' requested decrees and orders.


**Established evidence that Judge Abber, in fact, had *no* knowledge, of the events of October 24, 2012 and October 25, 2012**

547.     Further proving that the above-described acts were carried out purely for illicit motives is the audio recording of the court proceeding held on **December 11, 2012**—a copy of which is provided in previously referenced Exhibit 23.

548.     During the proceeding held on **December 11, 2012**, Plaintiffs provided **Judge Abber** (and all opposing counsel) with copies of the audio recording for the ex-parte proceeding of **October 25, 2012**.

549.    When Plaintiff Daughter Lisa informed **Judge Abber**, in court

550.    on **December 11, 2012**, about what had taken place while Judge Abber was on vacation, he reacted in a manner that, unequivocally, showed he had absolutely no clue about the ex-parte proceedings of **October 25, 2012**.

551.    At the hearing held on **December 11, 2012**, **Judge Abber** outright requested that **Defendant Attorney Feld** explain *why* he went to **Judge Ricci**, while he (Judge Abber) had been on vacation.

552.    The audio recording of **December 11, 2012** evidences that **Judge Abber** *de facto* did not ask **Judge Ricci** to act on his behalf—affirmatively proving that **Judge Ricci** lied when she *explicitly* made the representation, during the ex-parte proceeding of **October 25, 2012**.  The evidence shows that she purposefully misrepresented that Judge Abber had supposedly asked her to act on his behalf because the electricity supposedly went out in the courthouse at 10:30 a.m. on **October 22, 2012** and he was immediately leaving for vacation.

553.    The audio recording for the hearing of **October 22, 2012** shows that **Judge Abber** expressly indicated that he was not leaving until the end of the day; as well as—and previously set forth, that Judge Abber had no administrative problems because he had, personally, issued other orders and judgments later that day on **October 22, 2012**.

554.    Further bolstering the fact that **Judge Ricci** and the designated Defendants illicitly colluded are the very sarcastic and negative intimations that Judge Ricci specifically directed at **Judge Abber**—such statements are very inconsistent with the attitude of doing someone a favor; rather, such statements affirmatively show a tone of Judge Ricci enjoying the, proverbial, stabbing a knife in Judge Abber's back.

### D.  Evidence of bribery in the matters of James and Hope Pentoliros

### i.  Overview

555.    As previously set forth, **Defendant Attorney Ledoux** was court appointed guardian and conservator for Hope Pentoliros—which was inextricably enmeshed with the matter of In re James Pentoliros.

556.    From **February 1, 2013 through February 14, 2013**, **Defendant Attorney Ledoux**—as court appointed guardian for Hope Pentoliros—*personally* and *fervently* sought a DNR/DNI court order.  (Provided are copies of Defendant Attorney Ledoux's initial motions for DNR/DNI and other contemporaneous motions in **Exhibit 144**).

557.     Hope Pentoliros's sons did not initiate or take an active role in seeking a DNR/DNI.  The afore-referenced audio court recordings of **February 6, 2013**, **February 14, 2013** and **February 20, 2013** show that **Defendant Attorney Ledoux's** pursuit of a DNR/DNI court order was *solely* motivated for financial ill-gotten gain— which court audio recordings are provided in **Exhibit 145**.

558.     Bolstering the existence of ill-motives by **Defendant Attorney Ledoux** in seeking a DNR/DNI consists of: the previously described manner in which Defendant Attorney Ledoux had forced Hope Pentoliros out of her home and into a long-term care facility; and the fact that Defendant Attorney Ledoux, on **February 5, 2013**—*1 day before filing the motion for DNR/DNI*, Defendant Attorney Ledoux filed a Complaint for Contempt against son Perry Pentoliros to force him to turn over *lawfully* possessed funds of over **$1.3 million** to Defendant Attorney Ledoux. (Copy of the Complaint for Contempt against Perry Pentoliros and of pleadings with admissions by Defendant Attorney Ledoux that the Complaint for Contempt was baseless and illicit are provided in **Exhibit 146**).

### ii.  Details of ex-parte hearing before Judge Ricci on February 6, 2013

559.     **Judge Ricci** was the presiding judge over the matters of In re Hope Pentoliros and In re James Pentoliros.   She held a court hearing regarding **Defendant Attorney Ledoux's** motion for a DNR/DNI on **February 6, 2013**—which audio of court proceeding is in previously referenced Exhibit 145).

560.     **Defendant Attorney Ledoux's** sole claimed reason for his pursuit of a DNR/DNI Order was based on Hope Pentoliros having pneumonia.

561.     In court, **Defendant Attorney Ledoux** represented to **Judge Ricci** that he had been informed that Hope Pentoliros was in "full code" and that the doctors gave her "six (6) months to live"— again, on the basis of having *pneumonia*.

562.     Conspicuous is the fact the usual phrase—"6 months to live"—is *not* customarily associated with pneumonia.  It is common knowledge that pneumonia is a condition that ordinarily involves a matter of weeks, *not* months.

563.     Further evidencing that **Defendant Attorney Ledoux** had been fabricating the state of Hope Pentoliros to obtain a court order for a DNR/DNI is the fact that counsel for Hope Pentoliros (**Attorney Renee Lazar**) explicitly represented—at the hearing of **February 6, 2013**—that she had just visited, days prior, with Hope Pentoliros and that Hope was "alert" and "very happy to see [counsel]."  Attorney Lazar explicitly represented that Hope Pentoliros was able to have an intelligible conversation with her.

564.     It is suspect that **Attorney Lazar** explicitly represented that Hope Pentoliros had expressed, *personally,* wanting a DNR/DNI Order, where Attorney Lazar had described Hope Pentoliros as being lucid and cognizant.  It is suspect that if the above-described representations made by Attorney Lazar were true, the usual and customary practice for counsel would have been to submit an affidavit from Hope Pentoliros stating that it was her true desire and intention.

565.      It speaks volumes that **Attorney Lazar** did not submit her own affidavit as to her afore-described representations regarding the wishes of her client.

566.     It is highly significant, as previously set forth, that Hope Pentoliros had *previously executed estate planning instruments and advance directive instruments* and, at that time, <u>did</u> <u>not</u> set forth an intention or desire for DNR/DNI; especially, where it is customary and routine practice for the subject matter of DNR/DNI to be contemplated when executing these type of written instruments.

567.     In fact, well in advance of guardianship proceedings Hope Pentoliros and James Pentoliros had execured written instruments designating their sons (Perry and Larry Pentoliros) to make health care decisions for them—in **August 2012**, court appointed counsel for Hope Pentoliros (Attorney Renee Lazar) had **Judge Ricci** revoke such powers, with no supportable basis.  (Copy of the allowed motion is provided in **Exhibit 147**).

568.     Also, suspect is that **Defendant Attorney Ledoux** represented to **Judge Ricci** that sons (Larry and Perry) "did not object" to a court order for a DNR/DNI.  Such wording—that the sons did not object—shows that Defendant Attorney Ledoux *knew* that the sons, in fact, <u>had</u> <u>not</u> assented to the motion for a DNR/DNI Order.

569.     Logically, when a family member is asked what his or her position is regarding the obtaining of a DNR/DNI court order, the answer compels one of two responses: agree or disagree—in this context, "do not object" is not commensurate with actual agreement.

570.     Showing the disingenuiness of **Defendant Attorney Ledoux's** seeking a DNR/DNI court order and his giving a false impression that the sons had assented to the DNR/DNI order is the fact that Defendant Attorney Ledoux made no objection or plea for expediency of time when **Judge Ricci** had continued the hearing for a DNR/DNI to a date <u>2 *weeks away*</u>.

571.     Despite **Defendant Attorney Ledoux** having represented that the DNR/DNI court order was urgent, **Judge Ricci** could be heard flipping the pages of her schedule and outright asked if the "DNR and DNI Order could wait until **[February] 20th**" because she was not going to be in court over the next week.

572.     **Defendant Attorney Ledoux** led **Judge Ricci** to believe that he had no objection to the date of **February 20, 2013** (just like Defendant Attorney Feld had not objected to Judge Abber's waiting to issue the Bond until Judge Abber's return from vacation).

### iii.   Defendant Attorney Ledoux obtained ex-parte hearing before Judge Abber seeking an emergency DNR/DNI Order

573.     **Defendant Attorney Ledoux** did not wait for the afore-described pre-scheduled hearing with **Judge Ricci**.  Instead, within a week, he obtained an ex-parte hearing before **Judge Abber** on **February 13, 2013** and **February 14, 2013**.  (Copies of the motions presented to Judge Abber are provided in **Exhibit 148**).

574.     The audio recording shows that **Defendant Attorney Ledoux** was very much in a hurry to obtain a court order for a DNR/DNI; so much so that the audio court recording reflects Defendant Attorney Ledoux *actually getting exasperated* with **Judge Abber** for showing hesitation in rubber-stamping the motion for a DNR/DNI order. (Refer to prior referenced Exhibit 145).

575.     In a state of frustration, **Defendant Attorney Ledoux** stated to **Judge Abber** that he "guaranteed" Hope Pentoliros was "not going to make it another day". (Hope Pentoliros died, approximately, 3 weeks later of *sepsis—not pneumonia).  Out of desperation, Defendant Attorney Ledoux blurted out that getting this DNR/DNI court order *was, really, all about $5 million*; and then tangentially went on to describe how supposedly Larry and Perry Pentoliros were dangerous—that they had supposedly been criminally charged previously involving their threatening tenants with a gun, but that the charges were dismissed due to slick lawyering by their counsel.

576.     **Judge Abber** expressed to **Defendant Attorney Ledoux** that his *only* hesitance in not granting the DNR/DNI Order was the fact that Defendant Attorney Ledoux wanted Judge Abber to solely rely on Defendant Attorney Ledoux's verbal representation that Hope Pentoliros' sons had *assented* to having a DNR/DNI Order.

577.     **Judge Abber** started to outright apologize to **Defendant Attorney Ledoux** for his hesitation; stating that he felt *personally* indebted to Defendant Attorney Ledoux for teaching him the law *after* he had been appointed to the bench; stating that he (Judge Abber) had *no prior legal knowledge in this area of the law* and that Defendant Attorney Ledoux was the foremost person who had helped him—Judge Abber was emphatic that the reason for his hesitance in rubber-stamping the DNR/DNI Order was because Defendant Attorney Ledoux "taught him well" that *written* representation by counsel is needed.

96

578.    The audio recording of the **February 14, 2013** hearing shows that **Defendant Attorney Ledoux** continued to persist; upon which, **Judge Abber** re-iterated that if Defendant Attorney Ledoux would just get written representations of *assent* by Hope Pentoliros' sons to the motion for a DNR/DNI, that he (Judge Abber) then had no qualms about issuing the DNR/DNI Order.

579.    When **Defendant Attorney Ledoux** told **Judge Abber** that Hope Pentoliros was just transferred to the Portsmouth Regional Hospital in New Hampshire and that the three (3) sons were on their way to the hospital, Judge Abber suggested to Defendant Attorney Ledoux to call over to the hospital and have them fax over their *assents* to the DNR/DNI.

580.    Conspicuously, **Defendant Attorney Ledoux** obtained a faxed letter *from counsel* for two (2) of the sons—not the sons themselves, and not in the form of an affidavit by counsel.  Instead, Defendant Attorney Ledoux obtained a faxed letter from counsel simply stating (*again*) that the sons "did not object" to the DNR/DNI Order.  (A copy of a letter faxed from counsel—not the sons—is provided in **Exhibit 149**).

581.    Apparently, where **Defendant Attorney Ledoux** could not obtain written assent by Larry and Perry Pentoliros, Defendant Attorney Ledoux was able to get a letter from a hospitalist (Dr. Johad Toure of Boxford, MA) purporting to support a court ordered DNR/DNI.  (A hospitalist is not a patient's regular attending doctor).  The letter was directly and solely addressed to Defendant Attorney Ledoux.  Suspect is the scant content and over generalizations in the afore-described letter—a copy of the submitted letter is provided in **Exhibit 150**.

582.    On that *same afternoon* as the hearing held on **February 14, 2013**, **Judge Abber** *did*, in fact, issue the DNR/DNI order for **Defendant Attorney Ledoux**—*even though*, Defendant Attorney Ledoux *had not* provided the written assent as had been originally a condition imposed by **Judge Abber** to receive the DNR/DNI court order.  As evidenced Judge Abber's abdication is suspect and gives strong support that he issued a court ordered DNR/DNI because of receiving monetary and/or personal benefit.  (Copy of Judge Abber's written findings for the issuance of the DNR/DNI is provided in **Exhibit 151**).

583.    The original pre-scheduled hearing with **Judge Ricci** for **February 20, 2013** was still held.  The audio recording of the court hearing held on **February 20, 2013** is provided in previously referenced Exhibit 145.

584.     During the hearing of **February 20, 2013**, **Defendant Attorney Ledoux** lied to **Judge Ricci**—he told her that he attempted to get a DNR/DNI Order in her absence; but, that he *did not* need the DNR/DNI order after all because Hope Pentoliros' medical *condition had turned around* and so Hope Pentoliros had returned to the nursing home.

585.     Further bolstering the existence of **Defendant Attorney Ledoux** bribing **Judge Abber** are the following facts: **Judge Abber** was *not* the presiding judge in that matter; the context of the afore-described discourse between Judge Abber and **Defendant Attorney Ledoux** in court on **February 14, 2013**; and representations made by Defendant Attorney Ledoux to **Judge Ricci** in court on **February 20, 2013**.

### E.  Suspect routine pattern of Defendant Attorney Ledoux seeking court ordered DNR/DNIs—on his own and not at the request of family members

**In re Alba Corona**  (ES13P0665GD)

586.     Alba Corona was an 86-year-old woman, who lived independently in Florida, having family members in Massachusetts.  She had a husband and a daughter, who reside in Marblehead, MA and a son in Medford, MA.

587.     **Defendant Attorney Ledoux** sought a court ordered DNR/DNI for Alba Corona—again, such court order was not pursued by Alba Corona's family.

588.     On **March 19, 2013**, as private counsel for **North Shore Medical Center**, **Defendant Attorney Ledoux** filed a motion to appoint a temporary guardian for Alba Corona.  He explicitly requested in the afore-described motion to appoint **Attorney Susan Hubbard** as temporary guardian.  (Copy of the motion to appoint temporary guardian is provided in **Exhibit 152**).

**In Re Henry Sawicki and In Re Anna Sawicki**

589.    **Defendant Attorney Ledoux**, as private counsel for **North Shore Medical Center**, formally filed petitions for guardianships over—husband and wife—Henry and Anna Sawicki.  (In re Henry Sawicki is docket no. ES07P2662GC1 and In re Anna Sawicki is docket no. ES072178GC1).

590.    **Defendant Attorney Ledoux** specifically requested **Defendant Attorney Garmil** be made court appointed guardian over Henry Sawicki; Attorney Faith Delaney as court appointed counsel; and then-Attorney Karen Kearns (now a judge of the Massachusetts Probate & Family Court) as GAL.  Defendant Attorney Ledoux requested that Attorney Susan Huibbard be appointed as guardian for Anna Sawicki  (Copies of **Defendant Attorney Ledoux's** petitions and motions are provided in **Exhibit 153**).

591.    Despite Henry and Anna Sawicki having three (3) children, **Defendant Attorney Ledoux** sought individual and separate court orders—as counsel for the hospital—for court ordered DNR/DNI and withdrawal of life support regarding Henry and Anna Sawicki.

592.    Despite Kenneth Sawicki, son of Anna and Henry Sawicki, objecting to a court ordered DNR/DNI, it was still granted.  (Copies of Kenneth Sawicki's pro se motions and affidavit are provided in **Exhibit 154**).

F. **Defendants' use of relationship with medical facilities to prey on patients who appear to have no close family relations**

593.    **Defendant Attorney Ledoux** and his employee, **Attorney Katelyn Lynch,**filed a petition for guardianship over John Polando (Docket no. ES07P1489GI1). They made it appear as though they were filing as petitioners as friends of John Polando. They used residential addresses in identifying themselves as petitioners.  (Provided is a copy of the original petition in **Exhibit 155—**in which Defendant Attorney Ledoux specifically requested then-Attorney Kearns to be court appointed guardian).

594.    The medical report filed in the matter shows the circumstances surrounding John Polando's hospitalization that made it appear as though he had no family—the medical report states that John Polando had been hospitalized at North Shore Medical Center _multiple times_ during the two years prior to the petition for guardianship.  (A copy of medical report is provided in **Exhibit 156**).

595.   **Defendant Attorney Ledoux** and **Attorney Lynch** certified in the above-described petition for guardianship that "[a]fter due and diligent search no heirs at law could be found"; however, that representation made by Defendant Attorney Ledoux and Attorney Lynch appears to have been knowingly false, as Defendant Attorney Ledoux and Attorney Lynch filed an amended petition *on the very same day* that they filed the afore-referenced original petition for guardianship.  .

596.   The specific reason necessitating **Defendant Attorney Ledoux** to file the amended petition was to add John Polando's children as known kin of John Polando—the children *all having lived locally*.  Evidently, the children found out about the court proceeding through other means.  (Copy of the motion to amend petition and subsequent petitions/motions are provided in **Exhibit 157**).

597.   Evidencing that **Defendant Attorney Ledoux** and **Attorney Lynch** had ill-motives in certifying that no heirs could be found is the fact that Defendant Attorney Ledoux and Attorney Lynch sought to be heard by the court through an ex-parte hearing—had Defendant Attorney Ledoux and Attorney Lynch genuinely believed that there were no existing heirs, they would have felt <u>no</u> *need* to overtly ask the court to hold concealed court proceedings.

### G.  <u>Pattern of suspect concerted conduct involving the Essex Probate & Family Court and various local medical/nursing facilities</u>

#### i.  <u>Overview</u>

598.   There is an established pattern whereby medical facilities and social workers file as petitioners, seeking guardianship and conservatorship over elder patients; in addition, the medical facilities and social workers make requests for specific attorneys to be court appointed as guardians and conservators—even, when they have actual knowledge of an elder having existing family members.

599.   As previously set forth, Massachusetts Probate & Family Court judges routinely—as a matter of custom and practice—issue judicial decrees giving SJC Rule 1:07 court appointed guardians and conservators complete and exclusive control over the elder and the elder's assets.

600.    The testimony of Kathleen King, Director, Health Care—given before the Subcommittee on Health, Committee on Energy and Commerce, House of Representatives—shows that "medical facilities (such as medical centers, clinics and practices) and durable equipment suppliers were the *most frequent subjects of criminal fraud cases in Medicare, Medicaid* and CHIP in 2010.  Hospitals and medical facilities were the most frequent subjects of civil fraud cases."  (Copy of Kathleen King's testimony published by GAO is provided in **Exhibit 158**).

601.    There is an established pattern whereby attorneys—who are regular SJC Rule 1:07 court appointees, such as **Defendant Attorney Ledoux** and **Defendant Attorney Garmil** who simultaneously provide private legal representation for medical facilities and/or medical providers.

602.    In view of Massachusetts Probate & Family Court judges routinely issuing court ordered plenary authority to SJC Rule 1:07 court appointed guardians and conservators, the opportunity and incentive for kickbacks is substantial where there are SJC Rule 1:07 court appointees having business relationships with medical facilities and medical providers.  As set forth, there is an inherent pecuniary interest for medical facilities and medical providers to have their services used and/or services referred to their affiliates.

603.    There is a pattern of court appointed fiduciaries choosing medical placements and other medical treatment services connected with their pre-existing relationships with medical facilities and medical providers.

604.    Court appointed guardians and conservators have a *fiduciary obligation to carry out the elders' desires and intentions*, pursuant to G.L. c 190B, §§ 5-309 and 5-401; however, there is a pattern whereby SJC Rule 1:07 court appointees disregard the wishes and intentions of families pertaining to placement and/or medical treatment.

**ii.   Specific examples of suspect racketeering specifically facilitated through designated Defendants use of their close professional ties to medical facilities and nursing homes**

**In re Dorothy Orndorff**

605.   In **March of 2009**, 90-year-old Dorothy Orndorff was admitted to the Oxford Nursing Home.  She had two (2) adult children, who lived out-of-state—one daughter in Maine and the other daughter in California.

606.   In the beginning of **November 2009**, Dorothy Orndorff was admitted as a patient to **Defendant Merrimack Valley Hospital**, on the basis that she was diagnosed with "Dementia with Behavioral Discontrol."

607.   Promptly after Dorothy Orndorff's admittance to **Defendant Merrimack Valley Hospital**, it promptly filed, on **November 9, 2009**, petitions for guardianship proceedings over Dorothy Orndorff in Essex Probate & Family Court.  (Docket no. ES09P3109).

608.   The petitioner for guardianship was a social worker for **Defendant Merrimack Valley Hospital**, Amanda Coburn (who is, also, involved in the underlying matter of In re Marvin H. Siegel and other probate matters with designated Defendants). Amanda Coburn petitioned for guardianship over Dorothy Orndorff, for the specific purpose of obtaining court ordered forced treatment of antipsychotics.  (Copy of the petition is provided in **Exhibit 159**).

609.   Amanda Coburn, in her role as social worker for **Defendant Merrimack Valley Hospital** was, specifically, involved in the involuntary commitment of Father and the designated **Defendants'** formal filings, in the matter of In re Marvin H. Siegel, for forced antipsychotic administration.

610.   **Defendant Attorney Garmil** acted as private counsel for Amanda Coburn—in her role as "petitioner" and acting in a capacity for **Defendant Merrimack Valley Hospital**.

611.   **Defendant Attorney Garmil** requested the specific appointment of **Attorney Gormley** as Roger's counsel for Dorothy Orndorff, which was allowed.  (Copy of Defendant Attorney Garmil's afore-described motion is provided in **Exhibit 160**).

612.   As previously described, **Attorney Paul Gormley** was, also, involved as a court appointee in the afore-described matters regarding the matters of James and Hope Pentoliros. He is regularly a SJC Rule 1:07 court appointee in Essex Probate & Family Court.

613.     Court ordered forced administration of antipsychotics for Dorothy Orndorff was issued on **November 13, 2009**—which order stated for a court review date of **February 8, 2010** (*a little less than 3 months*).

614.     The Order for forced administration of antipsychotics, regarding the **primary course**, stated:

> Zyprexia (all forms) 0-25mg/day; Seroquel 0-400 mg/day only as PRN if simultaneously w/ another psychotic medication.

615.     The Order for forced administration of antipsychotics, regarding the **alternate course** stated:

> Abilify 0-30 mg/day; Risperdal 0-6mg/day.

616.      Soon thereafter, **Defendant Merrimack Valley Hospital** transferred Dorothy Orndorff back to Oxford Nursing Home.

617.     Dorothy Orndorff died on **February 5, 2010**.

618.     On **February 8, 2010**, the afore-referenced court review date was still held in the matter of In Re Dorothy Orndorff; *as if Dorothy Orndorff had been alive*.

619.     On the same day of the court proceeding, **February 8, 2010**, Attorney Paul Gormley filed his personal affidavit in support of his motion to extend the existing guardianship over Dorothy Orndorff, and for forced court ordered administration of antipsychotics.  (Copy of Attorney Gormley's Affidavit is provided in **Exhibit 161**).

620.     The Affidavit filed by Attorney Paul Gormley is date-stamped **February 8, 2010**, showing that he physically submitted and filed the Affidavit on the same day as the court hearing.  Attorney Gormley dated the signing of his Affidavit as **February 4, 2010**.

621.     **Attorney Gormley** attested in his afore-described Affidavit that he visited with Dorothy Orndorff ("his client") on **February 4, 2010**.  As previously set forth, Dorothy Orndorff died the very next day, on **February 5, 2010**.

622.     **Attorney Gormley** attested in his afore-described Affidavit that he was *assenting* to **Defendant Attorney Garmil's** motion to extend temporary guardianship (with Roger's Authority).  Attorney Gormley stated that Dorothy Orndorff was "not objecting to or demonstrating non-compliance with any of her current medications or course of treatment."

623.    **Attorney Gormley** attested in his afore-described affidavit that Dorothy Orndorff had "a significant cognitive decline *since* her hospitalization in **November 2009**"—which was Dorothy Orndorff's first time being given antipsychotics.

624.    **Attorney Gormley**, also, attested in his afore-described affidavit that, during his visit with his Dorothy Orndorff, on **February 4, 2010**, she "was unable to discuss her circumstances, did not recognize or remember [him] despite multiple visits to the Merrimack Valley Hospital and a prior visit at her setting at the Oxford Manor" and that Dorothy Orndorff at his visit of **February 4, 2010** was "entirely unable to advise of her wishes."

625.    *In the very same paragraph of the affidavit described above*, Attorney Gormley attested that Dorothy Orndorff "was accepting" of her medication "without complaint" when she was at **Defendant Merrimack Valley Hospital**; and that Dorothy Orndorff stated that the medication made her "feel better".

626.    **Attorney Gormley** stated in his affidavit: Dorothy Orndorff "has not indicated to me that she does not wish to be present at the instant proceedings."

627.    As previously set forth, the hearing in the matter of In re Dorothy Orndorff was held on **February 8, 2010** as if she were still alive—more than ample time had passed by the hearing date, where the various parties and counsel *must have known* that Dorothy Orndorff had died days prior.

628.    A copy of the written findings issued by **Judge Amy Blake** is provided in **Exhibit 162**. Illicit conduct is evidenced in the afore-referenced written findings issued by **Judge Amy Blake**:

> the Treatment Order of **February 8, 2010** was based on a completely different doctor than the original Treatment Order of **November 13, 2009**;

> the afore-referenced written findings show that the Treatment Order of **February 8, 2010** substantially changed from the original Order of **November 13, 2009**. The Order of **November 2009** stated that the primary course of treatment was "Zyprexia (all forms) 0-25mg/day; Seroquel 0-400 mg/day only as PRN if simultaneously w/ another psychotic medication"— whereas the Order of **February 8, 2010** had a *decreased* dosage and completely eliminated Zyprexia, explicitly stating: "Seroquel 0-400 mg/day only as PRN if simultaneously w/ another psychotic medication"; and

> the alternative course, also, *dramatically reduced* the milligrams of Risperdal and Abilify.

629.     Suspect conduct is evidenced from the petition signed and filed by **Defendant Attorney Garmil** on **November 13, 2009** (prior referenced Exhibit 159 consisting of:

> the representation that there was a "personal needs trust account" with no designated amount, of any kind—the allotted space left completely blank; and

> the representation that Dorothy Orndorff was receiving **"SSI"** with no designated amount, of any kindthe allotted space left completely blank.

630.     It is suspect that **Defendant Attorney Garmil** had filed the petition for guardianship, knowing that the Bond purportedly filed by Dorothy Orndorff's daughter (Carolyn Keyser) as appointed guardian to state the value of personal estate left completely blank—with a penciled "?" further over on the right hand margin.  (Copy of the filed bond is provided in **Exhibit 163**).

631.     On **March 8, 2010**, a motion was filed seeking that Oxford Manor Nursing Home be substituted as the petitioning party—replacing **Defendant Merrimack Valley Hospital**.  (Copy of the afore-described motion is provided in **Exhibit 164**).

632.     Even though the parties had ample opportunity to obtain a certificate of Death, counsel for Oxford Manor (Dawne Livigne, Esq.), instead, filed a pleading called a "Suggestion of Death".  The filing of a "Suggestion of Death" is highly suspect where there is no specific date of death nor a stated cause of death.  (Copy of the pleading called "Suggestion of Death" is provided in **Exhibit 165**).

633.     A "Statement of Administration" for Dorothy Orndorff was filed on **July 7, 2010**, and an attested copy of the Voluntary Administration was filed on **July 22, 2010** (Docket no. ES10P1943EA).  The petitioner seeking to probate the estate of Dorothy Orndorff was identified as Catherine Michaud—who was *not a family membe*r.  Catherine Michaud is a Registered Nurse, licensed in Massachusetts, who has been employed by the Lafayette Rehabilitation and Skilled Nursing Facility and the North Shore Medical Center. (Copy of a recent docket is provided in **Exhibit 166**).

634.     As of **April 19, 2014**, no other activity has been docketed—*yet, the estate of Dorothy Orndorff is still deemed to be "active" in the Probate & Family Court computer docket*.  As evidenced, there is a basis to believe that the designated court appointees are *still* receiving and cashing government benefit checks for Dorothy Orndorff.

### iii.  <u>Other illicit cases specifically involving Nurse Catherine Michaud and the Essex Probate & Family Court</u>

### <u>In re Panagiota Galmiadis</u>

635.    Catherine Michaud was the petitioner in the estate administration matter of In re Panagiota Galmiadis (ES11P0375EA).  The docket sheet for Panagiota Galmiadis does not list a date of death—the space allotted is left empty.  (Copy of docket sheet and death certificate are provided in **Exhibit 167**).

636.    Catherine Michaud filed a Voluntary Administration Statement in the matter of Panagiota Galmiadis.  She identified herself as "caretaker" in the afore-described statement, and listed *her* address as "22 Lafayette Street, Marblehead, MA"—which is the address for Lafayette Rehabilitation and Skilled Nursing Facility.  (Provided is a copy of the Voluntary Administration Statement in **Exhibit 168**).

637.    The afore-described Voluntary Administration Statement shows a date-stamp, stating it was filed on **February 7, 2011**.  A single line is drawn through that filing date; and above it is another date-stamp stating filed on **February 14, 2011**.

638.    On the backside of the Voluntary Administration Statement there is a hand-written notation stating: "Petitioner needs to be a relative."

639.    Also, the attorney who notarized the afore-described Voluntary Administration Statement (Lauren Keane Dowley, Esq.) for the matter of Panagiota Galmiadis is the same attorney who was involved in the estate administration of the afore-discussed matter of In re Dorothy Orndorff.

640.    Catherine Michaud filed a Military Affidavit in the matter of In re Panagiota Galmiadis (ES11P0375EA) listing her address as 25 Lafayette Street in Marblehead, MA.  (Copy of the filed Military Affidavit is in provided in **Exhibit 169**).

641.    The afore-described Voluntary Administration Statement states that the Domicile of Death for Panagiota Galmiadis was "5 Puritan Lane, Swampscott"—which is handwritten on top of white-out.  The Statement states that Panagiota Galmiadis had a son named "Andrew Galmiadis", with an address of "5 Puritan Lane, Swampscott MA."

642.    The filed Death Certificate, also, lists Panagiota Galmiadis' residence as "5 Puritan Lane."

643.    Andrew Galmiadis" is a fictitious name—the Registry of Deeds evidences that 5 Puritan Lane in Swampscott, MA was recorded as a single-family residence, belonging to a person named Andrew Galbadis and Anna Karatzoglou.  (Copy of downloaded information from the Essex County Registry of Deeds is provided in **Exhibit 170**).

644.    The afore-described Voluntary Administration Statement states the personal needs account as "$198.85" on **February 14, 2011**—yet, like the matters with Dorothy Orndorff, *over three (3) years later*, the matter of ES11P0375EA is still deemed "active" in the Probate & Family docket system.  Like the afore-discussed matter with Dorothy Orndorff, there is a basis to believe that the designated court appointees are *still* receiving and cashing government benefit checks for Panagiota Galmiadis.

### In Re Charles Bennett

645.    Catherine Michaud was the petitioner in the estate administration matter of **In re Charles Bennett** (ES10P1950EA).  As with In re Panagiota Galmiadis, the docket sheet for In re Charles Bennett does not list a date of death.  (Copy of the docket sheet, identifying Catherine Michaud as petitioner is provided in **Exhibit 171**).

646.    The afore-described docket sheet for Charles Bennett shows that no Certificate of Death was filed.  There is no published obituary, other than a one-sentenced description on the internet.  (Copy of public information relating to the death of Charles Bennett is provided in **Exhibit 172**).

647.    The place of death for Charles Bennett is Marblehead—the same city as Lafayette Rehabilitation and Skilled Nursing, and connected to Catherine Michaud.

648.    The afore-referenced docket sheet for Charles Bennett shows that the estate administration file was opened on **July 2, 2010**, that case, too, is deemed **"Active"** in the Essex Probate & Family Court computer docket.

**H. Partisan relationships between SJC Rule 1:07 court appointees and professional organizations**

649.    **Senior Partners for Justice** is an association that focuses on providing in-court "pro bono" involvement with guardianship and conservatorship matters. Information describing the scope of **Senior Partners for Justice** is provided in **Exhibit 173**.

650.    **Senior Partners for Justice**, also, openly holds out to the public about the intimate involvement amongst <u>all</u> its members. It emphasizes that its membership involves substantial mentoring, specifically stating:

> Staff at the VLP, <u>together with seasoned family law Senior Partners provide</u> <u>*ongoing telephone mentoring based on your own needs*</u>.  Senior Partners provides a support network of colleagues who are available to consult on the best course of action, and to answer any questions the Senior Partner may have regarding practical aspects of representing indigent clients.

651.    **Senior Partners for Justice**, also, openly touts that specific benefits of its organization include: "Enjoying the intellectual and social stimulus of 'plugging in' to a collegial network of other Senior Partners who meet regularly to discuss their cases and share their experiences."

652.    **Defendant Attorney Maxa Berid** served on the **Board of Advisors for Senior Partners for Justice.**

653.    **Defendant Attorney Lisa Cukier** has been involved in **Senior Partners for Justice** as a Mentor and a Pro Bono GAL.

**I.** **Misuse of influence amongst State agencies specifically designated for the elderly**

    **i.** **General conflict of interest**

654.    There is an established pattern that staff from various elder protective service agencies initiate guardianship and conservatorship proceedings in the Probate and Family Courts.  An example of such conduct include representatives of North Shore Elder Services as petitioner in the matter of In re Elizabeth Dunn (ES11P2190PM and ES12P2213GD).  (Copies of the petitions are provided in **Exhibit 174**).

655.    The corporate bylaws for **Defendant ESMV** show that one of the specific objectives for Defendant ESMV as a corporation is to act as guardian and conservator.  (Copy of the relevant page of the 1984 Articles of Amendment is provided in **Exhibit 175**—see prior referenced Exhibit 13 for complete Articles of Amendment).

656.    Other evidence of improper incentives for **Defendant ESMV** to have elders judicially deemed incapacitated is the booklet that Defendant ESMV distributes to the public, called "The Green Book".  (Copy of the Green Book is provided in **Exhibit 176**).

657.    On the front cover of the Green Book, it outright advertises that **Defendant ESMV** has "a partnership" with Pentucket Medical.  Pentucket Medical is a private for-profit primary health care business (physicians, nurse practitioners and physician assistants).

658.    In the section of the Green Book called "Housing", the first six (6) housing developments listed are owned and run by **Defendant ESMV**; with the listing for other privately run housing on the *backside* of that page.

659.    Pursuant to 651 CMR 5.10, one of the objectives for an elder service protective agency is to conduct an investigation to *establish whether there is a basis for offering services* if the existence of abuse is confirmed.

660.    Governmental funding given to agencies—like **Defendant ESMV**—are directly and proportionately determined by the *amount* of services provided; demonstrating an inherent incentive for elder service agencies to make false and baseless administrative findings of abuse.

661.    For elder protective service agencies to generate the use of their services, it necessitates judicial determination that the elder is incapacitated—which is accomplished through petitions of guardianship and conservatorship to the Probate & Family Courts.

### ii. __Attorney Referral List distributed by North Shore Elder Services__

662.     Evidencing a well-established partisan relationship between court appointees and elder protective services agencies is the fact that **North Shore Elder Services, Inc.** distributes a referral list of private attorneys, whose law practices focus on probate and family law; and who, *also,* do work as court appointees for the Probate and Family Court in the very same county that North Shore Elder Services covers.  (Copy of the afore-described referral list is provided in **Exhibit 177**).

663.     **Defendant Attorney Ledoux** is one of the attorneys on the afore-described referral list distributed by North Shore Elder Services.

664.     Of significance, the afore-described referral list is exceedingly limited, especially given the large number of attorneys who practice probate and family law in a very sizeable county.

665.     Further concrete evidence of such existing partisanship relationships between attorneys who work as court appointees and elder protective services agencies is the previously described manner in which Peggy Sullivan of **Mystic Valley Elder Services** referred 90 year-old Eleanor Mulligan to **Defendant Attorney Cukier**.

### iii. __Representatives of elder protective services as private attorneys working as SJC Rule 1:07 court appointees__

666.     As previously set forth, **Defendant Attorney Berid** has worked as a court appointee, specifically as *a private attorney* of **Defendant Berid & Schutzbank**—having nothing to do with her official capacity as counsel for **Defendant ESMV**.  For example, when she was court appointed as GAL in the afore-discussed matter of In re Joseph O'Shea, she specifically listed her private law practice address.

667.     **Defendant Attorney Berid** was, also, court appointed SJC Rule 1:07 GAL by the **Essex Probate & Family Court** in the matter of In re guardianship of Wayne Clouthier (ES08P1387GI1).  (Copy of court documents showing Defendant Attorney Berid's role as court appointed GAL are provided in **Exhibit 178**).

668.     **Defendant Attorney Berid** was court appointed as SJC Rule 1:07 GAL by the **Essex Probate & Family Court** in the matter of In re Helen Learned (ES238281).  In the matter of In re Helen Learned, **Defendant BNY Mellon** was petitioner and trustee. (Copy of court documents showing Defendant Attorney Berid's role is provided in **Exhibit 179**).

669.     Since the **mid 1970s**, **Defendant Attorney Berid** has simultaneously maintained a private law office, and been affiliated in varied official capacities for **Defendant ESMV**.

### iv.  <u>Councils of Aging located in individual towns and cities</u>

671.     Common fodder for abuse of the elderly by public officials include agencies, such as Council of Aging.  Like elder protective service agencies, Council of Aging is held out to the public as being *exclusively* concerned about the wellbeing of the elderly; however, in actuality, representatives of these agencies view the elderly as an opportunity for personal gain.  These types of agencies are the proverbial "wolves in sheep's clothing".  The common modus operandi of agencies like Council of Aging is illustrated in the matter of <u>In re Mildred Tanner</u> (ES090818EA).  Court records for the matter of In re Mildred Tanner are provided in **Exhibit 180**.

672.     Herbert and Mildred Tanner (husband and wife) were long-time residents of Rowley, MA, and had five children.  They bought their home in Rowley, in 1956.

673.     In **1996**, Herbert Tanner fell and broke his hip.  He was hospitalized in Boston, and later transferred to a nursing home in Newburyport.  Two of their children— Herbert, Jr. and Linda (and Linda's husband)—were the primary caregivers of their father and mother.   They would take their mother to visit their father every day from the time their father was hospitalized until their father's death in **2000**.

674.     In **1999**, Mildred Tanner fell and broke her hip, and she had convalesced at the same nursing home as her husband had; and in **2000**, Mildred Tanner moved to Rowley Elderly Housing.

675.     In **2001**, Mildred Tanner sold their family home for $200,000, which was the bulk of her assets.  In **2004**, she executed a health care proxy and durable power of attorney, designating Herbert, Jr. as her attorney-in-fact.  Her estate plan had been in place since **1975**.  Mildred Tanner's daughter, Linda, had been joint signatory on her banking accounts.

676.     In **2004**, Mildred Tanner's daughter, who had lived in California, died; upon which Mildred was a beneficiary of, approximately, $250,000.  Coinciding with these events, Anne McKenney, a volunteer with the Council of Aging, started to entrench herself into Mildred Tanner's personal life.

677.     Anne McKenney initiated her personal relationship with Mildred Tanner through group luncheons and outings with the Rowley Elderly Housing, and then extended it to frequent private socializing with Mildred Tanner; which, soon expanded to include Anne McKenney's husband, James.

678.     Even though Mildred Tanner had continuous regular contact with her children and grandchildren, she had not told her family about her social relationship with Anne and James McKenney.  They were completely unaware of the extent in which Anne and James McKenney had interjected themselves into Mildred Tanner's personal affairs.

679.     Anne and James McKenney employed tactics that isolated Mildred from her family.  Mildred Tanner's family had been close-knit.  Instead of Mildred Tanner's customary tradition of spending Thanksgiving with her family, she spent Thanksgiving of 2006 with Anne and James McKenney.

680.     Anne and James McKenney were aware of Mildred Tanner's $250,000 inheritance from her daughter's death—as they, *personally*, had her go to *their* financial advisor.

681.     Anne and James McKenney, also, had Mildred go to *their* attorney, David Greenough of Ipswich; and a new Will was drawn up for Mildred that named James McKenney as executor, as well as, a pour over irrevocable trust—*none* of which was discussed with Mildred Tanner's family.

682.     In April of 2007, James McKenney had Mildred Tanner create a residuary estate, in which James McKenney was named as trustee.  The Trust gave James McKenney discretion to make contributions to entities of his choosing; as well as, his receiving an annual fee as trustee and financial advisor.

683.     Mildred Tanner's original estate planning named the Shriners as the beneficiary of her previously executed residuary estate—as discussed above, James McKenney had Mildred Tanner change her estate planning, and substituted him as the beneficiary.

**J.  Defendants' improper use of influence with the Judicial Conduct Commission**

**i.  The trend in disciplinary actions by the Judicial Conduct Commission**

684.    The established pattern of disciplinary action taken by the **Judicial Conduct Commission** consisted of the following situations:

In 1**989**, Appeals Court Justice Frederick Brown received a public reprimand for comments he made criticizing the NAGE and its then president (Kenneth T. Lyons) to counsel for the Labor Relations Union, during oral argument.  Justice Brown was ordered to recuse himself from any future cases involving NAGE and Kenneth Lyons.  Two (2) prior times, Justice Brown had received official warnings for "injudicious and intemperate remarks"—resulting in a "confidential letter of concern" and "a confidential informal adjustment."

In **2004**, Appeals Court Justice Joseph Trainor was reprimanded for having operated a motor vehicle while under the influence of alcohol. Having "successfully completed" a continued without a finding, his criminal case was dismissed. Justice Trainor's sanction was his "agreement to not sit on any appeal involving a charge of operating under the influence" for one (1) year.

In **2005**, Judge Robert Murray of the Juvenile Court entered into an agreement to a suspension for one year without pay and a $50,000 fine for having engaged, for a 6-month period of time, in "inappropriate conduct directed toward two female employees of the Juvenile Court."

In **2006**, Judge Santo Rumer of the District Court entered into an Agreed Disposition for having improperly having placed a spectator in custody. Judge Rumer stipulated that he recognized the concern of the Commission and agreed to follow the Rules of Court for contempt matters; and stipulated that he recognized "that it is ordinarily preferable to issue a prior warning before placing a spectator in custody."

In **2010**, the Judicial Conduct Commission and Judge Diane Moriarty entered into a Conditional Submission Upon Acknowledged Evidence, which was filed with the Supreme Judicial Court.  Official proceedings against Judge Moriarty commenced in **_2007_**, _with a Complaint filed by the Supreme Judicial Court and another Complaint filed anonymously_. Judge Diane Moriarty was charged with: conducting improper ex parte hearings, displaying discourtesy toward parties appearing before her,

creating an appearance of bias and lack of impartiality, and failing to be faithful to the law in her handling of several District Court criminal matters.  Having entered into the afore-described agreement, Judge Moriarty's sanction consisted of monitoring by the Commission for two (2) years.

Also, in **2010**, Judge Christine McEvoy was reprimanded for having operated a motor vehicle while under the influence of alcohol.  Having "successfully completed" a continued without a finding, no other conditions were set forth.

In **2012**, Judge Brian Merrick received a public reprimand for a pattern of conduct, by which he has been giving procedurally flawed plea colloquies regarding minor motor vehicle criminal offenses.

### ii.  Written complaint submitted by Plaintiffs in March of 2014

685.    On **March 27, 2014**, Plaintiff hand-delivered a 118-paged complaint and accompanying documentation to the **Judicial Conduct Commission**—addressed to the attention of the Executive Director of the Judicial Conduct Commission, **Attorney Howard Neff, III**.  (Copy of the complaint is provided in **Exhibit 181**).

686.    The 118-paged complaint of **March 27, 2014** reported specific and concrete evidence of grave misconduct by: **Judge Jeffrey Abber**, **Judge Susan Ricci**, **Judge Amy Blake** and **Judge Peter DiGangi**.

687.    In addition to afore-described complaint of **March 27, 2014** setting forth misconduct having occurred in the underlying matter of In re Marvin H. Siegel, the Plaintiffs, also, described misconduct by the designated judges and Defendants in other unrelated probate court matters.

688.    In the written complaint submitted on **March 27, 2014**, Plaintiffs demonstrated, with indisputable and solid evidence, a prevalent *pattern* of illicit concerted conduct of the designated defendants and judges.

689.    *In addition* to the submission of the above-described 118-paged complaint and accompanying documentation, Plaintiff Daughter Lisa, specifically, filled out, by hand, four (4), <u>individual and separate</u>, standard complaint forms from the Judicial Conduct Commission—one for each of the afore-named judges.

690.    Each of the four (4) standard complaint forms referenced and incorporated the underlying 118-paged complaint and the two (2) CDs.

691.     As previously set forth**, Judge Susan Ricci** served a 6-year term as a member of the Judicial Conduct Commission, serving the last two (2) years as **Chair**; and **Judge Mary Ann Sahagian** *currently* sits as a member of the Judicial Conduct Commission.

692.     Both, **Judge Ricci** and **Judge Abber** have served under **Judge Mary Ann Sahagian** as First Justice **of the Essex Probate & Family Court**, for years until early **December of 2013**. **Judge Blake** has served under Judge Sahagian for several years and did so through **July of 2014**—when Judge Blake was appointed to the **Appeals Court**.

693.     **Judge Judith Fabricant** is also a current member of the **Judicial Conduct Commission** and has held high ranking positions in the affiliated chapter of the **American Inn of Courts**, the **Boston Inn of Court**—like that of **Justice Barbara Lenk** of the Supreme Judicial Court, who was past president of the **Boston Inn of Court**.

694.     Plaintiff Daughters made written complaints against each of the four (4) judges to the Judicial Conduct Commission for illicit concerted conduct, specific to In re Marvin H. Siegel.

695.     **Judge Jeffrey Abber**, **Judge Susan Ricci**, **Judge Amy Blake** and **Judge Peter DiGangi**—are members of the **Massachusetts Family & Probate American Inn of Court**. Both **Judge Abber** and **Judge Ricci** have served as Board of Directors for **Massachusetts Family & Probate American Inn of Court**.

696.     Also, as previously established, **Judge Judith Fabricant** is a member of the exclusive **MBF Society of Fellows**, as is **Judge Abber** and **Judge Ricci**.

### iii.  Response by the Judicial Conduct Commission

697.     Almost two (2) weeks after Plaintiff Daughter Lisa hand delivered the 118-paged Complaint, two (2) CDs and the four (4) individual hand-written forms for each judge, Plaintiff Daughter Lisa received a letter, **dated April 9, 2014**, from **Howard Neff, III** on behalf of the **Judicial Conduct Commission**.

698.     It took, essentially, two (2) weeks for the Judicial Conduct Commission to send a letter stating that it "cannot docket or investigate" the submitted 118-paged Complaint—*solely and exclusively*—on the proffered reason: "a separate complaint form must be used for each judge against whom you wish to file a complaint."  (A copy of the Commission's letter is provided, along with the other written correspondence between Plaintiff Daughter Lisa and Attorney Howard Neff, on behalf of the Judicial Conduct Commission in provided in **Exhibit 182**).

699.     A third-party had accompanied Plaintiff Daughter Lisa when she hand delivered the receptionist, at the office of the Judicial Conduct Commission, the 118-paged Complaint and two (2) CDs on **March 27, 2014**.

700.     While Plaintiff Daughter Lisa and the accompanying individual were standing at the receptionist's desk, the receptionist noticed that the complaint involved the reporting of four (4) judges; upon which the receptionist, explicitly, stated that Plaintiff Lisa Siegel Belanger needed to fill out a standard blank-form for each of the four (4) judges.

701.     The individual who had accompanied Plaintiff Lisa Siegel Belanger sat beside her, in the reception area of the Judicial Conduct Commission, while Plaintiff Daughter Lisa filled out four (4) separate and individual standard forms for each of the four (4) judges.

702.     In fact, the individual who had accompanied Plaintiff Daughter Lisa reviewed each of the hand-written completed four (4) standard issued forms.

703.     As previously set forth, in each of the respective afore-described standard forms, Plaintiff Daughter Lisa explicitly referenced and incorporated the 118-paged Complaint and CDs.

704.     Plaintiff Daughter Lisa and the individual who accompanied her, physically handed the above-described four (4) hand-written completed and signed forms to the *same* receptionist, who originally physically took the 118-paged Complaint and two (2) CDs.

705.     Evidencing ill-motives by the Judicial Conduct Commission in the above-described letter of **April 9, 2014** is the fact that, in the very *first* sentence of the letter, Attorney Neff explicitly identified *each of the very four (4) judges*, of whom Plaintiff Daughter Lisa had already submitted individual and separate standard form complaints to the Judicial Conduct Commission.

706.     Attorney Neff enclosed four (4) blank standard complaint forms with his letter of **April 9, 2014** that were identical to the previously described standard forms that Plaintiff Daughter Lisa had filled out in hand-writing—*in* the reception area of the office of the Judicial Conduct Commission—and had directly handed to the receptionist.

707.     On **April 14, 2014**, Plaintiff Daughter Lisa replied in writing to Attorney. Neff notifying him that she had, in fact, complied with the filing of four (4) separate and individual forms for each of the above-referenced judges.

116

708.     Enclosed with the above-described letter of **April 14, 2014**, Plaintiff Daughter Lisa, _again_, filled out four (4) mailed complaint forms of the Judicial Conduct Commission—one for each individual judge.

709.     In each individual complaint form of the Judicial Conduct Commission, Plaintiff Daughter Lisa referenced and incorporated the 118-paged complaint and the two (2) CDs.  In fact, Plaintiff Daughter Lisa set forth _specific page numbers from the 118-paged complaint that applied to each individual judge_ in the complaint forms enclosed in the reply of **April 14, 2014**.

710.     Again, it took almost two (2) weeks for the Judicial Conduct Commission to respond to Plaintiff Daughter Lisa.  And, again**,** in a letter from the Judicial Conduct Commission dated **April 24, 2014**, Plaintiff Daughter Lisa was informed: "This office cannot docket a complaint alleging misconduct against all four judges."

711.     On **May 2, 2014**, Plaintiff Daughter Lisa responded—in writing—to Attorney Neff's letter, on behalf of the Judicial Conduct Commission, dated **April 24, 2014**.  This time, Plaintiff Daughter Lisa asked Attorney Neff to specifically state, exactly, what she needed to do to have him accept her written complaints.

712.     Plaintiff Daughter Lisa received a letter, from Attorney Neff, on behalf of the Judicial Conduct Commission, dated **May 20, 2014**—in no manner, did Attorney Neff, legitimately, articulate any procedural clarification to facilitate the filing being met.  It is true that Attorney Neff strung words together and put them down on paper, but, de facto, he only put forth doubletalk.

713.     It is faulty logic and circular reasoning for Attorney Neff to assert that Plaintiffs cannot file a complaint that has more than one judge's name mentioned in it, _when_ the alleged acts involve _two or more judges_.  The specific misconduct alleged involved <u>concerted acts</u> of misconduct; therefore, the acts of the designated judges are <u>inextricably intertwined</u>.

714.     Of significance, Attorney Neff's afore-described letter of **May 20, 2014** further evidences that <u>his</u> repeated refusals to accept the Plaintiffs' written complaints stem from ill-motives, where he explicitly confirmed that he has, in fact, "reviewed <u>all</u> submissions" and Plaintiff Daughter Lisa has, <u>in fact</u>, complied with the "protocol" of having submitted <u>separate</u> and <u>individual</u> <u>complaints</u> for each of the four (4) above-referenced judges.

715.     Attorney Neff has acknowledged Plaintiffs' allegations are valid and meritorious, where he stated, in the afore-described letter, that Plaintiffs "are welcome" to make another submission of their allegations against the designated judges—given the fact that Attorney Neff, in fact, reviewed all of Plaintiffs' submissions, if the Plaintiffs' allegations were frivolous, Attorney Neff would *not* have stated in his letter of **May 20, 2014** that Plaintiffs were "welcome" to attempt another filing.

716.     After continuous and repeated attempts by Plaintiffs, Attorney Neff—on behalf of the Judicial Conduct Commission—has outright refused to, even, *accept* for filing the Plaintiffs' written complaints against the specified Probate & Family Court judges.

717.     Ill-motive is evident by the fact that, contemporaneous with Plaintiffs' submitting of the written complaints of **March 27, 2014**, **Judge Amy Blake's** appointment to the **Massachusetts Appeals Court** was in process.  Judge Amy Blake was nominated by Governor Patrick on **June 23, 2014** and her appointment to the Appeals Court was unanimously confirmed on **July 16, 2014**.

718.     As previously set forth, **Judge Amy Blake** has been a member of the **Massachusetts Family & Probate American Inn of Court**.  (Provided in Exhibit 23 is the audio court recording of **June 9, 2014**, wherein Judge Amy Blake states that she is supposedly no longer a member of the **Massachusetts Family & Probate American Inn of Court**, she—in fact—confirms her affiliation).

### K.  Defendants' improper use of influence with Board of Bar Overseers and Office of Bar Counsel

### i.  Established connections between Defendants and Board of Bar Overseers and Office of Bar Counsel

719.     The following Defendants have spent several years as hearing officers for the Board of Bar Overseers: **Defendant Attorney Kazarosian**, **Defendant Attorney Ledoux**, and **Defendant Attorney Costello.**  Defendant Attorney Costello, also, has been utilized by the Board of Overseers as a special prosecutor.

720.     As previously established, **Defendant Attorney Kazarosian, Defendant Attorney Ledoux, Defendant Attorney Berid** and **Defendant Attorney Cuffe** are members of the exclusive **MBF Society of Fellows**.

721.    As previously established, the following counsel on behalf of the Office of Bar Counsel and the Board of Bar Overseers are, also, members of the **MBF Society of Fellows**:

> **Karen D. O'Toole, Associate General Counsel for the Board of Bar Overseers**
>
> **Jeffrey Woolf, Esq. – Assistant General Counsel for the Board of Bar Overseers (Louis D. Brandeis Fellow)**
>
> **Thomas A. Kenefick, III, Esq. – Board of Bar Overseers**
>
> **Lisa Arrowood, Esq., Board of Bar Overseers (Life member)**
>
> **Linda G. Bauer, Esq., Assistant Bar Counsel  (Life member)**
>
> **Kenneth Luke, Esq., Assistant Bar Counsel (Life member)**
>
> **Susan Strauss Weisberg, Assistant Bar Counsel (Life member)**
>
> **Daniel Crane, Esq., Former Chief Counsel for the Office of Bar Counsel**

722.    Previously set forth are established social relationships amongst the designated attorneys and judges, also, arising from exclusive memberships with various chapters of the **American Inns of Court**.


### ii.  Obligations of Bar Counsel

723.    Bar counsel has a duty to investigate misconduct when presented with evidence, providing "reasonable cause" that an "attorney poses a threat of substantial harm to his clients or prospective clients."  S.J.C. Rule 4:01, § 12A; In the matter of Lawrence J. Kenney, 86-10 BD (decision date August 3, 1988, pp. 1, 8).

724.    Rule 4:01 further provides for Bar Counsel to investigate, and the Board of Bar Overseers to hear, *any allegation* that an attorney has violated the canons and disciplinary rules regulating the practice of law."  In the matter of Lawrence J. Kenney, 86-10 BD (decision date August 3, 1988 at 8).

725.    Records that an attorney is required to maintain as a court-appointed fiduciary "have assumed 'public aspects' which render them at least analogous to public documents."  In the matter of Lawrence J. Kenney, 86-10 BD (decision date August 3, 1988 at 10).

### iii.  Complaint submitted by Plaintiffs on March 28, 2014

726.    On **March 28, 2014**, Plaintiff Daughter Lisa served, by hand delivery, a 118-paged written complaint and supporting documentation to the office of the **Board of Bar Overseers**; directly to the attention of the **Chair, Attorney Lee Dunham**.

727.    The complaint is identical to the one submitted to the Judicial Conduct Commission.   Here too, the complaint had been accompanied by two (2) CDs of supporting documentation, containing the numerous audio court recordings and 248 attachments of written documentation—primarily consisting of court records and other objective sources of evidence.  (Copy of cover letter accompanying the Complaint and the compilation of correspondence in **Exhibit 183**).

728.    Although General Counsel for the Board of Bar Overseers, Michael Fredrickson, wrote to Plaintiff Daughter Lisa that an investigation was "opened" against Bar Counsel, Constance Vecchione, as a result of the complaint filed on **March 28, 2014**—stating that the investigation was "stayed" until the Judicial Conduct Commission takes action (the Judicial Conduct Commission having received the same underlying complaint and supporting documentation).

729.    The various written correspondence between General Counsel (Attorney Fredrickson) and Plaintiff Daughter Lisa demonstrate overt obstructive acts and attitude by the Board of Bar Overseers with regard to Plaintiffs' submitted complaint of **March 28, 2014**.

### iii.  Prior complaints submitted by Plaintiffs

730.    Over the course of 3 years, Plaintiffs have continuously and repeatedly provided incontrovertible evidence of unlawful conduct by designated **Defendants**.

731.    Plaintiffs filed their initial complaint with **Anne Kaufman, Esq.** of the Office of Bar Counsel on **February 17, 2012**.  (Copy of the complaint is provided in **Exhibit 184**).

732.    As demonstrated by the content of the initial complaint of **February 2012**, specific and concrete information was provided that evidenced actual misrepresentations made to the Probate Court and conduct constituting disloyalty to a client—which are direct violations of the professional rules of conduct.  Violations of the ethical rules of conduct necessitate the Office of Bar Counsel to conduct its own investigation; especially, to deter future harm to others.

733.    The Office of Bar Counsel *did not* send any written correspondence—and did not call—Plaintiffs regarding acknowledgment of the submitted complaint of **February 2012**.

734.    After not having heard—in writing or otherwise—from the Office of Bar Counsel, about **mid-March of 2012,** Plaintiff Daughter Lisa telephoned **Attorney Kaufman** to obtain a status of the complaint.  Attorney Kaufman was not available to take Plaintiff Daughter Lisa's call; and Plaintiff Daughter Lisa left a message, requesting a return call.

735.    When **Attorney Kaufman** returned the call to Plaintiff Daughter Lisa, she had informed Plaintiff that the Office of Bar Counsel was *not* going to conduct *any* investigation, of any kind.  Attorney Kaufman stated that the Plaintiffs' complaint of **February 2012** was improperly seeking intervention of the Board of Bar Overseers into the pending litigation of In re Marvin H. Siegel; that she viewed the Plaintiffs complaint as merely seeking to "overturn" the trial judge.

736.    However, as previously set forth, the afore-described allegations were very much within the purview of the Office of Bar Counsel, and the reported misconduct—de facto—necessitated an independent investigation by the Office of Bar Counsel.  During the above-described conversation, Plaintiff Daughter Lisa clarified that the substance of the complaint was not about reversal of rulings; and emphasized that the alleged misconduct had *far-reaching significance* to the *public as a whole—that the reported misconduct affected <u>other clients</u> of these attorneys, present and future.*

737.    **Attorney Kaufman** outwardly represented to Plaintiff Daughter Lisa that she was refusing to conduct, even, a threshold inquiry.

738.    Evidencing Attorney Kaufman's ill-motives in refusing to open an investigation is the fact that she had called **Defendant Attorney Studen** about the afore-described complaint submitted by Plaintiffs, *but had not initiated any contact with Plaintiffs*.  Plaintiffs specifically named and reported misconduct by Defendant Attorney Studen—who was counsel for **Defendant BNY Mellon**.  The invoice for **Defendant Burns & Levinson**, filed in the matter of In re Marvin H. Siegel shows that, on or about, <u>**March 21, 2012**</u>, the Office of Bar Counsel spoke with Defendant Attorney Studen. (Copy of the afore-described invoice is provided in **Exhibit 185**).

739.    Given **Attorney Kaufman's** afore-described representations that she was refusing to make even a threshold inquiry into the reported misconduct, Plaintiffs submitted subsequent written reports of new misconduct *directly* to **Bar Counsel Constance Vecchione**.

740.    Each new report of misconduct contained distinct and different acts than the acts contained in the complaint of **February of 2012**; but, overwhelmingly stem from the *underlined original circumstances* and constitutes a *continuation* of the original misconduct set forth in the complaint of **February 2012**.

741.    In writing, **Bar Counsel Constance Vecchione** has, repeatedly and continuously, refused to initiate any investigation of the afore-described reports of misconduct.  Given the depth of specific detail of illegal conduct provided in writing to Bar Counsel—and the concrete and solid supporting documentation submitted, Bar Counsel's repeated refusal to even initiate an official inquiry evidences the designated Defendants and judges using their connections to hinder Plaintiffs.

742.    In **Bar Counsel Vecchione's** multiple written responses to Plaintiffs, she stated that she would not conduct any investigation into the allegations; and that she *would not* do so based on her characterization of the allegations as being mere complaints about unfavorable rulings and good faith errors of law (complaints about the result of rulings do not fall within the domain of the Office of Bar Counsel, but rather that of the appellate courts).

743.    As previously set forth, the complaints submitted to **Bar Counsel Vecchione** by Plaintiffs cannot legitimately or reasonably be characterized in the above-described manner.

744.    In **Bar Counsel Vecchione's** written responses, she attempts to give the impression that her refusal to open an investigation against the designated defendants was based on the proscribed rules governing the Office of Bar Counsel—which is a blatant misrepresentation.

745.    The content of Plaintiffs' submitted complaints set forth substantiated claims of criminal conduct and *outright corruption*; and, therefore, the allegations set forth in the complaints to Bar Counsel fall squarely within the promulgated rules of professional conduct.

746.    The written response by **Bar Counsel Vecchione** of **March 20, 2013** acknowledged, in the first paragraph, that Plaintiff Daughter Lisa had raised issues pertaining to *misconduct* by **Judge Abber**—which further proves Office of Bar Counsel and Board of Bar Overseers had a duty to open an investigation.

747.    **Bar Counsel Vecchione's** above-described written explanations of refusing to initiate an official inquiry evidences her intentional use of smoke and mirror tactics; that such repeated refusal to initiate an official inquiry is a deliberate effort to aid and abet the conduct of the designated attorneys and judges.

748.     Further bolstering the existence of improper use of influence by designated defendants and judges with **Bar Counsel Vecchione** is the fact that Bar Counsel Vecchione made a *veiled threat*, in writing, to Plaintiff Daughter Lisa.  In Bar Counsel Vecchione's written response of **March 20, 2013**, she stated:

> We are a disciplinary agency only and cannot interfere with decisions made by a court or other tribunal.  *Given the October 22, 2012 findings of the probate court, especially, as relevant to your own conduct, and in light of the Supreme Judicial Court's decision yesterday denying your petition for extraordinary relief*, this office will not pursue your complaints further at this time. . . .

> I note from the probate court docket, for example, that there appear to be undecided motions pending, some of which relate to the estate and some which relate to you personally [motions by opposing counsel to sanction me and to dismantle the Trust that our father created in 1982].  In view of the course of the proceedings to date, you may wish to consider retaining counsel to represent you if there remain issues on which *you wish to be heard by in court*.

749.     Suspect is the fact that **Bar Counsel Vecchione** sent the above-described letter *the day after* **Justice Botsford** issued her denial of Plaintiff Daughter Lisa's emergency civil action—especially suspect is that Bar Counsel Vecchione indicates that she was specifically waiting for Justice Botsford's "official" issuance before sending that letter.

### v.   Further evidence that Bar Counsel and Board of Bar Overseers refusal to investigate is not legitimate, and is based on ill-motives

750.     There is evidence that the Office of Bar Counsel and the Board of Bar Overseers have engaged in disparate handling of complaints.

751.      As previously set forth, one of the proclaimed reasons for not conducting an investigation was the fact that allegations involved a pending matter in the **Essex Probate & Family Court** (In re Marvin H. Siegel).

752.     There is an established pattern of conduct demonstrating that the Office of Bar Counsel have, in fact, conducted investigations of complaints, in other matters, that *involved pending actions* in the State courts.

753.     For example, in the matter of <u>Admonition No. 01-65</u>, the respondent attorney was appointed executor of an estate in **April of 1993**, involving the probating of a will that was filed with the Middlesex Probate Court.  Four (4) years later in **<u>1997</u>**, the respondent attorney still had not settled the estate.  *The primary beneficiary filed a complaint with the Office of Bar Counsel*.  The respondent did not file a First and Final Account with the Probate Court until **<u>June of 2000</u>**.  As evidenced in the matter of <u>Admonition No. 01-65</u>, Bar Counsel conducted an investigation while the probate matter was *still* pending and effectuated disciplinary action against the respondent attorney; the respondent attorney was sanctioned for "failing to settle this simple estate matter in a timely manner."

754.     As established in the various complaints submitted by Plaintiffs to the Office of Bar Counsel and the Board of Bar Overseers, Plaintiffs presented substantial and substantiated information regarding: lack of filings by designated Defendants that are procedurally required; fraudulent filings by designated Defendants; misrepresentations made by designated Defendants; and the like.

755.     There is an established pattern of conduct demonstrating that the Office of Bar Counsel has conducted investigations in other matters specifically consisting of the above-described type of allegations; and, therefore, it is evidenced that above-described reported misconduct is, in fact, *within the purview of Bar Counsel*.   Where the complaints submitted by Plaintiffs contain the *very same type of allegations* as described above, the refusal to investigate by the Office of Bar Counsel and the Board of Bar Overseers is based on illicit motives.  Specific examples include: BD-2007-048; Admonition No. 97-66.

756.     As established in the complaint submitted by Plaintiffs to the Office of Bar Counsel and the Board of Bar Overseers, Plaintiffs presented substantial and substantiated information, specifically, demonstrating unethical solicitation of legal services.  It is established that this type of reported misconduct is, de facto, within purview of Bar Counsel, showing that Bar Counsel's and the Board of Overseer's refusal to investigate is based on illicit motives.

### vi.  Subsequent events evidence Bar Counsel's acknowledgment of misconduct

757.     As set forth, Plaintiffs submitted a written complaint to **Bar Counsel Constance Vecchione** on **November 15, 2013**—and had previously reported judicial misconduct.

758.     As previously set forth, on or about **December 5, 2013**, both, **Judge Abber** and **Judge Ricci** had been abruptly "reassigned" to other counties—**Judge Abber** was moved to **Middlesex County** and **Judge Ricci** to **Essex County**.

759.     On **December 4, 2013**, issued an Order for a pre-trial conference to be held in the matter of In re Marvin H. Siegel to take place on **December 30, 2013**.  Without any notice to Plaintiff Daughters, **Judge Abber** began his "new" assignment in Middlesex County the following day on **December 5, 2013**.  (Copy of the Order for pre-trial conference is provided in **Exhibit 186**).  In addition, Plaintiff Daughter were not sent notice of the order scheduling the pre-trial conference.

760.     Plaintiffs were not provided *any* notice, *of any kind*, that **Judge Abber** was no longer presiding over In re Marvin H. Siegel until Plaintiff Daughter Lisa appeared in court on **December 30, 2013**.  To reiterate, Judge Abber had been the presiding judge in the matter of In re Marvin H. Siegel for over two (2) years.

### L.  Explicit confirmation by Registrar O'Brien that Plaintiffs were not served notice of the ordered Pre-Trial Conference issued by Judge Abber

761.     The court records regarding the matters of In re Marvin H. Siegel show a long and continuous pattern of illicit conduct by designated Defendants and **Judge Abber** deliberately and deceptively excluding Plaintiffs from being present at court proceedings regarding matters of In re Marvin H. Siegel.

762.     Specific to the above-described Order for Pre-Trial issued by **Judge Abber** on **December 4, 2013**, deliberate and deceptive conduct in not serving notice to Plaintiffs was substantiated through the personal knowledge of Registrar Pamela Casey O'Brien for Essex Probate & Family Court.

763.     Registrar Pamela Casey O'Brien explicitly confirmed to Plaintiff Daughter Lisa and an unrelated third-party—in person—that notice of the Order for Pre-Trial Conference *had* *not* been sent out to Plaintiffs, but that notice had been sent out to all other parties.

764.     The event that initiated Plaintiff Daughters finding out about the scheduled pre-trial conference was when Plaintiff Daughter Lisa had received scant correspondence from **Defendant Attorney Barbar** on or about **December 13, 2013**.  Attorney Barbar's letter set forth one date and time that designated Defendants had selected to have a required outside of court pre-trial meeting for the afore-referenced pre-trial conference. (Copy of letter and email in **Exhibit 187**).

765.     As a result of **Defendant Attorney Barbar's** letter, Plaintiff Daughters then became aware that a pre-trial conference had been scheduled without their knowledge.  Consequently, Plaintiff Daughter Lisa went to to the Essex Probate & Family Court in Salem (the following business day being **December 16, 2013**) to review the court files in the matter of In re Marvin H. Siegel.

766.     Upon reviewing the court files for In re Marvin H. Siegel, Plaintiff Daughter Lisa found the Order for Pre-Trial Conference and the Notice of Pre-Trial Conference.  Immediately, Plaintiff Daughter Lisa went to the Clerk's Office and asked to speak with Registrar Pamela Casey O'Brien—and that is when Plaintiff Daughter Lisa found out that she and Plaintiff Daughter Devora had, in fact, not been sent the order and notice for pre-trial conference scheduled.

767.     Within minutes, Registrar Pamela Casey O'Brien met with Plaintiff Daughter Lisa —and the person, who had accompanied her to the court (who has no relation or involvement in the underlying probate matter whatsoever).

768.     Plaintiff Daughter Lisa showed the afore-described documents to Registrar O'Brien, whereupon Registrar O'Brien turned the Order over and specifically directed Plaintiff Daughter Lisa's attention (and the accompanying person) to the back of the Order, and explained that the lack of Plaintiffs' initials signified that the notice had not been mailed to Plaintiffs.

769.     Registrar O'Brien explicitly stated that the Clerk's Office had not sent out the notice to Plaintiffs because the notices were directly and exclusively sent out by the secretary for **Judge Abber**—*not* by the Clerk's Office.

770.     Registrar O'Brien stated that the notice for the Order for the pre-trial conference had nothing to do with the Clerk's Office and explicitly explained that she, personally, recognized that the handwriting on the back of the court's copy of the notice was that of **Judge Abber's secretary**.

II. **DELIBERATE DISREGARD BY ATTORNEY GENERAL MARTHA COAKLEY, THE SUPREME JUDICIAL COURT & OTHER REGULATORY ENTITIES OF PLAINTIFFS' DIRECT SUBMISSION OF CONCRETE AND OBJECTIVE EVIDENCE OF CORRUPTION IN THE PROBATE & FAMILY COURT**

A. **Well-established overt knowledge by Attorney General Martha Coakley of prevalent elder abuse by nursing homes regardung unnecessary use of antipsychotics**

771.    As an overall custom and practice, **Attorney General Martha Coakley** has overtly disregarded the overwhelmingly, open and obvious, routine practice of nursing homes and other professional careproviders improperly giving antipsychotics to elders diagnosed with dementia.

772.    In **2005**, the Food and Drug Administration (FDA) issued its most serious medication alert—known as a black-box warning—regarding the overuse of the antipsychotics (such as, Seroquel) for elderly dementia patients, specifically, because of the likelihood of fatality from using antipsychotics.  Identical FDA black-box warnings followed regarding Zyprexa and Risperdal.

773.    The above-described antipsychotics increase the risk of fatality for elders having dementia, arising from pneumonia and cardiovascular complications.  In addition, other common physical problems from use of these antipsychotics are sudden drop in blood pressure, abnormal heart rhythms and urinary problems.

774.    **Defendant Attorney Ledoux** has, explicitly, acknowledged, *in court*, the above-described FDA black-box warnings—with no objection having been made by any other designated Defendant. (Refer to transcript for **January 30, 2012**, page 16 in previously referenced Exhibit 24).

775.    As researched and published by Krista Maier, Esq.—who has worked in the pharmaceutical industry since 2001, elders are being given antipsychotics to "keep them from causing trouble for overworked and undertrained nursing [] staff."  Elders are put at risk daily.  Chemical Restraints and Off-Label Drug Use in Nursing Homes, 16 MSU Journal of Medicine and Law 243, 244 (2011-2012). (Copy of the journal article is provided in **Exhibit 188**).

776.     In **2009**, Eli Lilly was prosecuted for off-label promotion of its antipsychotic drug (Zyprexa) for unapproved uses in the treatment of dementia.  It was alleged that Eli Lilly had specifically promoted Zyprexa as a way to "reduce nursing time and effort" because it sedated unruly nursing home residents. Eli Lilly paid $1.415 billion in federal fines, with a dozen states opting out and obtaining amounts ranging from $13 to $45 million.  **Attorney General Coakley** opted out of the federal settlement and pursued settlement in that manner.

777.     Also, in **2009**, AstraZeneca—maker of the antipsychotic drug Seroquel— was prosecuted by the federal government for unapproved d uses in the treatment of dementia and agreed to pay $520 million.

778.     In **2010**, Johnson & Johnson was charged with paying kickbacks to the Omnicare nursing home chain for prescribing Risperdal and Levaquin—with the U.S. Attorney's Office in Boston having filed an action.  **Attorney General Coakley** issued a press release (in  **April of 2010**) stating that she was "playing a lead role in the investigation and prosecution of cases involving the use of kickbacks and other illegal marketing of antipsychotic drugs"—***especially, "the use of its atypical antipsychotic drug Risperdal in nursing homes."***  (Copies of AG's press releases from 2009 through 2012 are provided in **Exhibit 189**).

779.     I n **2011**, **Attorney General Coakley** filed a complaint against Janssen Pharmaceuticals, Inc. (a subsidiary of Johnson & Johnson) for promoting Risperdal to be used with elders having dementia.  A consent judgment was reached for **$15.1 million**.

780.     In **2011**, **Attorney General Coakley** reached a consent judgment of **over $2 million** with AstraZeneca, for its unlawful promotion of the use of Seroquel with elders having dementia—which **Defendant Attorney Ledoux**, explicitly, brought to the attention of **Judge Abber**, in-court, on **January 30, 2012** (page 16 of transcript).

781.     In **2012**, the Boston Globe had reported and provided actual data showing that the Commonwealth has had actual knowledge of the *pervasive* and *unnecessary* use of antipsychotics in nursing homes; that <u>no</u> implementation of accountability has taken place *against these nursing homes*.

782.     Multiple articles have been published by the Boston Globe that show— here, in Massachusetts—the prevalent use of antipsychotics for elders, diagnosed with dementia, specifically occur because professional caregivers want to make their work easier by sedating the elders.

783.    Articles written and co-written by Kay Lazar of the Boston Globe include:

A rampant prescription, a hidden peril, published on **April 29, 2012**; and

Mass. fails to rein in sedating of seniors: Nursing homes that overuse antipsychotics unpunished, published on **December 23, 2012**.

(Copies of the articles are provided in **Exhibit 190**).

784.    Bolstering the above-described abuse of antipsychotics—with *particular* regard to elders having dementia—is the testimony of **Defendant Dr. Peter Cohen** in the matter of In re Marvin H. Siegel (on **January 30, 2012**), wherein he attested:

Seroquel is – is quite sedating and in – in some settings, it's actually used to *either induce sleep* or to help control anxiety []

785.    The above-referenced **2012** news articles, published in the Boston Globe, provided the following information:

- data shows that an overwhelming high percentage of elders do not have a psychosis or related condition that warrants antipsychotics (like Seroquel, Risperdal, Zyprexa), but they are still given these antipsychotics;

- government data shows that Massachusetts nursing homes overuse and unnecessarily use antipsychotics *more than the national average*;

- nursing home administrators admit to antipsychotics because of generalized and purported aggressive behavior;

- other improper reasons cited for giving elders antipsychotics are to "help" them sleep at night; and

- medical documentation shows that agitation in elders having dementia occur because of pain from an undiagnosed urinary tract infection, as well as, resulting from anxiety because of an uncomfortable environment or situation creating confusion and fright.

786.    As provided in the above-discussed published review authored by Krista Maier, a study of **2004** nursing home data showed that *over **86.3%*** of nursing home patients had been given antipsychotics as ***an off-label use***.  Most of those patients had been diagnosed with dementia and **63%** of those elders were *residents of a for-profit facility*.  **75%** of those elderly patients were enrolled in either Medicare or Medicaid.

787.    As a matter of standard custom and routine practice, court appointed guardians obtain court orders authorizing forced administration of antipsychotics for elders under their authority—which standard process is known as a Roger's order. The ease in obtaining a Roger's order is well established; and is the epitome of rubber-stamping.

788.    An overwhelming percentage of elders under guardianship in the Massachusetts Probate & Family Court system who are given antipsychotics, have <u>no</u> prior history of any psychosis or other mental illness warranting treatment with antipsychotics.

789.    As previously set forth, **Attorney General Coakley** filed an action against the manufacturers of Seroquel for the ***specific** illegal act of promoting the use of Seroquel for elderly people diagnosed with dementia*—it is axiomatic, that given the afore-described prosecutions of the several drug manufacturers by **Attorney General Coakley**, she had knowledge of the actual medical providers and medical facilities having been recipients of such promotions from the drug manufacturers.

790.    It is highly suspect that **Attorney General Coakley** pursued money actions against several drug manufacturers for illegal promotion of using antipsychotics for elders having dementia, but completely refrained from prosecution of *nursing homes* and *prescribing doctors* for well-publicized and established abuse of the elderly by unnecessary use of antipsychotics.

791.    As evidenced, **Attorney General Coakley** has engaged in selective prosecution.  Egregiously she has espoused to the public how she has taken action to protect the elders in this Commonwealth, but, in reality, she has aided and abetted elder abuse through overt omissions.  The only action **Attorney General Coakley** took was to follow the money.

**B.** **Attorney General Martha Coakley and the Supreme Judicial Court have overtly disregarded presented evidence—concrete and objective evidence—of unlawful and unjustified forced use of antipsychotics and other acts of elder abuse by public officials, with specific regard to In re Marvin H. Siegel**

792.     As previously set forth, in **March of 2012**, Plaintiff Daughter Lisa filed an emergency civil action with the Single Justice of the Supreme Judicial Court that was wholly premised on illegal and unconscionable acts by multiple court officials of the Essex Probate & Family Court; the overwhelming thrust of the civil action seeking injunctive relief from continuous unlawful acts—specifically, regarding forcing Father to ingest or submit to injection of antipsychotics and other multitude acts of elder abuse. (Refer to previously referenced Exhibit 143).

793.     The Essex Probate & Family Court was a specific party named in the civil action filed by Plaintiff Daughter Lisa.   At the time of filing the above-described emergency civil action, the Clerk's Office for the Supreme Judicial Court directed Plaintiff Daughter Lisa to serve a copy of the petition to **Chief Assistant Attorney General Bill Porter** of the Massachusetts Attorney General's Office—as it is the standard custom and practice of the Massachusetts Attorney General's Office to act as counsel for public officials and State agencies when named as defendant in civil actions.

794.     Plaintiff Daughter Lisa served, by in-hand delivery, a copy of the above-described emergency petition and accompanying documentation to the **Massachusetts Attorney General's Office**.  De facto**, Chief Assistant Attorney General Porter** had actual knowledge of substantiated illegal acts of **Judge Jeffrey Abber** and by the officials of the Essex Probate & Family Court, specific to the underlying matter of In re Marvin H. Siegel.

795.     The **Massachusetts Attorney General's Office** directly served as legal counsel for the Essex Probate & Family Court; as it was named as defendant in the matters of SJ-2000 and SJC-11193.  Accordingly, the Attorney General's Office reviewed substantial and independent evidence of grave criminal misconduct by the designated Defendants.

796.     The failure of the **Attorney General's Office** to address the allegations set forth in the petition filed by Plaintiff Daughter Lisa exceeds willful blindness, to actual condoning of illegal conduct—if not, furthering and facilitating such misconduct.

797.   Such omissions by the **Attorney General's Office** is, also, evidence of the designated Defendants having used its afore-described connections to prevent Plaintiffs from obtaining legal relief.

### i.  Evidence of opportunity for improper influence

798.  Established is the fact that **Attorney General Coakley** and various assistant attorney generals (and other prosecutors) are affiliated with the **American Inns of Court**. Attorney General Coakley is specifically affiliated with the **Frank J. Murray Inn of Court.**  (Provided is a copy of information published on Martha Coakley's own website in **Exhibit 191**).

799.  Already established is the fact that **Judge Abber** and various counsel of **Defendant Burns & Levinson** (representing **Defendant BNY Mellon** in the matter of In re Marvin H. Siegel) belong to the **American Inns of Court**, and particularly, the **Massachusetts Family and Probate American Inn of Court**—along with, **Paula Carey, Chief Justice of the Trial Court** (Former Chief Justice of the Probate & Family Court) and **Angela Ordonez, current Chief Justice of Probate & Family Court**

800.  Established is the fact that **Attorney General Coakley** is a Life member of the **MBF Society of Fellows**, along with **Justice Margot Botsford (Life member), Justice. Barbara Lenk (Life member), Justice Francis X. Spina (Life member)**, **Judge Abber** and **Judge Paula Carey**.

801.  The designated Defendants named in the emergency petition who belong to the **MBF Society of Fellows** are:  **Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux, Defendant Attorney Maxa Berid,** and **Defendant Attorney Brian Cuffe**.

802.  As previously established, membership for the above-referenced chapters of the **American Inns of Court** and the **MBF Society of Fellows** is exclusive; as well as, contravening the professional rules of ethics for the Massachusetts judiciary.

**ii. <u>Specific evidence presented regarding unlawful concealed use of antipsychotics</u>**

803.    The audio recording of the court proceeding held on **<u>December 12, 2011</u>** (in previously referenced Exhibit 23) was provided to the Supreme Judicial Court and all parties, which contained the following evidence:

> **Defendant Attorney Cuffe** admitting, in court, that he did not have authority to facilitate the concealed use of antipsychotics for Father; and

> **Defendant Attorney Cuffe** admitting, in court, that he had actual knowledge that the home health care agency (**Defendant Right At Home**) was concealing antipsychotics in Plaintiffs' father's food.

804.    Also presented was supporting documentation of an email from the staff of **Defendant Right At Home** that explicitly described the act of concealing antipsychotics, at the *very* direction of **Defendant Attorney Cuffe**.  (Copy of the above-referenced email is provided in **Exhibit 192**).

805.    Plaintiffs submitted indisputable evidence that **Judge Abber** did not take *any* remedial action regarding the above-described unlawful conduct, despite having overt and actual knowledge.

**iii. <u>Nature and scope of other substantial evidence of unlawful conduct by public officials presented to the Attorney General's Office and the Supreme Judicial Court</u>**

806.    As set forth, Plaintiff's emergency civil action focused on seeking *court orders* to stop specific misconduct of **Defendant Attorney Cuffe** (as court appointed guardian) and **Defendant Attorney Feld** (as court appointed conservator)—which misconduct has been facilitated by **Judge Abber** and other opposing counsel involved in the matter of In re Marvin H. Siegel.  Defendants' misconduct—individually and jointly— center around grave, emotional and physical abuse of Plaintiffs' father.

807.    Substantiated evidence presented to the **Attorney General's Office** and the **Supreme Judicial Court**, included—but, was not limited to:

> Defendants' unlawful involuntary commitment of Father to **Defendant Merrimack Valley Hospital**;

> Defendants' facilitation of altering the Essex Probate & Family Court's electronic docket for In re Marvin H. Siegel;

Defendants' continuous retaliatory and malicious acts against Plaintiffs' exercising their legal right to advocate for their constitutional rights and that of their father;

Defendants unlawfully and unethically isolating Plaintiffs' father from family and friends; and

Defendants repeatedly attempting to force Plaintiffs' father out of his home into a long-term care facility.

808.    Plaintiffs provided a compilation of audio court recordings from the matter of In re Marvin H. Siegel and court documentation in support of the above-described emergency petition for extraordinary relief.

809.    As previously set forth, the Plaintiffs' emergency petition and accompanying documentation provided substantial independent and concrete evidence of several public officials committing the illegal act of unauthorized concealed drugging of Plaintiffs' father with the antipsychotic Seroquel.

### iv.  <u>No filed response by Attorney General's Office</u>

810.    **Attorney General Coakley** has an overt pattern of conduct that evidences her refusal to prosecute public officials with whom she has apparent partisan ties—for example, the recent convictions for corruption in the Massachusetts Probation Department was pursued *by the* U.S. Attorney General's Office, <u>*not*</u> Attorney General Coakley.  It is well established that Attorney General Coakley made several *personal* recommendations for positions hired in the Probation Department, and explains why she deliberately did not take any action against the Probation Department.

811.    Other examples of misconduct by public officials that **Attorney General Coakley** conspicuously did not take action include—but are not limited to: fraud by former Boston firefighter, Albert Arroyo; Lt. Governor Tim Murray's reckless motor vehicular crash; evidenced bribes taken by Senator Dianne Wilkerson and Boston City Councilor Chuck Turner.

812.    The afore-described pattern of lack of prosecution by **Attorney General Coakley** evidences selective prosecution, especially, where she *fervently* pursued the indictment of Former Treasurer Tim Cahill, for using Lottery advertisement for campaigning.  Also, speaking volumes is her indicting Richard Vitale—close "friend" of former House Speaker Sal DiMasi, for connected illegal campaign and lobbying finances, but *did not* pursue indictment against DiMasi.

813.     As evidenced by **Attorney General Coakley's** prior pattern of conduct, it lends much credibility that she, likewise, *deliberately chose* <u>not</u> to carry out her prosecutorial duties against the named Defendants in the afore-described filed emergency petition of Plaintiff Daughters—which emergency petition and supporting documentation were, in fact, served to the Attorney General's Office.

814.     De facto, **Chief Assistant Attorney General Porter** was assigned to represent the Essex Probate & Family Court, wherein **Essex Probate & Family Court** was specifically named as a defendant in the civil action filed with the Supreme Judicial Court.

815.     **Chief Assistant Attorney General Porter**—as counsel for a specific designated party (**Essex Probate & Family Court**) in the afore-referenced civil action— did not file any responsive pleading, of any kind.  He *did not* file any denials or claims of defense to the allegations set forth against **Judge Abber**, in his judiciary role for **Essex Probate & Family Court**; or for the specific allegations for illicit alterations of docket information by the Clerk's Office of the **Essex Probate & Family Court**.

### v.  Suspect nature of Justice Botsford's dismissal of Plaintiff's emergency civil action against Defendants and the Essex Probate & Family Court

816.     **Justice Margot Botsford** was the single justice assigned to preside over the Plaintiff's civil action.

817.     As previously established, **Justice Botsford** is a member of the **MBF Society of Fellows**, along with the primary named misfeasors in the above-described emergency petition: **Judge Abber, Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux, Defendant Attorney Brian Cuffe**, and **Defendant Attorney Maxa Berid**.

818.     Demonstrated by the memorandum issued by **Justice Botsford**, she did not review, in any manner, the merits of the allegations presented in emergency petition. (Copy of **Justice Botsford's** Judgment is provided in **Exhibit 193**).

819.     As a matter of law, a single justice is *required* to hold an evidentiary hearing *when* a plaintiff/petitioner presents a *seemingly valid* claim of a state and federal constitutional violation(s)—of serious import, when a plaintiff/petitioner files a petition, pursuant to G.L. c. 211, § 3, and meets the afore-described standard, a subsequent hearing is not a matter of discretion, but, rather, a *mandated requirement*.  <u>Ozenomic, Inc. v. Alcoholic Beverages Control Commission</u>, 412 Mass. 100, 108-109 (1992); <u>Collins v. Comm</u>, 412 Mass. 349, 351-352(1992).

820.     Demonstrated by the afore-described emergency petition filed by Plaintiff Daughter Lisa, pursuant to G.L. c. 211, § 3, she provided *more than ample* evidence of *several* state and Federal Constitutional violations, that set forth substantiated evidence of Plaintiff Daughters (and Father) being gravely and *irremediably* deprived of substantial liberty and property rights.

821.     The fact that **Justice Botsford** did not address the merits of Plaintiffs' allegations in her written Judgment, in any manner—and in particular, a *complete* avoidance of the subject matter regarding explicitly pled constitutional violations, it is further bolstered that Plaintiffs' claim that the Judgment issued by **Justice Botsford** was the result of improper influence used by Defendants, and that she *did not* conduct a legitimate judicial review.

### Inherent conflict of interest between designated Defendants and the Full Bench of the Supreme Judicial Court

822.     Plaintiffs appealed the afore-described Judgment by **Justice Botsford** to the Full Bench of the Supreme Judicial Court—particularly, focusing on **Justice Botsford's** failure to comport with cornerstone State and Federal constitutional requirements.

823.     Established is the fact that **Justice Barbara Lenk** is Past-President of the **Boston Inn of Court**; that **Attorney General Coakley** is affiliated with the **Frank J. Murray Inn of Court**; that **Hon. Paula Carey** and **Judge Abber** (Board member since 2012) are members of the **Massachusetts Family and Probate American Inn of Court.**

824.     Established is the fact the following Justices of the Supreme Judicial Court are members of the exclusive **MBF Society of Fellows**: **Hon. Margot Botsford**, **Hon. Barbara Lenk** and **Hon. Francis X. Spina**; along with: **Attorney General Martha Coakley, Hon. Paula Carey**, **Judge Abber**, **Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux, Defendant Attorney Maxa Berid,** and **Defendant Attorney Brian Cuffe**.

825.     The **Board of Bar Overseers** is an entity created and operated *by* the Supreme Judicial Court.  The members of the **Full Bench** of the **Supreme Judicial Court** have substantial communications with attorneys serving as hearing officers and special prosecutors for the Board of Bar Overseers.  The Defendants who have been hearing officers and/or special prosecutors include: **Defendant Attorney Marsha Kazarosian, Defendant Attorney Robert Ledoux,** and **Defendant Attorney Walter Costello**.

826.    **Defendant Attorney Maxa Berid** served eight (8) years on the **Massachusetts IOLTA Committee**—an entity created and overseen by the Supreme Judicial Court.  In **2005,** the Supreme Judicial Court appointed Defendant Attorney Berid to the **Commission for Access to Justice**. (Copy of Defendant Attorney Berid's profile and press release for the Commission for Access to Justice provided in previously referenced Exhibit 11).

827.    As previously set forth, **Defendant Attorney Marsha Kazarosian** is current President of the **Massachusetts Bar Association** (MBA), and has been a high-ranking officer of the **MBA** for many years.  She has been a member of the **Joint Bar Committee** for Judicial Nominations and has served on the **Supreme Judicial Court's Access to Justice Committee**.  (Refer to previously referenced Exhibit 8).

828.    Further evidencing **Defendant Attorney Kazarosian** having an exclusive connection with numerous and various Massachusetts judiciary is the position that she has held as chair of the **MBA's Education Committee**.  Co-chair, Douglas Sheff explicitly stated in the **Massachusetts Lawyer's Journal** segment called "conference programs will spotlight judges":

> We're going to try to shake it up and give them something more interesting, ***something that they can't get anywhere else***.  **There will be a strong judicial presence, the like of which they haven't seen before**.

A copy of the article from the **Massachusetts Lawyers Journal** is provided in **Exhibit 194**.

829.    In the afore-described article, Attorney Sheff emphasized the conference program's "uniqueness" and attributed it to an "increased presence of judges on the CLE panels, a bench-bar panel will feature a number of prominent judges, including chief justices."

830.    **Justice Botsford** has held herself out to the public as an active member of the **MBA**.  (Copy of Justice Botsford's profile is in **Exhibit 195**).

831.    Both, **Defendant Attorney Ledoux** and **Justice Botsford** are actively involved with **National Alliance on Mental Health Illness** (NAMI).  **Justice Botsford's husband**, Steve Rosenfeld, Esq., is on the Board of NAMI—a copy of Attorney Rosenfeld's article that he published is provided in **Exhibit 196**, showing the substantial and active involvement that he and **Justice Botsford** have with NAMI.

**Evidence of overt acts of influence**

**Multiple ex-parte communications by Defendants with the Supreme Judicial Court**

832.    **Defendant Attorney Cukier** submitted an invoice, on behalf of **Defendant Burns & Levinson**, to the **Essex Probate & Family Court** in the matter of In re Marvin H. Siegel that evidences Defendant Attorney Cukier asked her colleague, Attorney Stenger, to use her inner connections *with* **Susan Mellen, then-Supreme Judicial Court Clerk for the Commonwealth**.  Attorney Stenger, a Partner of **Defendant Burns & Levinson,** has specialized in the area of appellate law for a number of years.  (Copy of Attorney Stenger's profile is provided in **Exhibit 197**).

833.    The afore-described invoice stated that on **05/02/12** for "LMC" (Attorney Cukier) that **Defendant Attorney Cukier** placed a call to **Attorney Stenger**.  On the same date (**05/02/12**), under "SES" (Attorney Stenger), the invoice states: "Call from Attorney Cukier regarding appellate proceedings in Supreme Judicial Court."  (Provided is a copy of the above-referenced invoice submitted by Defendant Attorney Cukier in **Exhibit 198**)

834.    In the entry for **5/03/12**, under "SES", it states forty (40) minutes billed for "telephone conference with Susan Mellen.  Draft email to Attorneys Studen and Cukier regarding status and strategy."

835.    As previously set forth, **Defendant Attorney Studen** of **Defendant Burns & Levinson** was specifically named as a party in the afore-described emergency civil action filed by Plaintiff Daughter Lisa.  It is highly suspect that Defendant Attorney Studen did not file *a responsive pleading* with the Supreme Judicial Court—or any of the other Defendants; especially, given Attorney Stenger's afore-described call to her connections with individuals who have direct contact with the justices of the Supreme Judicial Court.

836.    Subsequently, on **January 4, 2013**, **Defendant Attorney Cuffe**, *also*, engaged in ex-parte communications with **then**-Clerk Mellen—*just days prior* to the scheduled date for oral argument.  The invoice entry for **1/04/13** states that Defendant Attorney Cuffe had a "call with *Clerk Mellen* re: hearing."  (Copy of the afore-described invoice is provided in **Exhibit 199**).

837.    Plaintiff Daughter Lisa had discovered the existence of the ex-parte call upon a subsequent review of **Defendant Attorney Cuffe's** filed invoice.

**Altered docket of the Supreme Judicial Court**

838.    *No* responsive pleading was filed by any designated Defendant in the matters of SJ-2000 and SJC-11193.  In fact, the Defendants—*all but* **Chief Assistant Attorney General Bill Porter**—sent a letter to then **Clerk Mellen** of the Supreme Judicial Clerk confirming that they were not filing a brief.  (Copy of the Defendants' letter is provided in **Exhibit 200**.

839.    When the Supreme Judicial Court sent notice that oral argument had been scheduled for <u>**January 7, 2013**</u>, **Defendant Attorney Costello** (counsel for **Defendants Cuffe** and **Feld**) sent a cover letter to then **Clerk Mellen** giving formal notice that he *would be* presenting oral argument, on behalf of his clients.  Defendant Attorney Costello's notice of appearance was physically entered onto the docket of SJC-11193. (Copy of Defendant Attorney Costello's afore-described cover letter is provided in **Exhibit 201**).

840.    The night *prior* to oral argument (**January 6, 2013**) Plaintiff Daughter Lisa checked the electronic docket for SJC-11193; whereupon she discovered that the docket entry documenting **Defendant Attorney Costello's** Notice of Appearance had been deleted—as though the entry of Defendant Attorney Costello's Notice of Appearance had never even been entered.  The electronic docket did not contain *any* notation that the entry had been deleted.

841.    The next day (**January 7, 2013**)—at oral argument before the Full Bench—Plaintiff Daughter Lisa was the *only* party who presented argument.  Even more suspect than **Defendant Attorney Costello** not presenting argument after having giving advance notice that he would do so, was the fact that he was *physically present* for oral argument—along with, **Defendant Attorney Cuffe**, **Defendant Attorney Feld, Defendant Attorney Kazarosian,** and **Defendant Attorney Berid**.

842.    **Chief Assistant Attorney General Porter**, as counsel for **Essex Probate & Family Court** did not present oral argument on **January 7, 2013**—and as previously set forth, he did not submit a brief.  During oral argument on **January 7, 2013**, Plaintiff Daughter Lisa explicitly informed the Full Bench about the afore-described alteration of the docket entries for SJC-11193—which took place on live webcam.

843.    *<u>After</u>* the Full Bench's issuance of its decision on **March 19, 2013**, the docket, *<u>again</u>*, had been altered.  This time the caption of the action had been changed. The alteration even appeared on the rescript itself.

844.     *Prior* to **January 7, 2013,** the caption for SJC-11193, originally, had been on the docket, explicitly, shown as: "**Lisa Siegel Belanger, Esq. v. Essex Probate & Family Court et al**". Correspondence from the Supreme Judicial Court, *prior* to **January 7, 2013**, shows the original caption—a copy of which is provided in **Exhibit 202**.

845.     As evidenced, the docket has been changed to read the caption as: **"Lisa Siegel Belanger vs. Brian Cuffe and others."** The party designation of "**Essex Probate & Family Court**" had been completely removed from the caption.

846.     Evidently, there is a pattern of **Clerk Mellen** having tampered with evidence in other matters before the Supreme Judicial Court. Aliana Brodmann E. von Richthofen had gone through the complete appeal process regarding the underlying matter of an employment retaliation suit that she had filed against Dana-Farber. In **March of 2010**, Ms. Richthofen had received the Supreme Judicial Court's denial for her Application for Further Appellate Review. Upon review of the Supreme Judicial Court's electronic docket, she had discovered numerous misfilings and omissions in the electronic docket; consequently, she went to review the file when **Clerk Mellen** had informed Ms. Richthofen that the entire file was "inexplicably missing". When no efforts were made to locate the file, Ms. Richthofen filed a complaint with then Chief Justice Margaret Marshall.

847.     In **February of 2012**, on behalf of Ms. Richthofen—specifically, regarding the afore-described allegations, then **U.S. Senator Scott Brown** filed a complaint with **U.S. Department of Justice**. (Downloaded information regarding the above-described allegations made by Ms. Richthofen in **Exhibit 203**).

848.     On **January 7, 2013**, *during* Plaintiff Daughter Lisa's oral argument to the Full Bench*,* she openly informed the justices about the specific details of the altered docket*.*

849.     Approximately 6 months later, **Clerk Mellen** took early retirement (which was *by* **August 1, 2013**). It is suspect that **Susan Mellen's** early retirement was due to her illicit acts that had been publicly exposed. The Supreme Judicial Court kept Susan Mellen's early retirement very quiet and this is seems unusual where Susan Mellen had been Clerk since **1999**. The information in the press release issued on **August 13, 2013** was very scant and is suspect for such a lengthy tenure. (Copy of press release regarding Susan Mellen is provided in **Exhibit 204**).

## Disparate treatment at oral argument

850.    The record shows the Plaintiff Daughters received significant and overt disparate treatment from all the other cases heard before the Supreme Judicial Court on **January 7, 2013**—which all the arguments presented can be viewed through the official website of the Supreme Judicial Court.

851.    Noticeably, each side for the other four (4) cases argued on **January 7, 2013** received, at least, fifteen (15) minutes to present oral argument, if not *more*— Plaintiff Daughter Lisa received ten (10) minutes even though she directly brought it to the Full Bench's attention that the designated Defendants had indicated to the Supreme Judicial Court that they were not presenting oral argument.  Plaintiff Daughter Lisa specifically requested that the Full Bench afford her more than her allotted reduced time of ten (10) minutes.   Chief Justice Ireland summarily rejected Plaintiff's request.

852.    During oral argument, Chief Justice Ireland had overtly expressed that the justices, in fact, <u>had</u> <u>not</u> read Plaintiff Daughter Lisa's brief.  The Full Bench refrained from asking <u>any</u> substantive questions; which was a stark contrast from the justices' vigorous questioning of counsel, in the other four (4) cases argued on that same day (**January 7, 2013**).

853.    As an appellate practitioner of, approximately, fifteen (15) years, **January 7, 2013** was the *first time* that Plaintiff Daughter Lisa had ever been told, by any appellate court panel, that her allotted time "was all hers"; that she could use it any way that she liked.  Plaintiff's prior experience before the appellate courts as legal counsel for others, always, consisted of vigorous questioning.

854.    Of significance, this was the first time that Plaintiff Daughter Lisa had appeared before an appellate court as a pro se litigant.

## Disparate treatment in the issued written decision

855.     The original civil action filed by Plaintiff Daughter Lisa, with **the Supreme Judicial Court**, was pursued under G.L. c. 211, § 3—which statute authorizes the Supreme Judicial Court to exercise its power of original superintendence when presented with extraordinary circumstances.

856.     As previously set forth, the afore-described petition filed by Plaintiff Daughter Lisa provided *indisputable and uncontroverted proof* that **Defendant Attorney Cuffe** facilitated the unlawful concealed use of antipsychotics with Father—that the very antipsychotics forcibly given to Father had been well-established and well-known to cause fatality amongst elders diagnosed with dementia. Defendants knew that Father has a history of pneumonia and low blood pressure, which are the primary factors in leading to death.

857.     Audio court recordings and court records for the matter of In re Marvin H. Siegel show **Judge Abber's** outright disregard of admitted guilt by **Defendant Attorney Cuffe**; that **Defendant ESMV**—as a state designated elder protective service agency— aided and abetted such unlawful conduct; and that Father's own attorneys (**Defendant Attorney Kazarosian** and **Defendant Attorney Myette**) aided and abetted such unlawful conduct.

858.     As set forth, the afore-described emergency petition made an overwhelming colorable showing of embedded corruption in the administration of the underlying matter by the Essex Probate & Family Court.  In prior matters, the Supreme Judicial Court has used its authority and power of superintendence upon demonstration of a trial court's prejudicial administration of a case.

859.     Prior to the creation of the various chapters of the **American Inns of Court (in 1989)**, the Supreme Judicial Court had, in fact, specifically expressed that it was the Court's duty to provide relief to a petitioner who had been aggrieved by judicial misconduct—and specifically pursued under G.L. c. 211, § 3.  In *Foley v. Lowell Division of District Court*, 398 Mass 800 (1986), the Supreme Judicial Court stated: "we consider the matter under our broader inherent common law and constitutional powers to supervise the administration of justice"; with the Court relying on *Enbinder v. Commonwealth*, 368 Mass 214 (1975) as precedence.

860.     Both, *Enbinder v. Commonwealth* and *Foley v. Lowell Division of District Court* involved dismissals based on improper judicial bargaining.  The particular situation in *Foley v. Lowell Division of District Court* involved the judge having promised to dismiss criminal charges in exchange for the defendant's signing a release that he would not sue for injuries inflicted during his arrest.

142

861.    After the institution of the **American Inns of Court**, the written decisions of the Supreme Judicial Court demonstrate the transition and implementation of its new attitude; that issues related to misconduct by judges, clerks and attorneys, persons aggrieved *must first* seek relief from the respective regulatory boards (for example, *Gorbatova v. First Assistant Clerk*, SJC-11194 and *Culley v. Cato*, SJC-10913*)*.

862.    In *Culley v. Cato*, the Supreme Judicial Court claimed that the Court was not the proper venue to seek disciplinary action for judicial misconduct—stating that the petitioners had another avenue that dealt with judicial misconduct, being the Judicial Conduct Commission.  The petitioner had cited precedent that supported the Supreme Judicial Court having proper authority under its power of superintendence, which the Court explicitly claimed that the petitioner's reliance on those cases were "misplaced" because those cases were prior to the creation of the Judicial Conduct Commission—however, such claims by the Court are not legitimate.

863.    It is well established that, in **1986**, at the time of *Foley v. Lowell Division of District Court*, the Judicial Conduct Commission had already been up and running.   The justices sitting on the Supreme Judicial Court at that time, unequivocally, reaffirmed the Supreme Judicial Court's obligation to provide relief to those aggrieved by misconduct inflicted by court officials.  The only true difference between *Culley v. Cato* and *Foley v. Lowell Division of District Court* are the particular justices who sat on the Full Bench.

864.    Of significance, in **2002**, Plaintiff Daughter Lisa, as private legal counsel, had previously succeeded in obtaining a hearing before the Single Justice of the Supreme Judicial Court when she filed a civil action, using the *very same avenue* of G.L. c. 211, § 3 in *Youngworth v. Commonwealth*, (SJ-2000-0378).  Single Justice, Ruth Abrams, granted a hearing and relief; which was affirmed by the Full Bench in its rescript of *Youngworth v. Commonwealth*, 436 Mass. 608 (2002).  (Copy of Youngworth decision is provided in **Exhibit 205**).

865.    Like, *Youngworth v. Commonwealth*, Plaintiff Daughter Lisa's petition regarding the underlying matter of In re Marvin H. Siegel, contained proof of substantive and grave deprivations of state and constitutional rights.  As a matter of law, Plaintiff Daughter Lisa demonstrated a colorable showing of her, being deprived of life, liberty and property—*and* that of her father.  Plaintiff Daughter Lisa, unequivocally, demonstrated that it was a *matter of life and death*; and a matter of unconscionable depths of inhumane acts by the designated Defendants—well commensurate with the level of the well-established standard of "shocking to the conscience."

866.    The Supreme Judicial Court's decision was issued by the Full Bench regarding Plaintiffs' father, did not address, *in any manner*, the merits of the emergency petition or constitutional violations.  (Copy of the decision is provided in **Exhibit 206**).

867.    For example, the published opinion of the Supreme Judicial Court, *Parents of Two Minors v. Bristol Division of the Juvenile Court Department*, 397 Mass 846 (1986) shows that the Supreme Judicial Court's actions regarding the emergeny civil action filed by Plaintiff Daughter Lisa was precluded from obtaining relief based on bad faith motives. In the case of *Parents of Two Minors*, the Full Bench declared that the circumstances in that case constitute extraordinary circumstances that required review under **G.L. c. 211, § 3**.  In that case, the circumstances consisted of the lower court judge not having authority to order the plaintiffs to submit to a nonemergency home visit by an employee of the DSS investigating an anonymous report of child abuse.  It is patently obvious that Plaintiff Daughter Lisa's petition presented far more severe circumstances than that of *Two Minors v. Bristol Division of the Juvenile Court Department*.  In addition to Plaintiff Daughter Lisa having established that she had properly pursued relief via **G.L. c. 211, § 3**, the Supreme Judicial Court made broad sweeping and empty conclusions in its written decision.

868.    As evidenced, the manner in which **Justice Botsford** *and* the **Full Bench** wrote the decisions pertaining to Plaintiff Daughter Lisa's emergency petition provides corroborative evidence of designated Defendants having improperly used influence and connections to harm the interests of Plaintiff Daughters.

869.    The court record, overwhelmingly, evidences that the allegations set forth by the Plaintiff Daughters—de facto—*have not been* litigated, in any State court.

870.    Through and through, the underlying matter of In re Marvin H. Siegel is *all about* outright corruption—broad and wide, and up the echelon; and *nothing* to do with innocent or benign error on the part of the judiciary and designated Defendants.

**Established pattern of disparate treatment towards pro se litigants**

871.    The Full Bench of the Supreme Judicial Court has engaged in strikingly similar conduct, as described above, towards other pro se litigants.

872.    The underlying probate matter of Gorbatova v. First Assistant Clerk (SJC-11194), also, involved misconduct of court officials regarding a guardianship and conservatorship of Valentina Gorbatova's elder husband, which took place in Essex Probate & Family Court—of which Valentina Gorbatova sought relief from misconduct by filing a petition with the Single Justice of the Supreme Judicial Court.

873.    Petitioner, Valentina Gorbatova, represented her own legal interests—and that of her husband's, as a pro se litigant.  Relief was denied by the Single Justice, with oral argument, before the Full Bench, having taken place on **November 8, 2012**.

874.    Like the afore-discussed oral argument in In re Marvin H. Siegel, Valentina Gorbatova's matter was the last case to be heard on the day of **November 8, 2012**.  Valentina Gorbatova, too, had only been allotted *ten (10) minutes* to present her argument.

875.    Valentina Gorbatova was, even at a greater disadvantage, because she could not speak English—as evidenced by the archived video from the webcam, she could *only* speak in Russian.  **Clerk Francis Kennealley** knew that because Valentina Gorbatova had personally gone to the Clerk's Office.  She was not provided a translator by the Supreme Judicial Court; on her own, she brought a friend/relative seeking assistance in translation.

876.    Plaintiff Daughter Lisa experienced similiar happenings that were described in the pleadings filed by Valentina Gorbatova regarding alleged conduct exhibited by **Clerk Francis Kennealley**.  In Plaintiff Daughter Lisa's situation, Clerk Francis Kennealley *vigorously* tried to convince Plaintiff Daughter Lisa that she could not obtain relief pursuant to **G.L. c. 211, § 3**—even though Clerk Francis Kenralley had actual knowledge that Plaintiff Daughter Lisa was an appellate attorney.   In the Gorbatova matter, she alleged that Clerk Francis Kenrealley used deceptive means to make it appear as though she had originally requested relief  *through* **G.L. c. 211, § 3**, when she had not.

877.    The webcam archives show that the multiple cases heard on **November 8, 2012**, prior to that of Gorbatova, demonstrate the same blaringly disparate treatment described in oral argument by Plaintiff Daughter Lisa.

878.    As previously set forth, the Supreme Judicial Court *berated* Valentina Gorbatova in its issued written opinion—with the Court failing to mention, in any manner, that Valentina Gorbatova could not speak English, and *did not* have a court provided translator.

**C.** **Evidence of Defendants' improper use of influence with other regulatory entities**

### i. **Federal Reserve Bank of New York**

879.     The misconduct by **Defendant Brian Nagle and Defendant BNY Mellon** are described in detail in a 93A Demand letter that Plaintiff Daughter Lisa, as Father's attorney-in-fact, served **Defendant BNY Mellon**.  (Copy of the 93A Demand is provided in **Exhibit 207**).

880.     At the end of **July 2011**, Plaintiff Daughter Lisa filed a complaint with the **Federal Reserve**, providing substantiated claims of illicit financial acts by **Defendant Brian Nagle** and **Defendant BNY Mellon**.  Plaintiff Daughter Lisa provided the **Federal Reserve Bank** a copy of the 93A Demand letter.

881.     Charles Sanders, Senior Bank Examiner for the **Federal Reserve Bank**, responded to Plaintiff Daughter Lisa's afore-described complaint in a letter, **dated September 21, 2011**.  Through this correspondence, the **Federal Reserve Bank** stated that it would not conduct any investigation into the matter.  (Copy of the letter from the Federal Reserve Bank is provided in **Exhibit 208**).

882.     It is suspect that the **Federal Reserve Bank** waited, almost two (2) months, to send its afore-described response—and, did so, only *after* adverse court proceedings had been initiated by **Defendant Attorney Berid** and **Defendant ESMV**.

883.     It is suspect that the **Federal Reserve Bank** sent the afore-described response *after* having substantial communications with **Defendant Burns & Levinson**, counsel for **Defendant BNY Mellon**.  **Defendant Attorney Cukier** filed an invoice on behalf of Defendant Burns & Levinson that shows *senior counsel* for Defendant Burns & Levinson had *direct discussions* with the Federal Reserve Bank.

884.     On page 4 of the previously described invoice, the entry of **8/30/11** contains the following corresponding notation: "Emails with Attorney Boylan and Attorney Arnold regarding [undersigned counsel's] latest complaint to the **Federal Reserve**."  (Copy of the invoice is provided in **Exhibit 209**).

885.     The **Federal Reserve Bank** explicitly represented in its letter of **September 21, 2011** that it had no authority to *initiate any inquiry*—however, the Federal Reserve Bank did, in fact, do so with **Defendant Burns & Levinson,** and explicitly refused to discuss the matter with Plaintiff Daughter Lisa.

886.    Other agencies and entities that Plaintiffs made complaints to, include: Chief of Boxford Police, District Attorney's Office for Essex County; U.S. Attorney's Office—all of which, overtly disregarded Plaintiff Daughter Lisa's reports of misconduct.

## III.   THE MASSACHUSETTS PROBATE & FAMILY COURT SYSTEM AS A CRIMINAL ENTERPRISE

### A.   Means used to facilitate financial exploitation

### Money laundering via the State Treasurer's Office

887.    One common mode to facilitate money laundering has been through the use of interrelated probate matters—which the below estate and administration matters illustrate the use of multiple counties.

888.    Edith Gates died on **July 13, 1977**, leaving two (2) adult children as heirs: Dorothy Gates and Parker E. Gates.  An estate administration was not opened until, *over twenty (20) years later* on, **March 27, 1996** (ES96P0763AD1).  (Copy of the docket sheet is provided in **Exhibit 210**).

889.    The filed petition for administration**,** in the afore-referenced matter of Edith Parker, on **March 27, 1996,** does not identify any other heirs.

890.    Attorney J. Barry Mulhern of Nashua, New Hampshire filed an Inventory regarding the estate of Edith Gates on **April 9, 1997**, which stated that Parker Gates was the administrator.  The amount of the Inventory was $128,094.40.  (Copy of the Inventory is provided in **Exhibit 211**).

891.    The afore-referenced inventory stated as follows:

Commonwealth of Massachusetts Unclaimed property Division Stock Dividend–$7, 845.08;

Commonwealth of Massachusetts Unclaimed property Division Stocks–$41,417.28; and

Commonwealth of Massachusetts Unclaimed property Division Bank Account–$78,832.04.

892.    A document was filed, purportedly, by Parker E. Gates, on **December 7, 2000** in the **Estate of Edith Gates.**  This document states that $74,202.85 was deposited into "The Commonwealth of Mass Custodian for Dorothy Gates Docket # 96P 0763-AD1 36 Federal Street, Salem, MA  01970"—a copy of which is provided in **Exhibit 212**.

893.    The afore-referenced $74,202.85 purported to be the inheritance from the death of Edith Gates—where the above-described document stated that the purpose for the "deposit" was because "Dorothy Gates has refused to accept or decline her inheritance."

894.    The $74,202.85 was transferred by the Essex Probate & Family Court to the State's abandoned property, approximately, a year-and-a-half later in **August of 2002**.

895.    Parker E. Gates died in **July of 2002** and an estate administration was opened on February 14, 2003 (MI03P0759EP1).  The docket sheet for the estate administration matter of Parker Gates is provided in **Exhibit 213**.

896.    Dorothy Gates died on **December 17, 2007**.  The administration of estate was not opened *until* **June 21, 2010** in Worcester County.  (Copy of the docket sheet for the state administration of Dorothy Gates is provided in **Exhibit 214**).

897.    Attorney Mulhern is the sole attorney on record for *all* three (3) estate matters: Edith Gates, Parker E. Gates, and Dorothy Gates.

898.    **On August 27, 2010,** Attorney Mulhern sent a letter to the **Essex Probate & Family Court**, asking that the State claim form for *abandoned* property be completed to reclaim the above-described "deposit."

899.    The property description of Claim form states:

Cash 55 – Court Funds:  $75, 650.18.  Reported in 2002 by Essex Probate and Family Court."

Cash 02 – Savings accounts $35.16 [] Reported in 1984 by TD Bank, N.A.

Cash 02 – Savings accounts: $47.28 [] Reported in 1980 by Peoples Savings Bank (Now Fleet Bank).

(Copy of claim form and letter from Attorney Mulhern are provided in **Exhibit 215**).

## **Money laundering involving the Massachusetts Attorney General's Office and use of judicial influence**

### **In re Lee Dunn Jr.** (Suffolk County)

900.    Lee Dunn, Jr. was a prominent practicing attorney for forty (40) years, specializing in medical malpractice litigation.  He graduated from Harvard Law School, serving in the 1990s as House Officer of the Harvard Club of Boston.  (Copy of the published obituary is in **Exhibit 216**).

901.    Attorney Lee Dunn, Jr. (herein referred as "Attorney Lee Dunn") had only a sister, Attorney Elizabeth Dunn.  There are no other apparent surviving relatives.

902.    Contemporaneous court appointments for guardianship and conservatorship were, also, foisted upon Elizabeth Dunn by the **Essex Probate & Family Court** (Docket Nos. ES11P2190PM, ES12P2213GD)—which involved North Shore Elder Services.  Illicit conduct is suspect in the instituting of court ordered guardianship and conservatorship over Elizabeth Dunn because of her brother and his estate already existing under court ordered guardianship and conservatorship—which is evidenced in the reports submitted by North Shore Elder Services.  (Reports, petitions and other court documents in the matters of In re Elizabeth Dunn are provided in **Exhibit 217**).

903.    In **2012**, Attorney Thomas Schiavoni obtained a court order to destroy Elizabeth Dunn's clients' files that were in her office—with the Order specifically stating that the destruction of the files were to take place "*without further norice to clients or third parties.*" (Refer to docket sheet provided in prior referenced Exhibit 217).

904.    **Massachusetts Appeals Court Justice Mitchell J. Sikora** has publicly held himself out as long-time friends of both, Lee Dunn and Elizabeth Dunn.  He made such representations to Nora Cooney, LICSW of North Shore Elder Services.   (Copy of affidavit of Nora Cooney is provided in **Exhibit 218**).

905.    It is suspect that **Justice Sikora** did not personally petition for guardianship and conservatorship of Attorney Lee Dunn, where a petition for guardianship and conservatorship specifically allows a friend to be able to do so; instead, the petition for guardianship and conservatorship was formally filed by **New England Baptist Hospital** in **Suffolk Probate & Family Court**.  (Copy of the afore-referenced petition is provided in **Exhibit 219**).

906.    In the afore-described petition filed by New England Baptist Hospital, it was *specifically* and *explicitly* requested that **"Mitchell J. Sikora"** and Joseph Competiello, Esq. be appointed as co-guardians over Attorney Lee Dunn.

907.    Of significance, the afore-described petition filed by New England Baptist Hospital did not identify **"Mitchell J. Sikora"** as being a judge—his name appears as though he were simply an ordinary private citizen.

908.    Attorney Lee Dunn and **Justice Mitchell Sikora** are both listed as members of the **MBF Society of Fellows.**  As set forth above, Both Attorney Lee Dunn was **Justice Sikora** very active as alumni of Harvard Law School.  (J**ustice Sikora** attended Harvard College and received a L.L.M from Harvard Law School in 1972.

909.    Legal counsel for **New England Baptist Hospital** is Carolyn Martello Spaulding, Esq., who has a private law office advertising representation in guardianships, estate planning and estate administration.

910.    On or about **July 13, 2012**, Attorney Lee Dun was a patient in the Intensive Care Unit of **New England Baptist Hospital**.

911.    As of **<u>July 24, 2012</u>**, **New England Baptist Hospital** reported that Attorney Lee Dunn was "experiencing respiratory failure which required a feeding tube and mechanical ventilator. . . [having] pleural effusions in his lungs, a hemorrhage like cyst in his kidney and a lesion in his liver. . . . He is sedated and such sedation is necessary to allow him to tolerate his breathing tube."

912.    On the same day that **New England Baptist Hospital** filed its petition for guardianship (**July 24, 2012**) **Justice Sikora** filed a Bond, as court appointed guardian for Attorney Lee Dunn, *<u>stating that Attorney Lee Dunn had "$0.00" in terms of real estate value and "$0.00" in terms of personal estate value</u>*.  (Copy of the afore-referenced filed Bond is provided in **Exhibit 220**).

913.    Given the long-established friendship between **Justice Sikora** and Attorney Lee Dunn, Justice Sikora knew that Attorney Lee Dunn had owned a condominium in Concord, MA.  (Copy of documentation from the Middlesex Registry of Deeds is provided in **Exhibit 221**).

914.    **Justice Sikora** knowingly and intentionally falsified information of the above-described filed Bonds.

915.    **Judge Joan Armstrong** granted the petition requesting **Justice Sikora** be appointed as guardian over Attorney Lee Dunn.  Judge Joan Armstrong and Justice Mitchell Sikora are both members of the American Inns of Court.  Judge Joan Armstrong is a Past-President of the **Massachusetts Family & Probate American Inn of Court**, and Justice Sikora is a member of the **Suffolk American Inn of Court**.

916.    The Will filed in the estate administration matter for Attorney Lee Dunn was purportedly executed on **September 26, 2013**—only weeks before he passed away. The Will stated that Attorney Lee Dunn was revoking all previous Wills and Codicils. (Copy of the above-described Will is provided in **Exhibit 222**).

917.    The above-described Will specifically *nominated* **Justice Sikora** as personal representative for Attorney Lee Dunn's estate, *and* Joseph Compitiello, Esq. *as successor personal representative* (co-court appointed guardian).

918.    The purported execution of the above-described Will was notarized by Attorney John Dugan, who represents **Justice Sikora** as private legal counsel in the estate administration matter of Attorney Lee Dunn.  Provided is a letter, **dated April 16, 2014**, by **Attorney John Dugan** to the **Suffolk Probate & Family Court** in **Exhibit 223**.

919.    Attorney John Dugan is a lifetime member of the **MBF Society of Fellows**, along with **Justice Sikora**.

920.    The above-described Will purports to be witnessed by Neils Burger, who teaches at Suffolk University.  **Suffolk American Inn of Court** is the local chapter of the American Inns of Court specifically affiliated with **Suffolk Law School**—again, which **Justice Mitchell Sikora** is a member**.**

921.    The Bond filed by **Justice Sikora** in the estate administration matter for Attorney Lee Dunn, on **February 24, 2014**, *again*, represented that Attorney Lee Dunn had **"$0.00"** in real estate; however, this time the value in personal estate stated: "$65,000."  (Copy of the afore-described Bond is in **Exhibit 224**).

922.    **Justice Sikora** had full control over Attorney Lee Dunn's assets since December of 2013.

923.    Attorney Lee Dunn's condominium was sold on **June 12, 2013** for **$315,000**—eight (8) months *before* **Justice Sikora** filed the afore-referenced Bond of **February 2014**.  (Provided are copies of documents recorded at the Middlesex Registry of Deeds regarding the above-described sale by Justice Sikora recorded in **Exhibit 225**— along with a homestad and municipal lien).

924.    The sale of the condominium has the purported signature of Attorney Lee Dunn—even though, Attorney Lee Dunn had been deemed incapacitated on **July 24, 2012**.

925.   On **April 1, 2014**, **Assistant Attorney General, Johanna Soris** formally assented to Justice Sikora's being personal representative to administer the estate of Lee Dunn.  (Copy of signed Assent in **Exhibit 226**). From **1975-1982**, **Justice Sikora** was an Assistant Attorney General for the Commonwealth.  Evidenced is Justice Sikora's use of his influence and status to facilitate money-laundering activities.

### Creating fictitious estate and administration cases - money laundering activities between estate matters: SU84P1151 and SU85P0326

### SU84P1151

926.   The physical court file for **SU84P1151** contains documents purporting to depict **SU84P1151** as an estate administration for the death of **James L. Buchanan**. There is no death certificate placed in the court file of SU84P1151.

927.   The electronic docket system of the Suffolk Probate & Family Court for docket number **SU84P1151** designates **"James L. Buchanan"** as **"other"**—not as the decedent.  (C

928.   opy of the docket sheet for SU84P1151 is provided in **Exhibit 227**).

929.   The electronic docket system of the Suffolk Probate & Family Court does not have anybody identified as being the decedent for docket number **SU84P1151**. (Provided is a complete case listing under the name "James Buchanan" in Suffolk Probate & Family Court **Exhibit 228**).

930.   The one and only person identified on the docket sheet for **SU84P1151** is **"James L. Buchanan"** as **"other"** and there is no date of death entered in the electronic docket system of the Suffolk Probate & Family Court.

931.   However, the electronic docket system of the Suffolk Probate & Family Court does have a "James Buchanan", explicitly, designated as a decedent for docket **SU06P1866A**.  The obituary published in the newspaper shows that the decedent's full name for SU06P1866A was **"James L. Buchanan."**  (Copy of the published obituary is provided in **Exhibit 229**).

932.   **James L. Buchanan**, who died in **December of 2004**, was a Boston Police officer, with strong ties to Jamaica Plain and Roxbury.  In 1968, he was appointed superintendent of the department, the highest of the uniformed ranks until **1974**.  He graduated from Boston Latin School.

933.    Involved in the administration of the purported estate under docket **SU84P1151** was **Judge Mary C. Fitzpatrick** and **Attorney Mary Ricketson**.

934.    In **April of 1991**, **Judge Mary C. Fitzpatrick** was named as Chief of Probate & Family Court.

935.    An articled published by the Boston Globe described **Judge Mary C. Fitzpatrick** as having: "spent her entire career in the Suffolk County probate court.  A South Boston resident, she was appointed in 1972.  She previously worked in the court as a clerk and assistant registrar while attending law school at night."  (Copy of the afore-referenced article is provided in **Exhibit 230**).

936.    The above-referenced article reflected that those opposed to the appointment of **Judge Mary C. Fitzpatrick** as Chief of Probate & Family Court had concerns because she was "not considered to be the kind of innovative leader that many feel is needed to improve the system, formally known as the Probate & Family Court Department of the Trial Court of Massachusetts. . . .Critics say that the probate court system needs strong leadership to dissolve the remnants of the county court fiefdoms, reinvigorates its judges and helps dispense more uniform justice."

937.    In **June of 1997**, the Boston Globe published an article about the **Massachusetts Bar Association's** having conducted the "first systemic examination of the Probate and Family Court"—which "Report" was described as having taken "2 ½ years in the making."  The article stated that the above-described "Report" of the Probate and Family Court described the court's problems as "widespread and deeply entrenched."  (Copy of the afore-referenced article is provided in **Exhibit 231**).

938.    The above-described "Report" was issued just months prior to the retirement of **Judge Mary Fitzpatrick** as Chief of Probate & Family Court.  She presided seven (7) years as Chief of Probate & Family Court.  Judge Fitzpatrick had served on the Judicial Conduct Commission prior to her appointment as Chief of Probate and Family Court."

939.    **Attorney Mary Ricketson,** of West Roxbury, was very involved in politics throughout her legal career.   During the 1970's, **Attorney Ricketson** was the President of the Massachusetts Association of Women Lawyers and in the **1980's**, Edward J. King had appointed her to the Judicial Nominating Committee.  (Copy of the obituary for Attorney Mary Ricketson is provided in **Exhibit 232**).

940.    Contemporaneously, both, **Judge Mary Fitzpatrick** and **Attorney Mary Ricketson** attended Portia Law School (now known as New England School of Law).

941.    Accordingly, as Superintendent of the Boston Police Department, James L. Buchanan had a position of status and influence that created the opportunity for **James L. Buchanan**, **Judge Mary Fitzpatrick,** and **Attorney Mary Ricketson** to know each other, and in a substantial manner. The inherent nature and influence of the official positions lends motive and opportunity for collusion amongst them.

942.    The fact that **James L. Buchanan** was of such high rank in the Boston Police Department explains why he was the person used to create a fictitious estate and administration case.  It afforded **Judge Fitzpatrick** and **Attorney Ricketson** the feasibility to facilitate a fictitious estate and administration case.

943.    A petition was filed in the **"Estate of James L. Buchanan"**, under **SU84P1151**, requesting that **Mary W. Fidler** be appointed executrix.   On **June 21, 1984**, **Judge Mary C. Fitzpatrick** allowed the afore-described appointment.  (Copy of the notice of petition to probate Will is provided in **Exhibit 233**).

944.    In the filed Probate of Will for "**James L. Buchanan**", under **SU84P1151**, **Mary Fidler** is <u>not</u> listed as a supposed relative or heir.  (Copy of afore-described filed Probate of Will is provided in **Exhibit 234**).

945.    From the documents contained in the court file for **SU84P1151,** there is <u>no</u> legitimate explanation for the existence of an actual relationship between **James L. Buchanan** and **Mary W. Fidler**.

946.    The purported signature of **"Mary W. Fidler"** is on an a document claimed as an original Will dated **May 3, 1979**.  The signature of **"Mary W. Fidler"** is also contained, *as notary*, in the filed purported "First Codicil" dated **August 12, 1981** and for a purported "Second Codicil" dated **March 24, 1984**.  (Copies of a purported Will and Codicils for **"James L. Buchanan"** are provided in **Exhibit 235**).

947.    The handwriting of the signatures for the numerous and different identities contained in the above-describe purported Will and Codicils are overwhelmingly and uncannily similar—*especially*, for signatures that supposedly took place on three (3) separate occasions from **1979 through 1984**.

948.    In addition, there is a filed Account designated to be <u>*for*</u> the estate of **<u>Mary W. Fidler</u>**, donning the docket number: **SU84P1151**, *and* was physically placed in the actual court file designated for **"James L. Buchanan."**  (Copy of the afore-described Account is provided in **Exhibit 236**).

949.    The Estate *for* **<u>Mary W. Fidler</u>** has its own distinct and separate docket number: **<u>SU85P0326</u>**.

950.    The caption for the afore-described Account is: "1ˢᵗ and Final Account of **Mary W. Fidler** as rendered by **Mary C. Ricketson and Lenore A. Fidler**, executrixes u/w/o Mary Fidler (Suffolk Probate No. 85P-0326) as Executrix of Estate of **James L. Buchanan**."

951.    The above-described caption, in and of itself, evidences overt illicit conduct.

952.    The afore-described Account contains three (3) signed names, consisting of**: Mary C. Ricketson**, **Lenore A. Fidler** and **Joseph M. Fidler**.  The handwriting on that form, for all three signatures, is virtually identical.

953.    Joseph M. Fidler is a practicing licensed attorney in Massachusetts.

954.    The purported executors of the estate for **James L. Buchanan,** under **SU84P1151,** were identified as: **Mary C. Ricketson** and **Lenore A. Fidler**

955.    **Joseph M. Fidler's** mother's name was **Lenore A. Fidler**.  Lenore Fidler was not an attorney; she was a secretary for a high school.  (Copy of Lenore A. Fidler's obituary [date of death May 10, 2011] is provided in **Exhibit 237**).

956.    Provided in **Exhibit 238** is a copy of the filed Account purportedly for **"James L. Buchanan"**—with the typed docket number **SU84P1151** and filed under **SU84P1151**.

957.    The Account specific to **Mary W. Fidler** with the typed docket number **SU84P1151** and filed under **SU84P1151** stated the value of personal property under Schedule A as: "$**166,394.65.**"

958.    The afore-described Account for **James L. Buchanan** stated almost the same value of personal property under Schedule A as that for **Mary W. Fidler**— except the Account for **James L. Buchanan** was: "$**166,182.81.**"

959.    The above-described filed Account regarding **Mary W. Fidler** listed out four (4) separate bank accounts under Schedule A, consisting of: Provident Institute, Mutual Bank for Savings, First American Savings Bank and Boston 5 Cent Savings Bank.

960.    The afore-described Account for **James L. Buchanan** listed bank accounts under Schedule A as: the Mutual Bank for Savings and Boston 5 Cent Savings Bank— which have the *exact same* account numbers as designated in the Account regarding **Mary W. Fidler**.

961.    The filed Account for **Mary W. Fidler** and the Account for **James L. Buchanan** each list out the exact same stocks.

962.    The named stocks listed in the Accounts for **Mary W. Fidler** and **James L. Buchanan** are listed in a different order, evidencing deliberate and knowing facilitation of criminal conduct.

963.    The Account of **James L. Buchanan**" states under Schedule B, paragraph numbered 19:  "**Estate of Mary W. Fidler**, executrix fee $500.00."

964.    The Account specific to **Mary W. Fidler** with the typed docket number **SU84P1151** and filed under **SU84P1151** was purportedly signed by **Mary C. Ricketson** and **Lenore A. Fidler** as co-executrices.

965.    The handwriting of the above-described signatures purporting to be **Mary C. Ricketson** and **Lenore A. Fidler**, on the Account specific to **Mary W. Fidler** with the typed docket number **SU84P1151** and filed under **SU84P1151,** are virtually identical.

966.    The filed Inventory for the Estate of **James L. Buchanan** stated the market value was: "166,182.81" (the value of the inventory stated in the filed Account for **Mary W. Fidler**) and stated that the total inventory value was: "166,394.24" (.02 deviance from the value of the inventory stated in the filed Account for **James L. Buchanan).**

967.    The above-described filed Account specific to **Mary W. Fidler** with the typed docket number **SU84P1151,** the caption explicitly cross-references **Suffolk Probate & Family Court No. SU85P0326**.

968.    The above-described filed Account specific to **Mary W. Fidler** with the typed docket number **SU84P1151**, under Item numbered 31 states that a total of **$177, 934.54** was **"paid over to Joseph M. Fidler, Administrator**."

969.    The filed Account in the **Estate of Mary W. Fidler** under **SU85P0326** does not, in any manner, reflect the above-described transaction.


**SU85P0326**

970.    **Suffolk Probate & Family Court No. 85P0326** purports to be the estate administration for **Mary W. Fidler**.  There is no death certificate placed in file of 85P0326.  (Copy of the docket sheet for 85P0326 is provided in **Exhibit 239**)

971.    The electronic docket system of the Suffolk Probate & Family Court for docket **SU85P0326** designates "**Mary W. Fidler**" as "other"—*not* as the decedent.

972.    The electronic docket system of the Suffolk Probate & Family Court does not have anybody identified as being the decedent for docket number **SU85P0326**.

973.     Provided is a listing of all cases involving "Fidler" beginning with the first name of the letter "M" in Suffolk Probate & Family Court.  (Copy of case listings under "M Fidler" is provided in **Exhibit 240**).

974.     "**Mary W. Fidler**" is the one and only person identified on the docket sheet for **SU85P0326.**"  There is no date of death entered in the electronic docket system of the Suffolk Probate & Family Court.

975.     There is no electronic record in any county of the Massachusetts Probate & Court for **Mary W. Fidler** as being a decedent; however, there is public record information showing that a "Mary W. Fidler" of West Roxbury died in **January of 1985**.

976.     Of significance is that "Mary W. Fidler" was purportedly the original fiduciary for the estate and administration of **James L. Buchanan** under docket **SU84P1151,** and then **Joseph M. Fidler, Esq.** petitioned to take over for **Mary W. Fidler** in **February of 1985**.

977.     Provided in **Exhibit 241** is a copy of the <u>allowed </u>petition by **Judge Mary C. Fitzpatrick** for **Joseph M. Fidler** to take over as fiduciary in administering the supposed estate of **James L Buchanan,** under **SU84P1151**.

978.     The purported executrices for **Estate of Mary W. Fidler** under **SU85P0326** consisted of: **Lenore A. Fidler** and **Mary C. Ricketson**.   A purported Will for **Mary W. Fidler** was filed under **SU85P0326**—a copy is provided in **Exhibit 242**.

979.     The purported Will for **Mary W. Fidler** is dated: **November 21, 1984**. Suspect is that **Mary W. Fidler** supposedly *notarized* the signing of the Codicil for **"James L. Buchanan"** on **March 4, 1984.**

980.     The various signatures contained in the afore-described Will for **Mary W. Fidler** consist of the following names: Bridget E. Costello, Mary A. Panciocco and Mary C. Ricketson.

981.     The handwriting for <u>all</u> of the above-stated names contained in the purported Will for **Mary W. Fidler**, overwhelming and uncannily, look exceedingly more than similar—*including* that of **"Mary W. Fidler"**.

982.     The purported Will of **Mary W. Fidler** explicitly designates **Lenore Fidler** as a **beneficiary** in the purported Will of **Mary W. Fidler**.  **Lenore Fidler** is identified <u>only</u> as a dear friend of Mary W. Fidler and **Lenore Fidler** is <u>no</u>t on the enumerated list of kin in the filed Decree for Probate of Will for the **Estate of Mary W. Fidler**, under **SU85P0326.**

983.    The purported Will of **Mary W. Fidler** explicitly designates **Lenore Fidler** and **Mary C. Ricketson** "of West Roxbury" as executrices.  The purported Will also stated: "If there is a vacancy in the office of Executor, I nominate and appoint my nephew, **Attorney Joseph M. Fidler** of Norwood, Massachusetts, to fill the vacancy."

984.    The purported Will of **Mary W. Fidler** explicitly referenced **Joseph M. Fidler** as Mary W. Fidler's nephew.  Joseph M. Fidler was explicitly listed under the enumerated list of kin in the above-discussed Decree for the Probate of Will for the Estate of Mary W. Fidler, as nephew.

985.    As previously set forth, **Lenore Fidler** is, in actuality, the **mother** of **Attorney Joseph M. Fidler**.

986.    Provided in **Exhibit 243** is a copy of the afore-described Decree for the Probate of Will for the purported **Estate of Mary W. Fidler** under **SU85P0326.**  The corresponding date to the signature of **Judge Mary B. Muse** is **April 25, 1985**.

987.    The copy of the afore-described Probate of Will shows that the Decree for the purported **Estate of Mary W. Fidler** under **SU85P326** was subsequently doctored; in particular, the document has a piece of paper attached by rusty staples, to cover over the original information provided.

988.    The stapled piece of paper was deliberately placed on the afore-described Probate of Will to conceal the original designation of "Father Charles Fidler" as the purported brother of "Mary W. Fidler."

989.    Charles Fidler, formally of Southborough, MA, was a member of the monastic family at St. Joseph's Abbey and the brother of Mary Fidler, Edith Corcoran and William Fidler.  Lenore Fidler was married to William Fidler.  (Copy of the published obituary for Charles Fidler is provided in **Exhibit 244**).

990.    The purported Will of Mary W. Fidler declares that the estate devised and bequeathed "[o]ne third to Saint Joseph's Abbey of Spencer, Massachusetts. (My brother, Father Charles, o.c.s.o., is a member of that religious community)."

991.    The above-described Decree Probate of Will is purportedly signed by **Justice Mary B. Muse.**  The handwriting of the signature for Justice Mary B. Muse is virtually identical to that of the two signatures above it purporting to be **Lenore A. Fidler** and **Mary C. Ricketson.**

992.    Such above-described signatures in the Decree of Probate of Will for **Estate of Mary W. Fidler** under **SU85P0326** are virtually identical to the signatures contained in the Account filed under the **Estate of Mary W. Fidler** for **SU85P0326**.

993.     Provided in **Exhibit 245** is a copy of the above-referenced Account filed under the **Estate of Mary W. Fidler** for **SU85P0326** that was physically located in the court file of SU85P0326.

994.     The handwriting of the signatures **for Lenore A. Fidler** and **Mary C. Ricketson** contained on the above-described filed Account for the **Estate of Mary W. Fidler** as docket **SU85P0326** are, also, virtually identical to that of the signatures in the documents contained throughout the file for docket **SU85P0326** *and* the file of **SU84P1151** (James L. Buchanan).

995.     The Account for the **Estate of Mary W. Fidler** under **SU85P0326** was designated as the "First and Final Account".  It was dated:  **January 29, 1987**.

996.     The Account for the **Estate of Mary W. Fidler** as **SU85P0326** itemizes accounts with: Boston Five Cents Savings Bank, Bank of New England CD, and Boston Five Money Market.

997.     The above-described bank account numbers listed in the filed Account for the **Estate of Mary W. Fidler** as **85P0326** do not match any of the accounts listed in the afore-described Accounts filed in the **Estate of James L. Buchanan** or **SU84P1151.**

998.     Following are suspect entries for Schedule A of the filed Account for the **Estate of Mary W. Fidler** under **SU85P0326**:

> under item 1 it is stated: "Lenore A. Fidler-cash advanced until appointment of executrices";

> under item 6 it is stated: "Reimbursement for advance on client's box Attorney Fidler"; and

> under item 7 it is stated: "Legal fees and costs from prior legal services rendered by testator" with the corresponding amount as "12,933.30".

999.     Schedule of Personal Estate in Detail was filed for the **Estate of Mary W. Fidler** under **SU85P326**—a copy of which is provided in **Exhibit 246**.  Suspect is item numbered 5 that stated: "Action of tort against Frederick Doyle for motor vehicle injuries" with a corresponding statement of "value uncertain."

1000.   The above-described Schedule of Personal Property for the **Estate of Mary W. Fidler,** under **SU85P326,** did not provide any docket number or any other identifying information regarding the supposed "action of tort".  It did not even name the court that the supposed action was filed in.  There is a civil action filed in the electronic docket of the Suffolk Superior Court as "Fidler v Doyle" designated as docket "SUCV1984-67960". (Copy of the electronic docket for SUCV1984-67960 is provided in **Exhibit 247**).

1001.   Illicit conduct is evidenced from the lack of information on the docket sheet that specifically pertains to information regarding the parties and attorneys.  The lack of docket entries is custom and routine practice for the date of the purported civil action, but the lack of information regarding the parties and attorneys is highly suspect.

1002.   Other civil actions in the electronic docket system of the trial court—within the same time period—contain complete information regarding parties and attorneys.  The information regarding parties and attorneys for SUCV1984-67960 in the electronic docket consists only of the defendant being identified as Frederick Doyle and the plaintiff as Mary Fidler.

1003.   There are no attorneys reported to ever being involved in the purported matter of SUCV1984-67960; which suspect nature is further magnified by the fact that there was _no_ contact information, of any kind, for the above-described identified parties on the docket.  It is suspect that the electronic docket for SUCV1984-67960 has the "party status" for "Doyle" designated as "Service pending" and for "Fidler" as "Active".  In addition, the electronic docket for SUCV1984-67960 does not provide a designation for "case type"—the corresponding section is left blank.   The designation for "case status" is, also, left blank.

1004.   The final accounting for the **Estate of Mary W. Fidler,** under **SU85P0326,** was allowed even though there was no value placed on the above-described civil action.

1005.   The reported date of death on the Certificate Releasing Massachusetts Estate Tax Lien for **Mary W. Fidler** was **January 23, 1985**—a copy of which is provided in **Exhibit 248** (the electronic docket for **SU85P0326** was opened on **February 5, 1985**).

1006.   The designated accounting period for the First and Final Account of **Estate of Mary W. Fidler** under **SU85P0326** was reported as **April 25, 1985** to **December 23, 1986**.  Accordingly, there is a period of, approximately, three (3) months that is unaccounted for since the official opening of the docket—the time **between February 5, 1985 through April 25**, **1985**.

1007.   The handwriting for the signature of "Marcia Goldsmith" in the afore-referenced Certificate Releasing Massachusetts Estate Tax Lien looks overwhelming similar to the signature of "Mary B. Muse" on the Decree for Probate of Will for the **Estate of Mary W. Fidler** under **SU85P0326.**


**Money laundering activities amongst the estate and administration cases of: SU97P0468, SU98P0397 and SU84P1251**

1008.   **Suffolk Probate & Family Court No. 97P0468** purports to be the estate administration for **Ethel   E. Sikora**.  The electronic docket system of the Suffolk Probate & Family Court for docket SU97P0468 designates Ethel E. Sikora as "other"—not as the decedent and does not have anybody identified as being the decedent for docket number SU97P0468.

1009.   Provided is a copy of all cases involving "Sikora" beginning with the first name of the letter "E" in Suffolk Probate & Family Court and a copy of the docket sheet for **SU97P0468** are in **Exhibit 249**.

1010.   **Ethel E. Sikora** is the one and only person identified on the docket sheet for **SU97P0468.**  There is no date of death entered in the electronic docket system of the Suffolk Probate & Family Court for **SU97P0468.**

1011.   **Ethel E. Sikora** is the mother of **Justice Mitchell Sikora**, and with whom Justice Sikora resided with in West Roxbury.  West Roxbury is located in Norfolk County—not Suffolk County.  (Copy of the death certificate was filed in the court file of SU97P0468, and is provided in **Exhibit 250**).

1012.   Provided is a copy of a purported **Will of Ethel E. Sikora** in **Exhibit 251** The handwriting in the afore-described Will for Ethel E. Sikora look, virtually, identical to that of the handwriting in the previously discussed documents in **SU84P1151** (Estate of James L. Buchanan) and **SU85P0326** (Estate of Mary W. Fidler).

1013.   Specifically regarding the signature for **"Ethel E. Sikora"**—and the multiple initialed signatures—contained in the afore-described **Will for Ethel E. Sikora** uncannily looks exceedingly similar with that of the handwriting on page 3 of the purported 1979 Will for **"James L. Buchanan"** (filed under **SU84P1151**) of the signatures and corresponding addresses of "[] E. Hirsch" and "Mary W. Fidler".

1014.   In particular, the handwriting of the words "Co-Executrix" with the purported signatures of **Mary C. Ricketson** and **Lenore A. Fidler** on the Order for Appraisal under **SU85P0326** look virtually identical to the handwriting of the signature for "Ethel E. Sikora" in the filed purported Will of Ethel E. Sikora, filed under **SU97P0468.**

### SU98P0397

1015.   **Suffolk Probate & Family Court No. 98P0397** purports to be the estate administration for **Mitchell J. Sikora, Sr. aka "Michelle J. Sikora"**.

1016.   All the written documents contained in the court file of **SU98P0397** refer to Mitchell J. Sikora.  There are no documents of any kind with the spelling of the name: "Michelle"—however, **"<u>Michelle</u> J. Sikora"** is the one and only person identified on the docket sheet for **SU98P0397** and on the electronic docket system of the Suffolk Probate & Family Court for **SU98P0397**.

1017.   Provided is a copy of all cases involving "Sikora" beginning with the first name of the letter "M" in Suffolk Probate & Family Court and a copy of the docket sheet for **SU98P0397** are in **Exhibit 252**.

1018.   There is no date of death entered in the electronic docket system of the Suffolk Probate & Family Court for **SU98P0397**.

1019.   The name "Michelle" instead of "Mitchell" was deliberately and intentionally input into the electronic system of the Probate & Family Court to deter the file of **SU98P0397** from being retrieved and searched by non-parties.  If the correct and exact spelling of "Mitchell" is entered into the search inquiry of the electronic docket system of the Probate & Family Court, the computer will indicate that no such case can be found.

1020.   When conducting a search on the electronic docket system of the Probate & Family Court, if the average person does not have a known docket number, he or she will most likely type in the full name of the person, and if the computer states that such search cannot find such case, the inquiry will, usually, end there.

1021.   There is no person designated as the decedent on the electronic docket system of the Suffolk Probate & Family Court for docket **SU98P0397**.

1022.   **Mitchell J. Sikora, Sr.** is **Justice Mitchell Sikora's** father.  A copy of the published obituary for Mitchell J. Sikora, Sr. is provided in **Exhibit 253**.

1023.   Mitchell J. Sikora, Sr. resided in West Roxbury, which is located in Norfolk County—<u>not</u> Suffolk County.

1024.   The docket for **SU98P0397** states that **Attorney Christopher Ianella, Jr.** was appointed as GAL.  Attorney Christopher Ianella, Jr. was the Governor's Council Chairman when **Justice Mitchell J. Sikora, Jr.** was voted for appointment to the Appeals Court.  He openly and publicly supported the above-described nomination of Justice Sikora to the Appeals Court.

1025.   The article, by Laurel J. Sweet—published by the **Boston Herald,** on **November 30, 2006**, about "the Governor's Council's Vote to elevate **Judge Mitchell J. Sikora, Jr.** to the Massachusetts Appeals Court"—reported then **Council Chairman Christopher Ianella, Jr.**'s own overt and announced support of Justice Sikora.  (Copy of the afore-referenced article is provided in **Exhibit 254**).

1026.   The article discussed the contentious nature of the nomination of **Judge Mitchell J. Sikora, Jr.** to the Appeals Court.  **Council Chairman Christopher Ianella, Jr.** stated that "he backed" Justice. Sikora because "[f]rom what [he had] been told, [**Judge Mitchell J. Sikora, Jr.**] is a man of integrity."

1027.   The handwriting of the various and multiple signatures contained in the documents filed in **SU98P0397** are, exceedingly and uncannily, similar.  In particular, the shape of the handwriting of "Sikora" in the signature for "Ethel E. Sikora" and "Mitchell J. Sikora" on page 4 of the purported Will of Ethel J. Sikora—and directly across from each other—is suspect (as well as all the other signatures on that page).

1028.   The shape of the handwriting of "Sikora" in the signature for "Ethel E. Sikora" and "Mitchell J. Sikora" on page 4 of the purported Will of Ethel J. Sikora is exceedingly and uncannily similar to the handwriting of "Sikora" for "Cheryl Sikora Doody" and "Mitchell J. Sikora, Jr." on the filed Decree of Administration Without Sureties for the **Estate of Mitchell J. Sikora** under **SU98P0397.**  (Copy of the afore-described Decree of Administration is provided in **Exhibit 255**).

1029.   The above-described handwriting of "Sikora" is exceedingly and uncannily similar to the handwriting of "Sikora" in both signatures (Sr. and Jr.), which is at the bottom of a document purporting to be a Decree of Guardianship of Mentally Retarded Person for Stephen Sikora [declared brother of Justice Sikora]—this document was located in the court file of **SU98P0397**.  (Copy of the afore-described Decree of Guardianship is provided in **Exhibit 256**).

1030.   It is suspect that there is no mention of "Cheryl Sikora Doody" as sister of Stephen Sikora on the interested parties section of the above-described Decree of Guardianship of Mentally Retarded Person.

## SU84P1251

1031.   The physical court file for **SU84P125**1 contains documents purporting to depict **SU84P1151** as an estate administration for **"Mary F. Sikora"**.  There is no death certificate placed in the court file of **SU84P1251**.

1032.   The electronic docket system of the Suffolk Probate & Family Court for docket number **SU84P1251** designates **"Mary F. Sikora"** as **"other"**—not as the decedent; and the electronic docket system of the Suffolk Probate & Family Court does not have anybody identified as being the decedent for docket number **SU84P1251**.

1033.   Previously referenced is the copy of all cases involving "Sikora" beginning with the first name of the letter "M" in Suffolk Probate & Family Court.  (Copy of the docket sheet for **SU84P1251** is provided in **Exhibit 257**).

1034.   The one and only person identified on the docket sheet for **SU84P1251** is **"Mary F. Sikora"** as **"other"**.  There is no date of death entered in the electronic docket system of the Suffolk Probate & Family Court.

1035.   There is no information provided in the court file of **SU84P1251** as to the real identity of **"Mary F. Sikora"**; and a public record search for **"Mary F. Sikora"** did not provide any information for the identity of a "Mary F. Sikora".

1036.   There was no purported Will filed in the matter of **SU84P1251.**

1037.   The electronic docket states that the court file for **SU84P1251** was **<u>first</u>** opened on **<u>May 24, 1984</u>**; however, the filed Bond for **SU84P1251** is signed as being issued by the Registrar as **<u>May 23, 1984</u>**—before a case file was even docketed for **SU84P1251**.  The named estate on the afore-described Bond is: "**Mary Fitzgerald Sikora**".  (Copy of the afore-described filed Bond in **Exhibit 258**).

1038.   An Inventory was filed in **SU84P1251** stating the "Estate of Mary Fitzgerald Sikora."  The afore-described Inventory stated that **"Mary Fitzgerald Sikora"** was of "Hyde Park, the County of Suffolk," with the Inventory having included an appraised value of $64,000 for the purported residence of 119 Summer Street, Hyde Park, MA.  Hyde Park is located in Norfolk County—<u>not</u> Suffolk County.  (Copy of the afore-described Inventory in **Exhibit 259**).

1039.   There is no record of any property designated as 119 Summer Street in Hyde Park, MA at the Norfolk County Registry of Deeds.  The only existing record for 119 Summer Street in Hyde Park is a supposed "Instrument of Taking" for such purported property.  There is no Deed for 119 Summer Street in Hyde Park filed in the Suffolk County Registry of Deeds.

1040.   The afore-referenced recorded taking is a fabricated document.  The handwriting of the signature for the purported Notary (Augustine Walker) is exceedingly and uncannily similar to the handwriting for the signature of "Marcia Goldsmith" in the afore-referenced Certificate Releasing Massachusetts Estate Tax Lien relating to **SU85P0326** (Estate of Mary W. Fidler).

1041.   A Notice of Claim was filed in the matter of **SU84P1251**on **November 30, 1984**.  The name designated on the afore-described Notice of Claim is: "**Mary Fitzgerald Sikora**".   (Copy of the stamped filing of the purported Notice of Claim is provided in **Exhibit 260**).

1042.   The attorney of record filing the Notice of Claim in **SU84P1251** was **Attorney Anthony B. Sandoe**.  His address was listed as 56 Temple Street, Boston, MA.  56 Temple Street in Boston was a residential address, not an office building.  Attorney Sandoe is a professor at Suffolk Law School; and, previously, was an associate at **Defendant Burns & Levinson** from **1971-1977**.  (Copy of published information regarding Attorney Anthony B. Sandoe is provided in **Exhibit 261**).

1043.   **Justice Mitchell Sikora** worked for **Defendant Burns & Levinson** commencing in **1972**.  Justice Sikora is a member of the **Suffolk American Inn of Court**, the local chapter of the American Inns of Court specifically affiliated with **Suffolk Law School**.  (Copy of published profile for **Justice Sikora** is provided in **Exhibit 262**).

1044.   An Inventory was purportedly filed on **October 14, 1984**, specifically designated as for the estate of **"Mary Fitzgerald Sikora"**.  (Copy of the afore-described filed Inventory is provided in **Exhibit 263**).

1045.   The individual stock and bank accounts—and with specific account numbers—listed in the afore-described Inventory for **"Mary Fitzgerald Sikora"** are identical to the stocks and bank accounts listed in the **Inventory** filed in SU98P0397 (Estate of Mitchell J. Sikora).

1046.   A copy of the Inventory filed in **SU98P0397** (Estate of Mitchell J. Sikora) is provided in **Exhibit 264**.

1047.   A distinct and separate Inventory was filed under **SU84P1251,** on **December 14, 1984**, specifically designated for the estate of **"Mary Sikora"**—no initial was included in the caption.  (Copy of the afore-described filed Inventory for **"Mary Sikora"** and petition for probate are provided in **Exhibit 265**).

1048.   A "First & Final Account" for **"Mary Sikora"** was, also, filed under **SU84P1251**—no initial was included in the caption—on **December 14, 1984**. "Judgment" was entered on **December 10, 1986**.  (Copy of the afore-described filed First & Final Account" for "Mary Sikora" is provided in **Exhibit 266**).

1049.   The afore-described Account stated that it only pertained to the period for **May 23, 1984 to August 2, 1984**.

1050.    Purportedly a Petition for Probate was filed for "**Mary P. Sikora"** under Docket Number **SU84P1251** on **July 30, 1986**.   The caption on the afore-described Petition designated the estate was **"Mary P. Sikora"**—not **"Mary F. Sikora"**.  (Copy of the petition cover sheet for the petition designated as the estate of **"Mary P. Sikora"** and Docket Number **SU84P1251** is provided in **Exhibit 267**).

1051.   The above-described petition filed under **SU84P1251** is identified as the matter of: **Estate of Mary P. Sikora**—not "**Mary F. Sikora**" (the electronic docket sheet for **SU84P1251** lists only the name of Mary F. Sikora).  Copies of petitions and bond filed under the name of Mary P. Sikora are provided in **Exhibit 268**.

1052.   In the afore-described filed petition, there is only one person listed as an interested party to **SU84P1251**: "Gwendolyn Pinette"—stated to be the niece of Mary Sikora.   In the afore-described Petition, it states that Gwendolyn Pinette has "100%" share of interest.

1053.   A "First Account" for **"Mary P. Sikora"** was filed on **July 31, 1986**.  The specific time period designated on the **"First Account"** was **August 3, 1984 to July 31, 1986**.  (Copy of the afore-referenced "First Account" for "Mary P. Sikora" filed under **SU84P1251** is provided in **Exhibit 269**).

1054.   When the only person listed as an interested party in the petition for the estate of **"Mary P. Sikora"** (designated under **SU84P1251**) is "Gwendolyn Pinette", suspect is that Schedule A of the filed "First Account" for **"Mary P. Sikora"** (designated under **SU84P1251**) lists the following under "Miscellaneous Receipts":

| | |
|---|---|
| 08-24-84 | Joe Sikora – August Rent |
| 09-14-84 | Joe Sikora – September Rent |
| 10-26-84 | Joe Sikora – October Rent |

1055.   Where the only person listed as an interested party is "Gwendolyn Pinette" of the filed "First Account" for **"Mary P. Sikora"** (designated under **SU84P1251**), it is suspect that under Schedule B of the filed "First Account" for **"Mary P. Sikora"** (designated under **SU84P1251**) has the following listed: "Leavitt & Finstein Reporting Services – **Joseph A. Sikora** vs. Robert J. Jordan."

1056.   There is a civil action entitled: **Joseph A. Sikora v. Robert J. Jordan**, filed in Suffolk Superior Court under docket number SUCV1985-74138.  (Provided is a copy of the electronic docket for SUCV1985-74138 in **Exhibit 270**).

1057.   The electronic docket sheet shows that the civil action, under SUCV1985-74138, *still* has the status of the parties designated as "Jordan" with "Service pending" and "Sikora" as "Active."

1058.   Provided in **Exhibit 271** are copies of the filed estate tax closing letter and purported Certificate Releasing Massachusetts Estate Tax Lien that Plaintiff Daughter Lisa found in the court file for **SU84P1251** that is purportedly from the Estate Tax Bureau of the Department of Revenue and specifically references the "**Estate of Mary P. Sikora**".

1059.   The above-described letter, purportedly, from the Estate Tax Bureau, had the Probate Number typed on it: **"84P1151"**—which is the Suffolk Probate & Family Court file for the "Estate of James L. Buchanan."  It, also, has a handwritten line crossed through the original typed Probate Number, with handwriting next to it, stating: **"84P1251"**.

### Established pattern of forgery & undue influence

1060.   There is an established pattern of conduct, specific to Massachusetts Probate & Family Court cases, in which attorneys use forgery to facilitate financial exploitation; which is demonstrated by published disciplinary actions by the Office of Bar Counsel and the Board of Bar Overseers.

1061.   Often, the forgeries pertain to signatures of relatives and/or beneficiaries of an elder or other individuals deemed to be incapacitated.  These forgeries, typically, involve documents giving assent and unfettered discretion to the attorney in the administration of the estates; as the significance of the signatures announce to the judge that the attorney has permission to make transactions in the administration of the estate without having to notify or inform the relatives/beneficiaries of such goings-on.

1062.   Even when actual signatures of relatives/beneficiaries *are* legitimate, often, attorneys refrain from fully informing the relatives/ beneficiaries as to the implications of their signing the document.

1063.   A specific illustration of using forgery, specific to Massachusetts Probate & Family Court cases, is the matter of In re guardianship of Joseph O'Shea (ES06P1391-GC2), in which it is evidenced that **Defendant Attorney Berid** had personally committed the act of forgery—having done so, <u>two (2) years</u> *prior* to her being court appointed as GAL in that very probate matter.

1064.   A petition for guardianship was filed on **June 13, 2006**, regarding Joseph O'Shea, which contained the purported signature of Frances O'Shea—who was Joseph O'Shea's mother.  (Copy of the afore-referenced petition is provided in **Exhibit 272**).

1065.   Provided are various documents in **Exhibit 273** that show the purported signature of Frances O'Shea is virtually identical to that of the handwriting of **Defendant Attorney Berid**.

1066.   In **August of 2006**, Frances O'Shea passed away, which resulted in another petition for guardianship being filed in the matter of In re guardianship of Joseph O'Shea, on **August 30, 2006**.  The subsequent filed petition contained the purported signature of Shannon O'Shea as petitioner—who was Joseph O'Shea's sister; here too such signature is virtually identical to that of **Defendant Attorney Berid.**  (Copy of the petition purportedly brought by Shannon O'Shea is provided in **Exhibit 274**).

1067.   A Bond was, also, filed with the **Essex Probate & Family Court** in **August of 2006** pertaining to the guardianship of Joseph O'Shea—and, again, the purported signature of Shannon O'Shea is identical to that of **Defendant Attorney Berid**. (Copy of the filed Bond is provided in **Exhibit 275**).

1068.   Further evidencing illicit conduct is the surrounding circumstances as to the individual who was the co-petitioner (**Denise Leydon Harvey**) of the subsequent guardianship petition, which was filed in **August of 2006**.  Denise Leydon Harvey signed as co-petitioner as if she were petitioning as an ordinary, private citizen; similar to the previously discussed examples with **Defendant Attorney Ledoux**.  Here, too, Denise Leydon Harvey listed her residential address in Lynn, MA as co-petitioner, while also signing the petition in her capacity as attorney *representing* the purported petitioner, Shannon O'Shea.

1069.   In the afore-described petition, the signature of Shannon O'Shea as petitioner is virtually identical to that of the handwriting of **Defendant Attorney Berid**.

1070.   Denise Leydon Harvey signed the above-described petition as the attorney for petitioner, as counsel under employment with the law firm of Stern, Keilty & Wall. She listed the law firm's address—which is different than the address she provided as "co-petitioner".

1071.   Like **Defendant Attorney Berid**, **Denise Leydon Harvey's** private law practice is predominantly focused in Probate & Family Court matters.  Downloaded information from Attorney Harvey's website is provided in **Exhibit 276**.  Attorney Harvey was appointed by **Attorney General Martha Coakley** to be a member of the statewide Personal Care Attendant.

1072.   Two (2) years after the afore-described petitions had been filed, Attorney Neal Winston filed a motion, in **2008**, with the **Essex Probate & Family Court** specifically requesting that **Attorney Susan Wall** of Stern, Keilty & Wall be appointed as GAL.  (Copy of the afore-described motionis provided in **Exhibit 277**).  (Both Attorney Winston and Attorney Wall are contained in the previously discussed **North Shore Elder Service's** exclusive referral list).

1073.   **Attorney Wall** declined the appointment in writing to the Essex Probate & Family Court giving a generic, blanket statement that she had a conflict of interest; which resulted in Attorney Winston subsequently writing a letter to **the Essex Probate & Family Court**, requesting the specific appointment of **Defendant Attorney Berid** as GAL, under SJC Rule 1:07.  (Copy of the afore-described letter requesting the appointment of Defendant Attorney Berid is provided in **Exhibit 278**).

1074.   Upon **Defendant Attorney Berid** being court appointed as GAL in the matter of In re guardianship of Joseph O'Shea, she filed a GAL Report in **2008**.  In the afore-described GAL report, Defendant Attorney Berid stated that Joseph O'Shea had sustained a brain injury resulting from a work accident that occurred in **2006**, which was the underlying basis for the inception of the guardianship proceedings.  (Copy of GAL Report filed by Defendant Attorney Berid in **Exhibit 279**).

1075.   The afore-described Bond—that was filed in **2006**—reported that Joseph O'Shea had "0" value for personal estate and for real estate; with **Defendant Attorney Berid** knowing that there was a worker's compensation action pending, involving the likelihood of a substantial lump-sum settlement.  The pending worker's compensation claim was, in no manner, referenced on the filed Bond.

1076.   In **Defendant Attorney Berid**'s GAL Report she stated that Joseph O'Shea suffers from "various mental impairments, which affect his ability to make financial and personal decisions."

1077.   Two (2) paragraphs later, in the very same above-described GAL report, **Defendant Attorney Berid** stated:

> Mr. O'Shea *does understand* that his weekly check from the Fund would stop. Further *he understands* that it is in his best interest to have the money placed in a Supplemental Needs Trust.  *He was aware* that Attorney Pierce's office had engaged the firm of Moschelle & Winston to draft the Supplemental Needs Trust and present to the Essex County Probate & Family Court to Approve the Estate Plan.  Mr. O'Shea had no problems with the concepts of the plan, and generally why it was necessary.

1078.   **Defendant Attorney Berid** stated in the afore-described GAL Report:

> *Mr. O'Shea had several concerns* with respect to his sister, Shannon O'Shea acting as trustee of his trust.

Yet, Defendant Attorney Berid made Shannon O'Shea trustee—*entirely* against Joseph O'Shea's explicit expressed wishes, which such wishes Defendant Attorney Berid, *personally,* attested to in her GAL report.

1079.   Attorney Pierce is the attorney who was handling Joseph O'Shea's worker's compensation case—which Joseph O'Shea's brain injury was a direct result of an at-work accident.  Of significance, as directly stated by **Defendant Attorney Berid,** the firm of **Moschelle & Winston** had been *directly* engaged by Attorney Pierce to draft the trust.

1080.   As previously set forth, **Attorney Winston** of **Moschelle & Winston** wrote to the **Essex Probate & Family Court** requesting that **Defendant Attorney Berid** *specifically* be court appointed as GAL under SJC Rule 1:07.

1081.   Also, of significance, the firm of **Moschelle & Winston** publicly held out as *simultaneously representing* Shannon O'Shea (Joseph O'Shea's sister) *for the very specific purpose of this matter of In re guardianship of Joseph O'Shea*—which is stated in a signed Stipulation.

 (Copy of the Stipulation is provided in **Exhibit 280**).

1082.   At the beginning of the above-described Trust, it stated:

This irrevocable Trust is established by the disabled Beneficiary's Guardian pursuant to Court order, having settled the Trust with assets of the Beneficiary, and the State Medicaid agency will be paid with *any remaining trust assets upon [his] death* prior to any other distributions, except those allowed by the SSA and Medicaid agency [].

1083.   The above-described Trust, also, contained a provision stating:

In determining whether the existence of this Trust has the effect of rendering the Beneficiary ineligible for any such program of public benefits, the *Trustee is granted absolute and sole discretion to initiate action to render the Beneficiary eligible for such program of public benefits* [].

1084.   The provision from the immediate preceding paragraph was followed by a provision entitled: "Purchase of Exempt Assets and Transfer to Beneficiary."  That provision stated:

This clause shall only apply as eligible or *potentially* eligible for any public benefits program.  The Trustee may purchase items that would be considered 'exempt' assets for purposes of the public benefits, such as personal household items, transportation devices, medical equipment, or a home.  The Trustee *may, in the Trustee's absolute and sole discretion*, distribute such items to the Beneficiary.  *Once distributed, such items are free of the trust and the Trustee need not further account for the distributed items*; the Trustee *should* [not required] report such in-kind distributions in the following regular accounting.

1085.   The above-described "Supplemental Needs Trust" made very broad provisions that would apply to payment for legal service fees and opportunity for kickbacks and/or other consideration for making referrals of services and/or purchases. Such description in the Trust included "private case management," "fees and costs for protective care proceedings" and "consultation with agencies."

1086.   The above-described Trust described in detail the scope of "consultation with agencies" as specifically including: "The Trustee may seek the counsel and assistance of [] any public or private agencies that have been established to assist the handicapped or disabled in similar circumstances."

1087.   Suspect is the language regarding a successor trustee in the above-described Trust that states: "A successor Trustee shall *not* have *any* duty to examine the record or actions of any former Trustee and shall *not* be liable for the consequence of *any* act or failure to act of *any* former Trustee."

1088.   Conspicuously, in **Defendant Attorney Berid's** GAL report, she described family dissension and credited family dissension as the very factor that "le[d] to the idea of adding a Trust Protector".

1089.   The above-described Trust did not name any specific successor Trustee, and explicitly stated that, in the event of needing a successor Trustee that the *Probate & Family Court would be appointing that successor Trustee*.

1090.   The above-described Trust that was actually filed with the **Essex Probate & Family Court** in **April of 2008** is further suspect based on the following factors: the typed section for the date was left blank; the signature page was blank; and there was no provision in the Trust regarding a "Trust Protector".

1091.   It is suspect that the above-described guardianship petition—filed **in 2006**—listed Joseph O'Shea as having two (2) brothers; **Defendant Attorney Berid** made no mention, whatsoever, in her filed GAL Report of 2008 about Joseph O'Shea having two brothers.

**B.** **SJC Rule 1:07—Fee Generating Appointments—used as a central instrument to facilitate exploitation of elders**

1092.    As previously set forth, when elders have been judicially deemed to be incapacitated (and then designated wards of the State), it is virtually automatic that judges of the Probate & Family Court—per statutory provisions of SJC Rule 1:07—appoint State certified professionals to carry out varied purported functions involving the financial and personal affairs of the elder.  Judges of the Probate & Family Court, also, make such court appointments in administrating the estate of a deceased person.

1093.    SJC Rule 1:07 was a creation, wholly, premised on the purported need for impartial and neutral individuals for two (2) distinct and separate type of roles: 1) to carry out duties and responsibilities as fiduciaries of elders, deemed wards of the State and 2) to act as investigator/consultant—by gathering factual information, specifically on behalf of the probate court judge, and to follow up with recommendations for judicial action.

1094.    The specific purported reason for issuing court appointments under SJC Rule 1:07 is the need for a neutral and unconnected party.

1095.    SJC Rule 1:07 court appointees are paid to "provide services" in their designated roles.  The first resource used to pay the public court appointment is the private estate of an elder, at a standard hourly rate of a private practitioner (usually, between $250-$300).  If a private estate is, initially, financially insufficient—or becomes depleted—the court appointee is paid by the Commonwealth at a pre-determined hourly rate.

1096.    A court appointee must have completed a "certified" training program and subsequent continuing education programs to maintain certification, solely and exclusively provided *by* the Massachusetts Probate & Family Court.

1097.    No other training program may be substituted for "certification" under Rule 1:07 Fee Generating Appointments—the only way to become a paid court appointee in Massachusetts is by completing the specific program run by the Massachusetts Probate & Family Court.

1098.    Reported in **2010** by the GAO on Guardianships, 9 (nine) states require court appointed guardians to pass a *national* guardianship exam or a state exam—Massachusetts is *not* one of those states requiring court appointed guardians and conservators to pass a national exam or state exam.

1099.   It is a rare occasion for the Massachusetts Probate and Family Court judges to select a family member or friend as a fiduciary appointment—almost always, an attorney from the SJC Rule 1:07 list is selected as the fiduciary.

1100.   The sole official designated overseer of SJC Rule 1:07 court appointees is the presiding Probate and Family Court judge.

1101.   In many probate cases, SJC Rule 1:07 appointees *have already established partisan relationships with each other*.  Often, these court appointees work together in multiple contemporaneous probate matters, taking varying and different roles in the unrelated probate matters—one may be court appointed guardian in one case and in another case, he/she will take the role as court appointed conservator or GAL *or* he/she may take a private counsel role or private petitioner.

1102.   Fiduciary court appointments, made under SJC Rule 1:07, routinely have <u>complete and exclusive control</u> over an elder's person and his/her estate.

1103.   Court ordered appointments create the opportunity for state actors to embezzle money and property, regardless of the value of the individual estate.  Even when an elder has no personal estate or real estate, as long as that person receives benefits from the government, the opportunity exists for financial illicit gain.

1104.   The routine issuance of court appointments in guardianship and conservatorship matters, via Supreme Judicial Court Rule 1:07 is the lynchpin in operating exploitation through the Massachusetts Probate & Family Court system.

### i.   <u>Guardianship and conservatorship matters</u>

1105.   As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes the Massachusetts Uniform Probate Code (MUPC), which mandates that plenary guardianship and conservatorship are a means of *last resort*. G.L. c. 190B, § 5-306.

1106.   As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes G.L. c. 190B, § 5-306(a), which states a probate court judge is mandated to exercise his or her authority in a manner that "encourages[s] the development of maximum self-reliance and independence of the incapacitated person. . . ."

1107.   As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes G.L. c. 190B, § 5-306(a), which states a probate court judge is mandated to issue orders "only to the extent necessitated by the incapacitated person's limitations or other conditions warranting the procedure."

1108.   As a matter of standard custom and practice, the conduct of the judiciary for the Probate & Family Court contravenes G.L. c. 190B, § 5-306(b)(8), whereby the statute states that a probate court judge can only appoint a guardian when the elder's "needs <u>cannot</u> be met by less restrictive means"—such as an existing durable power of attorney.

### ii.   <u>Pattern of caseload & financial gain</u>

1109.   There is an established systemic pattern of private practicing attorneys using court appointed work as a regular and steady source of income.

1110.   Evidence of the high  volume of contemporaneous cases handled by individual court appointees is provided in **Exhibit 281**—examples of caseload history records from the Probate and Family Court docket system include:

1111.   The average payment for a quarterly invoice made by a court appointee for a single matter ranges from $10,000 up through and exceeding $30,000.   Examples of such invoices are provided in **Exhibit 282**.

1112.   In their official capacities as SJC Rule 1"07 court appointed guardians, conservators and GALs, designated Defendants obtain ill-gotten gains by billing for unnecessary and excessive services.

### C.   <u>Established pattern of conduct by Massachusetts Probate & Family Court judges evidencing collusion with attorneys regularly appointed as fiduciaries and GALs</u>

### i.   <u>Routine disregard by Probate & Family Court judges of the cornerstone directives by the Massachusetts Uniform Probate Code (MUPC)</u>

1113.   As a matter of law, issuance of plenary authority to guardians and conservators is mandated to be a means of *last resort*; yet, there is an established pattern that Probate & Family Court judges automatically and summarily issue plenary authority to private attorneys, who are regularly court appointed as fiduciaries and GALs.

1114.   It is a very rare event for a Probate & Family Court judge to issue limited powers of guardianship and conservatorship.

1115.   As a matter of law, a durable power of attorney is deemed a "less restrictive means" under G.L. c. 190B, § 5-306(b)(8).  See *Guardianship of Smith*, 43 Mass. App. Ct. 493. 497-498 (1997).  It is a well established law that a durable power of attorney is to be considered an "alternative to a protective procedure, a designed supplement enabling nomination of the principal's choice for guardian to an appointing court and continuing to authorize efficient estate management under the direction of a court appointee." *Guardianship of Smith*, 43 Mass. App. at 497.

1116.   On **November 16, 2007**, Suffolk University Law School hosted a continuing legal education program called "Limited Guardianship: A New Approach." The brochures stated:

> Attend and Learn: What is limited guardianship and when is it appropriate; How medical professionals assess an individual's limitations; What models exist for a limited guardianship; How to handle a petition for limited guardianship.

 (Copy of the brochure is provided in **Exhibit 283**).

1117.   Sponsors of the afore-described legal continuing education program consist of associations, such as, the Massachusetts Guardianship Association and Geriatric Care Managers-N.E.

1118.   There is an established pattern of conduct by Probate & Family Court judges consisting of routinely issuing plenary guardianships and conservatorships; and doing so in a capricious and summarily manner.

1119.   There is an established pattern of conduct by Probate & Family Court judges routinely issuing plenary guardianships and conservatorships, <u>without</u> conducting any inquiry as to the existence of alternatives or limited authorization.

1120.   Court ordered decrees for plenary guardianship and conservatorship to court appointed guardians and conservators is the core means used for facilitating financial exploitation, under color of law, because of their judicially authorized, unfettered and exclusive access to the elder ward's estate.

### ii. **Established systemic pattern of probate court judges deliberately disregarding the explicit promulgated required standard for selecting court appointments**

1121.   The Preamble of the Supreme Judicial Court's SJC Rule 1:07 Fee Generating Appointment states:

> [t]he Justices have concluded that the fairest way to accomplish this goal, and at the same time avoid favoritism, is by requiring each court to create lists of qualified candidates and then generally make appointments from those lists in rotation or sequential order.

1122.   The Probate & Family Court has promulgated unambiguous rules that require probate court judges to select SJC Rule 1:07 Fee Generating Appointments from the court list and, *specifically*, doing so in *successive* order.

1123.   The Probate & Family Court outwardly states that the requirement—for probate court judges to make appointments in successive order—was explicitly and purposely devised to "assure that all fee-generating appointments made by the courts of the Commonwealth are made on a fair and impartial basis with equal opportunity and access for all qualified candidates for appointments."

1124.   As shown from the explicit language used in the Preamble of SJC Rule 1:07, the Supreme Judicial Court is well aware of the inherent and likely incestuous-like conduct, particularly when people work together on a regular basis.

1125.   It is well documented that the overwhelming pattern of conduct that occurs in the Probate & Family courts consists of counsel, during court proceedings, *just* <u>outright orally requesting</u> the specific person whom *he or she wants appointed* and/or counsel makes such requests through <u>written motions</u>.

1126.   As previously set forth, it is the standard custom and practice of the Probate & Family Court to cherry-pick SJC Rule 1:07 court appointees.

1127.   Some cases—like that of the underlying matter of In re Marvin H. Siegel, Probate & Family Court judges capriciously appoint a person based on <u>*his or her own*</u> particular preference, without even looking at the court appointment list.

1128.   The SJC Rule 1:07 and the Amended Standing Order 5-11 of the Probate and Family Court do permit an exception to the required standard protocol of selecting court appointees in succession, however, the rule <u>*mandates*</u> that a judge must provide <u>*a written explanation*</u> for utilizing the exception.  As a matter of practice, Probate & Family Court judges <u>*do not*</u> provide any written explanation for deviating from the protocol.

1129.   The above-described conduct of selecting court appointees based on explicit requests for specific individuals has no legitimate basis, where all persons placed on the court appointment list are certified by the Commonwealth to be on the court appointment list; especially, when the very essence of SJC Rule 1:07 is held out to the public as having an ample sized pool of individuals who are *all* court deemed qualified and certified to act in the capacity of the various designated court appointments.

1130.   The motive for Probate & Family Court judges to allow requests by counsel for particular individuals to be appointed—as well as judges making appointments based on their own preference—is an established systemic means for kickbacks and bribes; which is bolstered by solid documentation of the standard custom and practice of the judges rubber-stamping the motions for payment by these court appointees.

1131.   It is standard practice that court appointees—*when being paid directly by the estates of their wards* (*not* by CPCS)—submit by motion, invoices that purportedly substantiate the services rendered.  However, the invoices patently lack any real substantive detail of the services billed.


### iii. <u>Established pattern of summarily disregarding valid pre-existing Durable Power of Attorneys</u>

1132.   The Uniform Act "recognizes an individual's right to self-determination by permitting a principal to use a durable power of attorney to express his preference regarding any future court appointee charged with the care and protection of his person or estate." *Guardianship of Smith*, 43 Mass. App. Ct. 493, 497 (1997).

1133.   One of the foremost well-established legal reasons for elders to execute a DPOA is for the specific purpose of the elder avoiding the risk of becoming a ward of the State.

1134.   It has been long and well-established—and held out to the public—that the cornerstone judicial philosophy that the Massachusetts courts explicitly "discourage appointing a guardian contrary to the individual's clearly expressed wishes." *Guardianship of Smith*, 43 Mass. App. Ct. 493, 499 (1997).

1135.   The Appeals Court in *Guardianship of Smith* s*pecifically* indicated that the probate court's complying with an elder's expressed desire and intention is paramount because courts are "often uninformed about an individual's personal preferences and concerns in [guardianship] proceedings."

1136.   When an elder establishes in writing his or her specific desires through advance directives, such as a durable power of attorney, the existence of family dissension is *wholly* irrelevant; in particular, because the elder, *personally*, has set forth who *he or she wishes* to be attorney-in-fact and/or guardian and conservator.

1137.   There is an overwhelming established pattern of Probate and Family Court judges declaring elders as wards of the State, *despite* existing valid written advance directives that explicitly state the specific person(s) whom the elder has personally designated to act as his or her guardian and conservator.

1138.   In elder guardianship and conservatorship matters, it is virtually automatic that Probate and Family Court judges deem an elder incapacitated, thereby, rendering the elder a ward of the State; which is, almost always, immediately followed by a virtual automatic appointment of a public guardian and conservator—functioning like a venus fly trap.

1139.   There is an overwhelming established pattern of Probate and Family Court judges declaring elders as wards of the State, *despite* existing family members, who are capable and more than adequately suited to care for the elder as his or her guardian and conservator.

1140.   It is a common and routine occurrence in guardianship and conservatorship matters for Massachusetts Probate Court judges to disregard an elder's existing advance directives and estate planning instruments with no real evidence proffered to question the validity of the advance directive and no real basis for disqualification of the elder's nominee.

1141.   The facts in the underlying probate matter of *Guardianship of Smith*, 43 Mass. App. Ct. 493 (1997) bolster the Plaintiffs' assertion that the capricious disregard of validly executed durable power of attorneys is not an isolated event or aberration—and even more so, that such by probate court judges conduct has been a long-established pattern.

1142.   The ill-motive for judges of the Probate & Family Court to deliberately disregard family members (or other private person of a familial nature) designated as an elder's nominee of guardian and/or conservator is the fact that if no appointment were to be made from the probate court's list of Rule 1:07 Fee Generating Appointments, the court officials of the probate court would have, absolutely, no access, whatsoever, to the elder's estate.

1143.   The underlying probate matter of *Guardianship of Smith*, 43 Mass. App. Ct. 493, 495-501 (1997) is a prime example, where the Massachusetts Appeals Court expressly declared that the probate court judge summarily disqualified the nominees set forth in the elder's durable power of attorney.

1144.   The Appeals Court, in *Guardianship of Smith*, 43 Mass. App. Ct. 493, 500 (1997), emphasized that a probate court judge must base a disqualification of a nominee on "competent evidence"— that "statements made by counsel at [a] hearing and not substantiated through the testimony of witnesses or otherwise" does not rise to the level of competent evidence.

1145.   The Appeals Court, in *Guardianship of Smith*, expressly indicated that the probate court judge overtly disregarded the elder's durable power of attorney, as the Appeals Court explicitly noted that the nominee's attorney "requested to have his client testify, but the judge declined to hear the testimony."

1146.   The dicta of the Appeals Court, in *Guardianship of Smith*, demonstrates that the probate court judge, in fact, unjustly disqualified the elder's nominees in a knowing and deliberate manner.  Of significance, the presiding judge in the underlying probate matter of *Guardianship of Smith* was Judge Joseph Lian, Jr., who was subsequently selected to be a member of the committee specifically created by the Supreme Judicial Court to draft *the new code of ethics for Massachusetts judges* (which became effective on **October 1, 2003**).

### iv.   Established pattern of Probate & Family Courts disqualifying the elder's nomination for guardian and conservator, even though explicitly designated in advance directives

1147.   G.L. c. 190B, § 5-305 permits probate court judges to disqualify an elder's explicit designation of nominee for appointment of guardian and conservator "for good cause."

1148.   The written manual entitled "General MUPC Article V, Procedural Outline for Guardianship of an Incapacitated Person Conservatorship of a Protected Person" (herein referred as "General MUPC Outline") was issued on **July 8, 2009**.  On page 10 of the General MUPC Outline, it states that if a person "is being investigated" for "neglect of the Incapacitated Person" that he/she cannot be appointed as guardian.

1149.   As demonstrated, the threshold for disqualification has been promulgated by official court procedures to such an exceptionally low standard, that, in and of itself, evidences the extent to which illicit conduct is systemically, knowingly and intentionally, facilitated; so much so, that the mere existence of a supposed "investigation" is the actual established modus operandi that is used by the probate court judges to superficially support as a basis for disqualifying an elder's nominee for guardianship and conservatorship.

1150.   The promulgated rules make the disposition of an investigation completely irrelevant and not needed, in any manner, for the process of disqualification of an elder's designated nominee for guardian and/or conservator.

1151.   There is an established common pattern that once a purported investigation has been initiated, no further action is pursued; often the allegations just linger without any closure—evidencing that the initiation of an investigation is deliberately manufactured for ill-motives.  (Demonstrated in the underlying matter of In re Marvin H. Siegel, the matters of In re James and Hope Pentoliros, the matter of In re Esterina Milano and the matter of In re Antoinette Carpinone).

1152.   In addition, there is established documentation to show that court appointees band together with private counsel (who, often, are on "the court list" of appointees as well) and the judge to carry out a concerted attack against the designated attorney-in-fact or nominated guardian/conservator designated in the elder's written durable power of attorney; which further bolsters evidence of ill-motives by the court appointees and the judges.   (Demonstrated in the underlying matter of In re Marvin H. Siegel, the matters of In re Robert and Gertrude Pigeon, the matters of In re James and Hope Pentoliros, In re Esterina Milano and the matter of In re Antoinette Carpinone).

1153.   As set forth above, there is established documentation to show that the commonly employed tactic is to claim that the attorney-in-fact has financially exploited the elder, as well as claims of neglect.  This is the most common means used to purportedly justify the court appointments made under SJC Rule 1:07—it is routinely proclaimed that the Judge should disqualify family members from becoming guardian and/or conservator.

1154.   The other most prevalent means to superficially justify the court appointments of guardians and conservators is proclaimed family dissension— *even* in the face of pre-existing valid written advance directives that unambiguously and explicitly set forth the elder's chosen family member(s) to act as guardian and conservator. (Demonstrated in the underlying matter of In re Marvin H. Siegel, the matters of In re James and Hope Pentoliros, the matter of In re Esterina Milano and the matter of In re Antoinette Carpinone).

1155.   Absent undue influence, when an elder has made a specific designation as to his or her nomination of guardian and conservator, family dissension is wholly irrelevant where a prime reason for the elder executing such advance directive, in the first place, is to override family dissension.

1156.   As demonstrated above, there is a motive for State actors to fabricate allegations of exploitation by the family member(s) to superficially support the court appointment of a guardian and conservator.

1157.   Often, State actors utilize disgruntled family members' baseless and frivolous allegations of exploitations against the family member(s) suitable to act as guardian and conservator.

1158.   The established pattern is that State actors only proffer in-court blanket and empty allegations of exploitation against the family member seeking to be guardian and/or conservator; no true documentation is presented by State actors to prove exploitation; and no criminal complaints are initiated by State actors against the accused family members. (Specific cases include: In re Marvin H. Siegel, In re Esterina Milano, In re James and Hope Pentoliros, and In re of Antoinette Carpinone).

### D.   Modus operandi of SJC Rule 1:07 court appointees

1159.   As a matter of custom and practice, the Probate & Family Court and its judges hold out to the public that court appointments are made because of the need for neutrality; that the SJC Rule 1:07 court appointees have no personal knowledge about the involved parties.  As previously set forth, SJC Rule 1:07 court appointees routinely use their existing relationships with one another, in such a manner, that overwhelmingly negates any semblance of neutrality and unconnectedness.

1160.   The scope and nature of authority given to these public court appointees— in addition, to the lack of any meaningful oversight and accountability—allows the pervasive existence of financial exploitation by State court actors to thrive.

1161.   To facilitate illicit conduct, the ultimate objective of court appointed fiduciaries is to keep family members in the dark about the goings-on of the elder's financial and personal affairs.   There is an established pattern of court appointed fiduciaries taking overt actions to deliberately conceal information from an elder's family members.   Such evidenced concerted efforts by court appointed fiduciaries demonstrates evidence of consciousness of guilt.

1162.   A common method that court appointed fiduciaries use to minimize family members and/or close friends obtaining direct incriminating evidence is to isolate the elder from family and friends.   Isolation is, often, carried out by court appointed fiduciaries obtaining a court order forcing the elder out of his or her home into a nursing home or other long-term care facility; by obtaining protective orders that severely restrict visitation of family and friends—even to the extent of seeking to preclude *all* visitation and communication; by obtaining court orders for authorized forced drugging of the elder with anti-psychotic medication (usually, Seroquel and Risperdal); by refusing to provide requested information to family members, especially, financial transactions regarding the elder's estate and medical treatment.   (Demonstrated in the underlying matter of In re Marvin H. Siegel—evidence provided in **Exhibits 283B, 283C, and 283D**) In re James and Hope Pentoliros, In re Esterina Milano, In re Henry and Anna Sawicki, In re James Polando)

1163.   As previously set forth, it is a matter of routine for Probate & Family Court judges to summarily issue court ordered authorization for forced administration of antipsychotics, based solely on behaviors resulting from Alzheimer's and dementia— despite, well-known and long-established FDA black-box warnings of fatality, specifically with the susceptibility for elders having dementia.

### i.   <u>Illustration of specific implementation of modus operandi</u>

1164.   The matter of In re Esterina Milano is a prime example of how incestuous-like relationships amongst SJC Rule 1:07 court appointees and judges are used throughout the Massachusetts Probate & Family Courts to facilitate illicit financial and other personal gain.

1165.   T*hree* (3) of the primary misfeasors in the matter of In re Esterina Milano—having acted in the capacities as SJC 1:07 court appointed fiduciaries—<u>are, also, key misfeasors in the underlying matter of this Federal action: In re Marvin H. Siegel</u>. Those individuals being **Judge Jeffrey Abber**, **Defendant Attorney James Feld** and **Defendant Attorney Lisa Cukier**.

1166.   As previously set forth, prior to **Judge Abber's** appointment to the Massachusetts Probate & Family Court in **2010**, he had been a private practicing attorney and had acted in the capacity as a SJC Rule 1:07 court appointee.

1167.   Contemporaneous with the matter of Esterina Milano, **then-attorney Abber** and **Judge Peter DiGangi** had known each other socially and personally outside of court.

1168.   **Judge Abber** and **Judge DiGangi** are both members of the **Massachusetts Family & Probate American Inn of Court** and **American Association of Matrimonial Lawyers** (AAML); and both are alumni of New England School of Law.

1169.   In **December of 2008**, **Judge DiGangi** appointed **then-Attorney Abber** as *sole* guardian over Esterina Milano as a person *and* her estate.


### **Background of In re Esterina Milano**

1170.   Esterina Milano was a 66-year old woman, who owned homes in Framingham, MA <u>and</u> in Florida.  She routinely lived half of the year in Massachusetts, and the other half in Florida.  Esterina Milano owned her Massachusetts home outright; which was valued at $200,000, and without *any mortgage, whatsoever*.

1171.   Esterina Milano had three (3) adult children: two (2) daughters (Patricia and Brunella) and one (1) son (Enrico).  Son Enrico was his mother's caregiver for fourteen (14) years prior to the probate matter that arose.  He and his wife traveled with his mother between Massachusetts and Florida.

1172.   In early, **November 2008**, Esterina Milano needed to have brain surgery, which was performed at the Massachusetts General Hospital.  Prior to the November 2008 surgery and being of sound mind, Esterina Milano deliberately prepared her advanced directives by executing a health care proxy and durable power of attorney.

1173.   Esterina Milano wanted her son (Enrico Milano, Jr.) as her health care proxy, which she executed on **October 17, 2008**; and which was witnessed by Dr. Jeffrey Jaglowski of the Massachusetts General Hospital.

1174.   Esterina Milano, also, wanted her son as her durable power of attorney, and executed that DPOA on **October 21, 2008**; and she wanted her son's wife as successor attorney-in-fact.

1175.   Esterina Milano was admitted to Massachusetts General Hospital on **October 31, 2008**—having executed her advance directives *prior to even any hospital admission*.

1176.   On **November 12, 2008**, Esterina Milano was transferred to **Youville Rehabilitation** from the Massachusetts General Hospital.

1177.   Esterina Milano's two (2) daughters were disgruntled over their mother's established desire that Enrico be the exclusive person to be the mother's attorney-in-fact. The daughters attempted to obtain durable power of attorney while Esterina Milano was a patient of **Youville Rehabilitation**.

1178.   **Youville Rehabilitation** was well aware that Esterina Milano had already validly executed advance directives in **October of 2008**.  Youville Rehabilitation was, also, well aware that the durable power of attorney obtained by the daughters was not signed by Esterina Milano of her own free will.

1179.   It was very clear that Esterina Milano's son was the actual valid attorney-in-fact for his mother—as evidenced by submitted pleadings of counsel for **Youville Rehabilitation** (**Kristen Lambert, Esq**.); yet, counsel for Youville Rehabilitation filed a petition for an emergency appointment of guardian on **December 22, 2008**.  (Copy of petitions filed by Youville Rehabilitation and other memorandum are in **Exhibit 284**).

1180.   **Youville Rehabilitation** did not present any evidence that the above-described advance directives of **October 2008** were invalid.  Furthermore, in the Youville's motion, it is evidenced that all parties had actual and substantive knowledge that the daughters attempted to obtain a power of attorney *after* Esterina Milano's surgery.

1181.   **Then-Attorney Abber**—with reckless disregard for the truth—used claimed "strife" amongst the siblings to deliberately oust the family from having any input over their mother; so that he and his colleagues would have full control over Esterina Milano's estate, *for their own personal financial gain*.

1182.   A hearing was held on **January 5, 2009** regarding the continued temporary court appointment of **then-Attorney Abber** as guardian and conservator.  At that time, Son Enrico did not have an attorney representing him.

185

1183.   Esterina Milano's son, Enrico, had not been given advance notice of the hearing for temporary appointment held on **January 5, 2009**.  He found about the **January 5, 2009** hearing that *very* morning of January 5, 2009—by way of a telephone call from **Attorney Kristen Lambert**, as counsel for **Youville Rehabilitation**; upon which, Enrico Milano told Attorney Lambert, that he was on his way to the court.  When Enrico Milano arrived at the court, he was told that the motion had already been allowed.

1184.   The purported Notice of Petition, filed in **January of 2009**—in fact—*had not* been served to Enrico Milano.  Provided in **Exhibit 285** is a copy of the Notice of Petition, which contains a handwritten statement made by **Defendant Attorney Feld** (dated 7/29/09) and states that no service was made by **then-AttorneyAbber** or **Attorney Kristen Lambert**; *and that Attorney Lambert said that she sent the original to then-Attorney Abber*.

1185.   Provided in **Exhibit 286** is a copy of **Attorney Lambert's** letter to **Defendant Attorney Feld** making the above-representation (dated July 24, 2009) and a copy of Attorney Lambert's letter to **then-Attorney Abber** (dated January 15, 2009), stating that she was enclosing the original Petition, and that she had not published anything because Esterina Milano had been discharged from Youville.

1186.   Due to abusive conduct by **then-Attorney Abber**—in his role as court appointed guardian—Esterina Milano's son, Enrico, retained counsel (Angelina Siciliano, Esq.), on or about, **March 18, 2009**.

1187.   Attorney Siciliano faxed a letter to **then-Attorney Abber** on **March 18, 2009**, addressing the alleged retaliatory conduct.  (Copy of faxed letter is provided in **Exhibit 287**).  Attorney Siciliano had requested then-Attorney Abber to contact her to discuss this matter.

1188.   When **then-Attorney Abber** did not respond to the letter faxed on **March 18, 2009**, Attorney Siciliano attested that she mailed and faxed another letter to then-Attorney Abber on **March 24, 2009**.  On that same day, **March 24, 2009**, Enrico had called his mother's room, where she had been at the Massachusetts General Hospital.  The person who had picked up the telephone in the room told Enrico that his mother had been transferred out of the hospital; which upon being told such information, **Attorney Siciliano** called then-Attorney Abber.

1189.   On **March 24, 2009**, **Attorney Siciliano** placed a call to **then-Attorney Abber**, and finally reached him.  During that conversation, Attorney Siciliano learned that Esterina Milano had been moved to a different room.  However, then-Attorney Abber made statements to Attorney Siciliano showing that he, in fact, had such intentions to transfer Esterina Milano out of Massachusetts General Hospital, by stating that Esterina Milano had not been transferred because she first needed to be appointed a Roger's guardian.

1190.   Also, during that conversation of **March 24, 2009**, Attorney Siciliano asked when **then-Attorney Abber** was going to respond to her letters.  He stated that <u>he would call her *that* Thursday</u> to set up an appointment for March 30, 2009 or March 31, 2009.

1191.   **Then-Attorney Abber** did not call Attorney Siciliano as he had stated he would do; rather he waited until Friday to call her and then informed Attorney Siciliano that he would be going in on that Monday, March 30, 2009 for an emergency motion to appoint a Roger's guardian.   Attorney Siciliano filed a motion on **<u>March 28, 2009</u>** requesting that then-Attorney Abber be removed as temporary guardian and requested to appoint a guardian ad litem.  (Copies of the motion to remove guardian, supporting Affidavit of Attorney Siciliano, Affidavit of Enrico Milano and letter from R.N. employed with Youville Rehab are provided in **Exhibit 288**).

1192.   Attorney Siciliano attested to her first-hand dealings with **then-Attorney Abber**: that he was biased against Esterina Milano's son; that he had not proffered *any* valid basis for having such an adverse attitude against the son; that then-Attorney Abber *flaunted* the fact that he did not perform any independent investigation as to the allegations made by the daughters; that then-Attorney Abber *expressed to her that he had personally* determined that no effort needed to be expended on verification, as <u>he</u> had deemed this situation to be merely a "fight between Patricia and Enrico."

1193.   After Attorney Siciliano filed the above-described motion to remove **then-Attorney Abber** as guardian, she withdrew the motion based on there being a stipulation that a GAL would be appointed.

**Out-of-court pre-arrangement of SJC Rule 1:07 court appointments of Defendant Attorneys Feld and Cukier**

1194.   On **April 6, 2009**, **Attorney David Goldman** was court appointed as GAL in the matter of Esterina Milano.  Attorney Goldman is a member of the **Massachusetts Family & Probate American Inn of Court**—along with **Jeffrey Abber** and **Defendant Attorney Lisa Cukier**.

1195.   **GAL Goldman** stated in his filed invoice with the court, that he *personally* called **Defendant Attorney Feld on April 8, 2009** *to see if he was interested* in being guardian.  (Refer to GAL Goldman's invoice provided in previously referenced Exhibit 282).

1196.   **Defendant Attorney Cukier** was contacted by **GAL Goldman** *prior* to her being appointed co-guardian in the matter of In re Esterina Milano.  Like **Defendant Attorney Feld,** Defendant Attorney Cukier already had been very intimately involved in the matter of In re Esterina Milano *prior to* any official appointment as temporary co-guardian—which took place on **August 5, 2009**.   Defendant Attorney Feld transitioned to being conservator in that very same matter, with Defendant Attorney Cukier taking Attorney Feld's stead as co-guardian *with* **then-Attorney Abber**.

1197.   **Defendant Attorney Feld**, **Defendant Attorney Cukier**, and **then-Attorney Abber** worked all together as *co-court appointed fiduciaries* (in the matter of In re Esterina Milano) through **February of 2010**.

1198.   **GAL David Goldman's invoice states**:

> **July 28, 2009**:  GAL held meeting with Attorney Lisa Cukier from Burns & Levinson and Attorney James Feld regarding "settlement".

> **July 29, 2009:**  Calls between the GAL and James Feld about "selection for successor guardian".

> **August 4, 2009:** GAL had meeting at Burns & Levinson with Attorneys Cukier, Feld and Gassner.

1199.   **Defendant Attorney Cukier** faxed her bond application to **Judge Keamy**.  (Provided is a copy of the fax cover sheet and Bond in **Exhibit 289**).  Despite Attorney Cukier's evidenced intimate knowledge of the details of the matter, she filled in the bond application saying that she did not know the estimated values of the real estate and personal estate.

1200.   **Defendant Attorney Cukier** even filled out **<u>then-Attorney Abber's</u>** bond application form (see similarity of handwriting in the bond applications).  The form states that <u>then-Attorney Abber</u> *did not* know the value of the real estate and personal estate, *even though he was the original conservator as of **December 22, 2008.***  (Copy of the Bond filed for then-Attorney Abber in **December of 2008** and **August of 2009** are provided in **Exhibit 290**).

1201.   Refer to previously referenced Exhibit 282, which provides invoices submitted by **then-Attorney Abber**, **Defendant Attorney Feld**, **Defendant Attorney Cukier** and **GAL Goldman**; which demonstrate the substantial embedded partisan conduct amongst SJC Rule 1:07 court appointees.

1202.   **Defendant Attorney Feld** was not appointed guardian <u>*until*</u> **May 18, 2009**—however, <u>*before*</u> being court appointed (on or about, **<u>May 5, 2009</u>**), **then-Attorney Abber** facilitated the production of a bank check in the amount of **$270,272.74** of which funds came from the estate of Esterina Milano and gave it to Defendant Attorney Feld.

1203.   At the time of **May 5, 2009**, **then-Attorney Abber** was the only person who had the authority to facilitate the issuance of the above-described bank check. The afore-described check was made payable to: "**James E. Feld, temp. guardian**" and dated **May 5, 2009**.  (Copy of the bank check is provided in **Exhibit 291**).

1204.   0De facto, **<u>May 18, 2009</u>** was the first instance of any court appointment of **Defendant Attorney Feld** in the matter of In re Esterina Milano. (Copy of the issuance for the appointment of Defendant Attorney Feld is provided in **Exhibit 292**).

1205.   **Defendant Attorney Feld** requested that his court appointment as guardian—that, in fact, took place on **<u>May 18, 2009</u>**—be *backdated* so that the appointment would be judicially deemed to have occurred on **<u>May 6, 2009</u>**, even though it really did not.   (Provided is a copy of Defendant Attorney Feld's above-described motion is provided in **Exhibit 293**).

1206.   The decree of temporary guardianship that had been already issued on **<u>May 6, 2009</u>** exclusively referenced **then-Attorney Abber**—and immediately following his typewritten name on the form was the typewritten word "and" with a space provided for the name of a co-guardian that was left *completely blank*.  (Copy of the decrees are   in **Exhibit 294**).

1207.   The check was dated **<u>May 5, 2009</u>**—and even with back-dating the decree to **May 6, 2009** *still* precluded **then-Attorney Abber** and **Defendant Attorney Feld** from having lawful authority for such transaction.

1208.   As evidenced, there was no legitimate reason necessitating **Defendant Attorney Feld's** appointment to be made nunc pro tunc; to the contrary, the only reason to do so was to cover up then-Attorney Abber's unlawfully giving funds from Esterina Milano's estate to **Defendant Attorney Feld**.

**Fraudulent billings**

1209.   *Both*, **Defendant Attorney Feld** and **then-Attorney Abber** made alterations to their filed invoices with the **Middlesex Probate & Family Court**, pertaining to *the very same time period involving the "non pro tunc" appointment of Feld.*

1210.   **Defendant Attorney Feld** filed two distinctly different invoices for the same time period—with the identical submission date of **July 23, 2009**.  (Refer to prior referenced Exhibit 282).  The two sets of invoices are not duplicates.  The original invoice shows that the very first entry was: **"05/08/09"**.

1211.   **Then-Attorney Abber**, *also*, filed two (2) distinctly different invoices for the same time period.  He did not put a designated date of submission on *either* invoice, yet the two (2) distinctly separate invoices cover *the exact same time period*.  (See prior referenced Exhibit 282).

1212.   Not only did **then-Attorney Abber's** two submitted invoices cover the *same* time period, the first invoice had requested payment for **$5,827.50**, and states—on the top of the first page of the invoice—that the charged rate was "$175.00 per hour."  The second filed invoice had requested payment for **$9,717.50**, with the top of the first page of the invoice, the charged rate stated: "$325.00 per hour."

1213.   Both **Defendant Attorney Feld** and **then-Attorney Abber** changed their invoices to make it look like there had been an actual hearing, specific to Feld's appointment on **May 6, 2009**.  **Then-Attorney Abber's** *first* filing shows that there was a court proceeding that was held on **May 6, 2009**, but that it was solely a "status conference"—there was no mention whatsoever of any appointment being made regarding Defendant Attorney Feld.

### Other suspect filings with the Middlesex Probate & Family Court

1214.   **Then-Attorney Abber's** Inventory was, de facto, filed *over* one year from the date of his original appointment as guardian (**December 22, 2008**).  The Inventory shows it was filed on **February 22, 2010**—then-Attorney Abber was no longer conservator as of **May 18, 2009**.  (Copy of the Inventory is provided in **Exhibit 295**).

1215.   Like the above-described Inventory, **then-Attorney Abber** filed his Notice of First and Final Account, also, on **February 22, 2010**—again, having been relieved as conservator as of **May 18, 2009**.  (Copy of Notice for First & Final Account is provided in **Exhibit 296**).

1216.   Conspicuously, *both*, **then-Attorney Abber** and **Defendant Attorney Feld** filed their Inventory on **February 22, 2010**.  Then-Attorney Abber hand-dated his Inventory as **"August 5, 2009"**.   Defendant Attorney Feld dated his Inventory, **May 30, 2009**—*even earlier* than that purported by then-Attorney Abber.  (Copy of Defendant Attorney Feld's Inventory is provided in **Exhibit 297**).

1217.   **Then-Attorney Abber** declared Esterina Milano's personal estate as having a value of **"0"**.  Nowhere does then-Attorney Abber mention the **$270,272.74** of funds being transferred from Esterina Milano's estate to **Defendant Attorney Feld**, payable on **May 5, 2009**.

1218.   Furthermore, **GAL Attorney David Shwartz** (another GAL appointed in the matter of In re Esterina Milano) stated in his GAL report that **then-Attorney Abber** did not include Esterina Milano's annuity life insurance because then-Attorney Abber had informed GAL Goldman that the clerk of the Middlesex Probate & Family Court told him (Abber) that he could not write that the policy was stolen on the Inventory form.  (Copy of GAL Shwart'z report is provided in **Exhibit 298**).

1219.   Letters from counsel for Enrico Milano to GAL Goldman regarding the handling of Esterina Milano's estate are provided in **Exhibit 299**.

1220.   **Defendant Attorney Feld** stated that in his submitted Inventory, on **February 22, 2009** that Esterina Milano's personal estate was valued at **$270,272.74**—*the exact same amount of the afore-referenced bank check*.

1221.   *None* of the publicly filed reports showed disbursements for utilities to run the two homes owned by Esterina Milano, while she was in a nursing home—no disbursements were shown for medical care expenses.

1222.   **Defendant Attorney Feld** requested that a GAL be appointed to settle *then-Attorney Abber's* First and Final Account. Attorney David Shwartz was appointed as GAL.  He, also, happens to be affiliated with the **Massachusetts Probate & Family American Inn of Court**.  (Provided is a copy of **Defendant Attorney Feld's** filed motion to appoint GAL filed in **Exhibit 300**).

## Evidence of extortion by then-Attorney Abber and Defendant Attorney Feld

1223.   **Defendant Attorneys Feld** and **Abber** vehemently and publicly claimed Esterina Milano's son (Enrico) had financially exploited his mother; yet, after Enrico obtained private legal representation, Attorney Feld entered into a stipulation, turning over Esterina Milano's valuables to Enrico.  (Copy of the Stipulation between Attorney Feld and Enrico Milano, dated **April 28, 2010,** is provided in **Exhibit 301**).

1224.   Of significance, **then-Attorney Abber** and **Defendant Attorney Feld** did not initiate <u>any</u> criminal charges against Esterina Milano's son.

1225.   Brunella and Patricia Milano started scheming while their own mother was <u>*in*</u> surgery; making allegations, at that very time, about purported money being stolen by the brother.  (Refer to emergency motion filed by **Youville Rehabilitation**).

1226.   After **then-Attorney Abber** and **Defendant Attorney Feld** had filed civil contempt actions *against* Brunella and Patricia Milano, which contained allegations that described the sisters' activities as actual <u>conversion</u>.  (Copy of the Complaint for Contempt filed against Brunella and Patricia Milano is provided in **Exhibit 302**).

1227.   Esterina's Daughter, Brunella, actually wrote a letter to the judge, outright stating that she and her sister had taken money from accounts that belonged to the mother and Enrico.  Brunella Milano stated that she and her sister did so to keep their brother (Enrico) from having access to it.  Brunella Milano even sent a copy of the deposit she made into an account that she had control over.  (Copies of the letters from Brunella and Patricia Milano sent to Judge Keamy are provided in **Exhibit 303**).

1228.   In outright disregard of undisputed facts and law**, then-Attorney Abbe**r— and other involved counsel and judges—acted with deliberate intent of unlawfully precluding Esterina Milano's son from being guardian and conservator for his mother. In spite of the fraudulent allegations made by Brunella and Patricia Milano, Esterina Milano's health care proxy and power of attorney was still valid; which established the elder's actual desire and intent that her son be health care proxy and attorney-in-fact.

1229.   **Then-Attorney Abber** and **Attorney Feld** *knew* that there was actual evidence *outright exonerating* Enrico Milano of any alleged wrongdoing; instead, then-Attorney Abber and Attorney Feld took unfair advantage of the family turmoil and used it to facilitate their own exploits.

1230.   As discussed above, both, **then-Attorney Abber** and **Defendant Attorney Feld** alleged that Esterina Milano's daughters (Brunella and Patricia Milano) committed financial exploitation.  Despite such grave allegations made by then-Attorney Abber and Defendant Attorney Feld, they did not file a criminal report with law enforcement.  Also, of significance, no action was taken by elder protective services, despite its knowledge of such criminal allegations.

1231.   **Then-Attorney Abber** and **Defendant Attorney Feld** did not pursue criminal action against Esterina Milano's daughters because such allegations were the very means used to carry out extortion.  Esterina Milano had given Brunella and Patricia Milano a financial interest in the Florida house.  Defendant Attorney Feld's and then-Attorney Abber's extortive acts centered around the forced sale of the afore-referenced Florida house—in exchange for Brunella and Patricia Milano agreeing, in writing, to turn over their entire share of the financial proceeds from the sale of the Florida house to "Esterina Milano's estate".   It was stipulated that **Defendant Attorney Feld** would have the contempt judgment against Brunella and Patricia "modified"; as well as, refraining from initiating a criminal complaint against Brunella and Patricia for financial exploitation of their mother.   (Copy of modified Contempt Judgment and a copy of the stipulated agreement are provided in **Exhibit 304**).

## ii.   <u>Other Probate & Family Court matters evidencing the use of extortion by SJC Rule 1:07 court appointees</u>

1232.   As previously set forth, **Defendant Attorney Cuffe**, **Defendant Attorney Ledoux, and Defendant Attorney Berid** (as well as **Judges Abber** and **Ricci**) were directly involved in the matters of **In re James Pentoliros and In re Hope Pentoliros**.  Like the matter of In re Esterina Milano, designated Defendants used the threat of criminal action to extort money from Perry and Larry Pentoliros.

1233.   As previously set forth, out of vindictiveness, George and Tyler Pentoliros made false allegations of financial exploitation against Perry Pentoliros in **September of 2011**.

1234.   The specific use by **Defendant Attorney Ledoux** of the threat of criminal action to have Perry Pentoliros give money (in excess of $1 million)—that *lawfully* belonged to Perry Pentoliros and *not* property belonging to the estate of Hope Pentoliros— and to give up his legal rights and interest in litigating the matters of In re Hope and James Pentoliros is described in detail in Attorney Gormley's invoice.  The invoice *specifically describes* the joint efforts of extortion.  The following is set forth in Attorney Gormley's invoice (refer to prior referenced Exhibit 282):

**December 5, 2012**

Attorney Gormley went to the Haverhill District Court to file three (3) criminal applications against Perry Pentoliros.

**December 18, 2012**

Discussion of plans for criminal complaint.

**December 20, 2012**:

Discussions with Bob Ledoux about bank issues and multiple telephone calls with Bill Sullivan about bank issues and criminal complaints, willingness to resolve if Perry returns funds immediately.  Email of motion filed for next court date to all counsel.  Scanned documents supporting criminal complaint sought against Perry and emailed to counsel with explanation of notations on front and back of instruments/money orders involved.  Attorney Sullivan agrees to get funds returned, we will remove case from list only after receipt of funds.  Transmit video from Perry's interview to *select* counsel.

**December 21, 2012**:

Met Bob Ledoux, up to Bill Sullivan's office and collected funds for Hope/James then to Haverhill DC to remove matters from list, then to Pentucket Bank, back to Salem.

**December 31, 2012**:

Deliver DVD of Perry's interview to court for Judge Ricci's viewing.

**January 1, 2013**:

Email exchange about Bob Ledoux's meeting with Attorney Sullivan to attempt settlement.  Detailed review of documents *provided by Haverhill PD – power of attorney in favor of Perry/Larry identified.*

194

**January 23, 2013:**

Based on current status (no return of funds, no settlement)

**January 29, 2013:**

Extended discussion of mechanisms and structures to settle case; trust for Hope, identity of settlor of trust.  Discussion of rights of respective spouses where there are assets held by one.  Several further discussions and telephone calls to/from Bill Sullivan.

**February 1, 2013:**

Discussion with Bob Ledoux regarding resolution of case; collateral but immediate issues of Hope's health.  Status of negotiations with Attorney Sullivan and that it may be timely for siblings to see Hope.  Attorney Sullivan reports that Perry may settle matter as early as next week.  Discussion of James' fate if settlement doesn't occur before Hope passes, statutory share issues in NH and MA law, will own Haverhill property as JTWROS or TBE. Preparation of Bonds.  Judge Ricci has directed Bob Ledoux, concurrent with DNR/DNI to mark matter for hearing on issues of contempt and related motions for date certain in February.

1235.   In **November of 2010**, Hope Pentoliros had gifted, approximately, **$3 million** to each of her three (3) sons—in three (3) *equal* distributions; which was corroborated by sworn attestations, filed with the **Essex Probate & Family Court**, of two individual officials of Sovereign Bank.  The officials for Sovereign Bank had first-hand knowledge and observations of Hope Pentoliros giving the money to her sons *initiated from her own desire, intentions and free will*.  (Copies of the afore-referenced attestations by officials of Sovereign Bank and other corroborating court records are provided in **Exhibit 305**).

1236.   In addition, in **November of 2010**, Hope Pentoliros executed a durable power of attorney, deeming Larry and Perry Pentoliros co-attorneys-in-fact—of significance, Hope Pentoliros omitted son George Pentoliros.

1237.   As set forth, Perry Pentoliros lawfully had possession of funds that his mother gifted *to him*. Upon **Defendant Attorney Ledoux** threatening Perry Pentoliros with criminal charges, Attorney Ledoux entered into agreement with Perry Pentoliros indicating that Defendant Attorney Ledoux would not pursue charges with the Essex County District Attorney's Office in exchange for Perry Pentoliros relinquishing his legal rights in the matters of In re Hope and James Pentoliros and Perry Pentolrios's "turning over" approximately $1 million to Defendant Attorney Ledoux. (Copy of the afore-described durable power of attorney and the agreement between Defendant Attorney Ledoux and Perry Pentoliros are provided in **Exhibit 306**). `

### III.  CORRUPTION SPECIFIC TO IN RE MARVN H. SIEGEL

### A.  <u>Background</u>

### i.  <u>Father's 2003 DPOA & other estate planning instruments</u>

1238.   In **1999**, Plaintiffs' father hired **Defendant BNY Mellon** to manage investments of the **DSL Trust**, a profit sharing plan, and an IRA account.

1239.   In **2003**, Father had hired an independent and separate law firm to prepare and draft his estate planning instruments and advance directives; at which time, **Defendant Brian Nagle** had been the direct and primary manager of Father's above-described investment accounts—on behalf of **Defendant BNY Mellon**.

1240.   Before executing the above-described estate planning documents and advance directives, Father had provided drafts of these documents to **Defendant BNY Mellon** for review by **Defendant Brian Nagle**—as well as other representatives of Defendant BNY Mellon.

1241.   After reviewing the above-described estate planning documents and advance directives, **Defendant BNY Mellon** sent a letter to Father indicating that it would be adverse to Father's interest to have his daughters be trustees of the **DSL Trust**; that, instead, Father should have "a financial institution" be co-trustee with Father.  (Copy of letter is provided in **Exhibit 307**).

1242.   **Defendant Brian Nagle** received a copy of the above-referenced letter written by representatives of **Defendant BNY Mellon.**

1243.   Father rejected the recommendations made by the Representatives of **Defendant BNY Mellon** in the above-described letter.

1244.   Specifically, Father intentionally and specifically wanted his three (3) daughters to be co-trustees of the DSL Trust; Father, specifically, did not want **Defendant BNY Mellon** to act in any capacity as trustee regarding Father's capacity.

1245.   **Defendant Brian Nagle** was aware that Father overtly and intentionally did not want **Defendant BNY Mellon** to act—*in any capacity* relative to being trustee or other discretionary role.  This is evidenced as Father did not take Defendant BNY Mellon's afore-described recommendations in his executed estate planning instruments and advance directives of **February 11, 2003**.

1246.   Father gave a copy of the above-described executed documents to **Defendant BNY Mellon**.  **Defendant Brian Nagle** was aware that Father had provided a copy of the executed DPOA of **February 11, 2003**; and he was aware of the contents of Father's executed 2003 DPOA.  (Refer to prior referenced Exhibit 4).

1247.   In written contractual agreements between **Defendant BNY Mellon** and Father, Father *did not* give unfettered discretion to Defendant BNY Mellon in its handling of Father's accounts.  Father signed written agreements with that *explicitly* required Father's knowledge and authorization of transactions made.

1248.   On **February 11, 2003**, Plaintiff Daughter Lisa and **Defendant Daughter Sheryl** were present when Father signed the 2003 DPOA, at the law office of Attorney Andelman.  Plaintiff Daughter Devora had not been physically present due to residing out of state, however, she participated by teleconference at the above-described meeting on **February 11, 2003**.

1249.   In the presence of Father, Plaintiff Daughter Lisa and **Defendant Daughter Sheryl**—and Plaintiff Daughter Devora via teleconference—on **February 11, 2003**, Attorney Andelman explained the content of Father's advance planning and estate planning instruments.

1250.   As previously set forth, in the above-described estate planning instruments, Father designated that the co-trustees of the DSL Trust were Father and his three (3) biological daughters (Devora, Sheryl and Lisa); and that Father had established in his prior Wills—and the codicil of **February 11, 2003**—that each of the three (3) biological daughters (Devora, Sheryl and Lisa) were to have equal beneficiary interests.

1251.   At the above-described meeting on **February 11, 2003**, **Defendant Daughter Sheryl** had actual knowledge that Father *intentionally* precluded her from having any role as attorney-in-fact for him.

1252.   As a result, **Defendant Daughter Sheryl** harbored resentment regarding Father's decision to make Plaintiff Daughter Lisa primary attorney-in-fact and Plaintiff Daughter Devora as successor attorney-in-fact.  A copy of an email that **Defendant Daughter Sheryl** sent to Plaintiff Daughter Lisa is provided in **Exhibit 308** that evidences Defendant Daughter Sheryl's harbored resentment.

1253.   Further bolstering Father's not wanting Defendant Daughter Sheryl as his attorney-in-fact is the fact that **Defendant Daughter Sheryl** had been estranged from Father for, approximately, five (5) years—between the years of 1990 and 1994, and had cut-off all communications with Father.

1254.   In 1994, when **Defendant Daughter Sheryl** found that Father was scheduled to have surgery to remove his kidney because of cancer, she *suddenly* resumed contact with Father; and did so, out of fear that Father may have removed her from his Will, of which she had inquired.  (Father had not removed her from his Will).

1255.   The other reason Father deliberately and purposefully did not include **Defendant Daughter Sheryl** as an attorney-in-fact was due to her having *a long-established history* of mental illness—which she has been officially and medically diagnosed as being mentally ill.  In addition, Defendant Daughter Sheryl explicitly stated that she has a history of mental illness in the affidavit that she signed on **June 3, 2011**, which was submitted to the **Essex Probate & Family Court** through **Defendant Attorney DeNapoli**.

1256.   **Defendant Daughter Sheryl's** first substantial outward manifestation of mental illness occurred in her freshman year of college (academic year of **1977-1978**).

1257.   The severity of **Defendant Daughter Sheryl's** mental illness was demonstrated in **July of 2003** when she had a highly publicized psychotic episode—which involved her having hi-jacked a car, that led to a high-speed police chase, over a 30-miles stretch on a major highway, that ended by the police having to draw their weapons and actually fire a shot.  (Copy of the news article regarding Defendant Daughter Sheryl's psychotic episode is in **Exhibit 309**).

1258.   After the above-described episode, **Defendant Daughter Sheryl** began receiving disability benefits from the government (in **2003**), *specifically based on her having a formal diagnosed mental illness.*

### ii.  **Dynamics of Plaintiffs' family**

### **Plaintiff Daughter Lisa & Father**

1259.   Provided in **Exhibit 310** is a copy of the written attestation that was submitted to the **Essex Probate & Family Court** of Father's long-time close friend, Steven Kapsalis.  Father and Steven Kapsalis have been close, personal friends for over forty-seven (47) years.  In his affidavit, Steven Kapsalis described his personal observations and experiences with Father and Father's daughters.

1260.   In the afore-referenced affidavit of Steven Kapsalis, he attests to the fact that he has first-hand knowledge—from the time that Plaintiff Daughter Lisa was 5 years-old—of the close and loving, continuous relationship between Plaintiff Daughter Lisa and Father.

1261.   Father, personally, told Steven Kapsalis—throughout the years— about how much he relied on Plaintiff Daughter Lisa, in terms of her assisting him with his law office and with his personal affairs; that Father explicitly expressed that he, unequivocally, trusted Plaintiff Daughter Lisa.

1262.   Father and Plaintiff Daughter Lisa have had a non-penetrable bond, *especially* rooted from the time that she was 4 years old and her mother had left home.  Father and Plaintiffs' mother had a very turbulent marriage—she was unable to cope with the situation, and felt that, in the best interest of her children, she had no alternative but to leave home without her children; believing that the best way was to do so without advance notice or information as to her whereabouts.

1263.   From the time Plaintiff Daughter Lisa was a child and through high school, she frequently was with Father—whether it be to his law office in Boston, routine errands or special days of playing miniature golf at Hago Harrington's, going to the Stone Zoo and to Canobie Lake Park.

1264.   From the time that Plaintiff Daughter Lisa was 5 years old, she routinely went to the Cambridge YMCA with Father on Saturdays.  Like a ritual, on those Saturdays after Father finished his exercising for the day, he would take Plaintiff Daughter Lisa to lunch at the adjoining restaurant to the Cambridge YMCA—which is how Father came to know the co-owner of that adjoining restaurant (Steven Kapsalis).

1265.   Plaintiff Daughter Lisa followed in Father's foot-steps and became a practicing attorney—the relationship between Father and Plaintiff Daughter Lisa was so close that Plaintiff Daughter Devora used to call Plaintiff Daughter Lisa: "Marvin, Jr."; that Plaintiff Daughter Lisa even has Father's rough gravely voice; so close in personality, that they often butted heads.

1266.   Provided in **Exhibit 311** are photographs—spanning decades— showing the close bond that Father and Plaintiff Daughter Lisa have had since childhood; and the close bond between Father and Daughter Lisa's children and husband.

### Sibling dynamics

1267.   Plaintiff Daughter Lisa (the youngest daughter) is nine (9) years younger than Plaintiff Daughter Devora (the eldest daughter).  From early childhood, Plaintiff Daughter Lisa and Plaintiff Daughter Devora had an extremely close relationship.  Such closeness was fostered when Plaintiffs' mother had left home in **1972**, with 13 year-old Plaintiff Daughter Devora having nurtured 4 year-old Plaintiff Daughter Lisa like a mother.

1268.   Provided in **Exhibit 312** are photographs showing the closeness that Plaintiff Daughters Lisa (and her family) and Devora have had since childhood; and the close bond between Plaintiff Daughter Devora and Daughter Lisa's children and husband.

1269.   In the written report of **Defendant ESMV—**called the PS Collateral Interview, **Defendant Michael Springman** wrote that Plaintiff Daughter Devora had stated to him that "she had actually raised Lisa as a result of their mother leaving when they were young."

1270.   Plaintiff Daughter Devora attests, that from the earliest of memories that **Defendant Daughter Sheryl** showed resentment towards Plaintiff Daughter Lisa— beginning when Defendant Daughter Sheryl (at 7 years old) learned that their mother was pregnant with Plaintiff Daughter Lisa; as opposed to Plaintiff Daughter Devora who continuously bragged at school that her mother was having another baby.  Throughout childhood, Defendant Daughter Sheryl showed constant and continuous adverse feelings because she was no longer the youngest child in the family.

1271.   Plaintiffs have had continuously strained relations with **Defendant Daughter Sheryl**.  As previously set forth, Defendant Daughter Sheryl has long had a mental illness that has adversely affected her ability for family bonding and maintaining social relationships.  Defendant Daughter Sheryl's afore-described psychotic episode in **2003** had stemmed from her inability to bond with her infant son—she and her husband had given up custody, which they did not regain through the present.

1272.   From childhood to the present, Defendant Daughter Sheryl's underlying pattern of behavioral characteristics consists of rigidity, intolerance, lack of ability to nurture, emotionless, deceitfulness, lack of remorse, and a strong sense of entitlement.

1273.   During adulthood, the relationship between Plaintiff Daughter Devora and **Defendant Daughter Sheryl** has mostly consisted of limited or no communication.  In **2011**— at Plaintiffs' mother's persistent urging, Plaintiff Daughter Devora attempted to mend her relationship with Defendant Daughter Sheryl.

1274.   With the above-described renewed communications in **2011**, between Plaintiff Daughter Devora and **Defendant Daughter Sheryl**, Defendant Daughter Sheryl sought to alienate Plaintiff Daughter Devora from Plaintiff Daughter Lisa.

1275.   In **May of 2011**, Plaintiff Daughter Devora had been living in California— she had been there for over ten (10) years, and periodically came home for visits.  Plaintiff Daughter Devora attested, in-court, that during this time period, she had been enduring a tremendous amount of stress—involving constant chronic pain, as well as, having significant financial worries because her husband's employment situation was in flux, while Plaintiff Daughter Devora was unable to work full-time.

1276.   Likewise, Plaintiff Daughter Lisa had been enduring personal and financial stress because of severe physical injuries she had sustained in **2006** and in **2008**—in effect creating a continuous period of limited physical activity, essentially, being house bound.  Consequently, Plaintiffs had significant stressors in their individual personal lives that were compounded by a 3,000 mile separation—with no specific confrontation or event having caused less contact.

1277.   Due to Plaintiff Daughter Lisa's afore-described injuries, she had been prevented from her prior usual and regular assisting Father with his personal and business affairs.  As a result, there was a significant time period that Plaintiff Daughter Lisa had no alternative, but, to rely on **Defendant Daughter Sheryl** to help Father with his personal and business affairs.  Even though Plaintiff Daughter Lisa knew that she and Defendant Daughter Sheryl did not get along, Plaintiff Daughter Lisa believed, at the time, that it was better to trust family than a stranger to help with Father's personal affairs.  At that time, Plaintiff Daughter Lisa had no specific or concrete grounds to believe that Defendant Daughter Sheryl would engage in fraudulent type behavior.

1278.   Unforeseen by Plaintiff Daughter Lisa, **Defendant Daughter Sheryl** saw this as *her* opportunity to become Father's durable power of attorney—through deception and fraud, and with the assistance of Father's then-bookkeeper, Kathleen Enos.

1279.   Father has never been computer literate and has always relied on others to perform tasks on the computer for him.  This is shown by an email that Kathleen Enos sent to the synagogue that Father belonged to.  (Copy of emails involving Kathleen Enos and Defendant Daughter Sheryl and email showing Daughter Sheryl's resentment of Lisa are provided in **Exhibit 313**).

1280.   On **January 11, 2011**, **Defendant Daughter Sheryl** sent an email to Kathleen Enos, stating:

> Kathleen,
>
> I spoke with Atty. Michael Bass about creating a Durable Power of Attorney document for my father.
>
> He asked me to have my Dad send him an e-mail from his e-mail account.  The e-mail should be sent to [MBASS@BASSDOHERTY.COM](mailto:MBASS@BASSDOHERTY.COM).
>
> The e-mail should request that a Durable power of Attorney document be drafted in the event that my Dad becomes incapacitated.  That I should be named as Durable Power of Attorney and that Al be named as a backup in case I am not able to serve in that role.  (Both Al and I reside in Norfolk County).  Also, we want the document to rescind/revoke any prior Durable Power of Attorney documents.
>
> For a couple of years, my Dad says that he wants me to be Durable Power of Attorney but we have not done anything about it.  I am willing to pay the fee for Michael drafting this document.
>
> Can you please print this email and show it to my Dad.
>
> Thanks.
>
> Sheryl

1281.   On **January 11, 2011**, Kathleen Enos responded by email to **Defendant Daughter Sheryl**—using the email for Father's personal affairs ([marvin.h.siegel2@gmail.com](mailto:marvin.h.siegel2@gmail.com)) and stated:

> Hi Sheryl,
>
> Your father said he would do this and that he would pay the fee.  I will let you know once the email is sent.

1282.   Over one month later, on **February 15, 2011**, **Defendant Daughter Sheryl** directly sent an email to Kathleen Enos, using the reply format from the afore-referenced email, and stated:

Kathleen,

Do you think that you could remind my Dad about sending an e-mail to Michael Bass today?

He's been saying that he wants to do this for over two years now.

Thanks.

Sheryl

1283.   As evidenced above, it is suspect that **Defendant Daughter Sheryl** used **Kathleen Enos** as a means to facilitate the drafting of a new durable power of attorney where:

Defendant Daughter Sheryl expressed that she *had* *not* directly spoken to Father about the drafting of a new durable power of attorney;

Defendant Daughter Sheryl felt the need to use Kathleen Enos as an intermediary; that Defendant Daughter Sheryl *initiated* the implementation of new DPOA—not Father;

Defendant Daughter Sheryl stated that Father had supposedly expressed wanting a "new" DPOA *2 years prior*;

Father had not expressed the supposed intentions directly to Kathleen Enos— which was particularly suspect as Kathleen Enos was *Father's* personal assistant and bookkeeper;

Defendant Daughter Sheryl *explicitly* stated that Father was *not* the person to initiate contact with an attorney to draft a new DPOA—Defendant Daughter Sheryl explicitly stated that *she* contacted the attorneys (Gilbert and Michael Bass) who drafted the "new" durable power of attorney (Gilbert and Michael Bass were long-time family friends of Father); and

Gilbert and Michael Bass *did not* speak directly with Father.

1284.   Prior to **August 2011**, Plaintiff Daughter Lisa had faxed to **Defendant ESMV**, the afore-described email correspondence between **Defendant Daughter Sheryl** and Kathleen Enos.

1285.   Plaintiffs have a copy of Father's **2003 DPOA** that have handwritten intended modifications. The handwriting on the afore-referenced intended changes is the handwriting of **Defendant Daughter Sheryl**.  (Copy of handwritten intended changes in **Exhibit 314**).

1286.   **Defendant ESMV** documented that **Defendant Daughter Sheryl** provided Defendant ESMV a DPOA that was dated **March 29, 2011**; which stated that Defendant Daughter Sheryl was Father's attorney-in-fact and **Defendant Alan Sidman** (Defendant Daughter Sheryl's husband) as the successor attorney-in-fact.  (Copy of DPOA provided to ESMV by Defendant Daughter Sheryl is in **Exhibit 315**).

1287.   Father did not voluntarily and knowingly execute the DPOA, dated **March 29, 2011** that was provided to **Defendant ESMV** by **Defendant Daughter Sheryl**.

1288.   **Defendant Supervisor Dailey** of **Defendant ESMV** made notes in the computer system of **Defendant ESMV**, stating: "Was he [Father] able to understand POA signed on 3/29/11?"

1289.   **Defendant Supervisor Dailey** made notes in the computer system of **Defendant ESMV** that he had met with Father and that Father "did not remember signing a POA on **3/29/2011** naming his Dtr Cheryl as POA."

### iii.   Father openly and vehemently expressed that he wanted Plaintiff Daughter Lisa and her family to permanently reside with him and to tend to his personal care and needs

1290.   In **January of 2011**, **Defendant Daughter Sheryl** stopped assisting Father—in her written communications to **Defendant ESMV** (and wrote it as if she were a 3rd person), she stated that she had stopped taking Father to his medical appointments after **January 5 [2011]** *because her dog died*.   (It is documented in the investigation notes of **Defendant ESMV** that it received written information from Defendant Daughter Sheryl—of which Defendant Daughter Sheryl had given Plaintiff Daughter Devora a copy).

1291.   As described above, when **Defendant Daughter Sheryl** stopped helping Father, Plaintiff Daughter Lisa and her family resumed their long-time role as Father's primary caregivers.  Upon Father's request, in **April of 2011**, Plaintiff Daughter Lisa and her family moved in with Father.

1292.   It has been Father's long-established and openly expressed wishes to have his family live with him; enabling him to always remain in his own home, *surrounded by his loving family, to care for him*.  Father requested that Plaintiff Daughter Lisa and her family permanently move in with Father to care for him.

1293.   **Defendant Attorney Marsha Kazarosian** filed an affidavit with the Essex Probate & Family Court (on **August 17, 2011**), in the underlying matter of In re Marvin H. Siegel; in which she attested and confirmed that Father had personally expressed that *he* wanted Plaintiff Daughter Lisa and her family to live with him.  (Refer to Attorney Kazarosian's affidavit prior referenced as Exhibit 22).

1294.   Father has openly and vehemently expressed—personally—in court and *directly to* **Judge Abber** that he wanted Plaintiff Daughter Lisa and her family to live with him; and, on __April 1, 2011__, Plaintiff Daughter Lisa and her family had moved their permanent residence to Father's home.

1295.   Specifically evidencing Father's above-described unwavering desire—for Plaintiff Daughter Lisa and her family to permanently reside with him—are audio court recordings of **June 14, 2011**, **November 8, 2011** and **December 12, 2011**.  (The audio court recordings are provided in previously referenced Exhibit 23 and the transcripts in Exhibit 24).

1296.   Repeatedly and routinely, **Judge Abber**—then presiding judge in the matter of In re Marvin H. Siegel—would interrupt Father, precluding Father from fully and completely expressing himself.  The above-referenced audio recordings reflect Fathers desire to speak; to specifically express his wanting Plaintiff Daughter Lisa and her family to live with him and care for him.  (Refer to audio recordings and transcripts of the court proceeding held on **August 17, 2011**, **November 8, 2011**, **December 12, 2011** and **January 30, 2012**).

1297.   Notes made in **Defendant ESMV's** computer system repeatedly confirm and re-affirm **Defendant ESMV's** staff's knowledge—especially, **Defendant Attorney Berid**—regarding Father's explicit desire to have Plaintiff Daughter Lisa and her family live with him.

1298.   The numerous afore-described notes in **Defendant ESMV's** computer system consist of:

 On **June 27, 2011**, **Defendant Caseworker Springman** wrote that he made a home visit to Father; Defendant Caseworker Springman telling Father that he was there because Father had previously inquired about services offered by ESMV and to see if that he was there "to check to see that he [Father] had everything he needed"; that Father responded: "I do and I don't see why anyone called you guys.  I have everything I need and I am fine.  Leave me your card and I will have my daughter call you if I need anything."

On **January 4, 2012**, **Defendant Diane Powell** scanned in email correspondence involving she and **Defendant Michael Novack**, in which Defendant Michael Novack described Father responses to inquiries about Defendant Daughter Sheryl's visits and about Plaintiff Daughter Lisa and her family—Defendant Michael Novack reported that regarding Defendant Daughter Sheryl's visits, Father expressed: "My kids are my life.  The more time I spend with them, the better.  I am upset when they don't come more often.  I want them here."  When asked about Plaintiff Daughter Lisa Belanger and her family, Father expressed: "*it was not better.  I want her here*.  When she moved out, they didn't do me a favor."

On **January 17, 2012**, **Defendant Caseworker Springman** wrote that he had visited with Father at Merrimack Valley Hospital; that Elder [Father] stated "that he was not doing well as he was in the hospital and the elder stated that he was there unnecessarily.  [Father] asked PSW [Michael Springman] to call dtr Lisa to have her come and see him."

On **March 23, 2012**, **Defendant Diane Powell** wrote that **Defendant Attorney Myette** informed her that Father wants to remain at home; that Defendant Attorney Myette reported "elder [Father] is bored, lonely, depressed."

### B. Events that led up to Father being taken to Defendant Beverly Hospital

1299.   In **1999**—when Father first moved to Boxford—the **Boxford Police Department** (especially the Police Chief) came to know Father on a personal level.  Early on, it was well known throughout the Boxford Police Department that Father had a license to carry a concealed firearm.

1300.   By **2009**, the **Boxford Police Departm**ent knew full well that Father regularly carried a weapon on his person—and of Father's firearms collection.

1301.   In **2009**, **Boxford Police** took official action to have Father's driver's license revoked.  At that time, the Boxford Police stated in its incident report that **Elder Services** had been notified.  (Copy of Boxford Police Police report is provided in **Exhibit 316**).

1302.   When **Boxford Police** sought the revocation of Father's driver's license, it did so, specifically, based on the belief that Father was suffering from mental confusion and claimed that Father's mental state posed a danger; yet, having well-established knowledge of Father's possession of firearms, the Boxford Police took no precautionary measures in that regard.

1303.   As previously set forth, **Defendant Daughter Sheryl** stopped taking Father to his medical appointments in early **January of 2011**; which, initiated Father and Plaintiff Daughter Lisa making plans to fulfill Father's, *personal*, long-established desire for his family to live with him.

1304.   Around **mid-March of 2011**, Plaintiff Daughter Lisa and her husband— and Father's close friend (of more than 45 years), Steven Kapsalis—observed that Father seemed to have a noticeable change in his cognitive functioning.  Consequently, Plaintiff Daughter Lisa had a generalized concern about Father having possession of firearms in their home; and not knowing what to do, Plaintiff Daughter Lisa—as well as her husband—spoke with **Lt. Robert Hazelwood** of the **Boxford Police** about their concerns on *multiple occasions* during the last week of **March 2011**.

1305.   **Lt. Hazelwood** had informed Plaintiff Daughter Lisa and her husband that the **Boxford Police** had no authority to remove the guns.  Lt. Hazelwood told Plaintiff Daughter Lisa and her husband that the only avenue was for her to file a restraining order at Haverhill District Court.  Lt. Hazelwood advised them to speak with **Bethany Balford** at the Haverhill District Court.   (The afore-described events and statements made by Lt. Hazelwood are corroborated by the screening report of **Defendant ESMV**, which was input in the computer system of Defendant ESMV on **April 1, 2011**).

1306.   Plaintiff Daughter Lisa had reported detailed specifics to **Lt. Hazelwood** as to **Defendant Daughter Sheryl** having exploited Father—which Lt. Hazelwood completely disregarded.  Due to Lt. Hazelwood's repeated claims of the **Boxford Police Department's** inability to remove Father's firearms, Plaintiff Daughter Lisa had called **Defendant ESMV** to determine what avenues were available—*other than* Plaintiff Daughter Lisa having to pursue a court order.  This is corroborated by notes input into the computer system of Defendant ESMV by **Defendant Diane Powell** on **April 1, 2011**.

1307.   On **April 1, 2011**, various staff of **Defendant ESMV** (including **Defendant Diane Powell**) informed Plaintiff Daughter Lisa that she could make a report with the crisis team of Defendant ESMV and then Defendant ESMV could have the firearms removed—with the, unequivocal, expressed implication that if Plaintiff Daughter Lisa did so, Father would end up in a psychiatric ward.  Where the circumstances *did not justify or warrant Father needing to be involuntarily admitted to a psychiatric ward, Plaintiff Daughter Lisa, specifically and purposefully, did not make a report to the crisis team of* **Defendant ESMV**.

1308.   Consequently, on **April 1, 2011**, Plaintiff Daughter Lisa and her husband went to Haverhill District Court to speak with Bethany Balford—*as advised* by **Lt. Hazelwood**.

1309.   When Plaintiff Daughter Lisa and her husband spoke with Bethany Balford on **April 1, 2011**, she informed them that they had two options: 1) to file a petition for a "writ of apprehension"—in other words a civil commitment to a psychiatric ward or 2) to seek a court order from the District Court judge.

1310.   As previously set forth, Plaintiff Daughter Lisa could not, *in good conscience and ethics*, seek a petition to have Father put in a psychiatric ward—and Plaintiff Daughter Lisa, had continuously and unwaveringly, reached out to the various designated public officials seeking assistance, *solely*, in terms of: 1) removing the firearms and 2) to obtain out-patient help to evaluate Father's decline in memory and evident exacerbated anxiety and fear from Father being cognizant of his memory loss.

1311.   As an alternative to subjecting Father to an unjustified and unwarranted involuntary civil commitment in a psychiatric facility—and to purposefully avoid that, Plaintiff Daughter Lisa had no other viable option other than to seek a court order for removal of the guns from the Haverhill District Court; which she was successful in obtaining.

1312.   Unbeknownst to Plaintiff Daughter Lisa and her husband, after they had spoken with Bethany Balford, Lt. Hazelwood—on **April 1, 2011**—*personally*, went to speak directly with Bethany Balford at the Haverhill District Court.  This is corroborated by the afore-referenced screening report input in the computer system of **Defendant ESMV**.

1313.   After **Lt. Hazelwood** spoke with Bethany Balford (on **April 1, 2011**), Bethany Balford called **Defendant ESMV** and made a report of self-neglect regarding Father.  Bethany Balford's report to Defendant ESMV was *exclusively* based on hearsay from her afore-described conversation with Lt. Hazelwood.

1314.   There was an intake report made regarding the call Bethany Balford made to **Defendant ESMV** on **April 1, 2011**.  This intake report has a designated section for identifying information of an alleged perpetrator—this section was left <u>completely blank</u>. There was no alleged perpetrator—which is consistent with a report of self-neglect.

1315.   The afore-described screening report of **April 1, 2011** labeled Plaintiff Daughter Lisa as a "participant" and states that an investigation was opened on that same date.  **Defendant ESMV** assigned the investigation to **Defendant Caseworker Springman**.

1316.   Plaintiff Daughter Lisa had no indication, whatsoever, that **Defendant ESMV** had opened an investigation regarding self-neglect allegations regarding Father.

1317.   **Defendant ESMV** treated the investigation under the classification as a "nonemergency report"; which 651 CMR 5.10 states that under a nonemergency report, Protective Services shall "complete the investigation within 30 calendar days."

1318.   From **mid to late April of 2011 through May 19, 2011**, Plaintiff Daughter Lisa had actively sought adequate part-time home care assistance for Father.

1319.   On **April 6, 2011**, **Defendant Caseworker Springman** had come unannounced to Father's home.  Plaintiff Daughter Lisa answered the door and informed Defendant Caseworker Springman that Father was sleeping.  As shown by the report entered into the computer system of **Defendant ESMV** on **April 6, 2011**, Plaintiff Daughter Lisa was cooperative.

1320.   On **April 13, 2011**, **Defendant Caseworker Springman**, again, came unannounced to Father's home.  As shown by the report entered into the computer system of **Defendant ESMV** on **April 13, 2011**, Father and Plaintiff Daughter Lisa and her family were not home.

1321.   On **April 21, 2011**, **Defendant Caseworker Springman** came unannounced, with caseworker Cyr and visited with Father.

1322.   The report entered into the computer system of **Defendant ESMV**, on **April 22, 2011**, documented that Father did the following activities independently: bathing, dressing, grooming, toileting, eating, transferring and socializing.  **Defendant Caseworker Springman**, also, documented that Father stated: that "his needs are being met"; that his daughter lives with him and helps him; and that everything was fine.

1323.   Notes entered into the computer system of **Defendant ESMV** on **April 26, 2011** shows that **Defendant ESMV** and its staff *knew* that Father had a valid durable power of attorney that had been executed in **February of 2003**, in which Plaintiff Daughter Lisa was Father's attorney-in-fact.

1324.   Notes entered into the computer system of **Defendant ESMV** on **April 26, 2011** show that **Defendant Supervisor Dailey** had "concerns" about a durable power of attorney (dated **March 29, 2011**) that had been given to him from **Defendant Daughter Sheryl**, which stated she was Father's attorney-in-fact.  Defendant Supervisor Dailey outright expressed that Father did not knowingly sign the purported durable power of attorney presented from Defendant Daughter Sheryl.

1325.   In the same afore-described notes of **April 26, 2011**—where **Defendant Supervisor Dailey** outright knew the purported durable power of attorney presented by **Defendant Daughter Sheryl** was suspect, Defendant Supervisor Dailey stated that *he had asked Defendant Sheryl to exercise the purported durable power of attorney to get him Father's financial documents*—which he reported that Defendant Daughter Sheryl did as he requested.  As evidenced, Defendant Supervisor Dailey engaged in unethical and unlawful conduct.

1326.   Further incriminating conduct by **Defendant Supervisor Dailey** is the fact that he stated in the notes of **April 26, 2011** that Defendant Daughter Sheryl gave him the name and contact information of the attorney who drafted the durable power of attorney. *Nowhere* in the notes and reports of **Defendant ESMV** does it indicate that any contact— or effort to contact—was made regarding that attorney.

1327.   It is evidenced herein this Complaint that the attorneys (Gilbert & Michael Bass—who happened to be long-time family "friends" of Father) had aided and abetted **Defendant Daughter Sheryl's** exploitation of Father—as the notes of Defendant ESMV on **May 5, 2011** state that Defendant Supervisor Dailey directly asked Father about the purported durable power attorney that stated Defendant Daughter Sheryl was Father's attorney-in-fact and dated March 29, 2011; and that Father stated that he did not remember signing that document.

1328.   Investigation notes entered into the computer system of **Defendant ESMV** on **April 26, 2011** show that **Defendant Supervisor Dailey** consulted with **Defendant Attorney Berid** "to discuss case status and seek advice on how best to handle case."

1329.   Investigation notes entered into the computer system of **Defendant ESMV** on **April 26, 2011** show that **Defendant Daughter Sheryl** had made allegations that Plaintiff Daughter Lisa was financially exploiting Father.

1330.   Investigation notes entered into the computer system of **Defendant ESMV** on **April 26, 2011** show that, as of **April 26, 2011**, Defendant ESMV and staff *did not* inform Plaintiff Daughter Lisa of Defendant Daughter Sheryl's allegations.

1331.   Investigation notes entered into the computer system of **Defendant ESMV** on **April 29, 2011** show that **Defendant Supervisor Dailey** consulted with **Defendant Attorney Berid.**

1332.   Investigation notes entered into the computer system of **Defendant ESMV** on **May 10, 2011** show that **Defendant Caseworker Springman** visited with Father at home.  It was reported that Father "presented as clean and well groomed."  Plaintiff Daughter Lisa was asked by case manager to see Father's financial statements—which it was documented that Plaintiff Daughter Lisa immediately retrieved, and did so without any qualms.

1333.   Investigation notes entered into the computer system of **Defendant ESMV** on **May 10, 2011**, state that **Defendant Caseworker Springman** asked Father who was his power of attorney and *that Father responded that it was Plaintiff Daughter Lisa*.

1334.   Investigation notes entered into the computer system of **Defendant ESMV** on **May 10, 2011**, state that **Defendant ESMV** and its staff had information that:

>   Elder's assets are roughly $7 million including the home he lives in which is paid for;

>   Elder has a will that divides the elder's assets equally between the elder's three (3) children; and

>   Elder has a trust where the majority of his assets are managed by New York Mellon Bank and he has an investment banker by the name of Brian Nagle who is the personal banker for his account.

1335.   Reports entered into the computer system of **Defendant ESMV** on **May 11, 2011** (updated on **May 16, 2011**) show that **Defendant Caseworker Springman** wrote that he was actively obtaining "information regarding [Father's] will/trust and finances."

1336.   Reports entered into the computer system of **Defendant ESMV** on **May 17, 2011** (updated on **May 20, 2011)** show that **Defendant Caseworker Springman** spoke with Lieutenant Ryder of the Boxford Police Department.  It was documented that Lt. Ryder had known Father for ten (10) years; that he had no experience with the elder being a legitimate threat; that the information that Defendant Caseworker Springman had concerning prior events were "more benign than indicated"; that **as of May 20, 2011**, there has been no legitimate reason to use a section 12.

1337.   Investigation notes entered into the computer system of **Defendant ESMV** on **May 13, 2011** (updated on **June 8, 2011**), state that "case substantiated for SN [self neglect] on this date and allegation of FE [financial exploitation] will continue to be investigated."

1338.   Investigation notes entered into the computer system of **Defendant ESMV** on **May 16, 2011** show that **Defendant Caseworker Springman** met with Father and Plaintiff Daughter Lisa at residence to discuss home care services.

1339.   The home care assistant, who had been temporarily hired in **mid**-**May of 2011**, had been pressuring Plaintiff daughter to hire her full-time.  Father did not want to do so, and Plaintiff Daughter Lisa abided by Father's wishes.

1340.   On **May 19, 2011**, Plaintiff Daughter Lisa and her family were out of the home during the afternoon, having the part-time home care assistant stay with Father.  During that time, the home care assistant made a call to 911, claiming fear for her safety and for Father's safety.

1341.   The health care assistant knew Plaintiff Daughter Lisa's cell phone number, but she did not call Plaintiff Daughter Lisa to apprise her that there was any problem.

1342.   Arising from the home care assistant's call to 911, the Boxford Police had Father taken by ambulance to the Emergency Room of **Defendant Beverly Hospital**.  (Copy of Boxford Police Report is provided in **Exhibit 317**).

C. **Evaluation at Emergency Room of Defendant Beverly Hospital**

1343.   Plaintiff Daughter Lisa and her husband immediately went to the Emergency Room of **Defendant Beverly Hospital**.

1344.   Plaintiff Daughter Lisa informed the staff at **Defendant Beverly Hospital** that she was attorney-in-fact, pursuant to Father's **2003 DPOA**.

1345.   Notes in **Defendant ESMV's** computer system, input by **Defendant Caseworker Springman** on **May 10, 2011**, state that he asked Father who his power of attorney was and that Father stated that it was his daughter Lisa; and in Defendant Caseworker Springman's written report, called Investigation Summary and dated **May 13, 2011**, he stated: "Elder [Father] has a durable POA who is his daughter Lisa."

1346.   It was, approximately, two (2) hours, before the staff at the **Defendant Beverly Hospital** finally allowed Plaintiff Daughter Lisa to see Father.

1347.   During the clinical evaluation, the evaluator of **Defendant Beverly Hospital** became aware that Father's estate was valued at, approximately, $6 million.

1348.   The staff person for **Defendant Beverly Hospital**, who introduced herself as "the clinical evaluator," informed Plaintiff Daughter Lisa and her husband that an evaluation of Father had been already conducted and completed.

1349.   Prior to the evaluator of **Defendant Beverly Hospital** already having made a final decision that she was admitting Father to a psychiatric facility, the evaluator knew that Father had an existing durable power of attorney; and that Plaintiff Daughter Lisa was attorney-in-fact for Father.

1350.   Prior to the evaluator **Defendant Beverly Hospital** already having made a final decision that she was admitting Father to a psychiatric facility, she did not seek information from Daughter Lisa; and the evaluator had already made a decision regarding Father's admission to a psychiatric facility, without any input from Daughter Lisa, in her capacity as attorney-in-fact.

1351.   The evaluator of **Defendant Beverly Hospital** did not inform Daughter Lisa that Father's being admitted to **Defendant Whittier Pavilion** was an involuntary commitment.

1352.   The evaluator of **Defendant Beverly Hospital** informed Daughter Lisa and her husband that Father was being admitted to **Defendant Whittier Pavilion** based on a clinical diagnosis of Alzheimer's and Dementia; that the admission was to get a more extensive and detailed evaluation regarding a diagnosis of Alzheimer's and Dementia.

1353.   Daughter Lisa and her husband were not informed by the evaluator of **Defendant Beverly Hospital** that **Defendant Whittier Pavilion** was a psychiatric facility.

1354.   The evaluator of **Defendant Beverly Hospital** did not mention, in any manner, that antipsychotics would or could be a potential result of Father's admission to **Defendant Whittier Pavilion**.

### D.   Involuntary admission of Plaintiffs' father to Defendant Whittier Pavilion

1355.   Father was transferred from **Beverly Hospital's Emergency Room** to **Defendant Whittier Pavilion** at, approximately, 4:00 a.m. on **May 20, 2011**.

1356.   The Emergency Room of **Defendant Beverly Hospital** involuntarily admitted Father to **Defendant Whittier Pavilion**, under G.L. c. 123, § 12.

1357.   As previously set forth, **Defendant Attorney Robert Ledoux** has a long-established attorney/client relationship with **Defendant Beverly Hospital**.  Also, previously set forth, Defendant Attorney Ledoux has been regularly appointed by the Essex Probate & Family Court as a court fiduciary, under SJC Rule 1:07, for well over 20 years in Essex and Middlesex Counties.

1358.   On **May 20, 2011**, **Defendant Beverly Hospital,** without approval or consent by Plaintiff Daughter Lisa, facilitated the involuntary commitment of Father to **Defendant Whittier Pavilion**.

1359.   As previously set forth, **Defendant Attorney Garmil** acts as legal counsel for **Defendant Whittier Pavilion**; as well as, being regularly a court appointee of the Essex Probate & Family Court under SJC Rule 1:07.

1360.   From the inception of Plaintiffs' father's involuntary admission to **Defendant Whittier Pavilion**, **Defendant Attorney Garmil** and Defendant Whittier Pavilion were aware that Father had an estate valued at, approximately, $6 million.

1361.   From the inception of Plaintiffs' father's involuntary admission to **Defendant Whittier Pavilion**, **Defendant Attorney Garmil** (and other staff of Defendant Whittier Pavilion) had knowledge that Plaintiff Daughter Lisa was the attorney-in-fact for Father, pursuant to Father's **2003 DPOA**; as well as, knowledge that Father resided with Plaintiff Daughter Lisa and her family.

1362.   From the inception of Father's involuntary admittance to **Defendant Whittier Pavilion**, Plaintiff Daughter Lisa attempted to see Father.

1363.   Having knowledge of Plaintiff Daughter Lisa's status as attorney-in-fact, **Defendant Attorney Garmil**, as a representative of **Defendant Whittier Pavilion**, prohibited Plaintiff Daughter Lisa from seeing Father at the inception of Father's involuntary admission.

1364.   A social worker from the **Defendant Whittier Pavilion** telephoned Plaintiff Daughter Lisa and informed her that she was not allowed to see Father because **Defendant Attorney Garmil** told the social worker that Father's 2003 DPOA was not a health care proxy.

1365.   **Defendant Attorney Garmil** had no valid basis to prohibit Plaintiff Daughter Lisa from seeing Father.

1366.   As a direct result of **Defendant Attorney Garmil**'s and **Defendant Whittier Pavilion's** dishonoring Plaintiff Daughter Lisa's capacity as attorney-in-fact for Father, she immediately sought to retain private legal counsel as attorney-in-fact for Father.

1367.   At no time did, **Defendant Whittier Pavilion** seek to obtain information regarding family history or inquiry from Plaintiff Daughter Lisa in its evaluation and treatment of Father.

1368.   Within four (4) days of Father's involuntary admission to **Defendant Whittier Pavilion**, **Defendant Attorney Garmil** filed a petition with the Haverhill District Court to have Father involuntarily committed for a six (6) month period at a psychiatric facility.

1369.   **Defendant Attorney Garmil** *did not* notify Plaintiff Daughter Lisa of his filing a petition—on behalf of **Defendant Whittier Pavilion**, seeking Plaintiffs' father to be involuntarily committed to a psychiatric facility for a minimum of six (6) months.

1370.   **Defendant Attorney Garmil** had intentionally and knowingly concealed his filing of the six-month civil commitment petition from Plaintiff Daughter Lisa.

1371.   **Defendant Attorney Garmil** and his client—**Defendant Whittier Pavilion** and other clients/business contacts—would financially benefit from Father being court ordered to a long-term involuntary civil commitment.

1372.   Plaintiff Daughter Lisa inadvertently found out about the above-described petition for long-term civil commitment filed with Haverhill District Court on **May 24, 2011**.

1373.   The records of **Defendant ESMV** show that **Defendant Attorney Berid** and other staff of Defendant ESMV _knew_, on **May 20, 2011**, that **Defendant Whittier Pavilion** was going to seek a civil commitment in the Haverhill District Court based on Father _"not voluntarily [having] signed himself in."_  Defendant ESMV did not inform Plaintiff Daughter Lisa as to Defendant Whittier Pavilion's intent to pursue a civil commitment of Father.

1374.   The records of **Defendant ESMV** for **May 20, 2011**, and thereafter, show that Defendant ESMV had direct and repeated contact with **Defendant Whittier Pavilion**.

### E.  Conspired fraud and deception by Defendant Brian Nagle of Defendant BNY Mellon and Defendant Attorney Ed Tarlow to dismantle Father's 2003 DPOA to gain control of the DSL Trust for ill-gotten gain

1375.   As explicitly stated in Father's **2003 DPOA**, the attorney-in-fact is directed to use Father's funds to secure legal services on Father's behalf; therefore, Plaintiff Daughter Lisa called **Defendant Brian Nagle of BNY Mellon** to facilitate funding to retain legal counsel to defend Father against the afore-described petition.

1376.   At the time of **May 24, 2011**, **Defendant Brian Nagle** was Vice President and Senior Portfolio Manager for **Defendant BNY Mellon**.  As previously set forth, **Defendant Brian Nagle** was direct and primary manager of Father's accounts.

1377.   **Defendant Brian Nagle** testified in court that, prior to **May 24, 2011**, he was aware that **Defendant BNY Mellon** had a physical copy of Father's executed 2003 DPOA.

1378.   In early **April of 2011**, Father had verbally re-affirmed to **Defendant Brian Nagle** and other representatives of **Defendant BNY Mellon** the validity of his 2003 DPOA and that the 2003 DPOA still reflected his expressed intentions and desires. Representatives of Defendant BNY Mellon confirmed in writing to Father the above-described re-affirmation in writing.

1379.   Prior to **May 24, 2011**, **Defendant Brian Nagle** was aware that Plaintiff Daughter Lisa had been Father's attorney-in-fact, under the 2003 DPOA, for at least eight (8) continuous years.

1380.   **Defendant Brian Nagle** graduated from law school and received a juris doctorate.  He has made public representations that he has legal knowledge and expertise regarding estate planning instruments and advance directives.

1381.   Massachusetts General Laws Chapter 201B, § 1 provides the definition of a durable power of attorney, which states that the very purpose of a durable power of attorney is to remain effective if the principal becomes disabled or incapacitated.

1382.   The nature of responsibilities and duties of **Defendant Brian Nagle**, in managing investment accounts for **Defendant BNY Mellon**, makes it that he knew—or should have known—that a durable power of attorney remains effective upon the disability or incapacity of a principal; that he was familiar—or should have been familiar—with Massachusetts law that a durable power of attorney remains effective upon the disability or incapacity of a principal.


### i.   **Conversation of May 24, 2011 between Plaintiff Daughter Lisa and Defendant Brian Nagle**

1383.   Plaintiff Daughter Lisa, specifically, informed **Defendant Brian Nagle** as to the events that took place surrounding Father being involuntarily admitted at the psychiatric facility of Whittier Pavilion; that she had already secured legal counsel to defend Father against being involuntarily committed.

1384.   Plaintiff Daughter Lisa requested **Defendant Brian Nagle**, as financial manager of Father's account with **Defendant BNY Mellon**, to transfer money into Father's checking account for Plaintiff Daughter Lisa to be able to pay the retainer fee for legal counsel; that the funds requested were specifically to fight for Father's release from **Defendant Whittier Pavilion** and to *protect Father from Attorney Garmil's petition for a 6-month civil commitment*.

1385.   Through **Defendant Brian Nagle's** in-court testimony in the matter of In re Marvin H. Siegel, he acknowledged that Plaintiff Daughter Lisa's request for a transfer of funds to Father's checking account was for the purpose of obtaining legal counsel to defend Father from being involuntarily committed.

1386.   Unwittingly, Plaintiff Daughter Lisa informed **Defendant Brian Nagle** that legal counsel had advised her to seek guardianship and conservatorship.

1387.   During that conversation, **Defendant Brian Nagle** led Plaintiff Daughter Lisa to believe that he (Brian Nagle) would comply with Plaintiff Daughter Lisa's request as attorney-in-fact for Father.

**Defendant Brian Nagle called Father at Defendant Whittier Pavilion
immediately following his conversation with Plaintiff Daughter Lisa**

1388.   During the above-described conversation of **May 24, 2011**, Plaintiff
Daughter Lisa gave **Defendant Brian Nagle** specific information as to where Father was
being held involuntarily, which Defendant Brian Nagle attested to in court.

1389.   Also, as previously set forth, **Defendant Brian Nagle** was informed by
Plaintiff Daughter Lisa that **Defendant Whittier Pavilion** had filed a petition with
Haverhill District Court seeking a six-month commitment of Father to a psychiatric
facility and forced administering of antipsychotics.

1390.   On that same day (**May 24, 2011**), after speaking with Plaintiff Daughter
Lisa, **Defendant Brian Nagle** called Father at the psychiatric facility of **Defendant
Whittier Pavilion** while Father was involuntarily committed and under lock-down.

1391.   In-court testimony of **Defendant Brian Nagle** shows that *he* called Father
**on May 24, 2011**, as a direct result of his conversation with Plaintiff Daughter Lisa.
Defendant Brian Nagle attested in-court that he had initiated the call to Father for the
specific purpose of obtaining his permission for Daughter Lisa to act as attorney-in-fact in
the withdrawing of funds from **Defendant BNY Mellon**.

1392.   During **Defendant Brian Nagle's** conversation with Father, on
**May 24, 2011**, Defendant Brian Nagle told Father that Plaintiff Daughter Lisa had
requested to transfer funds out of his account with **Defendant BNY Mellon**.

1393.   **Defendant Brian Nagle** did not inform Father during their conversation
that Plaintiff Daughter Lisa requested a transfer of funds to be made to Father's checking
account.  Through specific omission, Defendant Brian Nagle intended for Father to think
that Plaintiff Daughter Lisa asked to have money transferred to her own checking account.

1394.   **Defendant Brian Nagle** attested, through in-court testimony, that Father
verbally revoked his 2003 DPOA during their conversation of **May 24, 2011**.  Where
Defendant Brian Nagle knew that Father had a prior and long-established validly executed
durable power of attorney, and with attested knowledge that Father was under a 3-day
involuntary commitment to a psychiatric facility, Defendant Brian Nagle knew it was
improper for him seek purported authorization from Father regarding Plaintiff Daughter's
Lisa's requests as attorney-in-fact.

1395.   **Defendant Brian Nagle** knew it was improper conduct for him to have relied on a supposed verbal revocation of a durable power of attorney, while acting in the capacity as Vice President of **Defendant BNY Mellon**; especially, when Defendant Brian Nagle knew that Father had a prior and long-established validly executed durable power of attorney, and with attested knowledge that Father was under a 3-day involuntary commitment to a psychiatric facility.

1396.   **Defendant Brian Nagle** testified in court that Plaintiff Daughter Lisa provided him the exact location of Father, during their conversation on **May 24, 2011**.

1397.   At no time did Father request a specific attorney to be called, during the **May 24, 2011** conversation between he and **Defendant Brian Nagle**.

1398.   **Defendant Brian Nagle** was made aware by Plaintiff Daughter Lisa that **Defendant Richard Garmil**, as a representative of **Defendant Whittier Pavilion**, had prohibited Plaintiff Daughter Lisa from seeing her Father.

1399.   **Defendant Brian Nagle** made statements to Plaintiff Daughter Lisa that he would be affirmatively taking steps to process a transfer of funds to Father's checking account.

1400.   At no time did **Defendant Brian Nagle**, or any agent of **Defendant BNY Mellon**, contact Plaintiff Daughter Lisa to inform her that Defendant BNY Mellon would not be complying with Plaintiff Daughter Lisa's afore-described request as attorney-in-fact, of **May 24, 2011**.

### Defendant Brian Nagle's telephone call on May 24, 2011 to Defendant Attorney Ed Tarlow of Defendant Law Firm TBHR

1401.   The only statements that Father made to **Defendant Brian Nagle,** regarding getting him counsel, during their conversation of **May 24, 2011** was a general plea to get legal counsel so that he could get out of **Defendant Whittier Pavilion**.

1402.   In-court testimony of **Defendant Brian Nagle** shows that, prior to his calling **Defendant Attorney Tarlow**, Defendant Brian Nagle knew Plaintiff Daughter Lisa had already obtained legal counsel for Father.  Yet, on the same day (**May 24, 2011**), Defendant Brian Nagle called Defendant Attorney Tarlow, specifically, to have Defendant Attorney Tarlow become counsel for Father; that he called Defendant Attorney Tarlow to go see Father at **Defendant Whittier Pavilion**.

1403.   **Defendant Brian Nagle** testified in-court that, prior to **May 24, 2011**, he had personally known **Defendant Attorney Tarlow** and his associates for several years— **Defendant Attorneys Albert DeNapoli and Catherine Watson**.

1404.   **Defendant Brian Nagle** came to know **Defendant Attorneys Tarlow, DeNapoli and Watson** through his official role with **Defendant BNY Mellon**.

1405.   **Defendant Brian Nagle** co-founded a magazine publication called "Family Business Association, Inc." with **Defendant Attorneys Tarlow** and **DeNapoli**.  Through Family Business Association, Defendant Brian Nagle specifically used and advertised his official position with **Defendant BNY Mellon**.  In addition, Defendant Brian Nagle, Defendant Attorney Tarlow, Defendant Attorney DeNapoli and Defendant Attorney Watson have, all, served together on the Board of Directors for "Family Business Association, Inc." for several years.  (Documentation of the official positions held by designated Defendants regardingFamily Business Association is provided in **Exhibit 318**).

1406.   Based, merely, on Plaintiff Daughter Lisa informing **Defendant Brian Nagle**, that upon advice of counsel, she was *going* to petition for guardianship and conservatorship, Defendant Brian Nagle became concerned that the multi-million dollar account could possibly be taken out of the custody of **Defendant BNY Mellon** to another financial institution.

1407.   With *no* indication given of *any* intention of a removal of the afore-described accounts from **Defendant BNY Mellon**—based on a mere generalized concern, **Defendant Brian Nagle** deliberately called **Defendant Attorney Tarlow** for the specific purpose of having Defendant Attorney Tarlow physically go see Father to get documents signed that would oust Plaintiff Daughter Lisa as Father's attorney-in-fact and definitely secure Defendant BNY Mellon's custody of Father's funds.

### Defendant Attorney Tarlow's and Defendant Attorney Watson's visitation with Father during 3-day involuntary commitment

1408.   On **May 25, 2011**—*the very next day* after **Defendant Brian Nagle** spoke with **Defendant Attorney Tarlow**—Defendant Attorneys Tarlow and Watson went to see Father, while locked-down at **Defendant Whittier Pavilion**.

1409.   The above-referenced prepared documents included three (3) written instruments for execution: 1) a purported revocation of Father's 2003 DPOA, 2) a new durable power of attorney, naming Father's CPA as attorney-in-fact and 3) a retainer agreement for the legal services of **Defendant Attorney Tarlow** and his law firm.

1410.   Father's signing of the above-described documents on **May 25, 2011** were notarized by **Defendant Attorney Tarlow**—of significance, Defendant Attorney Tarlow not being a disinterested party.

### The retainer agreement

1411.   The retainer agreement, brought with **Defendant Attorneys Tarlow** and **Watson**, did not contain, even one reference, about providing legal services to defend Father against the petition for a six-month civil commitment filed by **Defendant Attorney Garmil**, on behalf of **Defendant Whittier Pavilion**.  (Copy of retainer agreement is provided in **Exhibit 319**).

1412.   **Defendant Attorney Tarlow** was the person who notarized the agreement signed by Father, purportedly certifying Father signing the retainer agreement of his own free will.

1413.   The only legal services expressed in the above-described retainer agreement had to do with was *future* estate planning and other financial related matters.

1414.   With knowledge of Father's multi-million dollar estate, **Defendant Law Firm TBHR** overtly allowed and intended for *court-appointed counsel* from the Committee for Public Counsel Services (CPCS) to represent Father in the pending petition filed in Haverhill District Court by **Defendant Attorney Garmil**, on behalf of **Defendant Whittier Pavilion**, which sought a six-month civil commitment.

### Durable Power of Attorney

1415.   **Defendant Attorney Tarlow** and/or his agents drafted the durable power of attorney signed by Father on **May 25, 2011**—which was procured through fraud and deceit.  (Copy of the DPOA is provided in **Exhibit 320**).

1416.   The durable power of attorney stated that the attorney-in-fact was Father's CPA, Bill Austin of Braver; however, on **June 7, 2011**, **Defendant Attorney Tarlow** and his agents represented in court that Father's CPA (Bill Austin) did not want to accept the role of attorney-in-fact.  (Refer to audio and transcript for court proceeding held on June 7, 2011—prior referenced Exhibits 23 & 24).

1417.   Paragraph numbered 8 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To pay any and all bills, accounts, claims and demands now or hereafter payable by me including, without limiting the generality of the foregoing, the power to settle or compromise any such bills, accounts, claims and demands, and to specifically approve payment of professional legal fees incurred by [Father] with counsel at Tarlow, Breed, Hart & Rogers, P.C., and to authorize Bank of New York Mellon to distribute funds in payment of said professional legal fees within thirty (30) days of receiving an invoice.

1418.   Paragraph numbered 10 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To act for [Father] in any business in which I have been, am now or hereafter may be engaged or interested.

1419.   Paragraph numbered 12 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To sell, manage, invest and reinvest any or all of [Father's] property as [Father's] said attorney-in-fact shall deem expedient, changing investments according to [Father's] said *attorney-in-fact's* judgment.

1420.   Paragraph numbered 14 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To borrow money in my name, and to give promissory notes or other obligations therefor, and to deposit as collateral, pledge as security for the payment thereof or mortgage any or all of my securities or other property of whatever nature.

1421.   Paragraph numbered 15 of the durable power of Attorney, signed by Father on **May 25, 2011** stated:

> To borrow upon or collect monies due from all insurance policies which now or in the future stand in [Father's] name.

1422.   Paragraph numbered 18 of the durable power of attorney, signed by Father on **May 25, 2011** stated:

> []to employ specifically, TARLOW, BREED, HART & RODGERS, P.C. as counsel.

1423.   Paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on **May 25, 2011** allowed the attorney-in-fact to have unfettered discretion to act, regardless of Father's desires.

1424.   The paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on **May 25, 2011** even authorized the attorney-in-fact to act contrary to Father's intentions or desires.

1425.   The paragraph entitled "General Authorization" of the durable power of attorney, signed by Father on **May 25, 2011** included the following language:

> . . . hereby giving and granting unto my said attorney –in-fact full power and authority to do and perform <u>all and every</u> act and thing <u>whatsoever</u>. . . . as fully to all intents and purposes as I might <u>or could do</u> if personally present.

1426.   The paragraph entitled "Delegation of Powers; Compensation**"** of the durable power of attorney, signed by Father on **May 25, 2011**, allowed **Defendant Attorney Tarlow**—designated as attorney-in-fact—could delegate his powers to investment counsel, brokers, attorneys or "any other agent".

1427.   The DPOA stated:

> [Father's] said attorney-in-fact may deal with himself or herself or with <u>any concern</u> in which <u>he or she may be interested</u> <u>as freely</u> and effectively as though dealing with a third party.

1428.   The paragraph entitled "<u>HEALTH CARE PROXY</u>" of the durable power of Attorney, signed by Father on **May 25, 2011**, designated that Father's attorney-in-fact would be given full HIPAA rights.

1429.   The paragraph entitled "<u>HEALTH CARE PROXY</u>" of the durable power of Attorney, signed by Father on **May 25, 2011**, designated the CPA to have <u>complete</u> access to <u>any and all</u> of Father's <u>medical information and records</u>.

1430.   Of significance, Father's **2003 DPOA** unambiguously precluded the attorney-in-fact from being able to act with free reign.  The language of the 2003 DPOA precluded any attorney-in-fact from being able to dismantle Father's already well-established estate planning instruments.

1431.   Counsel of **Defendant Law Firm TBHR** did not have any intentions of providing legal services to protect Father against **Defendant Whittier Pavilion's** petition for a six-month civil commitment.

1432.   Through communications with **Defendant Brian Nagle**—acting on behalf of **Defendant BNY Mellon**, **Defendant Law Firm TBHR** knew that Father had validly executed his desires and intentions in a durable power of attorney and trust on **February 11, 2003**.

1433.   In a signed pleading submitted to the Essex Probate & Family Court on **June 7, 2011**, **Defendant Attorney DeNapoli** stated that "[in] order to accomplish his goals of protecting and preserving [Father's] assets, [Father] *may need only to finalize his estate plan and set up a trust with himself and the present holder of his funds, BNY Mellon, as co-trustee, to protect his assets and assure that his wishes are followed*."

1434.   **Defendant Attorney DeNapoli** sent correspondence to counsel obtained for Father, in Plaintiff Daughter Lisa's capacity as attorney-in-fact, **dated May 25, 2011**, identifying the law firm of **Defendant Law Firm TBHR** as Father's newly retained counsel and stated that Father had revoked the 2003 DPOA on **May 25, 2011**.

1435.   **Defendant Attorney Kazarosian** filed an affidavit with the Essex Probate & Family Court on **August 17, 2011**, attesting that Father had thoughtfully, comprehensively and cohesively explained to her that the documents presented to Father and signed on **May 25, 2011** were not knowingly and voluntarily executed by Father; that Father did not have knowledge of the content of the documents in which he signed.

1436.   **Defendant Brian Nagle** testified in court that, when he called **Defendant Attorney Tarlow** on **May 24, 2011**, he asked Defendant Attorney Tarlow to become legal counsel for Father for the purpose of getting Father out of **Defendant Whittier Pavilion**.

1437.   However, the content set forth in afore-described purported written retainer agreement, drafted by **Defendant Attorney Tarlow** and **Defendant Attorney Watson**— and signed while Father was under lockdown in a psychiatric facility, via a three-day involuntary psychiatric commitment—is *very extensive and specific* as to intended services for *estate planning*.

1438.   The afore-described content of the purported written retainer agreement— prepared by **Defendant Attorney Tarlow**—and signed by Father while under lockdown, in a psychiatric facility, for a three-day involuntary commitment is very detailed and specific as to the scope of legal services offered to Father by **Defendant Law Firm TBHR**.

1439.   There is no reference to, in any manner, regarding legal services to free Father from involuntary commitment at **Defendant Whittier Pavilion**.

1440.   As of **May 20, 2011**, records of **Defendant ESMV** show that **Defendant Attorney Berid** and staff of Defendant ESMV knew that Father was going to given antipsychotics by **Defendant Whittier Pavilion**.

1441.   As of **June 3, 2011**, records of **Defendant ESMV** show that **Defendant Attorney Berid** and staff of Defendant ESMV knew the above-described manner in which **Defendant Attorney Tarlow** obtained the signed documents of **May 25, 2011**.

1442.   The Office of Bar Counsel and the Board of Bar Overseers have been provided substantiating documentation of the above-described illegal solicitation by the designated Defendants.

1443.   The Attorney General's Office was provided substantiating documentation of the above-described illegal solicitation by the designated Defendants.

**i.   Evidence bolstering of ill-motives**

1444.   As previously set forth and discussed, **Defendant Attorney Tarlow** has a long-established pattern of unscrupulous and unconscionable acts in rendering estate-planning services.

1445.   Also, as previously set forth, **Defendant Attorney Tarlow** has a pattern of conduct, whereby he has induced his clients to make him trustee and/or executor of their estate planning instruments.

1446.   Specifically, in the matter of In re Marvin H. Siegel, **Defendant Attorney Tarlow**—and the **Defendant Law Firm of TBHR**—filed a motion with the Essex Probate & Family Court seeking an Order allowing **Defendant Attorney Feld** (as conservator in the matter of In re Marvin H. Siegel) to pay them, approximately, **$110,000**, for purported legal services.  (Copy of the motion and invoices filed by Defendant Law Firm of TBHR are in **Exhibit 321**).

1447.   **Judge Abber** knew that **Defendant Attorney Tarlow's** request for payment was so beyond the pale, that he, in effect, denied the specific amount requested —but did issue an Order for payment to be issued to **Defendant Law Firm TBHR** for the amount of **$6,500.00**.

1448.   The afore-referenced Order for payment to be made to **Defendant Law Firm TBHR** by **Judge Abber** was explicitly placed on the docket sheet of In re Marvin H. Siegel—in the entry dated **11/22/2011**, stating:

> After review of all the submissions and the invoice the motion is allowed in the amount of **$6,500.00**.  The court finds that the respondent did benefit from the services, but the time charged is excessive in light of the issues dated 11/21/11.

 (Copy of the electronic dockets are provided in prior referenced Exhibits 37 and 38—which evidences that entries were subsequently deleted from the docket).

1449.   Of significance, the above-referenced electronic docket entry was subsequently altered by the Clerk's Office of the Essex Probate & Family Court.  The above-described written entry has been removed from the electronic docket for In re Marvin H. Siegel.  The entry for **11/22/2011** was altered and in the place of the original entry now reads, only as: "Motion to approve statement of payment form Allowed 11/21/2011".

1450.   There is no legitimate reason for the above demonstrated alteration of the docket for In re Marvin H. Siegel.  The alteration of the docket was done with deliberate and knowing ill-motives; and done at the behest of designated Defendants.

1451.   Excessive billing for legal services is a violation of the Massachusetts Rules of Professional Conduct.  The Board of Bar Overseers has published several opinions about excessive fees constituting professional misconduct.

1452.   Under the Massachusetts Judicial Canon of Ethics, judges are required to report known professional misconduct to the Office of Bar Counsel/Board of Bar Overseers.  There are prior published decisions by the Board of Bar Overseers sanctioning attorneys for excessive billing.

1453.   As set forth above, **Judge Abber** explicitly used the word "excessive" to describe the afore-described billing submitted by **Defendant Attorney Tarlow** (and that of **Defendant Law Firm of TBHR**).  Judge Abber reduced the afore-described payment by **95%**—which shows why the above discussed docket entry had been illicitly altered.

### iv.  **Evidence of prior concerted efforts of fraud by Defendant Attorney Tarlow and other members of Defendant Law Firm TBHR**

1454.   In 1991, a civil action involving fraudulent conveyance of property was filed against **Defendant Attorney Tarlow** and other individuals affiliated with **Defendant Law Firm TBHR**.  Provided in **Exhibit 322** is a copy of the Complaint filed by Metropolitan Life Insurance Company in the above-referenced civil action (SUCV91-6312 and issued Execution of Judgment.

1455.   The underlying situation involved **Defendant Attorney Tarlow** and the other individuals affiliated with **Defendant Law Firm TBHR** having entered into a written lease agreement for rental space with a predecessor in interest with Metropolitan Life Insurance Company.  Metropolitan Life Insurance Company brought a summary process action, obtaining a judgment and execution against Defendant Attorney Tarlow and other individuals affiliated with Defendant Law Firm TBHR.

1456.   The written agreement to lease office space was executed on **September 30, 1987**.  After a year into the afore-described lease agreement, multiple parties in the above-described action began making conveyances and transfers of their respective interest in their respective homes.

1457.   Partners of **Defendant Law Firm TBHR**—Attorney Richard Breed and Attorney Jeffrey Hart—were, also, such parties of direct acts of conveying their interest to their spouses; and were, thereby, alleged to have specifically and deliberately engaged in acts to defraud creditors by such conveyances.

1458.   The above-described conveyances and transfer of interest took place, contemporaneously, with the previously discussed transactions by **Defendant Attorney Tarlow** as Trustee for the **North Street Irrevocable Trust** (Everett Cole, Jr. as settlor).

1459.   Metropolitan Life Insurance Company brought the afore-referenced civil action in Suffolk Superior Court in **September of 1991** because **Defendant Attorney Tarlow** and the other individuals affiliated with **Defendant Law Firm TBHR** did not make any payment on the afore-described judgment obtained in **April of 1991**.  Metropolitan Life Insurance Company obtained a judgment for damages in the amount of **$358,120.49** against Defendant Attorney Tarlow and the other individuals affiliated with Defendant Law Firm TBHR.  (Refer to Execution of Judgment provided in prior referenced Exhibit 322).

1460.   **Defendant Attorney Tarlow** and the other individuals affiliated with **Defendant Law Firm TBHR**, each, signed individual Agreement for Judgments for the sum of $51,500.  (Copies of the Agreement for Judgments are provided in **Exhibit 323**).

227

**F.  Conspired fraud and deception by Defendant BNY Mellon, Defendant Law Firm TBHR and Defendant Whittier Pavilion during litigation**

**i.  Overview**

1461.   Although Plaintiff Daughter Lisa is a practicing attorney, at the time Father had been involuntary committed on **May 20, 2011**, she did not practice probate law; and she did not have experience involving guardianships and conservatorships, mental health, or civil commitments.

1462.   Plaintiff Daughter Lisa sought Attorney Diane Long's private legal representation, as Father's attorney-in-fact.   Attorney Long's primary area of practice is in family and probate law.

1463.   Plaintiff Daughter Lisa had retained Attorney Long's legal services <u>prior</u> to **Defendant Attorney Tarlow's** afore-described visit to Father on **May 25, 2011**.  This is evidenced by **Defendant Attorney DeNapoli** having sent a letter *directly* to Attorney Long, *dated* **May 25, 2011**, informing Attorney Long of his purported legal services for Father.

1464.   Through counsel, Plaintiff Daughter Lisa was of the understanding that filing petitions for guardianship and conservatorship in Probate & Family Court was the sole available avenue to attempt to protect her father.  Consequently, Attorney Long sought an emergency hearing, on behalf of Plaintiff Daughter Lisa (as Father's attorney-in-fact), in the **Essex Probate & Family Court**; which was held on **May 27, 2011**.  Also on **May 27, 2011**, Attorney Long filed petitions for guardianship and conservatorship.

1465.   Attorney Long filed an affidavit with the **Essex Probate & Family Court**, in which she explicitly attested that Plaintiff Daughter Lisa solely sought relief in probate court because of **Defendant Whittier Pavilion's** and **Defendant BNY Mellon's** refusal to honor Father's **2003 DPOA**.  (Copy of Attorney Long's filed affidavit is provided in Exhibit **324**).

1466.   Attorney Long's affidavit, in support of the emergency motion, provided a detailed narrative of facts, specifically describing the unlawful acts by **Defendant Richard Garmil**—which were specifically done as representative for **Defendant Whittier Pavilion;** and the unethical solicitation of legal representation for Father by **Defendant Law Firm TBHR** and the afore-described signed documents by Father on **May 25, 2011**.

1467.   Attorney Long gave advance notice to **Defendant Law Firm TBHR** about the emergency hearing for **May 27, 2011**, which counsel on behalf of Defendant Law Firm TBHR did attend.

### ii.  Court proceeding of May 27, 2011

1468.    The emergency motion and supporting Affidavit were presented on **May 27, 2011** before **Judge Mary Ann Sahagian**, First Justice of the Essex Probate & Family Court.

1469.   Provided in **Exhibit 325** are copies of the case history of documented cases (obtained from a registry of the Commonwealth) in which **Defendant BNY Mellon** has been involved in the **Massachusetts Probate & Family Courts**—in particular, Defendant BNY Mellon has an extensive history as "trustee" in guardianship/conservatorship and estate administration matters.

1470.   Prior to **May 27, 2011**, **Judge Sahagian** had presided over multiple probate matters that have directly involved **Defendant BNY Mellon**.

1471.   Prior to **May 27, 2011**, **Judge Sahagian** had presided over multiple probate matters that have directly involved **Defendant Brian Nagle**, in his official capacity with **Defendant BNY Mellon**.

1472.   From at least **2005 through 2009, Defendant Brian Nagle**—on behalf of **Defendant BNY Mellon**—was directly involved in certifying and providing financial reports to the **Essex Probate & Family Court** in the matter of In re Fred Hussey; and whose financial reports **Judge Sahagian** personally had presided over and issued judgments.

1473.   Provided in **Exhibit 326** are copies of court documents filed in the matter of In re Fred Hussey.  Such documents include:

> a copy of the Account filed in **2005** that has the signature of **Defendant Brian Nagle** as the Vice President of Mellon Trust;

> the Account filed in **2006** signed by **Defendant Brian Nagle**—containing suspect illicit conduct wherein the Account is signed on **October 23, 2006** and dated-stamped as filed on **November 13, 2006**, with handwritten notations stating that a "new" citation was issued on **June 25, 2007** and returned on **August 6, 2007**, as well as, handwritten notations that a "new" citation was issued on **October 18, 2007** and returned on **November 20, 2007**;

provided is a letter, dated **September 12, 2007**, from Brickley, Sears & Sorett, P.A., regarding the above-described notations;

provided is a Judgment issued by Judge Sahagian, on <u>**July 11, 2008**</u>, allowing the <u>9th account through the 12th account of Mellon Trust</u>;

provided is a Judgment issued by Judge Sahagian, on <u>**July 26, 2010**</u>, allowing the <u>13th account through the 15th account of Mellon Trust</u>

1474.   At the time of the emergency hearing of **May 27, 2011**, **Defendant Law Firm TBHR** claimed to have a DPOA signed by Father.  Attorney Long had presented the afore-described verified affidavit.

1475.   Through counsel, Plaintiff Daughter Lisa requested that the Essex Probate & Family Court revoke the previously described instruments obtained on **May 25, 2011** by **Defendant Attorneys Tarlow** and **Watson**.

1476.   Demonstrating that **Judge Sahagian** knew that Attorney Long had presented substantial evidence of unscrupulous conduct by counsel of **Defendant Law Firm TBHR** and **Defendant BNY Mellon** is the fact that—despite Defendant Law firm TBHR's proffered DPOA of May 25, 2011—Judge Sahagian issued a temporary order that Father's financial accounts be frozen, but allowed the proffered DPOA to be used to access Father's funds for "health and medical expenses."  (Copy of the temporary order issued by Judge Sahagian is provided in **Exhibit 327**).

1477.   Had the affidavit submitted by Attorney Long not contained sufficient prima facie evidence of unscrupulous conduct by designated Defendants, **Judge Sahagian** would have had *no* reason to freeze Father's funds or limit the proffered DPOA by **Defendant Law Firm TBHR**.  Consequently, where Judge Sahagian did purport to restrict the proffered DPOA, it is axiomatic that Attorney Long—on behalf of Plaintiff Daughter Lisa—had, in fact, presented sufficient prima facie evidence of unscrupulous conduct by designated Defendants.

1478.   The manner in which **Judge Sahagian** tailored the above-described order, also, shows that she was influenced by her prior dealings with **Defendant BNY Mellon** and **Defendant Brian Nagle**, and showed bias in their favor.  At first glance, the order appears to give an impression as if Judge Sahagian were acting in a neutral manner; however, Judge Sahagian's above-described order*, in actuality*, evidences her bias in favor of Defendant Brian Nagle and Defendant BNY Mellon as she <u>*still*</u> allowed the designated Defendants access to Father's funds.

1479.   The magnitude of **Judge Sahagian's** biased actions in the manner that she tailored the afore-described order is demonstrated by her failure to make an emergency court appointment, from the Court's list of certified court appointees to manage subsequent transactions for Father's "health and medical expenses"—the underlying situation presented to Judge Sahagian at the hearing of **May 27, 2011** is the epitome of when a court appointment is *supposed to* occur.

1480.   As demonstrated, **Judge Sahagian** did not act in good faith in presiding over the hearing held on **May 27, 2011**—to the contrary, she knowingly and deliberatetly acted with ill-motives.

1481.   Having read the affidavit submitted by Attorney Long, **Judge Sahagian** saw that the allegations against the designated Defendants were substantial and substantiated, and, consequently, she did not want to be further involved in the matter of In re Marvin H. Siegel; therefore, at the hearing of **May 27, 2011**, she directed—at that time—that the other filed motions and petitions in the matter of In re Marvin H. Siegel be assigned to **Judge Abber**.

1482.   At the hearing of **May 27, 2011**, **Judge Sahagian** had scheduled the other temporary motions to be heard by **Judge Abber** for **June 7, 2011**.

### iii.  <u>Communications between Defendant Law Firm TBHR and Defendant Attorney Garmil/Defendant Whittier Pavilion through June 7, 2011</u>

1483.   The afore-described invoice filed by **Defendant Attorneys DeNapoli** and **Tarlow** state that:

> On **5/26/2011**, there were multiple telephone conversations between **Defendant Attorney Watson** and **Defendant Attorney Garmil**; multiple telephone conversations between **Defendant Attorney DeNapoli** and **Defendant Attorney Garmil**.

> On **5/31/2011**, there were multiple telephone conversations between **Defendant Attorney DeNapoli** and **Defendant Attorney Garmil**; telephone conference with **Defendant Attorney DeNapoli**, **Defendant Attorney Garmil** and **appointed counsel for Father** (Joel Favazza) regarding the commitment petition filed in Haverhill District Court—conference involved "discussion of status and strategy".

On **6/1/2011**, "further discussion" took place between **Defendant Attorney DeNapoli**, **Defendant Watson** and **Defendant Attorney Garmil** "relative to reviewing medical records, sending Durable Power of Authorization and release from holder of durable power of attorney (Father's accountant) to Attorney Garmil."

On **6/6/2011**, there were telephone conferences involving **Defendant Attorney Watson**, **Defendant Attorney DeNapoli**, **Defendant Attorney Garmil** and **CPCS Attorney Favazza**; and, telephone call from **Defendant Attorney Garmil** to **Defendant Attorney DeNapoli—**discussion involving "issues concerning voluntary commitment."

### iv.  Relationship between Defendant Law Firm TBHR and Defendant Daughter Sheryl through June 7, 2011

1484.   The following communications and actions took place between counsel of **Defendant Law Firm TBHR**, **Defendant Daughter Sheryl** and Plaintiff Daughter Devora:

On **5/31/2011**, there was a teleconference involving **Defendant Daughter Sheryl**, Plaintiff Daughter Devora, **Defendant Attorneys Tarlow, DeNapoli and Watson—**specifically having discussed Defendant Daughter Sheryl's and Plaintiff Daughter Devora's "thoughts on case, commitment hearing, family history, conservatorship and guardianship."

(Of significance, Defendant Attorney Tarlow, Defendant Attorney DeNapoli and Defendant Attorney Watson—each, *individually*, billed for this teleconference).

On **5/31/2011**, there was a follow-up telephone conference involving **Defendant Daughter Sheryl**, **Defendant Attorney DeNapoli** and **Defendant Attorney Watson** regarding the "continuation of commitment hearing."

On **5/31/2011**, **Defendant Attorney DeNapoli** billed for drafting affidavits for **Defendant Daughter Sheryl** and Plaintiff Daughter Devora.

On **6/1/2011**, there was a meeting held with **Defendant Daughter Sheryl** and her husband;

On **6/1/2011**, **Defendant Attorney DeNapoli** billed for "further work relative to preparation of affidavits and obtaining affidavit of Devora Kaiser"; then billed for more work on affidavit of **Defendant Daughter Sheryl**.

232

On **6/3/2011**, there were conversations with **Defendant Daughter Sheryl** and **Defendant Attorney DeNapoli**.

On **6/6/2011**, there were conversations between **Defendant Daughter Sheryl** with **Defendant Attorney DeNapoli** and **Defendant Attorney Watson**.

### v.  Involvement of Defendant ESMV up through June 7, 2011

1485.   The records of **Defendant ESMV** show that on **June 3, 2011**, **Defendant Daughter Sheryl** informed **Defendant Caseworker Springman** that she and Plaintiff Daughter Devora had "written affidavits for [the hearing of **June 7, 2011**] requesting an outside party be guardian."

1486.   *Prior* to the court proceeding held on **June 7, 2011**, **Defendant ESMV** had recorded in its electronic notes—input in the computerized system—that Plaintiff Daughter Lisa had an attorney representing her in the guardianship case named Diane Long out of Winchester, MA; that **Defendant Attorney Tarlow** was representing Father and that Father "had a new POA drawn up and named his Tax attorney and accountant Bill Austin his new POA removing his daughter Lisa."

1487.   In addition, prior to the court proceeding of **June 7, 2011**, **Defendant ESMV** had recorded the following information in its electronic notes:

> on **6/3/2011**, **Defendant Supervisor Dailey** wrote that the two other daughters "do not support Lisa as Guardian/Conservator.  AV [Father] has been prescribed Depakote";

> on **6/3/2011**, **Defendant Caseworker Springman** wrote that he "left a message for the elder's [Father] atty requesting a call back regarding the elder's guardianship hearing";

> on **6/6/2011**, **Defendant Supervisor Dailey** wrote: "PSW has spoken with **Tarlow** and informed him of PS investigation.  Tarlow indicated that he is also looking into FE and requesting bank statements going back 12 months."

### vi. <u>Court proceedings of June 7, 2011</u>

1488.   A copy of the audio court recording for **June 7, 2011** is provided in previously referenced Exhibit 23; and a copy of the transcript for the court proceeding of **June 7, 2011** is provided in previously referenced Exhibit 24.

### <u>Inquiry by Judge Abber as to how Defendant Attorney Tarlow had been retained to represent Father</u>

1489.   **Judge Abber** had asked **Defendant Attorney DeNapoli**, during the court proceeding of **June 7, 2011**, how **Defendant Attorney Tarlow** and their firm first came to be retained by Father.

1490.   **Defendant Attorney DeNapoli** intentionally gave the impression that Father, personally, initiated and sought out **Defendant Attorney Tarlow's** legal representation because they had known each other for thirty (30) years, as attorneys sharing a suite—which was false.

1491.   Immediately after the above-described representations had been made, **Judge Abber** conducted a series of inquiries that revealed **Defendant Attorney DeNapoli's** initial representation was not credible.

1492.   **Judge Abber** asked **Defendant Attorney DeNapoli** whether Father, *prior* to **May 25, 2011**, had ever used **Defendant Attorney Tarlow**'s legal services or that of his law firm; which Defendant Attorney DeNapoli stated that Father had <u>not</u>.

1493.   **Defendant Attorney DeNapoli's** answers to **Judge Abber's** successive questioning showed that **Defendant Attorney Tarlow** and Father had been only mere acquaintances—they just happened to have offices in the same building.

1494.   The above-described in-court inquiry went as follows:

| | |
|---|---|
| Judge Abber: | And, counsel, let me ask you a question.  Has your firm of Mr. Tarlow done business for Mr. Siegel before? |
| Attorney DeNapoli: | No. |
| Judge Abber: | When did you first meet him?  Or when did Mr. Tarlow first meet him? |

| | |
|---|---|
| Attorney DeNapoli: | Well, Mr. Tarlow had known him in the past, from being somewhat of a contemporary of his and shared office space.  And they recognized each other at that time, but we had not done any business with him.  So at that meeting— |
| Judge Abber: | Well on May 24th, was this the first that Mr. Siegel had spoken to Mr. Tarlow? |
| Attorney DeNapoli: | Since years when they shared – not shared offices, but had adjoining offices in the building together. |
| Judge Abber: | Is Mr. Siegel an attorney as well? |
| Attorney DeNapoli: | He is. |
| Judge Abber: | And they practiced in the same office? |
| Attorney DeNapoli: | The same building years ago. |
| Judge Abber: | The same building? |
| Attorney DeNapoli: | Yes. |
| Judge Abber: | **And when was the last time they shared the same building as an office?** |
| Attorney DeNapoli: | **I want to say it was <u>probably 30 years ago</u>.** |
| Judge Abber: | **And in that 30 years ago, had he any contact, communications or conversations with Mr. Siegel?** |
| Attorney DeNapoli: | **I don't believe he did.** |
| Judge Abber: | **Not until the 24th?** |
| Attorney DeNapoli: | **Yes, your Honor.** |

**Evidence arose in-court of prior suspect out-of-court judicial communications**

1495.   The very first proceeding that **Judge Abber** presided over in the matter of In Re Marvin H. Siegel was **June 7, 2011**.  Judge Abber did not conduct an evidentiary hearing—he only entertained oral arguments by counsel.

1496.   One of the very first issues raised by Attorney Long at the proceeding held on **June 7, 2011** was the affidavit that she had submitted on **May 27, 2011**, regarding the overt fraudulent and deceptive conduct of **Defendant Brian Nagle** and of **Defendant Attorneys DeNapoli, Tarlow** and **Watson**.  Attorney Long's affidavit specifically detailed what had occurred during Father's improper and unlawful involuntary commitment at Whittier Pavilion on **May 20, 2011**.

1497.   At the start of the court proceeding on **June 7, 2011**, Attorney Long began stating the specific details of the above-described fraudulent and deceptive conduct, but **Judge Abber** interrupted her *to ask her if she had a bond*.

1498.   Even though Attorney Long had been giving extensive details about Father being involuntarily committed to a psychiatric facility, **Judge Abber** could only focus on his seeing the actual paperwork for the bond.

1499.   Significantly, the bond was a subject matter that was *far afield from what* Attorney Long had been talking about; in addition to the fact that this was **Judge Abber's** very first official contact with this matter and that money was his foremost thought. Showing that Judge Abber's inquiry about the bond was so off topic, Attorney Long had to actually ask Judge Abber to repeat the question—which he did.

1500.   Even though Attorney Long promptly responded to **Judge Abber's** inquiry about the bond—informing him that she had already filed the bond and that it should be there in the court file, Judge Abber went on to perseverate on the issue of the bond.  Judge Abber would not let Attorney Long continue with her presentation of the facts because he was so fixated on seeing, with his own eyes, the actual document.

1501.   The discourse regarding the above-referenced bond went as follows:

Judge Abber:          You filed it this past Friday?

Attorney Long:       Well no, two Fridays ago when we
                              originally filed--

Judge Abber:          Do you have a copy of it?

Attorney Long:       --the motions?

| Judge Abber: | No, it's not in here, right.  Do you have a copy of it? |
| Attorney Long: | No, your Honor, without sureties on the bond. |
| Judge Abber: | Do you have a copy of it? |
| Attorney Long: | I do.  Yes, I'll have to dig it up out of the file.  I can have my associates (indiscernible – low audio at 10:27:11) that I get out for you.  So basically, that's what the motion (indiscernible—low audio at 10:27:17). |
| Judge Abber: | Well, first of all, let's get back to the original motion. . . . |

1502.   Within two *very* brief inquiries, **Judge Abber** went *right back to the topic of money;* he stated: "Where's the value of the estate?"  **Defendant Attorney DeNapoli** responded: "The value of the estate is $6.9 million dollars."

1503.   The quoted discourse evidences that **Judge Abber** had been provided *prior* out-side-of-court information by Defendants about Father's multi-million dollar estate.

1504.   At the proceeding held on **June 7, 2011**, Attorney Long did make **Judge Abber** aware of Father's **2003 DPOA**.

1505.   As previously set forth, G.L. c. 190B, § 5-503 states that a specific nomination of a guardian and/or conservator in a DPOA "shall" be abided by the judge— *unless* "for good cause or disqualification."

1506.   To reiterate, the proceeding of **June 7, 2011** was the very first time that **Judge Abber** had presided in the matter of In re Marvin H. Siegel—and as shown by the audio court recording and transcript, Judge Abber summarily declared, in open court, on **June 7, 2011** that he was *definitively*, not going to permit *any* of the three daughters to be appointed guardian or conservator.

1507.   Without any supporting evidence, **Judge Abber** made repeated in-court statements, at **the June 7, 2011** proceeding, that he was not going to appoint Plaintiff Daughter Lisa as Father's guardian or conservator—or any of the daughters for that matter.

1508.   The discourse about **Judge Abber** declaring that he had already decided that _none_ of Father's daughters would be guardian or conservator, during the **June 7, 2011** proceeding was as follows:

| | |
|---|---|
| Attorney DeNapoli: | If you were to find to appoint a conservator and guardian, would the Court have someone in mind that they would appoint to those? |
| Judge Abber: | We do.  We have a list of these people. |
| Attorney DeNapoli: | Okay, because we didn't come forward with a name.  We didn't know- - |
| Judge Abber: | Well, we have lists of people who have been approved by the Chief Judge's Office. |
| Attorney Long: | And you know, of course, that we'd contest that.  He's got three daughters.  He doesn't need just more fees and more costs that Mr. Siegel doesn't want. |
| Attorney DeNapoli: | Reminds [me] of King Lear, your Honor – three daughters. |
| Attorney Long: | Well, it's not about money.  They're making it about money, because they've made it about money going through the financial advisor - - |
| Judge Abber: | Well - - |
| Attorney Long: | - - that they know.  And there will be no money |
| Attorney DeNapoli: | It's always about the money, your Honor. |
| Judge Abber: | It's always about money. |
| Attorney DeNapoli: | Thank You, Your Honor. |

**vii. Defendant Tarlow knowingly and intentionally made misrepresentations in pleadings submitted on June 7, 2011 to Essex Probate & Family Court**

1509.   As previously set forth, members of **Defendant Law Firm TBHR**—specifically, **Defendant Attorneys DeNapoli** and **Watson**—spent extensive time and effort drafting affidavits *for* **Defendant Daughter Sheryl** and Plaintiff Daughter Devora; which affidavits were submitted to the Essex Probate & Family Court on **June 7, 2011**. The affidavits were adversarial towards Plaintiff Daughter Lisa.  (Copies of the filed affidavits are provided in **Exhibit 328**).

1510.   As evidenced by the previously discussed filed invoice of **Defendant Law Firm TBHR**, **Defendant Attorney DeNapoli**, *personally*, drafted **Defendant Daughter Sheryl's** Affidavit.  In that affidavit drafted by Defendant Attorney DeNapoli, Defendant Daughter Sheryl attested:

> Since Lisa and her family has moved into my father's house, I have received calls from concerned friends about my father's condition in relation to Lisa and her family living [in Father's home] and using it as if it were her own home.  My Father has been very distraught over the filth, mess, and turmoil in the house since Lisa and her family moved in.

1511.   Of significance, the above-stated attestation by **Defendant Daughter Sheryl** *was* *not*, in any manner, claimed to be based on first-hand personal observation or knowledge of the afore-stated allegation.  In fact, she attested that the allegations were based on "received calls from concerned friends"—which, the supposed people she received calls from are not named and no description whatsoever was provided as to the nature of the personal relationships of these supposed friends with Father, or how or when they supposedly obtained such supposed knowledge.

1512.   In the affidavit signed by **Defendant Attorney Tarlow** and filed with the Essex Probate & Family Court on **June 7, 2011**, he explicitly stated that Father had reported the poor condition of his home—with such disrepair supposedly caused by Plaintiff Daughter Lisa—to the Boxford Board of Health.  (Copy of Defendant Attorney Tarlow's affidavit, dated **June 6, 2011**, is provided in **Exhibit 329**—refer to page 7, Paragraph numbered 30(q)).

1513.   As previously set forth, **Defendant Caseworker Springman** had been inside Father's home, on multiple occasions, at the time that Plaintiff Daughter Lisa and her family had been living with Father—and Defendant Caseworker Springman had done so, at the time contemporaneous with the above-described allegations made by **Defendant Daughter Sheryl** and **Defendant Attorney Tarlow**.  Proving that such allegations were entirely false, Defendant Caseworker Springman—where he personally had seen the inside of the home for himself—raised no concerns in his reports and notes of Father's living conditions or the conditions regarding the house.  In fact, Defendant Caseworker Springman made written notes affirmatively showing that Father's living condition was *more than* acceptable.

1514.   Upon Attorney Long having received the afore-described affidavit of **Defendant Attorney Tarlow** on **June 6, 2011**—the day *before* the scheduled hearing, she personally called the Boxford Health Department, on **June 6, 2011**, to verify the purported claim made by Defendant Attorney Tarlow.  Attorney Long spoke to the Administrator for Boxford's Board of Health and submitted an affidavit regarding her discussions with the Administrator to the Essex Probate & Family Court on **June 7, 2011**.  (Copy of subsequent affidavit of Attorney Long is provided in **Exhibit 330**).

1515.   Attorney Long specifically asked the Adminstrator for the Boxford Board of Health to check her records to see if any calls had been made to that department complaining about the condition of Father's residence.  The Administrator then checked all records for the address of Father's residence and all records related to Father's name and informed Attorney Long that there was no record of any calls or other reports having been made.

### Defendants' malicious misuse of court information to disparage Plaintiff Daughter Lisa

1516.   **Defendant Attorney DeNapoli** in the above-described opposition submitted documentation from Land Court that consisted of a Complaint for foreclosure filed against Plaintiff Daughter Lisa's home in **July of 2009**—no other documentation was provided, just the Land Court docket sheet.  Showing the intentional maliciousness of Defendant Attorney DeNapoli's misuse of such documentation, along with his cohorts on **June 7, 2011**, is the fact that *no further foreclosure proceedings had occurred after the filing of the complaint in July 2009*.

1517.   When **Defendant Attorney DeNapoli** filed such information with the Essex Probate & Family Court on **June 7, 2011**, he outright knew that the Complaint— filed two (2) years prior—had not been pursued further.

### viii. **Acts of extortion by Defendant Attorney DeNapoli, as representative of Defendant Tarlow Breed Hart Rogers**

1518.   A few days after the above-described court proceeding, on **June 9, 2011**, **Defendant Attorney DeNapoli** called Attorney Long (counsel for Plaintiff Daughter Lisa) to propose what he characterized as an "offer of settlement"—which just because he called it an "offer of settlement", does not make it so.

1519.   As previously set forth, **Defendant Attorney DeNapoli** knew that Plaintiff Daughter Lisa and her husband had been having continuous and grave financial difficulties due to severe physical injuries that Plaintiff Daughter Lisa first sustained in **August of 2006**.

1520.   When **Defendant Attorney DeNapoli** spoke with Attorney Long, and informed her that *if* Plaintiff Daughter Lisa would withdraw her petitions that she filed in the **Essex Probate & Family Court** (In re Marvin H. Siegel), *he* would facilitate Plaintiff Daughter Lisa *immediately* receiving **$100,000** *from Father's estate*—which he attempted to veil the bribe by stating that Defendant Daughter Sheryl and Plaintiff Daughter Devora would, also, receive $100,000 each.

1521.   When Attorney Long relayed the above-statements made by **Defendant Attorney DeNapoli** to Plaintiff Daughter Lisa, Plaintiff Daughter Lisa immediately responded that Defendant Attorney DeNapoli's "offer" was an outright bribe; upon which, Plaintiff Daughter Lisa, without hesitation, refused.

1522.   At that time, Plaintiff Daughter Lisa, also, conveyed to Attorney Long that **Defendant Attorney DeNapoli's** supposed settlement was, in fact, attempted extortion; that a monetary settlement was *no*t consistent with the nature of this type of legal action— a petition for guardianship and conservatorship is *not*, in any manner, commensurate with tort actions that use monetary settlements as a valid and legal custom and practice (such as a personal injury case or breach of contract claim).

1523.   After the above-described discussion between Attorney Long and Plaintiff Daughter Lisa, Attorney Long called **Defendant Attorney DeNapoli** the following day and informed him that Plaintiff Daughter Lisa refused his above-described proposition.

1524.   Subsequent to Attorney Long's above-described telephone conversation with **Defendant Attorney DeNapoli**, the previously discussed submitted invoice shows that he and **Defendant Attorney Tarlow** *re-checked* the status of the Complaint of foreclosure regarding property owned by Plaintiff Daughter Lisa and her husband.

1525.   **Defendant Attorney DeNapoli** admitted to making the above-described propositions in the descriptions contained in the submitted invoice, as well as, in an affidavit that he filed with the **Essex Probate & Family Court** on **November 8, 2011**—which was filed in support of Defendant Attorney DeNapoli's opposition to pleadings filed by Plaintiff Daughter Lisa, through counsel.

1526.   The pleadings filed by Plaintiff Daughter Lisa explicitly set forth in detail the above-described events surrounding the offered $100,000 to Plaintiff Daughter Lisa by **Defendant Attorney DeNapoli** in exchange for her dropping her filed petitions for guardianship and conservatorship.  (Copy of the pleadings filed on behalf of Plaintiff Daughter Lisa are provided in **Exhibit 331** and Defendant Attorney DeNapoli's opposition and affidavit are provided in **Exhibit 332**).

1527.   In **Defendant Attorney DeNapoli**'s affidavit, he outright admitted to having made an offer of money to Plaintiff Daughter Lisa.  He explicitly admitted that he stated Plaintiff Daughter Lisa would receive $100,000 based on the condition that she were to *not* pursue her legal action seeking to validate Father's **2003 DPOA**.

1528.   In the afore-described affidavit**, Defendant Attorney DeNapoli** made statements directly relating the offer of money to his explicit representation that Plaintiff Daughter Lisa and her family were having financial difficulties.  **Defendant Attorney DeNapoli** expressed that he, intentionally and knowingly, made the $100,000 offer *based on his belief that Plaintiff Daughter Lisa was having financial difficulties*.

### ix. Communications between Defendants after the court proceeding held of June 7, 2011 through June 14, 2011

1529.   The following communications took place amongst the Defendants:

On **6/8/2011**, there was a telephone conference involving **Defendant Attorney Watson**, **Defendant Attorney Garmil** and **CPCS Attorney Favaza**— discussion involved "case status" of In re Marvin H. Siegel.

On **6/8/2011**, there was a telephone call from **Defendant Attorney Garmil** to **Defendant Attorney DeNapoli**, in which they discussed "cancellation of hearing and issues concerning discharge of Marvin H. Siegel."

On **6/8/2011**, discussions between **Defendant Attorney Watson** and **Defendant Brian Nagle** took place regarding case status regarding In re Marvin H. Siegel.

On **6/9/2011**, **Defendant Attorney Watson** called **Defendant Attorney Garmil**.

On **6/10/2011**, **Defendant Attorney DeNapoli** called **Defendant Attorney Garmil** to discuss "status and strategy for discharge" of Father from **Defendant Whittier Pavilion**.

On **6/10/2011**, there was an in-person meeting at **Defendant Whittier Pavilion**, involving **Defendant Attorney Watson**, **Defendant Attorney Tarlow** and **Ryan Sherwell of Defendant Whittier Pavilion**; "discharge plans" for Father was discussed.

On **6/10/2011**, there was email correspondence between **Defendant Attorney Watson** and **Ryan Sherwell of Defendant Whittier Pavilion** that discussed "discharge plans".

On **6/13/2011**, there was discussion between **Defendant Attorney Watson** with **Defendant Attorney Garmil** involving "case facts and strategy".

x. **Court proceedings held on June 14, 2011**

1530.   The audio recordings of the court proceedings for **June 14, 2011** are provided in prior referenced Exhibit 23 and the transcript in Exhibit 24.  The scope of the court proceeding was a hearing for temporary guardianship and conservatorship.  The sole medical documentation submitted was a medical certificate submitted by **Defendant Attorney Garmil**, in his role as counsel for **Defendant Whittier Pavilion**.

1531.   The certifying doctor identified on the submitted medical certificate was Dr. Buculu, the psychiatrist who treated Father while involuntarily committed at **Defendant Whittier Pavilion**.

1532.   During the afore-described court proceeding of **June 14, 2011**, unsolicited, **Defendant Attorney Garmil** proffered to explain to **Judge Abber** why he had initiated a petition, in the Haverhill District Court, for a six-month involuntary commitment of Father to a psychiatric facility.  The discourse that took place concerning **Defendant Attorney Garmil's** above-described explanation, went as follows:

Attorney Garmil:   Thank you.  Your Honor, Mr. Siegel has now been a patient on the locked psychiatric unit at the Whittier Pavilion for several weeks.  We did file a petition for civil commitment, and the reason for that was because Mr. Siegel refused to sign himself into the hospital and we were, therefore,

posed with two options: file a petition or discharge him to the street.  We had a civil commitment hearing scheduled for last Tuesday.  On Monday, I got a call from Mr. Siegel's attorney; he has another attorney involved with him in the civil commitment.

Judge Abber:   That's Attorney Favaza?

Attorney Garmil:   Favaza.  He requested to have an independent medical evaluation done and continue the civil commitment case, which they have a right to do, Your Honor, so we never had a civil commitment hearing.  It is now scheduled for Wednesday, the 22nd.

However, I am not going to win that hearing if I have to go forward, and the reason is because, Your Honor, civil commitment is not a capacity issue.

Judge Abber:   Right.

Attorney Garmil:   It's a dangerousness issue, in essence.  There are other things that have to be proven, but it boils down to a dangerousness issue.

The doctor is of the opinion that with the appropriate services in place in the community, Mr. Siegel can go home.  Whether or not that means his daughter living in the home or not, there's no opinion- -

Judge Abber:   That's a separate issue.

Attorney Garmil:   And I'm trying to report to the Court, the doctor does not have an opinion of that issue.  But there must be twenty-four hour services, seven days a week, put in place.

But the point is that he's ready to discharge now.  If it was not for all of the strife going on at this time, I wouldn't be here; Mr. Siegel would no longer be a patient at Whittier Pavilion.

What's going to end up happening, your Honor, is that they can't safely discharge him.  They can't keep him.  His insurance company is going to stop paying, because it's not necessary for him to be there.  And if we are now just going to end up housing him because of the strife, he's going to end up having to pay privately.  I don't know what the daily charge is, but I would suggest that it is somewhere in the seven-to-nine-hundred-dollar-per day range, because this is a psychiatric hospital.

We need to get Mr. Siegel discharged safely.  We need the parties at hand – either we need the Court to appoint a guardian independent of everybody else so that they are free to make decisions that are solely in the best interest of Marvin Siegel or we need to negotiate something with everybody, because Mr.  – Your Honor, if you were to appoint a guardian now and if – it's not possible, but if we were able to put the services in before 4:00 this afternoon, he would be discharged at 4:00 this afternoon. . . .

He's almost being incarcerated against his will for no reason whatsoever, but what are we going to do?

1533.   Throughout that court proceeding of **June 14, 2011**, **Judge Abber** explicitly expressed that he was not going to appoint a guardian at this proceeding, even though the afore-described medical certification exceedingly expressed that Father lacked capacity.  Upset by Judge Abber's declaring that he was not going to appoint a guardian, **Defendant Attorney Garmil** initiated the below discourse with Judge Abber:

Attorney  Garmil:  And I would suggest then, we are not going to be able to discharge Mr. Siegel until June 22nd when the judge of the Haverhill District Court - *because my client is not going to take the liability of discharging him* - -

Judge Abber:   I understand - -

Attorney Garmil:  - - at this point.

Judge Abber:   I understand that fully.

Attorney Garmil:  Thank you.

| | |
|---|---|
| Judge Abber: | And that, with all due respect, as you sit here, counsel, or stand here before me, and you equated this to an incarceration as well, I understand what needs to occur before he can be released, but maybe that gives everybody some time, including, Mr. Siegel to arrange for those support services twenty-four hours and for this family to possibly get together to unify for those support services **so** that we're not back here, and back here very quickly. |

1534.   As demonstrated by the above discourse, **Defendant Attorney Garmil** made it clear to **Judge Abber** that, he—as private legal counsel for **Defendant Whittier Pavilion**—was not going to discharge Father based solely on the fact that a guardian was not going to be appointed.  Still, Judge Abber did not appoint a guardian at the proceeding held on **June 14, 2011**.

### At the court proceeding of June 14, 2011, Defendant Attorney DeNapoli knowingly and maliciously made false and overwhelmingly baseless allegations that Plaintiff Daughter Lisa was financially exploiting Father

1535.   During the court hearing of **June 14, 2011**, **Defendant Attorney DeNapoli** repeatedly made blanket baseless allegations that Plaintiff Daughter Lisa was financially exploiting Father.  Defendant Attorney DeNapoli made the allegations knowing full well that such statements were false.

1536.   As previously set forth, **Defendant Attorney DeNapoli** had ill-motives in making false allegations against Plaintiff Daughter Lisa—specifically, done so with the intent to oust Plaintiff Daughter Lisa as attorney-in-fact for Father and to preclude her from being appointed guardian and conservator because she was an obstacle in Defendants facilitation of financial exploitation of Father.

1537.   Further, **Defendant Attorney DeNapoli** used the false and baseless allegations against Plaintiff Daughter Lisa as a means to deflect attention away from his own illegal conduct (and that of the other designated Defendants)—specifically, their having used deceit and undue influence in obtaining Father's signature while in lockdown in a psychiatric facility, under a 3-day involuntary psychiatric commitment.

1538.   **Defendant Attorney DeNapoli** had access to Father's records from **Defendant BNY Mellon** _prior_ to **June 14, 2011**.  Of significance, Defendant Attorney DeNapoli did not proffer any information from Father's financial records to support any inference of exploitation.

1539.   The only information proffered by **Defendant Attorney DeNapoli**, on **June 14, 2011**, were broad, empty blanket hearsay statements— in the form of affidavits signed by **Defendant Daughter Sheryl** and Plaintiff Daughter Devora; affidavits that, as previously set forth, were personally drafted by Defendant Attorney DeNapoli.

1540.   The very short affidavit, signed by Plaintiff Daughter Devora, was exceptionally scant and over broad.  Of significance, Plaintiff Daughter Devora's affidavit *did not* corroborate the allegations made in Defendant Daughter Sheryl's five-page affidavit—the gist of Plaintiff Daughter Devora's affidavit was expressing the desire for a neutral person to be guardian.


### Defendant Attorney DeNapoli did not proffer any evidence from Defendant ESMV to support inference of exploitation by Plaintiff Daughter Lisa

1541.   Various counsel from **Defendant Law Firm TBHR** had discussions with **Defendant ESMV** *prior* to both above-described court proceedings of **June 7, 2011** and **June 14, 2011**.  The following statements were contained in the invoices filed by **Defendant Attorneys DeNapoli** and **Tarlow** with the **Essex Probate & Family Court**:

> On **6/2/2011, Defendant Attorney Watson** received "telephone call *from* Elder Protective Services".

> On **6/8/2011**, **Defendant Caseworker Springman** wrote: "PSW spoke with Atty Tarlow who informed PSW that the hearing on guardianship and conservatorship was moved to next Tuesday and that they were working on getting the elder set up with independent living and also that they were investigating any potential FE and that they were requesting bank statements going back 12 months as well."

> On **6/8/2011**, **Defendant Caseworker Springman** wrote: "Sheryl stated that during the court session [June 7, 2011] that she did not think that Lisa was the best choice for the elder's guardian"; that Sheryl confirmed that the doctor for Defendant Whittier Pavilion did not feel that Father needed to be in a facility; that Sheryl stated that since Whittier "changed their stance and will be dropping commitment [] and the elder could be discharged in a couple of days; that "Sheryl stated that she was working with Atty Tarlow to find the elder a suitable place to go. . . they were looking for an assisted living facility for the elder to go to and will see if he likes it."

1542.   **Judge Abber** had personal knowledge of Plaintiff Daughter Lisa's appellate experience and explains why he was concerned about the flimsiness of **Defendant Attorney DeNapoli's** allegations against Plaintiff Daughter Lisa; that the issuance of a fiduciary court appointment based on what was presented on **June 14, 2011**, might not pass muster under appellate review.  At the time of the proceeding held on **June 14, 2011**, Judge Abber knew that he had full ability and opportunity to hold subsequent and imminent court proceedings, and, therefore, did not appoint a guardian or conservator at the hearing of **June 14, 2011**.

1543.   It is evident that **Judge Abber** did not want to jeopardize the concerted ultimate objective of appointing a guardian and conservator, pursuant to SJC Rule 1:07— which could only occur by disqualifying Plaintiff Daughter Lisa as Father's nominated guardian and conservator.  Judge Abber *deliberately* chose to hold off on issuing any fiduciary court appointment, until he and the Defendants could make it look supposedly supported to oust Plaintiff Daughter Lisa as Father's nominated guardian and conservator.

1544.   On <u>four (4)</u> distinct and separate times, during the court proceeding of **June 14, 2011**, **Judge Abber** made declarations that the parties would, likely, "be back" in court very quickly.  It is evidenced that the above-described *repeated* statements made by Judge Abber—that "we" may be back in court very quickly—was his way of assuring the Defendants to not be concerned about his not having made the fiduciary court appointments at that time, *because* he would do so soon, just at another time.

1545.   As already set forth, **Judge Abber** had a prior history of demonstrated corruption in the matter of In re Esterina Milano, which bolsters the existence of his having ill-motives and the confidence in carrying out a scheme to obtain ill-gotten gain.

### xi.  Direct and overt action by Defendant Law Firm TBHR against expressed wishes of Father

1546.   The rules of ethical conduct promulgated by the Board of Bar Overseers mandate that counsel—representing the elder in this very situation of guardianship and conservatorship proceedings—owe a duty to the elder of taking reasonable, appropriate and necessary steps to take action <u>*in support* of the elder's wishes</u>.

1547.   Of significance, on **June 7, 2011**, **Defendant Attorney Tarlow** and **Defendant Attorney DeNapoli** filed affidavits and pleadings with the **Essex Probate & Family Court** that *emphatically <u>represented that Father was competent</u>*.

**Defendants sought to have Father placed into a long-term care facility, despite Father's expressed wishes not to leave his home in Boxford**

1548.  **Defendant Attorneys DeNapoli** and **Defendant Attorney Tarlow** explicitly represented in writing—by affidavit, on **June 7, 2011**, that they were aware of Father's wishes to remain in his own home; that Father, explicitly, *did not* want to go into an assisted care facility.

1549.  The previously discussed filed invoice by **Defendant Law Firm TBHR** contain the following statements that show Defendants' outright <u>disregard</u> for Father's expressed wishes—and overt adverse conduct:

> on **June 8, 2011**—the very next day, after the court proceeding before **Judge Abber**—**Defendant Attorneys DeNapoli** and **Tarlow** asked **Defendant Attorney Watson** to research assisted living, skilled settings and independent living options for placement of Father; and

> on **June 8, 2011**, **Defendant Attorney DeNapoli** had various conversations with **Defendant Attorneys Tarlow** and **Watson** "relative to status and strategy concerning finding a suitable location for Father."

**Designated Defendants sought court ordered guardian and conservator against Father's expressed desires**

1550.   As previously set forth, on **June 7, 2011, Defendant Attorney Tarlow** and **Defendant Attorney DeNapoli** filed affidavits and pleadings that <u>represented that Father was competent</u>*; and that Father <u>did</u> not need a guardian or conservator* and that Father *<u>did</u> not want* a guardian or conservator.

1551.   Contrary to Defendants' above-described written attestation, on **June 14, 2011, Defendant Attorney DeNapoli** explicitly requested, in open court, that Father needed a guardian and conservator "to protect him from being exploited by any member of his family"—to which **Judge Abber** responded to such statements by Defendant Attorney DeNapoli, stating that he was "surprised" that Defendant Attorney DeNapoli was agreeing that Father needed to have a guardian and conservator.  Judge Abber explicitly pointed out in-court that Defendant Attorney DeNapoli was going against his own client's intentions.

1552.   **Defendant Attorney DeNapoli** then further stated: "We have a suggestion for guardian.  *I know* that Mr. Siegel does not believe that he needs a guardian, but I think he needs someone to protect him from the exploitation."

**Father wanted Plaintiff Daughter Lisa and her family to permanently reside with him**

1553.   Father explicitly and unequivocally stated in court, on **June 14, 2011**, that he wanted **Plaintiff Daughter Lisa** and her family to live with him.

1554.   *After* Father had expressed such desire in court, **Defendant Attorney DeNapoli** outright asked **Judge Abber** to have Plaintiff Daughter Lisa and her family *removed* from Father's home and prohibited from living with Father. *Again*, Judge Abber expressly emphasized Defendant Attorney DeNapoli's overt contradiction of his own client.

**Father fired Defendant Law Firm TBHR**

1555.   As previously set forth, on **June 14, 2011**, **Judge Abber** expressly stated that he determined that Father did not need a guardian or conservator, and, in effect, ruled that he deemed Father competent.  Bolstering this fact are the electronic notes of **Defendant ESMV**.  (Refer to prior referenced Exhibit 23 for the court-recorded audio and Exhibit 24 for the transcript).

1556.   The notes recorded in the computer system of **Defendant ESMV**, on **June 21, 2011** and on **July 7, 2011** by **Defendant Caseworker Springman**, documented that **Defendant Attorney Berid** had stated that **Judge Abber**, at the hearing on **June 14, 2011**, had made a ruling that Father was competent.

1557.   Two (2) days after the afore-described hearing of **June 14, 2011**, Father re-affirmed, in writing on **June 16, 2011**, his **2003 DPOA** and Plaintiff Daughter Lisa's capacity as his attorney-in-fact and health care proxy.  The staff of **Defendant Whittier Pavilion** *directly* facilitated and witnessed Father's afore-described re-affirmation.

1558.   Despite the in-court representations made on **June 14, 2011** by **Defendant Attorney Garmil**—that Father would have to remain involuntarily committed at the **Defendant Whittier Pavilion** because of the lack of a guardian being court appointed, the very next day, Plaintiff Daughter Lisa was notified by Defendant Whittier Pavilion (for the first time) that Father was going to be discharged within less than 48 hours, and that a 24/7 home healthcare agency needed to be put in place.

1559.   Father was discharged by the treating psychiatrist (Dr. Buluchu) for **Defendant Whittier Pavilion** on **June 16, 2011**.

1560.   On **June 16, 2011**, Father, *personally*, spoke with **Defendant Attorney Tarlow** by telephone—which Defendant Attorney Tarlow attested to in submitted affidavits to the Essex Probate & Family Court; that Father had informed Defendant Attorney Tarlow that he did not want Defendant Attorney Tarlow representing him and anyone associated with the **Defendant Law Firm TBHR**; that Defendant Attorney Tarlow said "okay" and then hung up.  (Copy of Defendant Attorney Tarlow's Affidavit of June 20, 2011 is provided in **Exhibit 333**).

1561.   **Defendant Attorney Tarlow** acknowledged and affirmed Father's termination of their legal services, upon which, Defendant Attorney Tarlow facilitated Father's case file to be picked up.

1562.   In the affidavit of **Defendant Attorney Kazarosian**—which she filed with the **Essex Probate & Family Court** (on August 17, 2011)—she attested that Father was, in fact, competent to fire **Defendant Attorney Tarlow** and **Defendant firm TBHR**.

1563.   In addition, **Defendant Attorney Kazarosian** attested in her affidavit as to the validity of Father's expressed claim that he did not fully knowingly and voluntarily agree to retain the services of **Defendant Attorney Tarlow** and **Defendant Law Firm TBHR**—that Defendant Attorney Tarlow and Defendant Law Firm TBHR resorted to deception and undue influence in obtaining Father's signature.  (Refer to Defendant Attorney Kazarosian's affidavit in prior referenced Exhibit 22).

1564.   **Defendant Attorney Kazarosian** attested that she and her associate (Attorney Janet Dutcher) met with Father, alone, for two (2) hours.  Defendant Attorney Kazarosian described her meeting with Father as follows:

> Siegel [Father], although forgetful of my name and Dutcher's on occasion throughout the conversation, (always with apologies), was well aware of all of the circumstances and orientations as I have set forth above [in paragraph 3]. He was very clear that and wanted to make sure that I understood that he is a very loud and passionate person when he speaks, that he was a trial lawyer for 50 years and is used to having his own way, that he often says things in the vernacular when angry but does not mean them literally, and gave me specific examples, such as, "I may say, I am so mad I just want to kill someone, but that doesn't mean that I want to kill anyone. . . .

251

I discussed Attorney Edward Tarlow ("Tarlow") with him [Father], and his role in this matter.  He was very adamant that he did not want Tarlow representing him and was very distrustful and angry.  I specifically discussed Tarlow's Affidavit that suggested in part that he did not want Belanger and her family living with him, as well as other statements and feelings that Tarlow attributed to him. . . .

He also expressed anger at ESMV and was extremely adamant that he did not want them involved, does not want their intervention, and believes it to be intermeddling and an affront to his intelligence and capabilities."

I asked him if he wanted to be represented at the hearing on August 17, 2011 and he was adamant that he wanted representation.  He appropriately asked me if there was any reason that I could think of as to why I should not be the one to represent him, he asked about any limitations that I thought I may have with regard to an appearance on this matter, he asked me if I could be forceful in my representation to the court as to his desires and intentions, and asked me if I had any concerns that would give me pause as to my representation.  I was impressed by this inquiry.

Dutcher and I formulated the opinion that he was not under duress, that he knew that he was asking our office to represent him, and that he was doing so in an informed and reasoned manner.

## G.  Defendants' concerted efforts to manufacture incriminating evidence to oust Plaintiff Daughter Lisa as Father's attorney-in-fact and as nominated guardian

1565.   The statutory language of the MUPC rules provide the opportunity for a nominated guardian and conservator—designated by the elder in formal written instruments—to be ousted based on the mere allegation that the nominee has exploited the elder.  Disqualification <u>does</u> <u>not</u> hinge on the outcome of the investigation; just *the mere initiation of an investigation*, in and of itself, gives the judge the ability to disqualify that person nominated by the elder.

1566.   As a matter of routine practice, court officials oust nominees *without* any formal court hearing or determination of exploitation made by elder protective service agencies.  There is an established pattern of court officials using the MUPC rules to illicitly oust elders' explicitly nominated guardian and conservator.

### i. **Motive to fabricate allegations of financial exploitation against Plaintiff Daughter Lisa**

1567.   As set forth above and from the provided audio court recordings, **Judge Abber** outwardly expressed, during the court proceedings of **June 7, 2011** and **June 14, 2011**, that it was *not* a matter of whether he would be putting a court appointed guardian in place—it was just a matter of *how soon*.

1568.   Ill-intentions harbored by **Judge Abber** is, further, confirmed where **Defendant Caseworker Springman** wrote the following notes regarding what **Defendant Daughter Sheryl** told him the very next day following the hearing of **June 14, 2011**:

> the Judge ruled that [Lisa and Donald] could stay as the elder expressed that he was fine having them at home with him.  *Sheryl reported that the judge made the statement that he was sure he would see everyone back in his court soon.*

1569.   Bolstering the existence of a pre-determined mindset held by **Judge Abber** is **Defendant Attorney Berid's** having stated, in a subsequent motion filed with Essex Probate & Family Court, that, at the **June 14, 2011** hearing, Judge Abber "admonished the family [to] come up with a plan for their father's sake to care for him, because if they appear here again an independent person would be appointed the guardian/conservator."

1570.   As previously set forth, **Judge Abber** did not make any fiduciary court appointment on **June 14, 2011** because he knew that there were no facts presented to support such court appointments and did not want to risk a chance of appellate reversal. As Judge Abber *repeatedly expressed*, he would surely have *another* opportunity to make the court appointment of guardian and conservator.  Judge Abber held off on making such court appointments so that he and Defendants/opposing counsel would have an opportunity to create superficially sufficient circumstances—as previously established, Judge Abber has a prior pattern of such conduct; specifically, when he was co-guardian with **Defendant Attorney Feld** and **Defendant Attorney Cukier** in the afore-described matter of In re Esterina Milano.

1571.   **Defendant Attorney Berid** had more than one incentive to fabricate allegations against Plaintiff Daughter Lisa.  As previously set forth, in the role of General Counsel for **Defendant ESMV**, Defendant Attorney Berid had financial and non-financial gain to be had by Father becoming judicially deemed a ward of the State.

1572.   In addition, **Defendant Attorney Berid** had a personal incentive for knowingly and deliberately falsely accusing Plaintiff Daughter Lisa of financial exploitation of Father, where she has had a prior established partisan relationship with **Defendant Attorney Tarlow**—specifically, in the previously described matters regarding the North Street Irrevocable Trust, which, also, involved fraud and deception.

1573.   As previously set forth, in **<u>2001</u>**, **Defendant Attorney Berid** provided private legal services for Everett Cole, III, who was the subject of the previously described litigation of the North Street Irrevocable Trust.  Defendant Attorney Berid represented Everett Cole, III in his divorce, in which the marital property was part of the North Street Irrevocable Trust.  A protective order was sought against Defendant Attorney Berid regarding the sale of the marital property—**Defendant Attorney Tarlow** was involved because of his role as trustee regarding the marital property and his part in allowing foreclosure of the marital property.

1574.   Where Plaintiff Daughter Lisa had openly exposed **Defendant Attorney Tarlow's** fraudulent and deceptive solicitation of legal services for Father and Defendant Attorney Tarlow's fraudulent and deceptive execution of written instruments of **May 25, 2011**, **Defendant Attorney Berid** had a motive to protect Defendant Attorney Tarlow from incurring adverse consequences from his afore-described unlawful conduct.  As such, the designated Defendants used false allegations of exploitation against Plaintiff Daughter Lisa to take the focus of financial exploitation *away* from Defendant Attorney Tarlow.

## ii.   <u>Evidence of out-of-court communications between Judge Abber and Defendants</u>

1575.   Early on in the litigation of In re Marvin H. Siegel, it became evident that the Defendants had been filing pleadings without providing copies to Plaintiff Daughters and having covert ex-parte hearings.  As a result, Plaintiff Daughters began making frequent and periodic review of the court files for In re Marvin H. Siegel.

1576.   There was a substantial lapse of time between the trial and the respective issuance of the written findings by **Judge Abber** (which were issued on **October 22, 2012**).  Sometime during that period of time, Judge Abber had been illicitly given a complete <u>un-redacted</u> version of a 111-paged packet of investigation notes and several formal written reports of **Defendant ESMV**.  Plaintiffs were not given notice by the Defendants of their having given Judge Abber the afore-referenced un-redacted 111-paged packet of investigation notes and reports.

1577.   By happenstance, during one of Plaintiff Daughter Lisa's periodic review of the court files—given to her by the Clerk's Office, Plaintiff Daughter Lisa unexpectedly came across the afore-described un-redacted investigation notes and reports of **Defendant ESMV** (which nature of documentation, as a matter of standard practice and custom, is input and stored in the computer system of **Defendant ESMV**).

1578.   The afore-referenced unredacted investigation notes and written reports of **Defendant ESMV** were provided to **Judge Abber**, through ex-parte means and with <u>no</u> notice ever provided to Plaintiffs that such documents were submitted to the Essex Probate & Family Court.  In addition to the 118-paged packet of un-redacted investigation notes, the un-redacted written reports, consisted of:

> Intake report, dated **4/1/2011**;
>
> Hazardous Conditions, dated **4/1/2011** (original information input by Millie Torres on **4/1/2011** and subsequently updated by Diane Powell on **4/1/2011**);
>
> Initial Contact Assessment of **4/6/2011**;
>
> Initial Contact Assessment of **4/13/2011**
>
> Elder Interview (originated on **4/21/2011** "last updated" on **4/22/2011**);
>
> Functional Assessment (originated on **4/21/2011** and "last updated" on **4/22/2011**);
>
> PS Collateral Interview of Sheryl Sidman, dated **4/22/2011**
>
> Investigative Summary (originated on **5/13/2011** and "last updated" on **5/16/2011**)
>
> PS Collateral Interview of Kathleen Enos (originated on **4/25/2011** and "last updated" on **8/16/2011**);
>
> PS Collateral Interview of Devora Kaiser (originated on **5/11/2011** and "last updated" on **5/16/2011**);
>
> Collateral Interview of Lieutenant Ryder on **5/17/2011**;

Intake report of **7/22/2011**; and

Investigative Summary (originated on **8/2/11** and "last updated" on **8/25/2011**).

### iii.  Evidence of Defendants' intentional fraudulent and deceptive conduct with regard to Defendant ESMV investigation

1579.   As previously set forth, the involvement of **Defendant ESMV**, in the matter of In re Marvin H. Siegel, _was_ _not_ initiated based on any allegation of financial exploitation by anybody.

### Defendant ESMV's tainted investigatory conduct & collusion

1580.   Pursuant to 651 CMR 5.10, the stated overall purpose for **Defendant ESMV's** function of conducting investigations is the gathering of "*objective information*." The staff of Defendant ESMV intentionally did not seek objective information.

1581.   Throughout the investigation that was opened on **April 1, 2011**, staff of **Defendant ESMV**—individually and collectively—took information, and deliberately manipulated such information (through direct acts and acts of omission) to create a false impression of incrimination against Plaintiff Daughter Lisa.

1582.   On **April 5, 2011**, **Defendant Caseworker Springman** called Lt. Hazelwood, which Defendant Caseworker Springman documented his conversation in the computerized notes of **Defendant ESMV**.

1583.   **Defendant Caseworker Springman** stated in the notes that he input in the computer system of **Defendant ESMV**, on **April 5, 2011**, that Lt. Hazelwood reassured him that he "would be fine without police presence and suggested that he would be better without"; that the firearms had been removed from Father's home.

1584.   **Defendant Caseworker Springman** wrote in the afore-referenced notes of **April 5, 2011**:

LT [Hazelwood] stated that cost would not be an issue for this [home health service] and did not see that ESMV involvement would change the mind of the elder [Father].  Lt stated that elder is a brilliant man but also very eccentric. LT stated that the elder's capacity depended on the day.

256

1585.   On **April 6, 2011**, without advance notice, **Defendant Caseworker Springman** and another caseworker came to Father's home.  Father had been sleeping. Defendant Caseworker Springman input notes into the computer system of **Defendant ESMV** on **April 6, 2011**, stating that he and his co-worker had been greeted by Plaintiff Daughter Lisa; that Plaintiff Daughter Lisa had stated that she and her family had, in fact, moved in with Father to care for him.

1586.   **Defendant Caseworker Springman** wrote in the afore-referenced notes of **April 6, 2011**: "PSW [Defendant Caseworker Springman] that he would call back and make an appointment."

1587.   **Defendant Caseworker Springman**, also, filed a written report, on **April 6, 2011**, called an Initial Contact Assessment—which written reports are input into the computer system of **Defendant ESMV**, as well.  The report—for the investigation opened on **April 1, 2011**—designated the status of the investigation to be: "As Needed".

1588.   On **April 7, 2011**, **Defendant Supervisor Dailey** input notes into the computer system of **Defendant ESMV**, regarding the investigation concerning Father, and wrote: "Case reviewed; report of SN; Elder may have dementia or paranoia; Elder walks around with a gun."

1589.   The above quoted statement made by **Defendant Supervisor Dailey** that "Elder walks around with a gun" was false—Plaintiff Daughter Lisa made no statements, of any kind, that Father walked around home with a gun; nor did she make any statements where such a statement could be even inferred.

1590.   Where **Defendant Supervisor Dailey's** statement of "Report of SN" is followed by the quoted statement—"Elder walks around with a gun"—it is evidenced that Defendant Supervisor Dailey made such statement, *knowingly and deliberately*, so as to have a purported basis to support continued involvement by **Defendant ESMV**.

1591.   As previously set forth, the notes in the computer system of **Defendant ESMV, as of April 1, 2011**, recorded that the Boxford Police had *removed* Father's firearms from the residence—well in advance of **Defendant Supervisor Dailey's** notes made on **April 7, 2011**.  As evidenced, Defendant Supervisor Dailey knew, *at the time* he input the notes into the system, that the firearms *were no longer a concern*; and shows that Defendant Supervisor Dailey acted in a knowingly fraudulent and deceptive manner.

1592.   Egregiously, in the same note input by **Defendant Supervisor Daily** on **April 7, 2011**, right underneath the above quoted statement, it is written: "Guns have been removed.  Current LOR appears low as AV's [Father] needs are met."

1593.   Further overt acts of fraud and deception by **Defendant Supervisor Dailey** and other staff of **Defendant ESMV** are evidenced by the fact Father <u>had</u> <u>not</u>, yet, been interviewed by Defendant ESMV when Defendant Supervisor Dailey made a finding of "SN" on **<u>April 7, 2011</u>**.

1594.   On **<u>April 13, 2011</u>**, **Defendant Caseworker Springman** filed a written report called an Initial Contact Assessment; in which he stated that he went to Father's home; that Plaintiff Daughter Lisa and Father were not home.

1595.   In the afore-described packet of investigation notes and reports of **Defendant ESMV** that Defendants provided to **Judge Abber**—ex-parte—there were no notes regarding any attempted visit by **Defendant Caseworker Springman** to Father's home on **<u>April 13, 2011</u>**.

1596.   There is overt evidence of fabrication by **Defendant Caseworker Springman** when he input notes that he supposedly called Plaintiff Daughter Lisa and left a voice message to set up an appointment to come to the house.  The manner in which the above notation was made evidences that it was input for the specific purpose of deception—this notation by Defendant Caseworker Springman was put under the designated heading of **"4/11/2011"**, yet, before making the notations under that very heading, there is a recorded date stamp, stating **<u>"4/13/2011"</u>**; and, there is a date/time stamp immediately after the notation stating: **<u>"4/13/2011"</u>**.

1597.   Immediately following the above-described notation were notes for **<u>April 22, 2011</u>**; however, **Defendant Caseworker Springman** filed a written report, called Elder Interview on **<u>April 21, 2011</u>**—which the report states that it was updated on **<u>April 22, 2011</u>**.  He, also, filled out a written report, called Functional Assessment on **<u>April 21, 2011</u>**—which he updated that report, as well, on **<u>April 22, 2011</u>**.  As evidenced, there was continuous alterations in the notes of **Defendant ESMV**.

1598.   In the afore-described Elder Interview report of **<u>April 21, 2011</u>**, it is stated that a supposed interview was conducted with Father.  Of significance, prior notes of **Defendant ESMV** state that Plaintiff Daughter Lisa and her family had moved in with Father—the Elder Interview report *does not* state, one way or the other, whether Plaintiff Daughter Lisa was present during the supposed interview.

1599.   Other reports show much evidence that the supposed interview of Father, conducted by **Defendant Caseworker Springman** on **<u>April 22, 2011</u>**, was a complete fabrication.  The afore-described written reports—Elder Interview and Functional Assessment—were fabrications.

1600.   The following evidence bolsters the conclusion that the afore-referenced reports by **Defendant Caseworker Springman** contained fabrications:

> the lack of notes for the time period between **April 13, 2011 and April 22, 2011**;

> the lack of notes for **Defendant Caseworker Springman's** supposed  visit with Father on **April 13, 2011** is suspect where it is inconsistent with the manner of other notes that he had made regarding other visits with Father— evidencing that Defendant Caseworker Springman did not visit with Father on **April 13, 2011**;

> the notes and reports of **Defendant ESMV** show that no interviews or conferences took place by Defendant ESMV, *until*, supposedly, **April  22, 2011**—that is *after* **Defendant Supervisor Dailey** already made his supposed finding of "SN" on **April 7, 2011**.  April 22, 2011 is when Defendant Caseworker Springman filed a written report called PS Collateral Interview, in which he described his meeting with **Defendant Daughter Sheryl** having taken place on **April 22, 2011**;

> **Defendant Caseworker Springman** completed the afore-described written reports of his supposed interview with Father on **April 22, 2011**—the same day as having reported that he met with **Defendant Daughter Sheryl**;

> the afore-referenced meeting between **Defendant Caseworker Springman** and **Defendant Daughter Sheryl**, held on **April 22, 2011**, was *initiated by* Defendant Daughter Sheryl—not **Defendant ESMV**.  The afore-described report filed concerning his interview with Defendant Daughter Sheryl stated: "Collateral wanted to meet with PSW and express concerns about the elder"; and

> the description of quotes attributed to Father by **Defendant Caseworker Springman** in his report of Elder Interview, dated **April 21, 2011** *and* **April 22, 2011** are *identical* to the notes he input dated **May 10, 2011**.

1601.   **Defendant Caseworker Springman** stated in his written report, regarding his interview with **Defendant Daughter Sheryl** on **April 22, 2011**: "The information given provided no solid evidence regarding the dtr's [daughter] allegations."

1602.   On **April 25, 2011**, **Defendant Caseworker Springman** spoke with Father's former bookkeeper (Kathleen Enos) who quit, promptly, after Plaintiff Daughter Lisa and her family moved in with Father.  Defendant Caseworker Springman filed a written report, purportedly describing his contact with Kathleen Enos on **April 25, 2011**— the report states it was *commenced* on **April 25, 2011** and that it was "updated" by Defendant Caseworker Springman on **August 26, 2011**.

1603.   The afore-referenced report purportedly describing **Defendant Caseworker Springman's** interview of Kathleen Enos—with the report, documenting it was *updated* on **August 26, 2011**—states: "Information supports other collateral interview information and allegations.  There is still no solid evidence showing FE [financial exploitation]."

1604.   On **April 26, 2011**, **Defendant Supervisor Dailey** input into the notes of **Defendant ESMV** that "AV [Father] appears well cared for and his current needs are met."

1605.   **Defendant Supervisor Dailey**, also, stated in the afore-referenced notes of **April 26, 2011** that he met with and consulted **Defendant Attorney Berid**.

1606.   On **April 29, 2011**, **Defendant Supervisor Dailey** input into the notes of **Defendant ESMV** that, supposedly, a "new allegation of FE reported during investigation."  However, there is no intake report regarding the supposed new allegations of financial exploitation.

1607.   In the afore-described notes of **Defendant Supervisor Dailey** for **April 29, 2011**, he stated: that the investigation was "extended"; that "AV is wealthy with extensive assets to look into"; "Decision on SN will be pended as well."

1608.   Contrary to the mandated regulations of 651 CMR 5.10, the investigation that was opened on **April 1, 2011** by **Defendant ESMV** was not completed within the proscribed <u>30-day</u> calendar period.  Of significance, the staff of **Defendant ESMV** kept the designated investigation open for its own personal and financial incentives.

1609.   **Defendant Supervisor Dailey** documented in the notes of **Defendant ESMV**, on **May 11, 2011**, that he had the article in the file regarding **Defendant Daughter Sheryl's** previously discussed psychotic episode in **2003**  (car jacking and police chase); that he was informed of Defendant Daughter Sheryl having a history of mental illness.

1610.   Notes for **May 13, 2011**, input by **Defendant Supervisor Dailey** described the status of the investigation of **April 1, 2011** as: "Open SN [Self Neglect], pending FE." The Date/Time Stamp shows that the notes for **May 13, 2011** had been modified on **June 8, 2011**—which was _after_ Father had been involuntarily committed to **Defendant Whittier Pavilion**.

1611.   Of significance, the staff of **Defendant ESMV** (in particular: **Defendant Caseworker Springman**, **Defendant Attorney Berid** and **Defendant Diane Powell**) had been informed by **Defendant Whittier Pavilion** that it was planning to petition for long-term civil commitment.  Defendant ESMV did not notify Plaintiff Daughter Lisa about the petition for civil commitment.  As previously set forth, Plaintiff Daughter Lisa found out about **Defendant Whittier Pavilion's** afore-described civil petition for commitment only through happenstance.

1612.   On **May 20, 2011**, **Defendant Caseworker Springman** input notes into the computer system of **Defendant ESMV**, documenting: "SW [social worker] stated that the facility would likely go to court and have a civil commitment as the elder has not voluntarily signed himself in."  (Of significance, during the afore-discussed hearing of **June 14, 2011**, **Judge Abber** publicly expressed that Father's 2003 DPOA had been valid, as well as, Plaintiff Daughter Lisa's role as an attorney-in-fact for Father).

1613.   After the afore-described court proceeding held on **June 14, 2011** and later that day, **Defendant Daughter Sheryl** emailed **Defendant Attorneys Tarlow**, **DeNapoli** and **Watson** stating:

> What can Bill Austen [Father's CPA] do NOW to protect my father's money permanently? Can't his money be put into an irrevocable trust that is used only for my father's needs and then have the money divided equally among his three (3) children after he passes?  I don't care if that means my father can't make any financial gifts to me while he is alive.
>
> What are your thoughts?
>
> The clock is ticking and something needs to be done now.

1614.   The day after the afore-referenced court proceeding, on **June 15, 2011**, Plaintiff Daughter Lisa was unexpectedly notified by the treating psychiatrist, from **Defendant Whittier Pavilion**, that Father was going to be discharged within 48 hours, and that a 24/7 home healthcare agency needed to be put in place.

1615.   Further evidencing illicit motives by the Defendants is the fact that the staff of **Defendant Whittier Pavilion** and **Defendant Attorney Garmil** completely left Plaintiff Daughter Lisa in the dark about plans for Father being discharged—where as previously set forth, *during* the hearing on **June 14, 2011**, Defendant Attorney Garmil made explicit representations that Father was not going to be released from **Defendant Whittier Pavilion** until a court appointment of a guardian.

1616.   Unlike Plaintiff Daughter Lisa, **Defendant Daughter Sheryl** had known, *on or before* **June 8, 2011** that Father's discharge from **Defendant Whittier Pavilion** was imminent.  On **June 8, 2011**, **Defendant Caseworker Springman** had input notes into the computer system of **Defendant ESMV** stating that Defendant Daughter Sheryl had informed him that Defendant Whittier Pavilion had dropped the petition for civil commitment filed with the Haverhill District Court and that Father "could be discharged within a couple of days."  To re-iterate, Plaintiff Daughter Sheryl—and **Defendant law firm TBHR**—had that knowledge prior to the hearing of **June 14, 2011**.

1617.   On the morning of **June 16, 2011**, Plaintiff Daughter Lisa and Father's close friend, Steven Kapsalis, went to **Defendant Whittier Pavilion** to facilitate Father's discharge.  Prior to Father being discharged, the treating psychiatrist and various staff of **Defendant Whittier Pavilion** facilitated the notarization and execution of Father's written re-affirmation of his **2003 DPOA** and health care proxy. Father re-affirmed his desire and intentions that were in his 2003 DPOA.

1618.   On **June 16, 2011**, Father was discharged from **Defendant Whittier Pavilion** and returned to his home in Boxford, to reside with Plaintiff Daughter Lisa.

1619.   As previously set forth, on **June 16, 2011**, Father, personally, terminated the legal services of **Defendant Attorney Tarlow** and **Defendant Law Firm TBHR**.

1620.   In the notes of **Defendant ESMV** for **June 21, 2011**, it is recorded that **Defendant Caseworker Springman** had a conversation with **Defendant Daughter Sheryl**; upon which Defendant Caseworker Springman wrote that Defendant Daughter Sheryl had informed him that **Defendant Attorney Tarlow** was "working to file an emergency motion" regarding Father's terminating Defendant Attorney Tarlow's legal services.

1621.   As previously set forth as of **May 24, 2011**, **Defendant BNY Mellon** refused to honor Plaintiff Daughter Lisa's authority as Father's attorney-in-fact.  Where Father had spent _one month_ involuntarily committed at **Defendant Whittier Pavilion**, Plaintiff Daughter Lisa was unable to pay Father's household and personal bills that continuously mounted.  Consequently, when Father came home, he, personally, called representatives of **Defendant BNY Mellon**, and explicitly requested $50,000 be transferred to _his_ account with Citizen's Bank.

1622.   Specifically where Defendants made blatant allegations that Plaintiff Daughter Lisa was trying to financially exploit Father, she and Father purposefully hired an unrelated and professional person to do the bookkeeping for Father's financial affairs.

1623.   A little over $16,000 of the $50,000 transferred from **Defendant BNY Mellon** went to pay the balance due for legal services rendered by Attorney Long, as counsel for Plaintiff Daughter Lisa, specific to her capacity as attorney-in-fact for Father under the **2003 DPOA**—legal services which had been incurred only because of the previously discussed unlawful conduct of **Defendant Attorney Garmil**, on the behalf of **Defendant Whittier Pavilion** (in particular, Defendant Whittier Pavilion's filing of a petition for six-month civil commitment in Haverhill District Court on **May 24, 2011**).

1624.   Father, personally, wanted Attorney Long's invoice paid for the services she rendered.  The remaining transferred funds went towards Father's other backed-up bills and expenses.

1625.   Of significance, the GAL who was subsequently appointed by **Judge Abber** in **2013** confirmed in his report that Plaintiff Daughter Lisa _had_ _not_ engaged in _any_ financial misconduct or other wrongdoing.

1626.   Plaintiff Daughter Lisa had multiple discussions with Michael Janko of **Defendant BNY Mellon** regarding the previously described misconduct of **Defendant Brian Nagle**.  Michael Janko had deliberately misled Plaintiff Daughter Lisa to believe that he was removing Defendant Brian Nagle from Father's account because of the alleged misconduct—but, it was all a rouse.

1627.   In the notes of **Defendant ESMV** for **June 21, 2011**, **Defendant Caseworker Springman** wrote that he consulted with **Defendant Attorney Berid** to discuss "the new developments in the case."

1628.   After **Defendant Caseworker Springman's** consultation with **Defendant Attorney Berid**, he wrote:

> Atty Berid stated that due to the judge ruling the elder [Father] to still be competent that PSW [Michael Springman] *should go out and visit the elder **and start the investigation from the beginning***.  Atty Berid stated that PSW should see when the emergency hearing initiated by Atty Tarlow was and if it was in the next couple of days to wait until after this hearing to see elder.  If not until next week Atty Berid suggested going out to see the elder this week and to interview him about the allegations.

1629.   The notes of **Defendant ESMV** for **June 22, 2011** state that **Defendant Daughter Sheryl** called **Defendant Caseworker Springman** to inform him that **Defendant Attorney Tarlow** was not going to file for an emergency hearing, that, instead, he was filing a petition for instruction.  (Refer to prior referenced Exhibit 333).

1630.   The relief sought by **Defendant Attorney DeNapoli** and **Defendant Law Firm TBHR** in the afore-referenced petition for instruction was to have **Judge Abber** (for the Essex Probate & Family Court) prohibit Father from terminating their legal services.  The pleading was dated **June 22, 2011** (however, no hearing was held on this petition and no judgment issued).

1631.   On **June 27, 2011**, **Defendant Caseworker Springman** and PSW Cyr visited Father at his home.  In the electronic notes of **Defendant ESMV** for **June 27, 2011**, Defendant Caseworker Springman wrote the following description about his interaction with Father:

> Elder came into the room well dressed and groomed.  Elder was wearing a button up shirt untucked and a pair of khaki pants with slippers.  Elder was using a cane to ambulate.  PSW's introduced themselves and elder did not remember who PSW's were.  PSW explained the original reason that PSW came out to see him and that there had been a few subsequent visits.  Elder stated that he did not know PSW's and asked where PSW's were from.  PSW showed the elder his photo ID badge and explained ESMV.
>
> Elder stated: "I don't know who the hell called you guys.  I don't need anything.  This is my house and I have everything I need."  PSW stated that there was a point in time when the elder was looking for services and also that the elder had been through a lot lately and that they were out to check to see

that he had everything he needed.  Elder stated, "I do and I don't see why anyone called you guys.  I have everything I need and I am fine.  Leave me your card and I will have my daughter call you if I need anything."  Elder then followed the PSW's out and shut the garage door as PSW's just got out of the garage after saying goodbye.

1632.   After the above-described visit by **Defendant Caseworker Springman**, he consulted with **Defendant Attorney Berid.**  On **July 11, 2011**, Defendant Caseworker Springman input notes into the computer system of **Defendant ESMV** and described his discussion with Defendant Attorney Berid.  Defendant Caseworker Springman stated in his notes that Defendant Attorney Berid told him:

> *that since the Judge ruled the elder to be competent <u>that the case could not be pursued any further</u>*.  Atty Berid suggested consulting with PSS Dailey as to whether or not to attempt one more visit.

1633.   In **mid-July of 2011**, the hired bookkeeper for Father's finances informed Plaintiff Daughter Lisa and Father that an immediate transfer of $15,000 was needed to avoid Father's checking account from being overdrawn.  Therefore, immediately, Plaintiff Daughter Lisa *and* Father called **Defendant BNY Mellon** to transfer funds to Father's checking account—again, Father *personally* requested the transfer of funds.  **Defendant BNY Mellon** refused to make the transfer of funds.

1634.   **Defendant BNY Mellon** was explicitly informed by Plaintiff Daughter Lisa and Father that the transfer was necessary to prevent Father's checking account from being overdrawn; with such knowledge, Defendant BNY Mellon still refused to honor Father's request for a transfer of funds (and that of Plaintiff Daughter Lisa, in her capacity as attorney-in-fact).

1635.   On **July 15, 2011**, there was email correspondence between **Defendant Attorney Watson** and **Defendant Attorney Studen** of **Defendant BNY Mellon**, which Defendant Watson provided the following description of the subject matter: "re: fund transfer request by L. Belanger, case status with Marvin Siegel and forwarding petition for information and hearing transcript."

1636.   Also, on **July 15, 2011**, there were telephone calls between **Defendant Attorney DeNapoli** and **Defendant Attorney Studen**, which discussion Defendant Attorney DeNapoli described as: "case status and BNY Mellon's current involvement in case."

1637.   Plaintiff Daughter Lisa made repeated attempts to resolve this above-described matter with **Defendant BNY Mellon**---with Plaintiff Daughter Lisa having reiterated that Father had been judicially adjudged to be competent at the proceeding held on **June 14, 2011**.  (Such judicial adjudication was acknowledged by **Defendant Attorney Berid** and documented in the notes of **Defendant ESMV**).  Plaintiff Daughter Lisa repeatedly and explicitly asserted her legal authority as attorney-in-fact pursuant to Father's **2003 DPOA**.

1638.   In addition, Father, personally, spoke with various respresentatives of **Defendant BNY Mellon** about his being very upset and distraught that Defendant BNY Mellon was denying him access to his own money; and that he would take action against Defendant BNY Mellon.

1639.   As evidenced by **Defendant Burns & Levinson's** filed invoice with the **Essex Probate & Family Court** in the matter of In re Marvin H. Siegel, **Defendant Attorney Studen** consulted with senior counsel, **Brian Bixby, Esq**. of **Defendant Burns & Levinson** on **July 16, 2011**, regarding how to deal with the requests made by Plaintiff Daughter in her capacity as attorney-in-fact pursuant to Father's **2003 DPOA.**  (Copy of **July 31, 2011** invoice is provided in **Exhibit 334**).

1640.   On **July 18, 2011**, Michael Janko informed Plaintiff Daughter Lisa that he had been instructed that he was prohibited from speaking with her and directed her to speak with counsel for **Defendant BNY Mellon** (**Defendant Attorney Laura Studen** of **Defendant Burns & Levinson**).

1641.   Accordingly, Plaintiff Daughter Lisa called **Defendant Attorney Studen** to discuss the afore-described events, upon which Defendant Attorney Studen refused to rectify the situation.

1642.   As a result of the above-described conduct by **Defendant BNY Mellon**, shortly thereafter, Father—*personally*—went to **Century Bank** in Medford, MA for *consultation* about transferring his accounts from **Defendant BNY Mellon** to Century Bank.  Father was accompanied by the on-duty home health aide of **Defendant Right At Home**, along with Steven Kapsalis and Plaintiff Daughter Lisa.

1643.   Father, on his own, chose Century Bank to consult with because he had, personally, known for over forty (40) years, then President, Marshall Sloan—Father had known Marshall Sloan because they both belonged to the Cambridge YMCA.

1644.   As evidenced by **Defendant Burns & Levinson's** afore-described invoice, on **July 18, 2011**, **Defendant Attorney Studen** and **Defendant Attorney Cukier** began illicitly scheming to harm the legal interests of Plaintiff Daughter Lisa.  **Defendant Attorney Cukier** stated that she, **Defendant Attorney Studen** and **Attorney Bixby** had been communicating by email to develop a "strategy" for "protection of Mr. Siegel's assets at BNY Mellon".  (See prior referenced Exhibit 334).

1645.   On that same day (**July 18, 2011**), **Defendant Attorney Cukier** stated that she had an *"emergency telephone conference"* with **Defendant Attorney Tarlow** of **Defendant Firm TBHR**. "re Marvin Siegel".

1646.   **Defendant Attorney Cukier** described further "strategy" conferences and emails with **Defendant Attorney Studen** and other specified representatives of **Defendant Burns & Levinson** that took place on: **July 19, 2011**, **July 20, 2011**, **July 21, 2011** and **July 22, 2011**.

1647.   **Defendant Attorney Studen** indicated in the afore-described invoice that she had spoken to **Defendant Daughter Sheryl** on **July 22, 2011**.  **Defendant Daughter Sheryl**, also, directly emailed **Defendant Attorney Studen** that same day providing her home telephone number, cell number, home address—as well as her husband's cell number and email.

1648.   **Defendant Attorney Tarlow**, also, spoke with **Defendant Daughter Sheryl** on **July 22, 2011**; stating to Defendant Daughter Sheryl that Plaintiff Daughter Lisa was attempting to transfer all of Father's funds out of **Defendant BNY Mellon**.  Upon which, Defendant Daughter Sheryl called Father to relay what she had been told by Defendant Attorney Tarlow and **Defendant Attorney Studen**.

1649.   During the above-described conversation between **Defendant Daughter Sheryl** and Father, there were others present with Father and who had heard the conversation first-hand because the volume on Father's cell phone was set to the loudest volume due to his hearing loss.  Defendant Daughter Sheryl could be heard telling Father that he needed to call **Defendant Brian Nagle** because he would be able to confirm what she said.

1650.   As **Defendant Daughter Sheryl** had directed, Father called **Defendant Brian Nagle**.  Defendant Brian Nagle arranged with Father to call Defendant Brian Nagle back for the *specific* purpose of recording their discussion.

267

1651.   Defendants had made their own informal transcription of the afore-referenced recorded call—**Defendant ESMV** submitted such transcription to the Essex Probate & Family Court.  (Copy of the uncertified transcription that Defendant ESMV filed with Essex Probate & Family Court is provided in **Exhibit 335**).

1652.   The afore-referenced transcription evidences there had been a *prior* conversation that had taken place between **Defendant Brian Nagle** and Father—not disclosed by Defendants.  As contained in the filed transcription it shows that **Defendant Brian Nagle** stated: "As I said to you <u>before</u> we are not going to make any transfers without talking to you. . . ."

1653.   As demonstrated, the recorded call of <u>**July 22, 2011**</u> was not a spontaneous call made by Father.  Further evidencing the recorded call was pre-orchestrated by **Defendant Brian Nagle** and the other designated Defendants is the information contained in **Defendant ESMV's Intake Report** of **July 22, 2011**.  That report stated that **Defendant Daughter Sheryl**, earlier that day, had been informed by counsel, from **Defendant Firm TBHR**, that Plaintiff Daughter Lisa was trying to transfer $6 million—all of Father's money from the accounts with **Defendant BNY Mellon Bank**; that as a result, Defendant Daughter Sheryl had called Father "to find out if he was aware of what was going on and the elder stated he was not aware"; that Father had told Defendant Daughter Sheryl that he was going to call Mellon Bank.

1654.   Of significance, **Defendant Attorney Tarlow** and his associates called **Defendant Daughter Sheryl** making the above-described allegations, <u>but did not call Father—*their own client.*</u>

1655.   In fact, **Defendant Brian Nagle** tried to trick Father into stating that it was Plaintiff Daughter Lisa as to who was trying to steal his money.  Defendant Brian Nagle, blatantly and flagrantly, attempted to, literally, put the words in Father's mouth that Plaintiff Daughter Lisa was trying to steal his money.

1656.   Following is the portion of the afore-described transcript—the dialogue between Father and Defendant Brian Nagle—where Defendant Brian Nagle, overtly attempted to do so:

| | |
|---|---|
| Father: | . . . . I'm ashamed to have to say it but all that is happening as I can see is that (inaudible) is trying to steal money from me |
| Brian Nagle: | Who is |

| | |
|---|---|
| Father: | I know you, I know you don't want to be a co-conspirator to it |
| Brian Nagle: | Nah I |
| Father: | So that's why we're having this conversation |
| Brian Nagle: | I'm sorry who. . .who did you say I didn't hear is it Lisa |
| Marvin: | I said my children I didn't start naming them individually |
| Brian Nagle: | ok, ok |
| Marvin: | I don't care which one or all of them |

(**Defendants** transcribed the call, in such a manner, as to leave out punctuation).

1657.   The Defendants' self-transcription of the call shows that Father did not indicate anyone, in particular, as to who was trying to steal his money.  Repeatedly, Father, only, spoke in terms of "his family" trying to steal his money.

1658.   The Defendants' transcription of the call, also, shows that Father was cognizant of **Defendant Brian Nagle** trying to get Father to say that it was Plaintiff Daughter Lisa who was trying to steal from him.

1659.   After **Defendant Daughter Sheryl** ended her afore-described call with Father, she then called Plaintiff Daughter Devora to relay what she had been told by counsel from **Defendant Law Firm TBHR** regarding a supposed transfer of all of Father's money.  **Defendant Daughter Sheryl** had been incessant in hounding Plaintiff Daughter Devora to call **Defendant Caseworker Springman** to make a formal report; as Defendant Daughter Sheryl kept insisting, over and over, that *she* could not be the one to make *another* report to **Defendant ESMV** because she had done so before and they did not do anything.

1660.   Plaintiff Daughter Devora told **Defendant Daughter Sheryl** that she *did not* want to make the call because she was 3,000 miles away and did not have first-hand knowledge as to what was going on.  Plaintiff Daughter Devora could not handle Defendant Daughter Sheryl's non-stop begging and gave-in; as attested, in court, Plaintiff Daughter Devora had just moved from California to South Carolina and had been going through a very difficult period, causing her to be overwhelmed.  Consequently, Defendant Daughter Sheryl pressured Plaintiff Daughter Devora to call **Defendant ESMV** in her stead to relay what she had been told by **Defendant Attorney Tarlow** and his associates.

1661.   As evidenced by the notes and formal reports of **Defendant ESMV**, it was readily apparent that **Defendant Caseworker Springman** did not take stock in **Defendant Daughter Sheryl**'s credibility—Defendant ESMV knew about Defendant Daughter Sheryl's high-profile psychotic episode in **2003**.

1662.   Plaintiff Daughter Devora called **Defendant Caseworker Springman**, on that same afternoon (**July 22, 2011**), and relayed the above-described information— Plaintiff Daughter Devora had relied, entirely, on **Defendant Daughter Sheryl's** representations made to her as to the supposed on-goings.

1663.   The notes input into **Defendant ESMV's** computer system, on <u>**July 22, 2011**</u>, were input by **Defendant Supervisor Dailey**, and were labeled as "screening".  The caption designated "Description" was followed by the statement: "New FE report filed on this date."

1664.   **Defendant Daughter Sheryl,** also, emailed **Defendant Attorney Tarlow** and his associates, and stated the following:

> Dear Ed, Al and Cathy,
>
> There is finally some news to update you with.  As you know, I have been communicating with Atty. Robert Ledoux for a few weeks now.  I had been hoping to have an emergency meeting with the Judge at Salem Probate Court to let the Judge know that Lisa had changed my father's durable power of attorney to her and Steven Kapsalis and that she had fired you, his attorneys, but I couldn't persuade Bob to do that.  Meanwhile, the certificate from Whittier Pavilion is no longer in effect.
>
> Today, after learning that Lisa is trying to transfer all of my father's money out of Mellon Bank I attempted one more time to let Bob know that I need his help. I understand that after I spoke with him today, he spoke with your firm and he spoke with Atty. Laura Studen who is affiliated with Mellon Bank. . . .
>
> One other thing that happened today is that Devora called and spoke to Mike Stringman [Springman] of Elder Services.  She told him what Lisa is trying to do with my father's money and he had her speak with some type of "Crisis" department at Elder Services.  They took information from Devora and discussed going to see my father.

> I guess that's all for now.  Please note that I am at Martha's Vineyard I will have my cell phone with me [] and I will take a laptop with me so that I can communicate by email also.
>
> Thanks for keeping me updated.
>
> Best regards, Sheryl.

1665.   **Defendant Daughter Sheryl**—knowing that Plaintiff Daughter Devora did not have the financial resources to hire her own individual attorney—deliberately wanted Plaintiff Daughter Devora to be beholden to her.  In an email that Defendant Daughter Sheryl wrote to **Defendant Attorney Ledoux**, she stated:

> I understand that you will be filing an appearance on my behalf at Salem Probate Court first thing on Monday morning.  Can you also file an appearance for my sister Devora Kaiser.  *I will be paying the full bill for your services, but I would like you to represent both of us*.

1666.   **Defendant Attorney Ledoux** did not, in any manner, explain to Plaintiff Daughter Devora about potential conflicts that could arise in his representing both she and **Defendant Daughter Sheryl**.

1667.   By **December of 2011**, an actual conflict of interest did arise in **Defendant Attorney Ledoux's** simultaneous representation of Plaintiff Daughter Devora and **Defendant Daughter Sheryl**.  With Plaintiff Daughter Devora living out-of-state, Defendant Daughter Sheryl deliberately did not keep Plaintiff Daughter Devora fully informed about the goings-on in the matter of In re Marvin H. Siegel—and, as a general practice, Defendant Attorney Ledoux did not contact Plaintiff Daughter Devora, individually, to keep her up-to-date.  As evidenced by Defendant Attorney Ledoux's invoices—filed with the Essex Probate and Family Court, virtually, all of his communications were with Defendant Daughter Sheryl.

1668.   As evidenced in the affidavits of Plaintiff Daughter Devora and Defendant Daughter Sheryl, submitted to the Essex Probate & Family Court for the court proceeding of **June 7, 2011**, there is a substantially marked difference of content and tone between these two affidavits.  Defendant Daughter Sheryl's affidavit was overwhelmingly tailored as a direct and vindictive personal attack against Plaintiff Daughter Lisa; as opposed to Plaintiff Daughter Devora's affidavit that was broad and general, with the only expressed concern of having neutrality and fairness.

1669.   On **December 9, 2011**, **Defendant Attorney Ledoux** joined in **Defendant Attorney Cuffe's** motion for a court order to force Plaintiff Daughter Lisa and her family out of their permanent home with Father.  Plaintiff Daughter Devora *had not been informed* that the afore-described motion had been filed, let alone the drafting of the motion.  **Defendant Daughter Sheryl** did not inform Plaintiff Daughter Devora about the motion, and neither did Defendant Attorney Ledoux.

1670.   Despite tense relations, during the above-referenced time period, between Plaintiff Daughter Devora and Plaintiff Daughter Lisa, Plaintiff Daughter Lisa believed that Plaintiff Daughter Devora *would not have wanted—let alone agree—* to have Plaintiff Daughter Lisa (and her family) removed from Father's house.  Therefore, on **December 10, 2011**, Plaintiff Daughter Lisa called Plaintiff Daughter Devora to find out if she had actually authorized **Defendant Attorney Ledoux** to take such action.

1671.   The afore-referenced telephone conversation between Plaintiff Daughters on **December 10, 2011** was the first time that Plaintiff Daughter Devora had learned about a motion seeking to remove Plaintiff Daughter Lisa and her family from Father's house.  Plaintiff Daughter Devora confirmed that she did not want **Defendant Attorney Ledoux** to agree to the removal of Plaintiff Daughter Lisa and her family.

1672.   Plaintiff Daughter Devora emailed **Defendant Attorney Ledoux** on **December 11, 2011**—copy of email is provided in **Exhibit 337**, which stated:

> Dear Bob:
>
> I learned on Saturday, December 10 that there is an emergency hearing scheduled for 9:00 A.M. on Monday, December 12, 2011, in Salem Probate and Family Court to have the Belanger family vacate the residence of my dad, Marvin H. Siegel, of 15 Arrowhead Farm Road, Boxford, MA.
>
> *As I stated early on*, my wishes were not to have the Belanger family removed from my dad's residence because my primary concern, which still remains the same, is for my niece and nephew, Hana and Ethan Belanger.
>
> My intention remains the same that appropriate arrangements can be made so that my sister, Sheryl and I can visit my dad at his home as desired.
>
> Thanking you ahead of time for passing on this information tomorrow morning to all of the necessary parties: Brian Cuffe, James Feld, Maxa Berid, Marsha Kazarosian and Lisa's Attorney.

1673.   A few weeks after the above-described email sent by Plaintiff Daughter Devora to **Defendant Attorney Ledoux**, she informed Defendant Daughter Sheryl that she (Plaintiff Daughter Devora) no longer wanted Defendant Attorney Ledoux to act as legal counsel for her—which Plaintiff Daughter Devora explicitly confirmed with Defendant Attorney Ledoux, by email on **January 15, 2012**.

1674.   In the afore-referenced email of **January 15, 2012**, Plaintiff Daughter Devora stated:

> This is to confirm that you understand that I do not wish you to represent me because I am no longer in complete agreement with my sister Sheryl as to the whole situation regarding my dad.

1675.   Plaintiff Daughter Devora stated that she wanted to represent her own legal interests.

1676.   On **January 19, 2012**, **Defendant Daughter Sheryl** emailed Plaintiff Daughter Devora stating that she would no longer be speaking with Plaintiff Daughter Devora.

### Defendant Caseworker Springman manipulated the records of Defendant ESMV to make it appear as though he did not speak with Plaintiff Defendant Devora

1677.   Evidencing the fact that Plaintiff Daughter Devora spoke with **Defendant Caseworker Springman** is **Defendant Daughter Sheryl's** confirming statements in the afore-described email to the Defendants.

1678.   After Plaintiff Daughter Devora had already relayed the above-described information to **Defendant Caseworker Springman** during their conservation on **July 22, 2011**, he told Plaintiff Daughter Devora that she needed to call the hot-line number and provide the information again.

1679.   Pursuant to 651 CMR 5.07, a report of elder abuse does not require that it be made *only* through the Elder Abuse Hotline—the regulation states that non-mandated reporters can make reports to "the Elder Abuse Hotline, a Protective Services Agency, *or* the Department."

1680.   It is suspect that there are *no* notes input into **Defendant ESMV's** computer system by **Defendant Caseworker Springman**.  Notes input into the computer system of **Defendant ESMV** for **July 22, 2011** simply reference that a formal report was made to the hot-line.

1681.   It is suspect that the investigation that **Defendant ESMV** opened on **April 1, 2011**, specifically pertaining to Father *extended* up and through **July 13, 2011**—with **Defendant Caseworker Springman** as the primary investigator; yet, the **Intake Report of July 22, 2011** designated that the case was "screened" by **Defendant Supervisor Dailey**—and with the subsequent investigations primarily conducted by Defendant Caseworker Springman.

1682.   When **Defendant Caseworker Springman** was explicitly asked, at trial, about his conversation with Plaintiff Daughter Devora on **July 22, 2011**, he *did not*, in any manner, deny that he spoke with Plaintiff Daughter Devora on **July 22, 2011**—he only testified that he had no recollection of the conversation; whereas Plaintiff Daughter Devora testified at trial, she, in fact, did have such conversation as described above, along with other corrobative evidence.

1683.   **Defendant Caseworker Springman** directed Plaintiff Daughter Devora to call the hot-line as a means to deceptively create an appearance as though Plaintiff Daughter Devora had originally called the hot-line on her own initiative—evidently intending to make the reporting appear to have been an emergency.

### Suspect conduct of Defendants by refraining from filing a report with Defendant ESMV concerning the events of July 22, 2011

1684.   If statements by the designated Defendants made to **Defendant ESMV**—on and after **July 22, 2011**—were done so in good faith, the designated Defendants' professional roles would have compelled their making a formal report to the District Attorney's Office and/or to **Defendant ESMV**.

1685.   If statements made by the designated Defendants to **Defendant ESMV**—on and after **July 22, 2011**—were done so in good faith, the designated Defendants' had *no* legitimate reason for not contacting the District Attorney's Office and **Defendant ESMV**.

1686.   As set forth above, the designated Defendants failure to make a formal report to **Defendant ESMV** evidences that they, knowingly and deliberately, made false allegations against Plaintiff Daughter Lisa.

1687.   **Defendant Caseworker Springman's** notes, input into the computer system of **Defendant ESMV**, demonstrate that **Defendant Attorney Studen** *did not* initiate contact with Defendant ESMV regarding the supposed afore-described events of **July 22, 2011**.

1688.   **Defendant Caseworker Springman's** notes, input into the computer system of **Defendant ESMV,** demonstrate that **Defendant BNY Mellon** *did not* initiate contact with Defendant ESMV regarding the supposed afore-described events of **July 22, 2011**.

1689.   **Defendant Caseworker Springman** stated in the notes he input on **July 26, 2011**:

PSW [Michael Springman] spoke with the elder's account manager at Mellon Bank, Brian Nagle.  Mr. Nagle stated that he was bound by confidentiality not to speak about any matters around the account but Mr. Nagle gave PSW the contact information for the Mellon Bank atty Laura Studen.

1690.   **Defendant Caseworker Springman** re-affirmed, during his testimony at trial, that **Defendant BNY Mellon** *did not initiate* contact with **Defendant ESMV**.

1691.   The **Intake Report for July 22, 2011** states that the official reporter, initiating new allegations of financial exploitation was, solely, based on the call made by Plaintiff Daughter Devora—not **Defendant Brian Nagle**, not **Defendant Attorney Studen**, and not **Defendant Attorney Tarlow**.

1692.   **Defendant Attorney Tarlow, Defendant Attorney Studen** and **Defendant Brian Nagle** knew that the allegations—claiming Plaintiff Daughter Lisa attempted to transfer Father's accounts held with **Defendant BNY Mellon**, for her own use and without Father's knowledge—was a complete fabrication.  In fact, the designated Defendants, all, knew that Father had *personally* sought the transfer of $50,000 to his checking account with Citizen's Bank, during the time in question; and that Father, *personally*, went to Century Bank and discussed the transferring of his account from **Defendant BNY Mellon**.

1693.   As evidenced, designated Defendants knew that Plaintiff Daughter Lisa never attempted to convert Father's accounts for her own use; Defendants knew that Father—*personally*—sought access to his own money and was precluded from doing so by his own financial institution.  The very reason that Defendants did not make a formal report with **Defendant ESMV** was because of their above-described knowledge; they felt it was too risky in this particular situation to file a fraudulent report of financial exploitation with **Defendant ESMV**.

1694.   As previously set forth, **Defendant Attorney Kazarosian** filed a written attestation (**on August 17, 2011**), with the Essex Probate & Family Court, stating that Father had expressly conveyed to her that he was furious and outraged with **Defendant BNY Mellon**.  (Refer to the previously discussed affidavit of Defendant Attorney Kazarosian in Exhibit 22).

1695.   As previously set forth, prior to **July of 2011**, the designated Defendants already had an existing alliance with **Defendant Daughter Sheryl** and Plaintiff Daughter Devora—Defendant Daughter Sheryl and Plaintiff Daughter Devora had signed affidavits, that had been drafted by **Defendant Attorney DeNapoli** for the sole purpose of opposing Plaintiff Daughter Lisa's seeking relief in the **Essex Probate & Family Court**.

1696.   The attestations of the afore-referenced affidavits of **Defendant Daughter Sheryl** and Plaintiff Daughter Devora, wholly, consisted of empty blanket allegations— the affidavits did not show any evidence to support an inference of exploitation, not even a scintilla.

1697.   As previously set forth, the afore-discussed investigative notes and reports of **Defendant ESMV**—from **April 1, 2011** up until **July 22, 2011** (approximately 35 pages)—show that **Defendant Caseworker Springman** *explicitly*, and *repeatedly*, confirmed that *there was no credible evidence to support an inference that Plaintiff Daughter Lisa had been exploiting Father*—even at the very lowest standard of proof: "reasonable cause".

1698.   Designated Defendants wanted the records of **Defendant ESMV** to reflect that **Defendant Daughter Sheryl** and Plaintiff Daughter Devora were the parties directly responsible for making a report of "new" allegations to **Defendant ESMV—and** *not* the designated Defendants**.**  For lack of better wording, the designated Defendants saw and seized the opportunity to have somebody else "do their dirty work"—the motive being to minimize the risk of exposing their illegal conduct.

1699.   It is documented in the **Intake Report for 7/22/2011** that Plaintiff Daughter Devora stated that the sole reason for her calling **Defendant ESMV** on **July 22, 2011** was because of the telephone call that she received from **Defendant Daughter Sheryl**.

1700.   The **Intake Report of July 22, 2011** listed Plaintiff Daughter Devora as being the only person as "Reporter" and **Defendant Daughter Sheryl** was listed under the section called "other Participant"; however, **Defendant ESMV** did not speak with Defendant Daughter Sheryl for purpose of the Intake Report of July 22, 2011.  It is suspect that Defendant ESMV did not, also, list counsel from **Defendant Law Firm TBHR** and **Defendant Attorney Studen** (counsel for **Defendant BNY Mellon**) as "other Participants".

### Evidence of fraudulent acts after July 22, 2011

1701.   **Defendant Caseworker Springman** spoke with **Defendant Attorney Studen** and recorded the details of the conversation in the notes for __**July 26, 2011**__, which stated:

> Atty Studen stated that there was a demand for the total $6 million of his [Father's] retirement account to be moved to a Citizen's bank account in Boxford.  Atty Studen stated that this was requested by Lisa Belanger who stated that she was the elder's power of atty.  Due to the recent history that the elder's account manager Brian Nagle was aware of Mellon then put a freeze on the account and informed Lisa Belanger that a court would have to order any money to be moved at this point.  Atty Studen stated that after the transfer of funds was denied Lisa Belanger had called Mellon Bank quite upset and threatened a lawsuit against them.  Atty Studen stated that this has yet to occur and that after a week's time had passed Lisa Belanger had called up the bank again.  This time when Lisa had called she stated that she was frustrated with the bank also stated that she had sent a letter explaining why the bank should transfer the money.  Attorney Studen also stated that the elder had called and left a VM at Mellon Bank stating that he was removing all power of atty's and that everyone was trying to steal his money.

1702.   Showing intended deception, it is not reported to _whom_ the supposed "demand" was made; **Defendant Attorney Studen** _does not_ state _when_ the supposed "demand" occurred; and the referenced voice mail supposedly left by Father was never provided as evidence.

1703.   On **July 26, 2011**, **Defendant Caseworker Springman** and another caseworker went to Father's home.  Plaintiff Daughter Lisa was not home at the time.

1704.   In the notes of **Defendant ESMV** regarding the afore-described visit on __**July 26, 2011**__, **Defendant Caseworker Springman** explicitly stated that _he_, _first_, "informed Elder [Father] of the allegations in the report."

1705.   **Defendant Caseworker Springman** further documented in the notes of **Defendant ESMV**, regarding the above-described visit that:

> PSW [Defendant Springman] asked Elder if he was aware of the attempt to move his money.  Elder stated that he was but was unsure of who it was.  Elder stated, 'Who do you know it to be, because when I find out they are going to jail?'  <u>PSW stated that it was reported to be his dtr Lisa and that she contacted Mellon Bank to have the $6 million moved.</u>  Elder asked how much of his money was stolen and how much was still at risk.  PSW stated that to his knowledge the Elder's assets were secure and that Mellon had frozen them.  Elder stated that this was good and asked again who had tried to move the money.  PSW told elder again that it was reported to be his daughter Lisa.  Elder again produced the account summary and handed it to PSW's again asking if they had seen this and was this what the report was about.  PSW stated that it was. . . .

> Elder asked 7 times about whether or not his money was safe and asked 7 times as to which one of his daughters had been the one 'to look out for'.  PSW explained the report each time and that PSW was told that the elder's assets were frozen until notice from the court.  PSW was then asked about what he [Father] would do if he had no money to get basic needs.  PSW stated that the elder could call PSW if that occurred and that he would help.

1706.   On **July 28, 2011**, **Defendant Supervisor Dailey** called Plaintiff Daughter Lisa and began questioning her about Father's finances.  As stated in the notes input by Defendant Supervisor Dailey, he had explicitly stated that Plaintiff Daughter Lisa "was cooperative" and had answered his questions.

1707.   Regarding the above-described conversation, **Defendant Supervisor Dailey** recorded, in the notes of **July 28, 2011**, that Plaintiff Daughter Lisa had expounded on the manner in which, for weeks, **Defendant BNY Mellon** had been unlawfully and unjustifiably denying Father access to all funds, as well as, Plaintiff Daughter Lisa, as Father's attorney-in-fact; that Plaintiff Daughter Lisa had, specifically, explained that she was finishing up the drafting of a 93A Demand letter (consumer fraud procedural letter) that she was going to be serving Defendant BNY Mellon.

1708.   The notes input by **Defendant Supervisor Dailey**, on **July 28, 2011**, state that Plaintiff Daughter Lisa faxed him the afore-described 93A Demand letter at the office for **Defendant ESMV**; and that he had received it.  (Refer to 93A Demand letter prior referenced in Exhibit 207).

1709.   On **July 28, 2011**, Plaintiff Daughter Lisa, also, sent a copy of the 93A Demand letter to the Chairman & CEO of **Defendant BNY Mellon** (Robert Kelly), President of Defendant BNY Mellon (Gerald Hassell) and Investment Management of Defendant BNY Mellon (Mitchell Harris).

1710.   Plaintiff Daughter Lisa, also, sent correspondence and a copy of the 93A Demand to **then-U.S. Senator Scott Brown**—which the **November 2011** invoice filed by **Defendant Burns & Levinson** with the Essex Probate & Family Court shows that Senator Brown, in fact, had substantial contact with Defendant Burns & Levinson regarding the described situation.  **Defendant Attorney Cukier** billed for discussions and the drafting of a written response to Senator Brown—which Plaintiff Daughter Lisa had not been provided any information whatsoever  about the substance of the communications between Senator Brown and Defendant Burns & Levinson; which further evidence designated Defendants' impoper use of influence.  (Copy of Plaintiff Daughter Lisa's correspondence to Senator Brown, email from Senator Brown's Office and Defendant Burns & Levinson's November 2011 invoice are provided in **Exhibit 338A**).

1711.   The notes input by **Defendant Supervisor Dailey**, on **July 28, 2011**, also, state that Plaintiff Daughter Lisa informed him of Father's **2003 DPOA** and Father's re-affirmation of his 2003 DPOA on **June 16, 2011**.  Defendant Supervisor Dailey explicitly documented that Father's re-affirmation was executed *at* **Defendant Whittier Pavilion**, and he stated: "which Lisa mentioned was witnessed by staff, including Dr. Baloocho."

1712.   **July 28, 2011** was the first time that **Defendant ESMV** had directly broached Plaintiff Daughter Lisa about there being an investigation regarding financial exploitation.

1713.   In a very informal casual manner, **Defendant Supervisor Dailey** asked if *she* wanted to come into the office of **Defendant ESMV** to talk.  Defendant Supervisor Dailey did not, in any manner, state that Defendant ESMV was making a formal request to interrogate Plaintiff Daughter Lisa.

1714.   In the notes input by **Defendant Supervisor Dailey** into the computer system of **Defendant ESMV**, he had phrased the manner of his requesting Plaintiff Daughter Lisa to come in and speak with him as: "PSS [Defendant Supervisor Dailey] *offered to set up visit* at ESMV for *next week to discuss* situation."

1715.   **Defendant Supervisor Dailey** explicitly, described in the notes of **Defendant ESMV** regarding the response by Plaintiff Daughter Lisa as: "Lisa *seemed interested*, but did not want to set up a time just yet."

1716.   The very next statement written by **Defendant Supervisor Dailey** was:

> She [Plaintiff Daughter Lisa] also provided a CWI, named Steven Kapsalis [telephone number provided] who is a friend of AV [Father] for over 40 years. Lisa wanted PS to contact him to hear his views on the situation.

1717.   Of significance**, Defendant Caseworker Springman** intentionally manipulated the notes of **Defendant ESMV** to make it appear as though he interviewed Steven Kapsalis on **July 29, 2011**, when, in fact, that was a complete fabrication.  As evidenced in the notes, Defendant Caseworker Springman had set up a caption under the date of **July 29, 2011**.  Right *before and after* the description of the supposed interview, there were date/time stamps stating that it was input on **August 25, 2011**.

1718.   In further egregious deception, Defendant Caseworker Springman had inserted those notes one full week *after the hearing of **August 17, 2011**—when Judge Abber made the court appointments of guardian and conservator*.

1719.   In the notes input on **July 28, 2011**, it is documented that **Defendant Supervisor Dailey** and **Defendant Caseworker Springman** met with **Defendant Attorney Berid**, after the above-described conversation had taken place.

1720.   **Defendant Supervisor Dailey** stated, in the above-described notes**,** that, during the meeting with **Defendant Caseworker Springman** and **Defendant Attorney Berid**, they reviewed the 93A Demand letter that had been faxed.  Defendant Supervisor Dailey wrote in the notes:

> Lisa accuses Mellon of Fraud and not handling AV's [Father] account properly.  This includes not honoring Lisa as Durable POA.

1721.   Specifically included in the above-referenced notes of **Defendant Supervisor Dailey's** consultation with **Defendant Attorney Berid** on **July 28, 2011**, he explicitly stated:

> After review of the above info, ESMV may pursue a motion to intervene and look to seek a court order to have AV [Father] evaluated for competency and freeze on spending to include only AV's expenses.  *Pending outcome of eval, a temp guardian/conservator might be needed.*

1722.   **Defendant Caseworker Springman** documented in the notes of **Defendant ESMV** that **Defendant Attorney Berid** told him to call **Defendant Attorney Studen** (counsel for Defendant BNY Mellon) "on this matter to notify her of Lisa filing the 93A today."

1723.   **Defendant Caseworker Springman** documented that he carried out **Defendant Attorney Berid's** above-specified instructions on that same day, **July 28, 2011**.   After the above-referenced conversation, **Defendant Attorney Studen** telephoned **Defendant Attorney DeNapoli** to update him.

1724.   **Defendant Caseworker Springman** input notes into the computer system of **Defendant ESMV** on **July 28, 2011**, stating that he had spoken with **Defendant Attorney Tarlow** and reported: "Mr. Tarlow stated that he did have 6 months of financial records but 'there were *no* signs of FE [financial exploitation] in those statements.'"

1725.   **Defendant Caseworker Springman** documented, in the notes of **Defendant ESMV**, on **July 28, 2011**, that **Defendant Attorney Berid** had informed him that Plaintiff Daughter Lisa had called **Defendant Attorney Studen** (counsel for Defendant BNY Mellon) giving notification that **Defendant Right at Home** was threatening to stop services by the end of day (July 28, 2011).

1726.   **Defendant Caseworker Springman** documented, in the notes of **Defendant ESMV**, on **July 28, 2011**, that he spoke with the owner of **Defendant Right at Home**, Jay Kenney; that Jay Kenney stated that "he had not been paid a dime for the services that had been put into the elder's home to this point."

1727.   The above statement made by Jay Kenney was completely false; and made such statement knowing it to be false.   On **July 29, 2011**, **Defendant Supervisor Dailey** documented in the above-referenced notes of **Defendant ESMV** that an email was received from Rosalee Doherty of Right at Home stating that Plaintiff Daughter Lisa, had, *in fact*, given Right at Home a check on **June 17, 2011** for **$5,376.00**; that Plaintiff Daughter Lisa had signed the check as POA [Power of Attorney].

1728.   As documented in the notes of **Defendant ESMV**, in the late afternoon of **July 29, 2011**, **Defendant Supervisor Dailey** had called Plaintiff Daughter Lisa about transactions regarding Father's accounts.   From the tone and manner in which Defendant Supervisor Dailey had been speaking to Plaintiff Daughter Lisa, she deduced that she was being accused of financial exploitation of Father.

1729.   **Defendant Supervisor Dailey** documented in the notes of **Defendant ESMV**, regarding the above-described conversation: "Plaintiff Daughter Lisa wanted to know 'what she was being accused of' and 'what that is based on.'"

1730.   As indicated by the notes input by **Defendant Supervisor Dailey**, he *did not*—and would not—answer Plaintiff Daughter Lisa's direct question.  Instead, as he documented in the above-referenced notes, he stated: "PSS Dailey informed Lisa that PS was looking into reported concerns of how the elder's money was handled, such as bills (Right at Home) that were not paid, which jeopardized his services."

1731.   **Defendant Supervisor Dailey** documented in the above-referenced notes of **Defendant ESMV** that he then "offered to meet Lisa at Elder Services of the Merrimack Valley to further discuss allegations."

1732.   As **Defendant Supervisor Dailey** knew—and as referenced several times in the notes and reports of **Defendant ESMV**, Plaintiff Daughter Lisa had been a practicing attorney for several years.  In view of Plaintiff Daughter Lisa's experience as a practicing attorney—with substantial experience as a criminal defense appellate attorney—reasonably and properly, stated that she would come to Defendant ESMV's office to speak to them, but that, *first*, she wanted Defendant Supervisor Dailey to have him put that request in writing; which is corroborated by the fact that Defendant Supervisor Dailey documented that Plaintiff Daughter Lisa provided him her law office address.  (At no time did Defendant ESMV send Plaintiff Daughter Lisa written communication about setting up a time to be interviewed).

1733.   On <u>July 29, 2011</u>, **Defendant Attorney Berid** sent email correspondence to **Defendant Attorney Watson** (of **Defendant Law Firm TBHR**).

1734.   On <u>August 2, 2011</u>, **Defendant Attorney Watson** received a telephone message from **Defendant Daughter Sheryl**, which Defendant Attorney Watson described as involving "the package from Elder Services regarding outstanding issues."

1735.   On <u>August 2, 2011</u>, **Defendant Caseworker Springman** put together a formal written report for **Defendant ESMV**, called an Investigation Summary, in which it states that: "Case was substantiated for Financial Exploitation."  As previously set forth, **Defendant ESMV** did not inform the District Attorney's Office of their having a substantiated case of financial exploitation.

1736.   <u>**On August 3, 2011**</u>, Plaintiff Daughter Lisa faxed a letter describing the misconduct of **Defendant BNY Mellon** —as well as the misconduct of **Defendant ESMV** and **Defendant Law Firm TBHR**—and a copy of the 93A Demand letter to **then-U.S. Senator Scott Brown**.

1737.   Subsequently, Plaintiff Daughter Lisa received a call from the aide for then-U.S. Senator Scott Brown simply making the blanket and empty statement that Senator Brown was not able to "do anything".

1738.   On **August 3, 2011**, Plaintiff Daughter Lisa faxed Executive Director of **Defendant ESMV** (Rosanne DiStefano) a copy of the 93A Demand and a summary of her concerns.  On that same day, **Defendant Attorney Berid** mailed out Plaintiff Daughter Lisa with **Defendant ESMV**'s written *non-emergency* motion requesting a hearing be held to determine whether Essex Probate & Family Court would allow Defendant ESMV *to be able to* get a court order to have Father be evaluated regarding competency—*not* a hearing to determine whether there is probable cause that Father had been abused or exploited.

1739.   On **August 4, 2011**, **Defendant Attorney DeNapoli** called **Defendant Attorney Berid**, with Defendant Attorney DeNapoli having described the conversation as "*regarding status and strategy*."


### iii.  **Further evidence of intentional deception by designated Defendants**

1740.   Throughout the notes input into the computer system of **Defendant ESMV** from **April, 1 2011 up until July 22, 2011**, the staff of **Defendant ESMV** *did not* use the standard classification of "alleged perpetrator" (AP) with regard to Plaintiff Daughter Lisa—outright to the contrary, Defendants continuously referred to her as "Participant" or "Other party" or by name.

1741.    The formal written reports for **Defendant ESMV** did not label Plaintiff Daughter Lisa as "perpetrator" until **July 22, 2011**.

1742.   There are *no* intervening notes between **July 11, 2011** and **July 22, 2011**.

1743.   **Defendant Caseworker Springman**, in his written report—called PS Collateral Interview (dated **May 11, 2011)**—explicitly stated that Plainitff Daughter Devora lived in California and had for years.  He, also, stated that Plaintiff Daughter Devora "was not in state during the events surrounding the allegations."

**Intentional deception evidenced in the Investigation Summary of 8/2/2011**

1744.   **Defendant ESMV** stated in its Investigation of Summary (originated on **8/2/2011**)—done by **Defendant Caseworker Springman**—that the determination of a substantiated case for financial exploitation against Plaintiff Daughter Lisa was based on the supposed following grounds:

> elder reported to Mellon bank that his "family is stealing his money" in a recorded phone call;

> Right at Home (the private home health agency) had an outstanding balance of $17,456.00;

> there was an unexplained disappearance of funds—as there was a transfer of $50,000 transferred into Father's Citizen's checking account and that Lisa "chose not to inform PSS Dailey where the money went"; and

> there was a concern about the validity of Father's re-affirmation of his 2003 DPOA.

1745.   The notes of **Defendant ESMV** state that a supposed substantiated finding of financial exploitation was made on <u>**August 2, 2011**</u>— which is the date that the afore-described Investigation Summary states was purportedly originated.  Subsequently, **Defendant Attorney Berid** made this representation in court.

1746.   It is suspect that the Investigation Summary—which was originally created on **August 2, 2011**—documented that it was *"updated"* on <u>**August 25, 2011**</u>.  As evidenced, the afore-described Investigation Summary was modified <u>*after*</u> **Judge Abber** had already made the court ordered appointment of **Defendant Attorney Cuffe** as guardian and **Defendant Attorney Feld** as conservator.  Demonstrated is the deceptive manipulation to manufacture incriminating evidence and falsification of records.

1747.   Conspicuous by its absence in the afore-described Investigation Summary is the original allegation by **Defendant ESMV** that Plaintiff Daughter Lisa attempted to move $6 million of Father's accounts out of **Defendant BNY Mellon**.

1748.   Demonstrating Defendants' patently deliberate intent to fabricate evidence is the fact that **Defendant ESMV's** report stated that one of the supposed grounds for a substantiated finding of exploitation was Father calling Mellon Bank to report that "his family was stealing his money"—as set forth above, Father's call to **Defendant Brian Nagle** was based on his being misled and a premeditated scheme by designated Defendants.  Especially, egregious is the fact that the notes and reports of Defendant ESMV continuously and repeatedly reflect a position that the agents of Defendant ESMV considered Father _not_ to be competent.

1749.   As previously set forth and explicitly documented in the notes of **Defendant ESMV**, Plaintiff Daughter Lisa provided Defendant ESMV specific and detailed evidence of fraud perpetrated by **Defendant BNY Mellon**.

1750.   Replete in the notes and reports of **Defendant ESMV** is the continuous documentation that Defendant ESMV did not, in any manner, conduct an investigation as to the information of exploitation by **Defendant BNY Mellon**.

1751.   Even more so, replete in the notes and reports of **Defendant ESMV** is the continuous documentation that Defendant ESMV aided and abetted **Defendant BNY Mellon** in the afore-referenced fraudulent conduct.

1752.   **Defendant Caseworker Springman** and **Defendant ESMV**, knowingly and intentionally, misused the outstanding balance owed to **Defendant Right at Home** as a grounds for a substantiated finding when they knew that the reason for the outstanding balance was directly and solely caused by **Defendant BNY Mellon** refusing Father's, personal request, to transfer funds to _his_ Citizen's Bank account.

1753.   **Defendant Caseworker Springman** and **Defendant ESMV**, knowingly and intentionally, falsely made representations that there had been an unexplained disappearance of funds.

1754.   As previously set forth and explicitly documented in the notes of **Defendant ESMV**, **Defendant Caseworker Springman** had been informed by **Defendant Attorney Tarlow** on <u>July 28, 2011</u> that he had the past six (6) months of Father's checking statements and that there were no signs of financial exploitation.

1755.   As previously set forth above and explicitly documented in the notes of **Defendant ESMV of <u>July 29, 2011</u>**, **Defendant Supervisor Dailey** wrote that Lisa had told him that she could provide proof of where funds had been dispersed.

1756.   **Defendant Caseworker Springman** and **Defendant ESMV**, knowingly and intentionally, made false representations that Plaintiff Daughter Lisa "chose not to inform PSS Dailey where the money went."

1757.   As previously set forth and explicitly documented _in_ the notes of **Defendant ESMV**, Plaintiff Daughter Lisa was consistently cooperative when questioned; that she was fully forthcoming in her responses; and that she asked for written correspondence to facilitate the setting up of a scheduled meeting—which **Defendant Supervisor Dailey** explicitly documented such request and that she gave him her law office address.  It was Defendant ESMV who chose not to follow up with the interview— _not_ Plaintiff Daughter Lisa.

## H.  **Events following Defendant ESMV's motion to intervene**

1758.   As previously set forth, on **June 14, 2011**, the court proceeding before **Judge Abber** was a petition for temporary guardianship and conservatorship; whereby Judge Abber declared that a court appointed guardian and conservator were not warranted.

1759.   At the close of the court proceeding, **Judge Abber** did not schedule any date for the parties of In re Marvin H. Siegel to return to court.  He did not express that he had any intention of holding a routine court proceeding for a status report.

1760.   Ostensibly, at the proceeding of **June 14, 2011**, **Judge Abber** had indicated that if _no_ problems arose amongst the siblings then the matter of In re Marvin H. Siegel would be resolved.  However—as previously set forth—during the court proceeding of **June 14, 2011**, Judge Abber had _repeatedly_ expressed that he was certain that the matter of In re Marvin H. Siegel would "be back in court _very quickly_" due to acrimony; which the matter of In re Marvin H. Siegel did return before Judge Abber on **August 17, 2011** because of **Defendant Attorney Berid** filing a motion to intervene with the Essex Probate & Family Court.

1761.   As set forth, **Defendant ESMV's** motion to intervene was used as a pretext to bring the matter of In re Marvin H. Siegel back before **Judge Abber**—as Judge Abber had repeatedly assured Defendants, in-court, on **June 14, 2011**.

1762.   **Defendant Attorney Berid** filed the motion to intervene on **August 3, 2011**, and scheduled the hearing for the afore-described motion to be heard **August 17, 2011**.  (Copy of Defendant ESMV's motion to intervene is provided in **Exhibit 338B**).

1763.   As set forth, Father had terminated the services of **Defendant Attorney Tarlow** and **Defendant Law Firm TBHR**.  After being served, **Defendant ESMV's** motion to intervene, Father had Plaintiff Daughter Lisa search for another attorney to represent him.

1764.   Based on representations held out to the public by **Defendant Attorney Marsha Kazarosian** and her reputation held out by legal professionals, Plaintiff Daughter Lisa—on behalf of Father—consulted with Defendant Attorney Kazarosian about representing Father at the scheduled hearing for **Defendant ESMV's** motion to intervene.

1765.   On or about **August 12, 2011**, Plaintiff Daughter Lisa (along with a friend/colleague of hers) met with **Defendant Attorney Kazarosian** for a consultation. Father was not present at this initial consultation.

1766.   At that meeting, Plaintiff Daughter Lisa explained the circumstances in which **Defendant Attorney Tarlow** and **Defendant Law Firm TBHR** became initial counsel for Father and the underlying events that led up to Father's involuntary commitment.

1767.   Plaintiff Daughter Lisa explained to **Defendant Attorney Kazarosian** that the ultimate purpose of her legal services were to specifically fight for the validity of Father's **2003 DPOA**.

1768.   Plaintiff Daughter Lisa told **Defendant Attorney Kazarosian** how Father had agreed to take the antipsychotic Seroquel because it was represented by the staff of **Defendant Whittier Pavilion** (on **June 16, 2011**) that Father's discharge from Defendant Whittier Pavilion was conditioned upon Father doing so.

1769.   **Defendant Attorney Kazarosian** met with Father, on or about **August 15, 2011**, at her law office in Haverhill, MA.  Father was driven by a home health aide of **Defendant Right At Home**—as due to logistics **Plaintiff Daughter Lisa** drove in her own car to the appointment.  Father's long time friend, Steven Kapsalis, also came to Defendant Attorney Kazarosian's office for the appointment.

1770.   **Defendant Attorney Kazarosian** met all together with Father, Plaintiff Daughter Lisa and Steven Kapsalis.  As set forth, **Defendant Attorney Kazarosian**—and her associate, also, talked with Father alone.  (Refer to affidavit of Defendant Attorney Kazarosian in prior referenced Exhibit 8).

1771.   Plaintiff Daughter Lisa explicitly conveyed to **Defendant Attorney Kazarosian** that she was being hired to protect Father from any and all intrusion by the State into Father's personal life; that Father was seeking representation to forcefully fight against any and all intervention by **Defendant ESMV**.

1772.   **Plaintiff Daughter Lisa** had shown **Defendant Attorney Kazarosian** how **Defendant BNY Mellon** had unlawfully and unjustifiably denied Father access to his own money.

1773.   Both, Plaintiff Daughter Lisa and Father, explicitly conveyed to **Defendant Attorney Kazarosian** that Father wanted Daughter Lisa involved in Attorney Kazarosian's representation of Father; to which Defendant Attorney Kazarosian did not object—*until* later having had a long meeting with **Defendant Attorney Cuffe** and other designated Defendants on or about **October 5, 2011**.

1774.   Father explicitly conveyed to **Defendant Attorney Kazarosian** that he wanted Plaintiff Daughter Lisa and her family to permanently reside with him.

1775.   Plaintiff Daughter Lisa provided **Defendant Attorney Kazarosian** various documents to help prepare her for the hearing that was scheduled for **August 17, 2011**.

1776.   Plaintiff Daughter Lisa gave **Defendant Attorney Kazarosian** the original affidavit from the home health aide of **Defendant Right At Home** who had been present when **Defendant Caseworker Springman** came to see Father on **July 22, 2011** (which Defendant Attorney Kazarosian submitted to the Essex Probate Court at the hearing on **August 17, 2011—**a copy of which is provided in **Exhibit 339**).

1777.   The home health aide's affidavit stated:

>   she was present when two men from **Defendant ESMV** came to Father's home;

>   the two men from **Defendant ESMV** initiated the conversation with Father, saying: "We are here because we heard your having problems with your money";

>   that the two men from **Defendant ESMV** led Father to believe that there was money "missing" from his bank and that they came to see Father telling him that they were there to help him get his money back;

>   the two men from **Defendant ESMV** spoke in a manner as if  Plaintiff Daughter Lisa had been the one who stole the money and continued on, specifically and exclusively, talking about Plaintiff Daughter Lisa; and that

the two men from **Defendant ESMV** instructed Marvin not to talk to Plaintiff Daughter Lisa about their conversation.

1778.   Plaintiff Daughter Lisa provided **Defendant Attorney Kazarosian** written documentation as to the accounting of Father's bank accounts.  Defendant Attorney Kazarosian was, also, provided a written statement by the bookkeeper handling Father's accounts explaining the underlying difficulties that had happened while she was handling Father's Citizen Bank account; and how **Defendant BNY Mellon** had directly been the source of the problems with Father's Citizen's Bank account.

1779.   On **August 16, 2011**, Plaintiff Daughter Lisa had emailed relevant sections of the Code of Massachusetts Regulations (herein referred as CMR) to **Defendant Attorney Kazarosian** showing that **Defendant ESMV** was improperly bringing a motion to intervene.

1780.   **Defendant Attorney Kazarosian**, on **August 16, 2011**, replied by email to Plaintiff Daughter Lisa, stating:

> I had the statutes although I appreciate you forwarding them.  But as far as attacking elder services tomorrow, I am not sure that is a good tact.  They may very well not be following procedure, *but they are only intervening right now*.  I would rather stick to keeping it simple. . .  that marvin is incompetent although forgetful, that unfortunately protective services investigator never spoke to you and relied upon the statement of a forgetful guy who was reacting to the guy's suggestion that you were stealing from [referring to the previously discussed recorded call with Defendant Brian Nagle on **July 22, 2011**]. . . .

### I.  Court proceeding of August 17, 2011

1781.   The audio recording of the proceedings held on **August 17, 2011** is provided in prior referenced Exhibit 23 and the transcript is provided in Exhibit 24.

1782.   The court proceeding held on **August 17, 2011** was a *non-evidentiary* hearing.

1783.   At the beginning of the hearing of **August 17, 2011**, **Defendant Attorney Kazarosian** had filed a notice of appearance, stating that Father had retained her to be his attorney; while, at the same time, **Defendant Attorney DeNapoli**—on behalf of **Defendant Law Firm TBHR**—requested that **Judge Abber** rule on his afore-described filed petition asking for a court order precluding the firing of Defendant Firm TBHR.

1784.   As previously set forth, **Defendant Attorney Kazarosian** submitted her own affidavit to **Judge Abber**, at the hearing of **August 17, 2011**.  In that affidavit, she described, in exceptional detail, her observations and conclusions that Father was competent; that Father expressed to her that he had been deceived by **Defendant Attorney Tarlow** and his associates; that the documents signed on **May 25, 2011** was procured under duress and deception; that Father explicitly expressed to Defendant Attorney Kazarosian that he wanted Plaintiff Daughter Lisa and her family to permanently reside with him, and to care for him; that Father's **2003 DPOA** should be deemed valid and effective.

1785.   **Judge Abber** permitted **Defendant Attorney Kazarosian** to appear on behalf of Father.  In addressing the afore-referenced petition filed by **Defendant Law Firm TBHR**, Judge Abber stated that there was no need to hear the petition because he was going to appoint a temporary conservator.

1786.   As previously set forth, **Defendant Attorney Kazarosian** submitted her personal written attestation to **Judge Abber**, during the hearing of **August 17, 2011**; wherein Defendant Attorney Kazarosian attested that Father had, personally, told her that the documents brought to him by **Defendants Attorney Tarlow** and **Watson** and signed by him on **May 25, 2011** were obtained by fraud and deception; that Father had signed those documents under coercion and duress.

1787.   The above-described affidavit submitted by **Defendant Attorney Kazarosian** expounded in great detail—supporting statements of fact—of Father being competent and of sound mind when Father told her that he been deceived by **Defendant Attorney Tarlow**.

### In Defendant ESMV's filed motion to intervene, it *did not* request that the hearing involve the appointment of a guardian and conservator

1788.   The scheduled hearing for **August 17, 2011** was set ahead of time, *exclusively*, for the motion to intervene filed by **Defendant Attorney Berid** and **Defendant ESMV**—and, therefore, was the *only* matter expected to be heard before **Judge Abber**.  This is bolstered by the afore-described email sent by **Defendant Attorney Kazarosian** to Plaintiff Daughter Lisa—wherein Defendant Attorney Kazarosian stated: . . . *but they are [Defendant ESMV] only intervening right now*."

1789.   As previously set forth, **Defendant ESMV's** purported claim of a substantiated case for financial exploitation was documented to have occurred on **August 2, 2011**.  **Defendant Attorney Berid** scheduled the afore-described hearing for the motion to intervene **14 DAYS** *after* this purported substantiated determination.  G.L. Chapters 19 and 20 provide procedural mechanisms that permit emergency proceedings *within 24 hours*.  As evidenced, **Defendant ESMV's** motion to intervene was not pursued as an emergency motion.

1790.   The specific relief that **Defendant Attorney Berid** had enumerated in the motion to intervene consisted of:

> to order a complete mental health evaluation of Father;

> to appoint a GAL to investigate the issues of financial exploitation;

> to appoint a GAL to determine whether Plaintiff Daughter Lisa and her family should be allowed to continue to reside with Father;

> to allow the firm of **Defendant Law Firm TBHR**, and in particular **Attorneys Tarlow, DeNapoli** and **Watson,** to continue to represent Father; and

> to order that all Home Health Agency Bills and household bills be presented to ESMV for approval and forwarded to BNY Mellon *until* a mental health evaluation is completed, when a temporary guardian is put in place.

(Refer to prior referenced Exhibit 338).

1791.   As set forth by the above-described requests made by **Defendant Attorney Berid** and **Defendant ESMV**—in the filed motion to intervene, there was <u>no</u> request for **Judge Abber** to issue an emergency order for an appointment of a guardian or conservator.

1792.   The *only* requested type of relief sought by **Defendant Attorney Berid** and **Defendant ESMV** was permission to conduct certain <u>investigative measures</u>; indicating that the investigative measures were necessary *to be able to make a determination whether a court appointed guardian and conservator was warranted*.

1793.   Further establishing that **Defendant ESMV's** motion did not, in any manner, request the appointment of a guardian and conservator is the fact that such proceedings require the presentation of a medical certificate stating that Father lacked capacity—which the *very essence* of **Defendant Attorney Berid**'s motion to intervene was her asking for a court order *so that she would be able to obtain a medical certificate*.

1794.   There was _no_ medical certificate prepared for the proceeding of **August 17, 2011**.  Of import, the medical certificate that had been _previously_ submitted to the Essex Probate & Family Court by **Defendant Attorney Garmil** (on behalf of **Defendant Whittier Pavilion**) on **June 14, 2011** was _no longer effective by_ **August 17, 2011**, pursuant to the procedural rules for the Probate & Family Court.  A new medical certificate was required.

1795.   The ill-motive of **Judge Abber** in ordering the temporary appointments of guardian and conservator is evidenced by the fact that Judge Abber, s_pecifically_, did not hold the scheduled hearing for temporary guardianship and conservatorship on **June 7, 2011** on the espoused basis that the provided medical documentation was not on the official standard form of the Probate & Family Court—yet, on **August 17, 2011**, _there was no medical documentation provided of any kind_.

1796.   Prior to the court proceeding—on **August 16, 2011**—Plaintiff Daughter Lisa emailed **Defendant Attorney Kazarosian**, bringing her attention to the _scope_ of the subject matter before the Essex Probate & Family Court; highlighting that the motion to intervene was _limited in_ scope; that **Defendant ESMV** was only requesting permission to become an intervening party.

1797.   As previously set forth, **Defendant ESMV's** motion to intervene was _not_ presented as an emergency motion, in any regard; and, further evidencing that Defendant ESMV's motion to intervene was not of an emergency nature is the fact that **Defendant Attorney Berid** and **Defendant ESMV** _did not_ notify the District Attorney of any determination of a finding of reasonable cause to believe Father (Marvin H. Siegel) had been exploited.

1798.   Pursuant to 651 CMR 5.19, when an investigation opened by an elder services protective agency results in a substantiated determination that an elder has been subjected to financial exploitation, the protective agency _must_ report such determination to the District Attorney _within 48 hours_.

1799.   As previously set forth, **Defendant Caseworker Springman** testified in-court (on **July 2, 2012**) that **Defendant ESMV** had _not_ reported _any_ alleged misconduct regarding financial exploitation of Father to the District Attorney's Office.

1800.   The written report for **Defendant ESMV**—entitled Investigation Summary—dated **August 2, 2011** states that _no other_ agencies were involved in the investigation.

1801.   **Defendant Attorney Berid's** in-court opening remarks—addressed to **Judge Abber**—evidenced that the motion to intervene was filed for intended retaliatory purposes.  Defendant Attorney Berid explicitly brought up the fact that Plaintiff Daughter Lisa had submitted complaints against **Defendant ESMV** and **Defendant BNY Mellon** to the Attorney General and the Executive Office of Elder Affairs.

1802.   The court record shows that **Judge Abber** attempted to give the appearance that the hearing was based on supposed emergency circumstances.  De facto, the subject matter of temporary guardianship and conservatorship *was* *not* initiated and not requested by **Defendant ESMV**, or any other party of In re Marvin H. Siegel.

1803.   **Judge Abber**, *knowingly and intentionally*, used **Defendant ESMV's** motion to intervene as a pretext.  This is evidenced by the discourse that took place between Judge Abber and **Defendant Attorney Berid** regarding court appointments. Judge Abber began with prompting the question to Defendant Attorney Berid: "And are you asking that this Court appoint a temporary guardian?"  The dialogue continued as follows:

> Attorney Berid:   I'm asking—
>
> Judge Abber**:**       who can then authorize the medical testing over this period of time?
>
> Attorney Berid:   Yes, I am, your Honor.

1804.   As demonstrated by the above dialogue, **Judge Abber** did not let **Defendant Attorney Berid** answer his supposed inquiry.  When Defendant Attorney Berid did not just say "yes", Judge Abber abruptly interrupted Defendant Attorney Berid, showing that he was worried that she might say something that would interfere with his pre-planned agenda.

1805.   As evidenced by the transcript and court recorded audio, when **Judge Abber** interrupted in the manner that he did, **Defendant Attorney Berid** got the message that Judge Abber was prompting her to simply just say: "Yes, I am your Honor."

1806.   The evidence set forth demonstrates that **Judge Abber's** issuing the court appointments of a guardian and conservator was an outright sham.

**Evidence of collusion between Judge Abber and Defendants prior to the hearing of August 17, 2011**

1807.   At the proceedings held on **August 17, 2011**, **Judge Abber** relied, *solely*, on mere arguments by opposing counsel.  There was no examination of witnesses.

1808.   During the hearing of **August 17, 2011**, it was explicitly brought to **Judge Abber's** attention that Plaintiff Daughter Lisa was present and the court proceeding held on **August 17, 2011** was brought under the dockets initiated by Plaintiff Daughter Lisa (ES11P1466GD and ES11P1465PM); however, **Judge Abber** would not let Plaintiff Daughter speak in any manner.

1809.   With **Defendant Attorney Berid** having made, only, blanket statements—and no concrete evidentiary support presented whatsoever—and **Judge Abber** outright refusing to let Plaintiff Daughter Lisa challenge the allegations made against her, Judge Abber declared that he had made up his mind as to what action he would take.

1810.   **Defendant Attorney Berid** was interrupted by **Judge Abber** in the midst of her presentation, when Judge Abber stated that he had heard all that he needed; declaring that he was going to appoint a guardian and conservator.

1811.   When **Defendant Attorney Kazarosian** attempted to convey that Father opposed the appointment of a guardian and conservator, **Judge Abber** directly stated to Defendant Attorney Kazarosian: "Well, counsel, tell me whether your client was comfortable with his daughter taking $6 million dollars out of his bank account."

1812.   **Defendant Attorney Kazarosian** indicated to **Judge Abber** that Plaintiff Daughter Lisa was present and should be permitted to address the allegations made against her in court.  The following in-court discourse took place:

| | |
|---|---|
| Attorney Kazarosian: | Your Honor, Lisa Belanger is here and I think she want's to address the Court as well-- |
| Judge Abber: | No. |
| Attorney Kazarosian: | - - as a person of interest who can give information. |
| Judge Abber: | On what? |

294

| | |
|---|---|
| Attorney Kazarosian: | Well, there's some accusations that have been made that she's denying, as to requesting $6 million or not let anyone see her father.  And I think she has indicated that she wants to address those, because she denies them.  The only other thing I would point out, Your Honor, is with regard to the durable power of attorney that was switched.  My client gave a durable power of attorney – |
| Judge Abber: | Counsel, I'm addressing the guardianship. |
| Attorney Kazarosian: | but - - |
| Judge Abber: | - - ordering a temporary conservator.  That's why I'm not willing to hear from Attorney Belanger on those issues. |
| Attorney Kazarosian: | Your Honor, if I may? |
| Judge Abber: | I'm concerned about who should be the guardian at this point.  Are you - - |
| Attorney Kazarosian: | Well, my - - - she's living with - - |
| Judge Abber: | Do you have any opposition to a neutral party being appointed the guardian? |

1813.  **Judge Abber** outright precluded Plaintiff Daughter Lisa from having the opportunity to rebut the allegations of financial exploitation made against her, in any manner.

1814.  As previously set forth, Father nominated Plaintiff Daughter Lisa to be his guardian and conservator in his **2003 DPOA**—which was directly brought to **Judge Abber's** attention by **Defendant Attorney Kazarosian**.  As a matter of law, Plaintiff Daughter Lisa was *entitled* to be heard regarding the allegations made against her; and that rebutting such allegations was a direct and material issue to the issue of guardianship and conservatorship.

1815.  As previously set forth, the fact that **Defendant BNY Mellon** did not initiate a call to **Defendant ESMV** lends credence to the fact that such allegation was completely fabricated.

1816.   As previously set forth, in **Defendant ESMV's** Investigation Summary of **8/2/2011**—in the section listing the supposed grounds for a substantiated finding of exploitation of Father—there was no allegation that Plaintiff Daughter Lisa attempted to take $6 million from **Defendant BNY Mellon**; yet, **Defendant Attorney Berid** explicitly made that representation to **Judge Abber**.

1817.   To-date, no evidence, *of any kind*, has been presented to support the above-described allegations against Plaintiff Daughter Lisa.

1818.   As previously set forth, the GAL Report later filed by **Attorney Dennis McHugh**—*over* two (2) years later on **November 18, 2013**—shows that the above-described allegations made by Defendants against Plaintiff Daughter Lisa were falsely made *from inception*.  (Copy of the GAL Report is provided in **Exhibit 340**).

1819.   Outright declarations were made by Defendants, in open court, that Plaintiff Daughter Lisa supposedly had attempted to steal $6 million.  Speaking volumes is that **Judge Abber** and Defendants knew that Plaintiff Daughter Lisa was a practicing attorney and, at no time, did they make a formal complaint against Plaintiff Daughter Lisa to the Board of Bar Overseers.

### iv.  <u>The court appointment of Defendant Attorney Cuffe was predetermined before the hearing of August 17, 2011</u>

1820.   Several discourses took place during the court proceedings on **August 17, 2011 hearing** showing pre-orchestration by **Judge Abber**, **Defendant Attorney Ledoux** and **Defendant Attorney Cuffe**.

1821.   Following is the discourse of **Judge Abber's** ostensible process of selecting the actual person to be appointed temporary guardian:

| | |
|---|---|
| Judge Abber: | [To Attorney Berid] And who are you suggesting should be that guardian? |
| Attorney Berid: | I would pray the Court   -- I have no particular person in mind. |
| Judge Abber: | Attorney Ledoux, *I assume you have somebody in mind*? |
| Attorney Ledoux: | Sitting right there, Your Honor.  Brian Cuffe is well known to the Court certainly and he's well experienced in the area of guardianship law.  That's my suggestion. |

> Judge Abber:      So, you're not asking for your client?
>
> Attorney Ledoux:  No your Honor, I am not.

1822.   As evidenced from the court record set forth above, **Judge Abber's** statement to **Defendant Attorney Ledoux** shows that Judge Abber was very concerned that the court record would reflect Defendant Attorney Ledoux's blaring suspicious response—as **Judge Abber** felt compelled to subsequently point out, on the record, that Defendant Attorney Ledoux's client (**Defendant Daughter Sheryl**) was not seeking to be guardian.

### v.  <u>Judge Abber, personally, cherry-picked Attorney James Feld as court appointed conservator</u>

1823.   Regarding **Judge Abber's** ostensible process of selecting the temporary conservator, he spontaneously stated: "Attorney Upley, I know you've served as conservator.  Would you be willing to do so in this case?"  To which Attorney Upley responded affirmatively.

1824.   Shortly thereafter, **Defendant Attorney Kazarosian** asked **Judge Abber** if she could have an opportunity to discuss something with Attorney Upley prior to his being appointed.

1825.   While the court was in recess, **Defendant Attorney Kazarosian** discussed the appointment of conservator with designated Defendants, in their capacity as opposing counsel.  When court proceedings resumed, Defendant Attorney Kazarosian apprised **Judge Abber** about the discussions amongst the Defendants, and stated:

> *We*, have agreed that, if you are going to appoint a temporary guardian, we have no objection to Brian Cuffe, although [Father] continues his objection. If you are going to appoint a temporary conservator, *we* have discussed the appointment of David Aptaker.

1826.   Showing the fact that the discussion of the appointment of David Aptaker had arisen purely from **Defendant Attorney Kazarosian's** closed discussion with designated Defendants—*to the exclusion of Plaintiff Daughter Lisa*, **Judge Abber** responded to **Defendant Attorney Kazarosian's** above statement:

> Is there some reason why the person that I had indicated that I might select is not appropriate?"

The issue was then discussed at sidebar—inaudible to Plaintiff Daughter Lisa and the court audio recording system.

1827.   Attorney Upley then identified himself during the court proceedings and indicated that he still wanted to be appointed.  Upon which **Judge Abber** stated: "Well, let's just deal with the guardianship for right now?  Is any one seeking authorization to admit to a nursing facility at this time?"

1828.   *Unsolicited*, **Judge Abber** declared that he was revoking the existing health care proxy executed by Father—in which Father had made Plaintiff Daughter Lisa his health care proxy.  To re-iterate, Plaintiff Daughter Lisa was precluded from being heard at the hearing.

1829.   **Defendant Attorney Cukier** asked **Judge Abber**, in court, if she could provided him with the names of *her* proposed persons to be appointed conservator.  Judge Abber stated that she could provide three (3) names.  In doing so, she gave the following names: Joseph Kropp of Gilmore, Reese & Carlson; Rebecca Benson of Margolis & Bloom; and Katherine O'Connor of Eckel, Morgan & O'Connor.

1830.   **Judge Abber** did not declare who he would be appointing as temporary conservator—in court, he indicated that he would do so outside of the hearing by the end of the day.

1831.   As evidenced, **Defendant Attorney Cukier** did not name **Defendant Attorney James Feld**—and *no other* opposing counsel (Defendants) had made any specific request.

### vi. **Evidence of ill-motives by Judge Abber for selecting Defendant Attorney Feld to be appointed temporary conservator**

1832.   Substantiating documentation that **Judge Abber** selected **Defendant Attorney Feld** *based on his own preference* is the prior existing and close relationship amongst Judge Abber, Defendant Attorney Feld and **Defendant Attorney Cukier** in their collaboration as co-fiduciaries in the previously discussed matter of In re Esterina Milano; as well as, the previously discussed conduct of **Judge Abber** that occurred during the court proceeding of **June 7, 2011**—specifically, pertaining to his erratic inquiry of Attorney Long regarding finding a copy of the filed Bond.

1833.   Suspect is that **Judge Abber** did not make a specific appointment of a temporary conservator during the court proceeding of **August 17, 2011**.   Not having made the temporary appointment of conservator, Judge Abber then instructed Attorney Upley to file *his* bond anyway; stating: "because I can't release this without a bond."  Attorney Upley confirmed that he would do so.

1834.   Prior to the close of the court proceedings, Attorney Upley stated to **Judge Abber** how difficult it is to get a bond for $6 million.  Attorney Upley reminded Judge Abber how difficult it was the last time to get a $4.3 million bond; that it took almost four (4) months.  Which then led into a drawn out discourse amongst the designated Defendants and Judge Abber about the type of assets that made up Father's $6 million estate.

1835.   Highly suspect is that **Judge Abber** knew that Father already had estate planning instruments executed in February of **2003**, and he (Judge Abber) had stated— while commenting on the problem with a limited bond: "But we may need to file an estate plan at some point."

1836.    As set forth, no specific appointment of conservator was made upon the closing of the court proceeding.  Notes input into the computer system of **Defendant ESMV** by **Defendant Caseworker Springman** on **August 17, 2011** state that **Defendant Attorney Cuffe** had been appointed as guardian—*there was no mention as to the appointment of a conservator*.

1837.   The notes input by **Defendant Diane Powell** on the following day (**August 18, 2011**) had a portion of an email, having been copied and pasted, from **Defendant Attorney Berid**.  In that email, Defendant Attorney Berid stated that **Defendant Attorney Cuffe** had reported that "the Judge appointed **Attorney Jim Feld** of Woburn as the conservator."

1838.   The above-described notes documented that *minutes later*, **Defendant Diane Powell** put in subsequent notes that stated:

> Met with ESMV legal and was updated from a legal standpoint as far as what took place in court yesterday.  Attorney Brian Cuff[e] appointed *but we are awaiting conservator being appointed*.

> As evidenced, the subsequent notation by Defendant Diane Powell shows an intent to deceive, as the *previous inclusion* of the email from **Defendant Attorney Berid** had stated that **Defendant Attorney Feld** *already* had been appointed.

1839.   Plaintiffs <u>*did*</u> <u>*not*</u> receive contemporaneous notification by the Essex Probate & Family Court about **Judge Abber** having selected **Defendant Attorney Feld** as conservator.


**J.  <u>Subsequent to the court proceeding of August 17, 2011, overt acts by Defendant Attorney Kazarosian against Father's expressed desires and intentions</u>**

1840.   Established by the court record of **August 17, 2011** and the affidavit of **Defendant Attorney Kazarosian**, Defendant Attorney Kazarosian, *personally*, made representations to the Essex Probate & Family Court that Father was, *in fact*, competent when Father retained her services to represent him at the court proceeding of **August 17, 2011**.  (Refer to affidavit in prior referenced Exhibit 22).

1841.   As previously set forth, **Defendant Attorney Kazarosian** promised Father—upon his retaining her legal services *to represent him*—that she would *actively* pursue *all* legal avenues to keep Father from being subjected to a court ordered guardianship and conservatorship.  Defendant Attorney Kazarosian made that explicit representation directly to Plaintiff Daughter Lisa.

1842.   Defendant Attorney Kazarosian attested, in her filed affidavit of **August 17, 2011**:

> I asked him [Father] if he wanted to be represented at the hearing on August 17, 2011 and he was adamant that he wanted representation.  He appropriately asked me if there was any reason that I could think of as to why I should not be the one to represent him, he asked about any limitations that I thought I may have with regard to an appearance on this matter, he asked me if I could be forceful in my representation to the court as to his desires and intentions, and asked me if I had any concerns that would give me pause as to my representation.  I was impressed by this inquiry.

1843.   According to the affidavit of **Defendant Attorney Kazarosian** (filed with the Essex Probate & Family Court on **August 17, 2011**), the rules of ethical conduct promulgated by the Board of Bar Overseers mandate that Defendant Attorney Kazarosian owed a duty to Father, as her client, that she take reasonable, appropriate and necessary steps to take action *in support* of Father's wishes.  Defendant Attorney Kazarosian breached that duty.

1844.   Once retained, attorney has obligation to abide by elder's decisions concerning his objectives of that representation.  Model Rules of Professional Conduct 1.2

1845.   Father's express and vehement desire for his representation by **Defendant Attorney Kazarosian** was to fight any and all incompetency proceedings and to return home to live with Daughter Lisa Belanger and her family (husband and two young children).

1846.   Father, as client, has the ultimate authority to determine the purpose to be served by legal representation within the limits imposed by law.  Id.

1847.   Model Rules 1.14, comment 5: Lawyers are to give their client the maximum decision-making autonomy possible, while respecting the client's family and social connections.

1848.   Model Rules 1.4 requires attorneys to communicate with reasonable frequency with current clients.

1849.   **Defendant Attorney Kazarosian** *did not* take any legal recourse, of any kind, to vacate the orders issued by **Judge Abber** of **August 17, 2011**—and has failed to do so through the present; as well as, Defendant Attorney Kazarosian's continuous failure to represent Father, in any manner, consistent with Father's expressed desires and intentions after the court proceeding of **August 17, 2011**.

1850.   **Defendant Attorney Kazarosian** *did no*t file substantive oppositions to motions that were adverse to Father's outwardly expressed desires and intentions, and she did not appeal *any* of the issued adverse orders by the **Essex Probate & Family Court**.

1851.   Even more egregious, in court proceedings that were held *after* **August 17, 2011**, **Defendant Attorney Kazarosian** engaged in conduct that diametrically went *against* Father's expressed desires and intentions.  (Copies of emails between Defendant Attorney Kazarosian and Plaintiff Daughter Lisa about the outcome of August 17, 2011's court proceeding in **Exhibit 341A** and examples of Defendant Attorney Kazarosian acting adversely to Father's expressed desires and intentions are provided in **Exhibit 341B**).

1852.   Father was so vehement about wanting **Defendant Attorney Kazarosian** to pursue legal action to vacate the orders issued by **Judge Abber** on **August 17, 2011** that he had Plaintiff Daughter Lisa email Defendant Attorney Kazarosian—that same afternoon—about setting up an immediate appointment to meet with her.

1853.   The next day, late in the afternoon on **August 18, 2011**, **Defendant Attorney Kazarosian** emailed Plaintiff Daughter Lisa the following response:

> I am still in a settlement conference *but can tell you that all of the research in the world is not going to change Abber's mind right now. I think that the best approach from my experience is to craft a letter to the conservator and guardian* explaining how your dad had given you a dpa years ago, that it went uninterrupted and without concern until the break that he had, that he was accosted at Whittier Pavilion and given documents to sign that interrupted it and that were self serving, and the other issues that I outlined in my proposed order, *and to let the appointees make recommendations to the court*. . . .

1854.   Plaintiff Daughter Lisa promptly responded by email to **Defendant Attorney Kazarosian**, conveying *how important it was to Father* that Defendant Attorney Kazarosian take every legal avenue to right the wrong incurred by **Judge Abber**.  Plaintiff Daughter Lisa stated in her email:

> Marsha,
>
> I need you to understand that the most crucial and important thing to me is that my Dad's reputation be cleared.  The fact that my father was labeled as incapacitated has devastated my father.  Please....the magnitude of someone being able to tell my father how he can spend his money, after the years that HE worked to obtain it and who is going to tell him what is in his "best interest" that will kill my father.
>
> Please, yesterday's ruling CANNOT be let go. It does not matter HOW temporary it is.....even for ONE day.
>
> I became a lawyer because of my father's passion for righting the wrong. I have dedicated my life to protecting people's constitutional rights. (so much so that I was even able to get Judge Ruth Abrams by G.L. 211 s 3 to get my client William Youngworth out of jail--and out of doing12 more yrs in jail).
>
> And yesterday's proceeding crushed my father's constitutional rights. My father would spend every dime he has to protect his. Yesterday was a travesty of justice.
>
> Judge Abber is biased and prejudiced against my Dad because Judge Abber resents my prior multiple advocacy of my client's due process rights before him....so much so that he explicitly threatened to hold me in contempt for my protecting my client's constitutional rights. He literally said to me that if I said one more word that he would hold me in contempt--and I am my father's daughter-- because those constitutional rights meant more to me than being held in contempt. And I did say one more word.....and I cited case law showing my client's rights.....and imagine that he did not hold me in contempt.
>
> And I beg of you to please right this wrong. I will send you all the case law and secondary sources to show the magnitude of the trampling of my father's rights yesterday.

If you look on YouTube, this is no isolated trampling of rights. My father restoring his name and dignity as a lawyer of 50 years means EVERYTHING to him.

What happened yesterday affects every elderly person.

1855.   **Defendant Attorney Kazarosian** emailed the following reply:

I understand that and cannot disagree with his sentiment. However, he has the opportunity to convince the guardian and conservator who are only temporary. Even if this goes away, I can guarantee that ESMV will come back and ask again, so it is better for him to put this to bed with the temporary appointments...IMHO.

1856.   As evidenced, *the very next day __after__ the hearing*, **Defendant Attorney Kazarosian** abandoned her promise to represent Father in the manner that *he* wanted to be represented.  Defendant Attorney Kazarosian implemented a strategy of "play along to get along"—knowing full well that the designated Defendants, inherently, acted in capacities that were adversarial to the expressed desires and intentions of Father.  Defendant Attorney Kazarosian knew that "a play along to get along" strategy was directly the antithesis of Father's expressed desires and intentions.

1857.   After the court proceeding of **August 17, 2011, Defendant Attorney Kazarosian** did not see Father until **August 31, 2011**—which she made such plans *because* **Defendant Attorney Cuffe** had scheduled his first visitation with Father for that day.  When Defendant Attorney Kazarosian came to Father's home on **August 31, 2011**, *she __did not__ speak with Father alone.*

1858.   When **Defendant Attorney Kazarosian** began manifesting the attitude and outwardly held position that Father *was not* competent, pursuant to the professional rules promulgated by the Board of Bar Overseers, she had an ethical duty to terminate her representation of Father *at the point* of having determined that she could not carry out the objectives that Father had hired her to do.

1859.   It became patently obvious that **Defendant Attorney Kazarosian** was engaging in action that was directly adverse to Father's expressed desires and intentions. Father had explicitly requested that Defendant Attorney Kazarosian terminate her legal representation of him; which she overtly refused to comply with Father's request.  She wrote, in an email directly to **Defendant Attorney Cuffe**:

> Attached is a copy of a note from Marvin Siegel faxed to me this afternoon, attempting to terminate my services because it is his understanding that I have not articulated his wishes.  Also attached is an affidavit from his friend, Steve Kapsalis.  Brian, since receiving this fax from Marvin, I have confirmed with you that you are not terminating my services, and since as guardian, only you (or Judge Abber) can do so, I will continue as Marvin Siegel's counsel until there is an order from the Court that I cease my representation.

(Copy of email and Father's written desire to terminate Attorney Kazarosian's representation are provided in **Exhibit 342A**).

1860.   **Defendant Attorney Kazarosian** had an ethical duty to inform the Essex Probate & Family Court about Father's faxed request that she terminate her representation of him.  She did not do so.

1861.   Per the professional rules promulgated by the Board of Bar Overseers, **Defendant Attorney Cuffe**—in his capacity as guardian—had an ethical duty to inform the **Essex Probate & Family Court** about Father's faxed request that she terminate her representation of him.  He did not do so.

1862.   Plaintiff Daughter Lisa—along with Plaintiff Daughter Devora—brought forth, in open court, to **Judge Abber** that Father had requested that **Defendant Attorney Kazarosian** terminate her representation of him.  Judge Abber refused to address that issue.

1863.   Over more than two (2) years of litigation, in the matter of In re Marvin H. Siegel—before **Judge Abber**, Plaintiffs have repeatedly and continuously raised, in open court, that **Defendant Attorney Kazarosian** has violated her duty owed to Father and has aided and abetted in the trampling of Father's State and Federal Constitutional rights; which such trampling of rights have been condoned and directly facilitated by **Judge Abber**.

1864.   While Plaintiff Daughter Lisa resided with Father**, Defendant Attorney Kazarosian** had not kept Father informed as to the on-goings of the litigation; had not kept Father informed by written correspondence and had not kept Father informed by telephone.  (Documentation is provided in **Exhibit 342B**).


### K.  Defendants' misuse of court proceedings to facilitate illicit activity


### i.  Father's established desire and intention that Plaintiff Daughter be intimately involved in his personal affairs

1865.   Prior to any involvement by the State, Father had firmly established his intention and desire that Plaintiff Daughter Lisa and her husband be involved in the handling of his personal affairs.  Each and every Defendant had knowledge of Father's above-described expressed intention and desire.

1866.   As previously set forth, Father had validly and deliberately executed a durable power of attorney in **February of 2003**; in which he declared Plaintiff Daughter Lisa as attorney-in-fact and Plaintiff Daughter Devora as successor attorney-in-fact.

1867.   *But for* the unlawful conduct of designated Defendants, Father's **2003 DPOA** would still be in effect through the present day.

1868.   Throughout the years of litigation of the matter of In re Marvin H. Siegel, Plaintiff Daughters had repeatedly requested the State courts to specifically address the validity of Father's **2003 DPOA** but the courts refused to do so.

1869.   At the court proceeding held on **June 14, 2011**, **Judge Abber** outwardly expressed that there was no concern of undue influence regarding **Father's 2003 DPOA**.

1870.   As previously set forth, at the court proceeding of **June 14, 2011** (and repeatedly throughout the litigation of In re Marvin H. Siegel), Plaintiff Daughter Lisa— through counsel—requested that the validity of the purported DPOA executed by **Defendant Attorneys Tarlow** and **Watson** on **May 25, 2011**, while Father was under the initial 3-day involuntary commitment at **Defendant Whittier Pavilion** be litigated; repeatedly, **Judge Abber** refused to do so.

1871.   At the court proceeding held on **June 14, 2011**, without any evidentiary hearing, **Judge Abber** explicitly stated that Father was competent to execute the **DPOA of May 25, 2011** and ruled that it was effective.

1872.   As previously set forth, 2 days later, on **June 16, 2011**, Father executed a re-affirmation of his **2003 DPOA** and **health care proxy**, directly in front of the staff of **Defendant Whittier Pavilion**—and re-instituted Plaintiff Daughter Lisa as his attorney-in-fact.  The validity of the re-affirmed DPOA and health care proxy, executed on **June 16, 2011**, has not been litigated in the State courts.

1873.   At the court proceeding on **August 17, 2011**, *without any evidentiary hearing*, **Judge Abber** revoked the above-described reaffirmed DPOA and health care proxy.  The revocation was unlawfully issued in terms of being procedurally defective; specifically, based on the failure to provide the procedurally required safeguards of due process and violating the constitutional protection of the sanctity of family relations.

1874.   As previously set forth, Plaintiff Daughter Lisa and her family had moved in to live with Father, permanently, at the beginning of **April 2011**.  **Defendant Right At Home** began providing services on **June 17, 2011**.

1875.   Attested by Father's long-time friend, Steven Kapsalis, Plaintiff Daughter Lisa and her family had been actively involved in helping Father with his personal affairs, long *before and after* Father's involuntary commitment to **Defendant Whittier Pavilion**.

## ii.  **Defendant Attorney Cuffe began his court appointment as guardian with a charade**

1876.   As previously set forth, Plaintiff Daughter Lisa was informed by the staff at **Defendant Whittier Pavilion** that Father's discharge was conditioned upon Father having a home health care agency in the home 24/7 and Father's being compliant with the prescribed medication.

1877.   As previously set forth, Plaintiff Daughter Lisa was given less than 48 hours to hire a home health care agency, and, therefore was not afforded adequate time to independently research health care agencies.  Due to the time constraints and the afore-described representations made to Plaintiff Daughter Lisa, she hired the services of the health care agency specifically recommended by the staff of **Defendant Whittier Pavilion**—which was **Defendant Right At Home**.

1878.   **Defendant ESMV** has had a long-established working relationship with **Defendant Right At Home**—which Defendants did not disclose to Plaintiffs.

1879.   **Defendant Right At Home** is a business contributor to **Defendant ESMV**.

1880.   At the inception of **Defendant Attorney Cuffe's** appointment, he gave an outward impression that he was allowing Plaintiff Daughter Lisa to be involved with Father's care.  For example, he asked Plaintiff Daughter Lisa to set up an appointment for Father to be seen by **Defendant Dr. Cui**; upon Plaintiff Daughter Lisa doing so, Defendant Attorney Cuffe emailed her stating:

> Hi Lisa, great job!  Thank you for your help.  I contacted Dr. Cui's office this morning to tell them about my role.  I will try to be present for your father's appointment on September 9th.  Let me know if any problems come up.  Brian.

(Copy of email thread is provided in **Exhibit 343**).

1881.   **Defendant Attorney Cuffe** subsequently emailed Plaintiff Daughter Lisa stating that he could not be present for Father's appointment with **Defendant Dr. Cui**, and asked if Plaintiff Daughter would attend Father's appointment.


### iii.  Manifested adversarial posture by Defendants

1882.   It became evident that **Defendant Attorney Cuffe** only intended for Plaintiff Daughter Lisa's involvement in Father's care to consist of being a puppet. Defendant Attorney Cuffe sought Plaintiff Daughter Lisa to perform obsequious menial tasks; however, he did not have any tolerance for unsolicited family input.

1883.   At no time did **Defendant Attorney Cuffe** seek input from Father's daughters.  To the contrary, his pattern of conduct shows that he has—with concerted efforts of other designated Defendants—overtly *sought to exclude* the daughters from having any input into personal decisions made for Father.  Defendants have continuously taken *extra-added* efforts to conceal information from the daughters.

1884.   For example, Plaintiff Daughter Lisa had discovered that Defendants had been making—under stealth—burial plans for Father.  Plaintiff Daughter Lisa only learned of the Defendants making burial plans for Father when some bare descriptions in Defendants' submitted invoices for payment to the Essex Probate & Family Court had made reference to burial plans.  (Copy of correspondence between Plaintiff Daughter Lisa and Defendants regarding her having discovered the burial planning are provided in **Exhibit 344**).

1885.   When Plaintiff Daughter Lisa and her family were still living with Father, Plaintiff Daughter Lisa, *specifically*, did not act in any manner that conflicted with **Defendant Attorney Cuffe's** true role as guardian.

1886.   As advised by **Defendant Attorney Kazarosian**, Plaintiff Daughter Lisa took *added extra effort* to *not* impinge upon **Defendant Attorney Cuffe's** supposed authority as guardian.  Evidencing that fact is a copy of the email that Plaintiff Daughter Lisa sent to Defendant Attorney Cuffe requesting that she be able to speak with Father's primary care doctor—a copy of email provided in **Exhibit 345A** (other email correspondence regarding Father's medical and emotional needs are provided herein) and emails showing Defendants' neglect of Father in **Exhibit 345B**.

1887.   The above-described email sent by **Defendant Attorney Cuffe** shows that Plaintiff Daughter Lisa did not just take matters into her own hands; that she had *requested* permission from Defendant Attorney Cuffe to speak with Dr. Ellenbogen—which, Defendant Attorney Cuffe did not allow Plaintiff Daughter Lisa to do so.

1888.   As previously set forth, Father had long involved Plaintiff Daughter Lisa in making decisions about his personal affairs.  The only type of acts that Plaintiff Daughter Lisa and her husband had engaged in upon the court appointments of **Defendant Attorneys Cuffe** and **Feld** was that of *voicing* their concerns regarding Father's safety and for Father to be treated with dignity and respect.  Plaintiff Daughter Lisa and her husband did not take any action that usurped the role of the court appointed guardian and conservator.

1889.   On or about **September 23, 2011**, Plaintiff Daughter Lisa became concerned when Father was having a consistent cough, over a period of days—at no time did any of the aides of **Defendant Right At Home** show any concern or acknowledgment regarding Father's persistent coughing.

1890.   Of import, as previously set forth, **since 2005**, the FDA has reported that pneumonia is the most prevalent adverse side effect suffered by elders who take Seroquel—and other types of antipsychotics, such as Risperdal and Zyprexa.  The FDA issued a Black-Box warning to not have elders with dementia use antipsychotics— specifically because of the risk of fatality due to increased susceptibility of pneumonia and other respiratory related illness.

1891.   Plaintiff Daughter Lisa was the one who raised concern for Father to be seen by his personal primary care physician (Dr. Ellenbogen) for the afore-described coughing—*not* the staff of **Defendant Right At Home**.  Father was seen by Dr. Ellenbogen and it was determined that Father had pneumonia.

1892.   Plaintiff Daughter Lisa sent a detailed email to **Defendant Attorney Cuffe** on **September 24, 2011**, raising her concerns for Father's safety that the staff of **Defendant Right At Home** had not showed any initiative in recognizing that Father needed to be seen by his doctor—and that if she were not there to have picked up on it, that Father would have been in a more precarious situation.

1893.   In that same above-described email, Plaintiff Daughter Lisa had brought to **Defendant Attorney Cuffe's** attention that one of the aides had been noticeably sick— with a cough.  Plaintiff Daughter Lisa described in the email that when the aide had arrived at the home, the aide was so visibly sick that, immediately, Plaintiff Daughter Lisa asked her to call **Defendant Right At Home** to notify the agency that she was ill, so that she could go home.  The aide told Plaintiff Daughter Lisa that she had already called **Defendant Right At Home** and had informed the agency that she was too sick to work, and that the agency said that she had to work because it was too short of a notice to find a replacement.

1894.   During the afore-referenced time period, Plaintiff Daughter Lisa, also, emailed **Defendant Attorney Cuffe** about Father needing to be examined by the ophthalmologist because Father was complaining that his eyes were causing him discomfort, and that Father was having angst because of his severe hearing loss and that he needed hearing aids that felt comfortable to him.

1895.   In **Defendant Attorney Cuffe**'s responding emails, he expressed exasperation that Plaintiff Daughter Lisa was bothersome with her raising the above-described types of concerns regarding her Father.

1896.   On **September 27, 2011**, Plaintiff Daughter Lisa's husband (Donald Belanger) had emailed **Defendant Attorney Cuffe** (as well as, **Defendant Attorney Feld**) providing a detailed description of inappropriate conduct by various home health aides of **Defendant Right At Home** that was becoming commonplace.  Donald Belanger described the following in his email to Defendant Attorney Cuffe:

> the constant changing of staff, causing Father confusion;

> finding Father crouched up in his chair in the living room late into the night/early morning—showing that the aide did not bring Father to his bedroom to get changed and into bed to sleep;

> there were times that aides on the overnight shift had fallen asleep on the couch in Father's bedroom—when the aides are, specifically, supposed to remain awake during that shift;

one of the aides assigned to the overnight shift was only seventeen (17) years old;

there were times that an aide from the overnight shift would leave early— *before* the 7:00 AM shift, leaving the entry door unlocked.

1897.   Plaintiff Daughter Lisa and her husband had requested that **Defendant Attorney Cuffe** hire a new home health care agency because of concerns for Father's well being, physically and emotionally.

1898.   **Defendant Attorney Cuffe** gave **Defendant Right At Home** a copy of Plaintiff Daughter Lisa's and her husband's emails requesting the termination of Right At Home's services.

1899.   Plaintiff Daughter Lisa had directly emailed **Defendant Attorney Kazarosian** about the above-described incidents; and explicitly raised concerns about Father's health being put at risk.  Defendant Attorney Kazarosian did respond to Plaintiff Daughter Lisa's email, but did not, in any manner, address the described incident.

1900.   As evidenced in the affidavit of **Defendant Caseworker Springman**, submitted by **Defendant Attorney Cuffe** at the court proceeding on **November 8, 2011**, Plaintiff Daughter Lisa's husband had reported to Defendant Caseworker Springman that there had been multiple incidents where staff of **Defendant Right At Home** had fallen asleep while on duty.

1901.   Evidencing the fact that Plaintiff Daughter Lisa and her husband were not disruptive in the manner that they were seeking a change of agency providing home health care services is the above-referenced affidavit of **Defendant Caseworker Springman**, in which, Defendant Caseworker Springman described Plaintiff Daughter Lisa's husband having stated to him that he and Plaintiff Daughter Lisa were "meeting with Attorney Cuffe to *suggest* a new agency that had impeccable credentials."

1902.   In **mid-October of 2011**, **Defendant Attorney Cuffe** had sent out an email stating that he had hired the services of **Defendant Michael Novack** to assist him in carrying out his responsibilities as guardian; showing that Defendant Attorney Cuffe did, in fact, feel that Plaintiff Daughter Lisa was exposing his inadequacy in addressing Father's needs.  (As previously set forth, <u>before</u> Defendant Attorney Cuffe became guardian over Father, he had hired Defendant Michael Novack as "geriatric care manager" in the matters of In re James and Hope Pentoliros).

1903.   During the period of time that **Defendant Attorney Ledoux** was representing Plaintiff Daughter Devora, he stated to Plaintiff Daughter Devora that Defendant Attorney Cuffe was going to make Plaintiff Daughter Lisa's life a living hell if she did not stop bothering him.

### iv.   **Open change in attitude by Defendant Attorney Kazarosian towards Plaintiff Daughter Lisa after she retained new counsel**

1904.   As stated by **Defendant Attorney Kazarosian**, in her own words, she had been communicating with Father *through* Plaintiff Daughter Lisa.

1905.   Plaintiff Daughter Lisa had kept **Defendant Attorney Kazarosian** apprised of the inappropriate conduct of **Defendant Attorney Cuffe** and **Defendant Right At Home**.  Instead of taking corrective action, Defendant Attorney Kazarosian expressly took an approach of "play along to get along".

1906.   By **October of 2011**, it became openly evident that **Defendant Attorney Kazarosian** was not going to follow through on the previously discussed promises that she made to Father, regarding the manner in which she would carry out her legal representation of Father.

1907.   From the pattern of **Defendant Attorney Kazarosian's** emails, Plaintiff Daughter Lisa saw that Defendant Attorney Kazarosian's conduct was suspect and decided to obtain counsel to specifically represent her in the matter of In re Marvin H. Siegel.

1908.   Emails from **Defendant Attorney Kazarosian** illustrating her change in attitude to that of open hostility are provided in **Exhibit 346**.

1909.   Early in the morning of **October 5, 2011**, **Defendant Attorney Kazarosian** responsed to Plaintiff Daughter Lisa's email regarding details of inappropriate conduct by **Defendant Attorney Cuffe**; in that email Defendant Attorney Kazarosian stated:

> I am not happy with Brian, and I have had a bit of a run in myself with him on this. But the court is NOT going to change him right now. The best thing to do in my opinion is to lie low and ride this out through **Nov 8**, and then see about getting someone else appointed if the judge decides to extend, and [I] think he will extend. Judge was not happy about whatever perceived behavior he thought was occurring, and I also made a stink about the first suggestion that he had. So I advise that we ride it, and try to make it Brian's decision that he may not be the best guy for the job given his schedule.

1910.   Later in the day on **October 5, 2011**, **Defendant Attorney Kazarosian** emailed Plaintiff Daughter Lisa and informed her that she had a long meeting with **Defendant Attorneys Cuffe** and **Feld**; and in that email, Defendant Attorney Kazarosian spoke *in support of* Defendant Attorneys Cuffe and Feld.

1911.   On or about **October 7, 2011**, Plaintiff Daughter Lisa informed **Defendant Attorney Kazarosian** that she had obtained independent counsel to represent her specific legal interest in the matter of In re Marvin H. Siegel—which, as evidenced from the provided emails, Defendant Attorney Kazarosian's attitude *quickly* turned openly hostile toward Plaintiff Daughter Lisa.

### v.  Evidence of temporary orders sought by Defendant Attorney Cuffe being based on illicit motives

1912.   As previously established, the common modus operandi by court appointed fiduciaries—issued under SJC Rule 1:07—to facilitate illicit liquidation of assets is to use tactics to conceal any real details concerning the affairs of the elder from family members.

1913.   **Defendant Attorney Cuffe**—along with concerted efforts of other designated Defendants—scheduled an appointment for Father to be evaluated by Dr. Bruce Kaster for **November 2, 2011**.  The sole purpose for Defendants seeking that Father be examined by Dr. Bruce Kastner was to obtain medical certification that would support the already unlawful court ordered guardianship and conservatorship.

1914.   Dr. Kaster is located in the *very same office suite* as **Defendant Michael Novack**—as set forth, Defendant Michael Novack was privately hired by **Defendant Attorney Cuffe** as a "geriatric care manager" to provide services pertaining to Father, as well as previously doing so in the matters of In re James and Hope Pentoliros.

1915.   Designated Defendants knew, on **August 17, 2011**, that **Judge Abber** had made the temporary appointments of guardian and conservator *without* having a *requisite* medical certification.

1916.   Of significance, Defendants did not seek a medical certification from Dr. Bulucu—who had purportedly completed the *original* medical certificate—that was submitted by **Defendant Attorney Garmil** (on behalf of **Defendant Whittier Pavilion**) during the guardianship and conservatorship proceedings held on **June 14, 2011**; the same court proceeding that **Judge Abber** stated that Father *did not* need a guardian.

1917.   Given the fact that Dr. Bulucu discharged Father despite **Defendant Attorney Garmil's** in-court representation that **Defendant Whittier Pavilion** would not discharge Father without a court appointed guardian, it is suspect that the Defendant's did not seek an updated medical certificate from Dr. Bulucu because his discharge of Father indicated that he would not be willing to act as a puppet for the Defendants—which establishes a motive for Defendants wanting to have Father examined by a doctor who would be "willing" to fill out the report in a manner desired by the Defendants.

1918.   Evidencing illicit motives by Defendants are the *number of* doctors that **Defendant Attorney Cuffe** had contacted in terms of obtaining medical certification to support guardianship and conservatorship—which is evidenced from invoices that Defendant Attorney Cuffe filed with the **Essex Probate & Family Court**, consisting of:

> On **September 1, 2011, Defendant Attorney Cuffe** sent a letter to <u>Dr. Naseer</u>;

> On **September 2, 2011**, **Defendant Attorney Cuffe** had a conference with **Defendant Attorney Garmil**—who, as counsel for **Defendant Whittier Pavilion**, was *no longer* involved in the matter of In re Marvin H. Siegel.  As previously set forth, evidence shows that they have an established and substantial personal relationship.  After speaking with **Defendant Attorney Garmil**, Defendant Attorney Cuffe emailed <u>Dr. Jane Funk</u>—who is directly connected with **Defendant Whittier Pavilion** and whom was the certifying doctor for the matters of In re Antoinette Carpinone and In re Robert and Gertrude Pigeon.  Especially suspect is that subsequently in **<u>April of 2012</u>**, Dr. Funk was a certifying doctor in the matter of In re Marvin H. Siegel.

> On **September 8, 2011**, **Defendant Attorney Cuffe** spoke with Dr. Funk;

> On **September 9, 2011**, **Defendant Attorney Cuffe** billed for reviewing the <u>affidavit of Dr. Gray</u>, which had been submitted by Defendant Attorney DeNapoli at the court proceeding to **Judge Abber** on **June 14, 2011**;

> On **September 12, 2011**, **Defendant Attorney Cuffe** spoke with **Defendant Dr. Cui**—Dr. Cui as Father's treating psychiatrist had the capability of completing the requisite medical certificate.

> On **September 15, 2011**, **Defendant Attorney Cuffe** received email from Dr. Funk, which he responded to on **September 18, 2011**; and back and forth emails with Dr. Funk on **September 20, 2011**.

> On **September 20, 2011**, **Defendant Attorney Cuffe** sent a letter to Dr. Cui.

On **September 28, 2011**, **Defendant Attorney Cuffe** spoke with Father's previous doctors, <u>Dr. Ellenbogen</u> and <u>Dr. Stakes</u>—whom, also, had the capabilities to complete the requisite medical certificate.

On **October 5, 2011**, **Defendant Attorney Cuffe** contacted Elder Resources—the company with whom **Defendant Michael Novack** is affiliated.

On **October 17, 2011**, **Defendant Attorney Cuffe** had a conference with Dr. Cui, as well as, on **October 18, 2011**;

On **October 21, 2011**, **Defendant Attorney Cuffe** had conferences with <u>Dr. Krell</u> and <u>Dr. Kraft</u>;

On **October 26, 2011**, **Defendant Attorney Cuffe** had conference with <u>Dr. Fitsel</u>.

1919.  According to **Defendant Attorney Cuffe's** invoice submitted to the Essex Probate & Family Court, he did not contact Dr. Bruce Kaster, any time, from **August of 2011 through October of 2011**.

1920.  Further evidencing ill-motives by designated Defendants is the fact that **Defendant Attorney Cuffe** did not bring Father to be evaluated by any of them prior to the advance scheduled date of **November 8, 2011**—which November 8, 2011 proceeding specifically pertained to the continuation of temporary guardianship and conservatorship.

1921.  As evidenced, it is suspect—after **Defendant Attorney Cuffe** contacting all the various doctors specified above—that Defendant Attorney Cuffe *had not* scheduled Father to be evaluated *until* **November 2, 2011**.

1922.  Suspect is the fact that given the above-described substantial contact between **Defendant Attorney Cuffe** and **Dr. Funk** in **September of 2011** that Father had not been scheduled to be evaluated by Dr. Funk for the medical certificate needed for the court proceeding of **November 8, 2011**—especially, when Dr. Funk had *previously* evaluated Father on the day he was being discharged from **Defendant Whittier Pavilion**—**June 16, 2011**, *at* the Defendant Whittier Pavilion.

1923.  Late at night on **November 1, 2011**, Father and Plaintiff Daughter Lisa were told by the aide for **Defendant Right At Home**—*for the first time*—that Father had a medical appointment early the next morning in Newton, MA; which doctor's office was a substantial distance from Boxford, MA.

1924.  Designated Defendants had foreseeability that Father would be caused emotional upset the next morning because of his personal make-up; as Father does not like to be rushed and it takes him an exceptionally long period of time to get ready in the morning because he is very compulsive in his routine; and complicated by the fact that Father routinely went to bed, well after, midnight and did not get up in the morning until well after 9:00 AM.  This was all well known by **Defendant Attorney Cuffe**, **Defendant Attorney Kazarosian**, **Defendant Michael Novack** and the staff of **Defendant Right At Home**.  As such, Plaintiff Daughter Lisa and her husband were very concerned for Father's emotional well-being because it was inevitable that forcing Father to get up early in the morning—when it was already late at night—would take a toll on Father and cause him to suffer unnecessary anxiety and confusion.

1925.  An email sent from **Defendant Michael Novack** was recorded in the notes of **Defendant ESMV** (input on **January 4, 2012**), in which it stated that "Marvin *continues* to go to bed late and sleep late."

1926.  The only response by Plaintiff Daughter Lisa and her husband to the above-described sudden announcement was their calling **Defendant Right At Home** to voice their concerns—nothing more.

1927.  On or about **November 3, 2011**, **Defendant Attorney Cuffe** filed an emergency motion with the **Essex Probate & Family Court** requesting a *temporary order* to:

> Prohibit[] the Petitioner, Lisa Belanger or her husband Donald Belanger from any way interfering with having Marvin H. Siegel prepared and taken to an appointment with Bruce Kaster, PHD on Wednesday, November 9, 2011. Further the undersigned requests that the Order also state that no party and/or agent speak to Marvin H. Siegel about this appointment with the exception of his attorney, Marsha Kazarosian, and his Guardian, the undersigned.

(Copy of the motion is provided in **Exhibit 347**).  A hearing date for the motion was set for **November 8, 2011**.

1928.  The following Defendants joined in the above-described motion brought by **Defendant Attorney Cuffe**: **Attorneys Kazarosian, Ledoux, and Berid**.

1929.  **Defendant Attorney Cuffe**, also, filed a motion on **November 3, 2011**, asking for permission to file a medical certification late regarding the court order to continue the temporary guardianship and conservatorship.  Defendant Attorney Cuffe based his motion solely on the allegation that Plaintiff Daughter Lisa had obstructed Defendant Attorney Cuffe's ability to obtain a medical certificate.

1930.   As set forth above, **Defendant Attorney Cuffe** knew that the allegations he made in his motion to file a medical certificate late were false and misleading.

1931.   Between **November 2, 2011** and **November 4, 2011**, it became evident that Father was having a sudden problem with incontinence—which is, also, another prevalent side-effect of Seroquel and Risperdal (and other antipsychotics) reported by the FDA. Father *did not* have any problems with incontinence *prior* to his taking Seroquel and Risperdal—becoming a continuous issue for Father through the present.

1932.   Father's problem with incontinence was not an emergency situation and, therefore, Plaintiff Daughter Lisa called Father's primary care doctor (Dr. Ellenbogen in Boston) to see if an appointment could be scheduled.

1933.   Dr. Ellenbogen was able to see Father, late afternoon, on **November 4, 2011**.  Plaintiff Daughter Lisa's husband had knee surgery and was at the doctor's with her husband, and unable to take Father herself.  So she requested that **Defendant Right At Home** take Father to the appointment, but Defendant Right At Home informed her that the agency did not have the capability to do so.

1934.   As documented by the notes of **Defendant ESMV** for **November 4, 2011**, Plaintiff Daughter Lisa informed **Defendant Supervisor Dailey** of the situation. Defendant Supervisor Dailey stated that he could have Father go by ambulance to get checked out for the incontinence issue at the local emergency room, however, Plaintiff Daughter Lisa *explicitly replied* that this was *not* an emergency and that if needed she would call and get an appointment for a different day.  Plaintiff Daughter Lisa specifically stated that to have Father go by ambulance would cause Father unnecessary angst.

1935.   The next evening—which was a Saturday (**November 5, 2011**), **Defendant Attorney Cuffe** *called an ambulance* to have Father brought to the local hospital's emergency room, even though there had been no incident of any kind having occurred. Defendant Attorney Cuffe made the call for an ambulance *without* any notice to Plaintiff Daughter Lisa and her husband.

1936.   When **Defendant Attorney Cuffe** called for the ambulance, he said the reason for Father needing to go to the emergency room was because of "increased confusion and incontinence."  He said that Father had "increased confusion" knowing that it was a lie—and deliberately did so because there was no actual reason for his calling for an ambulance.  (Copy of the Boxford Fire Department Report is provided in **Exhibit 348**).

1937.   When the ambulance had arrived, Father became very upset and did not want to go to the hospital, especially by ambulance.  Father was so upset that the paramedics called the Chief of Boxford Fire Department (Chief Stickney), who came to the home to talk to Father.

1938.   In the Boxford Fire Department Report, it was documented by Chief Stickney, personally, that he cancelled the ambulance because he discovered that there was no emergency requiring Father to go to the hospital.  Chief Stickney wrote:

> Talked with Marvin Siegel and Marvin was doing very well.  I have known Marvin Siegel for years and was doing very well and it was good to see him.  Fire Department not needed C1 cancelled Lyons.  No problem.

1939.   That following Monday, on **November 7, 2011**, Plaintiff Daughter Lisa took Father to the local hospital to be examined.  Father was diagnosed with pneumonia— it has been, also, reported that Father has suffered from pneumonia and other respiratory issues on the following subsequent dates of **April 22, 2012** and **May 3, 2012**.  (Emails from designated Defendants of the afore-referenced medical issues are provided in **Exhibit 349**).

1940.   Again, it was Plaintiff Daughter Lisa who raised concern about Father having an unusual issue with incontinence—_not_ the staff of **Defendant Right At Home**. As such, Plaintiff Daughter Lisa requested that Father be examined by his primary care doctor.

1941.   Through then-newly obtained counsel (Greg Hession), Plaintiff Daughter Lisa had filed an opposition to **Defendant Attorney Cuffe's** motion for temporary orders and the late filing of a medical certificate—with supporting documentation; which was sent to **Defendant Attorney Cuffe**—as well as, **Defendant Attorneys Kazarosian, Feld, and Berid**—on **November 5, 2011**.  (Copy of the oppositions and supporting documentation filed on behalf of Plaintiff Daughter Lisa are provided in **Exhibit 350**).

1942.   In the above-described opposition served upon the Defendants, counsel showed that Plaintiff Daughter Lisa and her husband _had not_ obstructed Defendants' taking Father to be evaluated by Dr. Bruce Kastner; and, had shown that Father not having been evaluated was _exclusively the fault of_ **Defendant Attorney Cuffe**.

1943.   Even more so, Plaintiff Daughter Lisa's written Opposition showed that **Defendant Attorney Cuffe** had engaged in suspect conduct; as it was shown that Dr. Kastner was located in the *very same office suite* as **Defendant Michael Novack** and that Defendant Attorney Cuffe sought the services of Dr. Kastner after first seeking so many different doctors beforehand to file a medical certificate in the matter of In re Marvin H. Siegel.

1944.   In notes of **Defendant ESMV**, input by **Defendant Caseworker Springman** on <u>September 21, 2011</u>, is an email that he received from **Defendant Attorney Berid** relaying statements made by **Defendant Attorney Cuffe**; which Defendant Attorney Berid stated in her email to Defendant Caseworker Springman:

> Further Marvin will need to be seen for a med cert [medical certificate], as he is on anti-psychotic medication. The guardianship papers will have to be amended.  *Brian [Brian Cuffe] is thinking of asking Dr. Funk to do the cert, and see if she can go to Marvin's home.  He has less confidence in Dr. Cui doing it*.  He would like Mike for you to continue for a while visiting and checking on things.

1945.   Further solidifying Defendants' illicit motive is the fact that **Defendant Attorney Cuffe** deceptively submitted additional motions and affidavits to **Judge Abber** at the court proceeding on **November 8, 2011**—these motions were <u>not</u> served to Plaintiff Daughter Lisa or her counsel and the motions had been submitted to the clerk without their knowledge.

1946.   With Defendants knowing—prior to the scheduled hearing—that counsel for Plaintiff Daughter Lisa had raised the suspect relationship between Dr. Kastner and **Defendant Michael Novack** in the written opposition, **Defendant Attorney Cuffe** had drafted another version of the motion for temporary orders which, as set forth above, was deceptively submitted to **Judge Abber**—a copy of which is provided, along with the accompanying affidavit of **Defendant Michael Springman** in **Exhibit 351**.

1947.   As set forth, the originally filed motion for temporary orders (on **November 3, 2011**) was a request that was specifically tailored to an anticipated examination, specifically limited to Dr. Bruce Kaster; whereas, the modified version of the request for temporary orders—which was deceptively and secretly given to Judge Abber at the court proceeding—*completely eliminated* any mention of Dr. Bruce Kaster and was changed to be an open-ended, carte-blanche order for Plaintiff Daughter and her husband to "not interfere" with the on-goings of Father's affairs.

1948.   Further showing Defendants' deliberate deception and illicit motives in originally seeking to use Dr. Kaster is the fact that after Plaintiff Daughter Lisa's counsel filed the afore-described opposition, **Defendant Attorney Cuffe** did not take Father to any subsequent appointment to be seen by Dr. Kaster.

1949.   Defendants deliberately filed the motion for temporary orders for the specific purposes of prejudicing and inflaming **Judge Abber's** bias against Plaintiff Daughter Lisa; to use in furtherance of Defendants' illicit scheme to obtain court ordered removal of Plaintiff Daughter Lisa and her family from Father's home.

1950.   **Judge Abber** _did_ _not_ conduct an evidentiary hearing at the **November 8, 2011** proceeding.  Representations made by Defendants and the affidavits of **Defendant Caseworker Springman** and **Defendant Michael Novack** were submitted at the court proceeding, knowingly, based wholly on totem-pole hearsay—*not first-hand knowledge* representations.  Plaintiff Daughter Lisa was not afforded the opportunity to challenge the veracity of the representations made.

1951.   As a matter of law, the temporary orders allowed by **Judge Abber** on **November 8, 2011** were unlawfully issued in terms of being issued based on collusion with designated Defendants and being procedurally defective.  Judge Abber intentionally and deliberately—based on ill-motive—deprived Plaintiff Daughter of the procedurally required safeguards of due process; that the language of the order was unconstitutionally vague and over broad; and violated the constitutional protections of the sanctity of family relations.

### vi.  **Evidence showing false allegations of disruption made by designated Defendants, where—in actuality—Plaintiff Daughter Lisa was lawfully and reasonably exposing Father to unsafe and improper care**

1952.   There is documentation to show that, from **June of 2011** through **August of 2011**, Plaintiff Daughter Lisa and her husband had a good rapport with the home health aides.

1953.   It was not until _after_ the court appointment of **Defendant Attorney Cuffe** as guardian did steady problems begin to occur with the home health aides from **Defendant Right At Home.**  Prior to Defendant Attorney Cuffe's appointment, there had been a set routine with the staff of Defendant Right At Home, with little turnover of assigned home health aides.

1954.   After **Defendant Attorney Cuffe's** court appointment as guardian on **August 17, 2011**, frequent changes in the assignment of home health aides of **Defendant Right At Home** occurred—which changes, originally, were _not_ at the request of Plaintiff Daughter Lisa or her husband.  The unsolicited and abrupt changes to the scheduling of home health aides were very confusing for Father and caused him unnecessary emotional harm.

1955.   As documented in the notes of **Defendant ESMV** (for **November 3, 2011**)—by a staff person not usually associated with Father's matter (Brian Sanborn), recorded that Plaintiff Daughter Lisa called and reported:

> She [Plaintiff Daughter Lisa] has consistently asked vendor [Defendant Right At Home] to stop sending new workers into the home as the elder needs routine as he has dementia.  Dtr [Plaintiff Daughter Lisa] stated that she is aware of enough workers that the elder knows who are willing to do the shifts, but the agency continues sending new workers.

1956.   Consequently, Plaintiff Daughter Lisa and her husband researched other home health care agencies.  They had asked **Defendant Attorney Cuffe** to use the Chelsea Jewish Community agency—an agency that specifically incorporated Jewish customs and traditions. **Defendant Daughter Sheryl** had solely objected to Plaintiff Daughter Lisa's request because a friend of Plaintiff Daughter Lisa's was an employee for that agency—the friend was _not employed as a caregiver_, but in an administrative capacity.  Defendant Attorney Cuffe assured Defendant Daughter Sheryl (by email) not to worry that he was not going to go along with Plaintiff Daughter Lisa's request_;_ telling Defendant Daughter Sheryl that _he_ had sole authority to make changes.

1957.   Of significance, **Defendant Daughter Sheryl** emailed **Defendant Attorney Ledoux** stating that _she did not object_ to the hiring of a new home health care agency—she just did not want _the one_ requested by Plaintiff Daughter Lisa; and, still, **Defendant Attorney Cuffe** did not implement any change of home health care agency.

1958.   In fact, **Defendant Attorneys Cuffe** and **Feld** made sure to give "holiday gifts" to the staff of **Defendant Right At Home** _funded from Father's estate_.

1959.   **Defendant Attorney Cuffe** had financial and other personal incentives in making sure that **Defendant Right at Home** remain as the service provider, which were not known by Plaintiff Daughter Lisa and her husband, and had been the ill-motive for **Defendant Attorney Cuffe** filing the above-described motion.

**L.  Retaliation for Plaintiff Daughter Lisa exposing Defendants' knowingly unlawful administration of antipsychotics to Father**

1960.   As previously set forth, **Defendant Whittier Pavilion** facilitated private outpatient psychiatric treatment for Father; and directly facilitated that Father be treated by **Defendant Dr. Ping Cui.**

1961.   **Dr. Ping Cui** was the treating psychiatrist for Father from the time of Father's discharge from the **Defendant Whittier Pavilion** on **June 16, 2011** until sometime in **December of 2011.**  Throughout this time period, **Dr. Ping Cui** was prescribing Seroquel to Father.

1962.   In **mid-August of 2011**, Plaintiff Daughter Lisa had been informed by the home health aide that **Defendant Daughter Sheryl** had called Father, in which it could be heard that the conversation consisted of convincing Father that he should not take the antipsychotic Seroquel.  Thereafter, Father openly expressed to Plaintiff Daughter Lisa and the employees of **Defendant Right At Home** that he no longer wanted to take Seroquel.

1963.   As previously set forth, Plaintiff Daughter Lisa did not have professional legal experience involving, mental health or civil commitments.  At that time, Plaintiff Daughter Lisa had no familiarity with regard to medication issues and procedural requirements regarding medication.

1964.   When it was brought to the attention of **Defendant Nurse Brenda Wojick** of **Defendant Right At Home**—in **mid-August of 2011**—that Father no longer was willing to take the Seroquel voluntarily, Defendant Nurse Wojick represented to Plaintiff Daughter Lisa that the standard customary and routine practice and regulations required that the family member crush the antipsychotic—not the home health care agency.

1965.   Where it was represented to Plaintiff Daughter Lisa by the staff of **Defendant Whittier Pavilion** that Father's discharge had been conditioned on Father taking the prescribed Seroquel, Plaintiff Daughter Lisa unwittingly believed **Defendant Nurse Wojick** above-described representations; having no indication that the directed procedure by Defendant Nurse Wojick was unlawful.

1966.   On **August 30, 2011**, **Defendant Caseworker Springman**—on behalf of **Defendant ESMV**—came to Father's home.  Defendant Caseworker Springman recorded his notes about the visit; in which, he stated that he had been informed by Father and Donald Belanger (Plaintiff Daughter Lisa's husband) that the doctor at **Defendant Whittier Pavilion** told them that if Father did not remain on Seroquel that he would be put back into the hospital.

1967.  **Defendant Caseworker Springman** documented, in the above-referenced notes:

> AV [Alleged Victim, meaning Father] and Mr. Belanger stated that they did not agree with this and that they both stated that AV [Father] wished to go to Beth Israel for any treatment, as he always has.

1968.  By early **October of 2011**, when designated Defendants' hostile attitude became evident, Plaintiff Daughter Lisa decided to obtain private counsel (Greg Hession). In late **November of 2011**, and the subject matter of the manner in which Father was being given Seroquel came up between Plaintiff Daughter Lisa and counsel—it was, at that time, that Plaintiff Daughter Lisa *then* discovered **Defendant Nurse Wojick** had lied to her about what was proper and lawful medication administration procedures; upon which, Plaintiff Daughter Lisa immediately, through counsel, raised such issue to the attention of designated Defendants.

1969.  It was through counsel that Plaintiff Daughter Lisa first learned of the existing law—known as "Roger's authority" or "Roger's Rule"—that confirmed the mandate that guardians and health care agencies are *not* allowed to facilitate or give prescribed antipsychotics by concealed means to a person who is not wanting to take it.

1970.  It was through counsel that Plaintiff Daughter Lisa then learned that the Roger's case set forth the procedural requirements mandated when a guardian believes the person, whom is under his or her "care", needs to be medicated with antipsychotics.  The mandated procedure requires that the guardian *must first* file a motion with the Probate & Family Court to obtain a court order authorizing the concealed use of antipsychotics, *before doing so*—which court order can be sought on an emergency basis.

1971.  On **July 31, 2011**, Defendants (**Kazarosian, Cuffe** and **Feld**) were informed by Plaintiff Daughter Lisa and her husband about the above-described situation, regarding Father not willing to take the prescribed Seroquel and the representations made by **Defendant Nurse Wojick** to Plaintiff Daughter Lisa about crushing the Seroquel.

1972.  **Defendant Attorney Cuffe**—having worked as a guardian for over fifteen (15) years—had actual knowledge, as of **August 31, 2011**, that Father was refusing to voluntarily take the prescribed antipsychotic Seroquel and that **Defendant Right at Home** was facilitating Father being given crushed and concealed Seroquel.

1973.  From the inception of **Defendant Attorney Cuffe's** appointment as guardian, he *directly authorized and oversaw* the home health aide agency's crushing of the Seroquel to conceal it in our father's food.

1974.   On **September 20, 2011**, Defendants (**Attorney Berid**, **Diane Powell** and **Caseworker Springman**) met "to discuss the case and status."  Defendant Diane Powell input notes into the computer system of **Defendant ESMV** describing the afore-described meeting.  She documented that the following was discussed:

> Defendant Caseworker Springman reported that Aids were putting the prescribed antipsychotic, in a crushed form, on Father's cereal;

> A court date had been scheduled for **November 8, 2011**;

> A new medical certificate was needed—"Guardian is going to ask Dr. Funk to do a home visit.  Back up plan is Dr. Qui [Cui].  PSS suggested psychiatrist who is a director for ABU.  Unsure of his name.  PSS to check with Trish Lavoi at MVH ABU to determine if he has a private practice."

1975.   On **September 21, 2011**, **Defendant Caseworker Springman** input notes into the computer system of **Defendant ESMV** that he had been informed by Donald Belanger that Father was not willing to take the prescribed antipsychotic.  Defendant Caseworker Springman documented that he spoke with a supervisor at **Defendant Right At Home**, who confirmed that Father was not willing to take the prescribed antipsychotic.

1976.   Also, on **September 21, 2011**, **Defendant Caseworker Springman** documented in the notes of **Defendant ESMV** that **Defendant Dr. Ping Cui** left a voice mail for him.  Defendant Caseworker Springman wrote that Defendant Dr. Ping Cui stated in the voice mail that Plaintiff Daughter Lisa had told her that Defendant Daughter Sheryl had called Father, trying to convince him not to take his Seroquel which led to Father's resistance.

1977.   **On September 22, 2011**, **Defendant Diane Powell** documented in the notes for **Defendant ESMV** that she spoke with **Defendant Jay Kenney**, owner of **Defendant Right At Home** and that Defendant Jay Kenney told her that Plaintiff Daughter Lisa was crushing the prescribed antipsychotic, with the aids of Defendant Right At Home putting it in Father's cereal.

1978.   At the court proceeding of **November 8, 2011**, **Judge Abber**, also, had knowledge that Father was not willing to take the prescribed Seroquel and that the Seroquel was being crushed and put in Father's food—this was *explicitly decribed in detail* by **Defendant Caseworker Springman**, in his affidavit that was submitted to Judge Abber *by* **Defendant Attorney Cuffe**.

1979.   In the affidavit of **Defendant Caseworker Springman**, it was attested in Paragraph numbered 5:

> PSW Springman asked about elder's psych meds and Donald stated that the elder still had his Seroquel but was resistant to taking it.  PSW Springman later spoke with Dr. Cui verifying that the elder had come into her office and that she gave elder another script for his Seroquel, that he should not run out and that it was the same dosage.  Dr. Cui also stated that Lisa had told her that elder's daughter Sheryl Sidman (hereinafter Sheryl) had called the elder and convinced him not to take his Seroquel which was where his resistance to take them came from.

1980.   In the affidavit of **Defendant Caseworker Springman**, it was attested in Paragraph numbered 8:

> On 9/22/11 PSW spoke with Mr. Kenney from [Right At Home] . . . .  Mr. Kenney also stated that it was reported that the elder was resistant to taking his meds but that Lisa was grinding them up and putting it on his cereal in the morning and that the elder was taking them that way.

1981.   As previously set forth, when Daughter Lisa had been apprised of the Roger's Rule in **late November of 2011**, her counsel emailed **Defendant Attorney Cuffe** and **Defendant Attorney Kazarosian** (counsel for Father) raising the issue of the impropriety of the manner in which the antipsychotic Seroquel was being given to Father. (Emails sent by counsel for Plaintiff Daughter Lisa to designated Defendants are provided in **Exhibit 352**).

1982.   **Defendant Attorney Cuffe** did not respond to the initial email sent by counsel for Plaintiff Daughter Lisa—nor the other designated counsel who were cc'd. Instead, Defendant Attorney Cuffe contacted the staff of **Defendant Right at Home**, directing the health care agency to stop crushing and concealing the Seroquel.

1983.   The *very next day* after Plaintiff Daughter Lisa's counsel had sent the afore-described email, **Defendant Nurse Wojick** sent out the following email to other staff and to **Defendant Attorney Cuffe**, which stated:

> Through an email from Marilyn [Staff] that I received, we will no longer be able to 'hide' Marvin's seroquel from him, meaning that we cannot crush it and put it into his food without knowing it.  According to his guardian/social worker, we must let him know that we are giving this to him, and tell him what it is.  I went over to discuss this with him.

(Copy of the above-described email is provided in **Exhibit 353**).

1984.   Days later, with no advance notice, **Defendant Nurse Wojick** came to the house unannounced to see Father; specifically, for the purpose of persuading Father to willingly take the Seroquel.

1985.   From the months of **Defendant Nurse Wojick's** interaction with Father, she regularly used flirtation to maintain agreeability.   Provided in **Exhibit 354** is a copy of the front and back cover of the book written by Defendant Nurse Wojick, entitled "Can You Squeeze My Banana?"   The front cover of the afore-referenced book is a vixon-like caricature of Defendant Nurse Wojick –an actual photograph of Defendant Nurse Wojick is on the back cover.

1986.   Plaintiff Daughter Lisa was present at the kitchen table when **Defendant Nurse Wojick** spoke with Father during the afore-referenced unannounced visit.  Plaintiff Daughter Lisa was not asked to leave.

1987.   To obtain consent, **Defendant Nurse Wojick** had a legal obligation to fully inform her client about the medication at issue.

1988.   During the afore-described visit, **Defendant Nurse Wojick**, repeatedly and purposely, refrained from telling Father the name of the medication; which she had expressed in an email that she had written to **Defendant Marilyn Staff**.  In that email, Defendant Nurse Wojick had described her version of the events that took place during the afore-referenced visit with Father.   (Copy of that email is provided in **Exhibit 355**).

1989.   Plaintiff Daughter Lisa raised the issue that **Defendant Nurse Wojick** was deliberately not identifiying the name of the medication to Father.  Plaintiff Daughter Lisa did so by making the sole statement to Father: "Ask her what the name of the medication is."

1990.   **Defendant Nurse Wojick** indicated, in the afore-mentioned email, that Father *remembered* that Seroquel was the medication he was given back in **May of 2011** when he was at **Defendant Whittier Pavilion**.  Defendant Nurse Wojick described, in the above-referenced email, that Father was engaging in a normal conversation like any other average functioning person.

1991.   In the afore-mentioned email, **Defendant Nurse Wojick**, specifically, described Father's then-ample ability to think and evaluate information.   She stated in the email:

> Marvin [Father] wanted to have a list of the side affects.  He felt that doctors prescribe things just to prescribe them and only takes vitamins and does not want to take anything else.

1992.   Corroborated by **Defendant Nurse Wojick's** above statements, she intentionally kept the known side-effects of Seroquel out of the conversation because of Father having capacity.

1993.   **Defendant Nurse Wojick** explicitly told Father that she did not know what the reported side-effects were and that she would get him the information about the side effects.  Defendant Nurse Wojick is a licensed registered nurse; she did, in fact know what the reported side-effects for Seroquel were.

1994.   In the afore-described email, **Defendant Nurse Wojick** stated that she had <u>no</u> intention of providing Father information about the side effects of Seroquel.  She stated in the email:

> I told him [Father] I could get the side effects to him, but I am going to leave that to the pharmacy or to Dr. Cui since she prescribed it.

1995.   **Defendant Nurse Wojick** told Father that Seroquel was the equivalent to that of melatonin (which is an over-the-counter natural based sleep aid).  She knew that Father had previously used melatonin to help him sleep—as the data sheet kept by **Defendant Right At Home** explicitly noted Father's usage of melatonin.  In the afore-described email, Defendant Nurse Wojick said to Father that Seroquel was used to help him sleep.

1996.   In the afore-described email, **Defendant Nurse Wojick** confirmed that the *only* conduct alleged, regarding Plaintiff Daughter Lisa interfering, was the above-described statement that Father should inquire as to the name of the medication and reminding Father of his lawful right to choose.

1997.   As set forth, the two (2) statements made by Plaintiff Daughter Lisa were made *after* repeated and deliberate acts by **Defendant Nurse Wojick** to deceive Father and to not have Father be fully informed—which Defendant Nurse Wojick's afore-described conduct being blatant and flagrant.

1998.   As evidenced, the above-described conduct of Plaintiff Daughter Lisa was lawful, warranted and justified.

1999.   Father continued to personally and vehemently express that he did not want to take Seroquel; and, on **<u>December 6, 2011</u>**, Father took the entire stock of Seroquel and flushed it down the toilet—*with no* involvement of Plaintiff Daughter Lisa and her husband, in any manner.

2000.   On **December 9, 2011**, Defendants filed a specific motion seeking to remove Plaintiff Daughter Lisa and her family from Father's house by court order.

2001.   **Defendant Attorney Cuffe** filed an ex-parte emergency motion, on **December 9, 2011**, seeking a court order to "temporarily" vacate Plaintiff Daughter Lisa and her family from Father's residence.  (Copy of the ex-parte motion and motion to temporarily vacate filed by Defendant Attorney Cuffe is provided in **Exhibit 356**).

2002.   Without Plaintiff Daughter Lisa being present, **Judge Abber** scheduled a hearing for **Defendant Attorney Cuffe's** motion to vacate to be heard on **December 12, 2011**.

2003.   Where Plaintiff Daughter Lisa and her family had resided with Father, they were able to observe—*first-hand*—the manner in which Father was being mistreated by **Defendant Attorney Cuffe**, as guardian, and by the staff of **Defendant Right At Home**. As established, **Defendant Attorney Cuffe** and other designated Defendants had illicit motives for not wanting Plaintiff Daughter Lisa knowing the on-goings with Father.

2004.   As previously set forth, right from the inception of the court proceedings, in the matter of In re Marvin H. Siegel—and demonstrated by the court audio recording and transcript for **June 14, 2011**, designated Defendants explicitly requested that **Judge Abber** remove Plaintiff Daughter Lisa and her family from Father's house.

2005.   When **Judge Abber** did not do so on **June 14, 2011**, designated Defendants made that same request to Judge Abber, again, on **August 17, 2011**—to remove Plaintiff Daughter Lisa and her family from Father's house.  Conspicuously, Judge Abber *did not* entertain that issue raised by **Defendant Attorney Berid** on  **August 17, 2011**, even though—at that very time, he capriciously declared Plaintiff Daughter Lisa to have financially exploited Father; showing that Judge Abber knew that Plaintiff Daughter Lisa had not committed any wrong doing.

2006.   Notes of **Defendant ESMV**, input on **November 3, 2011**—by **Defendant Diane Powell**, state that **Defendant Michael Novack** formally recommended that Plaintiff Daughter Lisa "be removed from the home".

2007.   Notes input on **November 8, 2011** state that **Defendant Michael Novack** submitted an affidavit to **Judge Abber**, in court, having recommended that if Plaintiff Daughter Lisa refused to leave that Father be placed in a long-term care facility for Alzheimer's.

2008.   Again, at the court proceeding of **November 8, 2011**, designated Defendants requested by motion to remove Plaintiff Daughter Lisa and her family from Father's house, but no such order was issued.

2009.   In the notes of **Defendant ESMV**, after the **November 8, 2011** court proceeding, **Defendant Diane Powell** recorded in the computerized note system her description of events that occurred in court.  She stated:

> Judge Abner [Abber] said that he was not able to order Lisa out of the house today but given this case he will be taking this under consideration.

2010.   Evidencing improper and distorted bias against Plaintiff Daughter Lisa by **Defendant ESMV**, **Defendant Diane Powell** stated in the above-described email:

> Dtr Cheryl and her husband were appropriate in the courtroom *but* dtr Lisa started to *sob* towards the end of the hearing.

2011.   As previously set forth, drugging elders with antipsychotics is a key component in the Defendants' modus operandi in leading to their ultimate objective of liquidating the elder's assets for Defendants' personal financial gain.

**December 12, 2011 court hearing**

2012.   Through counsel, Plaintiff Daughter Lisa filed a written opposition to **Defendant Attorney Cuffe'**s motion to vacate.  In the written opposition, Plaintiff Daughter Lisa brought forth the issue of Defendant Attorney Cuffe's long-established and knowing unlawful conduct of facilitating Father being given the prescribed antipsychotic Seroquel in a concealed manner because Father was not willing to take it.  (Copy of the Opposition filed on behalf of Plaintiff Daughter Lisa is provided in **Exhibit 357**).

2013.   The audio court recording for the court proceeding held on **December 12, 2011** is provided in prior referenced Exhibit 23 and the transcript is in Exhibit 24.

2014.   As previously set forth, **Judge Abber** had knowledge, on **November 8, 2011**, that Father was being given antipsychotics against his will—crushed up and put in cereal—and that the Defendants were *overtly taking part* in the concealed administering of the Seroquel.  **Defendant Caseworker Springman** attested to that fact in his written affidavit that was submitted by **Defendant Attorney Cuffe** to the **Essex Probate & Family Court** at the court proceeding of **November 8, 2011.** (Refer to prior referenced Exhibit 351 for affidavit of Defendant Caseworker Springman).

2015.   At the hearing on **December 12, 2011**, the very first topic addressed by **Judge Abber** was whether **Defendant Attorney Cuffe** knew that Father was being given Seroquel in a concealed manner.

2016.   **Judge Abber** directly asked **Defendant Attorney Cuffe** if he "had Roger's Authority"—in other words, Judge Abber asked Defendant Attorney Cuffe whether he had gone before another judge to obtain a court order (a "Roger's Order") to authorize the antipsychotic to be crushed up into Father's food.

2017.   **Defendant Attorney Cuffe** responded that he had not sought a Roger's Order.  He made in court admissions acknowledging that he had actual knowledge that Father had been receiving antipsychotics (Seroquel) by being crushed and concealed in his food.

2018.   **Defendant Attorney Cuffe** then went on to make general and broad statements about his attempts to obtain the medical certificate from **Defendant Dr. Cui**, as treating psychiatrist for Father.

2019.   As previously set forth, on **September 21, 2011**, **Defendant Attorney Berid** stated in an email to **Defendant Caseworker Springman** that **Defendant Attorney Cuffe** had expressed to her that **Defendant Dr. Cui** did not want to be involved in providing medical certification to obtain court ordered administration of antipsychotics.

2020.   Invoices submitted to the Essex Probate & Family Court by **Defendant Attorney Cuffe** show that he had spoken with **Defendant Dr. Cui** on **September 12, 2011**, **October 17, 2011** and **October 18, 2011**.

2021.   **Defendant Dr. Cui** was aware that Plaintiff Daughter Lisa was an attorney and was adamantly fighting for Father's rights; explaining Defendant Dr. Cui's reluctance to provide the above-described affidavit sought by **Defendant Attorney Cuffe**.

2022.   In subsequent court proceedings (January 24, 2012), **Defendant Attorney Cuffe** made the following in-court representations about his trying to obtain an affidavit from **Defendant Dr. Ping Cui**:

> At some stage and I've forgotten exactly the dates when I began getting in contact with [Dr. Cui], telling her that we needed a Roger's Affidavit, because there was an outstanding petition for authority.  I then called her at least three, if not four times, and as I say, I sent her a letter, "We have to have Roger's authority to have Mr. Siegel taking Seroquel."

Attorney Kazarosian, representing Mr. Siegel, then also contacted Dr. Cui both by telephone and in writing, requesting a Roger's affidavit.  When no responses to those requests were forthcoming, I began to search for another treating psychiatrist, as well as an independent psychiatrist to do a Roger's evaluation. . . .

So, within the past month, yet another psychiatrist has been located, [Dr. Portney], who practices at the Whittier Hospital.  He did see Mr. Siegel last month and was to see him Thursday for purposes of the Rogers.  In between those two appointments, he wasn't comfortable making a decision on a Roger's with just one evaluation . . . ."

2023.   It is suspect that **Defendant Dr. Cui**, having been the treating psychiatrist of Father—and *who had been* *the* *doctor* *prescribing antipsychotics to be given to Father*, beginning in **May of 2011** and *continuously* through **December of 2011**, would not provide the guardian (**Defendant Attorney Cuffe**) the requisite medical certification needed for a court ordered guardianship.

2024.   Also, conspiciuous is that Defendant Dr. Cui was unwilling to provide the guardian requisite medical certification for court ordered forced administration of antipsychotics.

2025.   **Defendant Attorney Cuffe** made blanket and general representations about failed attempts to obtain another psychiatrist to provide the needed medical certification.

2026.   Of grave significance, designated Defendants did, *in fact*, obtain a medical certificate from **Defendant Dr. Funk**, on or about, **December 2, 2011**—but, decided not to submit it *at* the above-described hearing.  **Defendant Attorney Cuffe** made in-court representations, as though Dr. Funk's signed medical certificate never even existed.

2027.   Through deception Defendants had filed it with the Essex Probate & Family Court on **December 12, 2011**—no notice provided to Plaintiff Daughters.

2028.   Designated Defendants did not give any notice or indication to Plaintiff Daughter Lisa that there was a medical certificate from **Defendant Dr. Funk**.  The only reason that Plaintiff Daughters subsequently found out about the medical certificate is because, after Plaintiff Daughter Devora had terminated **Defendant Attorney Ledoux's** legal representation, she had subsequently requested a copy of Defendant Attorney Ledoux's file for the time period that he had represented her—a copy of Defendant Dr. Funk's certificate was included in the package that Plaintiff Daughter Devora received.

331

2029.   It stands to logic that **Defendant Attorney Ledoux** deliberately did not intend to include **Defendant Dr. Funk's** medical certificate in the package that he sent to Plaintiff Daughter Devora, as it appears that he intentionally omitted a substantial portion of other documents that Plaintiff Devora *should have* received, but did not.

2030.   Plaintiff Daughter Lisa subsequently found the above-described medical certificate in the court files for the matter of In re Marvin H. Siegel.

2031.   The medical certificate signed by **Defendant Dr. Funk** stated that she examined Father on **December 2, 2011**—which is, also, the date that she signed the completed certificate.

2032.   Plaintiff Daughter Lisa and her family were still residing with Father at the above-designated date.  There was no indication that Father had been taken to see **Defendant Dr. Funk** and there were no indications that Defendant Dr. Funk had come to see Father at the house.

2033.   There is affirmative evidence through **Defendant Attorney Cuffe's** invoices that show that Father was not actually seen by **Defendant Dr. Funk** on **December 2, 2011**, as certified.  Defendant Attorney Cuffe's invoice for the relevant time period *does* *not*, in any manner, mention Dr. Funk, while he had extensively documented his contact with Defendant Dr. Funk (and the numerous other doctors) on *prior dates*. (Refer to Defendant Attorney Cuffe's invoices in prior referenced Exhibit 282).

2034.   Other grave and material problems with **Defendant Dr. Funk's** representations in her signed medical certificate of **December 2, 2011** consist of:

> Defendant Dr. Funk stated that Father had been admitted to Beverly Hospital (on **May 19, 2011**) because family members called the police—as previously set forth, it is indisputable that *family members had not called the police*, but rather an employee of Father's.  *Family members were not even present at the time of the supposed incident*.

> Defendant Dr. Funk stated that the psychiatric evaluation performed by Dr. Pierre Mayer "revealed Mr. Siegel to be generally cooperative".

> Defendant Dr. Funk stated that Seroquel was a tranquilizer—it may act like a tranquilizer, which is the reason for the previously described prevalent misuse of Seroquel with regard to elders with dementia, but it is classified as an ANTIPSYCHOTIC.

Defendant Dr. Funk stated that when she first evaluated Father (on **May 24, 2011**) "his baseline IQ as obtained on the Weshler Test of Adult Reading was **122** a score at the 93rd percentile"; and then when she evaluated him the second time (**June 16, 2011**)—after being given antipsychotics and *less* than 2 months later—that Father's IQ score declined to **85**; and then when she evaluated him for the third time (on **December 2, 2011**), Father's IQ was supposedly **79**.

Defendant Dr. Funk stated: "Mr. Siegel requires cues to feed and dress himself."—as previously set forth, the notes and investigation reports of **Defendant ESMV**, overwhelmingly, shows that representation to be outright false.

Defendant Dr. Funk stated: "Mr. Siegel opposes the appointment of a guardian/conservator.  He has made his wishes known in previously executed documents including a health care proxy and power of attorney"—which she was directly aware of Father's executing the re-affirmation of his 2003 DPOA and health care proxy, re-affirming Plaintiff Daughter Lisa as his attorney-in-fact—on **June 16, 2011** (the same day as her second evaluation).

Defendant Dr. Funk checked the box that stated that Father had "poor social skills"—as previously set forth, the notes and investigation reports of **Defendant ESMV**, overwhelmingly, shows that representation to be outright false.

Defendant Dr. Funk checked the box that stated Father *was not* a patient under her continuing care and treatment.

2035.   As evidenced, the Defendants had ill-motives in concealing **Defendant Dr. Funk's** medical certificate of **December 2, 2011**.

2036.   De facto, without a court issued order, it is unlawful to give a person antipsychotics through concealed means.

2037.   De facto, at the proceeding of **December 12, 2011**, **Judge Abber** was presented hard cold facts that Father was being unlawfully administered antipsychotics. Judge Abber *did not* take any action, whatsoever, regarding the above-described unlawful facilitation of antipsychotics by **Defendant Attorney Cuffe** and other designated Defendants.

2038.   Due to ill-motives, **Judge Abber** did not allow Plaintiff Daughter Lisa to be fully and adequately heard at the proceeding of **December 12, 2011**; Judge Abber did not allow Plaintiff Daughter Lisa to fully and adequately present her case; and Judge Abber acted in a manner that overtly precluded Plaintiff Daughter Lisa from doing so.

2039.   As previously set forth, the proceeding of **December 12, 2011**, **Judge Abber** did not conduct an evidentiary hearing.

2040.   **Judge Abber** did not take **Defendant Attorney Cuffe's** request for a court order to force Plaintiff Daughter Lisa and her family from their home under advisement; instead, Judge Abber ruled from the bench and granted the motion.  Plaintiff Daughter Lisa and her family were ordered to vacate their residence by **December 16, 2011**—which gave them 4 days to move out.

2041.   The written order issued by **Judge Abber**, on **December 12, 2011**, was an order to *only* vacate the residence by **December 16, 2011**.  (Refer to prior referenced Exhibit 356).  De facto, the Order of **December 12, 2011**, was not a restraining order or a stay away order.  Even more so, it was designated as a *temporary* order.

2042.   The fact that Plaintiff Daughter Lisa and her family were allowed to remain in the residence for 4 more days shows that **Judge Abber** knew that it was false and fabricated that Plaintiff Daughter Lisa was harmful to Father; and, that there was no legitimate emergency for her and her family to be forced out of their home.

2043.   There was no discussion at the court proceeding on **December 12, 2011** about there being supervised visitation—nor was there any order issued for supervised visitation.  There was no order that Plaintiff Daughter Lisa and her family could not see Father.

2044.   Further corroborating that there were no restraining orders issued of any kind—no 209A, no stay away order and no supervised visit—is the email sent by **Defendant Attorney Cuffe** *to* **Defendant Attorney Kazarosian**; which was recorded and input into the notes of **Defendant ESMV** on **January 17, 2012**.

2045.   The above-referenced email involved the circumstances of **January 13, 2012**, when Father was being taken away by ambulance to be involuntary committed at **Defendant Merrimack Valley Hospital** and Father had called Plaintiff Daughter Lisa on his cell phone begging her to help him and told her that he was being taken to Defendant Merrimack Valley Hospital.

2046.   Plaintiff Daughter Lisa and her husband immediately went to see Father *at* **Defendant Merrimack Valley Hospital**.  This incident was *after* the order issued on **December 12, 2011**; and **Defendant Attorney Cuffe** emailed **Defendant Attorney Kazarosian** stating that Plaintiff Daughter Lisa and her husband went to see Father at the hospital "without asking" him.  Defendant Attorney Cuffe stated in his email to Defendant Attorney Kazarosian:

> I want any visits to be supervised by a paid professional.  How do you feel about this?

—to which, Defendant Attorney Kazarosian expressed that Defendant Attorney Cuffe had her full support.

2047.   De facto, if there had been any restraining or court imposed supervised visitation orders issued by **Judge Abber** on **December 12, 2011**, **Defendant Attorney Cuffe** would not be asking **Defendant Attorney Kazarosian** whether he *should* seek supervised visitation—of import, note the future tense and the fact that Defendant Attorney Cuffe   *did not* express, in any manner, that Plaintiff Daughter Lisa had violated any existing order.

2048.   Further evidencing that designated Defendants *knew* that there was no restraining order against Plaintiff Daughter Lisa and that they were acting through deception and fraud is the following evidence:

> **Defendant Attorney Cuffe** filed a motion regarding the filing of a Complaint for Contempt against Plaintiff Daughter Lisa *under stealth*—provided is a copy of notice that Attorney Cuffe provided to designated Defendants and *not* to Plaintiff Daughter Lisa in **Exhibit 358**;

> in the afore-described notice, **Defendant Attorney Cuffe** stated that the Complaint for Contempt was based on supposed violation of the order issued by Judge Abber on **November 8, 2011**—not **December 12, 2011** (the court order of **November 8, 2011** was not, in any manner, a restraining or no contact order—refer to prior referenced Exhibit 351);

> after **Judge Abber** issued a "guilty" judgment against Plaintiff Daughter Lisa at the court proceeding on **January 30, 2012**—with no evidentiary hearing conducted of any kind, **Defendant Attorney Cuffe** was awarded attorney's fees against Plaintiff Daughter Lisa.  Defendant Daughter Lisa knowing that she had not committed any wrong-doing and that the conduct of Judge Abber,

Defendant Attorney Cuffe and other designated Defendants were de facto unlawful, she did not pay any money to Defendant Attorney Cuffe for the awarded fees.  Evidencing consciousness of guilt on the part of Defendant Attorney Cuffe, he _has_ _not_—at any time—filed any action or motion against Plaintiff Daughter Lisa for nonpayment of the awarded attorney's fees; and

further consciousness of guilt regarding the afore-described events was demonstrated at the court proceeding on **June 9, 2013**, before **Judge Amy Blake** when **Defendant Attorney Kazarosian** started to raise the issue that Plaintiff Daughter Lisa had not paid the afore-described awarded fees to **Defendant Attorney Cuffe**.  Defendant Attorney Kazarosian abruptly decided to drop the subject entirely (the court audio recording for **June 9, 2013** is provided in previously referenced Exhibit 23).

### M.  Defendants schemed to have Father involuntarily committed under Section 12 to further facilitate financial exploitation of the DSL Trust

#### i.  Motive for fabrication and overt acts of deceit in furtherance

2049.   The extensive list of psychiatric doctors that **Defendant Attorney Cuffe** had contacted in **September of 2011** and **October of 2011** seeking a medical certificate regarding Father and Defendant Attorney Cuffe's own in-court representations made on **December 12, 2011** and **January 24, 2012**, he had extraordinary difficulty in securing a private practicing doctor to give him a medical certificate.

2050.   It stands to common logic that a private practicing doctor would be very reluctant to get involved in a _highly_ contested and litigated matter, especially when an interested litigating party, also, happens to be an attorney—which is bolstered by the fact Father's treating psychiatrist since **January of 2012** (**Defendant Dr. Portney**) registration information that he provided to the Medical Board shows that he, _in actuality_, is _not_ a private practicing psychiatrist; but rather, works _for_ various hospitals and nursing homes. (Copy of Defendant Dr. Portney's registration information provided to the Commonwealth is provided in **Exhibit 359**).

2051.   Evidencing that the involuntary commitment of Father on **January 13, 2012** was a fabricated scheme by Defendants is **Defendant Attorney Cuffe's** in-court descriptions of exhausting his resources in the attempt to find a doctor willing to give him a medical certificate.

2052.   Of significance, _prior to Father's involuntary commitment of_ **January 13, 2012**, **Defendant Attorney Cuffe** had informed **Judge Abber** that he had obtained a new treating psychiatrist for Father—**Defendant Dr. Robert Portney**.

2053.   Further proving that Father's involuntary commitment was solely for illicit means was **Defendant Attorney Cuffe** having stated to **Judge Abber** that he (Defendant Attorney Cuffe) specifically sought out **Defendant Dr. Portney's** services to obtain medical certification for a Roger's Order.

2054.   Of significance, **Defendant Attorney Cuffe** further stated that **Defendant Dr. Portney** _was not willing_ to provide such medical certification.   Defendant Attorney Cuffe stated in court:

> So within the past month, yet another psychiatrist has been
> located, Dr. Courtney (phonetic) [Dr. Portney] who practices at Whittier
> Hospital.  He did see Mr. Siegel last month and was to see him this Thursday,
> for purposes of the Rogers.  _In between those two appointments, he wasn't_
> _comfortable making a decision on a Rogers with just one evaluation_ - in
> between the two appointments, there was a Section 12 on September 13th.
> Then the hospital took over, if you will, seeking the immediate Rogers
> authority, because their psychiatrist, Dr. Hayes (phonetic), wanted to institute
> the antipsychotic immediately.

2055.   **Defendant Dr. Portney** had been previously involved in afore-described guardianship matter of **Antoinette Carpinone**, in which **Defendant Attorney Berid**—on behalf of **Defendant ESMV**—had Defendant Dr. Portney evaluate Antoinette Carpinone. (Copy of Defendant ESMV's filed pre-trial memorandum in the matter of In re Antoinette Carpinone is provided in prior referenced Exhibit 87).

2056.   In early **January of 2009**, **Defendant ESMV** asked **Defendant Dr. Portney** to provide a medical certificate declaring Antoinette Carpinone incapacitated; and there, too, he refused to provide a medical certificate and sought other doctors to provide the medical certificate the way he wanted it to read.  (Copy of the GAL's notes in his invoice is provided in prior referenced Exhibit 91).

2057.   It was imperative that **Defendant Attorney Cuffe** obtain the requisite medicate certificate because Plaintiff Daughter Lisa had openly exposed Defendant Attorney Cuffe's unlawful concealed administering of antipsychotics to Father—as evidenced from the hearing of **December 12, 2011**.

2058.   As previously set forth, **Judge Abber** openly addressed **Defendant Attorney Cuffe's** unlawful administration of antipsychotics—with Defendant Attorney Cuffe having made incriminating statements and Judge Abber *not* taking any official action regarding that specific issue.

2059.   Replete throughout the court record of In re Marvin H. Siegel, it was evident to Defendants that Plaintiff Daughter Lisa was not going to stop attempting to litigate this issue; especially, given the fact of Plaintiff Daughter Lisa's experience as an appellate attorney.  Therefore, Defendants were not so confident that this matter would be quietly swept under the rug.

2060.   *Without a private practicing psychiatrist* to provide the requisite medical certificate for forced administration of antipsychotics, the <u>*only other way*</u> to obtain it was to have a provider from a psychiatric facility do so; which the *only way* to accomplish that, was an involuntary commitment under a Section 12.

2061.   It is highly suspect, just weeks after Plaintiff Daughter Lisa and her family had been forced to vacate their home with Father, that Father had been involuntarily admitted under Section 12 to the adult behavioral unit of the **Defendant Merrimack Valley Hospital** on <u>**January 13, 2012**</u>.

**ii.  <u>Affirmative evidence that Father was, in fact, *not* assaultive or threatening on January 13, 2012</u>**

**<u>Incriminating evidence against designated Defendants in the notes of Defendant ESMV</u>**

2062.   Evidence prior to <u>**January 13, 2012**</u>, notes of **Defendant ESMV**—input on <u>**December 29, 2011**</u>—by **Defendant Caseworker Springman** state:

> Elder is reported to be doing well and the situation at home is relaxed.  There is no reports as to elder becoming agitated with staff.

2063.   The previously referenced email sent from **Defendant Michael Novack** was recorded in the notes of **Defendant ESMV** (input on **January 4, 2012**), stated that: "During the visit, Marvin was alert and in good spirits."

2064.   The chronological notes of **Defendant ESMV** show that there were _no_ notes, of any kind, input between the period of **January 4, 2012 through January 17, 2012**.  Given the content of the notes of Defendant ESMV, throughout its 111-paged compilation, if there had been any incidents involving violent behavior by Father during the afore-referenced time, there would have been notes input into Defendant ESMV's computer system.  Therefore, the lack of notes shows that Father did not engage in any assaultive or threatening manner.

**Boxford Police Report overwhelmingly refutes any notion that Father was behaving aggressively or in a threatening manner—even more so, the police report evidences that Father was, in fact, _not_ acting aggressively, in any manner**

2065.   A copy of the Boxford Police report for **January 13, 2012** is provided in **Exhibit 360**.  The police report evidences that the police officers observed Father to be calm and cooperative.

2066.   The officer's reporting of the supposed events at issue is based, _solely_, on what the home health aide told the police officers.  The police report provided _no_ independent corroboration, of any kind, as to the veracity or accuracy of the aide's story.

2067.   _Contrary_ to the claims made by the aide, the police officer reported that when they came to the house, the home health aide was in a very excited state and _Father was not_.  The police officer explicitly stated in his report that it appeared that the situation had defused; that Father "was oriented to person and place" and that Father "kept denying there had been a confrontation."

2068.   As previously set forth, the afore-referenced police report described Father as being very cooperative.  The officer stated in his report:

> [Father] was asked to have a seat on the stretcher, in which he did under his own power.  No force needed to have [Father] transported by Lyons Ambulance.

2069.   The police officer stated in the above-referenced report that Father had been taken to **Defendant Merrimack Valley Hospital** under a Section 12 supposedly "due to [a]ssaultive and threatening manner"; yet, the police officer demonstrated in his report that there was no corroborative evidence of such alleged behavior—showing Defendants' illicit conduct where **Defendant Michael Novack's** mass email to designated Defendants and Plaintiff Daughter Devora (to the exclusion of Plaintiff Daughter Lisa), stated that Father's admitting diagnosis on **January 13, 2012** was "dementia with psychosis"—a copy of that email is provided in **Exhibit 361**.

2070.   **Defendant Attorney Cuffe's** invoice filed with the **Essex Probate & Family Court** shows that the following people were involved in pre-orchestrating Father's involuntary commitment: **Defendant Attorney Kazarosian**, **Marilyn Staff**, **Defendant Michael Novack, Amanda Coburn, LICSW** of **Defendant Merrimack Valley Hospital.**

iv. **Fraud and deception in claims that Father has hallucinations and delusions**

2071.   In the 111-paged compilation of investigative notes and other related formal written reports of **Defendant ESMV**—*__prior__* to Father being involuntarily committed to **Defendant Merrimack Valley Hospital** on **January 13, 2012**, there are *no* articulated facts, whatsoever, describing Father as having hallucinations or delusions.   In fact, the notes *do not* show—not even one—Father having had hallucinations or delusions when they were in the presence of Father.

2072.   In the above-described 111-paged compilation of notes of **Defendant ESMV**, the very first statement, of any kind, pertaining to Father having hallucinations is described on **January 17, 2012**.   Of significance, such descriptions are at the time when Father had been involuntarily locked up in a psychiatric ward at **Defendant Merrimack Valley Hospital**—*for over 3 days*; having been excessively and unnecessarily drugged with various antipsychotics and other medications against his will.

2073.   During the time period, in which it is reported that Father is described as having hallucinations, it is recorded in the notes of **Defendant ESMV**—input on **January 17, 2012** by **Defendant Caseworker Springman**:

> Elder reported to be refusing meds and that the elder has available Seroquel 50 mg every two hours PRN.  Elder is also reported to have Trazadone, Ativan and oxybutin available for pain.  Elder reported to be expressing delusions as he is stated that people were watching him through his window.

2074.   As previously set forth, this is the *first appearance* in the 111-paged compilation of notes where staff of **Defendant ESMV** have described any incident involving Father seeing things that were not there.   Prior to **January 17, 2012**, there are **no** such descriptions contained in the 111-paged compilation of notes—*not even remotely close in nature or by any stretch of the imagination*.

2075.   As set forth, any hallucinations and delusions are the direct and exclusive result of the manner in which **Defendant Merrimack Valley Hospital** administrated antipsychotics and other medication to Father.

2076.   Designated Defendants, individually and jointly, facilitated the illegal and unwarranted administration of antipsychotics and other medication to Father; and, did so, for the specific illicit purposes to create a pretext; to be able to say that Father was having hallucinations and delusions so as to support Defendants' filings of a petition for long-term civil commitment of Father with the Haverhill District Court and motion for court ordered forced administration of antipsychotics.

2077.   Defendants have an established pattern of engaging in the above-described type of conduct—as previously described in the matters of In re Dorothy Orndorff and In re Regina Ianolfo.

### vi.  **The timeline of documentation shows fraud**

2078.   At the court proceeding held on **January 24, 2012**, **Defendant Attorney Cuffe** made knowing and intentional misrepresentations to **Judge Abber** that Father's having been involuntary committed to **Defendant Merrimack Valley Hospital** on **January 13, 2012** was completely unexpected.  Defendant Attorney Cuffe outright stated that "nobody" had *anticipated* the involuntary commitment.

2079.   **Defendant Attorney Cuffe** outright lied when he made the above-described in-court representations—his invoices filed with the **Essex Probate & Family Court** show that he had *substantial prior* communications with the staff of **Defendant Merrimack Valley Hospital**, pre-orchestrating Father's being involuntary committed to Defendant Merrimack Valley Hospital.

2080.   **Defendant Attorney Cuffe's** filed invoices state that, on **January 11, 2012**, he made calls *to the adult behavioral unit* of **Defendant Merrimack Valley Hospital**, along with faxing Father's medical record to Defendant Merrimack Valley— *2 days prior* to the involuntary commitment.  (Refer to invoice provided in prior referenced Exhibit 282).

2081.   Defendants made in-court statements that Father had been a direct admit to the Adult Behavioral Unit (ABU) of **Defendant Merrimack Valley Hospital**.

2082.   Evidencing the calculated deception by **Defendant Attorney Cuffe** is his having billed for speaking with Amanda Coburn (licensed social worker for **Defendant Merrimack Valley Hospital**) in **mid-October of 2011**—months before Father's involuntary commitment to Defendant Merrimack Valley Hospital.  Of significance, Father was not a patient of Defendant Merrimack Valley Hospital prior to the involuntary commitment. Defendant Attorney Cuffe's call to Amanda Coburn in **October of 2011** was when he was desperately trying to find a psychiatrist to provide a medical certificate to secure court ordered forced administration of antipsychotics.

2083.   Further establishing the magnitude of intended illicit acts is the fact that Father had been previously involuntarily admitted to **Defendant Whittier Pavilion**—there was no logical reason for **Defendant Attorney Cuffe's** contact with **Defendant Merrimack Valley Hospital** given Father having *prior* treatment provided by Defendant Whittier Pavilion.

2084.   Where Father had prior treatment with **Defendant Whittier Pavilion** just *months earlier*, **Defendant Attorney Cuffe's** contact with staff of **Defendant Merrimack Valley Hospital**—two days prior to the 911 call is highly suspect.

2085.   Further, **Defendant Attorney Cuffe** had specific motives for *wanting to keep* Father from being taken to **Defendant Whittier Pavilion**.  As previously set forth, **Defendant Attorney Garmil** made in-court representations on **June 14, 2011** that Father could not be discharged without having a court appointed guardian—evidently, Dr. Buluchu refused to partake in Defendant Attorney Garmil's unlawful conduct and discharged Father on **June 16, 2011**—without the appointment of a guardian.

2086.   In addition, **Defendant Attorney Garmil** happens to serve as private legal counsel for, both, **Defendant Merrimack Valley Hospital** and **Defendant Whittier Pavilion**—which evidences the illicit nature of **Defendant Attorney Cuffe's** call to Amanda Coburn in **October of 2011**; especially where Defendant Attorney Cuffe's invoice shows that he spoke to Defendant Attorney Garmil just beforehand.

2087.   **Amanda Coburn** (LICSW) and **Defendant Attorney Saunders** were, also, directly involved in the probate matter of In re James and Hope Pentoliros—as was **Defendant Attorneys Cuffe, Ledoux** and **Berid**.

2088.   As previously set forth, Father was involuntarily committed on **January 13, 2012** to the Adult Behavioral Unit of **Defendant Merrimack Valley Hospital.**

2089.   *Just one day* after Father had been involuntarily committed, **Defendant Michael Novack** sent a mass email (to the exclusion of Plaintiff Daughter Lisa) stating: "Marvin has been medication compliant".  (Refer to prior referenced Exhibit 361).

2090.   Then the day after that (on **January 15, 2012**) **Defendant Michael Novack** sent a *subsequent* email that supposedly Father had a violent episode that is alleged to have necessitated Father's being injected with antipsychotics.  (Refer to prior referenced Exhibit 361).

2091.   It is suspect that **Defendant Michael Novack** sent a *subsequent* email stating that **Andrew Tarasuck, LICSW** of **Defendant Merrimack Valley Hospital** informed him that the "process" had been initiated to obtain a court order for forced administration of antipsychotics—which Defendant Michael Novack expressly indicated the court order was based on the alleged incident of **January 15, 2012**.

2092.   Of crucial significance, **Defendant Michael Novack**—in his own words in the afore-referenced email—described the supposed incident of **January 15, 2012** as Father having struck a male staff person *because* of the **sole reason** that Father was **being forced to take antipsychotic medication against his will**; which Defendant Michael Novack stated the supposed incident led to *Father being restrained in a "geri-chair" and injected with antipsychotic medication*.

2093.   The email sent by **Defendant Michael Novack** solely set forth facts of Father's conduct *exclusively* describing Father *as trying to defend himself* because he was being forced to take antipsychotics.

### N.  **Illicit manner in which Defendants sought court order for forced administration of antipsychotics**

**Defendants deceptively attempted to avoid having Judge Abber presiding over the court order for forced administration of antipsychotics**

2094.   On **January 17, 2012**—prior to the above-described hearings seeking Roger's Authority, **Defendant Attorney Brandon Saunders**, in his capacity as private counsel for **Defendant Merrimack Valley Hospital**, filed a motion to intervene and a motion to expand guardian's authority, pertaining to the matter of In re Marvin H. Siegel.

2095.   At the time that **Defendant Attorney Saunders** filed the above-described motion, the electronic docket for In re Marvin H. Siegel showed that **Judge Abber** was the presiding judge in the matter of In re Marvin H. Siegel.  As previously set forth—and as acknowledged in the motions, Defendant Attorney Saunders had direct prior communications with **Defendant Attorney Cuffe**; which means that Defendant Attorney Saunders *knew* that Judge Abber was the presiding judge.  Having such knowledge,

it is suspect that Defendant Attorney Saunders deliberately brought the motions before **Judge Sahagian** and not Judge Abber. Despite, such efforts, Judge Sahagian scheduled the matter to be heard before Judge Abber on **January 24, 2012**.

2096.   Given the previously described events surrounding the court proceeding of **December 12, 2011** hearing, it stands to reason that Defendants desired the matter of forced administration of antipsychotics be brought before a different judge, rather than going before **Judge Abber**.

### Illicit use of filing petition for civil commitment in District Court

2097.   There is a pattern of conduct wherein the Defendants automatically file a petition for long-term involuntary civil commitment with the District Court when the 3-day involuntary commitment, under G.L. 123, § 12, is about to expire. As previously set forth, **Defendant Attorney Garmil** used the same tactic when Father's 3-day involuntary commitment in **Defendant Whittier Pavilion Hospital** was about to expire.

2098.   Defendants repeatedly made in-court statements—on **January 24, 2012**—that patently show **Defendant Merrimack Valley Hospital's** filing of the petition for civil commitment was purposefully done for illicit purposes.  The nature and tone of the statements were specifically intended to sway **Judge Abber** to issue a court order for forced administering of antipsychotics; statements expressing that if Judge Abber did not issue the order that the matter would "have to" go to Haverhill District Court where Father would be subject to a long-term involuntary commitment in a psychiatric facility.

2099.   **Defendant Attorney Myette** began describing to **Judge Abber** the Defendants' supposed reasons for their seeking a court order for forced administration of antipsychotics, having stated:

> . . . because of the complexity of the situation, the staff wasn't able to offer the Seroquel without the Rogers in place.  So the petitioner filed the petition to commit, set to be heard last Friday.  We asked for a one week continuance, which is all that Dr. Hayes was willing to give, so that we could hear this matter, in hopes of getting the Rogers temporarily in place.  And then the hospital would withdraw their petition to commit, so that Mr. Siegel could return home with the Rogers authority, with the Seroquel treatment in place.

2100.   The following in-court discourse took place upon **Defendant Attorney Berid** having stated that **Defendant Merrimack Valley Hospital** had scheduled the District Court civil commitment proceeding to be heard on **January 27, 2012**:

| | |
|---|---|
| Judge Abber: | Friday? |
| Attorney Berid: | Friday.  The hopes of Rogers counsel and the hospital was that if Mr. Siegel were to start to take the medication that he would then not need the hearing.  And at which point, we could transition him home, which has been his overall desire.  And as the agency that's seeking the least placement shall we say, that would be our position. So I truly understand the reason why you're continuing it.  And I'm just trying in some way to get Mr. Siegel home.  Is if we could in some way find out whether or not he would be willing to accept the medication on his own. |
| Judge Abber: | He can't, Counsel. |
| Attorney Berid: | I know he can't. |
| Judge Abber: | He can't even be asked that question.  I take the position that once he's under a guardianship, he does not have the capacity to do that.  Now, that being said, is there any reason why the commitment hearing couldn't be continued? |
| Attorney Myette: | I had asked counsel for the hospital to continue -- |
| Father: | Louder. |
| Attorney Myette: | Sorry.  I had asked counsel for the hospital to continue one more week until the following Friday.  His position was that his doctor, his client, was unwilling. |
| Attorney Saunders: | I can certainly represent that given -- |
| Attorney Myette: | to move it one more week |

345

| Attorney Saunders: | -- given this.  I think there -- the problem is, he's on the -- the aggression is escalating on the ward, to the point where he's becoming somewhat violent.  And the longer he stays on the ward unmedicated it becomes a problem for Bethel (phonetic).  I will present to them the option of continuing (indiscernible -- low audio at 3:42:55). |
| --- | --- |
| Judge Abber: | Well, I certainly have no authority to continue a commitment hearing in another court.  But it absolutely does not appear to me to be appropriate, because I believe it's in the representations here that I've read, that if, in fact, he were on this medication, you believe that he would then be able to return to his home and his residence. |
| Attorney Saunders: | Correct.  But -- |
| Judge Abber: | It seems like an awful waste of resources to go forward with the commitment hearing. |

2101.   Defendants' above-described ill-intentions were demonstrated through statements made by **Defendant Attorney Saunders** when **Judge Abber** had asked whether he had provided copies of **Defendant Dr. Hayes's** affidavit to all of the parties. At first, Defendant Attorney Saunders expressed that he had not done so because he has expressed that he thought another person was going to "circulate" the documents for him—but before specifically identifying that person, inexplicably, **Defendant Daughter Sheryl** interjected and started explaining that she never said that she was going to do that. After Defendant Daughter Sheryl's interjection, Defendant Attorney Saunders then stated:

> Okay.  This was very - - *in the interest of trying to avoid a commitment,* this has all been a very abbreviated process.  And I apologize if formality, you know, I tried to get as much information as to as many people possible under the circumstances, you know.

2102.   Defendants' deliberate deceptive filing of the petition for civil commitment with the District Court is evidenced by the following discourse that took place when **Judge Abber** was expressing the defective nature of **Defendant Dr. Hayes's** affidavit:

| | |
|---|---|
| Judge Abber: | I don't know that it's enough here, Counsel.  Frankly, they're very - very general.  There's nothing specific in here.  I'm not even sure that I would have enough. |
| Attorney Saunders: | Well, that was with the - with the aid of the independent medical examiner and then hearing from Rogers counsel that it would be.  Again, the goal is to get him home and (indiscernible - low audio at 3:45:35). |
| Judge Abber: | I understand.  But I need a clinician's affidavit and a medical certificate regarding the Rogers - an affidavit - something.  I don't have enough.  I'm just telling you.  So everything needs to be re-served.  Now I don't want to extend this past Monday again.  But when can these people expect service, so they can properly prepare for a hearing at 2:00 in Lawrence, on Monday? |

### Other suspect acts in obtaining court order for forced administration of antipsychotics

2103.   Plaintiff Daughter Lisa did not receive any notice that **Defendant Merrimack Valley Hospital** had filed an above-described petition for civil commitment in Haverhill District Court.  Defendants attempted to hold a Roger's hearing without notifying Plaintiffs.  Just by mere happenstance, Plaintiff Daughter Lisa found about the hearing and was present.

2104.   **Defendant Attorney Cuffe** knowingly and falsely stated that Plaintiff Daughter Lisa was the one who filed a petition for Roger's authority. De facto, Plaintiff Daughter Lisa did not file any petition or other motion seeking Roger's authority.  As previously set forth, the only written submission that Plaintiff Daughter Lisa filed that had anything to do with the subject matter of Roger's authority was her filed opposition to the previously discussed motion to vacate by Defendant Attorney Cuffe that raised Defendant Attorney Cuffe's misconduct for violating the Roger's Rule.

2105.   Evidencing that **Defendant Attorney Saunders** and **Defendant Attorney Cuffe** were working in concert—and with ill-motives—is the fact that Defendant Attorney Cuffe had Defendant Attorney Saunders file the motion to expand guardian's authority; which is not the norm where Defendant Attorney Cuffe was guardian, where he would be expected to file the motion—*not* **Defendant Merrimack Valley Hospital**.

2106.   Bolstering the suspect nature of **Defendant Attorney Cuffe** having **Defendant Attorney Saunders**, as counsel for **Defendant Merrimack Valley Hospital,** is Judge Abber's comments and inquiry about such conduct at the court hearing on **January 24, 2012**.   Judge Abber stated as follows:

> [W]hat I have in front of me is a motion to expand the authority of the temporary guardian.  And I'm curious, Counsel, why this wasn't brought by you, Attorney Cuffe?  Is there some reason for that?

2107.   After **Defendant Attorney Cuffe** responded in a rambling manner—and self-described by Defendant Attorney Cuffe as a long-winded response, he gave no legitimate reason for **Defendant Attorney Saunders** having filed the motion to expand, instead of him.

2108.   When **Defendant Attorney Cuffe** paused to apologize for his long-winded response as to the reason **Defendant Merrimack Valley Hospital** had filed the afore-described motions, **Judge Abber** stated:

> I appreciated it, because it seems to me very strange that an appointed temporary guardian wouldn't petition himself.

Then, abruptly, **Defendant Attorney Ledoux** interceded and redirected Judge Abber's attention to an entirely different issue.

2109.   **Defendant Attorney Cuffe** stated in-court that "Dr. Hayes wanted to institute the antipsychotic immediately."  **Defendant Dr. Kai Hayes** was the psychiatrist whom **Defendant Merrimack Valley Hospital** used to support its petition, seeking court ordered forced use of antipsychotics for Father.  (Defendant Dr. Hayes was, also, involved in the matter of In re Hope Pentoliros).

2110.   Plaintiff Daughter Lisa made **Judge Abber** aware of the content of the above-discussed Boxford Police report in court on **January 24, 2012**.

2111.   As previously set forth in detail, **Defendant Dr. Hayes** was the prescribing doctor for Dorothy Orndorff, who died after just a few of months being forced to take antipsychotics, with **Defendant Attorney Garmil** acting as private counsel for **Defendant Merrimack Valley Hospital**.

2112.   **Judge Abber** reviewed the medical certificate and affidavit submitted by **Defendant Attorney Saunders** and then asked Defendant Attorney Saunders if he had "circulated it to everybody."  It had not been given to Plaintiffs and *was* *not* given to Plaintiffs at that time.

2113.   **Judge Abber** had declared that the affidavit **of Defendant Dr. Hayes** was grossly defective—which explains why Defendants wanted to conceal it from Plaintiff Daughter Lisa.  However, Judge Abber openly elaborated that the affidavit and medical submitted by Defendant Dr. Hayes was defective because it stated "Seroquel, 50 milligrams as needed every two hours, with an alternate of Risperdal."  Judge Abber expounded further, stating:

> Okay.  Well, counsel, this is a problem.  Because there was a case that came down – the name escapes me right now – that requires notice of those requested findings before I can do this.  I can't have a treatment plan that says "as needed," so we're going to have to continue this.  Can everyone be there Monday in Lawrence at two o' clock . . . .

> Has anybody read this medical certificate and this medical certificate. . . .  I don't know that it's enough here, Counsel.  Frankly, they're very very general.  There's nothing specific in here.  I'm not sure that I would have enough.

2114.   **Judge Abber** stated in court that he did not want **Defendant Merrimack Valley Hospital** using **Defendant Dr. Hayes** as the certifying doctor for the petition for court ordered forced administering of antipsychotics, he continued the hearing for **January 30, 2012**.

### **Defendants' incriminating conduct at the proceeding of January 30, 2012**

2115.   The audio recording for the court proceeding of **January 30, 2012** is provided in previously referenced Exhibit 23 and transcript in Exhibit 24.

2116.   Plaintiff Daughter Lisa raised, in court, that no evidentiary hearing had ever been held to determine the level of Father's capacity.  **Judge Abber** summarily dismissed the raised issue.

2117.   The in-court discourse was as follows:

> Judge Abber:   Counsel, he has private counsel here.   He has Rogers counsel here.   I heard from him the other day and what he wanted was to go home.   So we need to come up with a plan that get's him home Counsel, because it doesn't appear that in his present condition, he could go home.   You agree?
>
> Daughter Lisa: No, I don't agree, Your Honor.   Because - -
>
> Judge Abber:    Good.   And your objection's noted.   We'll hear the testimony.

2118.   Instead of advocating for Father's well-known desires, **Defendant Attorney Kazarosian** made in-court representations that Father told her that he was "glad" to take the Seroquel because "he was very clear that he did not want to engage in the behavioral issues that people are alleging he engaged in, if, in fact, there was something he could take to alleviate that."   As previously established, Defendant Attorney Kazaosian's statements were knowing and intentional misrepresentations.

2119.   Shown in each of the medical certificates submitted by the designated Defendants—medical certificates completed by **Defendant Dr. Hayes**.   **Defendant Dr. Cohen** and Dr. Land, the only claimed basis for having Father involuntarily committed on **January 13, 2012** was the supposed incident of **January 13, 2012**, described in the previously referenced Boxford Police Report.

2120.   At the hearing on **January 30, 2012**, despite **Judge Abber's** previously described admonition, **Defendant Merrimack Valley Hospital** *still relied* on **Defendant Dr. Hayes** as the certifying doctor for the petition—a new affidavit and certificate from Defendant Dr. Hayes was submitted by **Defendant Attorney Saunders**, with Defendant Dr. Hayes, again, putting in the prohibited prn.

2121.   Designated Defendants' ill-motives are evidenced by the affidavit of **Defendant Dr. Hayes** where:

> Defendant Dr. Hayes listed only one person as to whom she spoke with in her evaluation of Father—that person being **<u>Defendant Attorney Cuffe</u>**;
>
> Defendant Dr. Hayes falsely stated that Father had not experienced any adverse side-effects from Seroquel—which as set forth, **Defendant Attorney Cuffe** knew that father had, in fact, suffered serious side-effects, such as recurrent pneumonia and incontinence;

Defendant Dr. Hayes stated: "He has one daughter who has interfered with past attempts to treat his illness and behaviors. Currently, there is a restraining order prohibiting contact with him"—as previously set forth, no restraining order prohibiting contact with Father had been issued. The only order was a vacate order;

Defendant Dr. Hayes did not provide any factual statements to support the broad, conclusory statement that Father was having hallucinations or delusions;

Defendant Dr. Hayes did not provide any specific facts to show Father was violent, or a threat to himself or others—the only specific facts stated was Father defending himself from being forced to take antipsychotics that he did not want.

2122.   As previously established, **Defendant Dr. Portney** started treating Father *weeks prior* to the involuntary commitment of Father. Of significance, **Defendant Attorney Cuffe** had previously stated—in court—that Defendant Dr. Portney was not willing to provide an affidavit for forced administering of antipsychotics for Father; *specifically represented* that Defendant Dr. Portney did not want to do so because he had only seen father <u>once</u>.

2123.   **Defendant Dr. Cohen** stated in his written affidavit that he had seen Father only *one time*—on <u>**January 28, 2012**</u>, *2 days before* the hearing. As previously set forth, **Judge Abber** explicitly stated, in court, that he did not want to have the Defendants use **Defendant Dr. Hayes** as the certifying doctor; that the Defendants were to get a different doctor.

2124.   **Defendant Dr. Land** stated in his written Affidavit that he, too, had only seen Father only *one time*—on <u>**January 9, 2012**</u>.

2125.   **Defendant Dr. Cohen's** Affidavit was substantially duplicative to that of **Defendant Dr. Hayes**. Defendant Dr. Cohen listed the people with whom "conferred": the affidavit, medical certificate and progress notes of Defendant Dr. Hayes; the <u>notes</u> of Andrew Tarasuk (LICSW with **Defendant Merrimack Valley Hospital**); and the medical certificate of **Defendant Dr. Janice Funk, PH.D**.—indicating that he *did not* speak directly with any of these people.

2126.   As previously set forth, **Defendant Attorney Cuffe** obtained a medical certificate from **Defendant Dr. Funk** that was dated **December 2, 2011**—but did not present the medical certificate and he overtly made it appear as though it did not even exist. It is suspect that **Defendant Dr. Cohen** relied on **Defendant Dr. Funk's** medical certificate, dated **December 2, 2011**.

2127.   Of significance, Andrew Tarasuk (LICSW of **Defendant Merrimack Valley Hospital**) had previously worked for **Defendant ESMV**.  (He is listed in the 2007-2008 Annual Report of Defendant ESMV.)  Accordingly, he had a previous established working relationship with **Defendant Attorney Berid**.

2128.   Like **Defendant Dr. Hayes**, in filling out information with regard to family, **Defendant Dr. Cohen** stated:

> *One daughter and son-in-law are alleged to have interfered with prior attempts to treat Respondent and are presently prohibited by the Court to have contact with him without a monitor.*  A second daughter agrees that her father needs treatment and reportedly has not disagreed with the proposed treatment plan but has expressed concerns regarding adverse effects of medication treatment.

2129.   Of import, Father has <u>3 daughters</u>—<u>not 2</u>; as shown in the above provided statement, **Defendant Dr. Cohen** only referred to 2 daughters.  Plaintiff Daughters Lisa and Devora *had not* been contacted by Defendant Dr. Cohen.  However, **Dr. Land** stated in his Affidavit that he "conferred" with: **Defendant Michael Novack**; **Defendant Attorney Cuffe** and **Andrew Tarasuk**.

2130.   Regarding family, **Dr. Land** stated:

> The patient's family has presented their opinions and concerns in court and to the patient's treators on multiple occasions.

Conspicuously, there is no statement as to what Dr. Land believed to have been the supposed opinions and concerns of the family.  Plaintiff Daughters were <u>*not*</u> contacted by Dr. Land.  As previously set forth, Plaintiff Daughters have been precluded from fully stating their opinions and concerns in court and have been precluded from speaking directly to Father's medical providers.

2131.   As petitioner **Defendant Merrimack Valley Hospital's** submission of medical affidavits contained material and substantial misrepresentations, Plaintiff Daughters filed a motion to dismiss Roger's Hearing, substantiating in detail specific falsities.  (Copy of the motion to dismiss is provided in **Exhibit 362**).

2132.   Plaintiff Daughter Lisa's motion to dismiss was summarily denied at the beginning of the court proceeding; however, **Judge Abber**, _himself_— in his additional handwritten written findings—showed that Plaintiff Daughter Lisa's claims presented in the afore-described motion to dismiss were indeed true and valid.  Judge Abber explicitly hand-wrote the following:

> **The treatment plans proposed by Dr. Hayes are not considered by the Court**.

(Copy of Judge Abber's written findings are provided in **Exhibit 363**).

2133.   It is suspect that **Defendant Attorney Saunders** merely submitted the affidavit of **Defendant Dr. Hayes**, without appearing as a witness.

2134.   It is, also, suspect that the new treating psychiatrist (**Defendant Dr. Portney**) of Father—hired by **Defendant Attorney Cuffe**—would not provide a medical certificate and did not appear to testify at the court proceeding of **January 30, 2012**.  Instead, designated Defendants hired two professional witnesses to testify: **Dr. William Land** and **Defendant Dr. Peter Cohen**.

2135.   Upon cross-examination by Plaintiff Daughter Lisa, **Defendant Dr. Cohen** testified that he _did not review_ any records from **Defendant Right At Home**.  He stated:

> I did not have access to those records.  No, I did not review them.

2136.   When Plaintiff Daughter Lisa raised the importance of obtaining information from the aides—as they are the people who have the most constant with Father, **Defendant Dr. Cohen** stated:

> Um, there wasn't any opportunity for me to do so.  I just became involved in this case in this past week.

2137.   As previously set forth, **Defendant Dr. Cohen** attested that Seroquel is commonly used "to induce sleep".

2138.   When **Dr. Land** was asked by **Defendant Attorney Berid** what would happen to Father if he did not receive antipsychotics, Dr. Land testified:

> I think - - it's certainly an – a longer hospitalization – that's at a minimum.  I think that he's on a locked psychiatric unit right now.  I think without treatment, there's certainly a chance he will stay there for _an indefinite period of time_.

2139.   Plaintiff Daughter Lisa had asked **Dr. Land** to give specifics and not mere generalizations of agitation, which he then testified:

> that apparently it occurred while he [Father] was at home, with a home health aide and that 911 was called.  That he eventually was escorted to the hospital. That there was allegedly assault – an assault and he landed up in four-point restraints, which I think is quite significant for an 83 year-old man to land up in four-point restraints.

2140.   As previously set forth, the **Boxford Police Report** stated that Father was *extremely* cooperative and calm when the police arrived.

2141.   **Dr. Land** confirmed that he had *not* personally observed any alleged assault by Father—that *his* described accounts were from what he was told by *others*.

2142.   Of significance, Defendants *did not* have *any* of the people who supposedly observed Father's "assaultive behavior" testify—and those people were *easily* available to testify, given the fact that the supposed people who observed such assaultive behavior were home health aides of **Defendant Right At Home** and staff of **Defendant Merrimack Valley Hospital**.

2143.   Further bolstering the ill-motives of designated Defendants is that the home health aide (Mary Roche) of **Defendant Right At Home**—who was the very person who *made the 911 call* and made the afore-described allegations against Father—*was present in court*.  As represented, in court, by **Defendant Attorney Cuffe,** he had *subpoenaed* Mary Roche to testify at the contempt proceedings against Plaintiff Daughter Lisa, which was scheduled during the same court proceedings for the Roger's motions on **January 30, 2012**.  (Page 56 of the transcript provided in previously referenced Exhibit 24).

### Evidence of Defendants' ill-intended use of Drs. Cohen and Land

2144.   **Defendant Dr. Cohen** and **Dr. Land** are doctors whose medical practice is largely based on getting paid to be professional witnesses, otherwise known as "hired guns."

2145.   **Defendant Dr. Cohen** and **Dr. Land** were well known to **Defendant Attorney Ledoux**; especially, in relation to Defendant Attorney Ledoux's role as private counsel for **Defendant Beverly Hospital** and **North Shore Medical/Salem Hospital**.

2146.   **Defendant Attorney Ledoux** and **Defendant Attorney Berid** knew **Dr. Land** from his involvement in the previously referenced **2008** probate matters pertaining to **Antoinette Carpinone**.  As previously set forth, **Defendant ESMV** filed protective orders, initially, alleging that Antoinette Carpinone was being financially exploited by her sister—Lillian Schiavoni.  Attorney Mark Pelosky was court appointed to act as counsel for Antoinette Carpinone.  Attorney Pelosky retained **Dr. Land** to evaluate his own client, Antoinette Carpinone and then pursued the posture that she was incapacitated.  Lillian Schiavoni filed a motion to remove Attorney Pelosky as counsel for her sister—which Attorney Pelosky filed a written opposition.  (Copy of Attorney Pelosky's written opposition is provided in **Exhibit 364**).

2147.   The curriculum vitae for **Defendant Dr. Cohen** that was provided to Plaintiff Daughters had omitted Dr. Cohen's affiliation with **Beverly Hospital**.  Such omission was intentional and deliberate.  (Copy of CV for Dr. Cohen provided to Plaintiffs and documentation of Dr. Cohen's affiliation with Defendant Beverly Hospital are provided in **Exhibit 365**).

2148.   **Defendant Attorney Myette**, also, was acquainted with **Defendant Dr. Cohen** as he had stated, in subsequent court proceedings, that he had worked for many years with a person who is a *mentor* to Defendant Attorney Myette—being Attorney Valerie Jacoby; that Valerie Jacoby had used his services, about a dozen times, for expert witness testimony.

2149.   **Defendant Dr. Cohen's** testimony shows that he has very little working experience with elders diagnosed with Alzheimer's and dementia.  His experience as an expert witness is almost, exclusively, limited to supporting involuntary commitment of people and forced treatment with antipsychotics.  His experience as an expert witness has, almost exclusively, involved his role as staff for *hospitals*.

2150.   **Defendant Dr. Cohen's** treatment order had the starting dosage of Seroquel be 50 mg up to 250 mg; **Dr. Land's** treatment order had the starting dosage be 25 mg up to 300 mg.

2151.   **Defendant Attorney Cuffe** submitted proposed Findings and Order to be signed by **Judge Abber**, which already had a specific dosage typed in ahead of time. Judge Abber crossed out the dosage and handwrote his own dosage order.  (Refer to prior referenced issued findings and order in Exhibit 363).

2152.   In the proposed Findings and Order, **Defendant Attorney Cuffe** had written the antipsychotic dosage as: "**Seroquel up to 300 mg per day**"—**Judge Abber**, instead, hand-wrote: "**initial dosage of 25 mg twice per day up to 100 mg per day**". (Refer to prior referenced Exhibit 363).

2153.   The alternative antipsychotic medication and dosage filled out in the afore-described *proposed* Findings and Order by **Defendant Attorney Cuffe** was:

> "a) Risperdal, up to 6 mg per day"—with the addition made by Judge Abber: "with an initial dose of 1 mg bid" and

> "b) Zyprexa, up to 20 mg per day"—with Judge Abber changing the 20 mg to 10 mg and the addition of: "with an initial dose of 5g per day."

2154.   Showing ill-motives is Defendants' seeking Father to be given the <u>maximum amount</u> of antipsychotics proposed by the professional witnesses—who were *not* Father's treating doctors.  Further compounding the egregiousness of Defendants actions is the fact that they knew Father had been receiving **12.5 mg of Seroquel**, twice a day.

2155.   The above-described changes made by **Judge Abber** evidences consciousness of guilt of Father being unlawfully and unjustly forced to take antipsychotics.

### **Additional knowingly false in-court statements and adverse conduct against Father by his own attorneys—Defendant Attorneys Kazarosian and Myette**

2156.   **Defendant Attorney Myette** represented to **Judge Abber** that Father did very well when he was taking Seroquel after his discharge from Defendant Whittier Pavilion (which time period was **May of 2011 through late November of 2011**).

2157.   **Defendant Attorney Myette** represented to **Judge Abber** that there were no reports of Father having experienced adverse side-effects from taking Seroquel.

2158.   Both, **Defendant Attorneys Myette and Kazarosian**, had actual knowledge that the above set forth in-court statements were false and misleading.

2159.   Plaintiff Daughters explicitly brought to the attention of **Judge Abber**, in court, that the above set forth statements were false and misleading; with specific and concrete examples proving the falsity of those statements.

2160.   **Defendant Attorney Kazarosian**—*Father's own attorney*—<u>objected</u> to Plaintiff Daughter Lisa seeking to admit the **Boxford Police Report** of **January 13, 2012** to rebut the allegations that Father was violent.

**Explicitly raised Federal Due Process deprivations**

2161.   Plaintiff Daughter Lisa explicitly raised the issue that no evidentiary hearing has been conducted to determine the level of Father's capacity.

2162.   Plaintiff Daughter Lisa explicitly raised that she and Plaintiff Daughter Devora had been precluded from obtaining their own independent medical examination of Father—which Plaintiff Daughter Lisa raised at the court proceeding of **January 24, 2012** and at the subsequent court proceeding held on **March 27, 2012**.

**O.   Continued fraud and deception relating to continued court ordered forced administrating of antipsychotics and other sought court orders**

2163.   Due to continuous and repeated fraudulent and deceptive acts, Plaintiffs had filed numerous motions in the matter of In re Marvin H. Siegel that set forth criminal acts perpetrated by designated Defendants.

2164.   The electronic notes of **Defendant ESMV** for **February 1, 2012** (2 days *after* the Roger's hearing) and input by **Defendant Caseworker Springman** state that **Defendant Merrimack Valley Hospital** received the afore-described court order issued by **Judge Abber** on **January 30, 2012**—refer to last page of provided written findings; and that designated Defendants started administering **Seroquel** the night the Hospital received it.

2165.   The electronic notes of **Defendant ESMV** state that Father was discharged from **Defendant Merrimack Valley Hospital** on **February 3, 2012**.

2166.   The electronic notes of **Defendant ESMV**, input by **Defendant Caseworker Springman** (on **February 7, 2012**) state that Father was reported to be doing well at home.

2167.   The electronic notes of **Defendant ESMV** for **February 7, 2012** state that **Defendant Diane Powell** had directly spoken with the provider—but she does not specifically state or indicate to whom she spoke; she stated that it was reported that Father was "doing well" and "medication compliant".

2168.   **Defendant Attorney Cuffe's** submitted invoices show that since **January of 2012** Father spoke with **Defendant Dr. Portney** on *one occasion* during the relevant time period: **February 14, 2012**—the same day that Defendant Attorney Cuffe filed his motion seeking a court order to force Father to be placed into a long-term locked-down facility.  (Copy of Defendant Attorney Cuffe's motion is provided in **Exhibit 366**—which was not addressed until the court proceeding of **March 27, 2012**).

2169.   **Defendant Attorney Cuffe** stated that Father needed to be placed into a long-term care facility specifically on the claims that Father supposedly was too fearful to go up to the second floor of the home where Father's bedroom was located.

2170.   The submitted invoices for **Defendant Attorneys Cuffe and Feld** show that they actively started looking to place Father into a long-term facility starting in **October of 2011**.  (Refer to invoices provided in prior referenced Exhibit 282).

2171.   On **February 14, 2012**, **Defendant Diane Powell** input into the notes of **Defendant ESMV**:

> Elder [Father] is back in his home with 24 hour care from Right At Home. Elder is taking his medications.  Home situation is much more calm w/o dtr living in the home.  Dtr is not allowed to contact elder.  Elder is doing well and stable at this time.

2172.   On **February 15, 2012**, **Defendant Diane Powell** input into the notes of **Defendant ESMV** that she had just been informed that **Defendant Attorney Cuffe** had filed the afore-referenced motion to force Father out of his home into a long-term care facility.  Defendant Diane Powell made the notation "he won't go upstairs, shower, etc."

2173.   *Literally*, approximately 2 minutes later, **Defendant Diane Powell** put in new notes into the computer system of **Defendant ESMV** that supposedly Father—all of a sudden—was "refusing to shower, go upstairs and participate in PC".

2174.   As set forth, above, **Defendant Diane Powell** engaged in fraud—with designated Defendants, as her previous notes had stated that there were no problems.

2175.   On **February 16, 2012**, **Defendant Michael Springman** stated in the notes of **Defendant ESMV**:

> There's also a question of the elders [Father] safety at home as the Seroquel he is taking has not alleviated his aggression entirely.  Elders reported to have become verbally aggressive toward a woman in the waiting room at his doctor's office and also towards his geriatric care manager [Defendant Michael Novack].

2176.   On **February 22, 2012**, **Defendant Diane Powell** sent an email to **Defendant Attorney Berid**—which was copied into the notes of **Defendant ESMV** that stated:

> Maxa,
>
> Mike went to see Mr. Siegel yesterday in his home and *he appears to be doing well*.  He was focused on Mike going to the papers with him and helping him "expose what is going on", but other than that he was calm.  *Mike and I are a little concerned because he was calm yesterday, doing well with private pay aid and the stair issue has been resolved.*   They have added a safety bar to his stair/chair lift and he is now going upstairs to be showered.  At this point, I am not sure why placement is needed.

2177.   On **February 23, 2012**, **Defendant Michael Springman** input into the notes of **Defendant ESMV** that he spoke with the case manager of **Defendant Right At Home** and documented in the notes:

> Elder [Father] is reported to be doing well, taking his medication, going upstairs again, and having no issues with staff.

2178.   As previously set forth, on or about **March 16, 2012**, Plaintiff Daughter Lisa filed the previously described emergency civil action with the Single Justice of the Supreme Judicial Court.

2179.   **Defendant Attorney Cuffe's** invoices show that he spoke with **Defendant Dr. Portney** on **March 20, 2012** and that Defendant Attorney Cuffe filled out the medical certificate *for* Dr. Portney and faxed it to him.

2180.   Evidently **Defendant Dr. Portney** did not agree with the content of the medical certificate faxed to him by **Defendant Attorney Cuffe**—as Defendant Attorney Cuffe's invoice states that he received a new report from Defendant Dr. Portney on **March 21, 2012**, which Defendant Attorney Cuffe had subsequent telephone calls with Defendant Dr. Portney.

2181.   As revealed by Plaintiff Daughters' much later discovery, **Defendant Attorney Cuffe** did not find the reworked medical certificate by **Defendant Dr. Portney** desirable—*the very next day* (on **March 22, 2012**), as Defendant Attorney Cuffe's invoice shows that he called **Defendant Dr. Funk.**

2182.   **Defendant Attorney Cuffe's** invoice shows that, on **March 22, 2012**, he billed for preparing his motion requesting that the anticipated court order for **March 27, 2012** to continue forced antipsychotics be issued without the filing of a medical certificate—that he be allowed to file a medical certificate at a non-specified later date (which evidence set forth herein proved to be fabrication by Defendant Attorney Cuffe).

2183.   There were no further statements of alleged aggression issues with Father in the notes of **Defendant ESMV** *until* **March 23, 2012**—given the timing of the above-described events with **Defendant Attorney Cuffe**, it is highly suspect that **Defendant Diane Powell**, suddenly, input notes into **Defendant ESMV's** computer system that purportedly **Defendant Attorney Myette** told her that, a week prior, Father had *supposedly* hit one of the home health aides with his cane.

2184.   Of significance, the notes of **Defendant ESMV**—input on **March 23, 2012** by **Defendant Caseworker Springman**—state that the home health aide (Massiel Gomes) of **Defendant Right At Home** had reported to Defendant Caseworker Springman that Father had been excessively tired and sedated, sleeping a lot, until the recent change in Father's medication where he seemed more alert and energetic.

2185.   In the afore-described notes of **March 23, 2012** by **Defendant Caseworker Springman**, he stated that the home health aide (Massiel Gomes) reported to him that Father was still going upstairs to sleep in his bedroom and to shower.


**Court proceeding held on March 27, 2012**

2186.   Audio court recordings for **March 27, 2012** are provided in previously referenced Exhibit 23 and the transcript in Exhibit 24.

2187.   Evidencing **Defendant Attorney Saunder's** and **Defendant Merrimack Valley Hospital's** consciousness of guilt is their filing of a motion seeking the *withdrawal* of Defendant Merrimack Valley Hospital as a party to the matter of In re Marvin H. Siegel (at the court proceeding of **March 27, 2012**) *solely* based on the assertion that the litigation in this matter was too "costly" to Defendant Merrimack Valley Hospital. (Provided is a copy of the motion provided in **Exhibit 367**).

2188.   Plaintiff Daughter Lisa explicitly brought to **Judge Abber's** attention that the court appointments of guardian and conservator that he made on **August 17, 2011** had contravened the constitutional guarantees of Due Process; that there was no evidentiary hearing to make any determination regarding Father's competency.

2189.   The subject of **Defendant Attorney Cuffe's** having unlawfully facilitated the forced administering of antipsychotics to Father—with the concerted efforts of designated Defendants was, again, brought forth to **Judge Abber's** attention by Plaintiff Daughter Lisa.

2190.   As previously set forth, Plaintiff Daughter Lisa raised the issue to **Judge Abber** that she and Plaintiff Daughter Devora had been precluded from being able to obtain an independent medical examination of Father so that they have a full and adequate opportunity to present their case.  And, *again*, Judge Abber denied Plaintiff Daughters the ability to have Father examined by their retaining an expert.

### Evidence of illicit conduct regarding medical certificate for Roger's hearing of March 27, 2012

2191.   The motion to extend that was presented in court by **Defendant Attorney Cuffe** on **March 27, 2012** was not served proper notice upon Plaintiff Daughters.  The first notice that Plaintiff Daughters had was in court on **March 27, 2012**—which Plaintiff Daughter Lisa had explicitly informed **Judge Abber** and was disregarded.

2192.   As evidenced in the court record for the proceedings of **March 27, 2012**, **Judge Abber** accepted the misrepresentations that were made during the proceeding of **January 30, 2012**.

2193.   Of significance, as established in the court record for the proceeding, **Defendant Attorney Cuffe** *did no*t proffer *any* reason for his supposed inability to obtain a medical certificate from **Defendant Dr. Portney**—in fact, Defendants had repeated their conduct that took place with the proceeding of **December 12, 2011** where Defendant Attorney Cuffe  represented in court that there was *no* medical certificate, but Plaintiff daughter Lisa later discovered a medical certificate completed by **Defendant Dr. Funk** date-stamped as "**December 12, 2011**" in the court files for In re Marvin H. Siegel.  This time. Plaintiff Daughter Lisa later found a completed medical certificate by Defendant Dr. Portney that was date stamped as being filed on "**March 27, 2012**".

2194.   *On the same day* as the hearing of **March 27, 2012** and with *no* notice given to Plaintiffs, **Defendant Attorney Cuffe** had, also, filed his Report of Monitor (which filing was date-stamped), *with an attached medical report from* **Dr. Robert Portney**—which Plaintiff Daughters received *no* notice of the filing.

2195.   Further evidence of egregious deception by Defendants is that the medical report from **Defendant Dr. Portney** that was submitted with **Defendant Attorney Cuffe's** Report of Monitor shows that Father was being given **HALDOL** covertly.

2196.   As previously set forth, **Judge Abber** _knew_ that **Defendant Attorney Cuffe** had previously represented—on multiple occasions in **January of 2012**—that **Defendant Dr. Portney** was the treating psychiatrist of Father; yet, Judge Abber _completely disregarded_ Defendant Attorney Cuffe's explicit statement that he was _going to get the medical certificate from_ **Defendant Dr. Funk** and that Father was _scheduled_ to see **Defendant Dr. Funk** on **April 2, 2012**.

2197.   Even more so, Plaintiff Daughter Lisa _explicitly_ brought to the attention of **Judge Abber** that **Defendant Attorney Cuffe** had plenty of time to obtain a medical certificate from Father's treating psychiatrist, **Defendant Dr. Portney**, where it had been represented that Defendant Dr. Portney _saw Father on_ **February 14, 2012**.  Judger Abber immediately responded that Plaintiff Daughter Lisa's objection was "duly noted" and that Defendant Attorney Cuffe's motion was allowed.

2198.   Affirmatively establishing designated Defendants' illicit conduct, as previously set forth—and unbeknownst to Plaintiff Daughters at that time—**Defendant Attorney Cuffe** had, _in fact_, received a medical certificate from **Defendant Dr. Portney** on or about, **March 21, 2012**, which was the medical certificate later found by Plaintiff Daughter Lisa in the court files of In re Marvin H. Siegel.

2199.   Bolstering that **Defendant Attorney Cuffe** had originally filled out the medical certificate for **Defendant Dr. Portney** are the facts that the filed medical certificate shows that Defendant Attorney Cuffe had faxed it to Defendant Dr. Portney on **March 20, 2012** and the handwritten changes made to the medical certificate by Defendant Dr. Portney.  Showing deliberate fraud is the fact that Defendant Attorney Cuffe made in-court representations that he had _no_ medical certificate.

2200.   The filed medical certificate that included **Defendant Dr. Portney's** hand-written additions and changes—with the stamped filing date of **March 27, 2012**; as **Defendant Attorney Cuffe** had originally filled out the medical certificate the way that _he wanted_ and _then_ faxed it over to Defendant Dr. Portney.

2201.   **Defendant Attorney Cuffe** showed illicit motives in deliberately concealing information that **Defendant Dr. Portney** wanted to _reduce_ Father's dosage of antipsychotics—as evidenced by Defendant Dr. Portney's handwritten changes to the medical certificate.

2202.   **Defendant Dr. Portney** crossed out **Defendant Attorney Cuffe's** typewritten statements regarding prognosis without treatment.  Defendant Dr. Portney added the handwritten statement that by taking medication Father could "possibly live on his own without assistance"; and he added the handwritten statement that by taking medication, Father could "get the right back to make his own informed decisions with respect to health needs."

2203.   **Defendant Attorney Cuffe** had deliberately intended to conceal risks of Father taking antipsychotics.

2204.   **Defendant Attorney Cuffe** had filled in the dosages for the antipsychotics, which **Defendant Dr. Portney** completely revised and gave significantly decreased dosages and the complete elimination of Zyprexa.

2205.   **Defendant Attorney Cuffe** filed a medical certificate *by* **Defendant Dr. Janice Funk** *on* **April 13, 2012**—which notice was *not* given to Plaintiff Daughters of this filing.

2206.   Of significance, **Defendant Dr. Funk** did not specify any particular medical provider with whom she spoke and *no proposed treatment plan* was provided with the medical certificate.

2207.   **Defendant Dr. Funk** did not see or examine Father on **April 2, 2012**— which is evidenced by the invoices submitted by **Defendant Attorney Cuffe**.  Defendant Dr. Funk's medical certificate, dated **April 2, 2012**, is virtually identical to the medical certificate that she signed on **December 2, 2011**.

2208.   **Defendant Attorney Cuffe** specifically stated in his invoice that he, personally, provided **Defendant Dr. Funk** with Father's medication list—*not* from Father's medical providers.

2209.   Of significance, **Defendant Dr. Funk** stated that she spoke with friends and family in her completing the medical certificate for **April 2, 2012**—however, Defendant Dr. Funk *did not* contact Plaintiff Daughter Lisa, Plaintiff Daughter Devora or Steven Kapsalis (whom Defendant Dr. Funk personally met on **June 16, 2011** when Father was discharged from **Defendant Whittier Pavilion**).

**Continued pattern of subterfuge regarding certifying doctor for court ordered forced administering of antipsychotics**

2210.   Notes for **Defendant ESMV**—input by **Defendant Diane Powell** on **April 25, 2012**—indicate that **Defendant Dr. Portney** had appeared in Essex Probate & Family Court in an unrelated matter; with Defendant Diane Powell stating:

> Dr. Portney apparently upset Judge Sahagian, when he was sworn in by saying that he swears to tell the truth as much as anyone can.  She walked off the bench and told counsel to speak to him.  He also claims to have cured the elder of her mental illness with his treatment.  <u>We are going to get a new dr to treat Marvin</u> [Father].

2211.   As set forth, Defendants made overt in-court representations in **January of 2012 and March of 2012** that **Defendant Dr. Portney** was—and supposedly is and continues to be—the treating psychiatrist for Father; however, Defendants pattern of conduct evidences that they have used Defendant Dr. Portney as a mere front.  As set forth, Defendant Dr. Portney was <u>*not*</u> the certifying doctor for court ordered forced antipsychotics issued in **January of 2012**, **March of 2012**, **June of 2012**, **October 2012**, and **July of 2013**.

2212.   In **June of 2012**, with outwardly made representations by **Defendant Attorney Cuffe** that **Defendant Dr. Portney** was still Father's treating psychiatrist, Defendant Attorney Cuffe submitted a medical certificate completed by **Defendant Dr. Peter Cohen**.

2213.   In the afore-described medical certificate, **Defendant Dr. Cohen** stated that he relied on the *progress notes* of **Defendant Dr. Portney** and the *medical certificate* of **Defendant Dr. Funk**.

2214.     **Defendant Dr. Cohen** gave the following treatment order:

> Risperdal, 1 mg by mouth every other day alternating with .75 mg,; with the alternative of Risperdal Consta, 25-50 mg by intramuscular injection every two weeks and Seroquel, 25-50 mg by mouth at bedtimes *as needed* for agitation (up to 100 mg/day).

### i.  Court proceeding of July 13, 2013

2215.   In **June of 2012**, as a result of Plaintiff Daughter Lisa's continuous in-court exposure of criminal misconduct by **Defendant Attorney Cuffe** and **Defendant Attorney Feld**—in their respective official capacities as Court appointed guardian and conservator—they sought court orders allowing them to retain private counsel to *represent them* at all proceedings in the matter of In re Marvin H. Siegel and to be paid directly by Father's estate; which **Judge Abber** and **Judge Blake** allowed.  (Copies of the allowed motions are provided in **Exhibit 368**).

2216.   From **June 11, 2012** through **December of 2013**, **Defendant Attorney Walter Costello** represented **Defendant Attorneys Cuffe** and Feld in the matter of In re Marvin H. Siegel.

2217.   **Defendant Attorney Kazarosian**—Father's own attorney—had solicited the services of **Defendant Attorney Costello** to represent **Defendant Attorneys Cuffe and Feld**.   Defendant Attorney Kazarosian and Defendant Attorney Costello have a long and close social relationship evidenced by their mutual and high profile memberships with the **Massachusetts Bar Association**, **Essex Bar Association**, **Massachusetts Association for Trial Attorneys** and the like.  Their professional working relationship was so enmeshed that in **December of 2013** they formed a new law office together (**Kazarosian, Costello & O'Donnell**).

2218.   **On July 13, 2013**, **Defendant Attorney Cuffe** filed a Motion to Amend and Extend Roger's Order.  (Copy of the motion to Amend and Extend is provided in **Exhibit 369**).

2219.   Despite **Defendant Attorney Costello's** well-established role in this serious litigation, he did not give any advance notification of his inability to be present— formal or informal; obviously, Defendant Attorney Costello did not give such notification because then Plaintiff Daughters would have known to attend the **July 16, 2013** hearing.

2220.   Plaintiff Daughters were *never* notified that there was a "substitution" of counsel for **Defendant Attorney Costello**, in representing **Defendant Attorney Cuffe** at the **July 16, 2013** hearing  The evidence set forth shows that Defendant Attorney Costello did not appear on behalf of Defendant Attorney Cuffe because Defendant Attorney Costello *knew* of illicit acts ehgaged in by his client involving the afore-described motion to amend and extend forced use of antipsychotics.

2221.   **July 16, 2013** was the _first time_ **Attorney Solomon** made any appearance in this matter of In re Marvin H. Siegel—which underlying litigation has gone on, actively, _for more than two (2) years_.  Even more so, Attorney Solomon emphasized during the hearing that this was going to be a _"one-time"_ limited appearance.  (Copy of Attorney Solomon's Notice of Appearance in **Exhibit 370**).

2222.   As set forth, **Defendant Attorney Costello**—who had been specifically "appointed" counsel to represent **Defendant Attorneys Cuffe** and **Feld**—and who has routinely and continuously attended so many hearings in such capacity for well over a year, gave _no notice whatsoever_ that he was having an attorney take his "stead".  Even more egregious, Defendant Attorney Costello had someone who was completely unrelated to the underlying matter and unknown to Devora Kaiser and me.

2223.   The audio recording for the court proceeding of **July 16, 2013** is provided in prior referenced Exhibit 23.

2224.   No explanation was proffered for **Defendant Attorney Costello's** inability to appear as counsel at the hearing and none was given in Attorney Solomon's written "Notice of Appearance".

2225.   _And no inquiry was made by_ **_Judge Abber_** _during the hearing as to_ **_Defendant Attorney Costello's_** _absence—despite the record's demonstration that such lack of appearance by Defendant Attorney Costello would reasonably be of concern to a presiding judge_; especially, when this hearing involved **the forced used of antipsychotics on an elderly person**.

2226.   Of no small consequence, **Judge Abber** knew—from Plaintiff Daughter Lisa's having brought to his attention in court _on multiple occasions_—that this matter _specifically_ involved forced treatment with antipsychotics that has FDA black-box warnings: not to give it to elderly patients with dementia.  In addition to which, the record shows that Plaintiff Daughter Lisa had brought to Judge Abber's attention, in court on multiple occasions, that **_Father repeatedly had pneumonia over the past two years_**.

2227.   The manner and tone in which **Judge Abber** addressed the appearance of **Attorney Solomon** for **Defendant Attorney Costello** overwhelmingly demonstrates that Judge Abber _knew prior to the hearing_ of this "substitution of counsel".  Through Judge Abber's demeanor and from the context of what was said, Judge Abber was fully aware of this situation ahead of time—the only logical and reasonable explanation for Judge Abber's being so cognizant about Attorney Solomon's "Notice of Appearance" was through ex-parte and outside communications with opposing counsel; not to mention that Judge Abber outright stated at the hearing that he had a _substantial personal relationship_ with Attorney Solomon.

2228.   Plaintiff Daughters *only* found out about **Attorney Solomon's** appearance *after* the hearing was held—*and through our inadvertent discovery.*

2229.   Plaintiff Daughter Lisa wrote a letter to **Attorney Solomon**, dated **July 24, 2013**, directly stating the fact that Plaintiff Daughters were not served with the above-discussed Roger's motion.  In Attorney Solomon's written response, he *did not deny* the fact that Plaintiff Daughters were not served—*in fact, he made statements that were overtly incriminating.*  (Provided are copies of the afore-described correspondence in **Exhibit 371**).

### The motion to extend and amend contained false information

2230.   The afore-described motion to amend and extend Roger's hearing shows that the BBO number that is located under **Attorney Solomon's** typed name is *not* Attorney Solomon's actual BBO number—it is, in fact, that of **Defendant Attorney Garmil**.  This is evidenced by the handwritten Notice of Appearance form filled out by Attorney Solomon that contained his true information.  (Provided in **Exhibit 372** are copies of Attorney Solomon's registration information with the Board of Bar Overseers and Defendant Attorney Garmil's registration information with the Board of Bar Overseers).

2231.   **Defendant Attorney Garmil's** telephone number is listed on the formal motion to extend and amend treatment order; however, **Attorney Solomon** has his own separate law office, as seen by the telephone number used on Attorney Solomon's Notice of Appearance form and his registration information with the BBO.

2232.   **Defendant Attorney Garmil's** established working and personal relationship with **Defendant Attorney Cuffe**—along, with other designated Defendants— is described in detail herein this federal action and shows why Defendant Attorney Garmil intentionally and deceitfully used the name of different counsel (**Attorney Solomon**) corresponding with his (Defendant Attorney Garmil's) actual address, telephone number *and BBO number*.

2233.   Ill-motives of the designated Defendants and collusion are evident by the fact that **Attorney Solomon** used **Defendant Attorney Garmil's** letterhead in his written response to Plaintiff Daughter Lisa after she had *already* explicitly sent a letter describing their unethical and unprofessional conduct, regarding the motion to amend and extend treatment order.

2234.   Designated Defendants had not provided copies of their filed motion to amend and extend to Plaintiffs, as required by law; and Defendants did not provide notice to Plaintiffs that the filed motion had been scheduled to be heard on **July 16, 2013**—again, Plaintiff Daughters only found out about the motion and hearing through inadvertence.

### Attorney Solomon had a substantial conflict of interest with Defendant Attorney Richard Garmil

2235.   As previously set forth, **Attorney Solomon** openly held himself out to be part of **Defendant Attorney Garmil's** law practice—refer to Attorney Solomon's letter of August 24, 2013 provided in prior referenced Exhibit 371.

2236.   Described in detail herein this Complaint, **Defendant Attorney Garmil** was intricately involved early-on in the underlying guardianship/conservatorship matter of In re Marvin H. Siegel, as counsel for **Defendant Whittier Pavilion**.

2237.   **Defendant Attorney Garmi**l, on behalf of **Defendant Whittier Pavilion**, had filed a petition for a 6-month involuntary commitment of Father to a psychiatric ward. (Copy of the petition is provided in **Exhibit 373**).

2238.   **Defendant Attorney Cuffe**, in his capacity as guardian, has a fiduciary obligation to **_not_** take actions that *adversely conflict* with the interests of Plaintiffs' father. **Attorney Solomon** had an inherent conflict of interest by having acted in the capacity as private counsel for Defendant Attorney Cuffe—especially, with Attorney Solomon serving on behalf of the **Law office of Richard Garmil**, as **Defendant Attorney Garmil** was an official party in the underlying matter of In re Marvin H. Siegel and having *filed court action seeking long-term involuntary commitment of Plaintiffs' father to a psychiatric facility.*

### Evidence of Judge Abber and designated Defendants having colluded in concealing notice of the July 16, 2013 hearing from Plaintiffs

2239.   At the court proceeding, **Judge Abber** knew that Defendants had not filed a motion for short order of notice—standard and formal civil procedural requirement for conducting an expedited hearing; even more so, Judge Abber had previously issued *his own specific order* for *added* procedural <u>time</u> requirements for filing motions in the matter of In re Marvin H. Siegel.  (Copy of Judge Abber's procedural order is provided in **Exhibit 374**).

2240.   **Defendant Attorney Cuffe** and **Attorney Solomon** did not submit the required affidavits per the above-referenced Order regarding motions per the above-described *procedural order issued by* **Judge Abber**.  The Order *explicitly* stated that counsel was required to state in an affidavit, accompanying the filing of the motion that the non-moving parties were served and that the non-moving parties did not send an objection or opposition.

2241.   **Judge Abber**, in his own handwriting—on **Defendant Attorney Cuffe's** motion to amend and extend treatment order—wrote: "no family members present."  He did so in a knowingly intentional and deceitful manner—which is especially bolstered by the numerous audios of court proceedings spanning over a *two-year* period.  (Copy of Judge Abber's written findings are provided in **Exhibit 375**).

2242.   The submitted court audio recordings, overwhelmingly, show the established pattern of Plaintiff Lisa Belanger's *unwavering* advocacy for her father's rights and that of her own.

2243.   The submitted court audio recordings show that **Judge Abber** knew that Plaintiff Daughter Lisa's absence was due to deception—that Plaintiff Daughters' absence was *not* voluntary and knowing.

2244.   Demonstrated by the filing date of **Defendant Attorney Cuffe's** motion to extend and amend treatment, **Judge Abber** had actual knowledge that Defendants had not given proper notice to Plaintiff Daughters about the motion and the scheduled date for it to be heard.


**Compounded evidence of Defendants' deliberate fraud and deceit**

2245.   As evidenced by the court audio recording, **Judge Abber** brought up the issue about his having a conflict of interest with **Attorney Solomon**, who was appearing as counsel for **Defendant Attorney Cuffe**.  Judge Abber stated that Attorney Solomon had represented *a family member* of Judge Abber's.

2246.   The above-described conflict of interest had *not* been presented in any written motion.

2247.   Plaintiff Daughters did not find out about the conflict of interest until *after* the hearing was held—discovery was made only through happenstance when Plaintiff Lisa Belanger had listened to the audio officially obtained from the Clerk's Office of the **Essex Probate & Family Court**.

2248.   After **Judge Abber** made such statement of the nature of conflict, the court audio recording shows that *immediately* afterward, Judge Abber made it evident that he and **Defendant Attorney Myette** had *already* discussed the issue of the conflict of interest outside of court.

### The audio of the July 13, 2013 hearing shows that Judge Abber, de facto, did not even personally *read* the medical documentation submitted

2249.   **Judge Abber's** decision for the above-referenced court proceeding was *solely* based on verbal representations by **Attorney Solomon**—who had *no prior familiarity or involvement*, whatsoever, in the then two (2) year-long matter.

2250.   **Judge Abber's** first words in addressing the Roger's motion were: "Is this the same treatment plan as before?"

2251.   Unequivocally, the recording shows that **Attorney Solomon** responded to **Judge Abber's** above-stated request, as follows:

> Relative to the primary medication.  The alternative medication, Risperdal Consta and has been discontinued.  Waning on Risperdal.  The range 0-6 mg per day. (Inaudible).  Significantly reduced.

2252.   Speaking volumes is **Attorney Solomon's** rushed and garbled manner in which he spoke—which is consistent with a consciousness of guilt.

2253.   **Judge Abber** exclaimed that he was very surprised upon hearing **Attorney Solomon's** description of the alternating manner of taking the Risperdal—Judge Abber *explicitly* stated *that this was the first time that he had ever seen this particular alternating manner of treatment*.

2254.   Crucially, the PRIOR Treatment Order of **June 24, 2012** *and* **October 22, 2012** that **Judge Abber** signed, states the primary treatment as:

> **1 mg by mouth every other day (quod) alternating with 0.75 mg quod. range: 0-6 mg by mouth daily.**

2255.   And despite **Judge Abber** being the *only* judge to have issued treatment orders in this matter—which has been four (4) times—the audio, overwhelmingly, depicts how taken aback Judge Abber was when **Attorney Solomon** described the alternating pattern in which the medicine was to be given.

2256.   When **Attorney Solomon** originally finished his spiel, **Judge Abber**, immediately, wanted to make sure he understood that he heard Attorney Solomon correctly about the alternating dosages.  In doing so, Judge Abber <u>emphatically repeated</u> what *he had heard* Attorney Solomon describe as the primary manner of taking the Risperdal—in a "let me see if I heard you right" manner, Judge Abber explicitly stated:

> 1 mg on one day, and the next day would be .75 mg, and then back to the 1 mg, followed the next day with .75 mg.

2257.   **Attorney Solomon** then confirmed that **Judge Abber** had a correct understanding of what he had just described as the alternating dosage, and immediately thereafter is when Judge Abber **stated in a surprised tone of voice: "I've never seen that before."**

2258.   As set forth, *no one* responded to **Judge Abber's** remark about his first time seeing an order for an alternating dosage— even though the Roger's Order that *<u>he</u>* signed **on October 22, 2012** specifically stated that it was an alternating dosage.  Of significance, where no family members were present *due to the deliberate intentions of designated Defendants,* Plaintiff Daughters were prevented from bring that fact to Judge Abber's attention; but Plaintiff Daughters did report it to the Board of Bar Overseers to no avail.

**<u>Evidence of ex-parte communications *prior* to the hearing between opposing counsel and Judge Abber</u>**

2259.   Conspicuously, no reason was proffered, of any kind, for the modification in treatment at the Roger's hearing—*and neither was any reason given in the written Affidavit of Clinician* submitted for the Roger's hearing.

2260.   **Judge Abber's** Order for forced administering of antipsychotics is exclusively based on a medical affidavit and treatment plan that was improperly

2261.   **Defendant Attorney Cuffe's** "filed" motion solely *represented that **Defendant Dr. Portney** is the Affiant Clinician for the Roger's Order.*  The "filed" documents prepared by Defendant Attorney Cuffe only refer to Defendant Dr. Portney— Defendant Attorney Cuffe in no way refers to anybody by the name of **Sumi Dolben**.  At no other time during the years of litigation had Sumi Dolben's name ever been mentioned.

2262.   Yet, unequivocally, **Judge Abber's** *written findings* explicitly state that he based the Roger's Order on **an affidavit and treatment plan completed by Sumi Dolben**— and nothing about such documentation relating to **Defendant Dr. Portney**, in any way.

2263.   As seen from **Judge Abber's** "Findings" for the court proceeding of **July 16, 2013**, the physical appearance of the typewritten name of Sumi Dolben in the document itself shows that the appearance of her name cannot be dismissed or minimized as an innocent mistake.  (Refer to prior referenced Exhibit 375).

2264.   The evidence shows that **Judge Abber** did not rely on any documentation from **Defendant Dr. Portney**; instead had relied on a supposed affidavit from **Sumi Dolben, RN**.  (Copy of Sumi Dolben's license registration with the State is provided in **Exhibit 376**).

2265.   Of significance, **Judge Abber** <u>did</u> <u>not</u> identify, in any manner, Sumi Dolben's relationship to this case or her occupation in his written findings. **Sumi Dolben is a R.N.**—and is *not* affiliated *with* **Defendant Dr. Portney's office.**

2266.   Of significance, **Sumi Dolben** does have a direct working relationship with **Defendant Michael Novack**—as previously set forth, Defendant Michael Novack is a consultant **retained by Defendant Attorney Cuffe**.   (Provided is public documentation in **Exhibit 377** that shows Sumi Dolben holding out her "business" address at the *exact same location* as Defendant Michael Novack).

2267.    As previously set forth, **Defendant Michael Novack** *contracts out* his "professional" private services as a "geriatric care manager".

2268.   Crucially, Plaintiff Daughter Lisa has, on multiple occasions, retrieved the court files for In re Marvin H. Siegel at the Salem Probate Court and there is **<u>NO</u>** affidavit by **Sumi Dolben** in the court file; and there is no treatment plan by Sumi Dolben in the court file.

2269.   The above evidence shows that **Sumi Dolben** was used by designated Defendants for illicit purposes.  Very suspicious conduct is based on Sumi Dolben's dubious association with **Defendant Michael Novack**; the suspiciousness of such conduct is even more heightened by the fact that the documents explicitly <u>referenced by **Judge Abber** are NOT IN the court file and not able to be located by the Clerk's Office.</u>

2270.   Plaintiff Daughter Lisa personally met with Registrar Pamela Casey O'Brien to discuss "the missing" above-described documents referenced by **Judge Abber**.

2271.   Registrar Casey O'Brien explicitly stated to Plaintiff Daughter Lisa (and in the presence of another person) that there is nothing that she can do to address the "missing" documents referenced by **Judge Abber** in his findings.  Registrar Casey O'Brien explicitly stated to Plaintiff Daughter Lisa (and in the presence of that other third person) that if **Judge Abber** chooses to keep custody of that documentation it is beyond the scope of her responsibilities as Registrar.

2272.   Registrar Casey O'Brien refused to sign a statement regarding the above-described representations that she made to Plaintiff Daughter Lisa and the other person who was with her.

2273.   The Clerk's Office has repeatedly represented that it has done an exhaustive search; that it cannot locate the above-described documents.

2274.   As substantiated above, there can be no innocent or benign explanation for **Defendant Attorney Cuffe** giving **Judge Abber** medical documents attested by **Sumi Dolben** instead of—or even, in addition to— **Defendant Dr. Portney's** "Affidavit of Clinician".   Defendant Dr. Portney is supposedly the treating psychiatrist; there would be no need for anybody else's medical support.

2275.   As previously evidenced, designated Defendants have an established pattern of not wanting to submit documents signed by **Defendant Dr. Portney**; that designated Defendants actually used **Sumi Dolben** for actual treatment because Defendant Dr. Portney does not agree to do what designated Defendants want him to do—which Defendant Dr. Portney's voice mails left for Plaintiff Daughter Lisa provide extensive and specific concrete information to bolster such inference.

2276.   Provided are copies of the letters that Plaintiff Daughter Lisa sent to **Defendant Dr. Portney** in **Exhibit 378**, which explain in great detail the suspect nature of the "filed" affidavit that only has the *last page* with Defendant Dr. Portney's signature. Plaintiff Daughter Lisa explained that there was documentation tending to show that the medical certificate filed with his signature by **Defendant Attorneys Cuffe** and **Solomon** was intentionally altered.

2277.   The voicemails left by **Defendant Dr. Portney** are in response to the letters of Plaintiff Daughter Lisa.

**Audio of the court proceedings shows that Judge Abber and Designated Defendants discussed the findings for the Roger's hearing prior to the July 16, 2013 hearing**

2278.   Further evidencing the willfulness of **Judge Abber's** misconduct in holding the court proceeding of **July 16, 2013** is the fact that *Judge Abber* already had possession of typed up written "Findings" *while the hearing* was being held.

2279.   Of significance, the actual written document that **Judge Abber** referenced at the hearing were his "Findings"—*not proposed findings* submitted by counsel.  (Refer to prior referenced Exhibit 375).

2280.   **Judge Abber** expressly indicated on the record that he was making additional hand-written written findings on the typed-written findings—r*ight then and there*—that no family members were present.  (Refer to a copy of Judge Abber's Findings for Roger's Hearing in prior referenced Exhibit 375).  During the hearing, without *any* discussion of "findings", **Judge Abber** spontaneously asked **Defendant Attorney Myette** if she was satisfied with the findings.

**P.   Evidence that the court appointments of Defendant Attorney Cuffe and Defendant Attorney Feld were the result of collusion and with deliberate intention to embezzle money from the DSL Trust**

2281.   **Defendant Attorney Ledoux** made false representations while acting as counsel for Plaintiff Daughter Devora that **Defendant Attorneys Cuffe** and **Feld** did not have any intentions or desire to be made permanent court appointments.  Defendant Attorney Ledoux stated in the email:

> Neither of these attorneys [Defendant Attorney Cuffe and Defendant Attorney Feld] are stakeholders in this case and I know that Atty Cuffe feels that he should not be the substitute petitioner.  We can, however, discuss this when we meet.

(Email is provided in **Exhibit 379**).

2282.   The above-described misrepresentation was explicitly made to Plaintiff Daughter Devora by **Defendant Attorney Ledoux** so as to induce blind trust and unquestioning assent.

2283.   Prior to **November 2012**, **Defendant Attorney Feld**—and designated Defendants—had actual knowledge that Father explicitly stated in his written advance directives (in 1979 and re-affirmed in 2003) that he had <u>intentionally</u> precluded Susan J. Miller from having any interest in his estate and personal affairs.

2284.   It is uncontroverted in the underlying matter of In re Marvin H. Siegel that Plaintiffs' father freely executed a valid DPOA and other estate planning instruments in **February of 2003**.

2285.   Father explicitly expressed in the above-described advance directives and estate planning instruments of **<u>February of 2003</u>**—and re-affirmed in writing on **June 16, 2011**—that he wanted Plaintiff Daughter Lisa to be his attorney-in-fact; *and that should any reason that Plaintiff Daughter Lisa become unable to continue in such capacity that <u>Plaintiff Daughter Devora was to be the successor attorney-in-fact</u>*.

2286.   Father explicitly stated his desire and intention for Plaintiff Daughter Lisa to be his guardian if necessary—specifically, having stated in the **2003 DPOA** that he "nominate[d]" Plaintiff Daughter Lisa as his guardian.

2287.   Father had explicitly stated in his **2003 DPOA** that he desired and intended for Plaintiff Daughter Devora to be successor attorney-in-fact, should Plaintiff Daughter Lisa be unable to serve as original attorney-in-fact.

2288.   Father's **2003 DPOA** remained effective for over *eight (8) years*, including the afore-referenced time period in which Father had been involuntarily evaluated by **Defendant Beverly Hospital**.  But for the previously described fraudulent conduct by Defendants, Father's **2003 DPOA** would still be in effect.

### i.   <u>Deliberately overt acts of intentions to dismantle Father's advanced directives and estate planning instruments</u>

2289.   **Defendant Attorney Feld** stated in his invoices, filed with the **Essex Probate & Family Court**, that he and other designated Defendants have extensively consulted with **Attorney Maria Baler** to draft new estate planning instruments for Father.

2290.   As previously set forth, **Defendant Attorney Cuffe** had consulted with **Attorney Maria Baler** to draft new estate planning instruments in the matters of <u>In re Robert Pigeon and In re Gertrude Pigeon</u>. (Refer to prior referenced Exhibit 102 is a copy of Attorney Marie Baler's recommendations specifically regarding the drafting of new estate planning instruments).

2291.   **Defendant Attorney Kazarosian** filed a motion—joined in by designated Defendants—seeking to dissolve the **DSL Trust**.  Defendant Attorney Kazarosian attempted to have **Judge Abber** hear the above-described motion without notice to Plaintiffs on **October 10, 2012**.  Judge Abber did not rule on the motion ex-parte and scheduled a hearing for **October 22, 2012**.  (Copy of the afore-described motion is provided in **Exhibit 380**).

2292.   As previously set forth, the audio recording of the court proceeding held on **October 22, 2012** is provided in Exhibit 23.

2293.   In the afore-described motion, **Defendant Attorney Kazarosian** made numerous false and fraudulent representations in the above-described motion to dissolve the DSL Trust.

2294.   Plaintiffs specifically set forth the false and fraudulent representations in a submitted and filed written memorandum of opposition with supporting documentation to the Essex Probate & Family Court.  (Copy of the afore-described opposition and documentation filed by Plaintiff Daughters are provided in **Exhibit 381**).

2295.   **Defendant Attorney Kazarosian's** motion contained misrepresentations about the conditions of Father's house—which Plaintiff's opposition included attached photographs of Father's house evidencing misrepresentations having been made by Attorney Defendant Kazarosian.  (Photos that Plaintiff Daughters submitted with the afore-described opposition are provided in **Exhibit 382**).

2296.   Demonstrated by the audio recording of the court proceeding on **October 22, 2012**—*before* the case was called, Judge Abber's clerk (**Attorney Peter Krosunger**) can be heard whispering to **Judge Abber**; informing him that Plaintiffs had submitted an opposition with photographs.  The Clerk (Attorney Peter Krosunger) then asked whether Judge Abber wanted him to give the opposition back to Plaintiff.  The Clerk informed Judge Abber that he believed Plaintiffs gave copies to opposing counsel and that he (the Clerk) would give the photographs back to Plaintiffs if Judge Abber desired.

2297.   Just *after* officially going on the record, the Clerk quickly whispered to **Judge Abber** that "in fact" he would give the photographs back, just let him know.

2298.   At the end of the hearing, **Judge Abber** openly stated in court for the Clerk to return the attached photographs to Plaintiffs.  Plaintiff Daughter Lisa formally objected, on the record, specifically, to Judge Abber's keeping the written joint opposition, but making her take back the photographs.  Plaintiff Daughter Lisa explicitly stated to Judge Abber that he was dismantling a complete record of evidence, which had been submitted to the Court—of which the Judicial Conduct Commission and Board of Bar Overseers have been made aware of by Plaintiff Daughters.

2299.   The most recent fraudulent and deceptive conduct by designated Defendants in obtained court orders for forced administering antipsychotics was set forth earlier in this Complaint.


ii.   **Deliberate falsified financial filings in the matter of In re Marvin H. Siegel facilitated by the above-described relationships**

2300.   Fraudulent and deceptive conduct by designated Defendants in financial filings in the matter of In re Marvin H. Siegel were set forth earlier in this Complaint.

2301.   **Defendant Attorney Feld**–with the concerted efforts of designated Defendants—filed a Petition for Order of Complete Settlement in a deceptive and fraudulent manner; which Plaintiff Daughter Lisa explicitly brought to **Judge Abber's** attention at the court proceeding on **December 11, 2012**.  (Refer to audio of court proceeding in previously referenced Exhibit 23).

2302.   As previously set forth, the Inventory filed by **Defendant Attorney Feld** on **November 7, 2011**  (but date-stamped as filed on  "**Jan 19 2012**"), stated that Plaintiffs' father's total value of personal property was supposedly  "**$3,987.60**" and that the total real estate value as "**$.00**".  When Defendant Attorney Feld filed a subsequent Inventory on **January 18, 2013**, the Schedule of Personal Property (on page 1) stated: "**$5,572,767.69**" and the Schedule of Real Estate stated: the value of real estate as: "**$.00**". (Refer to Inventories provided in prior referenced Exhibit 27).

**Account filed on November 5, 2012**

2303.  As previously set forth, through deceptive proceedings with **Judge Ricci**, on **October 25, 2012**, **Defendant Attorney Feld** made in-court statements that he had used up the $1 million that had been initially placed in his possession.

2304.  **Defendant Attorney Feld** had submitted information to the **Essex Probate & Family Court** that over $450,000 of the $1 million was expended on supposed legal costs.  (Refer prior referenced Exhibit 18).

2305.  **Defendant Attorney Feld**, also, checked the box "Final Account"—and left the checkbox designated "Annual" blank.

2306.  In the first Account filed by **Defendant Attorney Feld** (in **November 2012**), he stated that Receipts and income was: "$994, 994.15"; that Payments and Debts were: "$994,994.15"; and that the Balance of Assets was: "$.00".

**Petition for Order of Complete Settlement**

2307.  **MUPC § 2-302** states that a person has the right to preclude heirs from benefitting from his or her estate; and that executed estate planning documents and Wills be abided by expressly written intentions to omit heirs.

2308.  **MUPC § 5-416** states that a conservator is mandated to *prior existing* estate plans and Wills executed by the person.

2309.  **MUPC § 5-407(e)** expresses that the primary objective for the conservator is to make decisions that "the protected person would have made if not disabled."

2310.  From the inception of **Defendant Attorney Feld's** court appointment as conservator and **Defendant Attorney Cuffe's** as court appointment as guardian, designated Defendants had overt and actual knowledge of Father's updated Will of **2003**. (Refer to prior referenced Exhibit 6).

2311.  Father's updated **Will of 2003** explicitly stated that Father had deliberately and intentionally omitted Susan J. Miller (adopted step-daughter) as an heir; removing Susan J. Miller from having any interest in his estate whatsoever.

2312.  Designated Defendants, also, had knowledge, through court proceedings held on **June 11, 2012,** that Father had explicitly established his deliberate and intentional complete exclusion of Susan J. Miller as a beneficiary to his estate, in any manner, way back in his **Will of 1979**.  (Audio for the court proceedings of **January 11, 2012** is provided in previously referenced Exhibit 23).

378

2313.   Against Father's explicitly expressed and known desires and intentions, **Defendant Attorney Berid**—with joint concerted efforts of designated Defendants—sought to have Susan Miller be included as an interested party in the matter of In re Marvin H. Siegel; which was allowed by **Judge Abber** on **June 11, 2012**.

2314.   The audio court recording of the proceedings of **June 11, 2012**, in which designated Defendants took the afore-described actions, is provided in prior referenced Exhibit 23.

2315.   The numerous and interconnected rules of the MUPC demonstrate that the primary objective of an appointed conservator and guardian is to carry out the express wishes *of the person on whose behalf they are acting*.

2316.   As previously evidenced, **Defendant Attorney Berid** has an established pattern of engaging in fraudulent and deceptive acts in multiple probate matters of the **Essex Probate & Family Court**—with Defendant Attorney Berid, specifically, having committed forgery in pleadings submitted to the Essex Probate & Family Court (refer to the previously described matter of In re Joseph O'Shea).

2317.    **Defendant Attorney Berid** submitted a purported affidavit of Susan J. Miller—a copy of which is provided in **Exhibit 383**.

2318.   Plaintiff Daughters have multiple and original documents actually handwritten by Susan Miller (aka Susan Siegel) that shows the afore-described affidavit by **Defendant Attorney Berid** is a forgery; that the signature on the affidavit is very apparent—to even a layman—that the handwriting is not that of Susan Miller.

2319.   The numerous documents that contain the handwriting of **Defendant Attorney Berid** show that her handwriting of the afore-described signature of Susan Miller on the afore-described affidavit is consistent with that of Defendant Attorney Berid.

2320.   At the time of **Defendant Attorney Feld** having filed a petition for complete settlement (on **November 5, 2012**), he had served as court appointed conservator in the matter of In re Marvin H. Siegel for over one (1) year—which he knew, at the time of the afore-described filing, that Father had three (3) full biological daughters.

2321.   Designated Defendants knew that Father explicitly expressed in writing, long ago, that he *did not* want Susan J. Miller to obtain any benefit in any manner from his estate; yet, on the second page of the afore-described petition for complete settlement, **Defendant Attorney Feld** represented that the *sole* interested parties in the matter of In re Marvin H. Siegel were: 1) **Susan Miller** and 2) **Defendant Attorney Cuffe** (court appointed guardian)—in the space designated for listing interested parties, there were 3 spaces allotted and the *third line was left completely blank*.

2322.   As previously established, **Defendant Attorney Feld**—and his then counsel, **Defendant Attorney Costello**—did not serve the petition for complete settlement upon Plaintiffs Daughters as mandated by **MUPC § 5-418B**.

2323.   **Defendant Attorney Feld** deliberately omitted the listing of Plaintiffs Daughter Lisa and Daughter Devora in the afore-described interested parties section.

2324.   Evidencing designated Defendants deliberately engaged in fraudulent and deceptive acts, they facilitated the altering and tampering of information contained in the electronic docket system of the **Essex Probate & Family Court**, regarding the matter of In re Marvin H. Siegel.

2325.   As previously set forth, **Defendant Attorney Berid** has had a long-established extra-judicial relationship with **Julie Matuschak** (high ranking administrative personnel in the Clerk's Office for the Essex Probate & Family Court) as co-existing members of the Board of Directors for Neighborhood Legal Services.  Evidenced in the court records of In re Marvin H. Siegel and in the numerous other described probate matters show Julie Matuschak's involvement.

2326.   The dockets for the matter of In re Marvin H. Siegel originally listed Father's residential address as Boxford, Massachusetts (as Father has resided in Massachusetts all his adult life).  (Copy of docket sheets obtained early-on in the matter of In re Marvin H. Siegel are provided in prior referenced Exhibits 37 and 38).

2327.   Contemporaneous with **Defendant Attorney Feld's** filing of his petition for order of complete settlement in **November of 2012**, the electronic docket for the conservatorship of In re Marvin H. Siegel (ES11P1465PM) showed a change of Father's original Massachusetts address to **"1025 Border Rd. Los Altos, CA  94022"**.  (Refer to the dockets that are provided in prior referenced Exhibit 38).

2328.   Of significance, the above-described changed address for Father—
pertaining to ES11P1465PM—is the residential address for that of Susan J. Miller.
(Father's original listed address in the docket for the guardianship of In re Marvin H.
Siegel for docket numbered 11P1466GD was *not* changed).

2329.   In court on **June 11, 2012**, Plaintiff Daughters brought to the attention of
Judge Abber and designated Defendants that Father had terminated all contact and had
omitted Susan Miller from his numerous and multiple estate planning documents, *going
all the way back to* **1979**.  (Refer to court audio recording in prior referenced Exhibit 23;
copy of Father's 1979 Will is provided in **Exhibit 384**).

2330.   Further incriminating evidence of consciousness of guilt was subsequently
provided by designated Defendants through their filing of a motion seeking **Judge Amy
Blake** to cover up their above-described fraudulent and deceptive acts.  (Refer to
designated Defendants' motion to amend decree and order prior referenced in Exhibit 35
and Plaintiffs' Opposition describes the incriminating conduct in detail in Exhibit 36).


### Evidence of designated Defendants' false statements made in Financial Plans filed with the Essex Probate & Family Court

2331.   Evidencing fraudulent and deceptive conduct by **Defendant Attorney
Feld**—as court appointed conservator—filed more than *one* Financial Plan in the matter of
In re Marvin H. Siegel for the year **2013**.  (Copy of Financial Plans filed by Attorney Feld
are provided in **Exhibit 385**).

2332.   **Defendant Attorney Feld** filed a Financial Plan on **January 18, 2013** and,
then, another one on **February 14, 2013**.  The first Financial Plan and the subsequent one
have, virtually, identical information —even to the extent, on page 5, the certification of
the veracity in completing the Financial Plan are dated—and have typewritten**: "January
18, 2013."**

2333.   The only difference between the two (2) above-described Financial Plans is
*the addition of a Return of Service* from the Sheriff, stating that a copy of the Financial
Plan was served on Marvin Siegel at his residence **on January 30, 2013**.

2334.   Ill-motives are bolstered by the fact that **Judge Abber**, **Defendant
Attorney Feld** and **Defendant Attorney Cukier** had a substantial and enmeshed working
relationship as co-guardians in the matter of the previously described matter of In re
Esterina Milano—which Plaintiff Daughter Lisa had openly raised in-court on **December
11, 2012** before **Judge Abber**.

2335.   **Defendant Attorney Feld** did not serve Plaintiffs a copy of the Financial Plan filed on **January 18, 2013**—Plaintiffs discovered the Financial Plan through a chance review of the court file.  Plaintiff Daughter Lisa brought the above-described misconduct to Bar Counsel Vecchione and the Board of Bar Overseers.

2336.   In addition, Plaintiff Daughters requested in writing to **Defendant Attorney Feld** and **Defendant Attorney Costello** to view documentation—which Plaintiffs were entitled—to verify the information provided in the financial filings that had been submitted to the Essex Probate & Family Court.  Plaintiff Daughters, specifically, stated that they were making such request in their capacity as *Co-Trustees* of the **DSL Trust**.  Defendant Attorneys Feld and Costello refused to provide Plaintiff Daughters access to the requested financial information.

2337.   **Defendants Attorneys Feld** and **Cuffe** refused to testify as witnesses in the trial of permanent guardianship and conservatorship—which such refusal is evidence of consciousness of guilt.

2338.   Even though **Defendants Attorneys Feld** and **Cuffe** were on the witness list of the Pre-trial Conference Report of **March 27, 2012** and Plaintiff Daughters had served them with subpoenas to testify, **Judge Abber** quashed the subpoenas—as well as, multiple times at other court proceedings that Plaintiff Daughter Lisa requested their testimony to challenge their veracity, but Judge Abber precluded it.  (Copy of the Pre-trial Conference Report is provided in **Exhibit 386**; also, refer to audio for the proceedings of **March 27, 2012** in prior referenced Exhibit 23).

2339.   Incriminating evidence of fraudulent and deceptive acts in the financial handling of Father's estate are contained in the invoices filed by **Defendant Attorney Feld**.  (Refer to prior referenced Exhibit 282 for invoices).  Examples are described as follows and include, but are not limited to:

**June 2012 invoice:**

An additional 5/21/12 entry was made, but with no details added.  Also, between the entries of 6/21/12 and 6/22/12, an entry dated 3/14/12 was inserted with no corresponding description.

**October 2012 invoice**

Between the entry dates of 7/24/12 and 7/31/12, an entry of 7/3/12 was made without any corresponding description.

Between the entry dates of 8/22/12 and 8/31/12, the entry date of 8/1/12 is inserted without any corresponding description.

Between entry dates of 9/27/12 and 9/30/12, the entry date of 9/1/12 was inserted without any corresponding description.

**February 2013 invoice**

Between multiple entry dates of 11/30/12, the entry date of 10/23/12 was inserted without any corresponding description.

Between the entries of 1/18/13 and 1/23/13, there are two suspect entries:

- 00/00/00 Phone call to BNY for transfer funds to fiduciary account and
- 02/01/22/13 – with litany of supposed services

**May 2013 invoice**

Between the entry dates of 3/7/13 and 3/8/13, there is an added entry date of 3/1/13, without any corresponding description; and the added entry date of 3/7/13 that merely states: "review and payment of bills".

There is an additional entry date of 3/12/13 with no corresponding description.

Between the entry dates of 4/3/13 and 4/4/13, there is an added entry date of 4/6/13 with no corresponding description.  There is, also, an added entry date of 4/8/13 that merely states: "review and payment of bills".

There is an entry for 5/29/13, without any corresponding description.

**February 2014 invoice**

Between dates of 10/5/13 and 10/8/2013, there is an inserted entry of 10/4/13, with no corresponding description.

Between multiple dates of 12/3/13, there is an inserted entry for 12/5/13.

Between 11/5/13 and 11/13/13, there is an inserted entry of 11/8/14.

**May 2014 invoice**

There is an inserted date of 5/3/14 with no following description.

There is an inserted date of 5/14/14 with no following description.

2340.   The *invoices* submitted by **Defendant Attorney Feld** show a suspect pattern of transfer transactions from **Defendant BNY Mellon** to the fiduciary account held by Defendant Attorney Feld—which consist of stated transfers being made on:

8/26/11

12/3/12

12/14/12

1/8/13

An unknown date in the invoice of **February 2013** that is between the entry dates of 1/18/13 and 1/23/13.

2/26/13

3/6/13

4/3/13

4/4/13

4/11/13

4/17/13

6/12/13

8/15/13

9/27/13

3/11/14

2341.   The above-described transfers reflected in **Defendant Attorney Feld's** invoices do not reconcile with the transfers recorded in his Account, filed on **February 14, 2013**.  The transfers in the afore-described Account are reflected as follows:

9/1/2011 - $50,000

9/1/2011 -  $50,000   (2nd transfer)

10/7/2011 - $50,000

11/3/2011 - $50,000

11/25/2011 - $55,000

12/19/2011 - $50,000

1/25/2012 - $50,000

2/10/2012 - $50,000

3/2/2012 - $50,000

4/30/2012 - $50,000

6/5/2012 - $50,000

6/25/2012 - $50,000

7/17/2012 - $125,000

7/24/2012 - $50,000

8/9/2012 - $70,000

8/31/2012 - $50,000

2342.   As previously set forth, **Defendant Attorney Feld** filed an Account in **August of 2014** stating that it was the First and Final Accounting for the matter of In re Marvin H. Siegel—which evidence has been set forth showing that such filing is a deliberate and false representation.

2343.   The Account filed by **Defendant Attorney Feld** on **February 14, 2013** states that the ending balance was:  **$994,994.15**.

2344.   The next Account in succession, filed on **August 25, 2014**, states that the beginning balance is: **$5,572,767.69**.

2345.   There is no explanation in the Account of **February 14, 2013** for the above-evidenced discrepancy.

2346.   **Defendant GAL McHugh** certified in his filed report with the **Essex Probate & Family Court** (refer to prior referenced Exhibit 340) that he had reviewed the above-described pleadings and filings in the matter of In re Marvin H. Siegel.  Defendant GAL McHugh explicitly stated that he had no concerns regarding such pleadings and filings.

2347.   However, the MUPC demonstrates that a reasonable and objective SJC Rule 1:07 GAL *would* have—and *should have*—been concerned with the above-described discrepancies set forth by Plaintiff Daughters; that the GAL was required to bring such discrepancies to the attention of the **Essex Probate & Family Court** and to *all i*nterested parties in the matter of In re Marvin H. Siegel.

2348.   **Defendant GAL McHugh** *did not* follow the mandated protocol set forth by the MUPC for performing his role as an investigator and overseer as a court appointee of SJC Rule 1:07.

2349.   **Defendant GAL McHugh** *did not* follow the mandated protocol set forth by the MUPC for notifying all interested parties in the matter of In re Marvin H. Siegel of his filing his report with the **Essex Probate & Family Court**.

2350.   **Defendant GAL McHugh** *did not* follow the mandated protocol set forth by the MUPC for performing his role as an investigator and overseer as a court appointee of SJC Rule 1:07.

2351.   As set forth, **Defendant GAL McHugh** breached his fiduciary duty and violated the rules of the MUPC—and that he did so, knowingly and intentionally to aid and abet the furtherance of designated Defendants' exploitation of the **DSL Trust**.

2352.   As set forth, **Judge Abber** reviewed the above-described pleadings and filings, followed by his taking subsequent actions favorable to designated Defendants.

2353.   However, the MUPC demonstrates that a reasonable and objective Probate & Family Court judge *would* have been—and *should have been*—aware that the above-described discrepancies were suspect; that the was required to bring such discrepancies to the attention of the **Office of Bar Counsel**.

2354.   As set forth, **Judge Abber** has violated the rules of the Massachusetts Judicial Canons of Ethics—and that he did so, knowingly and intentionally to aid and abet the furtherance of designated Defendants' exploitation of the **DSL Trust.**

## CLAIMS FOR RELIEF

2355.   In the following counts, Plaintiff Daughters incorporate by reference the numerical paragraphs above.


## <u>Declaratory Claims</u>

2356.   The following requests for declaratory judgments involves matters in actual controversy that arise under the Constitution and laws of the United States compelling judicial declaration of the legal rights and interests of Plaintiff Daughters.  The below requested declaratory judgments impact redress of grave deprivation of Plaintiff Daughters' Federal Constitutional rights; such deprivations as the direct and exclusive result from Defendants' misconduct facilitated through color of law.


2357.   The following requests for declaratory judgments significantly and substantially serve the interest of the public; as the below requested declaratory judgments affect all similarly situated litigants appearing before the Massachusetts Probate & Family Courts.  The below issues routinely involve matters pertaining to significant and irremediable deprivation of life and liberty, with this Federal action positioned as a precedent on issues of law that substantially and materially affect litigants in the Massachusetts Probate & Family Courts.


## Count 1

## <u>To declare: G.L. c. 190B, § 1-109—standard of proof provision—violates the Due Process Clauses of the Federal Constitution</u>

2358.   In **2012,** the Massachusetts Legislature set forth the standard of proof to be used in matters regarding guardianship and conservatorship in G.L. c. 190B, § 1-109, which states: "In contested cases, the standard of proof is a preponderance of the evidence."


2359.   Plaintiff Daughters seek a declaratory judgment that G.L. c. 190B, § 1-109 is unconstitutionally broad and ambiguous where the use of a preponderance of the evidence standard involves: 1) determination of incapacitation to impose court ordered guardianships and conservatorships and 2) determination of incapacitation to impose court ordered forced administering of antipsychotics; thereby, the carte blanche use of the preponderance of the evidence standard violates the substantive and procedural due process guarantees of the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.

2360.   As set forth in this Complaint, Plaintiff Daughters present substantial evidence that it has been long-established Massachusetts judicial philosophy that to declare a person incapacitated is a *significant deprivation of liberty*—as a judicially declared incapacitated person cannot vote or marry.   A person judicially deemed incapacitated loses *all* rights to make *any* personal decision.   It is well-established Massachusetts case law that court ordered guardianship strips a person of his or her right to make *any personal decision*; and, therefore, is commensurate to being imprisoned.   In actuality, elders who are placed under court imposed guardianship and conservatorship, almost, always become deemed wards of the State.

2361.    Set forth documentation demonstrates that SJC Rule 1:07 court appointees routinely—as a matter of standard custom and practice—strip elders of physical liberty by forced placement into nursing homes and other long-term facilities.   Documentation evidences that elders diagnosed with dementia are placed in long-term facilities consisting of a 24/7 locked-down existence.

2362.    Set forth documentation demonstrates that SJC Rule 1:07 court appointees routinely—as a matter of standard custom and practice—strip elders of life and liberty by such court appointees seeking court orders for DNR/DNI.

2363.    As set forth in this Complaint, Plaintiff Daughters present substantial and concrete evidence that SJC Rule 1:07 court appointees—as a matter of routine custom and practice—seek the above-described court orders for DNR/DNI in a covert and concealed manner so as to deliberately exclude input from family members.

2364.    SJC Rule 1:07 court appointees seeking court ordered DNR/DNI when there is *no* established advance directive requesting such measures is the antithesis *for* the very reason that advance directives came into existence.

2365.    As set forth in this Complaint, Plaintiff Daughters present substantial evidence that it has been long-established Massachusetts judicial philosophy that preservation of an elder's ability to retain dignity and respect is supposedly of the highest importance; yet, G.L. c. 190B, § 1-109 promotes such afore-described deprivations of life and liberty through the use of a preponderance of the evidence standard to declare a person incapacitated—people accused of being sexually dangerous are afforded *greater* protection of rights than the elderly (and other individuals alleged to be incapacitated).

2366.   The standard used to determine whether a person is deemed sexually dangerous is that of clear and convincing. See  18 U.S.C. § 4247.  As the United States Supreme Court stated in *Addington v. Texas*, 441 U.S. 418, 425: "Adopting a standard of proof is more than empty semantic."  See *U.S. v. Jeffrey Shields*, Civil Action No. 07-12056-PBS (2007 District of Massachusetts).

2367.   In citing *Addington v. Texas*, this Court, in *U.S. v. Jeffrey Shields*, declared the manner in which a burden of proof is established:

> When a case – whether civil or criminal – involves individual rights, the selected standard of proof 'reflects the value society places on individual liberty.'

2368.   As a direct result of an elder being judicially declared incapacitated and a ward of the State, as set forth, there is solid and concrete evidence that SJC Rule 1:07 court appointees obtain court ordered forced administering of antipsychotics to elders diagnosed with dementia—with the judiciary of the Massachusetts Probate & Family Court rubber-stamping such court orders (despite knowledge of the well-established black-box warnings issued by the FDA not to give elders having dementia antipsychotics specifically due to increased risk of death due to the side-effects of the antipsychotics causing pneumonia and other fatal respiratory infections).

2369.   The established custom and standard practice of the Massachusetts Probate & Family Courts is the use of a preponderance of the evidence standard to support court ordered forced administering of antipsychotics.  See *Guardianship of Jackson*, 61 Mass. App. Ct. 768 (2004).

2370.   As established in this Complaint, it is well-established that the Supreme Judicial Court declared court ordered administering of antipsychotics to be one of the most invasive and intruding type of deprivation of liberty.

2371.   Upon, approximately, 2 years of public research by Plaintiff Daughters in the various Massachusetts Probate & Family Courts, they have yet to find an elder who is placed under SJC Rule 1:07 guardianship and conservatorship and *not* being given antipsychotics. Elder deemed wards of the State are being given antipsychotics *based solely on having dementia*.

2372.   As set forth in this Complaint, Plaintiff Daughters have presented substantial and concrete evidence that nursing homes and psychiatrists (usually consisting of facilities and providers selected by SJC Rule 1:07 court appointees for placement and treatment of wards) give these elders antipsychotics specifically to facilitate: 1) Medicaid fraud; 2) the liquidation of real estate owned by elders having been forced out of their homes into long-term facilities (using antipsychotics to initiate and/or accelerate physical decline by the elder, so as to create a pretext for such placement; and 3) to induce sleep during waking hours to keep elders sedated for the convenience of health aides.

2373.   As set forth in this Complaint, Plaintiff Daughters have presented substantial and concrete evidence that nursing homes and psychiatrists obtained by SJC Rule 1:07 court appointees that demonstrate an overwhelming percentage of elders are being given antipsychotics unnecessarily and in excessive dosage.  (Refer to prior referenced Exhibits 190).

2374.   There is well-established and concrete evidence that SJC Rule 1:07 court appointees have, also, subjected children—who are involved with DCF (formerly DSS)—to unnecessary and excessive use of antipsychotics.  (Provided in **Exhibit 387** is a study that was issued to the public by the Commonwealth).

2375.   As evidenced by the findings of the afore-referenced published study by the Commonwealth, SJC Rule 1:07 court appointees have an established history of misusing antipsychotics for ill-gotten gain; which findings of the study stated as follows:

> A recent study indicates that antipsychotic drugs are more likely to be used to treat children covered by Medicaid than those who are privately insured.  It is also more common for children with Medicaid to be treated with antipsychotics for less extreme conditions like attention deficit disorder than for the more sever disorders for which the Food and Drug Administration has specifically approved the drugs' use in children.

2376.   In addition, it is custom and practice in the Massachusetts Probate & Family Courts—and nationwide—for medical opinions in support of judicial decrees of incapacitation are based on the diagnostic tool called Diagnostic and Statistical Method of Mental Disorders (herein referred as DSM).  DSM is a diagnostic means published by the American Psychiatric Association.

2377.   There is well-established evidence showing that use of DSM is an unreliable and invalid means on which diagnoses are based; including a prevalent pattern of the DSM leading to false diagnoses.  See *The Reality of the DSM in the Legal Arena: A Proposition for Curtailing Undesired Consequences of an Imperfect Tool*, 13 Houst. J. Health L. & Policy 79 (2012).  (Copy of the afore-referenced journal article is provided in **Exhibit 388**).

2378.   Of no small coincidence, it is standard custom and practice for state and federal funded programs to use the DSM to determine eligibility for the receipt of government funds and benefits.  In addition, the DSM Task Force committee consists of members who have ties to the pharmaceutical industry.  13 Houst. J. Health L. & Policy at 92.

2379.   There is substantial expert documentation showing that the use of psychiatric diagnoses for forensic purposes is often misused and misconstrued in court proceedings, such as guardianships and conservatorships.  The determination of capacity is *supposed* to be focused on evaluating the level of a person's *functioning—not* based on a psychiatric diagnosis.

2380.   It is well-stablished Massachusetts case law that a diagnosis, in and of itself, is *not* a sufficient basis to judicially declare a person incapacitated.  There have been studies done that show judges (in general) *do not* have adequate scientific or medical training to distinguish between the application and significance of diagnostic categories; that there is too high of a risk that judges rely on a diagnosis for false sense of certainty and that they make misattributions about the causes of behavior.  See *Forensic psychiatric diagnosis unmasked*, 88 Judicature 200 (2004-2005).  (Copy of the afore-referenced journal article is provided in **Exhibit 389**).

2381.   Plaintiff Daughters present solid and credible evidence to show that Massachusetts Probate & Family Court judges—especially, in the matter of In re Marvin H. Siegel—rely on a diagnosis, rather than an actual evaluation of specific behavioral conduct or lack of conduct exhibited by an elder.

2382.   On multiple occasions, the issue regarding the constitutionality of using the standard of preponderance of the evidence in rendering a judicial determination of incapacitation in guardianship and conservatorship proceedings has been raised before the Supreme Judicial Court; however, the Massachusetts appellate courts have *repeatedly* and explicitly refused to address this issue.   *Fazio v. Fazio*, 375 Mass. 394, 401 (1978); *John Doe v. Richard Doe*, 377 Mass. 272, 280 (1979); *In re Guardianship of McDonald*, 74 Mass. App. Ct. 1107 (2009).

2383.   As set forth above, to judicially declare a person sexually dangerous the standard of proof used is <u>clear and convincing evidence</u>.  Therefore, as it now stands, alleged sexually dangerous people have *greater rights* than the elderly (and other alleged incapacitated individuals).  As evidenced, it is in the public's interest that this Court declare the use of the preponderance of the evidence standard in determining incapacitation for court ordered guardianships and conservatorships violates the Due Process Clauses of the Federal Constitution.

2384.   Plaintiff Daughters have been injured— as interested parties in the matter of In re Marvin H. Siegel—by the **Essex Probate & Family Court's** use of the preponderance of evidence standard in declaring Father incapacitated.

## Count 2

2385.   Plaintiff Daughters seek a declaratory judgment that G.L. c. 190B, § 1-109 is unconstitutionally broad and ambiguous where the Legislature solely set forth the standard of proof for guardianship and conservatorship proceedings with regard to "contested cases"—the Legislature did not, in any way, indicate what standard of proof is to be applied in <u>uncontested cases</u>.

2386.   It is unconstitutionally unsound—in and of itself—to have differing levels of burden of proof for contested cased and uncontested cases.

2387.    Where the language of the statute *explicitly delineates* the preponderance of the evidence standard to apply <u>*only*</u> to "contested cases", it is axiomatic that the Legislature intended *a <u>lesser</u>* standard than preponderance of the evidence be applied to an uncontested case.

2388.   The Legislature's expressed designation of a different standard to be used for "contested cases" versus uncontested cases wholly contravenes the very essence of the foundational principles set forth in the Due Process Clauses of the Federal Constitution.

2389.    In view of the legislative history of G.L. c. 190B, the *only* logical and reasonable conclusion that can be drawn from the statutory provisions of G.L. c. 190B, § 1-109 is that the Legislature specifically and deliberately intended to use convoluted legalese to veil provided authority to the judiciary to engage in rubber-stamping.

2390.   Evidencing the above-described intent of the Legislature to purposefully allow judges to rubber-stamp is the fact that the foremost person spearheading the Legislature's promulgation of G.L. c. 190B was **Senator Cynthia Creem**—whose primary profession consists of practicing law concentrating almost entirely in probate and family law; operating the law firm of Stone, Stone & Creem with her daughter, Attorney Gayle Stone-Turesky.

2391.   Provided in **Exhibit 390** is information consisting of the publicly published profile for the law firm of Stone, Stone & Creem and public information demonstrating the leading role that Senator Creem played in promulgating the statutory provisions of the "new" Municipal Uniform Probate Code.

2392.   In addition, **Senator Creem** has accepted work as a SJC Rule 1:07 court appointed GAL for the Suffolk Probate & Family Court—during her tenure as Senator. (Copy of court records from Suffolk Probate & Family Court are provided in **Exhibit 391**).

2393.   **Senator Creem** has been serving as **Co-Chair** of the **Judiciary Commission** for the State Legislature.  She, also, had been a member of the **Governor's Council** from 1994-1998 and a Life member of the **MBF Society of Fellows**.

2394.   Other additional indicators of the opportunity for improper use of influence and power is Senator Creem's law firm's (Stone, Stone & Creem) association with the **Massachusetts Family & Probate American Inn of Court**, **Senior Partners**, and **Massachusetts Bar Association**.

2395.   On behalf of Stone, Stone & Creem, **Attorney Stone-Turesky**—Senator Creem's daughter—has served as an appointed member of the Supreme Judicial Court's "Task Force" for Child Support Guidelines and Access to Justice.  She is, also, a member of the **Massachusetts Family & Probate American Inn of Court**.

2396.   As an associate of Stone, Stone & Creem, **Attorney Judith McKinnon** previously worked as a law clerk in the Massachusetts Probate & Family Court, with her experience being described as having "had the opportunity to work closely with many of the State's Probate Judges."  She is, also, a member of the **Joint Bar Committee on Judicial Appointments**.

2397.   As an associate of Stone, Stone & Creem, **Attorney Katie Donahue** served as a law clerk in the Massachusetts Probate & Family Court; having worked in the Administrative Office, Middlesex County, Norfolk County and Worcester County.

2398.   As evidenced, it is in the public's interest that this Court declare G.L. c. 190B, § 1-109 unconstitutional based on the statutory language having created two (2) separate and different standards of burden of proof for contested cases and for uncontested cases; thereby, gravely contravening the foundational principles of Due Process guaranteed by the U.S. Constitution.

## Count 3

### To declare: a durable power of attorney is a mechanism that can be used as an alternative to the need for a court appointed guardian and conservator

2399.   Pursuant to G.L. c. 190B, § 1-201, Father's **2003 DPOA** is a governing instrument in guardianship and conservatorship proceedings.

2400.   Pursuant to G.L. c. 190B, § 5-306, the judiciary of the Massachusetts Probate & Family Court is precluded from appointing a guardian when the elder's needs can be met by least restrictive means—which Plaintiff Daughters set forth in this Complaint well-established Massachusetts case law that an executed durable power of attorney is an instrument that can satisfy the least restrictive means in context with G.L. c. 190B, § 5-306.

2401.   Designated Defendants held themselves out publicly to be the petitioners for permanent guardianship and conservatorship in the matter of In re Marvin H. Siegel; as well as, the **Essex Probate & Family Court** having officially deemed designated Defendants as such—especially, with regard to the trial held before the Essex Probate & Family Court in **June of 2012** and **July of 2012**.

2402.   Of significance, Plaintiff Daughters requested in-court that the **Essex Probate & Family Court** formally determine the validity of Father's **2003 DPOA** in court on: **May 27, 2011**, **June 7, 2011**, **June 16, 2011**, **March 27, 2012**, **June 27, 2012** and **July 11, 2012**; however, through **Judge Abber's** own initiative and in no manner requested by the designated Defendants, Judge Abber repeated and continuously refused to address the validity of Father's 2003 DPOA.

2403.   Given the above-described repeated and continuous raising of the issue regarding validity and materiality of **Father's 2003 DPOA** by Plaintiff Daughters, it was incumbent upon designated Defendants to dispute the validity of Father's 2003 DPOA—especially, having been deemed to be petitioners in the matter of In re Marvin H. Siegel. As purported petitioners for guardianship, G.L. c. 190B, § 5-306 required designated Defendants to prove that there were no other means available less restrictive than court ordered guardianship and conservatorship.  At trial, the existence of Father's 2003 DPOA was not disputed by designated Defendants and designated Defendants, in no manner, attempted to dispute the validity of Father's 2003 DPOA.

2404.   As set forth, where the court record shows that the existence of Father's **2003 DPOA** was explicitly raised by Plaintiff Daughters during the trial, Defendants had, more than, a full and fair opportunity to dispute the validity of Father's 2003 DPOA and were obligated to do so at that time; therefore, the Defendants are precluded, as a matter of collateral estoppel, from disputing Father's 2003 DPOA now.  Accordingly, based on designated Defendants conduct, the validity of Father's 2003 DPOA from **February 11, 2011 through May 25, 2011** is indisputable.

2405.   As previously set forth, Plaintiff Daughter Lisa has been unlawfully stripped of her rightful status as Father's attorney-in-fact and Plaintiff Daughter Devora of her rightful status as successor attorney-in-fact as a direct result of fraudulent and deceptive conduct by designated Defendants.

2406.   In addition, Plaintiff Daughters have established that Father's **2003 DPOA** would be effective today, but for the fraudulent and deceptive conduct of designated Defendants (BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Attorney Garmil, Whittier Pavilion, Sheryl Sidman and Alan Sidman).

2407.   As set forth in this Complaint, prior to the promulgation of the "new" MUPC provisions (G.L. c. 190B), it is long established by case law and legislative history that the *supposed* intent of the MUPC was to promote the philosophy that elders should be assisted in using "self-determination" as much as possible; that the execution of a durable power of attorney is specifically designed to avoid an elder from becoming a ward and to keep the the Probate & Family Court out of a person's private affairs.  The outwardly held out purpose of a durable power of attorney is to prevent the need for SJC Rule 1:07 court appointments; and to preserve and protect a person's expressed intentions and wishes of the elder—as so often heard in advertisements by lawyers on AM radio stations.

2408.   The above-described requests for declaratory judgment greatly serve the interests of justice and judicial economy; particularly, where a durable power of attorney is statutorily permitted as a least restrictive means to carry out the personal and financial affairs for an elder—*especially, it being well established statutorily and by case law that the whole purpose and essence for executing a durable power of attorney.*   It is well established by case law that a durable power of attorney should be used as an alternative to a court ordered guardianship and conservatorship—thereby relinquishing the need for involvement by the Massachusetts Probate & Family Court and elder protective services.

## Count 4

### To declare: G.L. c. 190B, § 5-305 violates the Due Process Clauses of the Federal Constitution

2409.   Plaintiff Daughters seek a declaratory judgment that the standard custom and practice of disqualifying family members as guardians and conservators by the Massachusetts Probate and Family Court judiciary violates the substantive and procedural due process guarantees of the Fifth and Fourteenth Amendments of the U.S. Constitution. G.L. c. 190B, § 5-305 governs the disqualification of family members as guardians and conservators—involving express advance directives and otherwise.

2410.   The language of G.L. c. 190B, § 5-305 unequivocally expresses that—with or without an advance directive—family members are supposed to be considered *prior* to any court ordered SJC Rule 1:07 guardian or conservator.

2411.   As set forth by Plaintiff Daughters in this Complaint, the standard custom and practice of Massachusetts Probate and Family Court judiciary is to automatically appoint a SJC Rule 1:07 guardian or conservator, without any formal consideration of family members to be appointed guardian and conservator.

2412.   Plaintiff Daughters have set forth solid facts and legal support in this Complaint establishing that the above-described manner in which the Massachusetts Probate & Family Courts routinely—without any substantiated basis of any kind—disregard an elder's written advance directive that explicitly set forth his or her nominated guardian and conservator (most often the nomination being a family member).

2413.   G.L. c. 190B, § 5-305 does not set forth any set procedure to be followed by judges in the disqualification of family members and other nominees from being appointed guardians and conservators.  The statute does not even require the judge to make formal findings—the statute does not mandate that the judge set forth written findings on which disqualification is based; and there is no mandate that an evidentiary hearing be held.

2414.   The language set forth in G.L. c. 190B, § 5-305 regarding a judge's disqualification of family members from being guardian and conservator promotes capricious judicial conduct.  The lack of any parameters in the statute shows that there are *no* safeguards, of any kind, to hinder corruption.

2415.   As Plaintiff Daughters set forth in this Complaint, there is an established pattern, throughout the Massachusetts Probate & Family Courts, of the judiciary failing to set forth reasons for the determination of disqualification of family members.

2416.   As Plaintiff Daughters set forth in this Complaint, there is an established pattern throughout the Massachusetts Probate & Family Courts of judges rubber-stamping baseless and unsupported claims of exploitation made by disgruntled family members and SJC Rule 1:07 court appointees.

2417.   As Plaintiff Daughters set forth in this Complaint, there is an established pattern throughout the Massachusetts Probate & Family Courts of SJC Rule 1:07 court appointees making false allegations and fabrications against family members and non-family nominations by an elder.

2418.   As Plaintiff Daughters set forth in this Complaint, there is an established pattern throughout the Massachusetts Probate & Family Courts of SJC Rule 1:07 court appointees deliberately using State elder protective service agencies to facilitate knowingly fraudulent and deceptive ousters of family members from being appointed guardian and conservator.

2419.   As Plaintiff Daughters set forth in this Complaint, there is an established pattern, throughout the Massachusetts Probate & Family Courts, of SJC Rule 1:07 court appointees making unlawful threats to family members of the pursuit of criminal prosecution on SJC Rule 1:07 court appointees' false allegations of exploitation.

2420.   For the reasons set forth above, Plaintiff Daughters seek a declaratory judgment that G.L. c. 190B, § 5-305 is unconstitutional based on: 1) statutory language being unconstitutionally broad and ambiguous; 2) the lack of procedural requirements for a judicial determination of a disqualification of family members as guardian and conservator contravening Federal Constitution guarantees for protection of the sanctity and integrity of the family unit; and 3) the lack of procedural requirements for judicial determination of the disqualification of family members as guardians and conservators contravening the Federal Constitutional protections of personal decision-making in private affairs.

## Count 5

## To declare: the Massachusetts Attorney General's Office had a conflict of interest in representing the Essex Probate & Family Court as legal counsel in the original civil action filed with the Supreme Judicial Court by Plaintiff Daughter (SJ-2012-0125 and SJC-11193)

2421.   Plaintiff Daughters seek a declaratory judgment that the established custom and practice of the Commonwealth—having the Attorney General's Office represent public officials as legal counsel to defend civil actions brought by private parties premised on allegations of criminal misconduct—violates the substantive and procedural due process guarantees to private citizens under the Fifth and Fourteenth Amendments of the U.S. Constitution.

2422.   *In the matter of Wanda W. Jones*, 379 Mass 826 (1980) shows that there have been substantial concerns previously raised before the Supreme Judicial Court about the duty of the Attorney General's Office acting with divided loyalties in its duty to represent the interests of the public.

2423.   It is indisputable that the Attorney General's Office has an obligation to take corrective action regarding acts of abuse of power by public officials.  As set forth in this Complaint, the Attorney General's duty to protect the public's interests is breached when the Attorney General's Office acts as legal counsel *for* public officials in civil actions brought by private citizens for injury sustained by alleged illegal conduct of public officials.  Inextricably, legal representation by the Attorney General's Office consists of *defending* public officials against allegations of illegal acts; therefore, it is axiomatic that the Attorney General's Office *cannot* abide by its duty to protect the public from criminality.  De facto, when private civil actions against public officials are wholly based on allegations of unlawful acts, the Attorney General's Office has divided loyalties—

398

this is a violation of the professional rules of ethics promulgated by the Board of Bar Overseers.

2424.   As set forth in this Complaint, the Attorney General's Office represented the **Essex Probate & Family Court** in the emergency civil action filed by Plaintiff Daughter Lisa with the Supreme Judicial Court in **March of 2012**.  As established, the Essex Probate & Family Court was explicitly and specifically designated a defendant in the afore-described emergency civil action.  The Attorney General's Office was served directly a copy of the emergency petition.

2425.   As set forth in this Complaint, Plaintiff Daughter Lisa's bringing a civil action seeking injunctive relief for illegal acts of public officials is *not* an isolated matter.  As demonstrated, there is a long-established history of private citizens having pursued similar civil actions that are wholly based on illegal conduct, with the Attorney General's Office acting as legal counsel for the public officials.

2426.   As previously set forth, Plaintiff Daughter Lisa presented <u>numerous specific and concrete allegations of substantial *criminal* misconduct</u> by **Judge Abber** of the **Essex Probate & Family Court** and **SJC Rule 1:07 Court Appointees** (**Defendants Attorney Cuffe, Feld** and **Myette**) in the afore-described emergency civil action—which Plaintiff Daughter Lisa sought immediate and permanent injunctive relief.

2427.   As previously set forth, there is overt and blatant evidence of designated Defendants' evidencing the Attorney General's actual conflict of interest in its representation of the **Essex Probate & Family Court** in the afore-described emergency civil action—established acts of the Supreme Judicial Court in deleting the designation of the Essex Probate & Family Court as a specific party named in the electronic docket and the written issued decision.

## Count 6

### To declare: actions by judges outside of the scope of lawfully presiding on a matter do not fall under the cloak of absolute judicial immunity

2428.   Plaintiff Daughters seek a declaratory judgment that communications outside the courtroom between the judiciary and litigants constitute acts beyond the scope of the duties of a judge; that judges be prohibited from being able to use the claim of absolute immunity regarding acts that are prima facie in violation of the Massachusetts Judicial Canons of Ethics.

2429.   Plaintiff Daughters seek a declaratory judgment that judges are prohibited from being able to use the of claim of absolute immunity regarding acts that have *no* bearing on carrying out legitimate duties of presiding over a matter and that are prima facie in violation of the Massachusetts Judicial Canons of Ethics.

2430.   Plaintiff Daughters seek a declaratory judgment that judges are prohibited from being able to use the claim of absolute immunity under the cloak of acting in a judicial capacity regarding prima facie evidence of criminal conduct.

2431.   As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that **Judge Abber** and **Judge Ricci** have violated the Massachusetts Judicial Canons of Ethics by having engaged in communications outside the courtroom with designated Defendants; colluding to facilitate financial exploitation in the matter of In re Marvin H. Siegel—as well as, in the matters of In re James Pentoliros and In re Hope Pentoliros, along with other numerous probate matters set forth in this Complaint.

2432.   As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that **Judge Abber** and **Judge Ricci** have engaged in accepting bribes and/or other improper personal benefits in exchange for rubber-stamping motions and other pleadings in favor of designated Defendants in the matter of In re Marvin H. Siegel and in exchange for denying motions and pleadings submitted by Plaintiff Daughters.

2433.   As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that **Judge Abber** and **Judge Ricci** have engaged in accepting bribes and/or other improper personal benefits in exchange for rubber-stamping motions and other pleadings in favor of designated Defendants in exchange for denying motions and pleadings in the matter of In re James Pentoliros and In re Hope Pentoliros.

2434. As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that **Judge Blake** and **Judge Sahagian** have knowingly and intentionally facilitated embezzlement in several probate matters over a long-established period of time.

2435. As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the judiciary of the Massachusetts Probate & Family Court facilitating SJC Rule 1:07 court appointees' acts of racketeering.

2436. As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the judiciary of the Massachusetts appellate courts deliberately disregarding and/or condoning the above-described conduct.

2437. As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the judiciary of the Judicial Conduct Commission disregarding and/or condoning the above-described conduct.

2438. As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that there is a long-established history and prevalence of the Attorney General's Office deliberately disregarding and/or condoning the above-described conduct.

2439. As set forth in this Complaint, the credibility of Plaintiff Daughters' claims is bolstered by substantial solid and concrete evidence of a long-established history and prevalence of corruption in the State's government—such as, RICO convictions as a result of corruption in the Probation Department; tampering of evidence by the State Drug Lab; years of the Commonwealth's lack of oversight over DCF (previously DSS).

2440. As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that it is in the public's interests that judges be precluded from being able to avoid liability from acts that are *not* within the scope of judicial duties and violate the Massachusetts Code of Judicial Conduct; and that directly and proximately cause injury to a private citizen—especially, where there is a long-established pattern of zero accountability by the State regarding judicial misconduct. Plaintiff Daughters have demonstrated, there is a long-established pattern of private citizens having no other avenue for redress of harm caused by unlawful conduct of the judiciary.

2441.   As set forth in this Complaint, Plaintiff Daughters present substantial solid and concrete evidence that it is in the public's interest that judges be precluded from being able to avoid liability from criminal acts that directly and proximately cause injury to a private citizen.

**WHEREFORE**, Plaintiff Daughters requests that this Court grant the above-described declarative relief.

## Count 7

### Fraud:  Facilitation of obtaining Father's signature on written instruments of May 25, 2011 and knowingly promoting the use of fraudulently obtained written instruments

(Defendants: BNY Mellon-diversity jurisdiction, Brian Nagle, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law Firm TBHR, Attorney Garmil,       Whittier Pavilion)

2442.   **Defendant BNY Mellon** is a foreign corporation based in Delaware.  A substantial portion of underlying alleged misconduct involved the participation of officers, agents, servants or employees of **Defendant BNY Mellon** located in New York.

2443.   **Defendant BNY Mellon**—through its officers, agents, servants and employees—knowingly and fraudulently engaged in acts of deceptively obtaining Father's signature on written instruments.  The written instruments consisting of: a revocation of Father's **2003 DPOA**, new durable power of attorney/healthcare proxy and retainer agreement for legal representation by **Defendant Law Firm TBHR**—signed by Father on **May 25, 2011**, while he was under involuntary commitment at **Defendant Whittier Pavilion**.

2444.   The new durable power of attorney and retainer agreement directly facilitated by **Defendant Law Firm TBHR** and designated Defendants (**Attorney Tarlow** and **Attorney Watson**) are replete with numerous provisions that explicitly gave **Defendant BNY Mellon** and **Defendant Law Firm TBHR** unfettered discretion to use the funds of **DSL Trust**, for designated Defendants' *own personal use*.

2445.   Since Father's first hiring **Defendant BNY Mellon** in <u>**1999**</u> to manage his funds—including the **DSL Trust**, **Father** explicitly signed a written agreement that **Defendant BNY Mellon** <u>*did*</u> <u>*not*</u> have unfettered discretion in the handling of funds.  In fact, **Defendant Attorney Cukier**—as counsel for Defendant BNY Mellon—provided a copy of that written agreement to **Judge Abber** in a clandestine manner.  (No notice was provided to Plaintiff Daughters that Judge Abber was provided documents outside of court. Plaintiff Daughter Lisa had discovered this inadvertently upon review of the court files for In re Marvin H. Siegel—a copy of the document that Defendant Attorney Cukier provided Judge Abber is in **Exhibit 392**).

2446.   On **May 24, 2011**, **Defendant Brian Nagle** knew that Father did not have any intention or desire to give unfettered discretion in the use of his funds—especially with regard to the **DSL Trust**.

2447.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Brian Nagle** knew that **Defendant Law Firm TBHR** could not ethically act as legal counsel for Father; as designated Defendants (**Attorney Tarlow**, **Attorney DeNapoli** and **Attorney Watson**) had served as co-members, for several years, on the Board of Directors and Officers of Family Business Magazine Inc. with Defendant Brian Nagle—in his specific official capacity with **Defendant BNY Mellon**).

2448.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that, <u>*prior*</u> to **May 25, 2011**, Father had <u>no</u> prior business dealings with **Defendant Attorney Tarlow** or **Defendant Law Firm TBHR**; that Father *did not* personally initiate legal representation by Defendant Attorney Tarlow or Defendant Law Firm TBHR.

2449.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Brian Nagle** breached his fiduciary duty to Father and to Plaintiff Daughters.

2450.   **Defendant Brian Nagle** had a fiduciary duty to Plaintiff Daughters in three separate and distinct respects: 1) on **May 24, 2011,** Plaintiff Daughters were valid and effective attorneys-in-fact for Father pursuant to Father's **2003 DPOA**, 2) Plaintiff Daughters are co-trustees of the DSL Trust and 3) Plaintiff Daughters are co-beneficiaries of Father's estate.

2451.   As set forth in this Complaint, **Defendant Brian Nagle** directly solicited **Defendant Law Firm TBHR** and **Defendant Attorney Tarlow** on **May 24, 2011** to provide legal services to Father.  Defendant Brian Nagle told them to go see Father at **Defendant Whittier Pavilion** while Father was under an involuntary commitment.

2452.   On **May 24, 2011** (and numerous years prior), **Defendant BNY Mellon**— through its officers, agents, servants and employees—and **Defendant Brian Nagle** knew that Father's **2003 DPOA** was valid and effective.

2453.   As set forth in this Complaint**, Defendant Law Firm TBHR**, **Defendant Attorney Tarlow**, **Defendant Attorney DeNapoli**, and **Defendant Attorney Watson** knew *prior* to designated Defendants going to see Father with the already prepared written instruments (signed by Father on **May 25, 2011**) that Father's **2003 DPOA** was valid and effective.

2454.   **Defendant BNY Mellon**—through its officers, agents, servants and employees in its offices in **Boston and New York**—knowingly and fraudulently engaged in acts of deception for intended conversion of funds belonging to **DSL Trust** for its own use including his having made misrepresentations to Plaintiff Daughter Lisa that Defendant BNY Mellon would honor her authority as attorney-in-fact for Father.

2455.   The Board of Directors and President for **Defendant BNY Mellon** had knowledge of the above-described misconduct by **Defendant Brian Nagle** and other designated Defendants where Plaintiff Daughter Lisa sent copies of the 93A Demand letter.

2456.   High ranking officials of **Defendant BNY Mellon** had taken overt acts to aid and abet the misconduct of **Defendant Brian Nagle**—as evidenced, in this Complaint, by their communications with the Federal Reserve and the Federal Reserve's written refusal to Plaintiff Daughter Lisa that it was not going to conduct an investigation.

2457.   From the inception of Father being admitted to **Defendant Whittier Pavilion**, on **May 20, 2011**, **Defendant Attorney Garmil** knew about Father's **2003 DPOA** and that Plaintiff Daughter Lisa was Father's attorney-in-fact.  Based on that knowledge, Defendant Attorney Garmil instructed the staff of Defendant Whittier Pavilion to prevent Plaintiff Daughter Lisa from seeing Father from, approximately, **May 20, 2011** through and past **May 25, 2011**.  Defendant Attorney Garmil did so in collusion with designated Defendants.  Defendant Attorney Garmil had fraudulently and deceptively kept Plaintiff Daughter Lisa from seeing her Father.

2458.   On or about **May 20, 2011**, the social worker on staff with **Defendant Whittier Pavilion** directly informed Plaintiff Daughter Lisa that she was not permitted to see Father because the social worker specifically stated that legal counsel for Defendant Whittier Pavilion claimed that Father's **2003 DPOA** was invalid.

2459.   As set forth in this Complaint, on **May 24, 2011, Defendant Attorney Garmil**—on behalf of **Defendant Whittier Pavilion**—filed a petition for a 6-month involuntary civil commitment of Father to a psychiatric facility.

2460.   On **May 25, 2011**, **Defendant Whittier Pavilion**—through its officers, agents, servants and employees—and **Defendant Attorney Garmil** knew, prior to **Defendant Attorney Tarlow** and **Defendant Attorney Watson** visiting with Father, that Defendant Attorney Tarlow and Defendant Attorney Watson were *private* attorneys—not court appointed counsel.

2461.   Designated Defendants kept Plaintiff Daughter Lisa from seeing Father until *after* Father had signed the documents given to him by **Defendant Attorney Tarlow** and **Watson**, and Plaintiff Daughter Lisa had retained private legal counsel, in her capacity as attorney-in-fact for Father.

2462.   As a direct proximate result of intentional acts of fraud and deception by **Defendant BNY Mellon**—through their officers, agents, servants and employees, Plaintiff Daughters have sustained considerable and substantial harm and other damages— including, but not limited to, emotional distress and loss of past, present and future income.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 8

### Fraud Conspiracy: facilitation of obtaining Father's signature on written instruments of May 25, 2011

(Defendants: BNY Mellon, Brian Nagle, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law Firm TBHR, Attorney Garmil, Whittier Pavilion)

2463.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2464.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Designated Defendants and its officers, agents, servants and employees have engaged in the facilitation of Father's signing the afore-described documents of **May 25, 2011** through fraud and deception.

2465.   Designated Defendants knowingly engaged in agreement to fraudulently and deceptively obtain Father's signature on the afore-described documents of **May 25, 2011**.

2466.    As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 9

### Breach of fiduciary relationship

(Defendant BNY Mellon – diversity jurisdiction)

2467.   Since **1999**, **Defendant BNY Mellon** has had a fiduciary relationship with Father regarding custody and investment management of the **DSL Trust** and other financial accounts of Father's.

2468.   **Defendant BNY Mellon**—through its officers, agents, servants or employees—knew that Plaintiff Daughters were co-trustees and co-beneficiaries of the **DSL Trust** and co-beneficiaries of Father's estate.

2469.   On or about **February 11, 2003**, **Defendant BNY Mellon**—through its officers, agents, servants and employees—knew about the execution by Father of his **2003 DPOA** and the content of Father's 2003 DPOA.  Defendant BNY Mellon knew that Father had personally sought the execution of the 2003 DPOA and of the validity of the 2003 DPOA.  Defendant BNY Mellon knew that Plaintiff Daughter Lisa was Father's attorney-in-fact, at all relevant times.

2470.   On or about **June 16, 2011** and at all other relevant times, **Defendant BNY Mellon** knew that Father had executed a written re-affirmation of his **2003 DPOA;** in particular, Defendant BNY Mellon—through its officers, agents, servants and employees—knew that Father had re-affirmed his designation of Plaintiff Daughter Lisa as his attorney-in-fact.

2471.   **Defendant BNY Mellon**—through its officers, agents, servants and employees—had a fiduciary duty to Plaintiff Daughters in their capacities: as attorneys-in-fact, as co-trustees of the **DSL Trust**, as co-beneficiaries of the **DSL Trust** and co-beneficiaries of Father's estate.  Specifically, Defendant BNY Mellon had a duty to not act for the benefit of itself in any matter to which it has duties to perform or interests to protect another.

2472.   **Defendant BNY Mellon**—through its officers, agents, servants and employees—breached its fiduciary duty to Plaintiffs Daughters by engaging in acts of self-dealing, which include, but are not limited to: **Defendant Brian Nagle's** soliciting the legal services of **Defendant Attorney Tarlow** and **Defendant Law Firm TBHR** in purported representation of Father; colluded with counsel of Defendant Law Firm TBHR in purportedly revoking Father's **2003 DPOA**; the inclusion of Defendant BNY Mellon in the durable power of attorney signed by Father on **May 25, 2011**; the inclusion of Defendant BNY Mellon in the retainer agreement signed by Father on **May 25, 2011**; converting funds belonging to **DSL Trust** (which Plaintiff Daughters are co-trustees and co-beneficiaries) to its own use; stealing funds from DSL Trust; creating false documentation to obtain stolen funds from DSL Trust; engaging in acts to conceal fraudulent and deceptive activity of other Defendants; using office property, including, without limitation, facsimiles, telephones and mailing items to facilitate fraud.

2473.   **Defendant BNY Mellon** had knowledge of the above-described misconduct by **Defendant Brian Nagle** and other designated Defendants where Plaintiff Daughter Lisa sent copies of the 93A Demand letter to the Board of Directors and President of Defendant of BNY Mellon.

2474.   High-ranking officials of **Defendant BNY Mellon** had taken overt acts to aid and abet the misconduct of Defendant Brian Nagle—as evidenced by the result of communications with the Federal Reserve and the Federal Reserve's written refusal to investigate.

2475.   As a direct proximate result of intentional acts of self-dealing by **Defendant BNY Mellon**—through the officers, agents, servants and employees, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 10

### Fraud: Involuntary commitment of Father to Defendant Whittier Pavilion

(Defendants: Beverly Hospital, Whittier Pavilion, Attorney Garmil, BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson)-

2476.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2477.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence **Defendant Beverly Hospital** fraudulently and deceptively directed and facilitated the involuntary admission of Father to **Defendant Whittier Pavilion** on **May 20, 2011**.

2478.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Beverly Hospital**—through its officers, agents, servants and employees— and **Defendant Whittier Pavilion**—through its officers, agents, servants and employees—have a pattern of common design and acting in agreement to refer patients for the specific purposes of obtaining ill-gotten gain through facilitating Medicare fraud and obtaining kickbacks for facilitating patient admissions.

2479.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Beverly Hospital** and **Defendant Whittier Pavilion** knowingly and intentionally disregarded Plaintiff Daughter Lisa's authority as attorney-in-fact for Father.

2480.     As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Beverly Hospital** and **Defendant Whittier Pavilion** purposefully excluded Plaintiff Daughter Lisa from decisions that were made by Defendant Hospitals regarding Father's admission.

2481.     As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendants Attorney Ledoux** and **Defendant Attorney Garmil**, in their capacities as counsel for respective hospitals, have an established pattern of collusion with specific regard to filing petitions for guardianship and conservatorship over patients admitted at their clients' medical facilities.

2482.     As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Garmil** engaged in fraudulent and deceptive conduct to prolong Father's involuntary commitment at **Defendant Whittier Pavilion**.

2483.     As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Garmil** engaged in fraudulent and deceptive conduct to foist Father into the Massachusetts Probate & Family Court system.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 11

## <u>Conspiracy: attempt to frame Plaintiff Daughter Lisa for financial exploitation</u>

(Defendants: BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Burns & Levinson, Attorney Studen, ESMV, Attorney Berid, Diane Powell, Scott Dailey, Michael Springman)

2484.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants have engaged in overt and specific fraudulent and deceptive acts in furtherance of attempted set-up to induce Father to make statements—on a recorded call—that Plaintiff Daughter Lisa was trying to steal $6 million from Father's accounts held with **Defendant BNY Mellon**.

2485.   As demonstrated in the Complaint, Plaintiff Daughters have set forth concrete and specific evidence that shows the existence of a conspiratorial agreement amongst the designated Defendants through the words, actions, and the interdependence of activities and persons involved.

2486.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants used blatant and flagrant trickery in the afore-referenced recorded call (of **July 22, 2011**) and outright attempt to put words in Father's mouth to make allegations against Plaintiff Daughters Lisa—which Father rejected.

2487.   As demonstrated in the Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' false allegations against Plaintiff Daughter Lisa.

2488.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughter Lisa has suffered—and continues to suffer—grave injury as a direct result of designated Defendants' above-described actions.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 12

## RICO violation under 18 U.S.C. §§ 1962 (c) and (d)

### (All Defendants)

2489.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2490.   Plaintiff Daughters have standing to pursue claims of relief under **18 U.S.C. § 1962** as they have set forth solid and concrete evidence of their having suffered—and continue to suffer—injury to their liberty and property interests as a direct result of the criminal enterprise operated through the **Massachusetts Probate & Family Court system**.

2491.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Essex Probate & Family Court** and the other Probate & Family Courts throughout Massachusetts are subset entities—with the **Massachusetts Probate & Family Court system** as the parent entity—have been operating for over _30 years_ and continue to operate a criminal enterprise of financial exploitation.

410

2492.   The afore-described criminal enterprise—facilitated through the **Essex Probate & Family Court** and the other Probate & Family Courts—affects interstate and foreign commerce.  As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence of the Massachusetts Probate & Family Courts being used to money launder; and, specifically, done so through the use of fictional decedents and forgery.  Also, presented is evidence of SJC Rule 1:07 court appointees continuing to collect government benefits of elders after they have died as wards of the State and/or elders who have deceased in nursing homes.

2493.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the afore-described criminal enterprise is a nest of interlocking conspiracies that involve overlapping conspiracies and smaller, discrete inner conspiracies of fewer persons and smaller scope that are tied in with a larger conspiracy whose members include some but not all of the members of the discrete inner conspiracies. *Aetna Casualty Surety Company v. P & B Autobody, Et Al.*, 43 F.3d 1456 (District of Massachusetts, 1994).

2494.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the common purpose of the enterprise is the systemic and surreptitious embezzlement of substantial sums of money from elders and other individuals who become subjects of petitions that seek to impose court ordered guardianship and conservatorship over the elder or other individual—*subsequent* to the filing of such petition, the elder and other individuals alleged to be ill are judicially deemed incapacitated, which then automatically triggers the court ordered appointments of a guardian and conservator.

2495.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is, also, the systemic and surreptitious embezzlement of substantial sums of money from estate administrative proceedings upon a person's death.

2496.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the above-described scheme specifically targets elders; and exists because there is an established routine standard custom and practice by the judiciary of the Massachusetts Probate & Family Court issuing court orders and decrees that give SJC Rule 1:07 court appointees *absolute* control over the elder's person (literally), over the personal affairs of the elder and over the elder's estate—with the judiciary explicitly allowing SJC Rule 1:07 court appointees to act with complete exclusion of family members.

411

2497.   In **2009** and **2012**, the Legislature formally effectuated changes to the Massachusetts Uniform Probate Code (MUPC)—spearheaded by **Senator Creem**.

2498.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that, _prior_ to **2009**, the Massachusetts appellate judiciary outwardly set forth—in their written decisions—the philosophy that the Probate & Family Court was to _limit_ the authority of SJC Rule 1:07 guardians and conservators.  The appellate courts explicitly declared that SJC Rule 1:07 guardians and conservators were to actively facilitate expressed desires and intentions of an elder.

2499.   In direct contravention to the above-described long-established and publicly held appellate court philosophy, the Massachusetts Legislature specifically set forth language in G.L. c. 190B, § 5-305 that promoted and encouraged the issuance of plenary authority to SJC Rule 1:07 guardians and conservators—unlimited authority.

2500.   As previously set forth, **Senator Creem** and her law firm financially benefit from the changes made to the MUPC; showing that she had a personal interest in facilitating the changes made to the MUPC—_which changes take away rights from private citizens, not enhance rights_.

2501.   The legislative groundwork for the afore-described changes to the MUPC began around **2007**.  Of significance, **between 2007 through 2011, 6 out of 7 seats on the Supreme Judicial Court were filled with new appointments**: Justice Roderick, Justice Botsford, Justice Lenk, Justice Cordy, Justice Gants, and Justice Duffly.

2502.   **Senator Creem** is a Life member of the **MBF Society of Fellows**—openly held out in her capacity with her law firm of **Stone, Stone & Creem.**  As previously set forth, the following justices of the Supreme Judicial Court are, also, Life members of the **MBF Society of Fellows**: **Chief Justice Spina**, **Justice Botsford**, and **Justice Lenk**.

2503.   As previously set forth, **Senator Creem** has significant connections with the justices of the Supreme Judicial Court from her past position with the **Governor's Council**, her current position as Co-Chair on the **Justice Commission** with the Legislature; along with the associate from her law firm (Judith McKinnon) being a current member of the **Judicial Nomination Committee** with the **MBA**.

2504.   Of significance, the new language of G.L. c. 190B, § 5-305 literally sets forth plenary authority as an automatic, with the provision regarding limited authority at the very end of the statute—previously, the MUPC espoused that plenary authority was intended to the exception, not the rule.  Evidencing that limited authority is now specifically and deliberately intended as an afterthought is that the language regarding limited authority is physically placed at the end of the provision.  The new statutory language was significantly changed to emphasize and to promote the automatic issuance of plenary authority to SJC Rule 1:07 guardians and conservators.

2505.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is an established routine custom and practice by the judiciary of the Massachusetts Probate & Family Court give plenary authority to SJC Rule 1:07 guardians and conservators—otherwise known as unlimited authority.

2506.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants' professional relationships with local hospitals, nursing homes and psychiatric facilities establish the opportunity for routine foisting of elders into the Massachusetts Probate & Family Court system.

2507.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the motive for designated Defendants to engage in the above-described acts stems from the financial gain and other personal gains as designated Defendants, also, regularly accept work as SJC Rule 1:07 court appointees—while serving as legal counsel and in other professional capacities with the local hospitals, psychiatric facilities and nursing homes (facilitating opportunity for kickbacks and facilitating embezzlement).

2508.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that—specifically through designated Defendants professional relationships with local hospitals, nursing homes and psychiatric facilities—designated Defendants have an established pattern of foisting elders into the Massachusetts Probate & Family Court system by their filing of petitions for guardianship and conservatorship, which ultimately results in court ordered appointments of SJC Rule 1:07 guardians and conservators.

2509.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants who have a professional working relationship with State elder protective service agencies, also, engage in routine foisting of elders into the Massachusetts Probate & Family Court system by filing—and helping to facilitate filings—of petitions for guardianship and conservatorship, which ultimately results in court ordered appointments of SJC Rule 1:07 guardians and conservators.

2510.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that, *for over 30 years*, **Defendant Attorney Ledoux** has been a direct leader and participant in this financial exploitation scheme carried out through the Massachusetts Probate & Family Court system—which is illustrated by Defendant Attorney Ledoux's private company that he originally established in **1984**: **CFD Liquidating Corporation**.  As established in this Complaint, the ultimate mode for obtaining ill-gotten money from elders judicially declared wards of the State is through the liquidation of their estates—which unrestricted access to the estates is attained through SJC Rule 1:07 court appointed guardians and conservators.

2511.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Ledoux** has provided private legal services to **Defendant Beverly Hospital, North Shore Medical Center/Salem Hospital**, **Kindred Hospital**, and **Winchester Nursing Home**.

2512.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Garmil** serves as private legal counsel for **Defendant Whittier Pavilion** and—in matters unrelated to In re Marvin H. Siegel— **Defendant Merrimack Valley Hospital**.

2513.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants—**Defendant Attorney Ledoux** and **Defendant Attorney Garmil—**have a long-established and regular practice of simultaneously working as SJC Rule 1:07 court appointed guardians and conservators, in addition to other types of SJC Rule 1:07 court appointments of the **Essex Probate & Family Court**.

2514.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is an established pattern of **Defendant Attorney Ledoux** and **Defendant Attorney Garmil** working alongside one another in an inordinate number of probate matters and in various capacities.

2515.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is an established pattern of **Defendant Attorney Ledoux** and **Defendant Attorney Garmil** having specifically requested the **Essex Probate & Family Court** to appoint one another at various times in numerous probate matters.

2516.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is an established pattern that other designated Defendants SJC Rule 1:07 court appointees (**Attorney Cuffe**, **Attorney Feld, Attorney Berid**, **Attorney Cukier**, **Attorney Myette**, **Attorney Saunders**, **Attorney McHugh**) work alongside one another in an inordinate number of probate matters and in various capacities.  These designated Defendants, also, facilitate embezzlement by making specific requests for one another.

2517.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants deliberately use local hospitals, nursing homes and psychiatric facilities to gain control over the elders' estates through court ordered appointments of SJC Rule 1:07 guardians and conservators.  The designated Defendants, also, use local hospitals, nursing homes and psychiatric facilities to provide a steady source of fodder.

2518.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants—**Attorney Ledoux**, **Attorney Garmil**, **Attorney Saunders, Attorney Berid**, **ESMV**, **Attorney Cuffe**, **Attorney Feld** —have a long-established pattern of using their professional relationships with medical facilities to facilitate elders being placed under a court imposed guardianship and conservatorship, The specific means used to do so is designated Defendants, in their capacity as private legal counsel, filing formal petitions for guardianship and conservatorship over elders *who are admitted patients* of these local hospitals and psychiatric facilities—the official petitioning parties being the local hospitals and psychiatric facilities.

2519.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is an established pattern of designated Defendant hospitals operating in a *primary function* of the criminal enterprise by directly facilitating the admittance of elders into **Defendant Whittier Pavilion** and the **Adult Behavioral Unit of Defendant Merrimack Valley Hospital**.

2520.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant ESMV**, also, has a *primary role* in the criminal enterprise of direct and indirect facilitation of the admittance of elders into **Defendant Merrimack Valley Hospital** and other local hospitals/psychiatric facilities—as Defendant ESMV has the opportunity and means to do so.

2521.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant ESMV** and **Defendant Attorney Berid** have the motive and opportunity for obtaining ill-gotten gains by directly and indirectly facilitating petitions for guardianships and conservatorships in the Massachusetts Probate & Family Courts.

2522.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants directly and indirectly facilitating admissions of elders into **Defendant Merrimack Valley Hospital** and other local hospitals based *solely* on symptoms of dementia and Alzheimer's.

2523.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that once elders are foisted into the Massachusetts Probate & Family Courts that there is a long-established pattern of the judiciary making automatic appointments of SJC Rule 1:07 guardians and conservators, regardless of known existing family members.

2524.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of Massachusetts Probate & Family Court's judiciary deliberately excluding family members from being appointed guardian and conservator for an elder for the specific purpose of facilitating embezzlement of an elder's estate.

2525.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of Massachusetts Probate & Family Court's judiciary deliberately selecting specific people to act as SJC Rule 1:07 guardians and conservators—doing so for the specific purpose of facilitating embezzlement of an elder's estate.

2526.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of Massachusetts Probate & Family Court's judiciary's deliberate selection of specific people to act as SJC Rule 1:07 guardians and conservators contravenes the principles set forth in the MUPC—the judiciary of the Massachusetts Probate & Family Court has knowingly and deliberately abandoned the promulgated rules set forth by the Massachusetts Probate & Family Court mandating the use of the respective court list of certified appointees to assign appointments by sequential order.

2527.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence of an established pattern that the judiciary of the Massachusetts Probate & Family Court intentionally and knowingly disregard previously executed advance directives—and knowing that such disregard violated the Fifth and Fourteenth Amendments of the Federal Constitution and the laws under the MUPC.

2528.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence of an established pattern that the judiciary of the Massachusetts Probate & Family Court intentionally and knowingly rubber-stamp SJC Rule 1:07 guardians and conservators motions and pleadings specifically to benefit the SJC Rule 1:07 court appointees and/or to the detriment of family members to facilitate embezzlement.

2529.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence of an established pattern that the judiciary of the Massachusetts Probate & Family Court intentionally and knowingly rubber-stamp SJC Rule 1:07 conservators' financial reports and pleadings; with the judiciary knowing that the filings have patently insufficient and incorrect information.

2530.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence of an established pattern that the judiciary of the Massachusetts Probate & Family Court intentionally and knowingly rubber-stamp SJC Rule 1:07 guardians' and conservators' requests for forcing elders into long-term care facilities; and knowing that it is used as a means to obtain ill-gotten gains.

2531.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence of an established pattern that the judiciary of the Massachusetts Probate & Family Court intentionally and knowingly rubber-stamp SJC Rule 1:07 guardians' requests to liquidate elders' estates; and knowing that they are used as a means to obtain ill-gotten gains.

2532.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Essex Probate & Family Court** intentionally and knowingly disregarded Father's **2003 DPOA**—and knowing that such disregard violated the Fifth and Fourteenth Amendments of the Federal Constitution and the laws under the MUPC; and did so to facilitate financial exploitation of Father's estate.

2533.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Essex Probate & Family Court** intentionally and knowingly excluded Plaintiff Daughters from being appointed guardian and conservator for Father based on the Essex Probate & Family Court colluding with designated Defendants to specifically financially exploit Father's estate.

2534.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Essex Probate & Family Court** intentionally and knowingly made particular court appointments of **Defendant Attorney Cuffe**, **Defendant Attorney Feld** and **Defendant Attorney McHugh** in the matter of In re Marvin H. Siegel to specifically help facilitate embezzlement of Father's estate.

2535.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Essex Probate & Family Court** knew that its exclusion of Plaintiff Daughters from being appointed guardian and conservator for Father was done in violation of the Federal Constitution and other law—and that the Essex Probate & Family Court acted in concert with designated Defendants to fraudulently and deceptively preclude Plaintiff Daughters from being appointed guardian and conservator.

2536.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Essex Probate & Family Court** knew that designated Defendants made continuous and repeated false representations in their filings of reports and pleadings in the matter of In re Marvin H. Siegel.

2537.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants—in particular, **Attorney Ledoux**, **Attorney Garmil** and **Attorney Saunders**—have a long-established pattern of using their attorney/client relationship with medical facilities to provide supposed supporting evidence to facilitate court ordered forced administering of antipsychotics to elders who have been judicially deemed wards of the State.

2538.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants filing petitions and motions with the Massachusetts Probate & Family Courts specifically to obtain court ordered forced administering of antipsychotics to elders; doing so to assist the facilitation of financial exploitation by allowing SJC Rule 1:07 court appointed guardians to unnecessarily and excessively sedate elders to facilitate: Medicaid Fraud and liquidation of assets for ill-gotten gain.

2539.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants deliberately using the effects from unnecessary and excessive use of antipsychotics to substantiate judicial findings that the elder is purportedly incapacitated and that the elders purportedly do not have sufficient capacity to be self-aware and cognizant.

2540.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants— **Whittier Pavilion**, **Merrimack Valley Hospital**, **Dr. Funk, Dr. Cui**, **Dr. Hayes**, **Dr. Cohen**, **Dr. Portney**— facilitating court ordered forced administering of antipsychotics to elders based _solely_ on symptoms of dementia and Alzheimer's.

2541.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a long-established pattern of designated Defendants using other type of court orders to keep elder's family from potentially becoming aware of illegal acts is to severely restrict family members' and friends' visitation and communications with the elder.  One of the most commonly used mechanisms is removing elders from their home into forced placement into long-term care facilities.

2542.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a pattern of designated Defendants using extortion of family members to prevent family members from challenging them in court, as well as, to obtain purported assent to various requested motions filed with the Probate & Family Courts. The most common means used by the designated Defendants is to force family members to give up their legal and financial rights by threat of criminal prosecution on baseless and fabricated allegations, as well as, the threat of losing visitation and communication with the elder.

2543.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a pattern of designated Defendants using fraudulently and deceptively obtained court orders to facilitate the above-described extortive tactics. Specific to Plaintiff Daughters, designated Defendants filed motions seeking sanctions against Plaintiff Daughters; motions seeking to restrict Plaintiff Daughter's access to the Probate & Family Court; fabricated allegations of exploitation against Plaintiff Daughter to elder protective service agency; fabricated information provided to elder protective service agency; filing of various motions and other pleadings restricting Plaintiff Daughters' visitation and communications with their father; filing motions and pleadings that have unlawfully stripped Plaintiff Daughters of their established valid capacity as attorney-in-fact for their father.

2544.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a pattern of designated Defendants—through their officers, agents, servants and employees—having engaged in other type of racketeering activities that include, but are not limited to: bribing the judiciary, falsifying information in various filed pleadings (such as Inventories, Accounts, Financial Plans, petitions and motions related to court ordered appointment of guardian and conservator, motions and other pleadings relating to court ordered forced administering of antipsychotics and the like).

2545.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is motive and opportunity for improper outside communications between members of the judiciary of **Essex Probate & Family Court** and designated Defendants, as well as between the judiciary of Supreme Judicial Court and designated Defendants.

2546.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a pattern of actual improper outside communications that have occurred between members of the judiciary of **Essex Probate & Family Court** and designated Defendants.

2547.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Essex Probate & Family Court** has improperly altered electronic docket information.

2548.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a pattern of actual improper outside communications that have occurred between members of the judiciary of **Supreme Judicial Court** and designated Defendants.

2549.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the **Supreme Judicial Court** has improperly altered electronic docket information.

2550.   In furtherance of the above-described schemes, violations of RICO have occurred through Defendants' use of mail, the internet in connection with emailing and the telephone lines in connection with mailing, faxing and the making of telephone calls.

2551.   Liability in terms of participation under § 1962 does not require that designated Defendants have any formal position in the enterprise.  See *Aetna Casualty*, supra.

2552.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Designated Defendants have engaged in more than two acts of racketeering; and *continue to* engage in a pattern of racketeering.

2553.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that there is a systemic pattern of  of designated Defendants conducting the criminal scheme carried out through the Massachusetts Probate & Family Court system; that the above-described acts are related and demonstrate a threat of continued criminal activity.

2554.   As demonstrated in this Complaint Plaintiff Daughters have incurred—and continue to incur—great expenses, delays, emotional distress and other harms by reason of designated Defendants' various acts of racketeering (damages include, but not limited to, investigation and preparation for litigation, litigation costs).

2555.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the judiciary's established pattern of deliberate disregard and/or indifference to designated Defendants' commission of financial exploitation and criminal abuse.

2556.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of financial exploitation and criminal abuse.

2557.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father and status as Father's designated attorneys-in-fact, and loss of property.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 13

### RICO Conspiracy violation under 18 U.S.C. § 1962

(All Defendants)

2558.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2559.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence that shows the existence of a conspiratorial agreement, through the words, actions, and the interdependence of activities and persons involved.

2560.   Liability as a conspirator still exists even if each defendant does not know all the details or the full extent of the conspiracy; a defendant is still jointly and severally liable for all acts in furtherance of the conspiracy.  *Aetna Casualty*, supra.

2561.   As a direct and proximate result of intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

### Violations of 42 U.S.C. § 1983

2562.   Below are specific violations by designated Defendants causing the Plaintiff Daughters to suffer substantial deprivations of multiple Federal Constitutional rights.

2563.   At all times relevant to acts and omissions by designated Defendants in violations of Plaintiff Daughters' Federal Constitutional rights, designated Defendants are acting under color of law.

2564.   The following Defendants are state officials/state agencies: **Supreme Judicial Court**, **Essex Probate & Family Court**, **ESMV**, **Attorney Berid**, **Michael Springman**, **Diane Powell**, **Scott Dailey**, **Attorney Cuffe**, **Attorney Feld**, **Attorney McHugh** and **Attorney Myette**.

2565.   SJC Rule 1:07 court appointees are not immune from liability under § 1983 because their intentional misconduct, by virtue of alleged conspiratorial action, has deprived—and continues to deprive Plaintiff Daughters of their Federal Constitutional rights, especially, to whom SJC Rule 1:07 court appointees have a fiduciary duty to protect Plaintiff Daughters' Federal Constitutional rights in their capacity as family, trustees of the DSL Trust and beneficiaries of Father's estate.

2566.   The piercing of the veil of presumed qualified immunity, also, applies to attorneys who are court appointed in the role of general legal counsel for the elder and attorneys who are court appointed to act as Roger's counsel for the elder.   See *Tower v. Glover*, 467 U.S. 914 (1988).

2567.   At all times relevant pertaining to the acts and omissions committed by designated Defendants State officials, a reasonable official would have understood that his or her actions were in violation of clearly established rights of Plaintiff Daughters.  Where designated Defendant public officials knew—and should have known—that their actions violated a clearly established Constitutional right, they do not have immunity from liability as they had fair notice that their conduct was unlawful.  See *Meaney v. Dever*, 170 F. Supp. 2d 46, 58 (D. Mass. 2001).

2568.   At all times relevant pertaining to the acts and omissions of designated Defendant State officials, designated Defendants did not act objectively or reasonably; and they knew that they were not acting objectively or reasonably—and did so with deliberate intention and purpose.

2569.   Defendant State officials and State agencies do not have immunity from liability where their acts and omissions—individual and joint—are substantially and inextricably enmeshed with their having intentionally made false statements and acted in reckless disregard for the truth.  *Burke v. Town of Walpole*, 405 F.3d 66, 86 (1st Cir. 2005).

2570.   The means used by designated Defendants to deprive Plaintiff Daughters of their Federal Constitutional rights were able to be effectuated *only because* designated Defendants are clothed with the authority of state law.

2571.   At all times relevant pertaining to the acts and omissions by designated Defendants who have deprived Plaintiff Daughters of their Federal Constitutional rights, designated Defendants' conduct has been facilitated—and continues to be facilitated—with malicious intent.  The sole purpose for Defendants' conduct has been to cause harm (financial and emotional harm) to Plaintiff Daughters.

2572.   Designated Defendant private parties are liable for violating 42 U.S.C. § 1983 as they intentionally engaged—and continue to engage—in joint participation with designated Defendant State officials in violating Plaintiff Daughters' Federal Constitutional rights.  See *Lugar v. Edmondson Oil Company*, 457 U.S. 922, 929 (1982).

2573.   Designated Defendants private parties are deemed state actors for the purpose of 42 U.S.C. § 1983 as they have acted together with designated Defendant State officials and/or have engaged in conduct that is otherwise chargeable to the State.

2574.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 14

### § 1983 Claim: Deprivation of Plaintiff Daughters' Due Process right to Equal Protection

(Defendants: Supreme Judicial Court and Essex Probate & Family Court)

2575.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2576.   The Due Process Clause under the Fifth and Fourteenth Amendments of the Federal Constitution guarantees protection to private citizens that government will use fair procedures when dealing with private persons—*even in the face of* _superficial court proceedings_.  *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st cir. 2011).

2577.   The equal protection guarantee in the Due Process Clause requires State courts to apply its laws in the same manner amongst similarly situated litigants to prevent fundamental procedural unfairness.  *Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st cir. 2011).

2578.   This equal protection claim is properly brought by "a class of two" where Plaintiff Daughters can demonstrate that they have been intentionally treated differently from others similarly situated who have private legal counsel; that no rational basis exists for that difference in treatment; and that the different treatment was based on a malicious or bad faith intent to injure.  *Walsh v. Town of Lakeville*, 431 F. Supp. 2d 135, 145 (D. Mass. 2006).

2579.   Plaintiff Daughters have presented substantial and concrete evidence that they have been treated differently by the Supreme Judicial Court based on their status of being pro se litigants, as opposed to litigants officially represented by legal counsel.

2580.   As set forth in the Complaint, an inordinate number of other people who have acted in the capacity of representing themselves in court—including attorneys who have acted in the capacity as a pro se litigant—have been treated differently by the Supreme Judicial Court and the Appeals Court than litigants who have official legal counsel representing them.

2581.   Plaintiff Daughters have presented substantial and concrete evidence that the Massachusetts Supreme Judicial Court and the Appeals Court have engaged in acts that have disadvantaged pro se litigants and/or favored litigants who are represented by legal counsel—specifically, such acts pertain to differences in procedural aspects that occur during hearings, in written decisions and various administrative acts taken and omissions by the Clerk's Office.  In effect, pro se litigants are precluded from fully and adequately being heard and precluded from being able to fully and adequately present their case.  Procedural acts and omissions pertain to rights that are guaranteed to Plaintiff Daughters under the Federal Constitution.

2582.   As set forth in this Complaint, there is an established pattern of acts and omissions by the appellate courts that exhibit abuse of power—often, in matters that involve issues of substantial and irremediable deprivation of life and liberty.

2583.   As set forth in this Complaint, there is an established pattern of bias by the appellate court in written decisions *against pro se litigants*, as well as, the favoring of certain litigants who have retained counsel having mutual memberships in various professional associations with various judiciary and administrative personnel— memberships that are expressly prohibited by the Massachusetts Judicial Canons of Ethics.

2584.  Specifically evidenced herein the Complaint regarding the matters involving Plaintiff Daughters, the judiciary and administrative personnel include, but are not limited to:  **then-Chief Justice Ireland, Chief Justice Spina**, **Justice Botsford**, **Justice Lenk, Justice Duffly**, **now-Appeals Court Justice Blake**, **Judge Abber**, **Judge Ricci**, **Judge DiGangi**, **then-Clerk Mellen.**

2585.  Plaintiff Daughters have set forth specific and concrete evidence that the **Supreme Judicial Court** has engaged in acts of bias against Plaintiff Daughters as pro se litigants, compounded by unethical acts of favoring designated Defendants—**Attorney Kazarosian**, **Attorney Berid**, **Attorney Ledoux**, **Attorney Costello**, **Attorney Cukier**, **Attorney Cuffe**, **Attorney Feld**, **Attorney Barbar, Attorney Myette**—that have precluded Plaintiffs from obtaining legal relief sought; thereby, causing substantial irreparable Constitutional harm to  Plaintiff Daughters and their father (deprived access and communication with Father, risk of death to Father by unwarranted and unlawful forced administering of antipsychotics, removal from permanent residence, financial exploitation of **DSL Trust**).

2586.  As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the **Essex Probate & Family Court** and the **Supreme Judicial Court**, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, have been carried out through color of law.

2587.  As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the **Essex Probate & Family Court** and the **Supreme Judicial Court**, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, have been capricious—beyond the pale, demonstrating an extreme lack of proportionality.  Even in the face of afforded broad discretion, widespread denials for arbitrary and purported technical reasons rise to the level of unreasonableness.  *Correia v. Department of Public Welfare*, 414 Mass 157, 164 (1993).

2588.  As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the **Essex Probate & Family Court** and the **Supreme Judicial Court**, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, have been conducted in such a manner demonstrating concerted efforts with designated Defendants.

2589.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the **Essex Probate & Family Court** and the **Supreme Judicial Court**, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, designated Defendants should have known—and did know—that they were violating Plaintiffs Constitutional rights where the law is clearly established and are reasonably expected to know that the law forbade their conduct.

2590.   Even in the face of broad discretion in interpreting laws, this deference does not extend to an unreasonable interpretation.  *Correia v. Department of Public Welfare*, 414 Mass at 165.

2591.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the **Essex Probate & Family Court** and the **Supreme Judicial Court**—involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action—have been conducted in such a manner demonstrating a specific intent to cause harm to Plaintiff Daughters by deliberately and knowingly unlawfully precluding Plaintiff Daughters from obtaining legal relief.

2592.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the **Essex Probate & Family Court** and the **Supreme Judicial Court**, involving the matter of In re Marvin H. Siegel and the afore-described emergency civil action, constitute an abuse of power.

2593.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 15

### § 1985 Conspiracy Claim: Deprivation of Plaintiff Daughters' Due Process right to Equal Protection

(Defendants: Supreme Judicial Court, Essex Probate & Family Court, BNY Mellon, Burns & Levinson, Attorney Cukier, Attorney Kazarosian, Attorney Cuffe, Attorney Feld, Attorney Costello, Attorney Berid, ESMV, Attorney Myette)

2594.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2595.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that designated Defendants and/or through its officers, agents, servants and employees have engaged in fraudulent and deceptive acts in furtherance of depriving Plaintiff Daughters of equal protection of the laws agreement of more than two designated Defendants.

2596.   Liability under § 1985 does not require that the agreement amongst the designated Defendants be an explicit agreement—agreement can be inferred from other evidence including a course of conduct; which such acts and omissions by designated Defendants are set forth in this Complaint.

2597.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that designated Defendants and/or through its officers, agents, servants and employees have engaged in fraudulent and deceptive acts in furtherance of depriving Plaintiff Daughters of equal protection of the laws; which violations have been specifically facilitated through various designated Defendants' influence and connections with various judiciary of the **Essex Probate & Family Court** and the **Supreme Judicial Court**—as well as administrative personnel in the Clerk's Office of the Essex Probate & Family Court and the Clerk's Office of the Supreme Judicial Court.  As established in this Complaint, designated Defendants' use of established influence and connections stem from mutual memberships in certain professional associations, organizations and other entities.

2598.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that designated Defendants and/or through its officers, agents, servants and employees have engaged in overt acts and omission to injure Plaintiff Daughters— which were carried out in a deliberate and knowingly unlawful manner.

2599.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 16

### § 1983 Claim: Retaliation against Plaintiff Daughter's for exercising their First Amendment right

(Defendants: Essex Probate & Family Court, BNY Mellon, Brian Nagle, Burns & Levinson, Attorney Cukier, Attorney Studen, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, ESMV, Attorney Berid, Attorney Kazarosian, Attorney Cuffe, Attorney Feld, Attorney Ledoux, Attorney Costello, Attorney Myette, Attorney Barbar)

2600.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2601.   Plaintiff Daughters as interested parties in the matter of In re Marvin H. Siegel have a Federal Constitutional right to present evidence in support of their position and claims. In such capacity, the Fifth and Fourteenth Amendment of the Federal Constitution guarantee Plaintiff Daughters be afforded the opportunity to be heard as interested parties; and to present their claims fully and adequately before the State courts.

2602.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence—from the inception of the matter of In re Marvin H. Siegel (**May 27, 2011**)—that they have continuously and repeatedly proffered evidence in open court, before the **Essex Probate & Family Court**, that has exposed unethical and criminal conduct of designated Defendants; as well as, multiple submissions of voluminous documentation to the **Supreme Judicial Court**, the Office Bar Counsel, Board of Bar Overseers, Judicial Conduct Commission and other regulatory entities.

2603.   As a direct result of Plaintiff Daughters above-described lawful actions of exposing designated Defendants misconduct and illegalities—which are set forth in detail in this Complaint—designated Defendants have, individually and jointly, maliciously engaged in continuous and repeated acts of unlawful retaliation against Plaintiff Daughters.

2604.   The content that Plaintiff Daughters' have exposed to the State courts and various regulatory entities directly and substantially interrelated with the interests of the general public; as the exposed unethical and criminal conduct of designated Defendants affect a broad scope of citizens—citizens who have litigated, are litigating and will be litigating in the Massachusetts Probate & Family Courts; citizens whose families were involved, are currently involved and families who are susceptible to involvement with State elder protective service agencies; and citizens who have in the past and present retained private legal services from the designated attorneys, as well as prospective clients.

2605.   The exposure of designated Defendants' misconduct and illegalities by Plaintiff Daughters have—at all times—been conducted in a manner that is reasonable and lawful; and substantiated with significant and objective concrete evidence.

2606.   Retaliatory acts and omissions of designated Defendants are directly a result of Plaintiff Daughters exposure of designated Defendants' unethical and criminal misconduct; with such retaliatory acts causing Plaintiff Daughters to suffer deprivation of loss of liberty and property.

2607.   As set forth in this Complaint, Plaintiff Daughter present specific and concrete evidence that the retaliatory acts and omissions by designated Defendants—and officers, agents, servants and employees of designated Defendants, include, but are not limited to:

> making false allegations that Plaintiff Daughter Lisa financially exploited Father;
>
> **Defendant ESMV** initiating an unwarranted and baseless investigation of Plaintiff Daughter Lisa as a purported perpetrator of financial exploitation of Father;
>
> facilitating false and fabricated administrative findings by **Defendant ESMV** against Plaintiff Daughter Lisa of supposed financial exploitation;
>
> filing of pleadings, motions and other actions with the **Essex Probate & Family Court** restricting Plaintiff Daughters' access and communications with Father;
>
> filing of pleadings, motions and other actions with the **Essex Probate & Family Court** having forced Plaintiff Daughter Lisa and her family to be removed from their permanent residence (which is Father's home in Boxford);
>
> seeking SJC Rule 1:07 court appointment of guardian and conservator—instead of following Father's explicitly expressed desires and intentions set forth in his **2003 DPOA**;

filing pleadings with the **Essex Probate & Family Court** seeking to have Father removed from his own home to be forcibly placed into a long-term care facility;

filing pleadings with the **Essex Probate & Family Court** and **Supreme Judicial Court** requesting that Plaintiff Daughters be precluded access to the State courts;

making outside of court communications with officials of the **Massachusetts Probate & Family Court**, **Supreme Judicial Court** and other regulatory agencies (Office of Bar Counsel, Board of Bar Overseers, Judicial Conduct Commission, Federal Reserve and the like) to hinder Plaintiff Daughters from obtaining legal relief;

filing of motions **Essex Probate & Family Court** and **Supreme Judicial Court** seeking sanctions to be issued against Plaintiff Daughters for their afore-described whistleblowing.

2608.   As set forth in this Complaint, Designated Defendants' above-described retaliatory acts have caused Plaintiffs Daughters to suffer constitutional deprivations of liberty and property.  Plaintiff Daughters' inalienable right to family integrity has been trampled by unjustly and unlawfully restricting when daughters can be with their father; precluding daughters from being caregivers to their father; and precluding family from being able to live together.

2609.   Plaintiff Daughters have been deprived of property interest, in terms of having been stripped of their rightful capacity as attorneys-in-fact for Father per Father's **2003 DPOA**; and their rightful capacity as nominated guardian and conservator; and in the funds of **DSL Trust** and other assets from Father's estate.

2610.   Plaintiff Daughter Lisa has been deprived on individual property interests, in terms of her permanent tenancy with Father in Father's home;

2611.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that designated Defendants engaged in the above-described retaliatory acts for the intentional and specific purpose of causing harm to Plaintiff Daughters.

2612.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that the above-described retaliatory acts by designated Defendants had no justifiable or legitimate basis, whatsoever.

2613.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that the above-described retaliatory acts by designated Defendants constitute conscience shocking; as designated Defendants' acts and omissions are so disproportionate to their proffered needs; and that were so inspired by malice.

2614.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that the above-described retaliatory acts by designated Defendants cannot reasonably be considered acts of mere carelessness or unwise excess of zeal.  See *Harron v. Town of Franklin*, 660 F.3d at 536.

2615.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the judiciary's established pattern of deliberate disregard to designated Defendants' commission of financial exploitation and criminal abuse.

2616.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the established pattern of the judiciary's *own overt* commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of financial exploitation and criminal abuse as evidenced from knowing and intentional improper alteration of electronic docket entries and overt concealment of pleadings filed by designated Defendants.

2617.   As demonstrated in the Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Supreme Judicial Court** based on the judiciary's established pattern of deliberate disregard to designated Defendants' commission of financial exploitation and criminal abuse.

2618.   As demonstrated in the Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Supreme Judicial Court** based on the established pattern of the judiciary's *own overt* commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of financial exploitation— as evidenced from knowing and intentional improper alteration of electronic docket entries.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

**Count 17**

### § 1983 Claim: Abuse of Power involving fraudulent and deceptive investigation by Defendant ESMV and overt acts of attempting a set-up

(Defendants: ESMV, Attorney Berid, Diane Powell, Michael Springman, BNY Mellon, Brian Nagle, Law Firm TBHR, Attorney Tarlow, Burns & Levinson,  Attorney Studen, Sheryl Sidman)

2619.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2620.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence there is an established pattern of **Defendant ESMV**— through its officers, agents, servants and employees—fraudulently and deceptively conducting investigations that have no sufficient grounds on which to do so; having deprived Plaintiff Daughter Lisa of her Fourteenth Amendment right pursuant to the U.S. Constitution to be free from unwarranted government intrusion.

2621.   As set forth in this Complaint, State law mandates that a State elder services protective agency is to make a determination within 30 days whether there is sufficient evidence to substantiate further action; and, if not, then the investigation must be closed.

2622.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant ESMV** was legally mandated to close the investigation that it had opened on **April 1, 2011**—which was exclusively based on a claim of self-neglect regarding Father.

2623.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the notes and reports of **Defendant ESMV** show that multiple visits had been made by **Defendant Caseworker Springman** to Father's home by **mid-May of 2011**; with notes and reports of **Defendant ESMV** showing that Father was being well cared for by Plaintiff Daughter Lisa and her husband.

2624.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence from the notes and reports of **Defendant ESMV** that on **April 22, 2011**, Father had refused any intervention of Defendant ESMV offered by **Defendant Caseworker Springman**.

433

2625.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence from the notes and reports of **Defendant ESMV** that Defendant ESMV *did not* have sufficient grounds to keep open the investigation of **April 1, 2011**.

2626.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence from the notes and reports of **Defendant ESMV** that the only reason Defendant ESMV kept the investigation of **April 1, 2011** open was because of the staffs' knowledge that Father had a multi-million dollar estate and that there was dissension in the family.

2627.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Berid**, in her official role with **Defendant ESMV**, deliberately kept Defendant ESMV involved in the private family affairs of Plaintiff Daughters and Father for illicit motives.  As established, on **April 26, 2011**, it was documented in the notes of Defendant ESMV that the staff knew of Father's **2003 DPOA**.

2628.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Berid**, in her official role with **Defendant ESMV**—along with **Defendants Powell, Dailey and Springman**—had repeatedly altered notes of Defendant ESMV;

2629.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Berid**, in her official role with **Defendant ESMV**—along with **Defendants Powell, Dailey and Springman**—had also,, manufactured false information and had placed it in the notes and reports of Defendant ESMV.

2630.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant ESMV**— through its officers, agents, servants and employees—colluded with designated Defendants (**BNY Mellon, Brian Nagle, Attorney Tarlow**, and **Attorney Studen**) in making false allegation of financial exploitation against Plaintiff Daughter Lisa.

2631.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that **Defendant ESMV** and **Defendant Attorney Berid** colluded with designated Defendants to attempt set-up of Plaintiff Daughter Lisa; specifically through the afore-described recorded call of conversation between **Defendant Brian Nagle** and Father.

2632.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact and loss of property.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 18

### § 1983 Claim: Deprivation of Due Process in Defendant ESMV's Administrative finding made against Plaintiff Daughter Lisa regarding false allegations of financial exploitation

(Defendants: ESMV, BNY Mellon, Brian Nagle, Attorney Berid, Diane Powell, Scott Dailey, Michael Springman, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law Firm Burns & Levinson, Attorney Cukier, Attorney Studen, Attorney Ledoux, Attorney Costello, Sheryl Sidman, Alan Sidman, Supreme Judicial Court, Essex Probate & Family Court)

2633.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2634.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV**—through its officers, agents, servants and employees—made a formal determination **on August 2, 2011**, specifically as an administrative agency, that Plaintiff Daughter Lisa purportedly financially exploited Father.

2635.   Formal determinations made by **Defendant ESMV** of a person having committed financial exploitation constitute an adjudicatory proceeding being conducted in its capacity as an administrative agency.  Plaintiff Daughter Lisa was deprived of Due Process by Defendant ESMV not giving Plaintiff Daughter Lisa notice of the adjudicatory proceeding held on **August 2, 2011**; depriving Plaintiff Daughter Lisa of the opportunity to present evidence to rebut the allegations made.

2636.   Adjudicatory proceedings of administrative agencies shall afford all parties an opportunity for full and fair hearing.  G.L. c. 30A, § 10.  To comport with providing a full and fair hearing, pursuant to G.L. c. 30A, § 10, it was required by **Defendant ESMV** to provide Plaintiff Daughter Lisa:

> notice of the adjudicatory proceeding that was held on **August 2, 2011** by Defendant ESMV;

> a reasonable opportunity to prepare and to present evidence and argument;

> the right to call and examine witnesses,

> to introduce exhibits;

> to cross-examine witnesses and evidence that Defendant ESMV relied on in making its formal finding made on **August 2, 2011**; and

> to submit rebuttal evidence.

2637.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV**—through its officers, agents, servants and employees—did <u>not</u> provide Plaintiff Daughter Lisa with *any prior* notice of an adjudicatory proceeding to be held on **August 2, 2011**; Defendant ESMV did not provide any written notice or verbal notice.

2638.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV** necessitated prior notice to have been provided to her regarding the **August 2, 2011** adjudicatory proceeding and that she should have been afforded a full and fair opportunity to be heard where Plaintiff Daughter Lisa has a protected Constitutional interest in her reputation—and, even more so, where such allegations directly affect her professional reputation as an attorney.  See *Pease v. Burns*, 719 F. Supp.2d 143, 154 (2010).

2639.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV** as a state actor threatened her professional reputation, with threat of unusually serious harm.

2640.   As set forth in this Complaint, Plaintiff Daughters presents concrete and specific evidence that **Defendant ESMV**—through its officers, agents, servants and employees—and other designated Defendants *intentionally and knowingly* deprived Plaintiff Daughter Lisa of notice of the adjudicatory proceeding that took place on **August 2, 2011**.

2641.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant ESMV**—through its officers, agents, servants and employees—and other designated Defendants had *bad faith motives* in depriving Plaintiff Daughter Lisa of notice of the adjudicatory proceeding that took place on **August 2, 2011**.

2642.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV's** formal determination of **August 2, 2011** is not supported by any scintilla of evidence—let alone substantial evidence.

2643.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV's** formal determination of **August 2, 2011** was based on designated Defendants making fabricated statements and information; and doing so, that such statements were false.

2644.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants have been carried out through color of law.

2645.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants that **Defendant ESMV's** formal determination of **August 2, 2011** that Plaintiff Daughter Lisa engaged in financial exploitation of Father was entirely capricious.

2646.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by the designated Defendants have been conducted in such a manner that demonstrates concerted efforts amongst designated Defendants.

2647.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants that designated Defendants should have known—and did know—that they were violating Plaintiffs Constitutional rights where the law is clearly established, and a reasonably competent public official is expected to know that the law forbade his or her conduct.

2648.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendant have been conducted in such a manner demonstrating a specific intent to injure Plaintiff Daughter Lisa—especially, with regard to her legal rights and interests as an interested party in the matter of In re Marvin H. Siegel.

2649.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV** has an established pattern of making false allegations against family members who are involved in similarly situated litigation, in the **Essex Probate & Family** Court, like Plaintiff Daughters—an established pattern of **Defendant ESMV** and other designated Defendants not making reports to the District Attorney's Office, specifically using false allegations as a means of extortion.

2650.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that designated Defendant public officials have intentionally fabricated information against Plaintiff Daughter Lisa; that designated Defendant public officials have intentionally omitted material facts in sworn statements that showed Plaintiff Daughter Lisa was entirely innocent of any wrongdoing.

2651.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the acts and omissions by designated Defendants constitute an abuse of power.

2652.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the judiciary's established pattern of deliberate disregard and/or indifference to designated Defendants' commission of financial exploitation and criminal abuse.

2653.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of financial exploitation and criminal abuse.

2654.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of constitutional violations.

2655.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Supreme Judicial Court** based on the judiciary's established pattern of deliberate disregard and/or indifference to designated Defendants' commission of constitutional violations.

2656.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact and loss of property.

2657.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact and loss of property.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 19

### § 1983 Claim: Deprivation of Due Process in judicial determinations that Plaintiff Daughter Lisa supposedly financially exploited Father

(Defendants: Essex Probate & Family Court, Supreme Judicial Court, BNY Mellon, ESMV, Attorney Berid, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Law Firm Burns & Levinson, Attorney Cukier, Attorney Ledoux)

2658.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2659.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Defendant ESMV**—through its officers, agents, servants and employees—did not request in its motion to intervene (that was specifically designated to be heard on **August 17, 2011**) to conduct any proceedings to render a judicial determination by the **Essex Probate & Family Court** as to whether, in fact, Plaintiff Daughter Lisa had exploited Father.

2660.   It is standard custom and practice that if a State elder protective service agency (such as **Defendant ESMV**) intends to have a Probate & Family Court make a judicial determination that an alleged perpetrator has engaged in financial exploitation, the specific manner in which the agency is authorized to do so is by pursuing a petition pursuant to G.L. 19A—which as set forth in this Complaint that Defendant ESMV *did not* do so in the matter of In re Marvin H. Siegel.   (Defendant ESMV's motion to intervene filed with the **Essex Probate & Family Court** did not make that request and Defendant ESMV has not done so through any other pleading or action to-date).

2661.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that there was no evidentiary hearing held, of any kind, on **August 17, 2011** at the court proceeding presided over by **Judge Abber**.

2662.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Judge Abber** made an explicit in-court finding—at the court proceeding held on **August 17, 2011**—that Plaintiff Daughter Lisa had financially exploited Father.

2663.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that Plaintiff Daughter Lisa was overtly and entirely precluded by **Judge Abber** from being able to rebut allegations of financial exploitation made against her by **Defendant ESMV** (and other designated Defendants) at the court proceeding held on **August 17, 2011**.

2664.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that Plaintiff Daughter Lisa was overtly and entirely precluded by **Judge Abber**, at the court proceeding held on **August 17, 2011** from: having a reasonable opportunity to prepare and to present evidence and argument; the right to call and examine witnesses to introduce exhibits; to cross-examine representations made by counsel and submitted affidavits by **Defendant ESMV**; and to submit rebuttal evidence.

2665.   Compounding prejudicial injury to Plaintiff Daughter Lisa by **Judge Abber's** explicit refusal to let Plaintiff Daughter Lisa be heard, in any respect whatsoever, at the court proceeding held on **August 17, 2011** is that Judge Abber made an expressed finding in his written findings, regarding the trial he conducted regarding permanent guardianship and conservatorship, issued on **October 22, 2012**.

2666.   Plaintiff Daughter Lisa presents concrete and specific evidence that **Judge Abber** precluded her from being able to fully and adequately rebut the original allegations of financial exploitation against her.

2667.   Plaintiff Daughter Lisa presents concrete and specific evidence that at the afore-described trial proceedings, **Judge Abber** unlawfully and unjustifiably—with illicit motives—substantially and gravely precluded Plaintiff Daughter from having a fair and full opportunity to rebut the allegations of financial exploitation made against her.  Judge Abber severely restricted Plaintiff Daughter Lisa's ability to rebut the allegations by: severely and unfairly having limited her examination of witnesses whom she called and proffered exhibits; and severely and unfairly having limited her cross-examinations of designated Defendants' witnesses and exhibits.

2668.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Judge Abber's** afore-described judicial determinations are not supported by a scintilla of evidence—let alone, substantial evidence.

2669.   As set forth in this Complaint, Plaintiff Daughter Lisa presents concrete and specific evidence that **Judge Abber's** afore-described judicial determinations were based on designated Defendants making fabricated statements and manufactured information.

2670.   As set forth in this Complaint, Plaintiff Daughter Lisa has presented specific and concrete evidence that the acts and omissions by **Judge Abber** have been carried out through color of law.

2671.   As set forth in this Complaint, Plaintiff Daughter Lisa has presented specific and concrete evidence that **Judge Abber's** afore-described findings are entirely capricious.

2672.   As set forth in this Complaint, Plaintiff Daughter Lisa has presented specific and concrete evidence that acts and omissions by **Judge Abber** have been conducted in such a manner that demonstrates illicit collusion with designated Defendants.

2673.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that **Judge Abber** should have known—and did know—that he was violating Plaintiffs Constitutional rights where the law is clearly established, and a reasonably competent judge is expected to know that the law forbade his or her conduct.

2674.   As set forth in this Complaint, Plaintiff Daughter Lisa has presented specific and concrete evidence that the acts and omissions by **Judge Abber** have been conducted in such a manner demonstrating a specific intent to injure Plaintiff Daughter Lisa—especially, with regard to her legal rights and interests as an interested party in the matter of In re Marvin H. Siegel.

2675.   As set forth in this Complaint, Plaintiff Daughter Lisa has presented specific and concrete evidence that **Judge Abber** knew that the allegations that he made in open court were false.

2676.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Supreme Judicial Court** based on the judiciary's established pattern of deliberate disregard to designated Defendants' commission of constitutional violations.

2677.   As demonstrated in this Complaint, Plaintiff Daughters have set forth concrete and specific evidence of liability by the **Essex Probate & Family Court** based on the established pattern of the judiciary's own overt commission of intentional and deliberate acts in aiding and abetting designated Defendants' commission of constitutional violations.

2678.   As a direct result of designated Defendants' misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of their Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact; and loss of property.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 20

### § 1983 Claim: Deliberate disregard by Defendant ESMV and the Essex Probate & Family Court of Plaintiff Daughters' rightful capacity as attorneys-in-fact for Father

 (Defendants: Essex Probate & Family Court, BNY Mellon, Brian Nagle, ESMV, Attorney Berid, Diane Powell, Scott Dailey, Michael Springman, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Law Firm Burns & Levinson, Attorney Cukier, Attorney Studen, Attorney Kazarosian, Attorney Feld, Attorney Cuffe, Attorney Ledoux, Attorney Costello, Sheryl Sidman, Alan Sidman, Supreme Judicial Court)

2679.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2680.   As demonstrated in the Complaint, Plaintiff Daughters have set forth concrete and specific evidence that there is an established pattern of **Defendant ESMV** and **Essex Probate & Family Court** purposely disregarding elders' written advance directives and estate planning instruments; and, doing so, to enable SJC Rule 1:07 court appointed guardians and conservators to embezzle funds from elders' estates under the guise of lawful authority.

2681.   The United States Supreme Court has held that the Fourteenth Amendment of the Federal Constitution encompasses a privacy right that protects against significant governmental intrusion into personal decisions, such as executed advance directives and estate planning instruments.  *Brown v. Hot Sexy and Safer Productions*, 68 F.3d 525, 531.

2682.   Even in the face of broad discretion of power given to State agencies and the courts to interpret laws, this deference does not extend to an unreasonable interpretation; such authorization is not intended to give power to violate citizens' constitutional rights.  See *Correia v. Department of Public Welfare*, 414 Mass at 165.

2683.   The Supreme Judicial Court and the Supreme Court of the United States have confirmed that the sanctity of the parent/child relationship is a constitutionally protected interest.  *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Opinion of the Justices to the Senate*, 427 Mass. 1201, 1203 (1998).

2684.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant ESMV** and **Essex Probate & Family Court** have engaged in widespread adverse actions based on arbitrary and purported technical reasons.

2685.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant ESMV** motion to intervene in the matter of In re Marvin H. Siegel constitutes unreasonable conduct.  See *Correia v. Department of Public Welfare*, supra.  Defendant ESMV used the motion to intervene as a pretext; the use of color of authority as a guise to facilitate financial exploitation of Father's estate.

2686.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that acts and omissions by designated Defendants have been conducted in such a manner that demonstrates illicit collusion with designated Defendants.

2687.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that designated Defendants should have known—and did know—that they were violating Plaintiffs Constitutional rights where the law is clearly established, and a reasonably competent public official is expected to know that the law forbade his or her conduct.

2688.   As set forth in this Complaint, Plaintiff Daughters presented specific and concrete evidence that the acts and omissions by designated Defendants have been conducted in such a manner demonstrating a specific intent to injure Plaintiff Daughters—especially, with regard to their legal rights and interests as interested parties in the matter of In re Marvin H. Siegel.

2689.   As set forth in this Complaint, Plaintiff Daughters present specific and concrete evidence that designated Defendants knew that the allegations that they made in open court were false.

2690.   As a direct result of designated Defendants' above-described conduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of the Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact; and loss of property.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 21

### § 1983 Claim: Essex Probate & Family Court deliberate and knowing unlawful deprivation of Plaintiff Daughters' Federal Constitutional right to be fully and fairly heard as interested parties in the matter of In re Marvin H. Siegel

(All Defendants)

2691.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2692.   As interested parties in the matter of In re Marvin H. Siegel, Plaintiff Daughters were entitled under the Fifth and Fourteenth Amendments of the U.S. Constitution to be afforded the opportunity to present their claims before the **Essex Probate & Family Court**; that Plaintiff Daughters be afforded the ability to fully and adequately present evidence in support of their claims; and that Plaintiff Daughters be afforded the ability to fully and adequately cross-examine the witnesses and evidence of the opposing parties.  Over 3 years of numerous court proceedings held in the matter of In re Marvin H. Siegel, the Essex Probate & Family Court has—continuously and repeatedly—precluded Plaintiff Daughters from having motions that they have filed, let alone being able to fully and adequately present their claims; in addition to, the preclusion of Plaintiff Daughters from being able to fully and adequately be heard *in opposition* to designated Defendants' motions.

2693.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that acts and omissions by **Essex Probate & Family Court** have occurred in such a manner that demonstrates illicit collusion with designated Defendants to preclude Plaintiff Daughters from being able to fully and adequately present claims and opposition to designated Defendants' claims.  Plaintiff Daughters' request to present and rebut claims have been continuously and repeatedly denied *without any* proffered

justification by the Essex Probate & Family Court; evidencing an established pattern of repeated judicial capricious conduct.

2694.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the **Essex Probate & Family Court** accepted financial and/or personal gain in exchange for rubber-stamping designated Defendants' motions and pleadings.

2695.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the **Essex Probate & Family Court** had *actual knowledge* that numerous motions and pleadings filed by designated Defendants contained false statements and representations.

2696.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that the motive for the **Essex Probate & Family Court's** repeated capricious conduct was to assist designated Defendants in covering up incriminating evidence of illicit activities to protect designated Defendants and to be able to keep the financial exploitation of Father's estate going.  The requests made by Plaintiff Daughters to present evidence and rejected by the Essex Probate & Family Court include, but is not limited to:

> Plaintiff Daughters made repeated pre-trial requests to have an evidentiary hearing to determine the validity of Father's **2003 DPOA**;

> at trial regarding permanent guardianship and conservatorship, Plaintiff Daughters requested that the issue of Father's **2003 DPOA** as an alternative to imposing a court ordered guardianship and conservatorship be determined;

> repeated requests by Plaintiff Daughters to obtain an evidentiary hearing to determine whether **Defendant Attorneys Cuffe** and **Feld** committed unlawful acts in their court appointed fiduciary capacities, requiring their removal;

> multiple requests prior to trial by Plaintiff Daughters to be allowed to have Father examined by a medical expert;

> multiple requests by Plaintiff Daughters to examine **Defendant Attorneys Cuffe** and **Feld** at motion hearings to challenge the veracity of the pleadings that *were filed by* Defendant Attorneys Cuffe and Feld and the very basis of the motion hearings.

2697.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants—**Attorney Kazarosian**, **Attorney Ledoux**, **Attorney Cukier**, **Attorney Berid**, **Attorney Myette**, **Attorney Costello**—took direct concerted efforts to facilitate **Defendant Attorney Cuffe** being judicially declared permanent guardian and **Defendant Attorney Feld** as permanent conservator in the matter of In re Marvin H. Siegel.  Designated Defendants were deemed by the **Essex Probate & Family Court** as the petitioners at trial; therefore, designated Defendants had the burden of meeting the standard of proof that Defendant Attorneys Cuffe and Feld were suitable to act in their respective court appointed capacities—yet designated Defendants *did* *not* call Defendant Attorneys Cuffe or Feld as witnesses.

2698.   Designated Defendants did not meet their burden of proving the suitability of **Defendant Attorneys Cuffe** and **Feld** as suitable permanent fiduciaries.

2699.   Even though **Defendant Attorneys Cuffe** and **Feld** were listed on the pre-trial conference report order issued by **Judge Abber** on **March 27, 2012**, Judge Abber refused to allow Plaintiff Daughters the ability to call Defendant Attorneys Cuffe and Feld as witnesses—even though Plaintiff Daughters properly subpoenaed Defendant Attorneys Cuffe and Feld to testify at trial.  Consequently, Judge Abber precluded Plaintiff Daughters from being able to fully and fairly present affirmative evidence that Defendant Attorneys Cuffe and Feld were *not* suitable permanent fiduciaries.

2700.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the sole reason for **Defendant Attorneys Cuffe and Feld** refusing to testify and for **Judge Abber's** *quashing* of the subpoenas that would have compelled Defendant Attorneys Cuffe and Feld to testify was because they would have had to: 1) invoke their 5th Amendment right not to incriminate oneself or 2) subject themselves to risk of incrimination.  As evidenced, Judge Abber knew for a fact that Defendant Attorneys Cuffe and Feld had committed illegal acts and, therefore—without any real justification, Judge Abber precluded Plaintiff Daughters from being able to call Defendant Attorneys Cuffe and Feld as witnesses.

2701.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that designated Defendants should have known—and did know—that they were violating Plaintiffs Constitutional rights where the law is clearly established, and a reasonably competent public official is expected to know that the law forbade his or her conduct.

2702.   As set forth in this Complaint, Plaintiff Daughters presented specific and concrete evidence that the acts and omissions by designated Defendants have been conducted in such a manner demonstrating a specific intent to injure Plaintiff Daughters—especially, with regard to their legal rights and interests as an interested parties in the matter of In re Marvin H. Siegel.

2703.   As a direct result **ESMV** of designated Defendants' above-described mi**s**conduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of the Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact; and loss of property.

2704.   **WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 22

### § 1983 Claim & 42 U.S.C. § 2000a-2: Deliberate and knowing unlawful deprivation of Plaintiff Daughter Lisa's Federal right to protection and preservation of the practice of religion

(Defendants: Essex Probate & Family Court, Attorney Kazarosian, Attorney Feld, Attorney Cuffe, Attorney Ledoux, ESMV, Attorney Berid, Attorney Costello, Attorney Barbar, Attorney Myette, Right At Home, Sheryl Sidman, Supreme Judicial Court)

2705.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2706.   Since childhood up until the involvement of **Defendant Right At Home** in providing services in Father's home (**June 17, 2011**), Plaintiff Daugfhter Lisa and Father had regularly observed Jewish holidays *together*, as a family—in particular, Rosh Hashanah, Yom Kippur, Passover, Hanukkah.

2707.   Plaintiff Daughter Lisa had repeatedly requested from designated Defendants that she and her family be permitted to honor the Jewish holidays with Father. Designated Defendants unlawfully prevented Plaintiff Daughter Lisa and her family from doing so—designated Defendants specifically used their claimed color of authority to unlawfully and unjustly obstruct Plaintiff Daughter Lisa's usual observation of Jewish practice with her family; which Plaintiff Daughter Lisa raised before the **Essex Probate & Family Court**, which **Judge Abber** aided and abetted through his role as presiding judge.

2708.   Provided in **Exhibit 393** are emails and correspondence demonstrating Plaintiff Daughter Lisa's persistent attempts for she and her family to observe their usual Jewish customs with Father, as they have done so as a family since childhood.  (Included in this Exhibit are faxed pleas made by the Plaintiff Daughter Lisa to the **Anti-Defamation League** that fell upon deaf ears).

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 23

### Defamation: § 1983 Claim & Common Law

(Defendants: BNY Mellon, ESMV, Attorney Berid, Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Law Firm Burns & Levinson, Attorney Cukier, Attorney Studen, Attorney Kazarosian, Attorney Cuffe, Attorney Feld, Attorney Costello, Attorney Barbar, Attorney Ledoux, Sheryl Sidman, Essex Probate & Family Court)

2709.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that on numerous occasions designated Defendants have made false and defamatory communications regarding Plaintiff Daughter Lisa to third parties—communications made in emails, correspondence and in open court.

2710.   As set forth in this Complaint, Plaintiff Daughters have presented specific and concrete evidence that on numerous occasions designated Defendants have knowingly and deliberately made false and defamatory communications regarding Plaintiff Daughter Lisa to third parties, with the specific intent to harm Plaintiff Daughter Lisa.

2711.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants' false and defamatory statements consisting of allegations that Plaintiff Daughter Lisa financially exploited Father and allegations that Plaintiff Daughter Lisa has voluntarily not visited with Father; that Plaintiff Daughter Lisa's actions, with specific reference to her proficiency as an attorney, was substandard and incompetent.

2712.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants made the above-referenced statements to third parties knowing that such statements were false.

2713.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants' above-referenced statements made to third parties were not simple expressions of opinion; that designated Defendants used words of contempt, hatred, scorn, and ridicule with *deliberate* intentions to impair Plaintiff Daughter Lisa's standing in the social community and the professional legal community.

2714.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the false and defamatory communications made to third parties by designated Defendants were unnecessary, unreasonable and excessive; that false and defamatory communications made to third parties by designated Defendants were done in actual malice.

2715.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that false and defamatory communications by Defendant State officials—including false and defamatory statements made by **Judge Abber**—were unnecessary, unreasonable and excessive.

2716.   As set forth in this Complaint, such intentionally made false and defamatory communications to third parties by designated Defendant State officials were specifically carried out as acts of abuse of power.

2717.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 24

### Abuse of Process

(Defendants—in their private capacities: BNY Mellon, Brian Nagle, Law Firm TBHR, Law Firm Burns & Levinson, Attorney Studen, Attorney Cukier, Attorney Kazarosian, ESMV, Attorney Berid, Attorney Ledoux, Attorney Saunders, Attorney Myette, Merrimack Valley Hospital, Dr. Funk, Dr. Cohen, Dr. Hayes, Dr. Portney, Sheryl Sidman)

2718.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants filed motions and pleadings with the **Essex Probate & Family Court** for illegitimate purposes; and that they did so with deliberate intent to cause harm to Plaintiff Daughters.

2719.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants—individually and jointly— filed motions and pleadings with the **Essex Probate & Family Court** for the specific purpose to facilitate financial exploitation of the **DSL Trust**— which particularly illustrate illegitimate purposes, but are not limited to:

**Defendant ESMV's** motion to intervene;

**Defendant Attorney Cuffe's** motions to continue guardianship;

**Defendant Attorney Feld's** motions to continue conservatorship;

motions by Defendants **Attorney Cuffe** and **Feld** to vacate decrees;

**Defendant Attorney Feld's** filed Accounts and Inventories;

joint motion brought by **Defendant Attorney Kazarosian** to amend the DSL Trust;

**Defendant Attorney Barbar's** motion to amend decrees;

**Defendant Attorney Cuffe's** motion for court ordered forced administering of antipsychotics to Father;

designated Defendants' motion to be paid for legal services directly from Father's estate (**DSL Trust**);

**Defendant Attorney Ledoux's** motion to intervene as petitioner;

**Defendant ESMV's** motion to add Susan J. Miller as an interested party;

designated Defendants' motions pursued ex-parte.

2720.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the above-described designated Defendants deliberately used false statements and representations in the above-described motions and pleadings to facilitate their financial exploitation of the **DSL Trust**.  The above-described motions were wholly based on deception and fraud.

2721.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants—individually and jointly— filed motions and pleadings with the **Essex Probate & Family Court** for the specific purpose to retaliate against Plaintiff Daughters for exposing designated Defendants' misconduct and deliberately cause emotional distress and financial harm to Plaintiff Daughters include, but are not limited to:

> **Defendant ESMV's** motion to intervene;

> **Defendant Attorney Cuffe's** motions for temporary orders against Plaintiff Daughter Lisa;

> **Defendant Attorney Cuffe's** motion to vacate Plaintiff Daughter Lisa and her family from their permanent residence;

> **Defendant Attorney Cuffe's** Complaint for Contempt against Plaintiff Daughter Lisa;

> **Defendant Attorney Kazarosian's** motions seeking sanctions against Plaintiff Daughters;

> **Defendant Attorney Cuffe's** motions for placement of Father into long-term care facility.

2722.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the above-described designated Defendants deliberately used false statements and representations in the above-described motions and pleadings to facilitate malicious retaliatory acts—and did so, for the purposes of punishing Plaintiff Daughters for exposing designated Defendants' misconduct, to deter Plaintiff Daughters from exercising their legal rights, and to deliberately inflict grave emotional distress.  The above-described motions were wholly based on deception and fraud.

2723.   As a direct result of designated Defendants' above-described misconduct, Plaintiff Daughters have been substantially and gravely harmed; especially, with their being deprived of the Constitutional right to family integrity—the right to unrestricted access and communication with Father, status as Father's designated attorneys-in-fact; and loss of property.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 25

### Intentional infliction of emotional distress

(Defendants—in their private capacities: BNY Mellon, ESMV, Attorney Berid,
Law Firm TBHR, Attorney Tarlow, Attorney DeNapoli, Law Firm Burns & Levinson,
Attorney Cukier, Attorney Studen, Attorney Kazarosian, Attorney Cuffe, Attorney Feld,
Attorney Costello, Attorney Myette, Attorney Barbar, Attorney Ledoux, Attorney Garmil,
Sheryl Sidman, Alan Sidman)

2724.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2725.   As set forth in this Complaint, Plaintiff Daughters present concrete and
specific evidence that designated Defendants intended to inflict emotional distress upon
Plaintiff Daughters.

2726.   As set forth in this Complaint, Plaintiff Daughters present concrete and
specific evidence that designated Defendants knew that their acts and omissions would
result in emotional distress to Plaintiff Daughters; that designated Defendants did so in
reckless disregard for truth—such acts include, but are not limited to: deliberately making
false allegations of criminal wrongdoing against Plaintiff Daughter Lisa; designated
Defendants' perverse use of the litigation process to unlawfully and unjustly restrict
Plaintiff Daughters' relationship with Father; designated Defendants' perverse use of the
litigation process to facilitate financial exploitation of Father's estate.

2727.   As set forth in this Complaint, Plaintiff Daughters present concrete and
specific evidence that designated Defendants' conduct was extreme and outrageous,
beyond all bounds of decency.

2728.   As set forth in this Complaint, Plaintiff Daughters present concrete and
specific evidence that Plaintiff Daughters suffered distress as a direct result of designated
Defendants' actions and omissions.

2729.   As set forth in this Complaint, Plaintiff Daughters present concrete and
specific evidence that Plaintiff Daughters suffered distress that was severe and of such a
nature that no reasonable person could be expected to endure.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary
damages.

## Count 26

## <u>Common law: Misrepresentation by Defendant Attorney Kazarosian in legal representation of Father</u>

2730.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2731.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Father terminated the legal representation of **Defendant Attorney Tarlow** and **Defendant Law Firm TBHR** specifically due to their having deceived and defrauded Father.

2732.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughter Lisa acted at the direct request of Father—and as Father's attorney-in-fact through Father's executed written re-affirmation of his **2003 DPOA on June 16, 2011** to retain new counsel to protect him from the motion to intervene filed by **Defendant ESMV** on **June 16, 2011**.

2733.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughter Lisa consulted with **Defendant Attorney Kazarosian** to represent Father specifically to protect Father *and his family* from *any and all* intervention by the State—which expressly included representation to *vigorously* fight against intrusion of **Defendant ESMV** into the private <u>*family*</u> affairs of Father and to *vigorously* fight against any court appointment of SJC Rule 1:07 guardian and conservator by the **Essex Probate & Family Court**.

2734.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** made the above-described representations to Plaintiff Daughter Lisa—<u>prior</u> to Defendant Attorney Kazarosian meeting Father.

2735.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** met with Plaintiff Daughter Lisa and one of Plaintiff Daughter Lisa's colleagues days prior to Defendant Attorney Kazarosian meeting with Father.

2736.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** made the above-described representations to specifically induce Plaintiff Daughter Lisa to have Father retain her legal services.

2737.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** made the above-described representations to Father in writing.

2738.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** made the above-described representations to specifically induce Father to retain her legal services.

2739.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** intentionally and knowingly abandoned her above-described explicit promise to fight vigorously to preclude **Defendant ESMV** and Rule 1:07 court appointments of guardian and conservator by the **Essex Probate & Family Court**.

2740.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** expressly and impliedly agreed to give Plaintiff Daughter Lisa advice and assistance with specific regard as to action and lack of action that Plaintiff Daughter Lisa, personally, should take concerning **Defendant ESMV**, **Defendant Attorney Cuffe** and **Defendant Attorney Feld**.

2741.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** did, in fact, give Plaintiff Daughter Lisa advice with specific regard as to action and lack of action that Plaintiff Daughter Lisa, personally, should take concerning **Defendant ESMV**, **Defendant Attorney Cuffe** and **Defendant Attorney Feld**.

2742.   Plaintiff Daughter Lisa and Father relied upon the above-described representations made by **Defendant Attorney Kazarosian** and did so to their detriment.

2743.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** has overtly fraudulently and deceptively colluded with designated Defendants to financially exploit the **DSL Trust**.

2744.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** has intentionally and knowingly colluded with designated Defendants to restrict Plaintiff Daughters' relationship with Father.

2745.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Kazarosian** has intentionally and knowingly colluded with designated Defendants to fabricate false allegations of financial exploitation against Plaintiff Daughter Lisa.

2746.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

## Count 27

## Embezzlement

(Defendants in their individual/private capacities: BNY Mellon, Brian Nagle, Attorney Tarlow, Attorney DeNapoli, Attorney Watson, Defendant Law Firm TBHR, Law firm Burns & Levinson,  Attorney Cukier, Attorney Studen, Attorney Cuffe, Attorney Feld, Attorney Ledoux, Attorney Berid, Attorney Myette, Attorney Costello, Attorney Barbar, Attorney McHugh, Michael Novack, Right At Home, Sheryl Sidman, Alan Sidman)

2747.   Plaintiff Daughters repeat and re-allege the allegations set forth above.

2748.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants have engaged in a common design to siphon funds from the DSL Trust**,** which **Defendant Attorney Feld** attained exclusive possession and control of through color of authority.

2749.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Feld** came to be court appointed conservator specifically because of his close connections with **Judge Abber** and **Defendant Attorney Cukier** as co-guardians in the matter of In re Esterina Milano.

2750.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that **Defendant Attorney Feld**, **Judge Abber** and **Defendant Attorney Cukier** engaged in prior fraudulent and deceptive acts for illicit gain through their roles as co-guardians in the matter of In re Esterina Milano.

2751.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that the following designated Defendants have an established pattern of fraudulent and deceptive conduct in siphoning funds from the estates of elders in private legal counsel and as SJC Rule 1:07 fiduciary appointees: **Attorney Cukier**, **Attorney Cuffe**, **Attorney Ledoux, Attorney Berid**, **Attorney Tarlow**.

2752.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants obtained ill-gotten gains by **Defendant Attorney Feld** making disbursements to designated Defendants through means such as, payment for fraudulent and deceptive billing of legal services and kickbacks.

2753.   As set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that designated Defendants have the opportunity and means to facilitate embezzlement as there is no actual oversight of **Defendant Attorney Feld's** management of Father's estate—especially, where Plaintiff Daughters present concrete and specific evidence that **Judge Abber**, **Judge Ricci, Judge Blake** and **Judge DiGangi** have all acted in collusion with designated Defendants.

2754.   As a direct proximate result of the above-described intentional acts of designated Defendants, Plaintiff Daughters have sustained considerable and substantial harm and other damages.

**WHEREFORE**, Plaintiff Daughters claim their right to a jury trial for monetary damages.

**Count 28**

**Injunctive Relief Claims**

2755.   Plaintiff Daughters seek injunctive relief to redress the deprivation of their Federal Constitutional rights that has occurred because of Defendants'—individual or joint—misconduct facilitated through color of law.

2756.   Plaintiff Daughters are likely to succeed on the merits of their claims against designated Defendants—particularly pertaining, but not limited to: substantial deprivation of Plaintiffs' Federal Constitutional rights under the First, Fifth, and Fourteenth Amendments; fraud; conversion; harassment; and intentional infliction of emotional distress.

2757.   Plaintiff Daughters have provided solid and concrete objective evidence of their having suffered irreparable injury that will continue to surmount if immediate injunctive relief is not granted.

2758.   Specific to Plaintiff Daughter Lisa, she has suffered—and continues to suffer—compounding harm consisting of, but not limited to: being unlawfully and maliciously precluded from having communications with Father *since* **December 16, 2011** (with indisputable proof that Father, personally, wanted an unrestricted relationship with Plaintiff Daughter Lisa and her family with Father—with Father, also, suffering irreparable physical and emotional harm as a result); the loss of time (years) and memories that can never be replaced.  Plaintiff Daughter Lisa and her family have been unlawfully and maliciously precluded from residing in their permanent residence with Father in Boxford, MA.

2759.   Plaintiff Daughter Devora has, also, suffered—and continues to suffer—compounding harm consisting of, but not limited to, severe restricted visitation with Father that is unwarranted, unlawful and maliciously facilitated.

2760.   Plaintiff Daughters suffer—and continue to suffer—irreparable harm by having been unlawfully and maliciously precluded from carrying out Father's expressed intentions and desires regarding his personal and financial affairs.  But for designated Defendants unlawful conduct, Plaintiff Daughter Lisa would have been acting, for the past three years through the present, as attorney-in-fact for Father and Plaintiff Daughter Devora as successor attorney-in-fact; hence, entitling Plaintiff Daughters to carry out Father's expressed intentions and desires.

2761.   As provided through submitted emails, designated Defendants have maliciously acted in direct conflict with Father's expressed intentions and desires—in addition to correspondence regarding designated Defendants' acts pertaining to pre-arranged funeral arrangements.  (Copy of correspondence is provided in **Exhibit 394**).

2762.   As demonstrated in **Defendant Attorney Kazarosian's** affidavit of **August 2011** (prior referenced Exhibit 22), *as of* **July 2011**, Father explicitly stated that he wanted to terminate the financial services of **Defendant BNY Mellon**; that he, personally, was upset with Defendant BNY Mellon and did not want Defendant BNY Mellon handling his money.  With actual knowledge of Father's afore-described intentions and desires, designated Defendants have continued to use Defendant BNY Mellon's services in handling Father's financial affairs—which designated Defendants have acted in concert with Defendant BNY Mellon to financially exploit the multi-million dollar **DSL Trust**; of which Plaintiff Daughters are co-trustees and co-beneficiaries.

2763.   As demonstrated designated Defendants have stripped the quality of Plaintiff Daughters' relationship with Father due to designated Defendants, knowingly and intentionally, seeking unlawful and unnecessary forced administering of antipsychotics to Father.  There is **no** legitimate basis for Father being prescribed antipsychotics—which antipsychotics are medically shown to *exacerbate* and *accelerate* the symptoms and progression of dementia; as well as, significantly increased risk of death.  As evidenced, designated Defendants have engaged in fraudulent and deceptive means in obtaining court ordered forced administering of antipsychotics.

2764.   The overall and core cause of irreparable injury to Plaintiff Daughters is a clearly established right to be free from unwarranted governmental intrusion into their family affairs under the due process clause of the Fourteenth Amendment of the Federal Constitution—which right Plaintiff Daughters had at all relevant times and through the present.

2765.    The Plaintiff Daughters' irreparable injuries are the direct and actual result of misconduct by designated Defendants—actions that are to the level of conscience-shocking and have continuously occurred from the knowing and intentional acts of designated Defendants.

2766.   There is no legitimate harm to designated Defendants by the sought injunctive relief—by not allowing Plaintiff Daughters' requested immediate, preliminary and permanent injunctive relief, it would only serve to allow designated Defendants to continue to engage in illegal conduct and reap ill-gotten gains.

2767.   Immediate, preliminary and permanent injunctive relief would serve public interest, as other elders and families are being harmed by similar misconduct through the official and private capacities of designated Defendants—in terms of designated Defendants' roles as SJC Rule 1:07 court appointees and in their providing private services to citizens in areas such as: representation in legal matters, in financial banking, and medical care.

WHEREFORE, Plaintiff Daughters requests that this Court grant the following injunctive relief:

### Ex-parte immediate injunctive relief

- an Order enjoining Defendants (**Defendant Attorney Cuffe**, **Defendant Attorney Berid**, **Defendant ESMV**, **Defendant Attorney Kazarosian**, **Defendant Attorney Ledoux**, **Defendant Attorney Myette**, **Defendant Attorney Barbar**, **Defendant Right At Home**) from restricting, in any manner, access and communication with Father by Plaintiff Daughters, their family, and friends;

- an Order enjoining Defendants (**Defendant Attorney Cuffe**, **Defendant Attorney Feld**, **Attorney Berid**, **Defendant ESMV**, **Defendant Attorney Kazarosian**, **Defendant Attorney Ledoux**, **Defendant Attorney Myette**, **Defendant Attorney Barbar**, **Defendant Attorney Remillard**, **Defendant Attorney McHugh**) from using any of Father's estate to retain legal representation in defense of this federal civil action;

- an Order enjoining all Defendants from filing any pleadings or actions in the underlying matters of In re Marvin H. Siegel (ES11P1466GD & ES11P1465PM);
- an Order enjoining the **Essex Probate & Family Court** from issuing any judgments, orders or decrees in any matter regarding Marvin H. Siegel;

- an Order requiring all Defendants to preserve and protect all written, computer and audio documents pertaining to Plaintiff Daughters and Father;

- an Order enjoining Defendants from transferring, selling, encumbering and/or disposing—in any manner—any individual or business interest in realty.

## Preliminary & permanent injunctive relief

• an Order enjoining **Defendant Attorney Cuffe** from acting as guardian for Father;

• an Order enjoining **Defendant Attorney Feld** from acting as conservator for Father;

• an Order allowing Plaintiff Daughter Devora to serve as temporary guardian and conservator—until the determination by this Court regarding the validity of Father's **2003 DPOA** (at which time, Plaintiff Daughters request that the 2003 DPOA be rendered effective).  As evidenced herein this Complaint, Defendants have never accused Plaintiff Daughter Devora of exploiting Father and Plaintiff Daughter Devora was explicitly designated by Father as successor attorney-in-fact;

• an Order specifically allowing Plaintiff Daughter Devora to retain a new financial institution to open an account in which Father's funds can be transferred to;

• when the afore-described account with a new financial institution is established, that an Order be issued requiring **Defendant BNY Mellon** to transfer all of Father's funds to that new financial institution;

• an Order enjoining Defendants (**Defendant Attorney Feld**, **Defendant Attorney Cuffe**, **Defendant Attorney Kazarosian**, **Defendant Attorney Barbar**, **Defendant Attorney Remillard**, **Defendant Attorney Cukier**, **Defendant Law Firm Burns & Levinson** ) from having any access to funds and property of Marvin H. Siegel and the DSL Trust;

• an Order requiring **Defendant Attorney Feld** to provide Plaintiff Daughters physical access—in their capacities as co-trustees of the **DSL Trust**—to all his records and documents pertaining to his role as court appointed conservator in the matter of In re Marvin H. Siegel and to permit Plaintiff Daughters to copy such information, which includes complete access to safety deposit boxes and all of Father's personal assets and documents;

- an Order requiring **Defendant Attorney Cuffe** to provide Plaintiff Daughters physical access to all his records and documents pertaining to his role as court appointed conservator in the matter of In re Marvin H. Siegel and to permit Plaintiff Daughters to copy such information;

- an Order requiring **Defendant Attorney Myette** to provide Plaintiff Daughters physical access to all her records and documents pertaining to her role as court appointed Roger's counsel in the matter of In re Marvin H. Siegel and to permit Plaintiff Daughters to copy such information;

- an Order having the matters of In re Marvin H. Siegel be transferred from the Essex Probate & Family Court and consolidated with this Federal action— as set forth in this Complaint, Plaintiff Daughters present concrete and specific evidence that Plaintiff Daughters are precluded from obtaining adequate and appropriate relief by the State courts which are related to Plaintiff Daughters' substantial and grave independent claims having exclusive Federal jurisdiction.

- an Order allowing Plaintiff Daughters to add **Judge Jeffrey Abber** and **Judge Susan Ricci** as parties where it is established in this Complaint that they engaged in unlawful acts outside the courtroom; and where Plaintiff Daughters have presented substantial solid and concrete evidence that Judge Abber and Judge Ricci have engaged in criminal conduct that has directly caused injury to Plaintiff Daughters.

## **Monetary Damages**

- an award of compensatory damages;
- an award of punitive damages;
- an award of reasonable attorney's fees and costs of litigation pursuant to 42 U.S.C. § 1988; and
- an award of statutory interest

**By Plaintiff Daughters,**

**/s/**  Lisa Siegel Belanger, Esq.

Lisa Siegel Belanger
Attorney at Law
BBO No.. 633060
300 Andover Street, No. 194
Peabody, MA  01960
(978) 998-2342

**/s/**  Devora C. Kaiser

Devora Kaiser
PO Box 294
Rocky Ford, Colorado  81067
(978)998-1359